# Tab 1



Royal Canadian     Gendarmerie royale
Mounted Police     du Canada

**Royal Canadian Mounted Police (RCMP)**
Vancouver 2010 ISU
11411 No. 5 Road,
Richmond, B.C.
V7A 4E8
Phone: 604 247-8403
Fax: 604-247-8482

**CONTRACT AWARD**
Her Majesty the Queen in Right of Canada, in
accordance with the terms and conditions set
out in the Request for Proposal document,
Solicitation Number 2007-10-718752 has
agreed to enter into a contract with the person
named. The Contracting Officers named are
authorized to enter into this contract on behalf
of Her Majesty the Queen in right of Canada,
the Government of Canada, Royal Canadian
Mounted Police, representing the Vancouver
2010 Integrated Security Unit

**Acceptance:**
The following are duly authorized officers of
Cruise Connections Charter Management 1 LP,
and hereby accept and acknowledge receipt of
this Contract.

Susan Edwards, Partner        Date

_(signature)_ 7/31/08
Tracey Kelly, Partner         Date

_(signature)_ 7/31/08
Michael Sloane, Partner       Date

| | |
|---|---|
| Title:   Charter Services to Provide Vessel Accommodation for Royal Canadian Mounted Police and Canadian Armed Forces, Vancouver 2010 Integrated Security Unit | |
| Contract Number:  7131902 | |
| Date: July 28, 2008 | |
| CONTRACT AWARD TO: Cruise Connections Charter Management 1, LP | |
| Contract Delivery Address: 1418 –B S. Stratford Road, Winston-Salem, NC USA 27103 | |
| Payment Terms:  As agreed and upon satisfactory completion of Terms under Annex A, the following payments shall be made by Direct Payment on or before the dates indicated: 80% of Contract value on or before 30 April, 2009  $43,332,537.00 plus GST 15% of Contract value on or before 31 October, 2009 $8,124,850.00 plus GST 5% of Contract value on or before 30 March, 2010 $2,708,285.00 plus GST Value of the contract is: $54,165,672.00  plus GST of $3,142,444.00 Total $ 57,308,116.00 | |
| Address Enquiries to: Kelly Meikle,  Manager Contracting Services | |
| Telephone No. 604-247-8403 | Fax No. 604-247-8482 |
| Signed by Authorized Representatives of the Government of Canada, RCMP _(signature)_ Kelly Meikle, Mgr. Contracting     Date _(signature)_ Michael W. Day Regional Director Contracting Vancouver 2010, ISU | |

## 1. Statement of Work

The Contractor must perform the Work in accordance with the Statement of Work at Annex A.

The contractor, Cruise Connections Charter Management 1, LP is in receipt of this contract based on a fixed daily rate of $298.00 per person per day based on double occupancy. The contractor shall provide 5037 berths, utilizing 4092 berths on two Carnival Cruise Line ships and 1248 berths on one "S" Class Holland America Cruise Line ship.

It is understood that the RCMP, Vancouver 2010 ISU, shall pay for 5037 berths whether or not the berths are occupied for the duration of the term of the contract as indicated herein.

The Carnival Cruise Line ships shall begin service under this contract on January 31, 2010 and end service at noon on March 2, 2010 (31 days of service). The Royal Canadian Mounted Police (RCMP), and other federal government personnel of the Vancouver 2010 Integrated Security Unit shall be the only occupants of these ships.

The Holland America Cruise Line ship shall begin service under this contract on January 19, 2010 and end service at noon on March 4, 2010 (44 days of service). The Canadian Armed Forces (CF) and other federal government personnel of the Vancouver 2010 Integrated Security Unit shall be the only occupants of this ship.

## 2. Standard Clauses and Conditions

All clauses and conditions identified in the Contract by title, number and date are set out in the *Standard Acquisition Clauses and Conditions* Manual issued by Public Works and Government Services Canada (PWGSC). The Manual is available on the PWGSC Website: **http://sacc.pwgsc.gc.ca/sacc/index-e.jsp**.

## 3. General Conditions

9676 (2007/11/30) General Conditions – Services apply to and form part of the Contract.

In the Contract, unless the context otherwise requires,

 **"Articles of Agreement"** means the clauses and conditions set out in full text or incorporated by reference from the Standard Acquisition  Clauses and Conditions Manual to form the body of the Contract but does not include these general conditions, any supplemental general  conditions, annexes, the Contractor's bid or proposal or any other document;

**"Royal Canadian Mounted Police"**, **"Canadian Armed Forces"**, **"Canada"**, **"Crown"**, **"Her Majesty"** or **"the Government"** means Her Majesty the Queen in right of Canada;

**"Contract"** means the Articles of Agreement, these general conditions,  any supplemental general conditions, annexes and any other document specified or referred to as forming part of the Contract, all as amended by agreement of the Parties from time to time;

# Tab 1(a)

**"Contracting Authority"** means the person designated as such in the Contract, or by notice to the Contractor, to act as the representative of the Minister in the management of the Contract;

**"Contractor"** means the person or entity whose name appears on the signature page of the written agreement and who is to supply goods or services to Canada under the Contract;

**"Contract Price"** means the amount expressed in the Contract to be payable to the Contractor for the Work;

**"Cost"** means cost determined in accordance with Contract Cost Principles 1031-2, as revised to the date of the bid solicitation;

**"Government Property"** means all materials, parts, components, Specifications, equipment, software, articles and things supplied to the Contractor by or on behalf of Canada for the purposes of performing the Contract and anything acquired by the Contractor in any manner in connection with the Work the cost of which is paid by Canada under the Contract and, without restricting the generality of the foregoing, includes Government Issue as defined in the *Defence Production Act*, R.S.C. 1985, c. D-1, Government Furnished Equipment and Government Supplied Material;

**"Inspection Authority"** means the person designated as such in the Contract, or by notice to the Contractor, to act as the representative of the Minister for whose department or agency the Work is being carried out in matters concerning the inspection of the Work, and for purposes of section 16 includes a Quality Assurance Authority if such an authority is mentioned in the Contract;

**"Minister"** means any Member of Parliament who is duly elected, appointed to their duties by the Prime Minister of Canada, and is the head of a Parliamentary Ministry.

For the purposes of clarity only, and not withstanding definitions in 9676 (2007/11/30) General Conditions, "Minister" in this contract be the Minister of Public Safety Canada whose Ministry includes the Royal Canadian Mounted Police, the "Minister" of Defense which includes all branches of the Canadian Armed Forces or any other Member of Parliament, or duly authorized employee acting on behalf of the Canadian Government. "

**"Moral Rights"** has the same meaning as in the *Copyright Act*, R.S.C.1985, c. C-42;

**"Party"** means Canada or the Contractor or any other signatory to the Contract and **"Parties"** means all of them;

**"Specifications"** means the functional or technical description of the Work set out or referred to in the Contract, including drawings, samples and models, and further includes, except to the extent inconsistent with anything set out or referred to in the Contract, any such description set out or referred to in any brochure, product literature or other documentation furnished by the Contractor in relation to the Work or any part thereof;

**"Subcontract"** includes a contract let by any subcontractor at any tier for the performance or supply of a part of the Work, and the derivatives of the word shall be construed accordingly;

**"Technical Authority"** includes Project Authority and means the person designated in the Contract, or by notice to the Contractor, to act as the representative of the Minister for whose department or agency the Work is being carried out in matters concerning the technical aspects of the Work;

"**Work**" means the whole of the activities, services, materials, equipment, software, matters and things required to be done, delivered or performed by the Contractor in accordance with the conditions of the Contract.

**4.**     **Security Requirement**

The security requirement specified at Annex A, Article 8 applies to and forms part of the contract.

**5.**     **Term of Contract**

The Period of the Contract is from the date of contract to 31 March, 2010.  Annex A, Article 2 refers.

**5.**     **Authorities**

**5.1**     **Contracting Authority**

The Contracting Authority for the Contract is:

Kelly Meikle, Manager of Contracting
Royal Canadian Mounted Police
Vancouver 2010 Integrated Security Unit (ISU)
11411 No. 5 Road,
Richmond, B.C.  V7A  4E8
Tel: 604-247-8403
Cell: 604-764-9504
Fax: 604- 247-8482
Email:  Kelly.Meikle@rcmp-grc.gc.ca

The Contracting Authority is responsible for the management of the Contract and any changes to the Contract must be authorized in writing by the Contracting Authority.  The Contractor must not perform work in excess of or outside the scope of the Contract based on verbal or written requests or instructions from anybody other than the Contracting Authority.

**5.2**     **Accommodation Director**

The Accommodation Director for the Project Authority for the Contract is:

Insp. Donna Kaluza
Accommodation Director
Royal Canadian Mounted Police
Vancouver 2010 Integrated Security Unit
11411 No. 5 Road
Richmond, B.C.  V7A  4E8
Phone: 604- 247-8428

The Accommodation Director is responsible for authorizing all personnel assignments, providing scheduling and project management of this contract; however, the Accommodation Director has no authority to authorize changes to the scope of the Work. Changes to the scope of the Work can only be made through a contract amendment issued by the Contracting Authority.

**5.3**     **On site RCMP Accommodation representative:**

The RCMP Site Accommodation Representative shall be identified to the Contractor when occupancy of the accommodation is commenced.

**6.**     **Payment**

**6.1**     **Basis of Payment**

The Contractor shall be paid for services rendered and accepted in accordance with the contract an all inclusive daily rate of $298.00 per bed, per day which includes:

|       |                                                          |
|-------|----------------------------------------------------------|
| (a)   | All applicable licenses                                  |
| (b)   | Water bunkering                                          |
| (c)   | Recycling                                                |
| (d)   | Solid garbage removal                                    |
| (e)   | Embarkment costs                                         |
| (f)   | Disembarkment costs                                      |
| (g)   | Port Agent costs                                         |
| (h)   | Ground Services Port Agent                               |
| (i)   | Vancouver Harbour Pilots                                 |
| (j)   | On board meals not to exceed applicable Treasury Board of Canada Travel Directive standards for Meal Allowances and Incidentals. |
| (k)   | Non-Alcoholic Beverages                                  |
| (l)   | Chartering of Cruise Ships                               |

Fuel surcharge:  Should the Cruise Line instill a Fuel Surcharge it will be the responsibility of the RCMP to pay the extra costs once proof of the Surcharge is identified and approved by the RCMP.

Waste Management/Gray Water/Black Water)
This is a pass through cost at net invoice price to the RCMP/CF.  The Contractor shall contact local engineers to provide quotes on work to be done to remove Gray/Black water from the ships.   The Contractor shall keep the RCMP appraised of plans and associated costs.  Final decision for implementation of any system other than barging Waste Management shall remain with the RCMP.

Port Fees: The RCMP shall pay Port Fees direct to Vancouver Port Authority.

**6.1.1**     **Limitation of Expenses**

This contract applies to the cost to the Contractor based on firm price only.  Any additional charges incurred by RCMP occupants shall be paid directly by the individuals.

**6.2**     **Method of Payment**

An initial payment equal to eighty percent (80%) of the Contract value shall be payable on or before April 30, 2009 providing the non-cancellable charter party agreement includes the clause:

"These vessels are chartered for the express and exclusive use of the Vancouver 2010 ISU. The Holland America Vessel from January 19, 2010 to March 04, 2010 and the Carnival Cruise Line Vessels from January 31, 2010 to March 02, 2010 at Ballantyne Pier" has been received by the ISU on or before September 1, 2008.

A second payment equal to fifteen percent (15%) of the Contract value shall be payable on or before October 31, 2009;

A final payment equal to five percent (5%) of the Contract value shall be payable on or before March 31, 2010 providing full and satisfactory completion of the contract.

**6.3     Goods and Services Tax/Harmonized Sales Tax and Provincial Sales Tax AND HOTEL TAX**

**1.     Municipal Taxes**
**Municipal Taxes are not applicable.**

**2.     Provincial Taxes**

(a)   Excluding legislated exceptions, federal government  departments and agencies are not required to pay any ad valorem sales tax levied by the province in which the taxable goods or services are delivered.  This exemption has been provided to federal government departments and agencies under  the authority of one of the following:

(i)      Provincial Sales Tax (PST) exemption license numbers, for the provinces of:

Prince Edward Island OP-10000-250
Ontario              11708174G
Manitoba        390-516-0
British Columbia     R005521

(ii)      For Quebec, Saskatchewan, the Yukon Territory, the Northwest Territories and Nunavut, an exemption certificate, which certifies that the goods or services purchased are not subject to the provincial/ territorial sales and consumption taxes because they are being purchased by the federal government with Canada funds for the use of the federal government.

(b)      Currently, in Alberta, the Yukon Territory, the Northwest Territories and Nunavut, there is no general PST.  However, should a PST be introduced in the Northwest Territories, Nunavut, or Yukon Territory, the sales tax exemption certificate would be required on the purchasing document.

(c)      Federal departments are required to pay the HST in the participating provinces of Newfoundland and Labrador, Nova Scotia and New Brunswick.

(d)   The Contractor is not exempt from paying PST under the above exemption license numbers or exemption certificate.  The Contractor is required to pay the PST on taxable goods or services used or consumed in the performance of the Contract (as per appropriate provincial legislation), including material incorporated into real property.

**3.     Changes to Taxes and Duties**

In the event of any change in any tax imposed under the *Excise Act*, R.S.C 1985, c. E-14, and *Excise Tax Act*, R.S.C. 1985, c. E-15, or

any duties imposed under the Customs Tariff or any other federal or provincial sales, excise or other like duties, taxes, charges or impositions after the bid submission date and which affects the costs of the Work to the Contractor, the Contract price will be adjusted to reflect the increase or decrease in the cost to the Contractor.

**4.   Goods and Services Tax/Harmonized Sales Tax**

The estimated Goods and Services Tax (GST) or Harmonized Sales Tax ( HST), if applicable, is included in the total estimated cost on page 1 of the Contract. The GST or HST is not included in the Contract price but will be paid by Canada as provided in the Invoice Submission clause below. The Contractor agrees to remit to Canada Revenue Agency any amounts of GST and HST paid or due.

**6.4    <u>T1204 – Information on Reporting by Contractor</u>**

1.   Pursuant to paragraph 221 (1)(d) of the Income Tax Act, R.S.C. 1985, c.1 (5th Supp.), payments made by departments and agencies to contractors under applicable services contracts (including contracts involving a mix of goods and services) must be reported on a T1204 Government Service Contract Payments slip.

2.   To enable departments and agencies to comply with this requirement, the Contractor must provide the following information within fifteen (15) calendar days from date of contract award:

(a)  the legal name of the Contractor, i.e. the legal name associated with its business number or Social Insurance Number (SIN), as well as its address and postal code;

(b)  the status of the Contractor, i.e. an individual, a sole proprietorship, a corporation, or a partnership;

(c)  the business number of the Contractor if the Contractor is a corporation or a partnership and the SIN if the Contractor is an individual or a sole proprietorship.  In the case of a partnership, if the partnership does not have a business number, the partner who has signed the Contract must provide its SIN;

(d)  in the case of a joint venture, the business number of all parties to the joint venture who have a business number or their SIN if they do not have a business number.

3.   The information must be sent to the person and address specified below.  If the information includes a SIN, the information should be provided in an envelope marked "PROTECTED":

Director, Contracting and Procurement
RCMP "E" Division Vancouver 2010 ISU
11411 No. 5 Road,
Richmond, B.C.  V7A 4E8

7.    **Invoicing Instructions**

The contractor must submit invoices in accordance with the information required in Section 36 of 9676, General Conditions, Services.

8.    **Certifications**

Compliance with the certifications provided by the Contractor in its bid is a condition of the Contract and subject to verification by Canada during the entire period of the Contract. If the Contractor does not comply with any certification or it is determined that any certification made by the Contractor in its bid is untrue, whether made knowingly or unknowingly, the Minister has the right, pursuant to the default provision of the Contract, to terminate the Contract for default.

9.    **Applicable Laws**

The Contract must be interpreted and governed, and the relations between the parties determined, by the laws in force in British Columbia.

10.   **Priority of Documents**

If there is a discrepancy between the wordings of any documents, which appear on the list, the wording of the document, which first appears on the list, has priority over the wording of any document, which subsequently appears on the list.

(a)    the Articles of Agreement;
(b)    9676 (2007/11/30) General Conditions- Services
(c)    Annex A, Statement of Work
(d)    The Contractor's bid dated 2008-05-20
(e)    Project Services Agreements

11.   **Vessel Replacement**

The cruise ship line shall have the option to substitute the vessels of similar size and quality that fully meets the requirement of the ISU and the Contractor.  In the event, however the Cruise ship lines intends to substitute a vessel, then the Contractor and the ISU shall be afforded the opportunity to inspect the proposed substituted vessel at the cruise lines expense, and the ISU and the Contractor shall then approve the substitution. The approval shall not be unreasonably withheld.  Notwithstanding the foregoing, it is imperative the Contractor makes every attempt to provide the vessels as stated in the contract nomination, and the Contractor provides the services in accordance with the terms of the Contract.

12.   **Insurance**

12.1.  The Contractor must provide proof of insurance which is valid and applicable and approved by Canadian Insurance carriers within thirty (30) days of securing the vessels.

12.2.  Within thirty (30) of securing the vessel, the Contractor must provide documentation of permission from the Insurance carrier for the Cruise ship line for multi-ship inventory to be docked at one location for an extended period of time.

12.3.   It shall be the sole responsibility of the Contractor to ensure the Cruise ship line holds and maintains this insurance during the term of this contract.

12.4.   Failure to provide proof of valid insurance from a Canadian Insurance carrier may result in termination of the contract.

12.5.   All contracted parties agree:

12.5.1  Ensure the maintenance of the vessels, engines, gear and equipment in good and sufficient repair during the period stated herein and agrees to pay for all necessary repairs, renewals or maintenance.

12.5.2  Indemnify and save harmless Her Majesty the Queen in Right of Canada from and against any claim for loss or damage to the vessels or any other vessel and to the engines, gear or equipment thereof, arising from this contract, and for injury to the persons or property of persons aboard such vessels, excepting injury to the person or property of Canada's servants, agents or representatives.

12.5.3  That if the vessels are disabled or are not in running order or are laid up without the consent of Canada's representative, then Canada shall not be liable for payment to the Contractor during such a period, and if such periods exceeds one (1) week, Canada may terminate the contract immediately and the Contractor shall provide a replacement vessel of the same quality, and standards as agreed to by Canada initially.  No other replacement standard will be acceptable.

12.5.4  That if any gear or equipment necessary for the efficient operation of the vessels for the purpose of this contract is not in good working order for any period of time, then the payment of hire to the Contractor shall cease for the time hereby lost.  Canada will be the sole judge of the capability of the vessels provided.


13.   **Commercial Liability**

1.   Canadian Commercial General Liability insurance shall be effected by the Contractor and maintained in force throughout the duration of the Contract in an amount usual for a contract of this nature, but, in any case, for a limit of liability NOT LESS THAN $1,000,000 per accident or occurrence and in the annual aggregate.

2.   The policy must include the following endorsements:

(a) Additional Insured:  Her Majesty the Queen in Right of Canada, as represented by the Minister responsible for the Royal Canadian Mounted Police is included as an additional insured, but only with respect to liabilities that may arise from the Contractor's own negligence, in the performance of the Contract.

(b) Notice of Cancellation:  The Insurer agrees to provide the Contracting Authority thirty (30) days written notice of policy cancellation.  The Contractor must, for the duration of this contract, carry valid insurance.

(c) Cross Liability:  Without increasing the limit of liability, the policy shall protect all insured parties to the full extent of coverage provided.  Further, the policy shall apply to each Insured in the same manner and to the same extent as if a separate policy had been issued to each.

(d) Joint and Several Liability:  The policy shall respond to liability arising from negligence of the Insured Contractor, any Insured, or joint negligence of Insured parties.

(e) Contractual Liability:  The policy shall, on a blanket basis or by specific reference to this Contract, extend to assumed liabilities with respect to contractual insurance provisions.

(f) Contingent Employer's Liability:  To protect the Contractor for liabilities arising in the management and administration of statutory and contractual entitlements of its employees.

(g) Employees and Volunteers as Additional Insured:  All employees and volunteers, on behalf of the Contractor, shall be included as additional insured.

(h) Voluntary Medical Payments, $10,000 per person, $50,000 per accident: To provide, without contestation, for expenses incurred in instances of minor accidental bodily injuries.

**3.      Insurance & Indemnification**

All Parties associated with this Contract, including the Contractor,  Cruise Ship Lines, the Royal Canadian Mounted Police and the Canadian Armed Forces agree to carry all insurance or other means of protection necessary, including self underwriting insurance, to cover the terms of this Agreement.
Liability coverage for the Royal Canadian Mounted Police and the Canadian Armed Forces is provided by the Government of Canada in accordance with the *Crown Liability and Proceedings Act.*

The Contractor shall indemnify and save harmless the RCMP and CF from any loss or damage arising from any wrongful act or omission of the Contractor or the Cruise Ship Lines, and against all claims, demands, losses, costs, damages, actions, suits or other proceedings by whomsoever made resulting from the negligence of an employee or by the Cruise Ship Line contracted by the Contractor or any person working under the direction or request of an employee of the Contractor.

The Royal Canadian Mounted Police (RCMP) and Canadian Armed Forces (CF) shall indemnify and save harmless the Contractor from any loss or damage arising from any wrongful act or omission of the RCMP or CF, and against all claims, demands, losses, costs, damages, actions, suits or other proceedings by  whomsoever made resulting from the negligence of an employee of the RCMP or CF or any person working under the direction or request of an employee of the Government of Canada.

**14.      Safety Regulations and Labour Codes**

The Contractor must adhere to all safety rules, regulations and labour codes in force in all jurisdictions in the Province of British Columbia, Canada.

**15.      Inspection of Vessels**

**15.1.**    The inspection of the vessels is as outlined in Annex A, Statement of Work, Section 6.

**16.      Pre-and Post-Occupancy Damage and Deficiencies**

**16.1.**    The Contractor agrees with the ISU conducting inspections to document the vessels condition pre and post occupancy.  The ISU will accept no claims for damages or deficiencies identified on the pre-occupancy inspection and any claims for post-occupancy damages or deficiencies to cabins, and contents therein, recreation and other

equipment, and any other areas of the vessels must be identified on the post-occupancy inspection, with full substantiation being provided by the Contractor to indicate that ISU personnel was responsible for the damages or deficiency.

17. **Change in Ownership**

Any change in the ownership of the Contractor prior to the completion of delivery of the services shall be subject to the provisions of Article 22 of General Conditions 2010, and brought immediately to the attention of the Contracting Authority.

18. **Charter Party Agreement**

The contractor must provide the RCMP with a Standard Cruise Ship Charter party agreement for review and comments.  The Charter Party agreement shall confirm all terms and conditions of the Agreement between the parties within thirty (30) days of the Contractors confirmation of acceptance of the ship nominated.

