**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CRUISE CONNECTIONS CHARTER MANAGEMENT 1, LP, *et al.*, : : : Plaintiffs, : : v. : ATTORNEY GENERAL OF CANADA, *et al.*, : : : Defendants. : | Civil Action No. 08-2054 (JR) |

## MEMORANDUM

The plaintiffs, the North Carolina limited partnership Cruise Connections Charter Management and its general partner, sued the Attorney General of Canada, the Royal Canadian Mounted Police (RCMP), and Her Majesty the Queen for breach of contract and violations of the North Carolina Unfair and Deceptive Trade Practices Act.  The defendants moved to dismiss for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, or, in the alternative, pursuant to the doctrine of *forum non conveniens*.  After hearing argument on June 9, 2009, I granted the defendants' motion for reasons given in open court.  This memorandum explains that ruling in greater detail.[1]

## Background

Although I must settle any contested jurisdictional facts on a motion to dismiss for lack of subject matter

---

[1] The plaintiffs have filed a notice of appeal, Dkt. 17, but that filing does not prohibit me from providing additional reasoning for my decision.

jurisdiction, see Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000), the following alleged facts are taken as true because they do not bear directly on the jurisdictional issue.

The RCMP is in charge of coordinating security for the 2010 Winter Olympic Games, which will be held in Vancouver, Canada. With space ashore limited, the RCMP decided to house extra security personnel for the Games in ships berthed in Vancouver Harbor. After soliciting bids, the RCMP selected Cruise Connections to provide the necessary ships.

In July 2008, after the RCMP and Cruise Connections reached agreement (the contract price was approximately $54 million Canadian), Cruise Connections, which had no ships of its own, began negotiating charter party agreements (CPAs) with two American cruise lines, Royal Caribbean International and Holland America Line. The cruise lines sought assurance that the RCMP was contractually obligated to pay any corporate or personal taxes the ships might incur in Canada. When asked, two RCMP representatives, Kelly Meikle and Michael Day, confirmed by email that the RCMP was so obligated.

Satisfied, the cruise lines executed their CPAs with Cruise Connections. Cruise Connections then turned to the task of securing financing from the Royal Bank of Canada (RBC). Before Cruise Connections could finalize the financing

arrangements, however, the RCMP replaced Meikle and Day with a new representative, Normande Morin.  Morin reversed the RCMP's stated position and asserted that the cruise lines' taxes were not reimbursable.  She also demanded that Cruise Connections put up a 90% letter of credit -- an obligation that had been cut from the final version of the contract.  When Cruise Connections refused to proceed under Morin's terms, the RBC refused to provide financing.  Shortly thereafter, on November 17, 2008, the RCMP terminated the contract, citing Cruise Connections' breach of its obligation to timely secure financing.

## Analysis

The Foreign Sovereign Immunities Act (FSIA) "provides the sole basis for obtaining subject matter jurisdiction over a foreign state in the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989).  In relevant part, the Act confers jurisdiction over actions based:

> [1] upon a commercial activity carried on in the United States by the foreign state; or
> [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or
> [3] upon an act outside of the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The plaintiffs rely explicitly and exclusively on the third clause as the basis for jurisdiction.  See Compl. ¶ 5.  The

defendants concede that their alleged breach of contract occurred in Canada, and that it came in connection with commercial activity in Canada, but they maintain that their alleged breach did not cause a "direct effect" in the United States.  The defendants bear the burden of proving this claim by a preponderance of the evidence.  Agudas Chasidei Chabad of U.S. v. Russian Federation, 528 F.3d 934, 940 (D.C. Cir. 2008).

Mere financial loss by an American individual or company does not constitute a "direct effect" in the United States.  Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1512 (D.C. Cir. 1988).  But, as the Supreme Court established in Republic of Argentina v. Weltover, Inc., 504 U.S. 607 (1992), a foreign sovereign's failure to deliver money that was supposed to be delivered to an American bank account does meet the "direct effect" requirement.  In Weltover, the Argentine government issued bonds denominated in U.S. dollars that permitted the bondholder to specify one of four cities -- London, Frankfurt, Zurich, or New York -- as the place where payment was to be made.  When the government realized that it did not have enough dollars to retire the bonds, it unilaterally extended the time for payment and offered the bondholders substitute instruments.  The plaintiffs, two Panamanian corporations and a Swiss bank, refused to accept the substitute instruments and insisted on full payment, specifying New York as the place where payment should be

made.  The government refused to pay.  The Court concluded that the government's failure to retire the bonds had a "direct effect" in the United States because "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming."  Id. at 619.

Weltover and its progeny in the Court of Appeals establish four scenarios in which a foreign sovereign's breach of contract has a "direct effect" in the United States: (1) the contract expressly designates an American location as the place of payment; (2) the contract allows the payee to designate a place of payment, and he designates an American location before the breach occurs, see Weltover, 504 U.S. at 619; (3) the contract is silent on payment location, but the payee asks to be paid at an American location, and the payer agrees to do so before the breach occurs, see I.T. Consultants, Inc. v. The Islamic Republic of Pakistan, 351 F.3d 1184 (D.C. Cir. 2003); and (4) the contract is silent on payment location, and the parties do not subsequently agree on a payment location, but there is a "longstanding consistent customary practice" between the parties of payment at an American location, see Goodman Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C. Cir. 1994) (Wald, J., concurring).  In short, before the breach occurs, the parties must have agreed -- either expressly or impliedly -- that payment

would occur in the United States.  <u>See</u> <u>Peterson v. Royal Kingdom of Saudi Arabia</u>, 416 F.3d 83, 90 (D.C. Cir. 2005).

