```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
   ------------------------X
3  CRUISE CONNECTIONS CHARTER      Docket No. 08-2054
   MANAGEMENT 1, LP, ET AL
4                     Plaintiffs,

5           v.                     Washington, D.C.
                                   June 9, 2009
6                                  10:05 a.m.

7  ATTORNEY GENERAL OF
   CANADA, ET AL
8                     Defendants.
   ------------------------X
9
                      MOTIONS HEARING
10         BEFORE THE HONORABLE JAMES ROBERTSON
               UNITED STATES DISTRICT JUDGE
11
   APPEARANCES:
12
   For the Plaintiffs:   STRAUCH & FITZGERALD, P.C.
13                        By:  Mr. Jack M. Strauch
                          118 South Cherry Street
14                        Winston-Salem, N.C.  27101
                          336.837.1061
15                        jstrauch@sandflaw.com

16                        WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
                          By:  Mr. Louis J. Rouleau
17                        1401 Eye Street, N.W.
                          Washington, D.C.  20005
18                        202.857.4558
                          lrouleau@wcsr.com
19
   CORPORATE REPS:        Mr. Phillip Sloane
20                        Mr. Michael Sloane

21 For the Defendant:     HUGHES HUBBARD & REED, LLP
                          By:  Mr. John M. Townsend
22                             Mr. Scott H. Christensen
                          1775 I Street, N.W.
23                        Washington, D.C.  20006
                          202.721.4640
24                        townsend@hugheshubbard.com
                          christen@hugheshubbard.com
25
```

```
1   APPEARANCES:   (CONT'D.)

2                           DEPARTMENT OF JUSTICE, CANADA
                            By:  Mr. Jean-Sebastien Gallant
3                           1200 Vanier Parkway, Room C-400
                            Ottawa, Ontario  K1A 0R2
4                           613.949.2699
                            JS.Gallant@rcmp-grc.gc.ca

5
    Court Reporter:         Catalina Kerr, RPR
6                           U.S. District Courthouse
                            Room 6716
7                           Washington, D.C.  20001
                            202.354.3258
8                           catykerr@msn.com

9   Proceedings recorded by mechanical stenography, transcript

10  produced by computer.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           P-R-O-C-E-E-D-I-N-G-S

2           (10:05 A.M.; OPEN COURT.)

3           THE DEPUTY CLERK:  This is Civil Action 08-2054,

4    Cruise Connections Charter Management 1, LP, et al versus the

5    Attorney General of Canada, et al.  For the Plaintiffs we have

6    Jack Strauch and Louis Rouleau, and for the Defendants we have

7    John Townsend and Scott Christensen.

8           THE COURT:  Okay.  This is a suit for breach of

9    contract and for violations of the North Carolina Unfair and

10   Deceptive Trade Practices Act brought by a -- I guess it's a

11   corporation, but it's an entity, in any event, that undertook

12   to charter ships and provide them to the RCMP for use,

13   basically, as sleeping facilities in Vancouver in connection

14   with the olympics.

15          I gather, from the papers, that everyone is agreed

16   that unless this action falls within the very specific third

17   element of the Foreign Sovereign Immunities Act, that the

18   Defendants are immune and that what we are talking about --

19   what we're here to talk about today is whether I have

20   jurisdiction upon an act outside of the territory of the

21   United States in connection with a commercial activity of the

22   foreign state elsewhere and that act causes a direct effect in

23   the United States.

24          That is the question we're here to talk about today,

25   is it not?

1           MR. STRAUCH:  I believe so, sir.

2           MR. TOWNSEND:  It is from the Defense side, yes.

3           THE COURT:  Well, the motion is the Defendant's

4  motion, and I'll hear from the Defendant.

5           MR. TOWNSEND:  Thank you, Your Honor.  My name is

6  John Townsend.  I appear for the Government of Canada, which

7  is sued in this action as the Attorney General, the Royal

8  Canadian Mounted Police and Her Majesty the Queen.

9           With me at counsel table, Your Honor, is

10  Mr. Jean-Sebastien Gallant from the Department of Justice of

11  Canada and my partner Scott Christensen.  I'd be happy, Your

12  Honor, to accept Your Honor's wig as a ruling on our motion

13  and sit down.

14           THE COURT:  I didn't put the black square on the top

15  of it, though.

16           (LAUGHTER.)

17           MR. TOWNSEND:  But assuming you want to hear from

18  us, I propose to address exactly the point Your Honor

19  identified.  We've also moved to dismiss on the ground of

20  *forum non conveniens*.

21           THE COURT:  But I don't have to reach that on if

22  I --

23           MR. TOWNSEND:  You don't have to reach that --

24           THE COURT:  -- submit that on the Sovereign

25  Immunities ground.

1          MR. TOWNSEND:  Exactly, Your Honor, and we're

2    prepared to submit that on the papers, unless Your Honor has

3    questions on that motion.

4          We are, as Your Honor said, faced with the questions

5    of whether the cause of action alleged is based upon the third

6    prong of the commercial exception to the Foreign Sovereign

7    Immunities Act, which Your Honor just read and will save me

8    the trouble of reading.

