# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CRUISE CONNECTIONS CHARTER MANAGEMENT 1, LP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ATTORNEY GENERAL OF CANADA, *et al.*, <br><br> Defendants. | Civil Action No. 08-2054 (RMC) |

## MEMORANDUM OPINION

Instructed by the D.C. Circuit that the district court has jurisdiction over this case under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-11,[1] the Court turns to the Government of Canada's motion to dismiss on the ground of *forum non conveniens* and to dismiss the second count of the Complaint. The motion will be granted in part and denied in part. Plaintiffs are U.S. corporations entitled to litigate their claims in U.S. courts, even if the law of British Columbia, Canada, will control the analysis. Thus, the motion to dismiss on the ground of *forum non conveniens* will be denied. Plaintiffs have, however, failed to state a claim under the North Carolina Unfair and Deceptive Trade Practices Act ("N.C. Trade Practices Act"), N.C. Gen. Stat. § 75-1 *et seq.*, and thus the motion to dismiss that claim (Count II of the Complaint) will be granted.

---

[1] *Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada*, 634 F. Supp. 2d 86 (D.D.C. 2009), *rev'd*, 600 F.3d 661 (D.C. Cir. 2010).

## I.  FACTS

Vancouver, Canada, hosted the 2010 Olympic Winter Games in a very security-conscious world.  As early as 2008, the Royal Canadian Mounted Police (RCMP), Canada's national police force, contracted with Cruise Connections Charter Management 1, LP, and Cruise Connections Charter Management GP, Inc. (collectively "Cruise Connections"), to provide three cruise ships to dock in Vancouver during the Games in order to house Mounties who would serve as security staff.  Cruise Connections and RCMP entered into a Project Services Agreement dated July 16, 2008.  The Agreement was negotiated and executed by Kelly Meikle, Manager Contracting Services, and Michael Day, Regional Director Contracting, as "Authorized Representatives of the Government of Canada, RCMP."  *See* Compl. [Dkt. #1], Ex. 1 (Project Services Agreement) at 1. It specified that "the Contract must be interpreted and governed, and the relations between the parties determined, by the laws in force in British Columbia."  *Id.*, Ex. 1 (Project Services Agreement) § 9.

Pursuant to this Project Services Agreement, Cruise Connections subcontracted with Holland America and Royal Caribbean to provide the ships.  In return, the RCMP agreed to pay Cruise Connections a little more than $54 million (Canadian).  The Charter Party Agreements between Cruise Connections and the cruise lines were worth approximately $39 million (U.S.) for the three ships.

Exactly what happened next is not entirely clear, since the district and circuit opinions vary slightly.  On a motion to dismiss, however, a court must accept the facts proffered by a plaintiff, and this Court does so here.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (on a motion to dismiss, a court must treat the complaint's factual allegations as true).  Before the Charter Party Agreements could be executed, the cruise lines wanted assurances that they would not be obligated

to pay income and payroll taxes in Canada.  Cruise Connections explains this issue:

> In the aftermath of Hurricane Katrina, Carnival Cruise Line placed cruise ships in Gulf Coast ports to house government workers and others who were assisting with reconstruction efforts or who were displaced by the storm.  The United States government thereafter assessed Carnival with millions of dollars of taxes.  The cruise lines are not typically taxed in this manner because they are registered under foreign flags and dock in harbors for very limited time periods in order to avoid such tax liability.  Thus, having seen Carnival assessed with substantial taxes following Katrina, the cruise lines were particularly concerned about being taxed by the Canadian government when they docked their ships for several weeks in Vancouver Harbor.

*See* Pls.' Opp'n [Dkt. # 25] at 6 n.4 (citing Kelly Aff. ¶ 7 [Dkt. # 12-2]).

RCMP representatives assured Cruise Connections that the tax issue already was addressed and stipulated in the Project Services Agreement between the RCMP and Cruise Connections.  However, when Cruise Connections asked for such assurances on RCMP letterhead, rather than by email, the game changed.

According to Cruise Connections, RCMP abruptly re-assigned its two procurement officials based in British Columbia, Kelly Meikle and Michael Day, and replaced them with Normande Morin, RCMP's Director, Strategic Procurement, Assets and Procurement Branch based in Ottawa.  Ms. Morin thereafter insisted that the RCMP would not be responsible for any taxes, which Cruise Connections asserts were clearly RCMP's responsibility under the Project Services Agreement and all previous representations by the Canadian contracting officers.  Cruise Connections further alleges that because RCMP repudiated its obligation to pay the taxes, the cruise lines delayed final execution of the Charter Party Agreements.  On November 17, 2008, Ms. Morin wrote to Cruise Connections and terminated the Project Services Agreement because the cruise lines

had not timely executed the Charter Party Agreements.