19. **Contract Financial Security**

The form of the required security will be a fully signed non-cancellable Charter Party Agreement, naming the Vancouver 2010 Integrated Security Unit,  having exclusive use of the vessels.

The balance of the amount payable will be paid in accordance with the payment provisions of the Contract upon completion of delivery and acceptance by Canada of all Work performed in accordance with the Contract and a final claim in the form of an invoice is submitted to the attention of the Contracting Officer.

Any additional expenses incurred by occupants, shall be paid directly to the Cruise ship by the Occupants.

20. **Cancellation of Contract:**

Both parties acknowledge and agree that this contract is under 100% penalty for any reduction of days of service or cancellation by either party.

The RCMP acknowledges and understands that Cruise Connections Charter Management 1, LP has an obligation to fulfill all terms and conditions in providing cruise ships for the use by the RCMP and CF on the dates specified under this contract. Further it is understood that  in order to meet this obligation, Cruise Connections Charter Management  must enter into non-cancelable charter agreement with the cruise lines and are under the same penalty clause (100%) penalty for any reduction in service.

# Tab 1(b)

 Public Works and        Travaux publics et
Government Services      Services gouvernementaux                    Canada
Canada                   Canada

| ID | 9676 |
|---|---|
| Title | General Conditions - Services |
| Date | 2007-11-30 |

**Public Works and Government Services Canada**

01   Interpretation
02   Powers of the Minister
03   Status of the Contractor
04   Amendments and Waivers
05   Conduct of the Work
06   Compliance with Applicable Laws
07   Subcontracting
08   Replacement of Personnel
09   Assignment
10   Time of the Essence
11   Excusable Delay
12   Security and Protection of the Work
13   Payment
14   Interest on Overdue Accounts
15   Changes in Taxes and Duties
16   Inspection of the Work
17   Title
18   Government Property
19   Indemnity Against Third-Party Claims
20   Royalties and Infringement
21   Copyright
22   Suspension of the Work
23   Default by the Contractor
24   Termination for Convenience
25   Accounts and Audit
26   Notice
27   Members of the House of Commons
28   Conflict of Interest
29   No Bribe
30   Survival
31   Severability
32   Successors and Assigns
33   Entire Agreement
34   Certification - Contingency Fees
35   Taxes
36   Invoice Submission
37   Transportation Charges
38   International Sanctions
39   Standard Clauses and Conditions
40   Code of Conduct for Procurement

**9676   01   (2007-05-25) Interpretation**

1.    In the Contract, unless the context otherwise requires,

"Articles of Agreement" means the clauses and conditions set out in full text or incorporated by reference from the Standard Acquisition Clauses and Conditions Manual to form the body of the Contract but does not include these general conditions, any supplemental general conditions, annexes, the Contractor's bid or proposal or any other document;

"Canada", "Crown", "Her Majesty" or "the Government" means Her Majesty the Queen in right of Canada;

"Contract" means the Articles of Agreement, these general conditions, any supplemental general conditions, annexes and any other document specified or referred to as forming part of the Contract, all as amended by agreement of the Parties from time to time;

"Contracting Authority" means the person designated as such in the Contract, or by notice to the Contractor, to act as the representative of the Minister in the management of the Contract;

"Contractor" means the person or entity whose name appears on the signature page of the written agreement and who is to supply goods or services to Canada under the Contract;

"Contract Price" means the amount expressed in the Contract to be payable to the Contractor for the Work;

"Cost" means cost determined in accordance with Contract Cost Principles 1031-2, as revised to the date of the bid solicitation;

"Government Property" means all materials, parts, components, Specifications, equipment, software, articles and things supplied to the Contractor by or on behalf of Canada for the purposes of performing the Contract and anything acquired by the Contractor in any manner in connection with the Work the cost of which is paid by Canada under the Contract and, without restricting the generality of the foregoing, includes Government Issue as defined in the *Defence Production Act*, R.S.C. 1985, c. D-1, Government Furnished Equipment and Government Supplied Material;

"Inspection Authority" means the person designated as such in the Contract, or by notice to the Contractor, to act as the representative of the Minister for whose department or agency the Work is being carried out in matters concerning the inspection of the Work, and for purposes of section 16 includes a Quality Assurance Authority if such an authority is mentioned in the Contract;

"Minister" means the Minister of Public Works and Government Services and any other person duly authorized to act on behalf of that Minister;

"Moral Rights" has the same meaning as in the *Copyright Act*, R.S.C. 1985, c. C-42;

"Party" means Canada or the Contractor or any other signatory to the Contract and "Parties" means all of them;

"Specifications" means the functional or technical description of the Work set out or referred to in the Contract, including drawings, samples and models, and further includes, except to the extent inconsistent with anything set out or referred to in the Contract, any such description set out or referred to in any brochure, product literature or other documentation furnished by the Contractor in relation to the Work or any part thereof;

"Subcontract" includes a contract let by any subcontractor at any tier for the performance or supply of a part of the Work, and the derivatives of the word shall be construed accordingly;

"Technical Authority" includes Project Authority and means the person designated in the Contract, or by notice to the Contractor, to act as the representative of the Minister for whose department or agency the Work is being carried out in matters concerning the technical aspects of the Work;

"Work" means the whole of the activities, services, materials, equipment, software, matters and things required to be done, delivered or performed by the Contractor in accordance with the conditions of the Contract.

2.   The headings used in these general conditions are inserted for convenience of reference only and shall not affect their interpretation.

3.   If the Contract is a defence contract within the meaning of the *Defence Production Act*, R.S.C. 1985, c. D-1, it is subject to that Act and shall be governed accordingly.

4.   In the Contract, words importing the singular number include the plural and vice versa, and words importing the masculine gender include the feminine gender and the neuter.

**9676   02   (1994-01-04)  Powers of the Minister**

Every right, remedy, power and discretion vested in or acquired by Canada or the Minister under the Contract or by law shall be cumulative and non-exclusive.

**9676   03   (2004-05-14)  Status of the Contractor**

1.   The Contractor is engaged as an independent Contractor for the sole purpose of performing the Work.  Neither the Contractor nor any of its personnel is engaged as an employee, servant or agent of Canada.  The Contractor is responsible for all deductions and remittances required by law in relation to its employees including those required for Canada or Quebec Pension Plans, unemployment insurance, workers' compensation, or income tax.

2.   Without restricting the terms and conditions of the Contract, and particularly section 19 of these general conditions, it is hereby

understood and agreed that, except to the extent caused by or due to
Canada, Canada shall not be liable for any losses, claims, damages,
or expenses relating to any injury, disease, illness, disability or
death of the Contractor or any employee, agent or representative of
the Contractor caused or alleged to be caused as a result of
performing the Contract.  The Contractor agrees to fully protect and
indemnify Canada and not to make any claims or demands against
Canada in respect of any of the foregoing contingencies.

## 9676   04   (1994-01-04) Amendments and Waivers

1.    No design change, modification to the Work, or amendment to the
Contract shall be binding unless it is incorporated into the
Contract by written amendment or design change memorandum executed
by the authorized representatives of the Minister and of the
Contractor.

2.    While the Contractor may discuss any proposed changes or
modifications to the scope of the Work with the Technical Authority,
Canada shall not be liable for the cost of any such change or
modification until it has been incorporated into the Contract in
accordance with subsection 1.

3.    No waiver shall be valid, binding or affect the rights of the
Parties unless it is made in writing by, in the case of a waiver by
Canada, the Contracting Authority and, in the case of a waiver by
the Contractor, the authorized representative of the Contractor.

4.    The waiver by a Party of a breach of any term or condition of the
Contract shall not prevent the enforcement of that term or condition
by that Party in the case of a subsequent breach, and shall not be
deemed or construed a waiver of any subsequent breach.

## 9676   05   (2001-05-25) Conduct of the Work

1.    The Contractor represents and warrants that:

   (a)    it is competent to perform the Work; and

   (b)    it has the necessary qualifications, including knowledge,
   skill and experience to perform the Work, together with the
   ability to use those qualifications effectively for that
   purpose.

2.    Except for Government Property specifically provided for in the
Contract, the Contractor shall supply everything necessary for the
performance of the Work, including all the resources, facilities,
labour and supervision, management, services, equipment, materials,
drawings, technical data, technical assistance, engineering services,
inspection and quality assurance procedures, and planning necessary
to perform the Work.

3.    The Contractor shall:

   (a)    carry out the Work in a diligent and efficient manner;

(b)   select and employ on the Work a sufficient number of properly qualified personnel, provide efficient and effective inspection and quality control procedures and provide administration and other support to its employees to the extent necessary to properly carry out the work;

(c)   perform the Work in accordance with standards of quality acceptable to the Minister and in full conformity with the Specifications and all the requirements of the Contract; and

(d)   provide effective and efficient supervision to ensure that the quality of workmanship is as stated in the Contract.

4.   The Work shall not be performed by any person who, in the opinion of the Minister or the Technical Authority, is incompetent or has been conducting himself/herself improperly.

5.   The Contractor warrants that all services performed under this Contract will, at the time of acceptance, be free from defects in workmanship and conform to the requirements of this Contract.  If the Contractor is required to correct or replace the Work or any portion thereof, it shall be at no cost to Canada, and any work corrected or replaced by the Contractor pursuant to this subsection shall be subject to all provisions of this Contract to the same extent as Work initially performed.

6.   The Contractor shall adhere to the Technical Authority's reasonable interpretation of the requirements of the Contract insofar as such an interpretation is not inconsistent with any other part of the Contract.

7.   Unless the Minister orders the Work or part thereof to be suspended pursuant to section 22 , the Contractor shall not stop or suspend any part of the Work pending the settlement or resolution of any difference between the Parties arising out of the Contract.

8.   The Contractor shall provide such reports on the performance of the Work as are required by the Contract and such other reports as may reasonably be required by the Minister or the Technical Authority.

9.   The Contractor shall be fully responsible for performing the Work and Canada shall not be liable for any negative consequences or extra costs arising out of the Contractor's following any advice given by Canada, whether given without or upon invitation by the Contractor, unless the advice was provided to the Contractor in writing by the Contracting Authority and was accompanied by a statement specifically relieving the Contractor of any responsibility for negative consequences or extra costs that might arise from following the advice.

**9676  06   (2007-05-25)  Compliance with Applicable Laws**

The Contractor must comply with all laws applicable to the performance of the Work.  The Contractor must provide evidence of compliance with such laws to Canada at such times as Canada may reasonably request.

The Contractor must obtain and maintain at its own costs all permits, licences and certificates required for the performance of the Work.  Upon request from the Contracting Authority, the Contractor must provide a copy of any required permit, licence or certificate to Canada.

**9676  07   (1994-01-04)  Subcontracting**

1.    Unless otherwise provided in the Contract, the Contractor shall obtain the consent of the Minister in writing prior to subcontracting or permitting the subcontracting of any portion of the Work at any tier.

2.    Notwithstanding subsection 1, the Contractor may, without prior consent of the Minister, subcontract such portions of the Work as is customary in the carrying out of similar contracts.

3.    In any subcontract, the Contractor shall, unless the Minister otherwise consents in writing, ensure that the subcontractor is bound by terms and conditions compatible with and, in the opinion of the Minister, not less favourable to Canada than the terms and conditions of the Contract.  Deviations in any subcontract from the terms of the Contract, including any right of termination of the Contract, shall be entirely at the risk of the Contractor.

4.    The Contractor is not obliged to seek consent to subcontracts specifically authorized in the Contract.

5.    Any consent to a Subcontract shall not relieve the Contractor from its obligations under the Contract or be construed as authorizing any liability on the part of Canada or the Minister to a subcontractor.

**9676  08   (1994-01-04)  Replacement of Personnel**

1.    When specific persons have been named in the Contract as the persons who must perform the Work, the Contractor shall provide the services of the persons so named unless the Contractor is unable to do so for reasons beyond its control.

2.    If, at any time, the Contractor is unable to provide the services of any specific person named in the Contract, it shall provide a replacement person who is of similar ability and attainment.

3.    The Contractor shall, before replacing any specific person named in the Contract, provide notice in writing to the Minister containing:

    (a)    the reason for the removal of the named person from the Work;

    (b)    the name, qualifications and experience of the proposed replacement person; and

    (c)    proof that the person has the required security clearance granted by Canada, if applicable.

4.    The Contractor shall not, in any event, allow performance of the Work by unauthorized replacement persons and acceptance of a

replacement person by the Technical Authority and the Contracting Authority shall not relieve the Contractor from responsibility to meet the requirements of the Contract.

5.    The Minister may order the removal from the Work of any such replacement person and the Contractor shall immediately remove the person from the Work and shall, in accordance with subsection 2 and paragraphs 3.(b) and (c), secure a further replacement.

6.    The fact that the Minister does not order the removal of a replacement person from the Work shall not relieve the Contractor from its responsibility to meet the requirements of the Contract.

**9676  09   (1994-01-04)  Assignment**

1.    The Contract shall not be assigned, in whole or in part, by the Contractor without the prior consent in writing of the Minister and any purported assignment made without that consent is void and of no effect.

2.    No assignment of the Contract shall relieve the Contractor from any obligation under the Contract or impose any liability upon Canada or the Minister, unless otherwise agreed to in writing by the Minister.

**9676  10   (1994-01-04)  Time of the Essence**

Time is of the essence of the Contract.

**9676  11   (1994-01-04)  Excusable Delay**

1.    A delay in the performance by the Contractor of any obligation under the Contract which is caused solely by an event that

    (a)    was beyond the reasonable control of the Contractor,

    (b)    could not reasonably have been foreseen,

    (c)    could not reasonably have been prevented by means reasonably available to the Contractor, and

    (d)    occurred without the fault or neglect of the Contractor

shall, subject to subsections 2, 3 and 4, constitute an "Excusable Delay" provided that the Contractor invokes this section by notice under subsection 4.

2.    If any delay in the Contractor's performance of any obligation under the Contract is caused by a delay of a Subcontractor, such a delay may constitute an Excusable Delay for the Contractor, but only if the delay of the Subcontractor meets the criteria set out in this section for an Excusable Delay by the Contractor and only to the extent that the delay has not been contributed to by the Contractor.

3.    Notwithstanding subsection 1, any delay caused by lack of financial resources of the Contractor or an event that is a ground for termination provided for in subsection 2 of section 23, or any delay

in the Contractor fulfilling an obligation to deliver a bond, guarantee, letter of credit or other security relating to performance or the payment of money, shall not qualify as an Excusable Delay.

4.   The Contractor shall not benefit from an Excusable Delay unless the Contractor has:

   (a)   used its best efforts to minimize the delay and recover lost time;

   (b)   advised the Minister of the occurrence of the delay or of the likelihood of a delay occurring as soon as the Contractor has become aware of it;

   (c)   within fifteen (15) working days of the beginning of a delay or of the likelihood of a delay coming to the attention of the Contractor, advised the Minister of the full facts or matters giving rise to the delay, and provided to the Minister for approval (which approval shall not be unreasonably withheld) a clear "work-around" plan indicating in detail the steps that the Contractor proposes to take in order to minimize the impact of the event causing the delay; this plan shall include alternative sources of materials and labour, if the event causing the delay involves the supply of them; and

   (d)   carried out the work-around plan approved by the Minister.

5.   In the event of an Excusable Delay, any delivery date or other date that is directly affected shall be postponed for a reasonable time not to exceed the duration of the Excusable Delay.  The Parties shall amend the Contract, as appropriate, to reflect any such change in dates.

6.   Notwithstanding subsection 5, the Minister may, after an Excusable Delay has continued for thirty (30) days or more, in the Minister's absolute discretion terminate the Contract.  In such a case, the Parties agree that neither will make any claim against the other for damages, costs, expected profits or any other loss arising out of the termination or the event that gave rise to the Excusable Delay. The Contractor agrees to repay immediately to Canada the portion of any advance payment that is unliquidated at the date of the termination.  Subsections 4, 5 and 6 of section 23 apply in the event of a termination under this subsection.

7   Except to the extent that Canada is responsible for the delay for reasons of failure to meet an obligation under the Contract, Canada shall not be liable for any costs or charges of any nature incurred by the Contractor or any of its subcontractors or agents as a result of an Excusable Delay.

## 9676  12   (2001-05-25) Security and Protection of the Work

1.   The Contractor shall keep confidential all information provided to the Contractor by or on behalf of Canada in connection with the Work,

including any information that is confidential or proprietary to third parties, and all information conceived, developed or produced by the Contractor as part of the Work where copyright or any other intellectual property rights in such information (except a licence) vests in Canada under the Contract.  The Contractor shall not disclose any such information to any person without the written permission of the Minister, except that the Contractor may disclose to a subcontractor authorized in accordance with section 07 information necessary for the performance of the Subcontract, on the condition that the subcontractor agrees that it will be used solely for the purposes of such Subcontract.  Information provided to the Contractor by or on behalf of Canada shall be used solely for the purpose of the Contract and shall remain the property of Canada or the third party, as the case may be.  Unless the Contract otherwise expressly provides, the Contractor shall deliver to Canada all such information, together with every copy, draft, working paper and note thereof that contains such information, upon completion or termination of the Contract or at such earlier time as the Minister may require.

2.   Subject to the *Access to Information Act*, R.S.C. 1985, c. A-1 and to any right of Canada under this Contract to release or disclose, Canada shall not release or disclose outside the Government of Canada any information delivered to Canada under the Contract that is proprietary to the Contractor or a Subcontractor.

3.   The obligations of the Parties set out in this section do not apply to any information where the same information:

(a)   is publicly available from a source other than the other Party; or

(b)   is or becomes known to a Party from a source other than the other Party, except any source that is known to be under an obligation to the other Party not to disclose the information, or

(c)   is developed by a Party without use of the information of the other Party.

4.   Wherever practical, the Contractor shall mark or identify any proprietary information delivered to Canada under the Contract as " Property of (Contractor's name), permitted Government uses defined under Department of Public Works and Government Services (PWGSC) Contract No. (fill in Contract number)", and Canada shall not be liable for any unauthorized use or disclosure of information that could have been so marked or identified and was not.

5.   When the Contract, the Work, or any information referred to in subsection 1 is identified as TOP SECRET, SECRET, CONFIDENTIAL, or PROTECTED by Canada, the Contractor shall at all times take all measures reasonably necessary for the safeguarding of the material so identified, including those set out in the PWGSC Industrial Security Manual and its supplements and any other instructions issued by the Minister.

6. Without limiting the generality of subsections 1 and 2, when the Contract, the Work, or any information referred to in subsection 1 is identified as TOP SECRET, SECRET, CONFIDENTIAL", or PROTECTED by Canada, the Minister shall be entitled to inspect the Contractor's premises and the premises of a subcontractor at any tier for security purposes at any time during the term of the Contract, and the Contractor shall comply with, and ensure that any such subcontractor complies with, all written instructions issued by the Minister dealing with the material so identified, including any requirement that employees of the Contractor or of any such subcontractor execute and deliver declarations relating to reliability screenings, security clearances and other procedures.

7. Any proposed change in the security requirements after the effective date of the Contract that would involve a significant increase in cost to the Contractor shall require an amendment to the Contract under the provisions of section 04.

**9676  13   (1994-01-04) Payment**

1. Notwithstanding any other provision of the Contract, no payment shall be made to the Contractor unless and until:

    (a)   an invoice, inspection notes, certificates and any other documents required by the Contract have been submitted in accordance with the terms of the Contract and the instructions of the Minister;

    (b)   all such documents have been verified by the Minister;

    (c)   with respect to all parts of the Work in respect of which payment is claimed, the Contractor, where required to do so, establishes to the satisfaction of the Minister that such parts of the Work will be free from all claims, liens, attachments, charges or encumbrances; and

    (d)   in the case of payment in respect of finished work, the finished work has been inspected by Canada and accepted as being in accordance with the Contract, including the Specifications.

2. The Minister shall notify the Contractor, within fifteen (15) days of receipt of an invoice, of any inadequacy of the invoice or of the supporting documentation, and where any such notice is given within that period the date for payment of the amount invoiced shall be postponed until the Contractor remedies the inadequacy to the satisfaction of the Minister.

3. Where a delay referred to in section 11 has occurred, the Minister may, at the Minister's discretion, withhold all or a portion of any payment due to the Contractor until a "work-around" plan approved by the Minister has been implemented in accordance with that section. Section 14 shall not apply to any amount withheld under this subsection.

**9676  14   (2000-12-01) Interest on Overdue Accounts**

1.    For the purposes of this section:

"Average Rate" means the simple arithmetic mean of the Bank Rates in effect at 4:00 p.m. Eastern Standard Time each day during the calendar month which immediately precedes the calendar month in which payment is made, where the "Bank Rate" means the rate of interest established from time to time by the Bank of Canada as the minimum rate at which the Bank of Canada makes short term advances to members of the Canadian Payments Association.

"date of payment" means the date of the negotiable instrument drawn by the Receiver General for Canada and given for payment of an amount due and payable;

an amount is "due and payable" when it is due and payable by Canada to the Contractor in accordance with the conditions of the Contract; and

an amount becomes "overdue" when it is unpaid on the first day following the day upon which it is due and payable.

2.    Subject to the Contract, Canada shall be liable to pay to the Contractor simple interest at the Average Rate plus 3 percent per annum on any amount that is overdue, from the date such amount becomes overdue until the day prior to the date of payment, inclusive.  Interest shall be paid without notice from the Contractor.

3.    Canada shall not be liable to pay interest in accordance with this section if Canada is not responsible for the delay in paying the Contractor.

4.    Canada shall not be liable to pay interest on overdue advance payments.

**9676  15   (1994-01-04)  Changes in Taxes and Duties**

1.    In this section, "bid" includes a proposal, tender or offer submitted by the Contractor in response to an invitation from the Minister.

2.    Subject to subsection 3, in the event of any change (including a new imposition or repeal), on or after the date of submission of the bid, of any tax, customs or other duty, charge, or any similar imposition that is imposed under sales or excise tax legislation of the Government of Canada and which affects the Cost to the Contractor of the Work, the Contract Price shall be adjusted to reflect the increase or decrease in the Cost to the Contractor.

3.    There shall be no adjustment under subsection 2 in respect of any change that would increase the Cost to the Contractor of the Work if public notice of the change was given before the bid submission date in sufficient detail to permit the Contractor to have calculated the effect on its Cost before that date.

4.     The Contractor shall forward to the Minister a certified statement showing the increase or decrease in Cost to the Contractor that is directly attributable to the change in the imposition.  The Minister may verify the increase or decrease in Cost by audit before or after the Contract Price is adjusted.

5.     Notwithstanding subsections 2 to 4, no adjustment to the Contract Price in respect of the Work or a part thereof shall be made for a change in any imposition referred to in this section that occurs after the date required by the Contract for delivery of the Work or that part of the Work.