Turning to the contract in the present case, the first page of the Articles of Agreement describes the "Payment Terms":

> As agreed and upon the satisfactory completion of Terms under Annex A, the following payments shall be made by <u>Direct Payment</u> on or before the dates indicated:
>
> 80% of the Contract value on or before 30 April, 2009 $43,332,537.00 plus GST
>
> 15% of Contract value on or before 31 October, 2009 $8,124,850.00 plus GST
>
> 5% of Contract value on or before 30 March 2010 $2,708,295.00 plus GST

Dkt. 1, Ex. 1, at 2 (emphasis added).[2]  On the same page, "1418-B S. Stratford Road, Winston-Salem, NC USA 27103" is designated as the "Contract Delivery Address."  <u>Id.</u>  The plaintiffs argue that these terms expressly obligated the defendants to provide "direct payment" in the United States.

The situation is complicated by Cruise Connections' decision to assign the RBC a portion of its first payment to secure its letter of credit.  Under the agreement, the RCMP would send the first payment to the RBC, which would take the amount it was owed and deposit the remainder in an RBC account in Cruise Connections' name.  <u>See</u> Affidavit of Michael Sloane, ¶ 13.

---

[2] The payment amounts were later amended when the RCMP requested additional berths, but the remaining terms were unchanged.  <u>See</u> Dkt. 1, Ex. 3, at 2.

Cruise Connections' agreement with the RBC had no impact on the second or third scheduled payments.  Id.

The initial question then is whether the RCMP's contractual obligation to provide "direct payment" of the second and third payments to Cruise Connections meant that the RCMP was supposed to send the payments to Cruise Connections' listed address in Winston-Salem, North Carolina.  I do not believe it did.  I interpret "direct payment" to mean that the RCMP had to make payments to an account of Cruise Connections' choosing, not that the RCMP had to send the money to Cruise Connections' corporate office.  That interpretation is confirmed, in some part, by Cruise Connections' decision to open an account at a Winston-Salem bank on August 7, 2008 for the purpose of receiving payments from the RCMP.  As Cruise Connections explains, "[h]ad the RCMP not breached the contract, Cruise Connections would have invoiced the RCMP (as required by paragraph 7 of the Articles of Agreement) for the second and third payments, and the invoices would have directed the RCMP to make the second and third payments by wire transfer to Tristone Community Bank in Winston-Salem."  Dkt. 12, at 9 (citing Sloane Affidavit, ¶ 13).  That intention belies the claim that the contract itself required payment at Cruise Connections' office.

The next question is whether the facts match any of the other scenarios hypothesized in the controlling Circuit cases.

There is no longstanding practice between the parties.  Nor is there any subsequent agreement on a payment location -- while Cruise Connections may have opened a bank account after the contract was signed (and before the breach), they never communicated that fact to the defendants, and the defendants certainly never agreed to send money to that account.  Cruise Connections might argue that the contractual term "direct payment" gave it the right to designate an account for payment, but opening a bank account with the intention of demanding payment there is not an exercise of that right.  Put simply, before the alleged breach occurred, there was no agreement between the parties, either explicit or implicit, to send the second and third payments to an American location.

   Cruise Connections notes that it would have made an additional $6 million from third parties if the RCMP had not breached: approximately $5 million from the cruise lines in "on-board revenue" generated during the Games, and approximately $1 million from a travel agency that agreed to charter one of the cruise ships during its transit from San Diego to Vancouver.  These are not "direct" effects.  "An effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'"  Weltover, 504 U.S. at 618 (quoting Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 152 (2d Cir. 1991)); see also Princz v. Federal Republic of Germany, 26 F.3d 1166, 1172

(D.C. Cir. 1994) ("A direct effect . . . has no intervening element, but, rather, flows in a straight line without deviation or interruption."). Cruise Connections' agreements with the cruise lines and with the travel agency were not part of its contract with the defendants. Therefore, there was an "intervening element" -- Cruise Connections' inability to perform its contractual obligations to the third parties -- between the defendants' actions and Cruise Connections' financial loss.

At the hearing on this motion, Cruise Connections cited two cases to support its contention that its lost third-party payments were a direct effect of the RCMP's alleged actions: <u>Lyon v. Agusta S.P.A.</u>, 252 F.3d 1078 (9th Cir. 2001), and <u>Harris Corp. v. Nat'l Iranian Radio & Television</u>, 691 F.2d 1344 (11th Cir. 1982). The plaintiffs seize on the court's holding in <u>Lyon</u> that a defendant's actions can have a direct effect in the United States without being foreseeable to the defendant. <u>Lyon</u>, 252 F.3d at 1083. If there can be unforeseen direct effects, plaintiffs theorize, then the unforeseen loss of third party payments here could constitute a direct effect. That argument misses the point: Cruise Connections' problem is that there was an intervening element between the defendants' actions and its losses, not that those losses were unforeseeable to the defendant. <u>Harris</u> too is of little help to the plaintiffs -- while the court found a direct effect there, it did so well

before the Supreme Court refined the "direct effect" standard in <u>Weltover</u>.

                                                JAMES ROBERTSON
                                  United States District Judge