9          There is no dispute between the parties that the

10   Government of Canada is a sovereign.  There is no dispute, for

11   purposes of this motion, at least, that the underlying

12   activity, that is, an attempt to lease ships, comes within the

13   definition of "commercial" in the Foreign Sovereign Immunities

14   Act in Section 1603(d).

15         So, the one question presented to the Court is

16   whether that activity had a direct effect in the United States

17   sufficient to defeat the Government's sovereign immunity in

18   this court.  If it did not, then this court would lack subject

19   matter jurisdiction and the case should be dismissed.

20         THE COURT:  Is there any really important

21   controlling precedent that I need to consider, except the

22   *Weltover* case?

23         MR. TOWNSEND:  Your Honor, since *Weltover*, there

24   have been several cases in the D.C. Circuit and in this court

25   which have addressed the particular question before the Court

today, which is when is the failure to make a payment, or put

another way, the disappointment of a plaintiff in the

expectation of a payment a direct effect?  Because when you --

I think when you cut through everything, that's the question

before the Court today.

The Plaintiffs did not receive a payment in the

United States, so the dog did not bark in the nighttime.  The

Supreme Court in *Weltover* held -- I suppose you call it a

holding.  It's a difficult decision.  That if the payment was

supposed to have been made in the United States in the

*Weltover* case, a payment on bonds issued by Argentina that

permitted the plaintiff to designate one of several accounts

as a place of payment -- the plaintiff had designated New York

accounts -- some payments were made to those accounts and then

the payments stopped.

And the Supreme Court said the cessation of the

payments caused a direct effect in the United States and

permitted that suit to go forward.

What the Supreme Court meant by "should have been

made" has been the subject of a number of cases since then,

and I'll skip ahead to that point.

The Second Circuit, a couple of years after

*Weltover*, considered a case involving a letter of credit where

the plaintiff was permitted by the letter of credit to

designate the place of payment, designated New York.  Payment

 1   was not made.  The Second Circuit in *Hanil Bank* said that was

 2   a direct effect.

 3        At the other end of the spectrum, however, Your

 4   Honor, where you have a mere disappointed expectation of

 5   payment, it's well established and in fact it was very well

 6   stated by this court in the *Lempert against Kasakstan* case

 7   that a refusal to pay for services performed by an American

 8   plaintiff usually does not meet the direct effect requirement.

 9        That -- Your Honor's reasoning in that case was

10   followed in this court in the *BPA International* against *Sweden*

11   case where there was an alleged breach of contract by a

12   corporation owned by the Government of Sweden where this court

13   said a financial loss in the United States, when all the acts

14   giving rise to the claim occurred outside this country, is

15   insufficient to show the direct effect in the United States

16   that the FSIA requires.

17        In the *Global Index* case decided in 2003, Judge

18   Kennedy lined up all the cases dealing with the failure to

19   make a payment, and he started with the proposition that the

20   fact that a U.S. citizen or entity suffers a loss does not

21   suffice to prove a direct effect in the United States.  And

22   then he went through the cases, all of course governed by

23   *Weltover*, separating them out and Judge Kennedy concluded in

24   that case that while the law does not require that the

25   underlying contract had required the payment be made in the

1   United States, he concluded, as a matter of fact, that every

2   case which had found the direct effect had a contract which

3   provided for payment in the United States.

4           So what Judge Kennedy said in *Global Index* was that

5   as a factual matter, in almost every case in this circuit and

6   others involving the direct effect exception, the existence or

7   absence of an expressly designated place of payment has been

8   decisive.

9           When a contractor note designates the United States

10  for payments -- for payment, the courts have found the direct

11  effect.  In that case, however, which involved financial

12  instruments, Judge Kennedy said, "The notes plainly require

13  payment in U.S. dollars to a U.S. company but on their face do

14  not designate any place of payment at all, let alone a

15  particular bank or city in the United States."

16          Plaintiffs' argument that the expressed text of the

17  note require payment in the United States is simply wrong.

18          These cases --

19          THE COURT:  Has Congress ever -- has Congress, you

20  know, ever had occasion to reconsider or look at this whole

21  direct effect thing?  I mean, the problem I have with this

22  case law is that it seems to me to be a lot of wriggling

23  around on the part of lower courts to try to escape the

24  legal -- the legal fiction that has been embossed onto the

25  direct effect language by the Supreme Court.

1    I mean, a -- an ordinary -- an ordinary mind might

2    look at this and say, of course, it's an ordinary effect.  Of

3    course, it's direct effect.  The company was expecting lots of

4    money; they're not going to get lots of money.  Why isn't that

5    a direct effect?  And the answer, of course, for a lawyer is,

6    because the Supreme Court says it's not.

7    MR. TOWNSEND:  That's one answer, Your Honor.  The

8    immediate answer to your question is I don't believe Congress

9    has addressed it.  Congress has circled back to the statute

10   tinkering with the terrorism exception.  The Supreme Court

11   just issued a case yesterday trying to figure out what they'd

12   done that time.

13   What they did with the original statute remains

14   subject to all the problems Your Honor has just identified.

15   It is not the crispest statute ever written, but I'm sure Your

16   Honor is used to that by now.  The courts, nevertheless, seem

17   to have found a line on which they line up the cases, some on

18   one side and some on the other, and the line they found, we

19   submit, leaves this plaintiff on the wrong side, because there

20   is -- there is nothing in the agreement or documents between

21   the parties that requires a payment in the United States.