Less than two weeks later, the RCMP solicited bids for a new contract and stated in the solicitation that it would only contract directly with cruise lines and would *not* deal with brokers such as Cruise Connections.  The November 28, 2008 Request for Proposal stipulated:  "No Cruise Line Broker shall appear on the final contract.  Only the official Cruise Line Company name and signature shall appear on the final contract.  Payments will be made out to the same.  No 3rd party (broker) contract shall exist."  Pls.' Opp'n, Ex. 2 (RCMP Nov. 28, 2008 Request for Proposal) at 33.  RCMP also made clear that it would not pay any Canadian government taxes imposed by reason of the charter.

Cruise Connections sues the Attorney General of Canada, RCMP, and Her Majesty the Queen in Right of Canada (collectively, the "Government of Canada"),[2] alleging breach of contract and unfair trade practices.  Relying on the FSIA, Cruise Connections filed its suit in the District of Columbia.  The Government of Canada persuaded the district court to dismiss on the premise that this is a Canadian dispute without direct effect in the United States.  *See Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, 634 F. Supp. 2d 86, 89 (D.D.C. 2009).  This holding was reversed on appeal.  600 F.3d at 665 ("Because RCMP terminated the contract, revenues that would otherwise have been generated in the United States were 'not forthcoming.'" (citation omitted)).  The Government of Canada now renews its motion to dismiss

---

[2] "The Attorney General of Canada is one of the principal officers of the Government of Canada as well as a legal name under which the Government of Canada may be sued in Canada. The RCMP is a department of the Government of Canada.  Her Majesty the Queen in Right of Canada is another legal name under which the Government of Canada may be sued in Canada." Defs.' Mem. in Support of Renewed Mot. to Dismiss [Dkt. # 23] ("Defs.' Mem.") at 1 n.1. Defendants renewed their original Motion to Dismiss [Dkt. #9].

on the ground of *forum non conveniens* and to dismiss Count II of the Complaint.  Neither of these

points was addressed previously in the district court or in the Circuit.[3]

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss on the Ground of *Forum Non Conveniens*

The Government of Canada moves to dismiss on the ground of  *forum non conveniens*.  Pursuant to Federal Rule of Civil Procedure 12(b)(3), upon motion a case may be dismissed for improper venue.  *See Hunter v. Johanns*, 517 F. Supp. 2d 340, 343 (D.D.C. 2007); Fed. R. Civ. P. 12(b)(3).  "In considering a Rule 12(b)(3) motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Darby v. Dep't of Energy*, 231 F. Supp. 2d 274, 276 (D.D.C. 2002).

### B.  Motion to Dismiss for Failure to State a Claim

The Government of Canada also moves to dismiss Count II of the Complaint for failure to state a claim for violation of the N.C. Trade Practices Act.  *See* Compl. [Dkt. # 1] ¶¶ 37-43. A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is

---

[3] While the *forum non conveniens* question was not addressed previously by the parties, D.C. Circuit Judge Silberman commented to Plaintiffs' counsel at oral argument:  "As you well know, even if you win here, you've got the *forum non conveniens* question.  And you've got a real problem there, because the statute, the contract[,] calls for Canadian law." Defs.' Mem. at 2 n.3 (citing Feb. 8, 2010 Tr. at 32).

"plausible on its face." *Id.* A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Id.* But a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## III.  ANALYSIS

Viewing this as a peculiarly Canadian-based dispute, on a contract negotiated in Canada, to be performed in Canada, and which the parties agreed would be construed under the law of British Columbia, the Government of Canada protests that Cruise Connections should not be allowed to proceed in the United States. It also protests that neither the alleged facts nor Canada's status as a sovereign government satisfy the requirements of the N.C. Trade Practices Act.