**9676   16    (1994-01-04)  Inspection of the Work**

The Work and any and all parts thereof shall be subject to such inspection as the Technical or Inspection Authority determines to be appropriate, consistent with the relevant provisions of the Contract, if any, prior to acceptance by Canada.  The Contracting Authority and the Technical or Inspection Authority, or their representatives, shall have access to the Work at any time during working hours where any part of the Work is being carried out and may make examinations and such tests of the Work as they may think fit.  Should the Work or any part thereof not be in accordance with the requirements of the Contract, the Technical or Inspection Authority shall have the right to reject the Work and require its correction or replacement at the Contractor's expense.  The Technical or Inspection Authority shall inform the Contractor of the reasons for any such rejection.  Inspection by the Technical or Inspection Authority shall not relieve the Contractor from responsibility to meet the requirements of the Contract.

**9676   17    (1994-01-04)  Title**

1.     Except as otherwise provided in the Contract, and except as provided in subsection 2, title to the Work or any part thereof shall vest in Canada upon delivery and acceptance thereof by or on behalf of Canada.

2.     Upon any payment being made to the Contractor in respect of the Work or any portion of the Work, either by way of progress payments or accountable advances or otherwise, title to the Work so paid for shall vest in and remain in Canada unless already so vested under any other provision of the Contract.

3.     Notwithstanding any vesting of title referred to in this section and except as otherwise provided in the Contract, the risk of loss or damage to the Work or part thereof so vested shall remain with the Contractor until its delivery to Canada in accordance with the Contract.

4.     Any vesting of title referred to in subsection 2 shall not constitute acceptance by Canada of the Work and shall not relieve the Contractor of its obligation to perform the Work in accordance with the Contract.

5.     If the Contract is a defence Contract within the meaning of the *Defence Production Act*, R.S.C. 1985, c. D-1, title to the Work or to

any materials, parts, work-in-process or finished work shall vest in Canada free and clear of all claims, liens, attachments, charges or encumbrances, and the Minister shall be entitled at any time to remove, sell or dispose of it or any part of it in accordance with section 20 of that Act.

**9676   18   (2004-12-10)   Government Property**

1.   Unless otherwise provided in the Contract, all Government Property shall be used by the Contractor solely for the purpose of the Contract and shall remain the property of Canada, and the Contractor shall maintain adequate accounting records of all Government Property, and, whenever feasible, shall mark the same as being the property of Canada.

2.   The Contractor shall take reasonable and proper care of all Government Property while the same is in, on, or about the plant and premises of the Contractor or otherwise in its possession or subject to its control, and shall be responsible for any loss or damage resulting from its failure to do so other than loss or damage caused by ordinary wear and tear.

3.   All Government Property, except such as is installed or incorporated into the Work, shall, unless otherwise specifically provided in the Contract, be returned to Canada on demand.

4.   At the time of completion of the Contract, and if requested by the Contracting Authority, the Contractor shall provide an inventory of all Government Property relating to the Contract to both the Contracting Authority and the Technical Authority.

**9676   19   (1994-01-04)   Indemnity Against Third-Party Claims**

1.   The Contractor shall indemnify and save harmless Canada, the Minister and their servants and agents from and against any damages, costs or expenses or any claim, action, suit or other proceeding which they or any of them may at any time incur or suffer as a result of or arising out of

(a)   any injury to persons (including injuries resulting in death) or loss of or damage to property of others which may be or be alleged to be caused by or suffered as a result of the performance of the Work or any part thereof, except that Canada and the Minister shall not claim indemnity under this section to the extent that the injury, loss or damage has been caused by Canada, and

(b)   any liens, attachments, charges or other encumbrances or claims upon or in respect of any materials, parts, work-in-process or finished work furnished to, or in respect of which any payment has been made by, Canada.

2.   The Minister shall give notice to the Contractor of any claim, action, suit or proceeding referred to in subsection 1 and the Contractor shall, to the extent requested by the Attorney General of Canada, at its own expense participate in or conduct the defence of

any such claim, action, suit or proceeding and any negotiations for settlement of the same, but the Contractor shall not be liable to indemnify Canada for payment of any settlement unless it has consented to the settlement.

**9676  20   (1994-01-04)  Royalties and Infringement**

1.    In this section, "Royalties" includes

(a)    license fees and all other payments analogous to royalties for, and also claims for damages based upon, the use or infringement of any patent, registered industrial design, trade mark, copyrighted work, trade secret, or other intellectual property right, and

(b)    any costs or expenses incurred as a result of the exercise by any person of Moral Rights.

2.    Subject to subsection 4, the Contractor shall indemnify and save harmless Canada, the Minister and their servants and agents against any claim, action, suit or other proceeding for the payment of Royalties, that results from or is alleged to result from the carrying out of the Contract or the use or disposal by Canada of anything furnished by the Contractor under the Contract.

3.    Canada shall indemnify and save harmless the Contractor and its servants and agents against any claim, action, suit or other proceeding for the payment of Royalties, that results from or is alleged to result from the use by the Contractor in performing the Contract of equipment, Specifications or other information not prepared by the Contractor and supplied to the Contractor by or on behalf of Canada, provided that the Contractor notifies the Minister immediately of any such claim, action, suit or other proceeding, but Canada shall not be liable to indemnify or save harmless the Contractor for payment of any settlement unless Canada has consented to the settlement.

4.    The Minister shall give notice to the Contractor of any claim, action, suit or proceeding referred to in subsection 2 and the Contractor shall, to the extent requested by the Attorney General of Canada, at its own expense participate in or conduct the defence of any such claim, action, suit or proceeding and any negotiations for settlement of the same, but the Contractor shall not be liable to indemnify and save harmless Canada for payment of any settlement unless it has consented to the settlement.

5.    The Contractor shall notify the Minister of all Royalties which it or any of its subcontractors will or may be obligated to pay or propose to pay in respect of carrying out the Contract, and the basis thereof, and the parties to whom the same are payable, and shall promptly advise the Minister of any and all claims which would or might result in further or different payments by way of Royalties being made by the Contractor or any of its subcontractors.

6.    Where and to the extent that the Minister so directs, the Contractor shall not pay and shall direct its subcontractors not to pay any

Royalties in respect of the carrying out of the Contract.

7.    After the giving of any direction provided for in subsection 6, and subject to compliance by the Contractor with the foregoing provisions, Canada shall indemnify the Contractor and its subcontractors from and against all claims, actions, suits or proceedings for payment of such Royalties as are covered by the direction.

8.    The Contractor shall not be entitled to any payment in respect of any Royalties included in the Contract Price to which the indemnity provided in subsection 7 applies.

**9676   21    (2001-05-25) Copyright**

1.    In this section,

      "Material" means anything that is created or developed by the Contractor as part of the Work under the Contract, and in which copyright subsists, but does not include computer programs and related software documentation.

2.    Copyright in the Material shall vest in Canada and the Contractor shall incorporate in all Material the copyright symbol and either of the following notices, as appropriate:

      © HER MAJESTY THE QUEEN IN RIGHT OF Canada (year)

      or

      © SA MAJESTÉ LA REINE DU CHEF DU CANADA (year)

3.    At the completion of the Contract, or at such other time as the Contract or the Minister may require, the Contractor shall fully and promptly disclose to the Minister all Material created or developed under the Contract.

4.    Where copyright in any Material vests in Canada under the Contract, the Contractor shall execute such conveyances and other documents relating to title or copyright as the Minister may require.

5.    The Contractor shall not use, copy, divulge or publish any Material except as is necessary to perform the Contract.

6.    At the request of the Minister, the Contractor shall provide to Canada, at the completion of the Work or at such other time as the Minister may require, a written permanent waiver of Moral Rights, in a form acceptable to the Minister, from every author that contributed to the Material.

7.    If the Contractor is an author of the Material, the Contractor hereby permanently waives the Contractor's Moral Rights in respect of the Material.

**9676   22    (1994-01-04) Suspension of the Work**

1.  The Minister may at any time, by written notice, order the Contractor to suspend or stop all or part of the Work under the Contract for a period of up to one hundred eighty (180) days. The Contractor shall immediately comply with any such order in the manner that minimizes the cost of so doing. While such an order is in effect, the Contractor shall not remove any part of the Work from any premises without the prior written consent of the Contracting Authority. At any time prior to the expiration of the one hundred eighty (180) days, the Minister shall either rescind the order or terminate the Contract, in whole or in part, under section 23 or section 24 .

2.  When an order is made under subsection 1, unless the Minister terminates the Contract by reason of default by the Contractor or the Contractor abandons the Contract, the Contractor shall be entitled to be paid its additional costs incurred as a result of the suspension plus a fair and reasonable profit thereon.

3.  When an order is made under subsection 1 and is rescinded:

    (a)   the Contractor shall as soon as practicable resume work in accordance with the Contract;

    (b)   if the suspension has affected the Contractor's ability to meet any delivery date under the Contract, the date for the performance of that part of the Work affected by the suspension shall be extended for a period equal to the period of suspension plus a period, if any, which in the opinion of the Minister following consultation with the Contractor is reasonably necessary for the Contractor to resume the Work; and

    (c)   subject to section 04, an equitable adjustment shall be made as necessary to affected terms and conditions of the Contract.

**9676   23   (1994-01-04) Default by the Contractor**

1.  Where the Contractor is in default in carrying out any of its obligations under the Contract, the Minister may, upon giving written notice to the Contractor, terminate for default the whole or any part of the Contract, either immediately, or at the expiration of a cure period specified in the notice if the Contractor has not cured the default to the satisfaction of the Minister within that cure period.

2.  Where the Contractor becomes bankrupt or insolvent, makes an assignment for the benefit of creditors, or takes the benefit of any statute relating to bankrupt or insolvent debtors, or where a receiver is appointed under a debt instrument or a receiving order is made against the Contractor, or an order is made or a resolution passed for the winding up of the Contractor, the Minister may, to the extent permitted by the laws of Canada, upon giving notice to the Contractor, immediately terminate for default the whole or any part of the Contract.

3.  Upon the giving of a notice provided for in subsection 1 or 2, the

Contractor shall have no claim for further payment other than as
provided in this section, but shall be liable to Canada for any
amounts, including milestone payments, paid by Canada and for all
losses and damages which may be suffered by Canada by reason of the
default or occurrence upon which the notice was based, including any
increase in the cost incurred by Canada in procuring the Work from
another source.  The Contractor agrees to repay immediately to
Canada the portion of any advance payment that is unliquidated at
the date of the termination.  Nothing in this section affects any
obligation of Canada under the law to mitigate damages.

4.    Upon termination of the Contract under this section, the Minister
      may require the Contractor to deliver to Canada, in the manner and
      to the extent directed by the Minister, any completed parts of the
      Work which have not been delivered and accepted prior to the
      termination and any material, equipment or work-in-process which the
      Contractor has acquired or produced specifically in the fulfilment
      of the Contract.

5.    Subject to the deduction of any claim that Canada may have against
      the Contractor arising under the Contract or out of the termination,
      Canada shall pay or credit to the Contractor the value, determined
      on the basis of the Contract Price including the proportionate part
      of the Contractor's profit or fee included in the Contract Price, of
      all completed parts of the Work delivered to Canada pursuant to a
      direction under subsection 4 and accepted by Canada, and shall pay
      or credit to the Contractor the Cost to the Contractor that the
      Minister considers reasonable in respect of all material, equipment
      or work-in-process delivered to Canada pursuant to a direction under
      subsection 4 and accepted by Canada, but in no event shall the
      aggregate of the amounts paid by Canada under the Contract to the
      date of termination and any amounts payable pursuant to this
      subsection exceed the Contract Price.

6.    Title to all material, equipment, work-in-process and finished work
      in respect of which payment is made to the Contractor shall, upon
      such payment being made, pass to and vest in Canada unless already
      so vested under any other provision of the Contract, and such
      material, equipment, work-in-process and finished work shall be
      delivered according to the order of the Minister, but Canada will
      not accept and will not pay for material, equipment or work-in-
      process that would not have been required to perform the Work or
      that exceed what would have been required to perform the Work.

7.    Where, subsequent to issuance of a notice pursuant to subsection 1,
      the Minister is satisfied that grounds did not exist for a
      termination under this section, the notice shall be deemed a notice
      of termination for convenience issued under subsection 1 of section
      24.

**9676   24   (2007-11-30)  Termination for Convenience**

1.    Notwithstanding anything contained in the Contract, the Minister may,
      at any time prior to the completion of the Work, by giving notice
      to the Contractor (in this section sometimes referred to as a "
      termination notice"), terminate the Contract as regards all or any

part of the Work not completed.  Upon a termination notice being given, the Contractor shall cease work in accordance with and to the extent specified in the notice, but shall proceed to complete such part or parts of the Work as are not affected by the termination notice.  The Minister may, at any time or from time to time, give one or more additional termination notices with respect to any or all parts of the Work not terminated by any previous termination notice.

2.    In the event of a termination notice being given pursuant to subsection 1, the Contractor shall be entitled to be paid, to the extent that costs have been reasonably and properly incurred for purposes of performing the Contract and to the extent that the Contractor has not already been so paid or reimbursed by Canada including the unliquidated portion of any advance payment:

   (a)    on the basis of the Contract Price, for all completed work that is inspected and accepted in accordance with the Contract, whether completed before, or after and in compliance with the instructions contained in, the termination notice;

   (b)    the cost to the Contractor plus a fair and reasonable profit thereon, for all work terminated by the termination notice before completion, the Cost to the Contractor being determined in accordance with the terms of the Contract and with Contract Cost Principles 1031-2;

   (c)    the amount of any capital expenditures actually incurred only if they were specifically authorized under the Contract or approved in writing by the Minister for the purpose of the Contract, less any depreciation in respect thereof already taken into account in determining cost, to the extent that the capital expenditures are properly apportionable to the performance of the Contract;

   (d)    all costs of and incidental to the termination of the Work or part thereof, including the cost of cancellation of obligations incurred by the Contractor with respect to the terminated work or part thereof, the Cost of and incidental to the taking of an inventory of materials, components, work-in-process and finished work on hand related to the Contract at the date of the termination, and the cost of preparation of necessary accounts and statements with respect to Work performed to the effective date of the termination and commitments made by the Contractor with respect to the terminated portions of the Work; but not including the cost of severance payments or damages to employees whose services are no longer required by reason of the termination except wages that the Contractor is obligated by statute to pay them and except for reasonable severance payments or damages paid to employees hired to perform the Contract whose hiring was expressly required by the Contract or approved in writing by the Minister for the purpose of the Contract.

3.    In paragraph 2.(c), "capital expenditures" includes the entry into

leases of real property and equipment.

4.    The Minister may reduce the payment in respect of any of the Work to the extent that, upon inspection, it is deficient in meeting the requirements of the Contract.

5.    Notwithstanding anything in subsection 2, the total of the amounts to which the Contractor is entitled under paragraphs 2.(a) to (c) inclusive, together with any amounts paid or due or becoming due to the Contractor under other provisions of the Contract, shall not exceed the Contract Price or the portion thereof that is applicable to the part of the Work that is terminated, and shall not exceed the proportion of the price quoted by the Contractor for all of the Work that is reasonably attributable to the proportion of the Work performed to the effective date of the termination.

6.    In the procuring of materials and parts required for the performance of the Contract and in the subcontracting of any of the Work, the Contractor shall, unless otherwise authorized by the Minister, place purchase orders and subcontracts on terms that will enable the Contractor to terminate the same upon terms and conditions similar in effect to those provided in this section, and generally the Contractor shall co-operate with the Minister and do everything reasonably within its power at all times to minimize the amount of Canada's obligations in the event of a termination under this section.

7.    Title to all material, equipment, work-in-process and finished work in respect of which payment is made to the Contractor shall, upon such payment being made, pass to and vest in Canada unless already so vested under any other provision of the Contract, and such material, equipment, work-in-process and finished work shall be delivered according to the order of the Minister, but Canada will not accept and will not pay for material, equipment or work-in-process that would not have been required to perform the Work or that exceed what would have been required to perform the Work.

8.    The Contractor shall have no claim for damages, compensation, loss of profit, allowance or otherwise by reason of, or directly or indirectly arising out of, any action taken or termination notice given by the Minister under this section, except to the extent that this section expressly provides.

**9676   25   (1994-01-04) Accounts and Audit**

1.    The Contractor shall keep proper accounts and records of the cost to the Contractor of the Work and of all expenditures or commitments made by the Contractor in connection therewith, and shall keep all invoices, receipts and vouchers relating thereto.  The Contractor shall not, without the prior written consent of the Minister, dispose of any such accounts, records, invoices, receipts or vouchers until the expiration of six (6) years after final payment under this Contract, or until the settlement of all outstanding claims and disputes, whichever is later.

2.    All such accounts and records as well as any invoices, receipts and

vouchers shall at all times during the retention period referred to
in subsection 1 be open to audit, inspection and examination by the
authorized representatives of the Minister, who may make copies and
take extracts thereof.  The Contractor shall provide all facilities
for such audits and inspections and shall furnish all such
information as the representatives of the Minister may from time to
time require with respect to such accounts, records, invoices,
receipts and vouchers.

**9676   26   (1994-01-04)  Notice**

Any notice shall be in writing and may be delivered by hand or by courier,
by registered mail, or by facsimile or other electronic means that provides
a paper record of the text of the notice, addressed to the Party for whom
it is intended at the address in the Contract or at the last address of
which the sender has received notice in accordance with this section.  Any
notice shall be deemed to be effective on the day it is received at that
address.

**9676   27   (1994-01-04)  Members of the House of Commons**

No member of the House of Commons shall be admitted to any share or part of
the Contract or to any benefit arising from the Contract.

**9676   28   (2005-12-16)  Conflict of Interest**

The Contractor agrees that it is a term of the Contract that no person who
is not in compliance with the provisions of the Conflict of Interest and
Post-Employment Code for Public Office Holders, the Values and Ethics Code
for the Public Service, or the Defence Administrative Orders and Directives
governing Conflict of Interest and Post-Employment, shall derive any direct
benefit from this Contract.

**9676   29   (1994-06-01)  No Bribe**

The Contractor represents and covenants that no bribe, gift, benefit, or
other inducement has been or will be paid, given, promised or offered
directly or indirectly to any official or employee of Canada or to a member
of the family of such a person, with a view to influencing the entry into
the Contract or the administration of the Contract.

**9676   30   (1994-01-04)  Survival**

All of the Contractor's obligations of confidentiality and all of the
Contractor's representations and warranties set out in the Contract as well
as the provisions concerning Government Property, indemnity against third
party claims, royalties and infringement, intellectual property rights and
accounts and audit shall survive the expiry of the Contract or the
termination of the Contract for default, for convenience, pursuant to
subsection 6 of section 11, or by mutual consent, as shall any other
provision of the Contract which, by the nature of the rights or obligations
set out therein, might reasonably be expected to be intended to so survive.

**9676   31   (1994-01-04)  Severability**

If any provision of the Contract is declared by a court of competent

jurisdiction to be invalid, illegal or unenforceable, such provision shall
be severed from the Contract and all other provisions of the Contract shall
remain in full force and effect.

**9676   32   (1994-01-04)  Successors and Assigns**

The Contract shall enure to the benefit of, and shall be binding upon, the
successors and permitted assignees of Canada and of the Contractor.

**9676   33   (1994-01-04)  Entire Agreement**

The Contract constitutes the entire and sole agreement between the parties
with respect to the subject matter of the Contract and supersedes all
previous negotiations, communications and other agreements, whether written
or oral, relating to it, unless they are incorporated by reference in the
Contract.  There are no terms, covenants, representations, statements or
conditions binding on the parties other than those contained in the
Contract.

**9676   34   (1994-06-06)  Certification - Contingency Fees**

1.   The Contractor certifies that it has not directly or indirectly paid
or agreed to pay and covenants that it will not directly or
indirectly pay a contingency fee for the solicitation, negotiation
or obtaining of this Contract to any person other than an employee
acting in the normal course of the employee's duties.

2.   All accounts and records pertaining to payments of fees or other
compensation for the solicitation, obtaining or negotiation of the
Contract shall be subject to the Accounts and Audit provisions of
the Contract.

3.   If the Contractor certifies falsely under this section or is in
default of the obligations contained therein, the Minister may
either terminate this Contract for default in accordance with the
termination for default provisions of the Contract or recover from
the Contractor by way of reduction to the Contract Price or
otherwise the full amount of the contingency fee.

4.   In this section:

"contingency fee" means any payment or other compensation that is
contingent upon or is calculated upon the basis of a degree of
success in soliciting or obtaining a government contract or
negotiating the whole or any part of its terms;

"employee" means a person with whom the Contractor has an employer/
employee relationship;

"person" includes an individual or group of individuals, a
corporation, a partnership, an organization and an association and,
without restricting the generality of the foregoing, includes any
individual who is required to file a return with the registrar
pursuant to section 5 of the *Lobbyist Registration Act*, R.S. 1985 c.
44 (4th Supplement) as the same may be amended from time to time.

**9676  35  (2007-05-25)  Taxes**

1.  Municipal Taxes
    Municipal Taxes are not applicable.

2.  Provincial Taxes

    (a)  Excluding legislated exceptions, federal government
         departments and agencies are not required to pay any ad
         valorem sales tax levied by the province in which the taxable
         goods or services are delivered.  This exemption has been
         provided to federal government departments and agencies under
         the authority of one of the following:

         (i)  Provincial Sales Tax (PST) exemption license numbers,
              for the provinces of:

              Prince Edward Island OP-10000-250
              Ontario              11708174G
              Manitoba          390-516-0
              British Columbia   R005521

         (ii)  For Quebec, Saskatchewan, the Yukon Territory, the
               Northwest Territories and Nunavut, an exemption
               certificate, which certifies that the goods or
               services purchased are not subject to the provincial/
               territorial sales and consumption taxes because they
               are being purchased by the federal government with
               Canada funds for the use of the federal government.

    (b)  Currently, in Alberta, the Yukon Territory, the Northwest
         Territories and Nunavut, there is no general PST.  However,
         should a PST be introduced in the Northwest Territories,
         Nunavut, or Yukon Territory, the sales tax exemption
         certificate would be required on the purchasing document.

    (c)  Federal departments are required to pay the HST in the
         participating provinces of Newfoundland and Labrador, Nova
         Scotia and New Brunswick.

    (d)  The Contractor is not exempt from paying PST under the above
         exemption license numbers or exemption certificate.  The
         Contractor is required to pay the PST on taxable goods or
         services used or consumed in the performance of the Contract
         (as per appropriate provincial legislation), including
         material incorporated into real property.

3.  Changes to Taxes and Duties

    In the event of any change in any tax imposed under the *Excise Act*,
    R.S.C 1985, c. E-14, and *Excise Tax Act*, R.S.C. 1985, c. E-15, or
    any duties imposed under the Customs Tariff or any other federal or
    provincial sales, excise or other like duties, taxes, charges or
    impositions after the bid submission date and which affects the
    costs of the Work to the Contractor, the Contract price will be
    adjusted to reflect the increase or decrease in the cost to the

Contractor.

4.    Goods and Services Tax/Harmonized Sales Tax

The estimated Goods and Services Tax (GST) or Harmonized Sales Tax (
HST), if applicable, is included in the total estimated cost on page
1 of the Contract.  The GST or HST is not included in the Contract
price but will be paid by Canada as provided in the Invoice
Submission clause below.  The Contractor agrees to remit to Canada
Revenue Agency any amounts of GST and HST paid or due.