22   The documents contemplate a payment.  The documents

23   identify the Plaintiff, finally, for the first time in the

24   articles as an American company after a lot of lead-up from a

25   Canadian address, but they don't say where payment is to be

1    made in the original articles.

2            In subsequent agreements, the parties agreed that

3    the first payment would be made in Canada.  The first payment,

4    under this contract, Your Honor, if it is a contract, was to

5    have been 80 percent of the value of the transaction, and that

6    80 percent, the parties agreed --

7            THE COURT:  And that was to clear the letter of

8    credit, I gather.

9            MR. TOWNSEND:  That was to secure the letter of

10   credit.

11           THE COURT:  Yeah.

12           MR. TOWNSEND:  And that payment would have been

13   larger than the letter of credit contemplated, so presumably,

14   there would have been money left over from that first payment

15   to be eventually transferred to the Plaintiff, wherever the

16   Plaintiff wanted the money.  It would have been in the

17   Plaintiffs' account in Victoria to start with.

18           As far as we know, that is the only account

19   maintained by the Plaintiffs that is a Canadian dollar

20   account, and the payments contemplated were to have been made

21   in Canadian dollars.

22           THE COURT:  And the -- your position is that the

23   designation of North Carolina as the contract location is

24   meaningless.

25           MR. TOWNSEND:  Well, it's designated as the place of

1    contract delivery in the articles, Your Honor.

2          THE COURT:  Place of contract delivery.

3          MR. TOWNSEND:  I don't think it's meaningless, but I

4    don't think it establishes any obligation to make payments

5    there.  Indeed, the Plaintiffs don't contend that it requires

6    all payments to be made to that address because they recognize

7    that agreement was made, you know, as their negotiator put it

8    in the note that is Exhibit 11, the Day declaration.  The

9    first payment by the Royal Canadian Mounted Police goes

10   directly to the bank, and the bank was the Royal Bank of

11   Canada in Victoria, and from there to the cruise lines.

12          So, they are reduced to talking about what would

13   have happened to the second and third payments had the

14   contract gone forward, had it been performed, had the second

15   and third payments been made.  They say they would have asked

16   that the payment be made to their bank in North Carolina, and

17   we have no doubt they're perfectly sincere in that that was

18   their intention, but there was never any agreement by the

19   Government of Canada as to where the second and third payments

20   would go beyond the fact that they were to be paid directly.

21          But a direct payment into Plaintiffs' account in the

22   Royal Bank of Canada would have been just as direct as a

23   payment in any other account maintained by the Plaintiffs.

24          THE COURT:  So your lesson to an American lawyer

25   writing the next contract with a Canadian company is specify

1   Canadian -- an American bank as the place of payment?

2         MR. TOWNSEND:  Well, Your Honor, you could simply

3   negotiate a forum clause.  There is no forum clause in these

4   papers.  I suspect the lesson to the Government of Canada is

5   there will be in the next one, but if an American plaintiff is

6   trying to take the Government by surprise, I would -- my

7   advice would be negotiate for a specific payment to a specific

8   account in a specific American city because what -- what

9   happened here was pretty well --

10        THE COURT:  Well, it's not clear on the facts of

11   this case who took whom by surprise.

12        MR. TOWNSEND:  That's probably a very fair

13   observation, Your Honor.  You know, in many ways, the facts

14   are similar to the facts in the closest *Master Fund* case,

15   which was a 2002 decision of this court where the Court

16   rejected the argument that payment would have been made in the

17   United States, in that case, on Brazilian bonds.

18        And what the Court said in that case is, first, the

19   plaintiffs do no more than speculate that Brazil would likely

20   have honored a designation of the United States as the place

21   of payment.  Second, plaintiffs never did designate the United

22   States as the place of payment, thus the Court is left with

23   mere conjecture.  The parties --

24        THE COURT:  All right, Mr. Townsend.  I think I

25   understand your position and perhaps I better hear from the

 1   Plaintiffs.  Thank you, sir.

 2          MR. TOWNSEND:  Thank you, Your Honor.

 3          MR. STRAUCH:  Thank you, Your Honor.  My name is

 4   Jack Strauch here on behalf of Plaintiffs, of course.

 5          I want to start up by noting that Mr. Townsend has

 6   argued to you that all we have here is a mere disappointed

 7   expectation of payment in the United States.  There hasn't

 8   been an effort to explain to you what "contract delivery

 9   address" means as it sits right next to "payment terms, direct

10   pay."

11          I will remind the Court that it is their burden of

12   proof, once we come forward with facts, that would support a

13   finding of jurisdiction.  The burden of proof remains with the

14   Government of Canada throughout.

15          There has not been, either in the papers or in oral

16   argument, an attempt to explain to you what the contract,

17   which they wrote, means when it has "direct pay" sitting right

18   next to "contract delivery address."

19          THE COURT:  I have a feeling there's about to be

20   such an attempt.

21          MR. STRAUCH:  Well, you know, Your Honor, I would

22   love to stand before you and say I have found a case or I have

23   found a treatise that says when those words are used, that

24   they are magic words.  I haven't found one.  I've looked, but

25   I haven't found one.

1      I think, however, that a very reasonable and

2 certainly the most reasonable reading of those words together

3 are that we -- that it is an expressed agreement by the

4 parties that Plaintiffs will be paid directly at their address

5 in Winston-Salem, North Carolina.  The fact that those words

6 sit together, the fact that that is the only address for them

7 in the contract -- and I think there's also a recognition by

8 the Government of Canada in its briefing that an address is

9 important because in their efforts to claim that my clients

10 portrayed themselves as a Canadian company, they note that in

11 the bid there was a Canadian address.