### A.  *Forum Non Conveniens*

*Forum non conveniens* is an equitable rule "based upon the proposition that a court may, in its discretion, decline to exercise jurisdiction over a transitory cause of action when it appears that there is an imposition upon its jurisdiction even though jurisdiction or venue is authorized by the letter of a venue statute, code article or a judicial decision interpreting same." Note, The Convenient Forum Abroad, 20 Stan. L. Rev. 57, 57 (1967) (quoting *Trahan v. Phoenix Ins. Co.*, 200 So. 2d 118, 120 (La. Ct. App. 1967) (*dictum*)). The main purpose of any *forum non conveniens* inquiry is to ensure that the litigation is in a convenient location. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981). A federal district court can "dismiss an action which it deems an imposition upon its jurisdiction so long as an adequate alternative forum is available and so long as

the trial judge has carefully 'weigh[ed the] relative advantages and obstacles to fair trial' and, taking into consideration the plaintiff's original choice of forum, found the balance of public and private interests to favor dismissal." *Pain v. United Tech. Corp.*, 637 F.2d 775, 779 (D.C. Cir. 1980) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947)).

The doctrine of *forum non conveniens* had its origin in admiralty and equity cases until *Gulf Oil v. Gilbert*, 330 U.S. 501, and *Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518 (1947), "extended the doctrine." *Pain*, 637 F.2d at 782. The general principle is that "a court may resist imposition upon its jurisdiction even when jurisdiction is authorized." *Id.* (quoting *Gulf Oil*, 330 U.S. at 507). Whether to do so is a decision made upon a balancing of factors related to the convenience of the parties as well as factors related to the convenience of the forum. *Id.* at 782.

At the outset of any *forum non conveniens* inquiry, a court must determine whether there is an alternative forum, *i.e.*, another jurisdiction where the defendant is "amenable to process." *Piper Aircraft*, 454 U.S. at 254 n.22 (citation omitted). The trial judge uses her discretion "to balance the interests of the plaintiffs, the defendant, *and* the forum as part of an overall 'weigh[ing of the] relative advantages and obstacles to fair trial' in the *particular* forum where suit is first initiated." *Pain*, 637 F.2d at 783 (quoting *Gulf Oil*, 330 U.S. at 508) (emphasis in original). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil*, 330 U.S. at 508. In other words, "[i]n any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown." *Pain*, 637 F.2d at 783 n.36 (quoting *Koster*, 330 U.S. at 524).

Thus, consideration of the Government of Canada's motion to dismiss must proceed

by way of a four-step inquiry:  first, whether an adequate alternative forum exists with jurisdiction over the entire dispute; second, consideration of the relevant factors of the private interest; third, if the private interests are near equipoise, whether public interest factors tip the balance in favor of dismissal; and, finally, whether plaintiffs can reinstate their suit in a foreign jurisdiction "without undue inconvenience or prejudice." *Pain*, 637 F.2d at 784-85.  The parties agree with regard to step one — they agree that the courts in British Columbia provide an adequate alternative forum for Cruise Connections' breach of contract claims.  They disagree regarding the other steps in the inquiry.

### 1. Relevant Private Interest Factors

The parties dispute whether private interest factors compel litigation in the United States or in Canada.  "Private interest factors" relate to the convenience of the litigants.  Such factors include:

> [T]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.  There may also be questions of the enforcibility [sic] of a judgment if one is obtained.  The court will weigh relative advantages and obstacles to a fair trial.

*Id*. at 782 (quoting *Gulf Oil*, 330 U.S. at 508).  Citizenship and residence are often treated as proxies for convenience.  *Pain*, 637 F.2d at 797.  However, state citizenship[4] does not define Cruise Connections' home court in this case because the FSIA statute requires that any claim against a foreign state must be brought in the U.S. District Court for the District of Columbia.  *See* 28 U.S.C.

---

[4] Both Plaintiffs are North Carolina businesses.  *See* Compl. ¶¶ 1–2.

§ 1391(f)(4).

Cruise Connections contends that its choice of forum is entitled to deference. The Government of Canada urges the Court to find the balance strongly in its favor. It points to a contract negotiated in Canada, to be performed in Canada, and expressly governed by Canadian law. Though these are some of the facts to be considered, it is not really that simple.

Cruise Connections responded to the RCMP request for proposal in Canada and negotiated the Project Services Agreement with the RCMP in Canada. However, the Project Services Agreement obligated Cruise Connections to subcontract with two specific American cruise lines to provide three ships to house security personnel for the 2010 Olympics in Vancouver. Cruise Connections performed this work almost entirely within the United States. As a broker of services, Cruise Connections would have had little or nothing to do with operating the cruise ships during their stay in Vancouver but only brokered the subcontracts to obtain said ships. Thus, by the fall of 2008, Cruise Connections had almost completed its portion of the contract work, its portion being the brokering of the subcontracts. The signing of subcontracts by the cruise lines would have completed Cruise Connections' work. This did not happen because RCMP declared the contract breached by Cruise Connections when the dispute over Canadian tax liabilities[5] caused a delay in execution of the subcontracts.