**9676   36   (2007-05-25)  Invoice Submission**

Invoices must be submitted in the name of the Contractor.  They must show
the name and address of the client department, item/reference number,
deliverable and/or description of Work, contract serial number, Client
Reference Number (CRN), Procurement Business Number (PBN) and financial
code(s).  If applicable, the method of shipment together with date, case
numbers and part or reference numbers, item, quantity, unit of issue, unit
price, and additional charges will be shown on the invoice.  If applicable,
fixed time labour rates and level of effort and, the amount invoiced (
exclusive of the GST or HST as appropriate), will be shown separately.

GST or HST, if applicable, will be incorporated into all invoices and shown
as a separate item on invoices.  All items that are zero-rated, exempt or
to which the GST or HST does not apply, are to be identified as such on all
invoices.  Invoices must be submitted for each delivery/shipment and must
apply to one contract only.  Each invoice must indicate whether it covers
partial or final delivery.

**9676   37   (2007-05-25)  Transportation Charges**

If transportation charges are payable by Canada under the Contract and the
Contractor makes the transportation arrangements, shipments must be made by
the most direct and economical means consistent with normal shipping
practice.  The charges must be shown as a separate item on the invoice.
The federal government's policy of underwriting its own risks precludes
payment of insurance or valuation charges for transportation beyond the
point at which title of goods passes to the federal government (determined
by the FOB point or Incoterms).  Where increased carrier liability is
available without charge, the Contractor must obtain the increased
liability for shipment.

**9676   38   (2007-11-30)  International Sanctions**

1.    Persons in Canada, and Canadians outside of Canada, are bound by
economic sanctions imposed by Canada.  As a result, the Government
of Canada cannot accept delivery of goods or services that originate,
 either directly or indirectly, from the countries or persons
subject to economic sanctions.

Details on existing sanctions can be found at:
http://www.dfait-maeci.gc.ca/trade/sanctions-en.asp.

2.    The Contractor must not supply to the Government of Canada any goods
or services which are subject to economic sanctions.

3.   The Contractor must comply with changes to the regulations imposed during the period of the Contract. The Contractor must immediately advise Canada if it is unable to perform the Work as a result of the imposition of economic sanctions against a country or person or the addition of a good or service to the list of sanctioned goods or services. If the Parties cannot agree on a work around plan, the Contract will be terminated for the convenience of Canada in accordance with Section 24.

**9676   39   (2007-05-25)  Standard Clauses and Conditions**

Pursuant to the *Department of Public Works and Government Services Act*, S.C. 1996, c. 16, the clauses and conditions identified in the Contract by number, date and title are incorporated by reference into and form part of the Contract as though expressly set out in the Contract.

**9676   40   (2007-11-30)  Code of Conduct for Procurement**

The Contractor confirms that it has read the *Code of Conduct for Procurement* and agrees to be bound by its terms.

# Tab 1(c)

**Annex A**

**STATEMENT OF WORK**

**1.      BACKGROUND**

1.1      In accordance with government direction and agreements, the Royal Canadian Mounted Police (RCMP) has been assigned the responsibility to plan and manage policing, security operations and services for the protection of the Vancouver 2010 Winter Olympic and Paralympic Games (the Games).  This task will necessitate the deployment of vessels to the Vancouver area in order to provide temporary accommodation of security force personnel for the period of the Games.   As conventional hotel-type accommodation is not expected to be available, temporary accommodation on a vessel or vessels berthed at a Vancouver terminal offers many advantages, including proximity to venues and ease of control.  Therefore, to meet some of the needs required for accommodation, the RCMP Vancouver 2010 Integrated Security Unit (ISU) intends to charter a vessel or vessels for its exclusive use in Vancouver, British Columbia for approximately five (5) to six (6) weeks during the period January 2010 to March 2010.

1.2      The services of a Charterer are required to secure the vessel or vessels, negotiate all costs, and work exclusively with the ISU on all issues related to providing safe, secure, and a healthy environment for the security force members.  **All components contained in this statement of work are considered mandatory unless otherwise indicated.**

1.3      This charter is for temporary accommodation only, at a level approximating that available at a standard national hotel chain.  While respecting the requirements outlined herein, the contractor is expected to adjust service levels accordingly in order to minimize costs.  Occupancy is to be planned on the basis of two persons per standard cabin and/or two persons per sleeping cabin in suites or equivalent.

1.4      The RCMP and ISU reserve the right to increase the bed density, alter cabins/room configurations and increase the number of persons occupying any cabin, within the actual maximum number of beds allowed for occupancy on the vessel, under the same terms and conditions and costs as per the Contractors bid of $298.00 per bed per passenger.

1.5      Individual services may be provided at the contractors discretion subject to the conditions outlined herein, but all costs associated with the provisions of such services will be borne by individuals.  The provision and costing of meals in specifically addressed herein.

**2.      TERM**

2.1      The contractor, immediately upon notification of contract award, shall be responsible for ensuring  the fulfillment of all obligations, meet the terms, conditions, and requirements as stated in the RFP and this Statement of work on an "as and when required" basis.  The end date of this contract shall be on or about March 31, 2010.

**3.      LOCATION**

3.1      The contractor shall ensure the vessel or vessels are berthed at Ballentyne Pier, Vancouver, British Columbia, Canada.  This location offers easy access to downtown venue locations and will enable a central deployment area and central muster area.

There is no shore power available at this location.

## 4.   SECURING THE VESSELS

**4.1**   The Contractor shall identify and secure the vessel or vessels within thirty (30) days of contract award.  Proof of security of the vessel, and proof of payment to the vessel provider (minimum 70%) must be received by the ISU Contracting Authority within thirty (30) days of contract award.  If this requirement is not met, the contract may be terminated.

**4.2**   The Contractor shall provide written documentation by way of a certified no fault declaration with respect to providing cruise ship charter services to any charter or large group during the past 5 years and written certification from the cruise ship provider attesting to a no fault declaration in providing cruise ship services to any Charter or Large Group during the past 5 years. Both these documents must be received on or before September 01, 2008.

**4.3**   The Contractor shall provide vessels which are "rated" at a minimum 3.5 as per Canadian Industry Standards and confirmed as a common industry guide.

**4.4**   The Contractor must ensure the vessels are seaworthy; the engines must be good running order and all gear and equipment in good repair. The vessels must meet or exceed those standards sited in accordance with Canadian Marine Safety Standards. It shall be the responsibility of the contractor to ensure the cruise ship pays for all necessary repairs, renewals and maintenance, and no costs shall be borne by the ISU.

**4.5**   The contractor shall ensure the vessel or vessels nominated must in all respects meet the specification standards of the RFP document. The ISU will confirm acceptance of the vessels within forty-eight (48) hours of receipt of the vessel nomination.

**4.6**   Failure by the Contractor to nominate and secure the ships within the time required will constitute a breach under the agreement and the ISU will take whatever measure at its disposition to resolve the issue.

**4.7**   The Contractor shall provide the following information at the time of vessel nomination: Name of the Vessel; Official number, Class, year built, Flag, length, beam, displacement, passenger capacity, proof of Health Canada inspection of no less than 95% in the last two years, proof  of Canadian Insurance and permission from the Cruise Ship line Insurance Carrier for multi-ship inventory to be docked at one location for an extended period of time.

## 5.   QUALITY

**Overview:**

**5.1**   **Health Standards:**  The guidelines of Health Canada Cruise Ship Inspection program were harmonized with the United States Centres for Disease Control and Prevention (CDC) Vessel Sanitation Program in 1988.  This is the minimum standard for the vessel or vessels provided by the contractor to the ISU and these standards shall be maintained throughout the term of the contract.   The site access to Health Canada's Cruise Ship Inspection Program Administrative Guide and Mini Guide is: http://www.phb_bsp@hc.sc.gc.ca.

5.2     The contractor shall be required to implement stringent protective measures against viral gastroenteritis and similar diseases in accordance with Health Canada and Centres for Disease Control protocols for disease prevention current at the time of the contract. The contractor shall ensure the vessel or vessels meet approved quality standards.

5.3     The contractor shall ensure that there is full access of the vessels by the Vancouver 2010 ISU, it assignees, representatives, or any government agency for the purposes of inspecting and ensuring the quality standards are met and maintained.  Following is a general list of areas which may be inspected:

-   medical facilities, for gastrointestinal illness surveillance documentation and medical logs
-   potable water systems; for source storage, distribution, protection and any cross connection and the disinfection process;
-   swimming pools and whirlpool spas; for filtration, disinfection, general maintenance logs and safety;
-   Galleys, dining rooms; for food protection during sourcing, provisioning, storage, preparation and service.  Employee health and personal hygiene may be evaluated, as well as facility equipment maintenance and dishwashing;
-   hand washing stations (if applicable), facility disinfection practices and infection control for staff;
-   room/cabins; for routine cleaning sequences and infection control procedures, appropriate usage of disinfectants and outbreak policies;
-   ventilation systems; for maintenance and cleaning of air handling systems;
-   common areas of the ship; for integrated pest management, strategies, general cleanliness and maintenance;
-   fire controls, fire and safety equipment, safety plans and procedures

5.4     There is a requirement in the Request for Proposal for the Contractor to provide a Health Canada Cruise ship Inspection score of no less than 95% for the year 2006 and 2007.  In addition to this requirement, the contractor shall provide to the Contracting Authority, within ten (10) days of the vessel receiving, the Inspection scores for the years 2008 and 2009.  It is the responsibility of the contractor to oversee compliance with the cruise ship with respect to all aspects of this Statement of Work, including maintaining a minimum score of 95%.  The applicable documentation ensuring remedial action has taken place for a score less than 100% shall also be provided to the contracting officer within ten days of receipt by the cruise ship line.

## 6.     VESSEL INSPECTIONS

6.1     The safety and security of ISU personnel accommodated on board the vessels is of critical importance.  Accordingly, the contractor must arrange a meeting within 30 days (thirty) days of contract award.  The purpose of this meeting between the ISU and the Cruise ship manager, Executive staff, Ships Security Manager and any others as required is to review the entire accommodation program and plan, including on-board safety and security measures.

6.2     This meeting will be followed within sixty (60) days by an on-site inspection by the appropriate assigned ISU personnel, of the contracted ships or sister ships to confirm compliance of the specifications, discussions held at initial meeting and to become familiar with the entire facility.  The ISU shall conduct a complete Threat/Risk Assessment to determine security enhancements that may be necessary and address any questions which may arise.  The Contractor and the Cruise lines agree that the ISU shall have full access to all areas of the ship in order to conduct this Threat/Risk Assessment.

6.3     A second inspection of this type will be conducted within sixty (60) days prior to occupancy of each of the nominated vessels which are to be provided as accommodation for the ISU.  Due to potential security risks, the Contractor is required to provide full and detailed information regarding the vessels layout, configuration and security measures only to select and suitably security cleared ISU personnel who shall be members of the RCMP.  To avoid the perception of these inspections being a junket, they are to be conducted to the greatest possible extent in a mutually-convenient port over as short a duration as possible.

6.4     The Contractor agrees with the ISU conducting inspections to document the vessels condition pre and post occupancy.  The ISU will accept no claims for damages or deficiencies identified on the pre-occupancy inspection and any claims for post-occupancy damages or deficiencies to cabins, and contents therein, recreation and other equipment, and any other areas of the vessels must be identified on the post-occupancy inspection, with full substantiation being provided by the Contractor to indicate that ISU personnel was responsible for the damages or deficiency.

## 7.     DISCLOSURE

7.1     Documents and records of any kind pertaining to this contract may be subject to disclosure under the Access to Information and Privacy Acts.  The disclosure, if requested by a third party, will be assessed for release under the provisions of those Acts, as required.

7.2     The Contractor must sign the non-disclosure form and submit it with the bid as attached Annex F.

7.3     It shall be the responsibility of the Contractor to ensure any other personnel working on behalf of the Contractor in delivering any goods and services with respect to the acquisition and performance of this contract, sign a non-disclosure, and are informed they may be subject to a RCMP criminal records security clearance check.

## 8.     SECURITY

### CONTRACTOR

8.2     As a provision of the RFP the contractor must submit completed security clearance documents with the bid.    A reliability security clearance shall be completed by the RCMP.

8.1     The Contractor must pass the RCMP Reliability Status criminal record check and maintain this level for the term of the contract.

### CONTRACTOR'S PERSONNEL

8.2     The Contractor shall submit security clearance forms within 10 days of contract award for any of their personnel who may be involved with the delivery of this contract. Any contract personnel who do not pass and maintain a security clearance at the Reliability Status level must not be permitted to work on this contract.  It is the responsibility of the Contractor to ensure their personnel meet this requirement for the duration of the contract.

### 8.3     SHIP PERSONNEL

The Contractor shall provide a complete list of all ship personnel.  The list shall include a photocopy of valid passport, position on board the vessel, and length of employment and

date of birth at least one hundred and eighty (180) days prior to docking in the City of Vancouver.

8.4    All ship personnel may be requested to provide further personal information to the RCMP, and shall do so, immediately upon request.

8.5    All ship personnel may be required to undergo an RCMP security background check at any time.

8.6    It shall be the responsibility of the contractor to ensure the ship personnel list is accurate at all times.

8.7    It is understood and agreed by all parties, the ship and the ships personnel shall be drug free at all times.  Any violation with respect to drugs, or illegal activities, by any crew member while occupied by the ISU, shall result in the immediate removal from the ship at no cost to the RCMP or Canadian Armed Forces.

9.    **ENVIRONMENTAL**

9.1    The RCMP is committed to the principles of environmental protection and sustainable development and strives to integrate these principles into our business decisions and practices.  It is incumbent on the contractor to demonstrate they will deliver the requirements of this RFP and in particular this Statement of Work, in a manner which incorporates consideration of environmental impact and demonstrates due diligence in that regard.  Specific environmental protection strategies, including, but not limited to, solid waste reduction and management approaches, wastewater handling and disposal, energy supply and conservation, emissions reduction, and all environment concerns, should be cited within the Contractors proposal, and practiced as part of the Statement of Work.

9.2    It is understood the Contractor is committed will ensure that the Cruise ship line will provide excellent environmental strategies and practices and such will be held as a benchmark for environmental performance.  All environmental practices must meet and shall preferably exceed those consistent with the RCMP's (and all other federal government departments) commitment to sustainability and are also aligned with the sustainability of the 2010 Olympic and Paralympic Games.

9.3    <u>**There is no Shore Power available at Ballentyne Pier**</u>

9.4    While in port, all wastes (for example, solid, liquid, hazardous) must be disposed of at an approved land based facility.

9.5    **Wastewater:**   No discharges while in port.
       **Note:** As the ship will not be leaving the pier for five (5) to six (6) weeks, it is the responsibility of the cruise ship line to ensure disposal methods are adhered to and applicable Acts and regulations are followed.

9.6    **Graywater:**  No discharges while in port.

9.7    **Solid Waste:**   Garbage must be landed ashore (incinerators cannot be used while in

Port.

**9.8**   **Hazardous Waste**: Waste such as film processing waste, pharmaceuticals, batteries, dry-cleaning solvents, must be landed ashore and disposed of at approved facilities, in the approved method of the Government of Canada and the Province of British Columbia.

**9.9**   **Air Emissions**: As referenced, there is no shore power available at Ballentyne Pier. Cruise ship lines are required to adhere to Transport Canada Regulations of providing maximum sulpher content in fuel (bunker not greater than 3% and marine gas/oil not greater than 0.5%).

*For Reference the Contractor is encouraged to be familiar and adhere to the Pollution Prevention Guidelines for the Operation of Cruise Ships under Canadian Jurisdiction which may be located at www.tc.gc.ca/MarineSafety

**9.10**   **Fisheries Act**:   The federal Fisheries Act prohibits the deposit of deleterious substances in the waters frequented by fish irrespective of compliance with other relevant environmental Acts or Regulations.

**9.11**   **Regulations**: The Contractor and Cruise Ships must comply with ALL applicable Canadian Environmental Laws, policies, regulations and Acts.

**9.12**   The contractor must ensure there is an Environmental Emergency Response Program (EERP) to promptly address any environmental issues which may arise while in port. The EERP must be provided upon request of the Contracting Officer.

**9.13**   The Contractor shall provide to the ISU a post –service Environmental Performance report within thirty (30) days of the cruise ship leaving Ballentyne Pier.  The report should summarize information regarding liquid waste, solid waste, and air emission quantities generated, amount of material recycled, power consumption, successes of air emission reduction strategies and air quality offsets.

**10.**   **FUEL**

**10.1**   The type and grade of fuel used must be a low sulpher fuel.

**11.**   **INSURANCE**

**11.1**   The Contractor must provide proof of insurance which is valid and applicable and approved by Canadian Insurance carriers within 10 days of securing the vessels.

**11.2**   By September 01, 2008, the Contractor must provide documentation of permission from the Insurance carrier for the Cruise ship line for multi-ship inventory to be docked at one location for an extended period of time.

**12.    ROOM ASSIGNMENT**

**12.1**    Cabin assignments will be managed by the contractor acting on the direction of the ISU
Accommodation Director or their assignee. A passenger list shall be provided to the
contractor by the ISU at a minimum of one hundred and twenty (120)  days prior to
embarkment for the purposes of room assignment, and the contractor will then be
required to produce an initial room assignment list within seven days (7) for approval by
the ISU Accommodation Director or their assignee. Once room assignments have been
approved, the Contractor agrees not to make any changes to room assignments without
the approval of the Accommodation Director or assignee. The contractor shall
immediately inform the Accommodation Director or assignee if there are any requests for
changes to the room assignment by a passenger. The ISU reserve the right to change
room assignments at any time during the term of the contract.  It is understood there may
be changes to the initial list of passengers due to security reasons or personnel
availability or transportation problems from the members place of origin to the Games.

**12.2**    The Contractor shall provide a list of room assignments, ninety (90) days prior to
embarkment, based on the document provided by the ISU.  The Charterer shall
immediately inform the Accommodation Director if there are any requests for changes to
the room assignment by a passenger.  The Contractor agrees not to make any changes
to room assignments until approval is received by the Accommodation Director.

**13.    LUGGAGE AND DOCKSIDE SERVICES**

**13.1**    It is the responsibility of the contractor to arrange all applicable port and dockside
services with any agency that may have an interest or have business at Ballentyne pier.
This includes any person or group of persons who normally perform any duties during the
normal Port of Vancouver cruise ship season.

**14    LOCKERS AND OTHER FACILITY USEAGE**

**14.1**    The Contractor shall arrange with the Cruise ship provider to supply lockers or a separate
onboard room which shall be secured by the ISU.  The Contractor and the Cruise ship
provider agree that only identified ISU personnel shall have access to this area while the
vessels are berthed in the City of Vancouver.

**14.2**    The Contractor shall arrange with the Cruise Ship provider full uninhibited access to the
medical facilities and all medical equipment, twenty-four hours per day, seven (7) days
per week. The ISU shall provide medical staff licensed to practice medicine and who
have billing privileges in the Province of British Columbia to assess and treat any medical
issues with ISU personnel while the vessel is docked at Ballentyne Pier.

**14.3**    The Contractor and the ISU will coordinate the use of public spaces on board the
vessels.  Potential uses shall include equipment storage and areas to conduct briefings
or meetings.  The Contractor shall provide a minimum of one large theatre-style area for
briefings per vessel complete with a standard suite of audio-visual services, public
address system, video equipment and any other applicable electronic equipment as
requested by the ISU.

**14.4.**   The Contractor shall ensure that Cruise ship personnel who are technologically responsible for internet, television reception services, and telephones are on call and shall be available twenty-four hours per day, seven days per week at no additional cost.

**15.   PASSENGER SERVICES**

**15.1**   As this contract is for a Charterer to provide temporary accommodation using cruise ships, and while an acceptable level of in room housekeeping is required, it is expected the contractor shall arrange to instruct the cruise ship carrier to modify cabin and individual services from those services which are normally provided to cruise ship passengers. The purpose of providing a minimized level of service is to ensure costs are curtailed and stay within the budget allocated for this contract.

   - Once-daily cabin cleaning is required without turn-down service.

   - Individual room service is not required

**15.2**   The contractor shall ensure services such as live entertainment, casino operations, concierge services, decoration, coordinated sport events, or any service which is not available at a standard national hotel chain should not be provided.

**15.3**   Subject to such restrictions as the RCMP or ISU may impose at its discretion, on board services such as photography, gift and specialty shops, personal training, spa services, telephone and internet café services or other value-added services may be provided, but all costs associated with the provision of such services will be borne by the individuals.

**15.4**   **Charges for Individual Billing Services**: The contractor is expected to provide on-board account billing services for each individual, with charges to the account being settled directly between individuals and the Cruise Ship line.   No charges will be made to the RCMP or the ISU for individual services of any kind and further accepts no responsibility for settlement of individual accounts.

**15.4**   The contractor shall ensure the normal cost free amenities which are usually accessible to passengers should be available for use to the ISU personnel.

**15.5**   **Meal Services:**  ISU personnel will be employed on a variety of shifts around the clock so flexible meal services will be required on a 24 hour, 7 day per week basis. It shall be the responsibility of the Contractor to negotiate with the Cruise Ship lines meal plans which conform to the shifting schedules; the details will be forthcoming from the ISU to the Contractor on an ongoing basis throughout the term of the contract.   It is anticipated members will consume two and occasionally all meals on board daily.

**15.6**   The contractor shall offer a solution to providing meals to ISU personnel who are not passengers who wish to take their meals on board. The costs of the meals shall not exceed the Treasury Directive on Meals and Incidentals at the time of service provision.

**15.7**   The contractor agrees they shall negotiate with the cruise line, for the provision of additional meals for non-passenger ISU personnel. The non-passenger ISU personnel must have the ability to set up an individual account.   It is expected meals or other services could be charged to that account upon the individual signing for the meal or service.

**15.8**   The contractor shall ensure meals are made available to the passengers twenty-four hours per day, seven days per week.   It is imperative the meals provided are modestly presented, healthy and balanced.  The meals shall be served in a cafeteria or buffet-style setting.

**15.9    Beverage Services: Non-Alcoholic:**

The Contractor shall arrange for ready access to coffee, tea, juices and drinking water at no charge to the members twenty-four hours per day, 7 days per week.

**15.10   Beverage Services: Alcoholic:**

The Contractor shall ensure compliance with all regulatory and licensing requirements in the Province of British Columbia with respect to serving alcoholic beverages.  The RCMP and ISU shall not be responsible for the payment of any alcoholic beverages consumed by any member of the ISU.  The payment for alcoholic beverages must be paid by the individual on their account.