12      I think they've recognized that the address in the

13 contract has significance.  I think it has significance.  As

14 stated, I would love to argue to the Court that such and such

15 case or such and such treatise says these are magic words.  I

16 think, however, plain language reading of these words is

17 something the Court can do, obviously, as well or better than

18 myself, and I'll stop arguing about expressed agreement.

19      I believe it's there, but I don't think the Court --

20 in fact, I know the Court does not need to find an expressed

21 agreement in order to find jurisdiction.

22      A case that was cited to you by Mr. Townsend is one

23 I would also like to cite to you, and it's the *Global Index*

24 case and it's out of this circuit, a 2003 case.  The

25 importance of that case, as counsel points out, is that Judge

1  Kennedy reviewed the FSIA cases, and what he explains is that

2  there is not a requirement in this circuit that there be an

3  expressed agreement.

4         And in fact, Mr. Townsend conceded that, although

5  the brief that they submitted claims that an expressed

6  agreement is required.  I think with further reading of the

7  cases, the Government of Canada has now come to recognize that

8  an expressed agreement to be paid in the United States is not

9  required and an implied agreement is enough, and the *Global*

10  *Index* case makes that quite clear.

11        What the *Global Index* case says is that this court

12  follows the "supposed to" test set out in *Weltover*, and

13  it's -- and it says that this implied contract provision can

14  be enough to establish jurisdiction if it means the payment

15  was supposed to be made in the United States, after all,

16  that's the words that the *Weltover* court used.

17        Now, what the *Global Index* case goes on further to

18  say is that if there is a contract provision that allows the

19  plaintiff to choose where he will be paid and then the

20  plaintiff later chooses the United States, you have a direct

21  effect requirement met.  That's *Global Index*, page 115, and

22  that cites to *Weltover*, it cites to *Hanil Bank*, which also

23  says that if there is a choice given to the plaintiff and the

24  plaintiff chooses the U.S., that is a direct effect, and it

25  cites to a case called *Adler* from the Ninth Circuit, which

1   also says that if there's a provision in the contract that

2   plaintiff can choose, that will establish a direct effect.

3           In our contract, I think that it is -- it is quite

4   clear that there is at least an implied right that we can

5   choose where payment is made.  As we point out in the brief,

6   paragraph 7 of the Articles of Agreement gives us the right

7   and actually gives us the obligation to invoice the Government

8   of Canada upon completion of work and to invoice in our own

9   name.  We're not allowed to invoice in a third party's name.

10  Paragraph 7 of the contract makes that absolutely clear.

11          I submit to the Court that where you have a

12  contractual right, and frankly, an obligation to submit an

13  invoice in your own name and the contract clearly states that

14  you are entitled to be paid directly and will be paid

15  directly, that at the very, very least you have a right to

16  choose where you will receive payment.  And in fact, the fact

17  that we directed that the first payment would be made through,

18  RBC is further evidence that we had the right to choose where

19  payments would go.

20          THE COURT:  Right to choose, perhaps, but when did

21  you choose?

22          MR. STRAUCH:  We chose -- we chose during -- before

23  the contract was terminated, we chose, by setting up the bank

24  accounts, by doing all the steps that would be necessary;

25  however, the reason that we never communicated the choice to

1   them is because they breached, our evidence is, they

2   terminated the contract before we were entitled to any

3   payments.

4           And to hold that, well, you never actually made a

5   choice, communicated to the other side, prevents us from being

6   able to litigate in this court means that a foreign government

7   ought to terminate contracts before payment is due and then

8   they can never have the jurisdiction in the American court if

9   it's a right-to-choose case.

10          Here --

11          THE COURT:  Or, as I was just discussing with

12  Mr. Townsend, or that a foreign clause should have been built

13  into the contract or that the contract should have said

14  something that -- up front about where payments were to be

15  made.  I mean, what do you make of the fact that the first

16  80 percent of the payments are to go to the Royal Bank of

17  Canada?

18          MR. STRAUCH:  What I make of it is that that was

19  something that we chose to have occur because we needed to

20  secure financing for these boats.  These boats are not

21  inexpensive.  I think the total price tag on them for us was

22  $39 million and needed to secure that amount of money -- or

23  not actually the whole amount of money.

24          THE COURT:  The very first payment is $44 million.

25          MR. STRAUCH:  Correct.

1          THE COURT:  Of which 5 million is yours.

2          MR. STRAUCH:  Correct.  But the bank and the

3   boats -- the boats -- the ship line, cruise lines required a

4   letter of credit to secure the ships, so we had to go through

5   that hoop, but we did request that the payment go through the

6   RBC.

7          The Government of Canada agreed, and agreed to do

8   that; however, we're still talking about $11 million in

9   payments in the second and third payment that we were going to

10  invoice them, as the contract permitted and required us to do.

11  We were going to invoice them in our own name, and we were

12  going to submit them with instructions.