The Government of Canada posits that contract "performance" entailed access to dormitory ships in Vancouver. True enough, but contract "performance" by Cruise Connections was, first and foremost, its brokering function to connect the RCMP and the cruise lines through

---

[5] Notably, the tax liabilities would not accrue to Cruise Connections but to its subcontractors, the cruise lines.

acceptable subcontracts.  That performance occurred almost entirely in the United States and forms

the basis for Cruise Connections' damages claims.  Viewed from the proper perspective, it is evident

that access to sources of proof for Cruise Connections is more readily obtained in a U.S. court than

in British Columbia.  Cruise Connections makes this point explicit with its listing of necessary

witnesses.  Pls.' Opp'n at 11–12.

Availability of compulsory process for unwilling witnesses, and the costs associated

therewith, favor litigation in the United States.  First, the greater number of potential witnesses

appears to reside in the United States and many are on the East Coast.  Second, Ms. Morin could be

a critical witness and the District of Columbia, although "foreign," is, in fact much closer to Ottawa

than to Vancouver, B.C. and much easier to reach.  Third, the Government of Canada does not

indicate in any manner that it will obstruct access to its employees in Canada, only that it has not

produced them for deposition yet because the motion to dismiss remains pending.[6]  Thus, the

location of Canadian witnesses in Canada may not, as a practical matter, affect trial in this case.

Finally, the parties agree that this is predominately a document case based on contract interpretation

and application that does not rely substantially on "live" witnesses.[7]

The Government of Canada relies almost exclusively on the so-called Canadian

nature of this dispute and the contract clause calling for application of Canadian law.  While it

speaks in generalities about access to witnesses and proofs in Canada, it fails to appreciate the very

real connection this dispute has to the United States, through the brokering work by Cruise

---

[6] For this reason, the Court will deny Cruise Connections' motion to compel [Dkt. # 36] and motion for issuance of letters rogatory [Dkt. # 32] without prejudice, as premature.

[7] Also, because the Court will dismiss Count II, the N.C. Trade Practices Act claim, it will not be necessary to assess witness credibility in the way that claim would have required.

Connections in this country and by the direct effects here flowing from the Government of Canada's alleged breach.  Cruise Connections has shown that trial of its claims will be more convenient, easier, and less expensive in this forum.  The Government of Canada has failed to meet its heavy burden in overcoming such a showing.  *See Pain*, 637 F.2d at 783.

### 2. The Public Interest Factors

The public interest factors also point to the United States as the proper forum for this litigation.[8]  The "public interest factors" focus on forum difficulties:

> Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin.  Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.  In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.  There is a local interest in having localized controversies decided at home.  There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum entangle problems in conflict of laws, and in law foreign to itself.

*Pain*, 637 F.2d at 782 (quoting *Gulf Oil*, 330 U.S. at 508-09).  The D.C. Circuit gleaned three key principles from this list:  (1) "courts may validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it;" (2) "courts may legitimately encourage trial of controversies in the localities in which they arise;" and (3) "a court may validly consider its familiarity with governing law when deciding whether or not to retain jurisdiction over a case." *Pain*, 637 F.2d at 791–92 (footnotes omitted).

---

[8] Since the private interest factors are not in equipoise, the Court could overlook the public interest factors, *see Pain*, 677 F.2d at 784–85, but the Court provides the public interests analysis because under either set of factors the result is the same.

The Government of Canada contends that all three of these principles favor dismissal of the Complaint in whole.  First, it argues that this case has no connection whatsoever to the District of Columbia.  The argument ignores the proper reach of the FSIA.  This case is in U.S. District Court for the District of Columbia because the FSIA gives U.S. plaintiffs a right to sue foreign governments in this jurisdiction when they are harmed by a foreign government's role in commerce, *see* 28 U.S.C. § 1605(a)(2), *i.e.*, when it is not acting as sovereign, and this district is the designated forum for such actions.  *See* 28 U.S.C. § 1391(f)(4) (U.S. District Court in the District of Columbia is the designated forum for FSIA claims against foreign states).

Second, the Government of Canada asserts that this case is a Canadian dispute that arose from events that took place entirely in Canada.  This argument posits too narrow a view of the facts.  Much of the work of Cruise Connections was to broker a deal between the cruise lines and the RCMP by way of subcontracts.  Cruise Connections completed that work almost entirely by the fall of 2008, and Cruise Connections performed that work in the United States.  The cruise lines, not Cruise Connections, would position the ships and provide dormitory space for security personnel by way of their subcontracts and the Project Services Agreement.  To focus merely on that result without attention to Cruise Connections' preparatory work in the United States truncates the facts inappropriately.