# Tab 1(d)

# Services for Charterer to Provide Vessel Accommodation for RCMP 2010 Integrated Security Unit

**Solicitation #** 2008 – 00147 - ISU

**Respondent**



### Your Cruise & Tour Vacation Headquarters Since 1992

4970 La Quinta Place, Victoria, British Columbia V8Y 3G9

Susan Edwards
Tracey Kelly
Michael Sloane

Submitted to:
Kelly Meikle
Vancouver 2010 ISU
11411 No. 5 Road
Richmond, BC V7A 4E8

Cruise Connections Contact: Susan Edwards
Contact: issumavik@shaw.ca  (250) 812. 2378
**Solicitation #** 2008 – 00147 - ISU

# TABLE OF CONTENTS

**PREVIEW** ...................................................................................................................**4**

    OPTION 1: .......................................................................................................4
    OPTION 2: .......................................................................................................4

**ONE SOURCE SOLUTION** .........................................................................**5**

**STATEMENT OF UNDERSTANDING**.........................................................**6**

**1.   CORPORATE OVERVIEW**.......................................................................**6**

    MANAGEMENT TEAM: ......................................................................................6

**2.   UNIQUE ATTRIBUTES** .........................................................................**7**

    BALLANTYNE PIER'S, PORT AGENT ON RECORD, IS OUR PARTNERS IN THIS BID. ...............9
    SUSTAINABLE BUSINESS PRACTISES .................................................................9
    EXTENSIVE CHARTER EXPERIENCE ...................................................................9
    PROJECT MANAGEMENT (METHODOLOGY) .........................................................10

**3.   OVERVIEW: REPLY TO PARTS 1 THROUGH 4, AND ALL ANNEX'S**.....**12**

**4.   OVERVIEW OF OFFERING** .......................................................................**14**

    OPTION 1: PRINCESS CRUISE LINES ...............................................................14
      *Benefits to Option 1:*.....................................................................................14
      *Challenges to Option 1:*.................................................................................14
    OPTION 2: HOLLAND AMERICA AND CARNIVAL CRUISE LINES...............................14
      *Benefits to Option 2:*.....................................................................................15
      *Challenges to Option 2:*.................................................................................15

**6.   OVERVIEW OF SHIP SECURITY PROTOCOLS** .......................................**18**

    EXISTING CRUISE SHIP SECURITY PROTOCOLS..................................................18

**7.   CLOSING** .................................................................................................**20**

**APPENDIX I**..............................................................................................**21**

    MANAGEMENT BIOGRAPHIES AND RESUMES ...................................................21
      *Susan Edwards, BRLS* ...................................................................................22
      *Tracey Kelly,* ................................................................................................26
      *Mike Sloane* ..................................................................................................30

**APPENDIX II**.............................................................................................**32**

    SUSTAINABLE BUSINESS PRACTISES ..............................................................32

**APPENDIX III**............................................................................................**37**

    SIMILAR SCOPE EVENTS AND REFERENCES .....................................................37
      *Cricket World Cup, West Indies, 2007* ............................................................38
      *NFL Superbowl: Jacksonville, Florida, 2006*....................................................42
      *XXVIII Olympiad, Athens, Greece, 2004*..........................................................44
    REFERENCES ..............................................................................................46
    CRICKET WORLD CUP, CARIBBEAN, 2007 ........................................................46
    SUPER-BOWL, JACKSONVILLE, FLORIDA, 2007 .................................................46

**PREVIEW**

In this reply, we have submitted all mandatory requirements for this Bid:

a) Bid Reply complying with all the Mandatory Vessel, Service and Security Requirements as identified in the RFP.
b) Required Certificates including a Letter of Credit in the amount of 10% of the Contract Value proving Financial capability of our company.
c) Rate Page as requested.

We have created 2 Options for your consideration.  Please refer to Appendix VII for full details.

**OPTION 1:**
2 Ships, no flexibility in dates, based on 5,276 passengers.
  $360.00  Per person Charter Hire per bed per day.
+  $ 45.00  Per person per day (estimate) Firm Price pass through Service Provider Costs, Taxes (GST$0.50 per person per day) – invoices will be given directly to RCMP for payment based on actuals in 2010.

**OPTION 2:**
3 Ships, maximum flexibility in dates, based on 5,362 passengers.
  $288.00  Per person Charter Hire per bed per day.
+  $ 43.00 Per person per day (estimate) Firm Price pass through Service Provider Costs, Taxes (GST $0.50 per person per day) – invoices will be given directly to RCMP for payment based on actuals in 2010.

**NOTE:**
Option 2, represents **a savings of: $15,768,864.00 CAD** (Charter Hire Cost)
Option 2, represents **a savings of: $    375,340.00 CAD** (Service Provider Est.)

4

Our company:

# ONE SOURCE SOLUTION

- We have provided within this reply a unique and comprehensive strategy that manages all components necessary for a successful ISU temporary accommodation program.
- Our team brings together experts in all aspects of Charter Management (Expert Negotiators, In house Port Agent, Operations and Customer Service Specialists, Ground Services, Environmental Compliance Team, Accountants, Legal Team).
- Built into all of our programs are expert onboard Operations and Service Staff who will liaise (RCMP and Ship Staff) to ensure that all services are provided as agreed to in the Contract.
- We have, in an exclusive partnership, the Port Agent on record for Ballantyne Pier, Stan Webber, President of Quay Cruises.
- Stan has his physical offices at the Pier and is well respected in his field.
- Stan's role will be to complete all negotiations for all the necessary Ground services with the Service Providers he already does business with such as grey water, black water, bunkering, stevedoring, etc.
- The unique advantage by having this working (exclusive) relationship with the Official Port Agent for Ballantyne is that we can provide best service at best NET rates.
- In addition, the access point (offices located within Ballantyne Terminal) provides for immediate response to any related issues that arise regarding the vessels, the Port and Ground Services.
- We have our own Ground Operator (Gateway Guest Services – staff of 80) who will handle the Embark and Debark process.
- We have established a positive working relationship with the following Government Agencies, Business or NGO Agencies; Transport Canada, Canadian Border Services, VFPA, RCMP and the ISU, CERES, Northwest Cruise Line Association.

5

## Statement of Understanding

The Royal Canadian Mounted Police (RCMP) has been assigned the responsibility to plan and manage policing, security operation and services for the protection of the Vancouver 2010 Olympic and Paralympics Games.  In order to fulfill this task, the RCMP requires the deployment of vessels to the Vancouver area in order to provide temporary accommodation of security force personnel for the period of the games.  Specifically, the RCMP Vancouver 2010 Integrated Security Unity (ISU) intends to charter vessels for its exclusive use for approximately five to six weeks during the period January 2010 to March 2010.

Approximately 5,000 beds are required, with approximately 2,500 being needed for the period January 23, 2010 to March 4, 2010 and approximately 2,500 additional beds for the period January 31, 2010 to March 2, 2010.

The greatest concern (consistently identified in the RFP), in offering this type of temporary accommodation is first the lowest rate and then the confirmation and guarantees that that ships will arrive in Port, on time.

Additional consistent themes throughout the RFP are the unique operational needs that are mandatory for this Charter and the specific security requirements associated with the ISU's Mandate.

We believe that we understand the nature and nuances of the project and seek to fulfill the ISU's needs by providing Chartered Cruise Ships for the 2010 Olympic Games in Vancouver.


## 1.     Corporate Overview

Management Team:
(Biographies and resumes available in **Appendix I**)

> **Susan Edwards,** VP Operations, Project Manager
> **Tracey Kelly,** VP Sales and Marketing, Port and Ship Negotiations
> **Michael Sloane,** VP Administration

- Our Management Team have a combined experience of nearly 100 **years in the Travel and Hospitality Industry.**
- Our Management Team has been in the Charter Ship business since 1986, and has specific expertise in providing Charter Cruise Ships.
- With over **60 Cruise Ship Charters to our record, we have the most experience in a full range of clientele, including** some very recent

6

and relevant charters for similar events to the proposed 2010 Olympics (see the below Ship Charters).

- Ships at the Athens Olympics (collective 84 days of Charter Ships)
- Ships at the NFL Super Bowl, Jacksonville, FL. (collective 14 days of Charter Ships)
- 1 Ship Cricket World Cup (collective 30 days of Charter Ship)
- We believe that **being local to Vancouver and the ISU offices, having a physical Operations Office at Ballantyne Pier**, providing immediate accessibility, ease of in-person communications, regularly scheduled or on-demand meetings at the ISU facilities which will all enable us to provide the ISU  with a successful program.
- The Charter Management Team has a stellar record of successful Charters. Mike Sloane **has Chartered 10 Ships within the last 48 months** alone, where they have negotiated best prices, and managed the program from start to finish, insuring that their client's Needs and Expectations are met.
- The Charter Management Team believes in clear, concise, and timely communications with their Client.
- The Charter Management Team is experienced in both Cruise Ship Chartering and is a Specialist in Group Travel.
- The Charter Management Team has the experience, knowledge and infrastructure to fulfil the specific needs of any large group / charter opportunity.  We have a successful track record working with Governments, Corporations, and Organizing Committees.  We understand the complexities of projects and the expectations of a client in order to fulfill all contractual obligations successfully on time and on budget.

## 2.    Unique Attributes

Our Charter Management Team is uniquely qualified to help the RCMP be successful for the following reasons:

**Unique knowledge and relationships in the cruise industry**

- We have Tracey Kelly on our team, past VP of Sales for Holland America Line and Carnival Cruise Lines.  Experienced in negotiating with Cruise Lines, Governments, Legal and Environmental agencies, and the Private sector, for best values in price, services, and terms of contract.  Over 60 charters to his credit in destinations around the world, with clients as diverse as World Olympic Committee (Athens, Greece), Super bowl Committee (Jacksonville, FL), to Russian business consortia.  Mr. Kelly applies his skill set to negotiating all contracts with Vancouver Ports,

7

Ground Services, Port Security (working with Transport Canada), and all Cruise Lines.
- Have contracted Ballantyne Pier's in house Port Agent, Quay Cruises, to meet all Port requirements. Our Port Agent has offices at Ballantyne Pier and is therefore immediately accessible for any and all needs.

- Local (Vancouver based) Strategic Alliance Partners illustrate substantial depth of expertise and experience to meet and exceed the RCMP needs. Example Tymac Services who will be responsible for all Grey Water, Black Water, Recycling and Garbage removal. For a listing of Strategic Alliance Partners, see attached Appendix IV.
- Guaranteed delivery of ships on time.
- Negotiated with 5 Cruise Lines to provide best value including negotiated with 2 cruise lines to bring ships from the Mediterranean/Caribbean to the Pacific at the Cruise Line's expense.

**Unique Operational knowledge and experiences to meet all the ISU's needs**

- Have Susan Edwards on our Team running Operations. Trained by the United Nations in Project Operations, Security Planning and married to a Police Officer, the Operations VP Susan Edwards has a unique command of both the ISU's needs and an expert level of knowledge of the Cruise Charter Industry.
- This combination in an Operations VP, offers an unprecedented level of comprehension, expertise and confidence that the unique needs of the ISU are understood and will be met.
- The Operations VP, initially contacted Mr. Tom Haworth, RCMP in 2005, to offer her services. We have been thoroughly researching the needs of this program since then, confirming again our long term, and steady commitment to these Charters.
- We believe that being local to Vancouver and the ISU offices, having a physical Operations Office at Ballantyne Pier, providing immediate accessibility, ease of in-person communications, regularly scheduled or on-demand meetings at the ISU facilities which will all enable us to provide the ISU a successful program.

**Unique Ship Charter Administration expertise and experiences to support the ISU.**

- Michael Sloane has successfully Chartered over **10 Full Ship Charters in 40 months,** his expertise in meeting the administration needs of several simultaneous Charters is renown in the Industry.

8

- Michael has also developed the first Full Ship Charter software program that allows the Corporations who are Chartering the ship to remotely access the ship inventory and assign staterooms 24/7 on demand.
- Although the assignment of the ISU's staterooms will be in-house, Michael's expertise and availability to assist in providing substantial depth of administration support to the ISU is unrivalled in the Industry.

**Ballantyne Pier's, Port Agent on Record, is our Partners in this bid.**

- This is an Exclusive agreement between our companies.
- Stan Webber, President of Quay Cruises, is the Port Agent on record for Ballantyne Pier.
- Stan has his physical offices at the Pier and is well respected in his field.
- Stan's role will be to complete all negotiations for all the necessary Ground services with the Service Providers he already does business with such as Grey Water, Black Water, bunkering, stevedoring, etc.
- The unique advantage by having this working (exclusive) relationship with the Official Port Agent for Ballantyne is that we can provide best service at best rates.  Greatest value to the ISU.
- In addition, the access point (offices located within Ballantyne Terminal) provides for immediate response to any related issues that arise regarding the vessels, the Port and Ground Services.

**Sustainable Business Practises**

- As this is a 'Green' Olympic Games, it is a requirement that we, as a Management Company have, abide by, and actively seek ways to improve our Sustainable Business Practises.
- As a Management Group, it *is* our mandate to protect the environment and to follow the principles of sustainable development.  This is not only a policy, but a culture that is fostered and supported daily as an integral part of our business.
- Please see our complete Sustainable Business Practises Policy and specific Program Details in **Appendix II.**

**Extensive Charter Experience**

- Corporate history includes over 60 Charters.
- Corporate history includes many Similar Scope Charters (see Appendix III)

9

## Project Management (Methodology)

The following methods are employed in our Charter Management Model:

PRIOR:

- Identify Key Personnel, Profession, Technical, Support, and gain contracts for the duration of the project.
- Meet with Key Personnel, identifying strengths and build up the Team
- Identify Key Elements of the project and set on Timeline.
- Match Key Elements with Personnel, outline job descriptions, responsibilities.
- Create Organization Chart
- Create and advise Communication lines and Reporting Protocols.
- Schedule Regular meetings, by Project Overview, Technical requirements, Support requirements, Liaison Meetings with all Strategic Partners, including continuing with all appropriate Government Agencies.
- Add in all activities to the Timeline, identifying who is responsible for what task and deadlines to completion.
- Feedback meetings to occur as scheduled, or as necessary.
- Partners meeting once a week.
- Meetings schedule will increase as Charter date gets closer.

During Event:

- Operations staff will escort the ship up to Vancouver and complete all preliminary inspections, note any issues and report upon arrival.
- 48 hours before Ship arrival, Operations meeting for final review of program.
- Accommodation Manager, Donna Kaluza and or her appointee(s), to early board and inspect the ship on embarkation day.
- VP Operations will be onsite everyday.
- Our Port Agent will be onsite everyday.
- In house Operational meetings will be held daily.
- Operational meetings with Cruise Line Hotel Manager and staff held daily at 7:30am.
- Operational meetings with ISU held daily.
- Direct Operational Supervision of all activities, onboard and pier side will occur with, on behalf of, and on the direction of the ISU.
- Operations Supervisor will liaise with all Government bodies during any inspections.

10

Post Event

- First Post Mortem held within 7 days for initial review with Key Personnel.
- ISU invited to attend.
- Key Personnel to write and submit their department's review.
- All Reviews are due in writing by March 31, 2010.
- A copy of this review (including the Environmental Report as requested in Annex A, 9.13) will be provided to the ISU.

In having this Project Management strategy in place, it has been our experience that we do control the quality of this project, that challenges to the Client are mitigated and a successful execution of the program is assured.

11

## 3.    Overview: Reply to Parts 1 through 4, and all Annex's

**PURPOSE:**

Our purpose and commitment to the ISU is to be the best business partner, to abide by the primary focus of lowest possible rate with all Services required, to create the best experience for every member of the ISU, to offer our leadership and expertise in a very unique sector of the Cruise Industry.

**We will meet or exceed all the Operational and Security needs of the ISU and provide a Cruise Ships at the <u>lowest possible rate.</u>**

We agree with and/or support the intent of every clause in the Statement of Work as required.  We have identified those Clauses that are, in our interpretation, in conflict with the primary focus of this RFP, which is to deliver the lowest daily cost per bed with all required Operational and Service levels met.

To the Clauses that we support the intent of, but do interpret them as conflicting to the primary focus, **we have offered alternatives that are consistent with the Charter Cruise Ship Industry** and that also illustrate our commitment to providing the lowest price per bed with all required Services on the most appropriate ship.

Please refer to **Appendix VI**, Statement of Work.

**Example**: Clause:, Part 4.6, and Annex A, 4.1, To meet the financial requirements as outlined in the RFP, this would require approximately 100 million dollars of available funds. Simple Interest on those funds at 15% would add 30,000,000 to the ISU's Cost.  Or, put another way, this Interest alone would increase the base Bid rate by $171.43 per person per day (just to cover the interest).

As the stated goal of this RFP is to achieve the lowest possible rate with all Operational and Services requirements met, when faced with Clauses that are not consistent with the Charter Cruise Ship Industry and that will provide significant additional costs to the ISU's costs which we interpret to be in conflict with the primary focus of this RFP, we will support the intent of the Clause and offer alternative strategies to ensure the successful execution of the ISU Charters..

**Strategy**:  Clause:, Part 4.6, and Annex A, 4.1.  In addition to irrevocable contractual agreements with the Cruise lines we will also establish a separate Trust for Receivership Fund to add further security on both the payments made

12

by the ISU and the payments received by the Cruise Lines as per the Charter Cruise Ship Industry standards and practices, and this meets the focus of not creating additional costs to the ISU as outlined above ($171.43) as we interpret these added costs to be in conflict with the lowest rate requirement.

We look forward to discussing these Clauses during negotiations so that we may further understand the ISU's intent, why the Clause was included, and come to a solution regarding each Clause consistent with the Charter Cruise Ship Industry and ISU lowest cost focus that would enable our purpose and commitment to be fulfilled and the ISU to secure the temporary accommodation as required.

# 4.   Overview of Offering

In our effort to meet or exceed any anticipated needs of the ISU in accordance with the Statement of Understanding, we offer the following options for the ISU's consideration.

Please Note:  All Ships involved in the below Options all meet the minimum standard requirements in terms of Quality of Vessel and Passenger Service as outlined in the Statement of Work.  Please refer to **Appendix VI**, for specific details.

**OPTION 1:  Princess Cruise Lines**

Princess Cruise Lines: 2,598 + 2,678 = 5,276 passengers (double occupancy). This meets the 5,000 approximate passenger capacity requirement with 276 additional spaces to utilize as per the ship configurations – (Clause 2.3, Annex A: Statement of Work).

Princess Cruise Lines has a successful history in Chartering Ships.  They are the 3rd largest Charterer in the Industry.

**Benefits to Option 1:**
- Meets the required # of passengers easily.
- New, glitz and glass type ships.

**Challenges to Option 1:**
- Rate is high compared to Option 2.
- Love Boat reputation might impact the ISU through PR – The RCMP "LOVE BOAT"
- New, glitz and glass type ships.  It is more difficult to 'adjust the ship services' to the level requested in the Statement of Work (Ship quality that of National Budget Hotel Chain).
- **The dates of Option 1 cannot be altered in any way**.  Princess Cruise Lines advises that there can be no extensions or date changes. **(Refer to Pt. 5 Mandatory Criteria Evaluation)**

**OPTION 2: Holland America and Carnival Cruise Lines**

| | | |
|---|---|---|
| Holland America ship with a capacity of - | | 1,258 passengers |
| Carnival has 2 ships with capacity of 2052 x 2 | = | 4,104 passengers |
| Total Capacity | = | 5,362 passengers |

14

This meets the approximate 5,000 passenger capacity requirement with 362 additional spaces to utilize as per the ship configurations (Clause 2.3, Annex A: Statement of Work)

Holland America Line is the #1 Ship Charterer in the world with Carnival Cruise Lines as the #2 Ship Charterer.  Both companies have large dedicated Charter Operation Teams which we have experience working with.  Their Charter departments are renowned for their ability to meet all issues, deadlines and to find solutions more efficiently and effectively than any other Cruise Lines.

**Benefits to Option 2:**

- Rate is lower that Option A (by over $15,000,000.00 CAD)
- With 3 ships there is **maximum opportunity for flexibility** re the start and end dates. **(Refer to Pt. 5 Mandatory Criteria Evaluation)**
- With 3 ships there is now the option to have the most adaptable Accommodation Program for the ISU.
- With the 2 different Cruise Lines, ISU has the ability to assign members and VIP's to the most appropriate vessel.
- The Carnival Ships are very easy to 'adjust the ship services' to the level requested in the Statement of Work' (Ship quality that of National Budget Hotel Chain).
- Carnival Ships were used by the US Government to house troops and FIFA workers for 8 months in New Orleans.
- The Holland America ship is smaller and can be adjusted to the service level required, but yet still retain 1 or more decks for VIP's with elevated service levels if necessary or required.
- All 3 ships fit at Ballantyne, 2 at the North Berth and 1 at the East Berth. This has been confirmed and has been previously executed.

**Challenges to Option 2:**

- Carnival's ad campaign "Fun ship's" may impact the RCMP; however, Carnival targets and carries more families and senior citizens than any other Cruise Line.  There has been a precedent set for troops and rescue workers using the Carnival Ships for Government temporary housing. From a public relations point of view, Carnival will not be seen as a luxury type product the way Option A might. A press junket onboard may prove the reduced onboard services at the required level are being met, so that we deem this challenge minimal.

15

**Notes:**

- Because we are working directly with the Port Agent of Ballantyne Pier, we were able to keep our Service Costs at Net.  This is illustrated in our Rates Page. Basis of Payment Appendix VII.
- Projected **savings to the ISU over $300,000.00 CAD.**

16

## 5.   Overview Cruise Line Contract Process / Delivery of Ship Guarantees

In the RFP, a common theme is the concern that the temporary housing will, for some reason, not show up, and it seems as if the staggering financial obligations have been placed in this RFP to address that possibility.

In the Cruise Line Charter Industry, contracts are extremely thorough, and they are the same contracts that have been used for many decades with very few changes made.  That is because these contracts work.  The contracts clearly lay out all possible scenarios and possibilities to ensuring that the Chartered Ship shows up to where it is supposed to be.  In addition to clearly outlining all possibilities and scenarios, the Charter Party Agreement (CPA) also indicates clear solutions.

In addition to the stringent contractual agreements outlining what would be done in a worst case scenario, if we are correct in assuming that this a driving and significant concern, then during Contract Negotiations, it would be our responsibility to negotiate in turn with the Cruise Line to add in any specific Clauses that the ISU may wish to have included in the CPA on this issue.  The CPA is a live document, and together, the Management Team and the ISU can work together to meet all issues.

Never in the history of modern day Ship Chartering, has a ship not shown up at the right place at the appointed time.  Even if there were a significant event, there are too many back up protocols in place that would ensure that ship would arrive as agreed.

Exclusive to our negotiations is the additional 100% penalty Clause that will placed against the Cruise Lines with regard to the unlikely possibility of delay or change of equipment.

17

**REDACTED**

## 7.   CLOSING

We are excited to be able to respond to this RFP.  We feel most strongly that with our combined and extensive expertise and experience in the Charter Industry that we will meet and exceed all the needs of the ISU. All of our extensive experiences and skill set enable us to ensure that all Security and Operational requirements will be identified and achieved.