13         You think about it, any business that sends out an

14  invoice sends an invoice directing "return your check to Joe's

15  Auto Body,"  "return your check to, fill in the blank."

16  That's what happens with invoices.

17         THE COURT:  Yeah.

18         MR. STRAUCH:  And that's why I submit that there is

19  a direct effect under the *Global Index* case and the grounds

20  that a right to choose gets you the direct effect, but you

21  also have this onboard revenue, okay, four-and-a-half million

22  dollars in onboard revenue that were going -- was going to be

23  paid from the cruise lines.

24         The response to that from the Government of Canada

25  is, "Well, those are third parties and third parties --

1  payments from third parties don't count."

2         Stop and think for a second about what *Weltover*

3  says.  *Weltover* not only talks about the -- payments supposed

4  to be made, but *Weltover* expressly rejects any requirement

5  that the harm that is a direct effect be foreseeable.  The

6  *Weltover* court had to be contemplating payments other than

7  contract payments from the foreign sovereign to the plaintiff,

8  because those are always foreseeable.

9         There's no question if I breach a contract with Your

10  Honor that I foresee the payment I was supposed to be made to

11  you, if that's not coming, that's clearly foreseeable.

12  *Weltover* says the injury in the United States that is the

13  direct effect --

14         THE COURT:  Let the record reflect that there is no

15  contract between you and me for making any payments to me.

16         MR. STRAUCH:  Yes.  I should have chosen someone

17  else, Your Honor.  But *Weltover* makes it clear that there is

18  no foreseeability requirement at all under the FSIA, and I

19  actually like a quote out of the Ninth Circuit.  It's from a

20  case called *Lyon versus Agusta SPA*.  It's 252 Fed3d, 1078, and

21  they're talking about the part of *Weltover* that says there is

22  no foreseeability requirement nor substantiality requirement,

23  and the Court says once we choose substantiality and

24  foreseeability, we must interpret immediate consequences,

25  which was the language from *Weltover*, to mean something

1  different from those terms, and it does mean something

2  different from foreseeable.

3          So, the fact that it was from a third party, the

4  fact that it might not have been known to the Government of

5  Canada is not relevant.  What is relevant is this inquiry.

6  Was the loss of the CPA, Charter Party Agreement, with the

7  ships that my clients had with the ship owners, was the

8  termination, was the ending of that an immediate consequence

9  of the Government of Canada's termination of our contract with

10 them?  I submit that it could be nothing but an immediate

11 consequence.

12         The only thing that we were supposed to do was put

13 ships in the harbors.  We had contracts with the cruise lines

14 to get those ships put in the harbors and those contracts with

15 the cruise lines were going to pay us additional money beyond

16 what the Government of Canada was going to pay.

17         As soon as -- the instant that the Government of

18 Canada terminated the contract with us, our contract with the

19 boats, with the ship owners ended, because we can't take the

20 boats to a harbor where we're not allowed to be because the

21 contract's been terminated, an absolutely immediate

22 consequence, and *Weltover* tells us that we're supposed to be

23 looking at whether it's an immediate consequence.  Is the

24 direct effect harm an immediate consequence of the defendant's

25 activity?  If so, then it satisfies the test.

1      Here, the OBR payments were to be made in the United

2 States from an American company to an American company, and

3 it's unquestionably, in my view, a direct effect.

4      The Government of Canada wants to cite you to cases

5 which they suggest support the proposition that it can't be a

6 direct effect if it comes from a third party.  The cases that

7 they cite are -- are a little bit interesting.  One of the

8 cases is a case where a man has a roof collapse on him in an

9 airport in Iran, and actually three people, two are killed,

10 one survived.

11      So the guy who survives comes back to the United

12 States, after being treated, and claims he's got a direct

13 effect in the United States because he's still suffering from

14 his injury, and the Court says, "I'm sorry, but the injury

15 occurred there and the fact that you happened to move here

16 doesn't make it a direct effect.  It's not an immediate

17 consequence."

18      And the other case was some -- some person who had

19 gone through the horror of being a Holocaust survivor --

20 Holocaust victim who sued the government of Germany claiming

21 that what happened to him in the '40s, as awful and

22 unimaginable as it was, that when he was living in the United

23 States in the 1980s, that that counters a direct effect

24 because he still suffered from it, and the Court said that's

25 just not an immediate consequence of what happened.

1   Those are the cases they've cited to you to suggest

2   that the OBR payments, which were from an American company to

3   an American company, which we lost the right to the moment

4   they terminated the contract, it followed as an immediate

5   consequence, those are the cases they cite to you to suggest

6   that the OBR payments can't be enough.

7   I would like to suggest another case to the Court.

8   It's called *Harris Corporation versus N-I-R-T*, which is from

9   the Eleventh Circuit.  It's 691, Fed2d, 1344.  It's an

10  interesting case, as many of these are, because it involves

11  some history, and in that case an American company contracted

12  with the National Iranian Radio and Television, I want to say

13  Company, but I know it's not a company.  National Iranian

14  Television Group, and it was to sell 144 radio transmitters.

15  I guess they're the machines that make the signal go.  And

16  this was before the Shah was overthrown.

17  And during the performance of the contract, it was

18  understood that this American company couldn't make all these

19  transmitters at once and they were going to send them to them

20  over time as they built them.