Certainly, this breach of contract case *could* be heard in British Columbia.  After all, the Government of Canada does have a strong interest in the controversy because the alleged contract breach occurred there, its laws are implicated, and the conduct of its officials is at issue.  Defs.'

Mem. at 15.  These points could influence a conflict-of-laws analysis under D.C. law[9] but they only partially speak to the question of having local disputes tried in local courts because this dispute has its proper "location" in both countries and the Cruise Connections Plaintiffs have legitimately chosen the United States to pursue their claims.

The other public interest factors also do not compel the choice of a Canadian forum over a U.S. forum.  Are there "administrative difficulties" in this Court that favor dismissal and trial at the litigation's "origin?"  *Pain*, 637 F.2d at 782.  The Court concludes not.  No one has provided any information about the extent of congestion in B.C. trial courts but this litigation did not solely originate in Vancouver.  Jury duty for local citizens does not impact the analysis because the FSIA claim will be tried to the Court.  Inasmuch as this dispute "touch[es] the affairs of many persons," *id.*, on both sides of the border, this particular public interest factor does not counsel dismissal. Finally, this is not a diversity case between U.S. citizens of two different U.S. states but, rather, a suit by a U.S. citizen against a foreign government in the precise forum established by Congress when it created the right to sue under the FSIA.  *See* 28 U.S.C. § 1391(f)(4).

"[T]he need to apply foreign law pointed towards dismissal [in the *Gulf Oil* case]." *Piper Aircraft*, 454 U.S. at 29.  "Of course, this factor alone is not sufficient to warrant dismissal when a balancing of all relevant factors show that the plaintiff's chosen forum is appropriate."  *Id.* at 260 n.29.  The basis for Cruise Connections' claims in this Court is U.S. federal law.  However, the Project Services Agreement specified that "the Contract must be interpreted and governed, and the relations between the parties determined, by the laws in force in British Columbia."  *See* Defs.'

---

[9] A conflict of laws analysis is not required here because the parties specifically agreed that the laws of British Columbia apply.

Mot. to Dismiss [Dkt. # 9], Ex. 5 (Project Services Agreement) § 9.  Indeed, this Court will be required to learn and apply foreign law.  While the application of the law of British Columbia provides the strongest of the public factors to support dismissal on ground of *forum non conveniens*, none of the other public or private factors so indicates.  Because the law of British Columbia is in English and arises from the same common-law tradition from which U.S. law arises, its "foreign-ness" is much less than in cases involving civil code countries with different languages, a prominent factor in other cases where courts have dismissed on the ground of *forum non conveniens*.  *See, e.g., MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 32-33 (D.D.C. 2008) (the law of Cameroon, written in French, applied); *Irwin v World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 36 (D.D.C. 2006) (the law of Gabon, written in French, applied); *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 39 (D.D.C. 2002) (the law of Brazil, written in Portuguese, applied).

The Court concludes that the balancing of private and public factors does not support dismissal on the ground of *forum non conveniens*.  The fact that foreign law applies to this dispute does not, in these circumstances, carry such weight as to change the conclusion.

### B.  N.C. Trade Practices Act Claim

Cruise Connections also advances a claim under the N.C. Trade Practices Act, a North Carolina statute designed to protect the State's residents from unfair and deceptive commercial acts.  The claim is a creature of statute, *i.e.*, *sui generis,* under State law and is neither a breach of contract claim nor a common law tort claim.  *Defeat the Beat, Inc. v. Underwriters at Lloyd's London*, 669 S.E.2d 48, 53 (N.C. Ct. App. 2008) (*sui generis*); *Lapierre v. Samco Dev. Corp.*, 406 S.E.2d 646, 650 (N.C. Ct. App. 1991) (*sui generis* and not an action for breach of contract or tort).

-14-

Therefore, Cruise Connections concludes, "a contractual choice-of-law provision designating one jurisdiction (here British Columbia), and choice-of-law principles applicable to common law claims, do not apply to and do not preclude [N.C. Trade Practices Act] claims, which are neither breach of contract claims nor common law tort claims." Pls.' Opp'n at 32; *see United Dominion Indus., Inc. v. Overhead Door Corp.*, 762 F. Supp. 126, 128 (W.D.N.C. 1991) (contractual choice of law provision did not bar N.C. Trade Practices Act claim, which is *ex delicto* and not *ex contractu*).