Our Statement of Understanding underscores our total command and scope of the project. We have specifically identified major concerns surrounding this type of project and offered proven (cost effective) solutions.

We believe that being local to Vancouver and the ISU offices, having a physical Operations Office at Ballantyne Pier, providing immediate accessibility, ease of in-person communications, regularly scheduled or on-demand meetings at the ISU facilities which will all enable us to provide the ISU a successful program.

That while we are addressing the components of the program, timelines, rates, operational requirements, our commitment is also to create the best program/ experience for the serving members of the ISU.

Thank you for the opportunity to submit to this RFP.

We understand the entirety of this project.

We do deliver.


Sincerely,



Susan Edwards
Tracey Kelly
Michael Sloane

# Appendix I

# Management Biographies and Resumes

### Susan Edwards, BRLS
### VP, Operations
### Project Manager

Susan, based in Canada, is a Project Manager, Team Leader, Event Specialist and an Administrative Law Tribunal Member and Member Chair. Examples of Susan's project management, team leader credits include the: Cricket World Cup, 2007; Special Olympics, Ontario; District Sport Events; Hamilton Ti-Cats accommodation director at Brock University; Arts Festivals and has credit for over 100 major cruise ship groups/Charters.

Susan is a respected and often requested OperationsTeam Leader for the United Nations, working in countries emerging from Civil War specializing in Projects that include major events (ie. elections). Her communication, mediation skills and enhanced security logistics skills, coupled with Project Management expertise make her an extraordinary asset.  Susan was the youngest appointed Team Leader in the UN with her area of responsibility covering all of Europe, Russia, Eastern Bloc Nations, North Africa, Great Britain, and the near Middle East (UNAMET).

Susan began her 2010 Games involvement by proof-reading for the City of Vancouver the Bid drafts in October, 2002. She was in BC Place for the announcement, and has one of the official Olympic Flags that were given to Vancouver when the bid was announced.   Correspondence with VANOC and the ISU began with regard to the fact that Susan could do more for the Games by working with VANOC and their Sponsor Partners by providing additional accommodation by Chartering ships for the Games in 2005.

Susan recently Chartered a Luxury Ship for the Cricket World Cup (30 collective days) which was held in the Caribbean in 2007.


Susan Edwards

22

# Susan Edwards, BRLS
## Certified Mediator, Alternative Dispute Resolution
4970 La Quinta Place, Victoria, BC, V8Y 3G9
ph: 250 598 2526   cell: 250 812.2378
issumavik@shaw.ca

## PROFILE

Extensive Project Management and Public Service background including 25 years in the Travel Industry.

Expertise in:

- Operational Needs Assessments
- Logistics Assessments
- Operations Program Implementation
- Assessment of Facts, Analysis, Applications and Implementation.
- Communication, oral, written
- Mediation, Negotiation

Ms. Edwards has formal Alternative Dispute Resolution (ADR), Mediation and Negotiation education and has been trained and worked for the United Nations and the International Organization of Migration – IOM in Logistics and Operations.

- Travel Industry leadership culminating in becoming Canada's first, and currently Canada's only, female full Ship Charterer.

Combine these applicable skill developments and work experiences with:

- strong initiative,
- exceptional organizational skills,
- integrity, energy, patience

Ms. Edwards has spent many years combining all her skills and experience to become an internationally respected, exceptional Operations Project Manager.

23

## SELECTED WORK EXPERIENCES

1.  Cricket World Cup, Cruise Ship Charter, Holland America Line, 2007 over 650,000 people attended this world class event.  Ms. Edwards was responsible for: Budgeting, Contract Negotiations; Ship to End User Negotiations prior to Charter commencement; all Ship Side Operations; all Ship Side Logistics prior, during to completion; liaison between Ship, End User, Governing Body (International Cricket Council and Cricket Logistics) to meet all logistical and operational needs, ensured that all End-User needs, issues and concerns were addressed and a solution created and implemented.

2.  Over 100 groups and cruise groups, various cruise lines.
Susan was responsible for all Operational, logistics strategies through to implementation, execution and post mortem.

3.  United Nations Mission East Timor (UNAMET), International Organization of Migration (IOM). Team Leader / Logistics Chief / District Electoral Officer / Tribunal Policy Interpretation and Implementation/ Personnel Officer / Trainer Duty Posting: Lisbon, Portugal, was Team Leader, Logistics Chief for all of Europe, Russia, Baltic States, North Africa, Scandinavia, and the British Isles.

The United Nations criteria for the Popular Consultation in East Timor were being created as it was being implemented.  Responsible for:
*   Ongoing, simultaneous problem solving for all international staff;
*   Interpreting newly created policies using administrative principles, financial administration and human resource management in this democratic project;
*   clear written and oral communication with all interest groups from an illiterate person to Ambassadors of their respective countries;
*   successful adaptability, flexibility and problem solving were a substantial part of each day in this project;
*   designed and directed the polling day Operations Plan specific to the needs of the Lisbon Centre which enabled the voters the opportunity to attend to the polling stations in a safe and efficient manner;
*   created the evacuation plan for all Canadian and Commonwealth Nationals in UNAMET;
*   reporting to the Country Representative, UNAMET/ UN officials in Australia and New York, the Australian Embassy Aide to UNAMET and the Canadian Ambassador to Portugal;
*   UNAMET, Portugal did have an incident involving a near riot with weapons.  Ms. Edwards had the responsibility of maintaining the peace and successfully used available resources to do so.
*   Ms. Edwards has been requested many additional times by UN, but thus far, unable to accept due to family commitments.

24

## EDUCATION

Administrative Law Tribunal Council of British Columbia, Certificate: Decision Writing, Vancouver City College, 2006

Certificate in Advanced Alternative Dispute Resolution, Mediation, and Negotiation, University of Windsor Law School 1999

Certificate in Alternative Dispute Resolution, Mediation and Negotiation, University of Windsor Law School, 1998

Bachelor of Recreation and Leisure Studies (BRLS): Major in Large Event Organization, Operations / Public Administration, Brock University, 1981-1985.

## UPDATE

Currently, Susan divides her time as a full time Project Manager for Ship Charters around the world and continues her Public Service, sitting in her 6th year, as an Administrative Law Tribunal Panel Member and Chair for the Employment and Assistance Tribunal of British Columbia.

25

**Tracey Kelly,**
**VP Sales and Marketing**
**Contract Negotiations**

Mr. Kelly with more than 25 years of experience in the Cruise and Tour Industry has managed a 200 plus person sales force, with sales offices in the USA, UK, Holland, and Australia.  He was responsible for Global sales and client relations. In his capacities, he has negotiated multi-million dollar contracts with Corporations, Special Event Committees, and Government Agencies.

Mr. Kelly has to his credit has over 60 Ship Charter Contracts worth in excess of $300 million dollars.  Under Mr. Kelly's leadership Holland America Line grew their sales from $600 million annually to $1.3 Billion annually.  Of particular note, was that Holland America Line grew to be the largest Charter Line within the Carnival Corporation (made up of 7 different Cruise Lines).  Mr. Kelly personally oversaw the Ship Charters for the Athens Olympic Games, the NFL Super Bowl (in Jacksonville, FL.), and the Cricket World Cup.

In addition, Mr. Kelly has worked to develop International Tourism, opening offices in Europe, Australia, and the Orient.  Mr. Kelly's professional experience and expertise includes contract negotiations, ship operations, ground services, client/customer communications, world-wide sales and marketing.

Mr. Kelly is a nationally ranked spokesperson and recognized expert in the Cruise Industry.  Mr. Kelly provides unique qualifications to the Management Team.

Tracey Kelly

26

# TRACEY F. KELLY

4721 West Emerson Street, Seattle, WA 98199-1819
Phone: (206) 283-2686   Cell: (206) 658-3334
tracey4721@comcast.net

### VP SALES • VP MARKETING • VP OPERATIONS
Career is distinguished by outstanding performance in developing sales,
strategies, organization, and operations to achieve goals of profitability, yield
management, acquisition costs, and market share.

## PROFILE

Disciplined, organized and high-energy Executive is a proven leader bringing
business acumen and an outstanding record of achievements developed over a
dynamic 20-year career in Sales, Marketing, and Operations in the highly
competitive cruise industry.   A strong orientation in sales and the use of
Internet/technology provided Company growth both physically and fiscally. Strong
and adaptive leadership style with a focus on the importance of communication,
team-building, cooperation, and participation. Acknowledged for successes in
building business and delivered sustained profitability in challenging economic
conditions.

## CAREER DISTINCTIONS

- Increased sales from $800 million to $1.5 billion over a four-year period.
- Created and implemented new sales force structure that increased market
  penetration, improved performance and reduced acquisition costs.
- Developed International Sales, price strategies by country/market (AU, UK,
  EU, etc), sales offices (RO and UK), marketing and brand campaign.
- Effectively managed and motivated a sales force of over 200 sales managers.
  Responsible for all aspects of sales generation: Consumer direct programs,
  Onboard sales programs, Field Sales, Charter and Incentive sales, National
  Account Sales, and International Sales.
- Responsible for developing and managing multi million dollar operating
  budgets to guideline.   Budgets managed to highest productivity and cost
  management.
- Achieved best individual company performance metric of a seven-company
  corporation.

27

## PROFESSIONAL EXPERIENCE

Holland America Line; Seattle, WA                              10/2003 to 9/2007

### Vice President of Sales

Responsible for all aspects of the development, implementation and management of a world-wide sales strategy.  Created new sales divisions to better sales results and lower costs including Consumer Programs (direct guest sales) and Onboard Sales Consultants (direct guest sales).  Re-organized field sales team to better penetrate marketplace and reduce costs.  Opened international sales offices and expanded market-share. Negotiated contracts with National Accounts to better performance and reduce acquisition costs, stimulated new charter sales to the highest company records.  Re-designed contracts for National Accounts and C&I Business to reduce potential liabilities for Company.  Managed all cost implications of sales contracts and operating budgets, with a focus to expand sales and contain/reduce acquisition costs.  Created team approach to re-write pricing strategies in order to increase yield and reduce liabilities. Built strong partnership relations with National Accounts, Charter clients, and international marketing/sales partners.  Turned the Company's poorest performing team into the Company's highest performing team in four years.  Featured speaker at national forums for the travel agency community.

Carnival Cruise Lines; Miami, FL                              10/1993 to 10/2003

### Regional Vice President of Sales (1998 to 2003)
### Director of Sales (1993 to 1998)

Managed and developed a regional sales team for Carnival Cruise Lines. Recognized as the highest performing team eight years in a row.  Achieved market-share growth in a time of unprecedented Ship Builds. From 1993 to 2003 Carnival's capacity grew eight-fold.  Responsible for sales and operating budgets for a nine-state region.  Served as a featured speaker and trainer at the Carnival National Sales meetings.  Received outstanding performance reviews every year. Recognized as a top performer by Carnival Corporation's Chairman Micky Arison.

Holland America Line; Seattle, WA                              5/1988 to 10/1993

### Manager Sales and Service (1989 to 1993)
### Manager Tele-Account Sales (1988 to 1989)

Developed and implemented a new sales department (Tele-Account Sales) aimed at non-producing agencies, achieved $180 million in sales in the first year

28

(against a goal of $80 million).  Developed and implemented the first LAN system on West Coast. Holland America Line was purchased by Carnival Corporation in 1989 and my position became the pivotal point between the sales teams of Holland America and Carnival Cruises. Managed and developed sales strategies for both teams.  Featured speaker/trainer at the National Sales meetings for both companies.

Princess Tours; Seattle, WA                                                 1985 to 1988

### Manager Reservations (1985 to 1988)

Managed Call Centers for Reservations (FIT and Group), implemented new booking system, and provided oversight responsibility for the acquisition and consolidation of Tour Alaska into Princess Tours.

### EDUCATION / CERTIFICATION

- B.A., Psychology/Marketing – University of Washington
- CTC Certification – Institute of Certified Travel Agents

### AFFILIATIONS

- Board Member – American Diabetes Association (2006 to Present)
- Board Member – American Academy of Hospitality and Travel (2005 to Present)
- Youth Sports Coach – CYO Sports (1999 to Present)

29

## Mike Sloane
## VP, Administration

Cruise Connections was founded in 1992 by Mike Sloane. The business, based in Winston Salem, North Carolina has agents operating coast-to-coast within the continental United States.

Cruise Connections is dedicated exclusively to cruise/land package sales and counselling, and is dedicated to ongoing training to bring to the marketplace the latest in the cruise industry development.  Our overall objective is to provide quality, professional consultation, and planning services for individuals, corporations, associations, and incentive and vacation groups.

In the past 5 years Cruise Connections has focused primarily on full ship charters and large groups and has proved that Cruise Connections is a true leader in that aspect of the industry.

Cruise Connections has received numerous awards including:  Carnival Cruise Line "The Winner's Circle Club" award every year since 1995; "National Account" status with Carnival, Royal Caribbean, and Celebrity Cruise Lines and Carnival Cruise Line "Pinnacle Club" award just to mention a few.  Cruise Connections is also a member of CLIA, IATA and Vacation.com and Mr Sloane is a member of the Advisory Board of Directors for Vacation.Com.


Mike Sloane

30

**Michael Townsend Sloane**
1054 Keswick Lane
Clemmons, N.C. 27012

**1991-Present     President Cruise Connections, Inc.     Winston Salem, N.C.**

Retail travel agency operating in 34 states.  Ship charter division headquartered in Winston Salem.  Cruise Connections began in a basement with two people and today is one of the premier travel agencies in the country.

Cruise connections has been at the forefront of the cruise ship business during the height of its growth period.  For the past four years Michael Sloane has served on the Advisory Board of Directors for Vacation.com, the largest consortium of travel agents in the world.

Cruise Connections has chartered ten (10) ships in the past four years from Carnival Cruise Lines and one ship from Royal Caribbean Lines.  Has one ship currently under charter and is negotiating one more.

Cruise Connections has handled seminars at sea for World Book Encyclopaedia and has managed conventions at sea for Kiwanis International, Rotary International, Southern Baptist (California) and numerous marketing groups. Cruise Connections group business has included such diverse groups as 1,200 software writers from India.

**1981-1991  Executive Vice-President Forest Hills Lumber & Building Supply**

Managed family owned business for ten years.  Company located in Winston Salem, N.C.

**1968-1980     President Kennedy & Sloane, Inc. d/b/a Fabric Discount Stores**

Manufacture of bedspreads, draperies, and soft goods.  It was through Kennedy & Sloane that Michael was introduced to the cruise ship industry.  Kennedy and Sloane did extensive interior renovations on Song of Norway, Nordic Prince, and Sun Viking all owned by Royal Caribbean Cruise Lines.  For Costa Cruise ships the Flavia was renovated.  For NCL the SS France was completed and then had a name change to The Norway.

31

# Appendix II

# Sustainable
# Business Practises

32

# SUSTAINABLE BUSINESS

As a Management Group, it is our mandate to protect the environment and to follow the principles of sustainable development.  This is not only a policy, but a culture that is fostered and supported daily as an integral part of our business.

Corporate Social Responsibility (CRS) is a company's commitment to operating in an economically, socially and environmentally sustainable manner whilst balancing the interests of diverse stakeholders.

**We support the principles of sustainable development in the following ways:**

<u>Environmentally Sustainable</u>

The Cruise Lines we support are required to be:

ISO14001 Certificate Holders and accountable country members of MARPOL and of the MARPOL Annexes.

## 1. ISO 14001
International standard from the International Organization for Standardization "Environmental management systems - Specification with guidance for use." Details the required elements for an environmental management system, following five EMS principles: commitment and policy, planning, implementation, measurement and evaluation, and review and improvement.

## 2. The **International Convention for the Prevention of Pollution from Ships,** commonly known as the **MARPOL Convention:**

MARPOL is one of the most important international marine environmental conventions.  It was designed to minimize pollution of the seas including dumping, oil and exhaust pollution.  Its stated objective is: to preserve the marine environment through the complete elimination of pollution by oil and other harmful substances and the minimization of accidental discharge of such substances.

Annex I – Oil, Annex II – Noxious Liquid Substances carried in Bulk, Annex III – Harmful Substances carried in Packaged Form, Annex IV – Sewage, Annex V – Garbage, Annex VI – Air Pollution

- Each ship that we use will have a full time Environment Officer onboard the vessel, whose sole purpose is to ensure compliance with national and international Cruise Line Environmental laws and policies.

33

- Environment Officers also provide Leadership in determining, for each individual ship, the best possible combination of Sustainable Practices.
- Environment Officers analyze and inspect onboard power consumption and advise and/or direct appropriate changes to reduce power consumption in every department.
- External and internal audits and inspections are conducted regularly and environment checks are conducted and reported to the Captain and Cruise Line Head Offices daily.
- Crews are trained in how to reduce power consumption, be aware of energy tapping sources, and report any concerns or environmental issues.
- Crews are awarded for their 'reusing, reducing, recycling' ideas and practices.
- Monthly crew meetings are held to ensure that everyone understands how to comply with the strict procedures, updates to procedures and legislation and to come up with additional ideas.
- Towels and bed linens are now changed every second day.  This reduction in laundry has made a significant reduction in water, electricity, detergent, and grey water waste.
- No Styrofoam is used in any circumstances.
- Elimination of wasteful packaging of condiments.
- Use of cloth napkins.
- Housekeeping policies to turn off lights in rooms not in use.
- All trash is sorted to the appropriate system, either going to (typically) the onboard incinerator or is landed ashore to be managed by approved waste management and recycling companies.
- Air – With the new Gas Turbine engines, air pollution is reduced by 80%.
- Land – As garbage would be typically incinerated onboard as much as possible the impact on any land fill site during these Charters are extremely minimal.
- Paper that has been printed on one side is collected and sent back to the print shop so that it can be re-used for Staff and Crew notices, announcements or turned into pads of notepapers for all departments.
- Each Ship will be actively recycling all possible materials.  Each ship will have an expected amount of recycling each day and the Environment Officer will ensure compliance and encouraging aggressive recycling.
- All paper used will be recycled paper with vegetable ink.
- Our company encourages the use of Home Offices and/or Flex time, thereby actively reducing carbon emissions from vehicles for daily travel to and from the place of employment.
- Making our environmental statement available to all our suppliers, staff and ensuring that that statement is an integral focus of our everyday business practices.

34

<u>Economically Responsible</u>

- Sustaining businesses in our local communities.
- Supporting our families and supporting the local business community.
- Providing employment, contract, or consulting work, awarding supplier contracts to local businesses.

<u>Socially Responsible</u>

- Always seeking methods to provide support mechanisms to increase the quality of life for our families and our community.
- We will have, as interns, identified disenfranchised individuals.
- We have single moms, minorities, and First Nations people working on the project or advising on issues.
- Operational and embarkation staff are trained and aware of our Sustainable expectations.

Additionally, it is our mandate to:

- Prevent site contamination and the release of hazardous and toxic materials and wastes:
  - o Any cruise ship contracted must be a member in good standing with MARPOL, ISO 14001, which is extremely stringent in it's directives regarding waste materials of any kind;
  - o In addition, we require the presence of an Onboard Environment Officer to analyze, create, monitor and maintain an aggressive Sustainable Program;
  - o Adopt contracting, procurement and fleet management policies and procedures which minimize environmental impacts;
  - o Our Sustainable policies are consistent to these and have outlined the many ways that we support and manage our company to ensure minimal environmental impacts.
- Minimize the environmental effects of the construction, renovation and demolition of real property projects:
  - o Any construction or renovations in support of this project at the piers will be completed with an independent Environmental Officer advising best policy.
  - o Increase energy efficiency, reduce water consumption, and reduce the amount of waste being sent to landfill.
- Any ship contracted must be able to abide by the posted Sustainable Plan that is created.
  - o The ships must be able to convert and create their own potable water, recycle, sort and clean the garbage to minimize the amount sent to landfill.

35

- The company used to remove the garbage is a local company (TYMAK) who, in turn, are aggressively environmentally responsible.
- "Speed Showers" are a proven method of reducing water usage and will be included in our Green Games plan.
- All Officers and Crew in addition to their already existing programs will be trained and monitored on the specific 'Green Games' protocols created by VANOC and by the Cruise Line and Ship Environment Officers.  Training will be in-class, and daily Sustainable Policies maintenance meetings will also occur to ensure compliance.
  - Officers and Crew will be encouraged to be active partners to also offer suggestions on how to increase the 'Green' of the ships. Peer, Cruise Line Head Office Recognition and sustainable gifts (i.e. trees being planted, or an acre of rainforest saved and secured under their names) will be awarded for deserving ideas.
  - All passengers will be advised of the Sustainable Policies by the Environment Officer onboard the ship.
  - 'Green Games' environment programs will be outlined and participation in those programs will be heartily encouraged. Example:  Recycling Blue Bins will be found in every stateroom.
  - Reminders of the 'Green Games' protocols will be reviewed via a specific Ship TV channel and every stateroom has a TV.
  - Leading by example.  The Ship's Officers and Crew and our Management Team are sensitive and always conscious to live up to the Sustainable Policies we have all set and live by.
  - Beyond policies, any Ship contracted must be 'Green' in its own right – as we will only work with the Cruise Lines that follow the Environment Protection Laws.

In conclusion, we are a Management Team that respects, supports and is aggressive in the creation and adherence to Sustainable Practices for this planet.

36

# Appendix III

# Similar Scope Events and References

**Cricket World Cup, West Indies, 2007**
**Ship Charter**

## OVERVIEW

- Negotiated and contracted ship for the world's 3rd largest sporting event on behalf of Cricket Logistics (CL), part of the International Cricket Council (ICC). (Equivalent = VANOC and IOC).
- 672,000 people attended the events with over 8,000 ground staff.
- Worldwide coverage of the Cricket World Cup reached an estimated 2.2 billion people in over 200 countries.
- Provided ship accommodation to coaches, players, spectators, security, VIP's.

## RESEARCH and CONTRACTS

- We were asked to provide a 4/ 5 star ship.
- We researched appropriate Cruise Lines and Ships that would meet the needs of CL.  A short list was created and options weighed.
- Completing the research stage, a site inspection of the ship was undertaken with CL to ensure that the reality of the ship met their needs.
- Contracts with the chosen Cruise Line were negotiated.
- Due to substantial concern regarding delivery of passengers to islands for their matches;
  a) Contracts included provisions for ship replacement if something major were to occur prior to the event on the chosen vessel.
  b) Ships and ship contracts always guarantee and maintain a full complement of maintenance staff and mechanics onboard, however, in the event of a major malfunction, the cruise line flies in to port a repair specific engineer to quickly address the issue.
  c) A Substantial cash deposit and full payment LOC was placed with the Cruise line to guarantee the Cricket Charters.