21  So the American company demanded $1.3 million as an

22  upfront payment, got that money.  The Iranian Government

23  wanted some security for it, so they got a guarantee from an

24  Iranian bank.  The Iranian bank said, "Well, we need a

25  guarantee that this American company is going to pay us back

1    if we have to pay the government, and so they went to an

2    American bank and told the American bank you need to provide a

3    standby letter of credit.  That's what occurs.

4         Now, 136 of these transmitters gets shipped and then

5    the Shah is overthrown and the revolution.  As you might

6    imagine, there were some problems making deliveries thereafter

7    of these transmitters.  The parties are nonetheless trying to

8    work through it, and then the hostages are taken.

9         President Carter issues his executive order, nobody

10   is shipping anything to Iraq -- to Iran, so these remaining

11   eight radio transmitters can't be shipped to Iran.  At that

12   point there is a *force majeure* clause in the contract, but at

13   this point the Iranian Government tells the Iranian bank, "Pay

14   us on the guarantee that you made on behalf of the American

15   company."

16        As you might imagine, the Iranian bank complied and

17   gave notice to the American company saying, "Hey, we're going

18   to make this payment."  When the American company got notice

19   that the Iranian bank was going to make the payment, the

20   American company told the American bank -- and this is

21   important -- once receiving notice, the American company tells

22   the American bank, "Block our account so that they can't get

23   at the money that you're supposed to guarantee for us."

24        And the American bank says to the American company,

25   "By telling us to block the account, you have just forfeited

1    your right to the letter of credit."

2          The case goes to the Court on a motion for permanent

3    injunction and it is raised whether there is jurisdiction

4    here.  And what the Court does to try to figure out whether

5    this is a direct effect is it looks at what happened in the

6    United States, and the only thing that happened in the United

7    States was that the United States company told its bank "Don't

8    Pay, block the account," and the United States bank said,

9    "You've terminated your letter of credit."

10         And what the Court found is that the act of the

11   foreign sovereign, Iran, demanding the payment to the bank in

12   Iran, that that triggered, that's their word, triggered the

13   American company to issue instructions to its bank and

14   triggered the third party, the American bank, to cancel the

15   letter of credit and that that followed as an immediate

16   consequence of the Iranian Government's actions and

17   constituted a direct effect.

18         That is a case that is complicated, and it might not

19   have gotten through it if it wasn't so interesting with the

20   history, but it shows that payments from third parties, it

21   doesn't matter if they're from a third party, are they

22   payments that were supposed to be made in the United States

23   that weren't made because of -- because of an immediate

24   consequence of the defendant's activity?  That's the question

25   under *Weltover*; doesn't need to be foreseeable in any way, per

1   *Weltover.*

2           These payments, although they may not have known

3   about them, were certainly ones that we lost immediately when

4   they terminated the contract.

5           So, in summary, on the -- on the direct effect

6   issue, I submit that the words "direct pay" and "contract

7   delivery address" together have as their most logical meaning,

8   in a contract that they drafted, their most logical meaning to

9   be that's where we're supposed to get paid.

10          And certainly they've got the burden of proof on

11  that and haven't even touched it, haven't even touched it on

12  their burden of proof.  But then, if you step back and you

13  say, "Okay, let's now look at whether there can be an implied

14  right to choose, and if so, that gets it done under the cases

15  that we both cite out of this circuit, *Global Index*.

16          And when you look at invoices that are -- have to be

17  in our name and we're entitled to direct payment, even they

18  concede we're entitled to direct payment, when we're entitled

19  to invoice in our name and get direct payment, I submit that

20  we have the right to choose where payment will be made upon

21  the time that invoices are sent out.  We don't have the right

22  to send an invoice yet.

23          THE COURT:  Remind me of the chronology here.  When

24  was it that -- that the Defendants allegedly breached this

25  contract?

1        MR. STRAUCH:  The chronology is as follows, and I'm

2    glad -- I'm glad Your Honor asked because it gives me a chance

3    to address something that's in the brief.  There's a claim in

4    the brief that the exchange rate just caught us by surprise

5    and we really weren't going to make any money on it.  And I

6    don't know whether that's an attempt to argue the merits or

7    that's an attempt to say they weren't going to get that much

8    of a payment, so it's really not all that much of a direct

9    effect anyhow, but let me address that because it's part of

10   the chronology.

11       It is in July that the contract is signed.  July 31

12   is when the contract is signed.  In August, I want to say,

13   Your Honor, it's August 24 but it may be August 25, but it's

14   Exhibit 3 -- I'm sorry, Tab 3 to the complaint is the

15   amendment to the contract which increases the number of room

16   nights and therefore increases the price.  It is in early

17   September that the -- that the cruise lines come to us and

18   say, "Hey, we got burned or almost burned in Katrina with the

19   taxes.  We need assurance here that the taxes will be covered

20   by the Canadian government if any are assessed."  That's in

21   early September.  Actually, Cruise Lines had come to us in

22   August.  We go to the Royal Canadian Mounted Police in early

23   September.

24       It is around September 8 that we have these e-mails

25   from Kelly Meikle and Michael Day that say, "Yeah, we owe the

1   taxes.  It's in the contract.  It's clear."

2           There's also another document that you don't have

3   before you, but there's another document that's specifically

4   incorporated into the contract where the Canadian Government,

5   at another time, says that they have the obligation to pay all

6   taxes assessed against the cruise lines.  But that happens in

7   early September.