Cruise Connections over-reads *United Dominion* which, despite its analysis of the N.C. Trade Practices Act claim, applied North Carolina choice-of-law principles to find that Texas law applied to the contract dispute before it. *United Dominion* concerned the sale of part of Overhead Door Corporation's business to the plaintiff with allegedly fraudulent financial records; the sale closed in Texas, and the contract specified Texas law. The federal district court in North Carolina held that United Dominion's argument that it had a claim under N.C. Trade Practices Act "would allow a corporation to conduct an entire transaction in a foreign jurisdiction and urge the law of the corporation's state of residency in subsequent litigation," which the court found untenable. *Id.* at 130. Since the closing of the sale, the last act that caused United Dominion's damages, occurred in Texas, the court applied Texas law and dismissed the N.C. Trade Practices Act claim.[10] So too here. The last act that caused Cruise Connection's harm was Ms. Morin's termination of the Project Services Agreement, an act she took in Canada. These facts provide no basis to apply N.C. Trade Practices Act to Cruise Connection's claims against Canada.

---

[10] Were this Court to perform a choice-of-laws analysis, it would of course apply the law of this forum, *i.e.*, the District of Columbia. As noted previously, such is not necessary because the parties have agreed that British Columbia law applies. The Court refers to choice of law as discussed in *United Dominion* only to address whether Cruise Connections can proceed on an N.C. Trade Practices Act claim.

Moreover, Canada is not subject to suit under the N.C. Trade Practices Act because it is not a "person, firm or corporation" within the meaning of the Act. *See* N.C. Gen. Stat. § 75-16 (authorizing a civil action by a person or business "injured by reason of any act or thing done by any other *person, firm or corporation* in violation of" the Act). So, for example, the State of North Carolina, its agencies, and its agents are not subject to suit under the Act. *See Sperry Corp. v. Patterson*, 325 S.E.2d 642, 645 (N.C. Ct. App. 1985) ("The State of North Carolina is not a 'person, firm or corporation' within the meaning of [the N.C. Trade Practices Act], so plaintiff has not stated a claim against the State for which relief can be granted."); *see also Rea Construction Co. v. City of Charlotte*, 465 S.E.2d 342, 343 (N.C. Ct. App. 1996) (a claim under the N.C. Trade Practices Act cannot be brought against a city).

Cruise Connections hangs its argument on the statement in *Sperry Corporation* that "'[w]hen the defendants act in their official capacity, it is the State acting'" and for that reason, the N.C. Trade Practices Act claim was dismissed. *Id.* Cruise Connections argues that Canada was *not* acting as a sovereign when it contracted with Cruise Connections and, therefore, the logic of *Sperry* does not preclude its N.C. Trade Practices Act suit. Cruise Connections confuses two concepts: first, whether a government actor is acting in his "official capacity" and second, whether a government is acting as a sovereign or as a commercial actor. There can be no doubt that the Canadian signatories to the Project Services Agreement executed that contract in their official capacities as "Authorized Representatives of the Government of Canada, RCMP." *See* Compl. [Dkt. #1], Ex. 1 (Project Services Agreement) at 1. Similarly, Ms. Morin was acting in her official, not personal, capacity when she terminated the contract. As a result, under *Sperry*, it was the Government of Canada acting and Canada is not a "person, firm or corporation" subject to suit under

-16-

N.C. Trade Practices Act.  The claim under the N.C. Trade Practices Act, Count II of the Complaint, must be dismissed.

## IV.  CONCLUSION

Cruise Connections sued in U.S. District Court for the District of Columbia.  The Government of Canada fails to demonstrate that the doctrine of *forum non conveniens* requires dismissal and litigation, if at all, in British Columbia, Canada.  However, Cruise Connections' claim under the N.C. Trade Practices Act cannot proceed because that statute is limited to a claim against "a person, firm, or corporation" and the Government of Canada is not a person, firm, or corporation.  Therefore, Defendants' motion to dismiss [Dkt. # 23] will be granted in part and denied in part as follows:  (1) the case will not be dismissed on the ground of *forum non conveniens*; and (2) Count II of the Complaint will be dismissed.  The Court will deny Cruise Connections' motion to compel [Dkt. # 36] and motion for issuance of letters rogatory [Dkt. # 32] without prejudice, as premature.  A memorializing Order accompanies this Memorandum Opinion.


Date: February 15, 2011                          _____/s/_____
                                                 ROSEMARY M. COLLYER
                                                 United States District Judge