## RISK ASSESSMENT

- Due to the variety of User Groups that would be onboard, we worked closely with all user groups;
- We began this process over a year in advance of sailing to research and discuss logistics, operations.
- Risk Assessments were completed for each user group (12).
- Identifiable Risks were discussed, options evaluated and implementation written into the Ship Contract.
- An example of a Risk Assessment was completed on the Security onboard.  The following was taken into consideration:

38

a) A coach had been found dead and believed to have been murdered during the event at Event Secured Accommodation;
b) Civil unrest was identified in a location that we were to be at for many days;
c) Possible cultural clashes onboard due to wins/losses;
d) Excess consumption of liquor in general by many passengers at once;
e) Combination of excess liquor and cultural clashes.

- Security Risk Assessment outcome was that additional Security was provided onboard;
  a) Additional training was provided;
  b) Protocols were created and mandated;
  c) Daily meetings and report was held;
  d) Visual presence was increased;
  e) Occurrences were acted upon immediately, investigated with appropriate manpower and reported to First Officer and Management Team;
  f) Appropriate actions were taken for each individual occurrence;
  g) Additional Security protocols were discussed, weighed and implemented for each occurrence as a pro-active measure against future, similar occurrences.

## TECHNICAL

- There were unique technical requirements for this Charter;
  a) Satellite equipment needed to be requisitioned for live feed of games while in the Caribbean;
  b) Permission of Use negotiated;
  c) Equipment loaded on the ship nearly 3 weeks ahead;
  d) Oversee the install, take down and off loading of the equipment.
- Embarkation and Disembarkation was required 24 hours a day many times through out the Charter.  Additional Checkpoint and Screening machines were required.
- Maintenance onboard the ship was continual and thorough.
- During overnight stays, additional secondary, tertiary maintenance and repairs were completed.

39

## LOGISTICS and OPERATIONS

- Substantial logistics were required to meet the unique needs of all the groups on the ship:
    a) Each User Group felt they had the priority;
    b) Larger User Groups pushed their collective weights around;
    c) User Groups were prioritized not by size but by needs and by Cricket World Cup Event Priority Lists;
    d) Embarkation and Disembarkation was cleanly executed;
    e) All User Groups had all of their logistical needs met.
- User Groups had substantial input into Menu Development, ensured by the Management Team working closely with Ship Staff.
- Operations were implemented, coordinated and directed by a strong Management Team.
- Logistics, Operations issues arising (daily, sometimes hourly) were communicated clearly during daily muster, to specific departments. Options created, evaluated and implemented.
- Daily Management meetings with Ship's Officers also ensured efficient and effective Operations implementation.
- All conflicts, concerns, guest relations, technical issues were addressed quickly with communication, mediation with actions to satisfaction.

## STAFFING

- Highest level of Management and Operations Staff expertise, reliability, flexibility are ensured through:
    a) Extensive experience, over 60 Charters to date;
    b) Trained and extremely knowledgeable Management Staff, with an average of 25 years in the Industry for each;
- Management and Operations Staff are highly skilled, covering/shadowing all areas of the Ship's Operations (Food and Beverage, Forensic Accounting, Conference Facilities and meeting scheduling, Housekeeping, Guest relations, Security, Communications, Protocols).
- Stable, cohesive Management leadership ensures excellent quality of services, accommodations, flow of operations for all user groups.
- Successful and effective liaison between all User Groups.
- Successful and enduring positive maintenance of relationships with User Groups.

Cruise Connections Contact: Susan Edwards
Contact: issumavik@shaw.ca  (250) 812. 2378
Solicitation # 2008 – 00147 - ISU

## SUMMARY

- Security, VIP's, Coaches, Players, Spectator comment cards rated this the best experience they had had during a sporting event.
- User Group Leadership comments advised that the Operations side was flawless in it's execution, every step being well and thoroughly researched, and because of this, issues arising were easily dealt with.
- Excellent communication and accessibility of someone on the Operations Team to assist should any need arise, were benchmarks met and exceeded during this Charter.

41

**NFL Superbowl: Jacksonville, Florida, 2006**
**2 Ship Charter**

**SIMILAR SCOPE and HIGH PROFILE EVENT OVERVIEW**
- Negotiated and contracted ship for the NFL Super-Bowl;
  - a) 1 ship on behalf of the NFL Super-Bowl Committee;
  - b) 1 ship on behalf of Super-Bowl Committee's Sponsors.
- 75,000 people attended the stadium event with over 400,000 people attending non-stadium events.
- Media coverage of the Jacksonville Super-Bowl reached an estimated 150 million people in the US and up to a potential of 1 billion people worldwide.
- Provided accommodation specifically for:
  - a) Organizing Committee;
  - b) Committee Official Sponsors;
  - c) Media;
  - d) Team Families.

**TECHNICAL**
- Ground team was created specifically to work with the Charterer and NFL Super-Bowl Committee.
- Working Pier facilities to increase security protocol to meet and exceed NFL Security expectations.
- Working with transportation facilities to coordinate passenger movement with Venues and venue start/end times (Media events, Pre-Game Shows, Game Day).

**LOGISTICS and OPERATIONS**
- Organized port operations to maintain and facilitate the in-port daily activities of the Ship.  Focus on security, safety of guests, vessels, and property.
- Negotiated, organized and assisted in meeting the security guidelines for the VIPs.
- Liaison for NFL Super-Bowl Committee, Government officials, and local city officials with port operators to develop and execute daily operations and meet standards of performance.
- Directed personnel responsible for utilization of the ships.  To insure smooth operations and revenue achievement.
- Negotiated with local transportation companies to facilitate the multiple events and 24 hour operations of the game and surrounding events schedule.
- In partnership with the Jacksonville Port Officials negotiated all aspects of Port Use.

42

- In partnership with the Jacksonville Port Officials negotiated pricing of Ships water supply, as well as grey water and black water handling.
- Maintained excellent communications with all involved parties in Four stages of programs execution:
  a) During the negotiations of the Ship Charters, where multiple parties are involved.
  b) During the pro-forma stage, where guidelines are being developed for the Program.
  c) During the 14 days of the Super-Bowl Game, ensuring that standards and expectations are being met.
  d) During the post 30 days of the Game, where invoices are finalized, all billing is reconciled, and a post-survey is executed.
- Maintained excellent and on-going relationships with all Parties involved.

**STAFFING**
- A team approach was developed in regards to staffing.
- Team One consisted of Sales and Marketing.  This group negotiated all associated costs to execute the Charters.
- Team Two was the Operations.  This team coordinated efforts with Port Officials, Cruise Lines, Security Teams, Transportation, waste removal and Ship Provisions.
- Team Three, was dedicated to public relations, working with local and civic government agencies, the Super-Bowl Committee, the Port Media and the Worldwide Media Agencies.

**SUMMARY**
- These Charters were a success for the clients and the Super Bowl.
- As testament to the NFL Super-Bowl Committee's feedback, regarding our Charters, we were enlisted to provide Charter Accommodations for the Corporate Sponsors who participated in the Super-Bowl.
- We measure success in the creation and sustainability of long term working relationships that we established with the Jacksonville Port Authority, the NFL Super-Bowl Committee, and the Charterer (NFL Super-Bowl Committee, Corporate Sponsors, and National Media).

**XXVIII Olympiad, Athens, Greece, 2004**
**3 Ship Charter**

**OVERVIEW**

- Negotiated and contracted **3 ships** for the Athens Olympics:
  - a) 1 ship on behalf of the Athens Olympic Organizing Committee;
  - b) 1 ship on behalf of the Athens Olympic Committee's Sponsors;
  - c) 1 ship on behalf of the Russian Olympic Family, Russian Olympics
  - d) Value of these Charters were in excess of $24,810,000 USD.
- Committee's Sponsors, Russian Government Officials, visiting Russian Dignitaries and VIP's.
- 3.2 million event tickets were sold.
- 3.9 billion estimated to have watched the Games world wide.

**RESEARCH AND CONTRACTS**
- Charterer required 3 ships at 1,300 passengers per ship for 3 weeks. Research was completed on 11 different cruise lines.
- Holland America was chosen based on their ability to meet itinerary, culinary and service requirements.
- Contracts were negotiated 2 years prior.

**TECHNICAL**
- Ground team was created specifically to work with the Charterer and Athens Olympic Committee.
- Working Pier facilities to increase security protocol to meet and exceed IOC Security expectations.
- Working with transportation facilities to coordinate passenger movement with Venues and venue start/end times.

**LOGISTICS and OPERATIONS**
- Organized port operations to maintain and facilitate the in-port daily activities of the Ship.  Focus on security, safety of guests, vessels, and property.
- Negotiated, organized and assisted in meeting the security guidelines for the VIPs.
- Liaison for Olympic Committee, Government officials, and local city officials with port operators to develop and execute daily operations and meet standards of performance.
- Directed personnel responsible for utilization of the ships, to insure smooth operations.

44

- Negotiated with local transportation companies to facilitate the multiple events and 24 hour operations of the games schedule.
- In partnership with the Athens Port Officials negotiated all aspects of Port Use.
- In partnership with the Athens Port Officials negotiated pricing of Ships water supply, as well as grey water and black water handling.
- Maintained excellent communications with all involved parties in Four stages of programs execution:
    a) During the negotiations of the Ship Charters, where multiple parties are involved.
    b) During the pro-forma stage, where guidelines are being developed for the Program.
    c) During the 23 days of the Olympic Games, ensuring that standards and expectations are being met.
    d) During the post 30 days of the Games, where invoices are finalized, all billing is reconciled, and a post-survey is executed.
- Maintained excellent and on-going relationships with all Parties involved.

**STAFFING**
- A team approach was developed in regards to staffing.
- Team One consisted of Sales and Marketing.  This group negotiated all associated costs to execute the Charters.
- Team Two was the Operations.  This team coordinated efforts with Port Officials, Cruise Lines, Security Teams, Transportation, waste removal and Ship Provisions.
- Team Three, was dedicated to public relations, working with local and civic government agencies, the Athens Olympic Committee, the Port Media and the Worldwide Media Agencies.

**SUMMARY**
- These Charters were a success with the highest levels of client satisfaction.
- We measure success in the creation and sustainability of long term working relationships that we established with Athens Port Authority, the IOC, and the Charterer (Athens Olympic Committee and the Russian Consulate).

# References

**Cricket World Cup, Caribbean, 2007**

Maria Moore:  Australia.  maria@gregritchietravel.com.au
Nicolas Grover: Australia.  nicolas@gulliverssporttravel.com.au
David Corless: Canada.  corless6218@rogers.com
Eric Thompson: Canada.  eathompson@shaw.ca

**Super-Bowl, Jacksonville, Florida, 2007**

Bill Sharp, VP of Port Operations, Holland America Line,
bsharp@hollandamerica.com
Rob Coleman, Director of Charter and Incentive Sales,
rcoleman@hollandamerica.com

**Athens Olympic Games, Greece, 2004**

Marshall Livingston, Director of International Sales,
mlivingston@hollandamerica.com
Rob Coleman, Director of Charter and Incentive Sales,
rcoleman@hollandamerica.com

**Cruise Connections Charter Clients, 2007**

Denny Kurir, Rotary District Governor (2007-2008), dkurir@cfl.rr.com
Matthew Dunaway, President, Praise Fest Ministries, md0568@att.com

# Appendix IV

# Associated and Affiliated Strategic Partners

**REDACTED**

# Appendix V

# Ship Descriptions

Cruise Connections Contact: Susan Edwards
Contact: issumavik@shaw.ca  (250) 812. 2378
**Solicitation #** 2008 – 00147 - ISU

**REDACTED**

# Appendix VI

# Acceptance of Statement of Work

(Beginning at Part 6
Introduction.)

## PART 6: BASIS OF PAYMENT

The all-inclusive price per bed per day means all costs associated with providing the vessels and all services as indicated in Annex A at the Port of Vancouver Ballantyne Pier.

All port fees required in consideration of the Contractor satisfactorily completing all of its obligations under the Contract, the Contractor will be paid a firm price, Goods and Services Tax or Harmonized Sales Tax extra, if applicable.

This creates an all-inclusive rate with 2 parts.

1. Price per person per bed at _____.
2. Port Fees are _____ for a total of _____ per person per day.

The Port Fees are a direct pass through cost, and the ISU has identified that those costs will be paid a 'firm price' indicating a direct pass through cost to the RCMP.

Note: Government Fees, Taxes and docking fees shown are those assessed in 2008 as of the date of this response. Cruise Connections Charter Management will invoice ISU based on the actual costs invoiced by the applicable government entities and suppliers for the 2010 Charter. These government taxes and applicable fees will be paid as a direct pass through cost.

## PART 6.3

In Part 6.3, the ISU have identified only 2 taxes that they believe will apply to these Charters.

1. The GST (Goods and Services Tax or Harmonized Sales Tax) which will be paid by the RCMP.

2. PST or Provincial Sales Tax which the RCMP is exempt from by law (Exemption # R005521).

Any additional taxes identified by the Cruise Lines are questionable, and a tax lawyer will be consulted on these issues after the Bid Award.

In any case, all taxes are not the responsibility of the Charterer, they are additional and a pass through cost to the Government of Canada.

54

## PART 9: PRIORITY OF DOCUMENTS

a) The Contractor's bid, dated, May 23, 2008;
b) The Cruise Lines Charter Party Agreement;
c) The Articles of Agreement;
d) All annexes in alphabetical order;
e) 2003 (200711/30) Standard Conditions;
f) 9676 (200711/30) General Conditions- Services
g) Services for Charterer to provide Vessel Accommodation for RCMP 2010 Integrated Security Unit, Solicitation No 2008-00147-ISU, and all Annexes.

## PART 11: VESSEL REPLACEMENT

The cruise ship line shall have the option to substitute the vessels of similar size and quality that fully meets the requirement of the ISU and the Contractor.  In the event, however the Cruise ship lines intends to substitute a vessel, then the Contractor and the ISU shall be afforded the opportunity to inspect the proposed substituted vessel at the cruise lines expense, and the ISU and the Contractor shall then approve the substitution.  The approval shall not be unreasonably withheld.  Notwithstanding the foregoing, it is imperative the Contractor makes every attempt to provide the vessels as stated in the contract nomination, and the Contractor provides the services in accordance with the terms of the Contract.

Supplemental for Contract Negotiations:  Cruise Connections Charter Management agrees to the above, and provides additional clarity, that the vessel replacement clause in the Charter Party Agreement (CPA) will be carefully reviewed for process, decision making and any associated costs.

## PART 12: INSURANCE

While we agree to the intent of the Insurance clauses within the ISU RFP, what we can state is what the Cruise Lines have confirmed. The Cruise Lines have confirmed that they have adequate and approved Insurance for operating in (and outside) of Canada. Until a final decision is rendered and the Bid is awarded, the Cruise Lines continue discussions with Insurance Carriers to determine whether their current insurance levels will cover  the Olympic events, and specifically the ISU members, due to the probability of weapons/ammunitions on/or adjacent to the vessel. Should our bid be accepted,  we will work with the Cruise Lines and ISU to address concerns about Insurance and identify (if any) cost implications. As this is a unique charter situation, the Cruise Lines current insurance policies would not anticipate the potential of weapons and security forces on-board, therefore there maybe additional cost s which will be the responsibility of the ISU.

## PART 18: CHARTER PARTY AGREEMENT

18.1   Our interpretation of this Clause is that the RCMP will be provided with the Terms and Conditions of the Charter Party Agreement between the contractor and the cruise lines.

56

# SECTION 1: MANDATORY REQUIREMENTS

**The bidder must demonstrate its acceptance of the requirement described in the bid solicitation by adhering to all conditions and providing all requirements as outlined in Annex A and documents as required in both Annex A and Annex B.**

**All articles in the Statement of Work are mandatory unless otherwise indicated in this document.**

## ANNEX A
## STATEMENT OF WORK

We agree with and/or support the intent of every clause in the Statement of Work as required.  We have identified those Clauses that are, in our interpretation, in conflict with the primary focus of this RFP, which is to deliver the lowest daily cost per bed.

To the Clauses that we support the intent of, but do interpret them as conflicting to the required lowest cost per bed, we have offered alternatives or options to discuss during Contract negotiations that are consistent with the Charter Cruise Ship Industry and that also illustrate our commitment to providing the lowest price per bed with all required Services on the most appropriate ship.

We look forward to discussing these Clauses during negotiations so that we may further understand the ISU's intent, why the Clause was included as worded, and come to a solution regarding each Clause that would enable our purpose and commitment to be fulfilled and the ISU to secure the temporary accommodation as required at the lowest rate per bed.

These Clauses, which we interpret to be in conflict to the Ship Charter Industry and to the RFP core goal, are identified by the title:
'Supplemental to Contract negotiations'.

Where we interpret a clause as being one which requires additional corresponding information that is specific to the Ship Charter Industry in order to ensure the success of that Clause, it is identified under the title:
'Supplemental Information'.

57

## 1.   BACKGROUND

**1.1**   We have read and understood.

**1.2**   We accept that all components contained in this Statement of Work are considered mandatory unless otherwise indicated in this document.

**1.3**   We accept.

**1.4**   We accept that the ISU has the right to change stateroom density to increase the number of persons per stateroom providing that this is to accommodate VIP's or those who are requiring single staterooms and that the total passenger count does not exceed the ships double occupancy capacity.

**1.5**   We accept.

## 2.   TERM

**2.1**   We accept responsibility to ensure the fulfillment of all obligations and Terms and Conditions as agreed to in our signed Contract.

**2.2**   We accept that approximately 5,000 beds are required.
        2,500 beds – January 23, 2010 to March 04, 2010
        2,500 beds – January 31, 2010 to March 02, 2010.
Beds are to be ready for occupancy for 1500 hours, PST on the first day of occupancy and will be vacated by 1200 hours, on the last day of occupancy.

As stated in the Overview of Offerings, the ISU do have the ability to apply a second option (3 ships with 5,362 passengers) to address the 'approximately 5,000 beds required'.

**2.3**   We accept.

Supplemental to the intent of the RFP, we provide 2 Options for your consideration - Option 2, being the most economical and flexible.

**Option 1 -** Cruise Line has stated that NO changes to the Charter length are possible.
**Option 2 -** Cruise Line does have the ability on all 3 ships to alter the Charter length.

Any and all associated costs to the change in Charter length are the sole responsibility of the ISU.

58

## 3.    LOCATION

**3.1**    We accept and acknowledge that there is no shore power at Ballantyne Pier.

## 4.    SECURING THE VESSELS

**4.1**    Supplemental to Contract negotiations:  To meet the financial requirements as outlined in the RFP, this would require approximately 100 million dollars of available funds.  Simple Interest on those funds at 15% would add 30,000,000 to the ISU's Cost.  Or, put another way, this Interest alone would increase the base Bid rate by $171.43 per person per day (just to cover the interest).

As the stated goal of this RFP is to achieve the lowest possible rate, when faced with Clauses that will provide significant additional costs, we will support the intent of the Clause and offer alternative strategies to ensure the successful execution of the ISU Charters.

**Strategy**:  In addition to irrevocable contractual agreements with the Cruise lines we will also establish a separate Trust for Receivership Fund to add further security on both the payments made by the ISU and the payments received by the Cruise Lines as per the Charter Cruise Ship Industry standards and practices, and this meets the focus of not creating additional costs to the ISU as outlined above ($171.43) as we interpret these added costs to be in conflict with the lowest rate requirement.

We accept, based on the following interpretation, that Contract Award is the execution of signatures between the Contractor and the ISU.  The Contractor shall identify and secure the vessel or vessel(s) with ten (10) days of contract award.

Proof of security of the vessel will be provided within ten (10) days of contact award.

Proof of payment to the vessel provider to be received by the ISU Contracting Authority is agreed.  Proof of payment timeline in the Charter Cruise Ship Industry is set via the Cruise Line's Charter Party Agreement (CPA) which has yet to be executed.  That document will dictate the payment schedule to the Contractor.  The Contractor is under obligation to the contractual agreements of the CPA.  We wish to further discuss the reasoning behind this Clause by the

59

ISU so that we may create and implement a solution to that reasoning that also complies with the Cruise Line requirements.

We look forward to discussing these Clauses during negotiations so that we may further understand the ISU's intent, why the Clause was included, and come to a solution regarding each Clause that would enable our purpose and commitment to be fulfilled and the ISU to secure the temporary accommodation as required at the lowest rate per bed.

**4.2** We accept.

**4.3** We accept

**4.4** We accept on that basis that the Cruises Lines will provide confirmation that the ships are seaworthy and to maintain their vessels in accordance to Maritime and safety standards to the ISO 14001 Standards.

**4.5** We accept.

**4.6** We accept that the Contractor with secure the nominated ships of a signed/executed contract with the ISU.

**4.7** We accept.
Supplemental Information: Please refer to Appendix V

## 5.  QUALITY

**Overview:**

**5.1** We have read and understood.

**5.2** The Contractor agrees that CDC protocols that has been accepted by the Cruise Lines in regard to protective and responsive measures are in place and any costs associated are the responsibility of the Cruise Lines.

**5.3** We accept.
Supplemental to Contract negotiations: In order for those assignees, representatives, or any government agency who is required to inspect the ship on behalf of the ISU, it will be mandatory that they follow the Cruise Lines Security and Health Canada protocols before gaining permission to board the vessel.

The protocol will entail the ISU working with the Contractor and Cruise Lines to provide:

60

a)   the legal name of all those who will be inspecting the ship.
b)   their birthday's.
c)   their citizenship.
d)   a verifiable Government Issued piece of ID. (Driver's license #, Passport #).

**5.4**   We accept.
Supplemental to Contract negotiations:  Note - Ship Technical Specifications and Health Inspection Scores in the Appendix for all cruise ships currently under consideration - please refer to Appendix V.

# 6.   VESSEL INSPECTION

**6.1**   We accept.
Supplemental to Contract Negotiations:  This meeting will take place in Vancouver, BC, Canada.
A full complement of appropriate positions and Management Team will attend.

**6.2**   We accept.
Supplemental to Contract Negotiations:  The above Cruise Lines Security Protocols will be followed for any assigned ISU personnel attending the on-site inspection.  Any costs associated with this site inspection are borne by the ISU. These site inspections will be contained to a Port of Call. Appropriate notice (14 days) is required.

**6.3**   We accept.
Supplemental to Contract Negotiations: The above Cruise Lines Security Protocols will be followed for any assigned ISU personnel attending the on-site inspection.  Any costs associated with this site inspection are borne by the ISU. These site inspections will be contained to a Port of Call. Appropriate notice (14 days) is required.

**6.4**   We accept.

Supplemental to Contract Negotiations:
a)   With full substantiation, any individual who is a registered passenger causing damage will have the charges for the damages placed on their onboard account.
b)   With full substantiation, any individual onboard causing damage who is not a registered passenger onboard, the Contractor will demand payment for all damages.  If no payment is forthcoming, the Contractor will actively pursue all avenues to recover the damages.  The Cruise Lines must participate in the Post Occupancy Inspection for damages.

61

## 7.    DISCLOSURE

**7.1**    We have read and understand.

**7.2**    We accept and the Non-Disclosure form is included in this submission.

**7.3**    We accept that  all Contractor Management Team non-disclosure forms will be included as instructed by the Bid.

Supplemental to Contract Negotiations:
Cruise Lines state that their personnel shall not be required to sign the non-disclosure form attached as Annex F of the Bid.