8           At the same time, the Cruise Lines are wanting to

9   sign and finalize the CPAs and the bank has already approved

10  our financing and is ready to get the deal all wrapped up.

11  That's in early September.

12          It is at that point that Normande Morin comes in,

13  changes the position on the taxes and claims that despite the

14  repeated and multiple admissions that they owe the taxes,

15  they're not paying any taxes, period.  That is in mid

16  September.

17          Our evidence will be, if this case -- wherever this

18  case goes forward, but our evidence will be that both the

19  cruise lines and the banks -- the banks -- singular bank,

20  plural Cruise Lines -- were ready to sign all of the

21  agreements and have the deal done before the end of September

22  of 2008.  Our evidence will also be that we had an agreement

23  with the bank to lock in our exchange rate, and that's

24  important because it's not until you get into about the first

25  week, I'm going to say, October 5, October 6 time frame that

1 the exchange rate goes out the window, and in September the

2 exchange rate is about on par, and it would have been not

3 quite but close to a one-to-one exchange for dollars.  It's

4 our evidence that -- or our submission that they delayed until

5 the exchange rate got to where it was, put us into a

6 proverbial pickle and continued to refuse to pay the taxes and

7 at that point made it impossible for us to perform because the

8 cruise lines would not sign the CPAs without assurance that

9 the taxes would be covered by the Government.

10        So, that's the time line, and it's in November, Your

11 Honor, that the letter comes terminating the contract that

12 Normande Morin sends saying, "Contract is hereby terminated."

13 By that time the exchange rate is down the tubes, but again,

14 we had it locked in, in September, at a very good exchange

15 rate.

16        THE COURT:  What's the downside of litigating this

17 case in Canada, from your point of view?

18        MR. STRAUCH:  A big unknown to my folks.  I think

19 they have the right to be in this court, which is what they've

20 chosen.  A -- to be absolutely frank, a fear by my client of

21 potentially biased treatment.  Whether that has justification

22 or not, I don't know, but this is the chosen forum for this

23 plaintiff.

24        I think that the record makes it quite clear, they

25 have the right to receive payments here and therefore have a

1    right to file this lawsuit in this court and respectfully

2    request that the Court uphold the jurisdiction and deny their

3    motion.

4          THE COURT:  Thank you, Mr. Strauch.  I'm going to

5    give Mr. Townsend a few minutes for rebuttal.

6          Particularly, I'd like to hear what your response is

7    to this business about the onboard revenue payments.

8          MR. TOWNSEND:  Well, Your Honor, starting with that

9    one -- Thank you for the indulgence to hear me.  You just

10   heard Mr. Strauch say the cruise lines were ready to sign the

11   contracts, so on the onboard revenue, I submit, Your Honor,

12   it's simply there is a chain reaction, dominoes have to fall.

13         The contract has to be final with the Government of

14   Canada, Cruise Connections has to sign with the cruise lines,

15   the ships have to sail, passengers have to get on them,

16   passengers have to buy liquor, and only when the passengers

17   buy liquor is there onboard revenue to be paid.

18         It is simply too many steps, Your Honor, to meet the

19   immediate consequence language of *Weltover*, you know.  These

20   may all be provable in terms of causation, but the breach does

21   not cause a direct effect in the United States as the courts

22   have used that.

23         And if I'm -- if I may, Your Honor, let me also

24   address the plain language question.  The parties agreed,

25   after signing the articles, that the first payment would be

1   made to the Plaintiff's account in the Royal Bank of Canada.

2   That's a direct payment.  It never occurred to anyone in all

3   the correspondence between the parties that there was any need

4   to amend the articles to permit that first payment to be made

5   to the Royal Bank of Canada.  There was simply an acceptance

6   that that payment was within the meaning of direct payment,

7   and if they could be paid in that account directly, then there

8   is no implied requirement that they be paid in the United

9   States.

10          In the D.C. Circuit's next to last pronouncements on

11   this subject, Your Honor, which was in the *Peterson against*

12   *Saudi Arabia* case, the court said, "These assertions evidence

13   no agreement, expressed or implied, that Peterson was to be

14   paid in the United States. Similar to the situation in *Goodman*

15   *Holdings,* Saudi Arabia might well have paid Peterson or

16   another employee in the United States but it might just as

17   well have done so outside the United States."

18          Now, Your Honor, that was the next to last

19   pronouncement.  The D.C. Circuit has actually looked at

20   *Weltover* once that I know of since then in a per curium

21   decision handed down in November, a very short unpublished

22   opinion, which is only on Westlaw, as far as I know, Your

23   Honor, called *Agrocomplect AD against the Republic of Iraq*,

24   but they dismissed that claim because the plaintiff had not

25   shown that payments under its contract with Iraq were supposed

1    to pass through an American bank, as *Weltover* requires.  And

2    that was dismissing one of these multistep requirements that

3    a -- the Iraqi bank was supposed to send money to a Bulgarian

4    bank that was supposed to clear through an American account.

5            It's simply not enough for the Plaintiffs to say

6    what they would have done.  In the *Global Index* case, the

7    Court took that on directly.  The Court said there is no

8    direct effect if the creditor plaintiff chooses unilaterally

9    the U.S. as a place of payment without any prior agreement

10   with the debtor.  If it were otherwise, the court said, any

11   plaintiff American or not could, by unilaterally electing to

12   accept payment in the U.S., frustrate otherwise valid

13   contracts.