## 8.    SECURITY

**8.1**    We accept and the Security Forms are included in this submission for:
   Edwards, Susan
   Kelly, Tracey
   Sloane, Michael

**8.2**    We accept.

**8.3**    The Cruise Lines have agreed to provide a complete list.

**8.4**    The Cruise Lines have agreed providing that reasonable advance written notice from the Charterer occurs.

**8.5**    The Cruise Lines have agreed to inform their crew members that they may be asked by the RCMP to undergo a security check.

**8.6**    The Cruise Lines have agreed to provide an accurate ship personnel list at all times.

**8.7**
Supplemental to Contract Negotiations: The Cruise Lines shall enforce its current Code of Conduct with respect to illegal drugs or illegal activities by crew members onboard the Ships.  The Contractor is contractually unable to be involved in the Cruise Line Code of Conduct; therefore the Contractor will not assume any expenses from the immediate removal of any crew member due to any violation with respect to drugs, or illegal activities.

62

## 9. ENVIRONMENTAL

**9.1**     We accept.
Supplemental as requested:
Please refer to Appendix II: Sustainable Business Practises.

**9.2**     We accept and actively support this as per our Sustainable Business
Mandate.  All of the Cruise Lines under consideration currently meet or exceed
Transport Canada guidelines for pollution prevention for the operation of cruise
ships under Canadian jurisdiction.  The cruise lines environmental practises shall
continue to be consistent with published Transport Canada guidelines for the
operation of the ships when under Canadian jurisdiction during the Charters.
www.tc.gc.ca/publications/en/tp14202/pdf/hr/tp14202e.pdf

**9.3**     We have read and understand that there is no shore power at Ballantyne
Pier.

**9.4**     We accept.
Supplemental Information:  We have already secured the services of Transport
Canada's approved Cruise Line waste removal company.  All costs associated
with any and all waste water disposal shall be borne by the RCMP as per
Resulting Contract Clause, 6.1.  The RCMP have identified that the Contractor
will be paid a firm price.  The Contractor will submit the original invoice to the
RCMP to ensure the paying of the Firm Price as per 6.1.

**9.5**     We accept.
Supplemental Information:  No discharges in Port and that all disposal methods
are adhered to and applicable Acts and Regulations are followed.  The
Contractor has made arrangements to dispose of any waste water with a
contractor that is certified and approved by Transport Canada.  All costs
associated with any and all waste water disposal shall be borne by the RCMP as
per Resulting Contract Clause, 6.1.  The RCMP have identified that the
Contractor will be paid a firm price.  The Contractor will submit the original
invoice to the RCMP to ensure the paying of the Firm Price (Pass through Cost)
as per Resulting Clause 6.1.

**9.6**     We accept.
Supplemental Information.  Agreed as above and we will adhere to all applicable
Acts and Regulations. The Contractor has made arrangements to dispose of any
grey water with a contractor that is certified and approved by Transport Canada.
All costs associated with any and all grey water disposal shall be borne by the
RCMP as per Resulting Contract Clause, 6.1.  The RCMP have identified that the
Contractor will be paid a firm price.  The Contractor will submit the original
invoice to the RCMP to ensure the paying of the Firm Price (Pass through Cost)
as per Resulting Clause 6.1.

63

**9.7**   We accept.
Supplemental Information: We have made arrangements to dispose of all garbage with a contractor that is certified and approved by Transport Canada. All costs associated with any and all garbage disposal shall be borne by the RCMP as per Resulting Contract Clause, 6.1.  The RCMP have identified that the Contractor will be paid a firm price.  The Contractor will submit the original invoice to the RCMP to ensure the paying of the Firm Price (Pass through Cost) as per Resulting Clause 6.1.

**9.8**   We accept,
Supplemental Information:  We have made arrangements to dispose of all hazardous waste with a contractor that is certified and approved by Transport Canada.  All costs associated with any and all hazardous waste disposal shall be borne by the RCMP as per Resulting Contract Clause, 6.1.  The RCMP have identified that the Contractor will be paid a firm price.  The Contractor will submit the original invoice to the RCMP to ensure the paying of the Firm Price (Pass through Cost) as per Resulting Clause 6.1.

**9.9**   We accept.
Supplemental to Contract Negotiations:  We have met with the Cruise Line's Environmental Officers and they confirm that our choices of Cruise Ships adhere the minimum standards as required in this RFP.

**9.10**   We accept.

**9.11**   We accept.
Supplemental Information: All of the Cruise Lines under consideration currently meet or exceed Transport Canada guidelines for pollution prevention for the operation of cruise ships under Canadian jurisdiction.  The cruise lines environmental practises shall continue to be consistent with published Transport Canada guidelines for the operation of the ships when under Canadian jurisdiction during the Charters.
www.tc.gc.ca/publications/en/tp14202/pdf/hr/tp14202e.pdf

**9.12**   We accept.
Supplemental to Contract Negotiations:  As the Cruise Line's Environment Director and the Cruise Ship Environment Officers will be directly involved in the creation and of the outlining of the specific needs of this Charter's EERP, we will provide this when it is completed, on request, after contract award.

**9.13**   We accept.
Supplemental Information: The Cruise Lines have agreed to provide a post-voyage environmental performance report within twenty (20) days of the ships leaving Ballantyne Pier.  The summary shall include liquid waste, solid waste, air

64

emission quantities generated and the amount of material recycled.  Further clarification of the other summary points is required and should be discussed further during Contract negotiations.

65

## 10.   FUEL

**10.1**   The Cruise Lines being considered already utilize low sulphur fuel and guarantee that they will continue to use the low sulphur fuel during the berthing of their ships in Vancouver.

## 11.   INSURANCE

**11.1**   We accept.

**11.2**   We accept.

## 12.   ROOM ASSIGNMENT

**12.1**   We accept.
Supplemental Information: That the ISU will provide a passenger list to the Contractor and that the contractor will be required to produce an initial room assignment list immediately for approval of the ISU Accommodation Director or assignee.
- The Contractor agrees not to make any room changes without the approval of the Accommodation Director or assignee.
- The Contractor agrees to immediately inform the Accommodation Director or assignee if any requests are made directly to the Contractor.
- The contractor agrees that the ISU reserves the right to change room assignments during the contract.

Supplemental to Contract Negotiations:  The Cruise Lines will advise the Contractor on the specific cut-off periods and dates regarding the upload of passenger information and room assignment prior to embarkation.  The Contractor agrees to work closely with the Accommodation Director to advise him/her of these Cruise Line deadlines so that all needs are being met.

**12.2**   We accept.

## 13.   LUGGAGE AND DOCKSIDE SERVICES

**13.1**   We accept.
Supplemental to Contract Negotiations: We have a long term business alliance relationship with the Port Agent at Ballantyne Pier.  Quay cruises (our Port Agent) have offices physically located in Ballantyne Pier and is in readiness to complete all tasks with ease following contract award.

66

## 14.   LOCKERS AND OTHER FACILITY STORAGE

# REDACTED

**14.2**   We accept.
Supplemental to Contract Negotiations:  The Cruise Lines require a copy of all
medical personnel's certificates that allows them to practise medicine in the
Province of British Columbia.  The Cruise Line's doctors and nurses will need to
be present in order to treat all Cruise Line employees and crew aboard the
Charters.

The Cruise Lines request an Operational meeting following Bid Award to discuss
ways that the RCMP medical staff will be able to collaborate with the Cruise Line
Medical staff and the RCMP's medical staff's access to the medical facility, and
its equipment.

**14.3**   We accept.

**14.4**   We accept.

## 15.   PASSENGER SERVICES

**15.1**   We have read and understand.

67

**15.2**   We accept.

**15.3**   We accept.
Supplemental to Contract Negotiations:  We request that any restrictions by the RCMP or ISU that they may impose be listed and discussed during contract negotiations.

**15.4**   We accept.

**15.4 (1)**  We accept.

**15.5**   We have read, understand and accept.

**15.6**   We accept.

Supplemental to Contract negotiations: We offer the following Solution.

**Option:**
a)      Any Non-Passenger ISU member (Ship Guest) who believes that they will, at some point, wish to come onboard, or eat a meal onboard must first, in all instances, be on an approved Ship Guest List (See Ship Security Protocols **Annex A 5.3**).  The Contractor will work with the ISU to create all Ship Guest Lists.

b)      There will be stated periods of time when a Non-Passenger ISU member will be able to register with the Ship to get on the approved, permanent Guest List. (These Registration times will be further discussed during Contract negotiation.  At those prescribed times, an onboard account secured by a Credit Card will be created for each Ship Guest.  This ship ID card created for a Ship Guest will be the same as for all Registered Passengers.
Registered Passengers staying onboard the ships – BLUE coloured Ship ID Card
Registered Ship Guests that are ISU Members – GOLD coloured Ship ID Card
Registered VIP's staying onboard the ships – BLACK coloured Ship ID Card

c)      When the Ship Guest wants to purchase a meal or any other service onboard, he/she will simply swipe his Ship ID card.  The charge is attached to his/her onboard account which is immediately lodged against their onboard account.

d)      Meal costs for those Ship Guests are guaranteed that they will not exceed the Treasury Board limits of:
Breakfast –   $13.60
Lunch -        $12.85

68

Dinner -      $36.30
And, depending on volume estimated, these rates may be lowered.  This
Operational point will be furthered discussed during Contract negotiations.

**NOTE:**      Marine Laws dictate how many people may be onboard a ship tied
up at Port at any given time.  The Contractor will advise the ISU of those Marine
Law maximums upon Contract Award.  We will not be able to exceed those
Marine Law maximums in any circumstances even if there are Ship Guests who
are cleared to board via the approved Guest List.

**15.7**   We agree, see above.

**15.8**   We agree.
Supplemental information: The main dining room will be closed and all meals will
be served cafeteria style or buffet style setting.

Supplemental to Contract Negotiations: Above and beyond the meal service
included in the per day rate, the speciality (surcharge) restaurant and specialty
coffee bar will remain open for those Registered Passengers and Ship Guests,
who may wish to pay at their own expense an additional fee to eat in those 2
locations. (Refer:  Annex A 15.3)

**15.9**   We accept.
Supplemental Information:  Coffee, tea, juice will be made available at no charge
to the members and Guests twenty-four hours per day, 7 days a week. Bottled
Water and all other types of beverages will be billed at actual cost to the
Registered Passenger or Ship Guest ship ID Card and the charges placed
against their onboard accounts.

**15.10**  We accept.
Supplemental to Contract Negotiations:  We wish to further discuss this for clarity
and process.

69

# Appendix VII

# Basis of Payment

70

# SECTION II – FINANCIAL BID
## Appendix VIII
## BASIS OF PAYMENT

### 6.1

The all inclusive price per bed per day means all costs associated with providing the vessels and all services as indicated in Annex A at the Port of Vancouver, Ballantyne Pier which we have provided below.  All rates in CAD.  Please note that for the purposes of determining Bid Value: we have interpreted that we include the Fixed Costs of the known Charter Hire Amount.  As all Service Provider Costs are provided as estimates at this time (Pass through Costs), they are NOT included in the Bid Value for the purposes of calculating the LOC during this phase of the Proposal.

### OPTION 1: Princess Cruise Line

**2 Ships, <u>No flexibility in dates</u>. 5,276 beds are being offered.**

$360.00  Per person Charter Hire per bed per night.

= $66,310,560*** / 184,196 bed nights = $360.00 per bed per night CAD

$ 45.00 Per person per bed night (estimate) Firm Price pass through Service Provider Costs, Taxes (GST $0.50 per person per day) – invoices will be given directly to RCMP**  These costs are not included this Bid Value as they are estimates only.

### OPTION 2: Holland America Line, Carnival Cruise Line

**3 Ships, <u>Maximum flexibility in dates</u>, 5,362 beds are being offered.**

$288.00  Per person Charter Hire per bed per night.

= $50,541,696*** / 175,492 bed nights^^ = $288.00 per bed per night CAD

$ 43.00 Per person (estimate) Firm Price pass through Service Provider Costs, Taxes (GST $0.50 per person per day) – invoices will be given directly to RCMP.** These costs are not included this Bid Value as they are estimates only.

^^**Option:** By utilizing 3 ships that can vary start and end dates, this creates best price, best operational options. **The ISU *can add or subtract bed nights, ship days,* during contract negotiations**.  By offering these 3 Ships, we maximize on flexibility of options and operational plans to consider, and ensures best rate.

### NOTE:
**Option 2**, represents **a savings of: $15,768,864.00 CAD** (Charter Hire Cost)
**Option 2**, represents **a savings of: $    375,340.00 CAD** (Service Providers Est)

71

Case 1:08-cv-02054-RMC   Document 1-1   Filed 11/26/08   Page 117 of 126

**The rates shown are for informational purposes and are based on current 2008 pricing. The Charterer will invoice the ISU based on the actual costs of these additional services and items as billed by suppliers in 2010.

***For the purposes of determining Bid Value: we have identified the Net Service Provider Costs as required by the RFP. We have interpreted that we include the Fixed Costs of the known Charter Hire Amount in our Bid Value at this time as all Service Provider Costs are provided as Estimates, Pass through Costs. Estimates are NOT included in the Bid Value for the purposes of calculating the LOC during this phase of the Proposal.

**"Bidders are to provide the period of notification required to extend or shorten the duration of the occupancy by up to three (3) days (72 hours), before and after the indicated dates."**

## Option 1

Princess Cruise Lines: No period of notification as Princess Cruise Lines has advised that there is no flexibility and that there is no ability to shorten or lengthen the duration.

## Option 2

Holland America and Carnival Cruise Line: *Prior to the Cruise Line contract being signed*, the ISU has maximum ability to shorten or lengthen the duration with 48 hours notice.

Upon any decision to extend or shorten, *after* the Cruise Line contract is signed, the ISU should immediately notify the Contractor.  If, at the date and time of the request, the Cruise Line is able to extend or shorten, they will confirm any costs associated with the change of scope in the project and revert back to the Contractor and the ISU for a final decision within 48 hours.

72

Cruise Connections Contact: Susan Edwards
Contact: issumavik@shaw.ca  (250) 812. 2378
Solicitation # 2008 – 00147 - ISU

# Appendix VIII

# Letter of Credit - Required Certificates

73

**REDACTED**

Tab 1(e)



# *Cruise Connections Charter Management Team*

## Project Services Agreement

2008-07-16                                                            PSA: 1

This document, signed by both parties, create the specific Logistics and Operational Plan as they arise for the duration of the contract and as outlined by the RCMP to the Contractor, in accordance with the Statement of Work.

CCCM will be responsible for the consistent, timely development of each Project Services Agreement and subsequent authorization of documents.

This document is to be used as agreement on discussions and does not supersede anything found in the Request for Proposal Resulting Contract clauses. If there is a monetary costs or any monetary ramification associated with any of the Project Services Agreement, a Change Order will be signed off by all Parties and an amendment to the Contract would be entered into the Federal Government financial system.

All Project Service Agreement documents are confidential, with the exception of specific facts that must be relayed to the Cruise Lines in order for the Cruise Lines to meet all Logistics and Operational requirements.

# 1 covers items discussed in our meetings, emails and phone calls from Tuesday, June 3rd 2008, through June 23, 2008.

Present at the Meeting, Tuesday June 3, 2008
Inspector Donna Kaluza-Genik, Accommodations Directors, Logistics (RCMP-GRC)

Michael Day, Director of Procurement and Assets (RCMP-GRC)
Kelly Meikle, Manager of Contracting Services (RCMP-GRC)

Sue Edwards, Contractor (Cruise Connections Charter Management One, LP)
Tracey Kelly, Contractor (Cruise Connections Charter Management One, LP)

*4970 La Quinta Place, Victoria BC, V8Y 3G9 : 250 598 2526*
*4721 Emerson W, Seattle WA : 206 283 2686*
*1418-B S. Stratford Rd. Winston-Salem, NC : 1 888 999 1099 and*
*The Royal Canadian Mounted Police, Vancouver 2010 Integrated Security Unit*
*11411 No. 5 Road, Richmond, B.C.. V7A 4E8   604-247-8403*



# *Cruise Connections Charter Management Team*

**General Statement:**
The Contract Bid was awarded to Cruise Connections Charter Management One, LP for the price of $298 per person per day. The Agreement is for a total number of 5374 berths. 4092 berths will utilizing two Carnival vessels, the vessels to begin service in Vancouver on January 31st 2010, and end service (at Noon) on March 2nd 2010 for a total of 31 days of service to the RCMP.

Additionally, a third ship is required for 1248 berths (utilizing 1 S Class Holland America Line vessel) for the price of $298 per person per day to begin service in Vancouver on January 19, 2010 and end service (at Noon) on March 04, 2010, for a total of 44 days of service to the RCMP.

**Payment Terms:**
Payments are guaranteed as funds have been appropriated. Funds will be made via wire transfers and in Canadian Dollars. There will be three payments to complete the contract.

1. On or before April 30th, 2009 a Payment will be made to Cruise Connections Charter Management One, LP of 80% of the Contract value. Contract Value is defined by 31 days Charter Hire at 4092 Berths at $298 per Berth plus 44 days Charter Hire 1248 Berths x $298 = $54,165,672 total RCMP contract value.

80% payment = $43,332,537.

2. On or before October 31st, 2009 a second Payment will be made to Cruise Connections Charter Management One, LP of 15% of the Contract value = $8,124,850

3. On or before March 30th 2010 a third and final Payment will be made to Cruise Connections Charter Management One, LP of 5% of the Contract value = $2,708,285.

Total Payment: $54,165,672

4. **As discussed and Agreed:**

a.) The Agreement of Terms is signed between RCMP (ISU) and Cruise Connection Charter Management One, LP. The RCMP is under 100% penalty for any reductions of days of service or cancellations. RCMP representative signature on this contract



# *Cruise Connections Charter Management Team*

acknowledges that there is 100% penalty for any reductions or cancellations of the ISU Charters.

b.) Cruise Connections Charter Management One, LP signs (concurrently) contracts for the charter vessels with the Cruise Lines. Once these contracts have been signed with the Cruise Lines and Cruise Connections Charter Management One, LP, (CCCM One), are under 100% penalty for any cancellations of charter vessels.

c) Listing of those items that are included in the 'Firm Price' of $298.00 pppd:

Chartering of the Cruise Ship(s)
Water Bunkering
Recycling
Solid Garbage Removal
Embarkation Costs
Disembarkation Costs
Port Agent
Ground Services Port Agent
Vancouver Harbour Pilots

5. As discussed and Agreed: Should the RCMP/ISU require additional days of charter vessel service, after the contracts have been signed by the Contractor and Cruise Line, the Contractor will negotiate with Cruise Lines a rate based on the RCMP's request. Our Negotiated Rates may increase based on market conditions for these additional days of service.

6. **Components of the Contract Price**.

As noted within the Response to RFP there are costs that the Cruise Line and Cruise Connections Charter Management One, LP must pass thru to the RCMP.

a. **Fuel Surcharge:**  This subject was noted in the Response to RFP. CCCM will work to minimize this costing, however, should the Cruise Lines instill a Fuel Surcharge it will be the responsibility of the RCMP to pay.



# *Cruise Connections Charter Management Team*

b. **Insurance Premiums:** As noted in the Response to RFP, should the Cruise Lines be required to buy additional insurance for this charter, this cost is to be the responsibility of the RCMP.

c. **Government Taxes:** As noted in the Response to RFP any and all Canadian Government Taxes imposed as a result of this Charter will be the responsibility of the RCMP. CCCM is providing a Service and the RCMP is paying the 5% GST in addition to $298. pppd.

d. **Waste Management:** (Gray Water/Black Water): This is a pass through (at NET invoice) cost to the ISU/RCMP/DND. The Contractor to contact local engineers to provide quotes on the work to be done.  Contractor to keep ISU/RCMP completely informed.  The final decision on which quote to accept will be the ISU/RCMP.

e. **Port Fees:** It is agreed that the RCMP will pay all VFPA Port Fees regarding Ballantyne Pier.

f. **Embarkment/Disembarkment:** As noted in the RFP, there will be one embarkation date for Vessel #1 (1/19/10), and one embarkation date for vessels #2 & #3 (1/31/10). Additionally, there is one dis-embark date for.vessel #1 (3/04/10), and one dis-embark date for vessels # 2 & #3 (3/02/10). Any additionally embarkation and dis-embarkation dates are possible, but will require additional funding.

g.  **Specific Room Assignment:** As discussed and agreed, over the three vessels, CCCM requires 3 suites and 2 balcony state-rooms for on-board dedicated Logistics and Operations personnel.

7.  As per the meeting of 23JUNE08 at Base Esquimalt, the following has been agreed to and directed by the ISU/RCMP/DND to the Contractor:



# *Cruise Connections Charter Management Team*

a. That the original bid award of 3 ships (2 Fantasy Class Carnival Ships, 1 S Class Holland America Line Ship) will move forward.

b. Susan Edwards is in receipt of the PO that outlines a 2 ship option, but was directed by Kelly Meikle, Contracting Authority to go to immediate contract with the Cruise Lines for the above 3 ships.

c. A meeting 08JULY08 with Dubai Ports, DND, RCMP, ISU, Contractor, Port Agent, VFPA will occur to outline the necessity of the 3 ships and to come to a solution as to the placing of 3 ships that will have overhangs to the East and the West on the North Berth (noting: possible addition of overhang length due to security boom). Kelly Meikle will be chairing this meeting, and have advised that the ISU/RCMP will work with DP on the solution, and the ISU/RCMP did indeed advise the DND that there *may* be an additional cost to the contract due to the loss of business to DP - yet to be determined at the 08JULY08 meeting or in subsequent negotiations between DP and the ISU/RCMP.

4970 La Quinta Place, Victoria BC, V8Y 3G9 : 250 598 2526
4721 Emerson W, Seattle WA : 206 283 2686
1418-B S. Stratford Rd. Winston-Salem, NC : 1 888 999 1099 and
The Royal Canadian Mounted Police, Vancouver 2010 Integrated Security Unit
11411 No. 5Road, Richmond, B.C.. V7A 4E8   604-247-8403



# *Cruise Connections Charter Management Team*

It is agreed this Project Service Document No. 1 is accurate and thereby agreed to by all parties:


_____     Dated _July 16/07_.
Kelly Meikle,
Manager Contracting Service
Senior Contracting Officer
RCMP, Vancouver 2010 ISU


_____     Dated_____
Susan Edwards, (also for Tracey Kelly, Michael Sloane)
Partners, Cruise Connections Charter Management (One) LP

*4970 La Quinta Place, Victoria BC, V8Y 3G9 : 250 598 2526*
*4721 Emerson W, Seattle WA : 206 283 2686*
*1418-B S. Stratford Rd. Winston-Salem, NC : 1 888 999 1099 and*
*The Royal Canadian Mounted Police, Vancouver 2010 Integrated Security Unit*
*11411 No. 5 Road, Richmond, B.C.. V7A 4E8   604-247-8403*