14           Canada submits, Your Honor, that the Plaintiffs have

15   not demonstrated a direct effect in the United States of any

16   conduct on the part of Canada, and that's what the direct

17   effect must flow from under *Weltover* in connection with this

18   transaction.  Their chronology of events has also omitted the

19   quite considerable lead up to the articles signed in July,

20   including the request for bids from the Government of Canada,

21   published on a website in Canada to which the Plaintiffs made

22   a submission with Canadian addresses on it advertising their

23   presence in Canada.  This was a deal negotiated in Canada,

24   done in Canada, to provide ships in Canada, to be paid for in

25   Canadian dollars directly but with the first 80 percent to go

1    to a bank account in Canada, and we submit, Your Honor, if

2    there is to be litigation about it, it should be before the

3    court in Canada.

4             THE COURT:  All right.  Thank you, Mr. Townsend.

5             Counsel, the outcome of this motion, I think, is

6    quite clear, but before I tell you what it is, I have some

7    observations on the Foreign Sovereign Immunities Act, which

8    there's all kinds of policy built into the Foreign Sovereign

9    Immunities Act, all kinds of international acquiescence to the

10   sovereignty of one nation to another, and that's all

11   appropriate.

12            The direct effect exception written into the statute

13   has, I think, all the lawyers involved in this case will

14   agree, become the repository for a whole lot of legal fiction

15   writing on both sides of the line.  I mean, it strikes me that

16   *Weltover* itself creates a legal fiction about what direct

17   effect really is, and then all the cases trying to avoid the

18   effect of *Weltover* are building their own legal fictions,

19   including the most recent one that's been brought to my

20   attention, which is Judge Wald's concurrence in the *Goodman*

21   *Holdings* case, finding a longstanding consistent customary

22   practice would be enough to get out from under the *Weltover*

23   gloss on the direct effect exception.

24            So, it's -- it is a classic case of, I'm afraid,

25   hard cases making bad law and there really ought to be a

1    simpler and more direct way to resolve these questions, but

2    maybe, as Mr. Townsend suggests, the simplest and most direct

3    way is simply to write a forum clause into a contract, which

4    probably should have been done in this case, or when Michael

5    Sloane opened a bank account in North Carolina, to send a

6    telegram to Her Majesty saying, "Pay me at this bank account,"

7    which also, I think, would have done it.  Neither of those

8    things was done.

9          The Plaintiffs' assertion that the contract language

10   is clear enough to establish an agreement that payment would

11   be made in the United States doesn't do it for me.  The

12   contract delivery address is 1418 BS Stratford Road,

13   Winston-Salem, North Carolina, which I think is not the

14   address of the Tristar Bank that Mr. -- Tristar?  TriStone

15   Bank that Mr. Sloane said that he was -- that he opened the

16   account so he was going to ask that monies be paid there.

17         So, although that may be the contract delivery

18   address, it wasn't even the payment address that was

19   contemplated but not specified by Mr. Sloane.  The picture is

20   made considerably more murky by the fact that the first

21   80 percent of the contract was to be paid to a Canadian bank

22   in Vancouver; more complicated again by the agreement that

23   the -- all the contract payments were to be made in Canadian

24   dollars.  And although it is tempting to reach out and help an

25   American contractor by finding that the onboard revenue

1   payments -- the loss of onboard revenue payments constituted a

2   direct effect independent of the other contract payments, I

3   have to agree with Mr. Townsend that it's two or three steps

4   removed from -- from direct effect by the fact that the

5   contracts, although ready to be signed, weren't signed and the

6   ships didn't sail, the drinks weren't bought, the revenue

7   wasn't earned.

8          So, I think I have no choice, under the existing

9   case law and the controlling case law, except to grant the

10  motion to dismiss for lack of subject matter jurisdiction.   I

11  think the Defendant has sustained its burden of proof,

12  whatever -- however that burden is characterized of defeating

13  jurisdiction in this court.

14         Now, I can write this all down, and I -- and I will

15  write it all down, but the problem with doing that is that

16  that's going to take time.   Time is or ought to be the enemy

17  of litigation, and it seems to me that the Plaintiffs are best

18  served either by taking this matter to another court in this

19  jurisdiction or by taking it, as I expect they're ultimately

20  going to, to Canada, and the quicker they take it there the

21  better.

22         So, I'm going to enter a docket entry today granting

23  the Defense motion to dismiss, and the memorandum explaining

24  that decision will follow at a respectable distance, but the

25  parties will perhaps prefer to let the transcript of this

1  hearing reflect the reasons for it if they want to take this

2  case someplace else.

3          That's the ruling of the Court.  Thank you very

4  much.  Thank you, Counsel, for straightforward and interesting

5  arguments, and we're -- I think we've completed our business

6  in this case.  Thank you.

7          (PROCEEDINGS END AT 11:00 A.M.)

8                          *-*-*-*

9

10

11

12              **CERTIFICATE OF REPORTER**

13          I, Catalina Kerr, certify that the foregoing is a

14  correct transcript from the record of proceedings in the

15  above-entitled matter.

16

17

18

19

20  _____    _____

    Catalina Kerr                       Date

21

22

23

24

25