# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CRUISE CONNECTIONS  CHARTER MANAGEMENT 1, LP, *et al.*, ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 08-2054 (RMC) |
| ATTORNEY GENERAL OF CANADA, *et al.*, ) | |
| Defendants. ) | |

_____

**OPINION**

## TABLE OF CONTENTS

**I. FACTS** ............................................................................................................................ **2**

    **A. The Parties** ................................................................................................................ **2**

        *1. Plaintiffs* .............................................................................................................. 2

        *2. Defendants* ........................................................................................................... 4

    **B. April 2008: The RFP** ................................................................................................ **4**

    **C. April and May: Exchanges with Cruise Lines Prior to Bid** ........................................ **10**

    **D. Late May: CCCM Prepares for Bid** ........................................................................ **12**

    **E. May 23: The CCCM Bid** .......................................................................................... **16**

    **F. May 30 through June 26: CCCM Awarded Contract; Discussions About Payment and Taxes Begin; June 3 Meeting** ...................................................................................... **20**

    **G. June 29 through July 14: Negotiations Continue; Bank Involved** .............................. **27**

    **H. July 15 and 16: Agreement on Project Services Agreement #1** .................................. **33**

    **I. July 16 through 18: Discussions Shift to Articles of Agreement; First Draft of Articles of Agreement and Feedback** ........................................................................... **36**

    **J. July 24 through 27: Internal CCCM Discussions Prior to RCMP Meeting** .............. **39**

    **K. July 28, 2008 Meeting and Second Draft of Articles of Agreement** .......................... **41**

    **L. July 30 and 31: Negotiations Over Second Draft of Articles of Agreement** .............. **45**

    **M. July 31: Executed Version of Articles of Agreement** ................................................ **51**

    **N. July 31 through August 19: CCCM Refocuses on Cruise Lines** ................................ **56**

        *1. Negotiations with Holland America Start Well* .......................................................... 57

        *2. Negotiations with Carnival Stall; CCCM Considers Royal Caribbean* ...................... 57

        *3. Holland America and Royal Caribbean Raise More Tax Concerns* ........................... 59

    **O. August 20 through 27: Bank Financing Talks Stall; RCMP Ship Tour; Tax Issues Escalate** ...................................................................................................................... **63**

    **P. August 25 through September 5: Tax Issues Continue to Escalate** ............................ **68**

    **Q. September 5 through 8: Discussions with Canadian Revenue Agency; Financing Approved** ........................................................................................................................ **76**

    **R. September 9 through 12: Parties' Discussions on Canadian Taxes** ............................ **82**

    **S. September 10 through 13: Charter Agreements and Tax Terms Negotiations With Cruise Lines; RCMP Asks to Raise Contract Amount; Holland America Proposal** ..... **86**

**T. September 15 through 23: CCCM Proposes Contract Clarification; Further Involvement with CRA; CCCM's Lawyers Involved; Negotiations with Royal Caribbean** ........................................................................................... 92

**U. September 26 through 30: Normande Morin Replaces Kelly Meikle as RCMP Contracting Authority; Contractual Relationship Begins to Break Down** .................... 97

**V. Evening of September 30: CCCM Prepares Nomination Documents** ..................... 102

    *1. Discussion of Nomination of Ships by Class* ............................................................. *103*

    *2. September 30 E-mails Preparing Nomination Documents* ......................................... *105*

**W. October 1: CCCM Responds to September 30 Letter & Nominates Ships** ............ 113

**X. October 2 through 6: RCMP Response to Nomination; Renewed Discussions with Cruise Lines; RBC Sends Formal Conditional Credit Offer** ........................................... 119

**Y. October 9 through 15: Increased Urgency Leads to Frayed Relationships** ............ 122

**Z. October 16 through 23: Despite Resolution on Some Issues, Disputes Over Taxes and CPA Review Continue** ....................................................................................... 124

**AA. October 24 Meeting; RCMP States that 90% Letter of Credit Requirement Is Reimposed, Then Re-waived** ....................................................................................... 129

**BB. October 28: Threatening to "Walk Away," CCCM Demands Assurance on Three Issues** ........................................................................................................................ 137

**CC. October 29 through November 7: RCMP's Response; Final Royal Caribbean Charter Party Agreement; Attorneys Involved; the Bank Withdraws Financing; Final Holland America Charter Party Agreement** ..................................................................... 141

**DD. November 10 through 17: Contract Termination** ................................................... 150

**EE. Late November: CCCM's Actions Post-Termination** ............................................ 155

**FF. November 28 through April 2009: RCMP Issues New RFP and Contracts Directly with Cruise Lines** ........................................................................................................ 155

    *1. Revised RFP* ........................................................................................................... *156*

    *2. RCMP-Holland America Charter Party Agreement* ................................................ *157*

**GG. *Post Facto* Issues** ............................................................................................... 158

    *1. The Sessions Letter of Credit* .................................................................................. *158*

    *2. The Health Scores* .................................................................................................. *159*

**HH. Procedural History** ............................................................................................... 159

**II. LEGAL STANDARD** ............................................................................................... **161**

**A. Summary Judgment** .............................................................................................. 161

    **B. Application of Foreign Law**................................................................................ **162**

**III. ANALYSIS**.................................................................................................................. **163**

    **A. British Columbia Law** .................................................................................... **164**

        *1. Contract Interpretation*.................................................................................. 165

        2. The "Factual Matrix"...................................................................................... 166

        *3. Promissory Estoppel* ...................................................................................... 168

        *4. Repudiation, Fundamental Breach, and Effect of Breach* ......................................... 169

    **B. Summary of Parties' Arguments** ........................................................................ **171**

    **C. Status of the Agreements at the Time of Breach**.................................................... **172**

    **D. Responsibility for Taxes** ................................................................................ **172**

        *1. Whether the Taxes Include CCCM's Taxes* ........................................................... 173

        *2. Parties' Arguments* ...................................................................................... 174

        *3. The Articles of Agreement Bound RCMP to Pay Canadian Taxes Imposed on the Cruise Lines* ............................................................................................... 175

        *4. The Documents Incorporated in the Final Articles of Agreement Required RCMP to Pay the Cruise Lines' Canadian Taxes*........................................................... 181

        *5. Promissory Estoppel* ...................................................................................... 185

        *6. Anticipatory Repudiation by Normande Morin* ...................................................... 191

        *7. Fundamental Breach*...................................................................................... 193

    **E. RCMP's First Breach Argument: Provision of Charter Party Agreements** ........... **196**

    **F. RCMP's Second Breach Argument: CCCM's Inability to Obtain Financing** ........ **200**

    **G. RCMP's Third Breach Argument: Health Scores**.................................................... **204**

    **H. RCMP's Fourth Breach Argument: Canada versus United States Law in Charter Party Agreements**.......................................................................................... **206**

**IV. CONCLUSION** .......................................................................................................... **208**

Vancouver, Canada hosted the 2010 Winter Olympic Games.  To ensure available hotel rooms for athletes, spectators, and staff, the Canadian government sought alternative housing for the Integrated Security Unit, a multi-agency task force headed by the Royal Canadian Mounted Police ("RCMP").  The Integrated Security Unit was responsible for ensuring the safety of visitors, athletes, and venues during the Olympic Games.  RCMP found a creative low-cost solution to the lodging scarcity: it would house members of the Integrated Security Unit on cruise ships docked at Vancouver's Ballentyne Pier, using the ships as floating hotels for approximately six weeks.  Through a competitive bidding process in 2008, Plaintiff Cruise Connections Charter Management 1, LP was selected as the broker to negotiate charters for ships that met RCMP requirements.

Well before the 2010 Olympics, the relationship between RCMP and Cruise Connections broke down completely.  In this suit, each party blames the other for their failed agreement.  Cruise Connections contends that RCMP reneged on its promise to pay certain taxes that Canada might impose on the cruise lines.  Cruise Connections argues that RCMP's refusal to cover these costs made it impossible for Cruise Connections to finalize charter agreements and bank financing.  RCMP insists that it never agreed to pay the taxes in dispute and that Cruise Connections breached its own contract obligations and missed key deadlines. Both parties now move for summary judgment, relying on an extensive written record consisting of the parties' written agreements, correspondence, depositions, and other (almost entirely) uncontested materials.

For the reasons set forth below, the Court finds that RCMP agreed to pay all Canadian taxes imposed on the cruise lines.  When RCMP refused to acknowledge its commitment and then repudiated it, it breached the agreement between the parties in a distinctly

1

fundamental way.  In contrast, the claims of RCMP against Cruise Connections relate to duties

that were not fundamental to the contract, were waived, or were provoked by RCMP's breach on

tax payments.  Summary judgment will be granted to Cruise Connections and denied to RCMP.

The Court will set a bench trial to determine damages.

## I.  FACTS

### A.  The Parties

#### 1.  Plaintiffs

Plaintiffs are Cruise Connections Charter Management 1, LP (a North Carolina

limited partnership) and Cruise Connections Charter Management GP, Inc. (a North Carolina

corporation).  Cruise Connections Charter Management GP, Inc., is the general partner of the

limited partnership, of which the limited partners are Michael Sloane; New West Group, LLC

(an LLC organized by Mr. Tracey Kelly); and Issumavik Management Limited (an entity

organized by Susan Edwards).  *See* CCCM Organizational Documents, RCMP Motion for

Summary Judgment [Dkt. 62] ("RCMP MSJ"), Ex. 7 [Dkt. 62-11].[1]  Plaintiffs are referred to

collectively as Cruise Connections or CCCM,[2] and references to the "CCCM partners" mean Ms.

Edwards, Mr. Kelly, and Michael Sloane.  Michael Sloane is also the president of Cruise

Connections Charter Management GP, Inc., of which Mr. Kelly and Ms. Edwards are officers.

Phillip "Bud" Sloane is the Chief Financial Officer of Cruise Connections Charter Management

1, LP, but not a partner.  Decl. of Phillip Sloane ("P. Sloane Decl."), January 15, 2013, CCCM

Br. Opp'n RCMP MSJ ("CCCM Opp.") [Dkt. 67], Ex. 3 [Dkt. 67-3] ¶ 2.

---

[1] Individual pages of the parties' exhibits are cited by their Bates numbers, with leading zeros omitted.

[2] In some of CCCM's internal documents, "CCCMT" is used as an abbreviation for "Cruise Connections Charter Management Team."

The legal entities comprising CCCM were established on May 23, 2008, immediately before CCCM submitted its bid to RCMP.  *See* CCCM Organizational Documents at CCCM9535 (North Carolina Secretary of State certificate dated May 23, 2008); *see also* Deposition of Tracey Kelly ("Kelly Dep."),[3] RCMP MSJ, Ex. 2 [Dkt. 62-6]; Pls. Mot. Summ. J ("CCCM MSJ") [Dkt. 60], Ex. 5 [Dkt. 60-5]; Defs. Opp. Pls. MSJ ("RCMP Opp.") [Dkt. 66] Ex. 3 [Dkt. 66-5]; CCCM Opp., Ex. 9 [Dkt. 67-9]; RCMP Reply [Dkt. 69], Ex. 1 [Dkt. 69-2]; at 122–23 (stating that the CCCM partners agreed to form CCCM on May 17, 2008 and incorporated on May 23).

The CCCM partners' roles for the 2010 Olympics bid were: "Susan Edwards, VP Operations, Project Manager;" "Tracey Kelly, VP Sales and Marketing, Port and Ship Negotiations;" and "Michael Sloane, VP Administration." *See* E-mail from Sue Edwards to CCCM Partners titled "Final ISU Bid," with copy of CCCM Bid ("Bid"), RCMP MSJ, Ex. 17 [Dkt. 62-21], CCCM8248–8320 at CCCM8254; *see also* CCCM MSJ, Ex. 9 [Dkt. 65-4] (duplicate of Bid).  None of the CCCM Partners is an attorney.  The Bid listed Sue Edwards's profession as a "Project Manager, Team Leader, Event Specialist and [ ] Administrative Law Tribunal Member and Member Chair," with previous experience chartering ships.  *Id.* at CCCM8270.  Ms. Edwards was a resident of Victoria, British Columbia, Canada.  *Id.* at CCCM8271.  A resident of Seattle, Washington, Mr. Tracey Kelly had worked in the cruise line industry for more than 20 years, including as Vice President of Sales at Holland America Line

---

[3] The depositions appear in the record piecemeal, with each party submitting only limited excerpts with each brief.  (For example, many pages of Michael Day's deposition appear in Exhibit 10 to CCCM's Motion for Summary Judgment.  Some, but not all, of those pages are repeated as Exhibit 1 to RCMP's Opposition.  However, RCMP's Opposition includes other pages that were not attached to CCCM's motion.)  For simplicity, on the first citation to any deposition, this Opinion lists all exhibits containing any portion of the deposition.  Thereafter, it cites only to the deposition generally—for example, "Day Dep. at 16."

and Regional Vice President of Sales at Carnival Cruise Lines.  *Id.* at CCCM8276.  Michael

Sloane owned Cruise Connections, Inc., a travel agency in Winston-Salem, N.C., *id.* at

CCCM8279, that had focused "primarily on full ship charters" for the five years preceding

CCCM's 2008 Olympic bid.  *Id.* at CCCM8278.

### 2. Defendants

Defendants are Her Majesty the Queen in Right of Canada, the Attorney General

of Canada, and RCMP (collectively, "RCMP").  The three RCMP personnel most important to

the case are Kelly Meikle, Michael Day, and Normande Morin.  Ms. Meikle was the Contracting

Authority and CCCM's primary contact throughout contract formation; her job title was

Manager of Contracting, RCMP "E" Division, Vancouver 2010 Integrated Security Unit

("ISU").  *See* E-mail from Kelly Meikle titled "Use of the Port at Ballentyne Pier & Request for

Proposal," Solicitation No. 2008-00147-ISU, RCMP MSJ, Ex. 9 [Dkt. 62-13]; *see also* CCCM

MSJ, Ex. 3 [Dkt. 65-1] (duplicate of RFP).  Michael Day was the Director of Procurement and

Contracting for the ISU and Ms. Meikle's supervisor.  *See* Deposition of Michael Day ("Day

Dep."), CCCM MSJ, Ex. 10 [Dkt. 60-10]; RCMP Opp., Ex. 1 [Dkt. 66-3]; CCCM Opp., Ex. 6

[Dkt. 67-6]; CCCM Reply, Ex. 2 [Dkt. 70-2] at 16-17.  Ms. Meikle and Mr. Day were both

stationed in Vancouver.  The contract in dispute was the largest on which Mr. Day had ever

worked and was among the largest he handled in connection with the 2010 Olympics.  Day Dep.

at 95–96.  Normande Morin was the Director of Strategic Procurement for RCMP at RCMP's

headquarters in Ottawa, Ontario.  Letter from Normande Morin to CCCM, CCCM MSJ, Ex. 32

[Dkt. 65-22].   Ms. Morin became involved only in late September 2008.

### B. April 2008: The RFP

RCMP issued a formal Request For Proposal ("RFP") in April 2008, for a broker

to negotiate shipboard accommodations for the Integrated Security Unit ("ISU") during the

Vancouver Olympics.  *See* RFP, RCMP MSJ, Ex. 9; *see also* CCCM MSJ, Ex. 3 (duplicate).

The RFP contained several annexes in addition to its main text and is the first of several

documents that formed the parties' overall agreement.  Its details are described here only as

needed to understand the dispute and the contentions of the parties.

> ***Prefatory Section:*** The RFP contained a prefatory section titled "Statement of

Work:"

> > [RCMP] has been assigned the responsibility to plan and manage
> > policing, security operations and services for the protection of the
> > Vancouver 2010 Winter Olympics and Paralympic Games (the
> > Games).  This task will necessitate the deployment of vessels to the
> > Vancouver area in order to provide temporary accommodation of
> > security force personnel for the period of the Games. . . . [T]he
> > RCMP Vancouver 2010 Integrated Security Unit (ISU) intends to
> > charter a vessel or vessels for its exclusive use in Vancouver,
> > British Columbia for approximately five (5) to six (6) weeks
> > during the period January 2010 to March 2010.  It should be noted
> > that all Sections of Annex A, Statement of Work are mandatory
> > requirements.

RFP § 1.2; *see also id.*, Annex A § 1.2 ("*All components contained in this statement of work are*

*considered mandatory unless otherwise indicated.*").

> ***RCMP Contracting Authority***:  Ms. Meikle was identified as RCMP's

Contracting Authority, with responsibility for "management of the Contract" and authorizing

changes to the contract.  *Id.* § 5.1.

> ***Incorporation of Standard Contracting Terms and RFP Terms into Contract***:

The RFP incorporated its own terms into any resulting contract.  *Id.* § 2.1.  It also incorporated

by reference various standard Canadian government contracting clauses.  *See id.* §§ 4.3, 4.3.1

("All clauses and conditions identified in the title, number and date are set out in the *Standard*

*Acquisition Clauses and Conditions* Manual issued by Public Works and Government Services

Canada ('PWGSC'). . . .  9676 (2007/11/30) General Conditions–Services apply to and form part

5

of the contract."). The interpretation and applicability of one of the standard clauses from the "9676 General Conditions" are a focal point of the instant dispute.

*Choice of Law*: As pertinent to CCCM, the RFP required that the law of British Columbia apply. *Id.* § 2.4; *see also id.* § 4.8 ("The Contract must be interpreted and governed, and the relations between the parties determined, by the laws in force in British Columbia.").

*General Requirements for Submitted Bids*: The RFP set forth extensive requirements for bids. *See* RFP § 3.1.I. Annex A detailed services requirements and Annex B detailed financial requirements. As particularly relevant to the matters in dispute, the text of the RFP stated:

> Financial Bid. The Bidder must submit its financial bid in accordance with Annex 'B', Basis of Payment. The total amount of Goods and Services Tax (GST) or Harmonized Sales Tax (HST) is to be shown separately, if applicable.
>
> Certifications with the Bid: The following certifications *must be completed and submitted with the bid:* Annex B-(Basis of Payment) Irrevocable Letter of Credit[;] . . . Health Canada Cruise [S]hip Inspection score of no less than 95% for the year 2006 and 2007. . . . The bid will be declared non-responsive if it is determined that any certification made by the Bidder is untrue, whether made knowingly or unknowingly.
>
> Mandatory Requirements: The bidder **MUST** demonstrate in its bid that the vessels and services proposed meet those indicated in Annex A, Statement of Work. These shall include . . . all the requirements of the Solicitation[;] [and] . . . the financial capabilities to perform the requirement.

*Id.* §§ 3.1.II–.III, 3.2.3 (all emphases in original).

*Basis of Payment*: Bidders were instructed to provide a per-person, per-day ("PPPD") rate that would cover the bidder's costs for ship charters that would satisfy all requirements. The RFP noted that certain costs would be passed through to RCMP for payment and should not be included in the daily passenger rate.

Specifically, Section 4.6.1 of the RFP provided:

> The Contractor shall be paid for services rendered and accepted in accordance with the contract an [sic] all inclusive daily charter rate in CDN dollars $ _____. *The all inclusive price per bed per day means all costs associated with providing the vessels and all services as indicated in Annex A at the Port of Vancouver Ballentyne Pier*:  All port fees, negotiates [sic] costs for federal departments, businesses, or other persons providing port services; licenses; port taxes; fuel for power; water; engine oil;, [sic] port pilots; crew; meals; non-alcoholic beverages (see Annex A) or any other applicable fee or cost; required in consideration of the Contractor satisfactorily completing all of its obligations under the Contract, the Contractor shall be paid a firm price, Goods and Services Tax or Harmonized Sales Tax extra, if applicable.

*Id.* § 4.6.1.  Two sections later, the RFP stated:

> All prices and amounts of money in the Contract are exclusive of Goods and Services Tax (GST) as applicable, unless otherwise indicated.  The GST is extra to the price herein and will be paid by the RCMP.  The RCMP is exempt from Provincial Sales Tax (PST) under exemption number R005521.
>
> The GST shall be extended and incorporated into all invoices and progress claims and must be shown as a separate item on invoices and progress claims.  All items that are zero-rated, exempt or to which the GST does not apply, are to be identified as such on all invoices.  The Contractor agrees to remit to Canada Customs and Revenue Agency any amounts of GST paid or due.

*Id.* § 4.6.3.

    ***Financial Security & Payment***:  Bidders were required to "provide security in the form of [an] irrevocable Letter of Credit from a registered financial institution drawn in favour of the Receiver General for Canada in the amount of ten (10%) percent of the bid value [with its bid], and a second security deposit of ninety (90%) percent of the bid value, on or before April 1, 2009 if a the [sic] bid is successful and contract is awarded."  *Id.*, Annex B § 1.  The successful bidder would be paid as follows:

> A deposit of seventy-five (75%) of the Contract value shall be payable to the Contractor, after April 1, 2009, providing the

contract financial security, in the amount of one-hundred (100%)
of the contract value has been received by the ISU. The form of
the required security will be as previously indicated in this [RFP].
The balance of the amount payable will be paid in accordance with
the payment provisions of the Contract upon completion of
delivery and acceptance by Canada of all Work performed in
accordance with the Contract and a final claim in the form of an
invoice is submitted to the attention of the Contracting Officer.

*Id.* § 4.6.2.

***Contractor's Obligation to Nominate and Secure Vessels***:  The RFP allowed

only ten days from contract award for a successful bidder to identify and "secure" the ship(s) to

house the ISU, and it allowed just twenty days to submit proof to RCMP that the bidder had paid

the relevant cruise line(s) 75% of the cost of the charter(s) to guarantee the ship(s)' presence in

Vancouver.  *Id.*, Annex A § 4.1.  Those deadlines provided little occasion for a bidder to involve

RCMP in the selection of ships, but other portions of the RFP show that RCMP clearly intended

to have such a role.  A few subsections later, Annex A required the successful bidder to:

provide the following information at the time of *vessel nomination*:
Name of the Vessel; Official number, Class, year built, Flag,
length, beam, displacement, passenger capacity, proof of Health
Canada inspection of no less than 95% in the last two years, proof
of Canadian Insurance and permission from the Cruise Ship line
Insurance Carrier for multi-ship inventory to be docked at one
location for an extended period of time.

*Id.*, Annex A § 4.7 (emphasis added).[4]  The text of the RFP also required the successful bidder to

"provide the RCMP with a Standard Cruise Ship Charter party agreement for review and

comments."  *Id.* § 4.18.1.[5]  Nothing in the RFP reconciled the differing requirements in Annex A

---

[4] *See also id.*, Annex A § 4.5 ("The contractor shall ensure the vessel or vessels *nominated* must
in all respects meet the specification standards of the RFP document. *The ISU will confirm
acceptance of the vessels within forty-eight (48) hours of receipt of the vessel nomination*."
(emphasis added)).

[5] This provision further required "[t]he Charter Party agreement [between the successful bidder
and the cruise line(s) to] confirm all terms and conditions of the Agreement between [RCMP and

§§ 4.1, 4.5 and 4.18.1; defined the terms "secure" or "nominate;" or explained its short timeline, a full two years before the Vancouver Olympics. It bears emphasis that the RFP appeared to require the successful bidder to negotiate terms (or execute a contract) for one or more acceptable ships within 10 days of contract award and to pay 75% of the charter cost to the cruise line(s) within twenty days of contract award, without allowance for the mandated review and input from RCMP on charter contracts and specific ships. Moreover, the RFP was silent as to how the parties would proceed if RCMP, during its review of "nominated" ships, were to reject them or ask for additional information.

Notwithstanding this set of conflicting provisions, the RFP specified that any: "[f]ailure by the Contractor to nominate and secure the ships within the time required will constitute a breach under the agreement and the ISU will take whatever measure at its disposition to resolve the issue." *Id.*, Annex A § 4.6. Annex B contained similar language that covered a broader scope of requirements. *See id.*, Annex B § 2.

The difficulties posed by these various provisions explain, at least in part, the post-award discussions between RCMP and CCCM.

***Requirements for Vessels***: The main text of the RFP and Annex A contained both mandatory and optional specifications for the ships. The instant dispute only involves these specifications in respect to the ships' health scores. In relevant part, the RFP stated:

> There is a requirement in the [RFP] for the bidder to provide a Health Canada Cruise ship Inspection score of no less than 95% for the year [sic] 2006 and 2007. In addition to this requirement, the contractor shall provide to the Contracting Authority, within ten (10) days of the vessel receiving, the Inspection scores for the years 2008 and 2009. It is the responsibility of the contractor to

the bidder] within 10 days of the Contractors [sic] confirmation of acceptance of the ship nominated." *Id.*

> oversee compliance with the cruise ship with respect to all aspects
> of this Statement of Work, including maintaining a minimum score
> of 95%. The applicable documentation ensuring remedial action
> has taken place for a score less than 100% shall also be provided to
> the contracting officer within ten days of receipt by the cruise ship
> line.

*Id.*, Annex A §§ 5.1, 5.4.

The RFP allowed the cruise lines to substitute one ship for another as long as "the Contractor and the ISU [are] afforded the opportunity to inspect the proposed substituted vessel at the cruise lines [sic] expense" and approve the substitution. *Id.* § 4.11. Notwithstanding this allowance, the RFP specified that it would be "imperative [that] the Contractor make[] every attempt to provide the vessels as stated in the contract nomination . . . ." *Id.*

***Priority of Documents***: Forecasting conflict among the provisions of a resulting agreement, the RFP established a priority list of documents:

> If there is a discrepancy between the wordings of any documents,
> which appear on the list, the wording of the document, which first
> appears on the list, has priority over the wording of any document,
> which subsequently appears on the list. (a) the Articles of
> Agreement; (b) 2003 (200711/30 [sic] Standard Conditions; (c)
> 9676 (2007/11/30) General Conditions-Services[;] (c) [sic] All
> annexes in alphabetical order; (d) The Contractor's bid dated
> _____.

*Id.* § 4.9.

## C. April and May: Exchanges with Cruise Lines Prior to Bid

As noted above, the RFP was issued in April 2008, and CCCM was not formed as a legal entity until May 23, 2008. Sometime during late April or early May, the CCCM partners began working together to collect cost quotes from cruise lines. Holland America Line (occasionally "HAL") submitted a quote of $145 PPPD for the *ms Statendam* on May 21, 2008, specifying that "[a]ll passenger-based taxes" and "[a]ll additional taxes" were not included and

would be the responsibility of the charterer, CCCM.  HAL Quote, CCCM MSJ, Ex. 6 [Dkt. 65-2]

at CCCM8491.  Holland America also stipulated:

> ADDITIONAL TAXES: The quoted CHARTER HIRE makes no
> provision for income taxes, gross receipts taxes, branch profits
> taxes, withholding taxes, capital taxes, stamp taxes, luxury or
> consumption taxes, gross receipts taxes, sales taxes, value added
> taxes, goods and services taxes or similar taxes or levies on any
> sum payable by CHARTERER imposed by Canada or any political
> subdivision thereof.

Id. at CCCM8491–92.  A May 22, 2008 quote from Carnival Cruise Lines contained similar

language, stating that it did not include "[a]ny government taxes and fees including docking

charges in ports for the duration of the charter" and omitting any kind of taxes from the list of

costs included in the cost estimate.  Carnival Quote, CCCM MSJ, Ex. 7 [Dkt. 65-3] at CCCM53–

57.

Cherie Weinstein of Carnival warned Tracey Kelly by email dated May 23, 2008,

that a lengthy duration in port in Vancouver might raise tax issues for the cruise lines and/or

CCCM.  Ms. Weinstein wrote:

> Please note that we have uncovered some major unanticipated tax
> issues around this charter. From my taxation dept. . . .
>
> "There are a host of Canadian taxes that may be applicable to this
> Vancouver dockside charter. These include the following potential
> taxes:
>
> 1. Customs duty on 25% on a prorated value of the vessel.
>
> 2. GST tax of 5% on a prorated value of the vessel.
>
> 3. GST tax of 5% on the Charter hire.
>
> 4. Canadian payroll taxes on the shipboard crew working in
> Vancouver—These include:
> a) social security type taxes on the employee at 5.5% and the
> employer portion at 6.5%.
> b) individual income tax withholding at 15%.

5. Corporate Income and Branch Profits Tax at a combined effective rate of approximately 51% on the net profits of the charter.

6. Hotel Taxes-10% of the 'Hotel fee.'[""]

The above is just a list of the potential taxes that I have been advised that could apply to a Canadian full ship dockside charter.

. . .

*I believe you have anticipated the GST tax and the potential hotel tax.* Although you can see there is potential to be double-taxed on the GST.

As far as Canadian Payroll taxes and Corporate income/branch profits tax (at 51%!) *these are big issues for us because as an offshore company, we do not pay any of these taxes in our normal course of business. Had I known this, I would have had to factor these into the cost of the charter.*

Our corporate taxation dept will consult with a Canadian tax attorney for some counsel on this. *If it is determined that these taxes will apply, we will withdraw and reprice our quote to ensure that these additional costs are covered in the charter contract rate.* I will be consulting with my counterparts at Holland America and Princess to inquire as to how (or if) they have treated these matters. Apologies for this hiccup.

E-mail Among Tracey Kelly & Cherie Weinstein, *et al.*, RCMP Opp., Ex. 97 [Dkt. 66-99] at

CCCM8–9 (emphasis added).  After submitting CCCM's bid to RCMP, Mr. Kelly forwarded

Ms. Weinstein's e-mail to the CCCM partners, advising, "Just an FYI . . . Noted that we already

addressed these concerns in our Reply to RFP, and they would be vetted out during

negotiations."  *Id.* at CCCM8.

### D.  Late May: CCCM Prepares for Bid

CCCM made final preparations for submitting its bid to RCMP in late May 2008.

However, a problem arose at the eleventh hour.  CCCM's private financial arrangements for a

letter of credit for 10% of the bid value, as required by the RFP, fell apart when its financier

abruptly withdrew on May 6, 2008.[6]  *See* P. Sloane Decl. ¶ 5; Kelly Dep. at 122–23.  At that

point, CCCM was, in Phillip Sloane's words, "out of time and out of options" and "had no other

viable alternatives for getting the letter of credit before [the] bid was due."  P. Sloane Decl. ¶ 5.

CCCM was not yet a formal business entity, Kelly Dep. at 122–23, and had no cash collateral to

secure a letter of credit, Deposition of Phillip Sloane ("P. Sloane Dep."), RCMP MSJ, Ex. 4

[Dkt. 62-8]; CCCM Opp., Ex. 39 [Dkt. 67-39]; CCCM Reply, Ex. 5 [Dkt. 70-5]; RCMP Reply,

Ex. 6 [Dkt. 69-7] at 112.

        At almost the last minute, CCCM approached John Sessions, a North Carolina

businessman, for help.  Although none of the CCCM partners knew Mr. Sessions personally, he

had been suggested "[b]y someone else who was interested in being a backer."  Kelly Dep. at

128.  With very limited time—Michael Sloane "had to be in Charlotte in an hour and 45 minutes

to be on an airplane" to meet the bid deadline in Seattle[7]—CCCM signed a Letter of Intent with

Mr. Sessions and received a document purporting to be a Standby Letter of Credit.  According to

Phillip Sloane, Mr. Sessions "took advantage of the situation, repeatedly raising the price for

providing the letter of credit until he eventually demanded a price equal to the amount of the

letter of credit ($5,057,500.00)," to which CCCM agreed only because it had no options.

P. Sloane Decl. ¶ 5; *see also* M. Sloane Dep. at 144 ("At the last minute, he went to that dollar

---

[6] Anticipated funding was to have come from Dennis Laliberte, a resident of Canada, who had
been collaborating with one or more of the CCCM Partners since June 2007.  M. Sloane Dep. at
28.  Messrs. Sloane and Kelly and Ms. Edwards sued Mr. Laliberte in the United States District
Court for the Middle District of North Carolina, but the case was dismissed for lack of personal
jurisdiction over Mr. Laliberte. *Sloane v. Laliberte*, No. 1:08-cv-00381-CCE-LPA (M.D.N.C.
July 19, 2011) (memo. op. & recommendation of magistrate judge that case be dismissed due to
lack of personal jurisdiction over Laliberte) at *9, *adopted in full by district judge* (Sept. 15,
2011).

[7]  P. Sloane Dep. at 66–67; Deposition of Michael Sloane, July 18, 2012 ("M. Sloane Dep."),
RCMP MSJ Ex. 3 [Dkt. 62-7]; CCCM Opp., Ex. 11 [Dkt. 67-11]; CCCM Reply, Ex. 4 [Dkt. 70-
4]; RCMP Reply, Ex. 7 [Dkt. 69-8]; at 36–38.

for dollar."), P. Sloane Dep. at 66–67 ("[Mr. Sessions] was to get a dollar for dollar for every

dollar he put up, including the letter of credit.").

The Letter of Intent was a four-page document executed by Mr. Sessions and

each of the CCCM partners.  *See* E-mail & Letter of Credit ("LOC"), RCMP MSJ, Ex. 67 [Dkt.

62-71]; CCCM Opp., Ex. 36 [Dkt. 67-36] (duplicate); Sessions Letter of Intent, RCMP Opp., Ex.

75 [Dkt. 66-77].  Because the Sessions Letter of Intent figures prominently in RCMP's defense

to this suit, its relevant provisions are quoted in full:

> This Letter of Intent is offered by John Sessions ("Sessions") to
> identify the terms upon which he is willing to enter into a business
> relationship with both of you and your company, "Cruise
> Connections Charter Management 1, LP" (the "Partnership"), in
> order to provide certain accommodation to assist you in submitting
> a response to Solicitation Number 2008-00147-ISU issued by the
> Royal Canadian Mounted Police, Vancouver, 2010ISU11411 No. 5
> Road, Richmond, B.C.V7A4E8.  The definitive arrangement
> between Mr. Sessions and/or his nominee and yourselves shall
> include but not necessarily be limited, at the discretion of Mr.
> Sessions, to the following:
>
> In exchange for providing an unredeemable, non payable Letter of
> Credit in the amount of $5,057,500.00, Mr. Sessions shall be
> granted assignable rights to receive Warrants at no cost to him for
> special limited partnership interest in the Partnership which he or
> his assignee solely at their election may either cause the
> Partnership to redeem or convert to special limited partnership
> interests.
>
> If the Partnership is the successful bidder and enters into a contract
> providing services for the Royal Canadian Mounted Police (the
> "RCMP Contract"), and if Sessions or his assignee elects to
> exercise his right to receive a special limited partnership interest in
> the Partnership or demand that the Partnership redeem the
> Warrants, Sessions or his assignee shall receive allocations and
> distributions from the Partnership in an amount equal to the sum of
> (i) $5,057,500.00 plus (ii) two (2) times the amount of additional
> capital advanced, loaned, or provided by Mr. Sessions or
> advanced, loaned, invested or provided with the assistance of Mr.
> Sessions or his nominee together with the principal amount so
> advanced,   loaned,   or   provided   with   his   assistance.  . . .

14

If the Partnership is the successful bidder and enters into the contract contemplated herein, the Partnership shall pay Sessions' choice of either the redemption for special limited partnership interest or if the Warrants are exercised allocations and distributions of the amounts described above within 10 days after the Partnership receives its initial payment from the Royal Canadian Mounted Police or Government of Canada or the contracting authority whomever that should be (currently expected to be 75% of the total project fee) (the "Initial Fee Installment").

This Letter of Intent is offered upon your express representations that the parties will work in good faith toward the preparation and execution of a definitive Limited Partnership Agreement with Warrants as described herein that reflects the terms set forth in this Letter of Intent; that the Partnership will be duly formed as a North Carolina limited partnership; that there are not now and will not in the future be any outstanding warrants, or options, or liens or encumbrances of any kind, which would prevent the issuance of warrants for special limited partnership interest to Sessions free of all claims and assessments.

. . .

The terms of the Letter of Credit to which Sessions agrees are attached hereto . . . . It is specifically understood that Sessions is making no commitment to provide any further accommodation, letter of credit or loan, and, at this time, is only arranging for the issuance of the initial Letter of Credit pursuant to the terms attached hereto. In the event the contract is awarded to agent or owner or other entity which pays any of the parties to this agreement a fee of any kind, that party shall pay to Sessions 35% (thirty-five percent) of the fee any party receives within 10 days of receipt.

Sessions Letter of Intent at CCCM15132–33.

Dated May 22, 2008, the Sessions Letter of Credit was titled "Irrevocable Standby Letter of Credit." LOC at CCCM12394. It listed the Southern Community Bank and Trust "We" Credit Administration Department, Winston Salem, NC as the "advising" bank; Canada as the Beneficiary; CCCM as the "Applicant;" and Carolina Shores Leasing, LLC, as the "co-

applicant."[8]  *Id.*  The face amount of the Sessions Letter of Credit was $5,057,500.00 and its

"Expiry date" was July 1, 2008.  *Id.*  It further stated:

> We hereby issue our Standby Letter of Credit in favour of the
> Crown, in the amount of Five million fifty-seven thousand five
> hundred dollars and zero center ($5,057,500.00), subject to the
> following terms: This Letter of Credit may not be drawn upon
> under any circumstances, and is provided only to show that
> applicant has the ability to provide a Letter of Credit.
> Notwithstanding the foregoing, for greater clarity, this Letter of
> Credit shall not be drawn upon even if the applicant is the
> successful bidder in the above referenced RFP.

*Id.*

The legal effect of the Sessions Letter of Intent is put at issue by RCMP, which

argues that the Sessions Letter of Intent created a definitive debt obligation that CCCM wrongly

did not disclose when it sought financing from the Royal Bank of Canada and, had it done so,

CCCM would have received no financing to meet contract requirements.  *See infra* § III.F.

### E.  May 23: The CCCM Bid

The CCCM Bid ("Bid"), submitted on May 23, 2008, is reproduced in the record

as Exhibit 17 to RCMP's Motion for Summary Judgment, Dkt. 62-21, and as Exhibit 9 to

CCCM's Motion for Summary Judgment, Dkt. 65-4.[9]  The Bid identified Victoria, British

Columbia, as CCCM's location.  Bid at CCCM8249.  In its "Acceptance of Statement of Work,"

CCCM responded to each clause of the RFP—*i.e.*, either agreement or a request for a change.

As an "Overview," CCCM indicated:

---

[8] Carolina Shores Leasing, LLC is not otherwise identified in the record or known to Ms.
Edwards or Phillip Sloane.  Deposition of Susan Edwards, July 21, 2012 ("I Edwards Dep."),
RCMP MSJ, Ex. 1 [Dkt. 62-5]; CCCM MSJ, Ex. 19 [Dkt. 60-19]; RCMP Opp., Ex. 2 [Dkt. 66-
4]; CCCM Opp., Ex. 12 [Dkt. 67-12]; RCMP Reply, Ex. 4 [Dkt. 69-5]; at 22, P. Sloane Dep. at
69.

[9] The opinion cites to the CCCM Bates numbers as contained in RCMP MSJ Exhibit 17.

> We agree with and/or support the intent of every clause in the Statement of Work as required. We have identified those Clauses that are, in our interpretation, in conflict with the primary focus of this RFP, which is to deliver the lowest daily cost per bed with all required Operational and Service levels met.
>
> To the Clauses that we support the intent of, but do interpret them as conflicting to the primary focus, we have offered alternatives that are consistent with the Charter Cruise Ship Industry and that also illustrate our commitment to providing the lowest price per bed with all required Services on the most appropriate ship.

CCCM8260. CCCM proposed that "during Contract Negotiations, it would be our responsibility to negotiate in turn with the Cruise Line to add in any specific Clauses that the ISU may wish to have included in the [Charter Party Agreement] on this issue." *Id.* at CCCM8265.

The Bid offered RCMP two price options, each giving a fee of "Per person Charter Hire per bed per day" plus "Per person per day (estimate) Firm Price pass through Service Provider Costs, Taxes (GST.50 per person per day)—invoices will be given directly to RCMP for payment." *Id.* at CCCM8252. Option 2 proposed to use one Holland America ship with a capacity of 1,258 passengers and two Carnival ships with a capacity of 2,052 passengers each, for a total of 5,362 passengers. *Id.* at CCCM8262–63, CCCM8298–300.

***Basis of Payment***: The Bid responded to the RFP's payment clauses, RFP § 4.6, in a section of the Bid labeled "Part 6" and "Part 6.3" at CCCM8302. CCCM proposed that: (1) Port Fees would be "a direct pass through cost" paid by RCMP; (2) Government Fees, Taxes and docking fees would also be a direct pass through cost, *id.*; (3) the two taxes identified by the ISU, Goods and Services Tax (GST) and Harmonized Sales Tax (HST), would be paid by RCMP *and* no Provincial Sales Tax (PST) would be paid because RCMP is exempt; (4) "Any additional taxes identified by the Cruise Lines are questionable, and a tax lawyer will be consulted on these issues after the Bid Award;" and, finally, (5) "*In any case, all taxes are not the responsibility of the Charterer, they are additional and a pass through cost to the Government of Canada*." Bid

17

at CCCM8302 (emphasis added).  The final clause was "specific language" CCCM put into its

Bid as a response to the "consistent feedback and concerns voiced by the cruise lines" about "the

potential that Canadian government taxes would be assessed against the cruise lines, due to the

fact that the ships would be docked in a Canadian port for an extended period of time."  Kelly

Dep. at 213–15; Declaration of Tracey Kelly, November 29, 2012 ("I Kelly Decl."), CCCM

MSJ, Ex. 8 [Dkt. 60-8] ¶¶ 4, 6.  The cruise lines "informed [CCCM] that whatever Canadian

government taxes were imposed against them as a result of the charter, in whatever amount,

would be additional to the charter fare."  I Kelly Decl. ¶ 7.   "[T]he cruise lines did not know

which specific taxes would ultimately be assessed, and did not know how much those taxes

would be," so CCCM "could not include a specific amount in its bid price to cover the amount of

the taxes" and instead "included a provision in its bid stating that the RCMP would be

responsible for paying any such taxes as a pass-through cost to the RCMP." *Id.* ¶¶ 6, 8.  Mr.

Kelly explained the cruise lines' concerns as follows:

> In the cruise industry, cruise lines are structured to avoid paying
> corporate taxes.  They sail foreign flagged ships and normally are
> in port for less than 24 hours. These conditions help the cruise
> lines avoid taxes. However, after Hurricane Katrina, one cruise line
> inserted ships in Gulf coast ports for an extended period of time, to
> house rescue workers and others. The cruise line was subsequently
> charged a substantial amount in taxes by the United States
> government. After that experience, the cruise lines were generally
> unwilling to charter ships for extended stays in port without
> assurance that they would not be responsible for resulting taxes.

*Id.* ¶ 5.

CCCM Bid § 4.6.3, in response to RFP § 4.6.3, is one of the centerpieces of the

parties' dispute about allocation of tax responsibilities.

***Payment and Security***:  CCCM proposed an alternative to the RFP requirement

that "proof of payment to the vessel provider (minimum 75%)" had to be received by RCMP

twenty days after contract award.  RFP Annex A § 4.1.  CCCM first noted that a successful

bidder would need approximately $CDN100M of available funds, on which interest alone would

raise the daily passenger rate charged to RCMP by more than $150.00.  It then proposed a

resolution:

> Strategy: In addition to irrevocable contractual agreements with the
> Cruise lines we will also establish a separate Trust for
> Receivership Fund to add further security on both the payments
> made by the ISU and the payments received by the Cruise Lines as
> per the Charter Cruise Ship Industry standards and practices, and
> this meets the focus of not creating additional costs to the ISU as
> outlined above ($171.43) as we interpret these added costs to be in
> conflict with the lowest rate requirement.  We accept, based on the
> following interpretation, that Contract Award is the execution of
> signatures between the Contractor and the ISU. The Contractor
> shall identify and secure the vessel or vessel(s) with ten (10) days
> of contract award.
>
> Proof of security of the vessel will be provided within ten (10)
> days of contact award.
>
> Proof of payment to the vessel provider to be received by the ISU
> Contracting Authority is agreed. [However,] [p]roof of payment
> timeline in the Charter Cruise Ship Industry is set via the Cruise
> Line's Charter Party Agreement (CPA) which has yet to be
> executed. That document will dictate the payment schedule to the
> Contractor.  The Contractor is under obligation to the contractual
> agreements of the CPA.  *We wish to further discuss the reasoning*
> *behind this Clause by the ISU so that we may create and*
> *implement a solution to that reasoning that also complies with the*
> *Cruise Line requirements.*

Bid at CCCM8307–08 (emphasis added).  CCCM also indicated that it accepted RFP Annex A

§ 4.5 (RCMP would "confirm acceptance of the vessels within forty-eight (48) hours of receipt

of the vessel nomination") and Annex A § 4.7 (contractor would provide detailed "information at

the time of vessel nomination").  *Id.* at CCCM8308.

    ***Provision of Charter Party Agreement***:  In response to the RFP obligation to

provide "a Standard Cruise Ship Charter party agreement for review and comments," RFP

§ 4.18.1, the Bid proposed: "Our interpretation of this Clause is that the RCMP will be provided

with the Terms and Conditions of the Charter Party Agreement between the contractor and the

cruise lines."  Bid at CCCM8304.

*Requirements for Vessels*:  CCCM agreed to RFP Annex A § 5.4, which required

the contractor to "provide a Health Canada Cruise ship Inspection score of no less than 95% for

the year [sic] 2006 and 2007," and added that it had provided "Health Inspection Scores . . . for

all cruise ships currently under consideration" in an appendix to the Bid.  Bid at CCCM8309.

*Priority of Documents*:  CCCM proposed a materially different priority order for

documents than the RFP.  The Bid placed the Bid first, listing controlling documents as follows:

"a) The Contractor's bid, dated, May 23, 2008; b) The Cruise Lines Charter Party Agreement; c)

The Articles of Agreement; d) All annexes in alphabetical order; e) 2003 (200711/30) Standard

Conditions; f) 9676 (200711130) General Conditions- Services[;] g) Services for Charterer to

provide Vessel Accommodation for RCMP 2010 Integrated Security Unit, Solicitation No 2008-

00147-ISU, and all Annexes."  Bid at CCCM8303.

### F.  May 30 through June 26: CCCM Awarded Contract; Discussions About Payment and Taxes Begin; June 3 Meeting

CCCM was awarded the contract on May 30, 2008, by e-mail from Ms. Meikle to

Ms. Edwards.  E-mail from Kelly Meikle to Susan Edwards, RCMP Opp., Ex. 41 [Dkt. 66-43] at

CAN3188 ("Hi Susan, Congratulations, you are the successful bidder! I am happy to award you

the contract for Charterer services for cruise ships to be provided for security personnel for the

2010 Vancouver Integrated Security Unit. The Ships (Carnival) will be required from January

31, 2010 to March 2, 2010, with an option to extend on or before June 15, 2008.").  Ms. Meikle

had read the Bid "from cover to cover" before accepting it.  Deposition of Kelly Meikle, May 16,

2012 ("Meikle Dep."), CCCM MSJ Ex. 4 [Dkt. 60-4]; RCMP Opp., Ex. 4 [Dkt. 66-6]; CCCM

Opp., Ex. 4 [Dkt. 67-4]; CCCM Reply, Ex. 1 [Dkt. 70-1]; at 124.

   CCCM (in the persons of Ms. Edwards and Mr. Kelly) and RCMP (in the persons

of Ms. Meikle, Mr. Day and RCMP Inspector Donna Kaluza[10]) met on June 3, 2008, to discuss

unresolved issues.  CCCM was most interested in how it could provide adequate financial

security to RCMP and receive payment from RCMP.  Representatives for RCMP provide very

limited information about the meeting.  Mr. Day could not recall any details and remembered

only that he was there for "less than half an hour," Day Dep. at 96; the record contains no

statements from Ms. Meikle concerning the meeting; and Inspector Kaluza's handwritten notes

provide only sketchy information about topics, not the content of the discussion.  *See* Notes of

CCCM/RCMP Meeting by Donna Kaluza, RCMP Opp., Ex. 13 [Dkt. 66-15].   Mr. Kelly and

Ms. Edwards provide similar detail in declarations that are not contested by RCMP.  *See* Second

Declaration of Tracey Kelly ("II Kelly Decl."), January 15, 2013, CCCM Opp., Ex. 1 [Dkt. 67-1]

& Second Declaration of Susan Edwards, January 14, 2013 ("II Edwards Decl."), CCCM Opp.,

Ex. 2 [Dkt. 67-2] ¶ 4.  For simplicity's sake, Mr. Kelly is cited.

   Mr. Kelly declares that "a goal of this meeting was to agree to a schedule for

payment to Cruise Connections as well as to address the RCMP's financial security concerns."

II Kelly Decl. ¶ 9.  Mr. Kelly and Ms. Edwards asked Ms. Meikle to explain why RCMP wanted

the contractor to execute letters of credit for 100% of the contract price no later than April 1,

2009, prior to the date CCCM would receive any payment from the RCMP.  *Id.* ¶ 10.  Ms.

Meikle explained "that the RCMP needed some type of financial security in place to make sure

---

[10] Ms. Kaluza was the "accommodation director" for the ISU, with duties to "oversee and address the matters of accommodation relating to the security force, in its broadest sense, for the Olympics."  Deposition of Donna Kaluza, May 16, 2012, CCCM Opp., Ex. 5 [Dkt. 67-5] at 4.

that the RCMP did not pay Cruise Connections tens of millions of dollars, only to have Cruise Connections fail to deliver the ships when it came time for the Olympics," and "letters of credit in favor of the RCMP for 100% of the contract price would allow the RCMP to recoup any payments already made to Cruise Connections if Cruise Connections ultimately failed to deliver the ships." *Id.* ¶¶ 11–12. CCCM responded that "obtaining letters of credit for 100% of the contract price before receiving any payment from the RCMP was simply not possible, especially when coupled with a requirement that Cruise Connections also pay the cruise lines at least 75% of the cruise fare before receiving any payment from the RCMP." *Id.* ¶ 13.

Mr. Kelly and Ms. Edwards declare that the parties reached a mutually satisfactory compromise with three points that were significantly different from the RFP and Bid:

> [1] [T]he "contract financial security" to be delivered to the RCMP by April 1, 2009 would not be letters of credit totaling 100% of the contract price, but would instead be fully signed, non-cancellable charter party agreements naming the ISU as having exclusive use of the vessels during the time period the ships were to be in Vancouver Harbor for the Olympics. . . . [CCCM] would submit the fully signed charter party agreements to the RCMP by April 1, 2009 . . . because the signed charter party agreements were being used as a substitute for the contract financial security originally referenced in the [RFP], [which] called for contract financial security to be submitted to the RCMP by April, 2009.
>
> . . .
>
> [2] [The] first payment from the RCMP would not be due to [CCCM] until a reasonable time after [CCCM] submitted the signed charter party agreements to the RCMP, [*i.e.,*] April 30, 2009. Either Mr. Day or Ms. Meikle explained that the funds necessary to pay [CCCM] could not be appropriated until after April 1, 2009, since the RCMP's fiscal year commences on April 1. Since [CCCM] could arrange to make its initial payments to the cruise lines in May 2009, this payment schedule was agreeable.

> [3] [I]nstead of paying the cruise lines 75% of the cruise fare prior
> to receiving payment from the RCMP, as contemplated by the
> [RFP], Cruise Connections would obtain letters of credit securing
> 70% of the cruise fare within 30 days of entering the charter party
> agreements with the cruise lines. These letters of credit would
> secure the ships for the RCMP well before [CCCM's] first
> payment to the cruise lines came due.

II Kelly Decl. ¶¶ 14–17.

Officer Kaluza's contemporaneous notes reflect that taxes were discussed but do

not provide any substance of that discussion.  Notes of CCCM/RCMP Meeting at CAN20650.

Mr. Kelly described the discussion on taxes at his deposition:

> I said that it was impossible to know what taxes would be applied;
> that because the ships are acting as—for lack of a better term—a
> static hotel, we didn't know what ramifications would mean for
> Canadian taxes. We talked about this for a while. We talked
> specifically about a number of different taxes that could be
> potential for this charter. Michael Day and Kelly Meikle both
> understood and agreed that we couldn't come up with a hard
> number for that, and I believe it was Michael and Kelly Meikle
> who also believed that—and I won't get this exactly right, but that
> the government, by taxing the RCMP, it's taking money from one
> pocket and putting it into another pocket of the same suit. And I
> believe that that's where these potential and questionable taxes,
> would they or would they not be applied, was their position of they
> didn't even know if they would be applied.

Kelly Dep. at 216.

A few days after the June 3 meeting, Mr. Kelly recounted the discussion on

Government Taxes in an email to Messrs. Phillip and Michael Sloane and Ms. Edwards:

> As noted within the Response to RFP there are costs that the
> Cruise Line and Cruise Connections Charter Management must
> pass thru to the RCMP. . . .
> 3. Government Taxes. As noted in the Response to RFP any and all
> Canadian Government Taxes imposed as a result of this Charter
> will be the responsibility of the RCMP.  Kelly Meikle notes "I do
> not think any GST will apply . . . Anything over 28 days is not
> applicable. But the Contract is with CCCM and not the Cruise
> Lines and CCCM is providing a "service" and so we are including
> in our Budget the 5% GST." Michael Day notes "Since our

23

> contract is with CCCM and not the cruise lines, there should be no
> Hotel Tax (cannot pay GST plus Hotel Tax). We are PST exempt."
> Also noted is that [the Canadian Border Services Agency
> ("CBSA")] states no need for "working visas."

E-mail from Tracey Kelly to Messrs. Sloane & Susan Edwards, RCMP Opp., Ex. 9 [Dkt. 66-11].

Mr. Kelly proposed drafting an agreement to reflect the June 3 meeting with RCMP.  *Id.* at

CCCM171.  In response, Ms. Edwards expressed some concern about GST and the Hotel tax.  E-

mail from Susan Edwards to CCCM Partners, RCMP Opp., Ex. 10 [Dkt. 66-12] at CCCM178

("It is a fact that hotel accommodation is being supplied–is it by us or by Carnival??").  Mr.

Kelly wrote back: "3. The point about GST vs. HTL Tax, CCCM is providing a 'service' w/ the

charter ships. Specifically, Mike [Day] said that this cannot be viewed as both a service and Htl?

It was his quote."  E-mail from Tracey Kelly to CCCM Partners, RCMP Opp., Ex. 11 [Dkt. 66-

13] at CCCM179.

Ms. Edwards was not entirely convinced and worried in a June 12 email about

visas for crewmembers, hotel taxes, Canada Revenue Agency income taxes and other costs.  *See*

E-mail from Susan Edwards to CCCM Partners, RCMP Opp., Ex. 14 [Dkt. 66-16] at CCCM206.

Mr. Kelly responded: "In our RFP response, did we not write that all Taxes (associated w/ the

Vancouver stay) will be a Pass Thru?"  E-mail from Tracey Kelly to CCCM Partners, RCMP

Opp., Ex. 15 [Dkt. 66-17] at CCCM209.

Ms. Edwards then began an effort to procure a signed acknowledgment from

RCMP concerning the parties' agreements at the June 3 meeting.  She sent Ms. Meikle an e-mail

on June 18, 2008, with an attachment named "Contractor Outline.doc," explaining: "Here is a

document from Tracey re: contract details.  We would look to have these points agreed to in any

Contract."  E-mail from Susan Edwards to Kelly Meikle & CCCM Doc., CCCM MSJ, Ex. 12

[Dkt. 65-6] at CAN568; *see also* CCCM Reply, Ex. 6 [Dkt. 70-6].  The Contractor Outline is

24

referred to in the record as "Minutes" of the June 3 meeting or as an effort to "memorialize" the

meeting.  In relevant part, the Minutes stated:

> This Document is to formalize our Agreement to the Terms
> identified in our Response to the ISU RFP as discussed in our
> meetings, emails and phone calls from Tuesday, June 3rd 2008,
> through June 23, 2008.
>
> . . .
>
> Components of the Contract Price. As noted within the Response
> to RFP there are costs that the Cruise Line and Cruise Connections
> Charter Management One, LP must pass thru to the RCMP.
>
> … [Fuel Surcharge; Insurance Premiums]
>
> Government Taxes. As noted in the Response to RFP any and all
> Canadian Government Taxes imposed as a result of this Charter
> will be the responsibility of the RCMP. CCCM is providing a
> Service and the RCMP is paying the 5% GST in addition to $298.
> pppd.

*Id.* at CAN9671–72.  The document also noted that "the original bid award of 3 ships (2 Fantasy

Class Carnival Ships, 1 S Class Holland America Line Ship) will move forward." *Id.*

Procurement by RCMP was customarily accomplished through only a purchase order, and Ms.

Meikle issued a Purchase Order to CCCM on June 20, 2008.  E-mail from Susan Edwards to

Tracey Kelly, Bud Sloane & Mike Sloane, Confirmation Letter, Purchase Order & General

Conditions 9676, RCMP MSJ, Ex. 58 [Dkt. 62-62]; *see also* CCCM MSJ, Ex. 24 [Dkt. 65-15]

(duplicate).  Ms. Meikle hesitated to adopt any other process and did not sign the Minutes.

At the same time, restrictions on space for rafted ships[11] at the Ballentyne Pier

forced CCCM to reconsider its plan to use a combination of Holland America and Carnival

ships.  *See* June 19, 2008 E-mail from Susan Edwards to Tracey Kelly, RCMP MSJ, Ex. 89 [Dkt.

---

[11]  When ships are "rafted," they are tied to each other, side to side, to form a raft.  Limited dock
space can cause one ship to be tied to the dock itself and one or more other ships rafted
alongside.

62-93] at CCCM354; *see also* RCMP Opp., Ex. 95 [Dkt. 66-97].  CCCM was also investigating

financing options to secure letters of credit. *See* E-mail Chain Between Susan Edwards & Kelly

Meikle, CCCM MSJ, Ex. 14 [Dkt. 65-8].[12]  While Ms. Edwards was worried that it might be

financially infeasible for CCCM to fulfill the contract[13] and wanted to convey her worries to Ms.

Meikle,[14] Mr. Kelly responded, "We are not going to provide the RCMP with 'choices.'  We will

provide them with 'solutions.'  Please do not provide Kelly the Options. You can only say, how

we got here (to this situation) and that we are confident that we will have a solution that will

work." *Id.*

On June 24, 2008, Ms. Edwards sent an updated copy of the Minutes of the June 3

meeting to Ms. Meikle, now described as a Project Services Agreement.  E-mail Chain Between

Susan Edwards & Kelly Meikle at CAN9671–73.  This was CCCM's second effort to obtain

more formal sign-off on the topics and agreements from the June 3 meeting and thereafter, in

part for CCCM's protection and in part for the cruise lines and banks that wanted to see a

"contract," not merely a purchase order.  Ms. Edwards wrote:

> Went to the bank today :)
>
> They need a copy of a contract (see attached [Project Services
> Agreement] on RCMP letterhead).  This will enable the bank to
> send the [Letters of Credit] to the Cruise Lines.   The contract

---

[12] This e-mail chain was apparently reconstructed from multiple sources; the document submitted as Exhibit 14 to CCCM's motion for summary judgment consists of pages CCCM503–04, CAN7228, and CAN9671–73.

[13] June 19, 2008 E-mail from Susan Edwards to Tracey Kelly at CCCM354 ("We always knew that we might run into someone (else) who would bid low and then get caught out on something. To some degree, we are in that position. . . . It is not too late to change our minds if the profit is not enough for everyone.").

[14] June 21, 2008 E-mail Chain Among CCCM Partners, RCMP MSJ, Ex. 88 [Dkt. 62-92] at CCCM383 (proposing that she "put[] together a fact sheet" to"present to Kelly [Meikle] on Monday").

illustrates what we have discussed and agreed previously. . . . If
you could pls review, print off and sign 2 original copies.

*Id.* at CAN7228.

On June 26, 2008, Ms. Meikle and Ms. Edwards both signed the version that had

been sent to Ms. Meikle on June 18, 2008, *i.e.*, the so-called Minutes of the June 3 meeting. *See*

Executed Version of June 3, 2008 Meeting Minutes, CCCM MSJ, Ex. 13 [Dkt. 65-7] at

CCCM13790. Ms. Edwards signed on behalf of Messrs. Kelly and Sloane. *Id.* Ms. Meikle

testified at her deposition that she "believe[d] this document was a document of minutes of what

was discussed. . . . Whether or not I agreed to everything in it was not my intent. My intent was

a – this basically was what they wanted and what we had talked about." Meikle Dep. at 135.

On June 26, Ms. Meikle also reminded Ms. Edwards that RCMP needed signed

charter party agreements with the cruise lines. Ms. Edwards promised to ask Mr. Kelly about

their delivery date. E-mail from Susan Edwards to CCCM Partners, RCMP Opp., Ex. 81 [Dkt.

66-83] at CCCM556.

### G. June 29 through July 14: Negotiations Continue; Bank Involved

At least by June 29, 2008, CCCM was deep in discussions with Cindy Brand of

the Royal Bank of Canada (also "the Bank") about financing. Negotiations for financing are

relevant because RCMP argues that CCCM would never have been able to get the necessary

funding and therefore could never have performed under the contract. RCMP also argues that

because CCCM could not get the requisite financing, RCMP is not liable to CCCM even if

RCMP itself breached the contract. *See infra* § III.F. Ms. Brand notified Ms. Edwards on June

29 that the Bank would need various confirmations from Mr. Day concerning the contract and

payment schedule "prior to moving forward with [CCCM's] financing request." E-mail Chain

Among Susan Edwards, Cindy Brand & Tracey Kelly, *et al.*, CCCM Opp., Ex. 40 [Dkt. 67-40] at

27

CCCM636.  Ms. Brand also sought "[c]onfirmation of the financial ability of CCCM to provide

some level of financial backup for the financing requested. We could start with Bankers

references for each of the limited partners." *Id.*

The record then reflects silence in the three-way discussions among CCCM,

the Bank, and RCMP for approximately two weeks.  However, during the lull on financing

issues, Mr. Kelly received additional information on the still-burgeoning tax issue, by way

of a detailed e-mail from Mark O'Brien, Chief Tax Strategic Officer of Carnival

Corporation.  *See* E-mail Chain Between Tracey Kelly & Carnival, RCMP MSJ, Ex. 42

[Dkt. 66-44] at CCCM965–67.  Mr. O'Brien's e-mail is repeated here nearly in full, as it is

the most complete and contemporaneous exposition of the tax issues in the entire record:

> Below is a summary of the taxes that applies to our transaction.  As
> discussed, we recomend [sic] that our Canadian tax advisor talk to
> your Canadian tax advisor so that we are all in agreement with the
> issues.  Note that our tax advisor works at Miller Thomson LLP.
> Let me know the name and number of your tax advisor and we will
> set up a call.
>
> Customs Duty: Upon importation, duty is payable under the
> Customs Tariff, Chapter 89, at the rate of 25% of the value;
> however, the "Vessel Duties Reduction or Removal Regulations"
> would generally apply to remit the duty on cruise ships to $0
> provided there is no suitable Canadian duty paid or Canadian
> registered vessel available.
>
> GST: GST is applicable at the rate of 5% of the duty paid value of
> the imported vessel (value of the vessel plus any applicable
> customs duty).  Under the "Value of Imported Goods (GST/HST)
> Regulations" and section 215(2) of the Excise Tax Act, the value
> for GST (i.e. the amount on which the 5% GST is imposed) is
> remitted to 1/120th per each month the vessel remains in Canada.
> GST would also be payable by the RCMP on the charterer but it is
> given an internal credit so the tax is not borne by the RCMP,
> although a GST registrant would have to collect it.
>
> B.C. PST: The British Columbia Social Service Tax Act (the
> "SSTA") imposes a sales tax on sales of taxable tangible personal

property and certain enumerated services.  Tax at a rate of 10% will apply to sales of liquor to individual RCMP officers, although the RCMP itself is not subject to the tax.

Hotel Room Tax: The British Columbia Hotel Room Tax Act ("HRTA"), the purchaser of a hotel room accommodation must pay a tax of 8% of the purchase price of the accommodation.  The HRTA imposes a further tax of 1.65% on the purchase price of the accommodation. The City of Vancouver imposes an additional tax at a rate of 2% payable in respect of accommodation purchased within the City of Vancouver for a total of 10% payable by the purchaser.  This tax is payable by the federal government pursuant to the Reciprocal Tax Agreement and is payable to the RCMP, if applicable.  However, an exemption would appear to cover the provision of lodging for a period of over 30 days where the lodging is occupied during that period by employees of the RCMP such that the 10% HRTA would not apply.

Payroll Taxes: The Income Tax Act (the "ITA") and Regulations impose an obligation on a non-resident employer to withhold and remit tax . . . in respect of remuneration paid to a non-resident employee to the extent that such remuneration is reasonably attributable to employment duties performed  (or to be performed) in Canada. Accordingly, the ITA requires that any employer withhold and remit in respect of remuneration attributable to employment duties performed in Canada, even if, by reason of the ITA or the application of a tax treaty between Canada and the employee's country of residence, the employee's income is ultimately not taxable in Canada.

Corporate Income Tax: The corporate tax rate is 29.5% if the Canadian source business income of a non-resident from a business "carried on in Canada" is not earned in a province (e.g. British Columbia), or 31.5% if the business income is considered to be earned in British Columbia.  In addition to the corporate tax rate, a non resident corporation will be subject to Canadian branch tax at a rate of 25% under Part XIV of the ITA unless reduced or eliminated by a Treaty.  Generally, branch tax applies to after tax profits that are not reinvested in Canada.  Therefore, the aggregate corporate tax rate levied on the profits of Princess Bermuda from carrying on business in Canada would be just under 50%.

Taxes Collectible from Individuals: GST on taxable goods and services (at 5% on all supplies) and liquor tax (10%) and BC SSTA (7%) must be collected by a GST or BC Registered Company.

*Id.* at CCCM966–97.

Mr. Kelly wrote back:

> To be clear Mark, you are stating that the Taxes that are noted below, are all outside of the normal tax consequences for operations of Carnival Cruises?  (CCCM accepted Response to the RFP stated that the RCMP would be responsible for any Taxes specifically associated with the Olympic Charter, that were outside of the normal/standard operating taxes of the Cruise Line). Can you provide the contact name and number at Miller Thompson and we will review.
>
> We will begin the process with the RCMP to identify and put in writing the specifics of these Taxes.
>
> As we have discussed, most of these Taxes are not identified via the official government web site and associated with providing accommodations for the 2010 Olympics.  So there will likely be an "educating process" we will need to go through with the RCMP. We will most likely need some supportive points from Miller Thompson as why these Taxes (could) apply.

*Id.* at CCCM965–66.  A few days later, Mr. O'Brien advised: "There are all [sic] outside our normal tax consequences.  Again let's get our Canadian tax advisors together to discuss.  These are complicated issues."  *Id.* at CCCM965.  Mr. Kelly forwarded Mr. O'Brien's e-mail to Ms. Edwards, asking whether she had "an update on getting these Tax concerns in-front of Mike?"— presumably, Mr. Day.  *Id.*  The e-mail chain does not show a response from Ms. Edwards.

Beginning on July 14, 2008, CCCM began anew its efforts to obtain a formal written version of the agreements between the parties subsequent to the contract award.   Mr. Kelly explained:

> [W]hen we submitted our response to the RFP, it made up—in Kelly Meikle's mind, it made up our agreement. They then put together a PO, standing for "purchase order." And the bank—no. Strike that.  Phil[l]ip said that the bank—because I did not have direct knowledge. Phil[l]ip said that the bank required a signed contract and that a purchase order would not suffice. We brought this to Kelly Meikle, and Kelly Meikle said, "Oh, no, we only do purchase orders," and then obviously a contract developed out of that.

Kelly Dep. at 150.

On the morning of July 14, Ms. Edwards asked Ms. Meikle to put the attached agreement on RCMP letterhead, sign it, and return.  Email Chain Among Kelly Meikle & Susan Edwards, *et al.*, CCCM MSJ, Ex. 14 at CAN399; *see also* RCMP Opp., Ex. 16 [Dkt. 66-18] (partial copy of exchanges).  With her email, Ms. Edwards forwarded the prior emails between Mses. Edwards and Meikle from June 24, 2008, with the draft Project Services Agreement ("PSA").  Ms. Meikle responded later in the afternoon, stating:

> I have sent a letter outlining the payment terms as requested. . . . The other items are not included as my understanding the payment terms are what you needed. Mike Day is back in the office on Wednesday and I need to have his approval on signing this off. The reason is that I would like to ensure we are consistent in our management of this project. If it is a project sign off sheet, then that's fine, or if it a change order which will need funding then I must do an amendment. But I think we need to ensure consistency and number each document.

E-mail Chain Among Kelly Meikle & Susan Edwards, *et al.*, at CAN398.  Ms. Edwards further wrote that evening that she "absolutely support[ed] the Project Sign Off Document strategy" and "consider[ed] this the first Document of many that will take us through this Project.  Through some method, I will need this Document (Contractor Outline) acknowledged and signed off on for my Records . . . ."  *Id.* at CAN398.

The RCMP letter promised by Ms. Meikle was signed by Michael Day, but it proved to be a disappointment to CCCM.  It stated that it was written "in response to the request for clarification sent you [sic] by Cindy Brand" of the Royal Bank of Canada."  Letter from Michael Day to CCCM, part of RCMP MSJ, Ex. 10 [Dkt. 62-14] at CAN1392.[15]  It continued:

---

[15] The letter appears in the record separate from the e-mail chain and from the attachments to the letter.

> [T]he Notice of Award (PO) [Purchase Order] dated June 23, 2008 is attached.  In addition, a copy of [General Conditions 9676] are [sic] provided.  These, along with the Agreement of Terms, the resulting contract clauses, and the statement of work contained in the RFP, constitute the current agreement between Canada and [CCCM].
>
> The [ISU] have [sic] the authority to enter into contracts on behalf of the Government of Canada.  Ms. Kelly Meikle is a Senior Procurement Office employed by the Government of Canada and has delegated authority to enter into contracts, in that capacity, on behalf of Canada.
>
> All payments specified in the contract will be made at the stipulated time assuming the obligations of the Contractor have been fulfilled.  Those obligations require the Contractor to have secured, under contract, sufficient and suitable vessels to fulfill the requirements of the contract.
>
> The contract with [CCCM], as amended or replaced from time to time, will comprise the entire agreement between the named parties.  The terms of that agreement will not be changed without the knowledge and concurrence of both parties to the agreement.
>
> Upon receipt, the RCMP will acknowledge and comply with a properly executed agreement between an authorized officer of [CCCM] and the [Royal Bank of Canada] requesting us to assign payments due under the contract.

*Id.*  Enclosed with Mr. Day's letter were copies of the Purchase Order and General Conditions

9676.  *See supra* § I.B.   General Conditions 9676 contained a section critical to this dispute.

"§ 35: Taxes" stated, in part:

> 3. Changes to Taxes and Duties.  In the event of any change in any tax imposed under the Excise Act, R.S.C 1985, c. E-14, and Excise Tax Act, R.S.C. 1985, c. E-15, or any duties imposed under the Customs Tariff or any other federal or provincial sales, excise or other like duties, taxes, charges or impositions after the bid submission date and which affects the costs of the Work to the Contractor, the Contract price will be adjusted to reflect the increase or decrease in the cost to the Contractor.

E-mail from Susan Edwards to Tracey Kelly, Bud Sloane & Mike Sloane, Confirmation Letter,

Purchase Order & General Conditions 9676, RCMP MSJ, Ex. 58 at CCCM917.

Ms. Edwards forwarded Mr. Day's letter and attachments first to the CCCM partners for review, *id.* at CCCM890, and then to Ms. Brand, E-mail from Susan Edwards to Cindy Brand, CCCM Opp., Ex. 18 [Dkt. 66-20] at CCCM930.  Separately, Ms. Edwards warned the CCCM partners that Kelly Meikle was "starting to dig in her heels" about providing any further documentation to make the cruise lines or banks feel more secure about the contract.  E-mail from Susan Edwards to CCCM Partners, CCCM Opp., Ex. 17 [Dkt. 66-19] at CCCM924.  Ms. Edwards worried that if CCCM pushed any harder, "she will dig her heels in farther.  PO=Contract.  Period."  *Id.*  Nonetheless, Ms. Edwards planned to forward the draft Project Services Agreement on RCMP letterhead in hopes that Ms. Meikle, who had approved it in the format of Minutes, would sign off.  *Id.*

That evening, Ms. Edwards shared her frustration with Mr. Kelly: "I am losing it with regard to the financing.  Phillip [Sloane] calls me again and again stating that he must have his contract or there is no point in going to a Bank.  Kelly [Meikle] calls me again and again stating that the PO and the Payment Terms Outline is as good as it [is] going to get and that the financing is our problem don't involve them."  E-mail from Susan Edwards to Tracey Kelly, RCMP Opp., Ex. 21 [Dkt. 66-23] at CCCM959.

### H.  July 15 and 16: Agreement on Project Services Agreement #1

Ms. Edwards yet again sought a more detailed document from Ms. Meikle on July 15.  *See* E-mail from Susan Edwards to Kelly Meikle, *et al.*, RCMP Opp., Ex. 101 [Dkt. 66-103] at CAN2322 ("As per our conversation yesterday Tracey and the Cruise Lines are looking for the full contract option that you spoke of yesterday.").[16]  She wrote further to Ms. Meikle later in the day on July 15, copying Mr. Day and suggesting:

---

[16]  Ms. Edwards also advised Ms. Brand at Royal Bank of Canada that she had "the RCMP officially signing off on a few more Operational Details that will give RBC a clearer picture of

> Upon further reflection about how to meet our (CCCM's) regular recording process to meet all of our Client's Logistics and Op's needs, I usually create a timely and consistent record of everything that I have gone over with a Client and sent it to them for acknowledgement and approval. [*i.e.*] See Attached; Project Sign Off #1. . . . I would like to continue this practise, but I am happy to format these Documents in any way the RCMP would like them. . . .

E-mail from Susan Edwards to Kelly Meikle & Michael Day, RCMP Opp., Ex. 22 [Dkt. 66-24] CCCM970.

Ms. Meikle answered the second of these e-mails, indicating that they were both "on the same page" and that "[t]his project is going to need this type of record keeping for the purposes of audit, and best practices."  E-mail Chain Among Kelly Meikle, Susan Edwards & Tracey Kelly, *et al.*, RCMP Opp., Ex. 23 [Dkt. 66-25] at CCCM983.  On the next day, July 16, Ms. Meikle and Ms. Edwards signed "Project Services Agreement 1" on CCCM letterhead with an RCMP watermark ("Project Services Agreement," occasionally referred to as "Project Sign Off #1").[17]  *See* Project Services Agreement, CCCM MSJ, Ex. 17 [Dkt. 65-10] at CCCM1098.  As discussed above, the Project Services Agreement was a slightly more developed version of the June 3 meeting minutes.  It stated, in part:

> This document, signed by both parties, creates the specific Logistics and Operational Plan as they arise for the duration of the contract and as outlined by the RCMP to the Contractor, in accordance with the Statement of Work. . . . This document is to be used as an agreement on discussions and does not supersede anything found in the Request for Proposal Resulting Contract clauses.  If there is a monetary costs or any monetary ramification

---

early non-required Operational Issues," but the Bank should not be concerned because CCCM's only performance obligation prior to April 30, 2009 is "to provide a copy of the Cruise Line Contract, Section 18 RFP (Charter Party Agreement)."  E-mail from Susan Edwards to Cindy Brand, RCMP Opp., Ex. 85 [Dkt. 66-87] at CCCM980.

[17] The handwritten dates say 2007, but this is clearly a typo, as Ms. Meikle acknowledged.  *See* Meikle Dep. at 21.

> associated with any of the Project Services Agreement a Change
> Order will be signed off by all Parties and an amendment to the
> Contract would be entered . . . . #1 covers items discussed in our
> meetings, emails and phone calls from Tuesday, June 3rd 2008
> through June 23, 2008.

*Id.* at CCCM1092.  As in the prior Minutes, the Project Services Agreement stated:

> Components of the Contract Price. As noted within the Response
> to RFP there are costs that the Cruise Line and Cruise Connections
> Charter Management One, LP must pass thru to the RCMP. . . .
> Government Taxes. *As noted in the Response to RFP any and all*
> *Canadian Government Taxes imposed as a result of this Charter*
> *will be the responsibility of the RCMP.* CCCM is providing a
> Service and the RCMP is paying the 5% GST in addition to $298.
> pppd.

*Id.* at CCCM1094–95 (emphasis added).  Ms. Edwards sent a copy of the Project Services

Agreement to Ms. Brand at the Royal Bank of Canada later that same day.  E-mail from Susan

Edwards to Cindy Brand, RCMP Opp., Ex. 106 [Dkt. 66-108] at CCCM1065.

Ms. Meikle and Mr. Day were questioned about the Project Services Agreement

and the status of the parties' agreements as of July 15 and 16 at deposition.  Ms. Meikle testified

that Ms. Edwards drafted the document, including putting the RCMP watermark on it, and that

she believed the Project Services Agreement "doesn't supersede the contract."  Meikle Dep. at

141, 143–44.  By contrast, Mr. Day had the following exchange with CCCM's counsel:

> Q. By July 15, 2008, you knew that CCCM's bid had included in it
> a provision that any and all community and government taxes
> imposed as a result of the charter would be the responsibility of the
> RCMP.  Right?
>
> A.  Yes.
>
> Q.  And you knew that RCMP had accepted that provision of the
> bid; right? . . .
>
> A. I—yeah, we have accepted that we are responsible for the taxes.

Q.  RCMP had accepted by July 15, 2008, that RCMP would be responsible for any and all Canadian government taxes imposed as a result of the charter; correct?

A.  Yes.

Q.  Which is why when you read Project Sign Off #1 you didn't have any concern about the government taxes paragraph contained in that document; correct? . . .

A.  I would agree with that.

Day Dep. at 105.

## I.  July 16 through 18: Discussions Shift to Articles of Agreement; First Draft of Articles of Agreement and Feedback

Despite agreement on the Project Services Agreement, CCCM still wanted a formal contract to share with cruise lines and banks, as Mr. Kelly explained to Mr. Day in a July 16, 2008 e-mail:

Mike, we are going to need a full contract created to work in conjunction with the PO.

In our business circle, the PO is meeting with too many questions and although we are clear in the PO use and what the PO means, the Cruise Lines and our other Key Partners are not accepting the contractual value of the PO.

Simply put, the PO is not sufficient.

With a full contract to work in conjunction with the PO and the signed PSO's, we will have enough to satisfy everyone in our business. . . .

This is a unique Contract and we are very excited to be on 'your team.'  To that end, the RCMP also get to work on 'our team' and we are requesting as soon as possible to have a full contract created and the PSO #1 returned so that we can move forward with our key partners and maintain our records to the professional level that we employ.

E-mail from Tracey Kelly to Michael Day, RCMP Opp., Ex. 27 [Dkt. 66-29] at CCCM1045.

When he forwarded a copy of this e-mail to the CCCM partners, Mr. Kelly commented, "I have

been asking for a contract for 6 weeks with Kelly's eyes glazing over whenever I do." E-mail

Chain Among CCCM Partners, *et al.*, CCCM Reply, Ex. 13 [Dkt. 70-13] at CCCM1046. Ms.

Edwards also exchanged emails with Ms. Brand at the Bank, expressing regret that RCMP had

not yet given CCCM "a full Service Contract" and asking Ms. Brand to be patient. *See* E-mail

from Susan Edwards to Cindy Brand, RCMP Opp., Ex. 28 [Dkt. 66-30] at CCCM1051; *see also*

E-mail Chain Between Susan Edwards & Cindy Brand, RCMP Opp., Ex. 105 [Dkt. 66-107] at

CCCM1059–60 (response that the Bank had "not given up" on CCCM).

   In fact, on July 17, 2008, Ms. Brand offered to have the Bank's own lawyer draft

a "legal document" to confirm that CCCM would assign 80% of the contract value directly to the

Royal Bank of Canada as collateral for the requested financing. E-mail from Cindy Brand to

Susan Edwards, RCMP Opp., Ex. 26 [Dkt. 66-28] at CCCM1138. She added: "It must be clearly

noted that the drafting of these legal documents and considering 100% financing of a project is a

very unusual step for RBC," but she was willing "to present this deal if it can be confirmed that

payment is undoubted, which will assist in mitigating the risk level." *Id.*

   Apparently, CCCM had finally persuaded RCMP that a formal contract was

needed because, also on July 17, 2008, Ms. Meikle's assistant sent the first draft of a full-length

contract to Ms. Edwards. E-mail Chain & First Draft of Articles of Agreement ("First Draft"),

CCCM MSJ, Ex. 18 [Dkt. 65-11] at CCCM1104. The First Draft followed the structure of the

RFP and continued many of its terms as if the intervening discussions and Project Services

Agreement had never occurred.[18] For instance, it incorporated all the standard Canadian

procurement terms without change, § 3; its language on tax responsibilities came directly from

---

[18] Unlike the terms of the RFP and Bid, the Articles of Agreement's terms were not divided into
different "Parts," meaning that the leading number for some sections was dropped—for example,
§ 4.6.3 of the RFP, regarding taxes, corresponds to § 6.3 of the Articles of Agreement.

the RFP and was arguably inconsistent with Project Services Agreement, which had specified

that "any and all Canadian Government Taxes imposed as a result of this Charter will be the

responsibility of the RCMP;" it incorporated terms from Annex A § 4.1 ("proof of payment to

the vessel provider (minimum 75%) must be received by the ISU Contracting Authority within

twenty (20) days of contract award") and Annex B § 1 (requiring "a second security deposit of

ninety (90%) percent of the bid value, on or before April 1, 2009"), despite subsequent

discussions; it retained the RFP's timing for CCCM to nominate and secure ships—

notwithstanding, of course, that more than ten days since the initial contract award had already

lapsed and CCCM had neither nominated nor secured any ships; and it put the First Draft in first

place among the priority of documents, followed by: "(b) 9676 (2007/11/30) General

Conditions-Services[;] (c) Annex A, Statement of Work[;] (d) Annex B, Basis of Payment[;] (d)

[sic] The Contractor's Bid dated 2008-05-20[;] (e) Project Services Agreements[.]"  First Draft

§ 9.  One of the negotiated changes did survive: § 6.2 stated:

> Method of Payment.  An initial payment equal to eighty percent
> (80%) of the Contract value shall be payable on or before April 30,
> 2009) providing the contract financial security, in the amount of
> one-hundred (100%) of the contract value has been received by the
> ISU.  A second payment equal to fifteen percent (15%) of the
> Contract value shall be payable on or before October 31, 2009; A
> final payment equal to five percent (5%) of the Contract value
> shall be payable on or before March 31, 2010 providing full and
> satisfactory completion of the contract.

CCCM's partners immediately expressed their dismay to each other.  Mr. Kelly

emphasized the most critical point regarding § 6.3: "This section needs to state specifically that

all Tax consequences that arise as a result of this Charter are the responsibility of the

RCMP/ISU.  IT DOES NOT CURRENTLY."  E-mail Chain Among CCCM Partners, *et al.*,

RCMP Opp., Ex. 29 [Dkt. 66-31] at CCCM1146.  Ms. Edwards asked to meet with Mr. Day

during the week of July 21 "to go over the Contract."  E-mail Chain Among Michael Day, Susan

Edwards & Kelly Meikle, *et al.*, RCMP Opp., Ex. 30 [Dkt. 66-32] at CAN7214.  She told Mr.

Day and Ms. Meikle that she would "be sending out, ahead of time, some notes/suggested

amendments for clarity and for operational correctness that will assist the project."  *Id.*  When

Mr. Day stated that he was unavailable and suggested pushing the meeting to the week of July

28, Ms. Edwards responded: "The amendments we are suggesting are almost all cosmetic, or

minor due to Operational issues. . . .  I am loathe to wait another minimum 10 days before we

can present something to the Cruise Lines, would there be any alternatives as to how we can

push this??"  *Id.*  Ms. Meikle then sent an email only to Mr. Day, expressing some exasperation:

> The ships were supposed to be contracted 10 days after contract
> signing.  The PO was signed within 5 days of contract and given to
> Sue in June.  Nothing in the contract was any different from that of
> the PO.  If there is to be a contract "amendment" then that will
> happen once we receive confirmation of the actual acquisition of
> the vessels.  The company is responsible for putting the finances in
> place, and acquiring the ships, this is taking too long.  I think we
> need to push back a bit, we seem to be doing a lot of work to
> ensure the contractor can get financing.

*Id.*

### J.  July 24 through 27: Internal CCCM Discussions Prior to RCMP Meeting

While waiting for its meeting with RCMP, CCCM continued its internal

discussions about how to respond to the First Draft.  These e-mails demonstrate that the absence

of a full-length contract continued to be a sticking point for the Royal Bank of Canada.  *See* E-

mail from Phillip Sloane to CCCM Partners, RCMP Opp., Ex. 102 [Dkt. 66-104] at CCCM1346.

On July 24, Ms. Edwards assured the Bank that CCCM's discussions with the RCMP were

"moving forward and the RCMP have the ball in their court[.]"  E-mail Chain Among Susan

Edwards & Cindy Brand, *et al.*, RCMP Opp., Ex. 107 [Dkt. 66-109] at CCCM1344.

CCCM responded to the First Draft on July 24 with a document titled "Response

to Contract: Clarifications."  *See* E-mail from Susan Edwards to Kelly Meikle & Michael Day, *et*

*al.*, Clarification Doc.& Timeline Doc.("CCCM First Draft Resp."), RCMP Opp., Ex. 8 [Dkt. 66-10]. Most clauses in the Articles of Agreement were identified only by number and CCCM's statement that it "Agreed." CCCM placed comments or responses to others. CCCM also proposed a timeline to complete negotiations between the parties, which envisioned execution of the Articles of Agreement on July 30, 2008, and then a month, until August 30, 2008, for CCCM to deliver to RCMP "[a]ll required certificates [and] [charter party agreements]/Proof of non-cancelable contracts with the Cruise Lines." *Id.* at CAN627. Whereas Annex A § 4.1 of the First Draft had required CCCM to "identify and secure" vessels within "ten (10) days of contract award" and provide proof of 75% payment and security within twenty days, CCCM proposed: "The contractor shall identify and secure the vessels within 30 days of contract award. Proof of contractual obligations to cruise lines will be provided to ISU contracting authority within 30 days of contract being signed." *Id.* at CAN622–23. CCCM also proposed to extend to 30 days the deadline for providing charter party agreements to the RCMP following acceptance of the nominated ships. *Id.* at CAN621.

The Response to Contract included two lengthy sections on taxes. In the first section, under a heading of "Payment," CCCM wrote:

> As noted in the Response to the RFP, the below are identified as pass through costs to the RCMP. . . . Government Taxes: As noted in the Response to RFP, any and all taxes imposed by Canadian Authorities imposed as a result of the ship charters will be the responsibility of the end user (RCMP) same as all identified taxes by the end user when sailing on a ship at any time. As CCCM is providing a service, the RCMP is paying the 5% GST in addition to the $298.00 pppd which CCCM is responsible for paying to the proper governmental authorities.

*Id.* at CAN616. The second section responded to "Goods and Service Tax," at § 6.3 of the First Draft, and began with the following two paragraphs:

40

> Potential taxes have been identified by the Cruise Lines as a result of this Charter being stationary (these potential taxes were identified by a tax consultant from issues arising from the Hurricane Katrina Ships and the United States Government). As is standard practice, when purchasing any item, including travel, it is the end user who must bear the cost of these taxes if the Government of the Day imposes them. As referred to in the RFP reply, " . . . In any case, all taxes are not the responsibility of the Charterer, as the Charterer is providing the service, and the RCMP are the end user. Therefore if any of these potential taxes are levied, they are additional and a pass through cost to the Government of Canada."
>
> It is unknown if the Government of Canada will assess any of these Taxes.

*Id.* at CAN618.  The Response to Contract then included a nearly verbatim repetition of the lengthy e-mail on potential taxes sent to Mr. Kelly by Mark O'Brien, Carnival's Chief Tax Strategic Officer, quoted *supra* at § I.G.  *See* CCCM 1st Draft Resp. at CAN618–20.  CCCM also replaced RCMP's Goods and Services Tax paragraph with the statement "GST is included in the RFP as a pass through cost, the Contractor will remit upon receipt to the Government."  *Id.*

### K.  July 28, 2008 Meeting and Second Draft of Articles of Agreement

Mr. Kelly and Ms. Edwards finally met with Ms. Meikle and Mr. Day on July 28, 2008.  For this meeting, as with the June 3, 2008 meeting, the record includes depositions and declarations from Mr. Kelly and Ms. Edwards and limited excerpts from the depositions of Mr. Day and Ms. Meikle to reconstruct the parties' discussions and agreements.  There is no pertinent disagreement among these sources.  Mr. Kelly avers:

> On July 28, 2008 Sue Edwards and I met with Ms. Meikle and Mr. Day to discuss the first draft of the Articles of Agreement. . . . During the meeting, Mr. Day repeatedly assured me and Ms. Edwards that General Conditions 9676, paragraph 35, bound the RCMP to pay any and all Canadian government taxes imposed on the cruise lines as a result of the ship charters, including taxes, such as income taxes, imposed on the cruise lines as a result of their cruise ships being docked in Vancouver Harbor for the duration of the Olympics ("the taxes").  Mr. Day assured me and

41

> Ms. Edwards that it was unnecessary to add further language into
> the Articles of Agreement to confirm that the RCMP was obligated
> to pay the taxes.

I Kelly Decl. ¶ 12; *accord* Declaration of Susan Edwards ("I Edwards Decl."), November 27,

2012, CCCM MSJ, Ex. 15 [Dkt. 60-15] ¶ 4.  At deposition, Mr. Kelly testified that Ms. Meikle

and Mr. Day "confirm[ed] multiple times that 9676 obligated the RCMP to pay any and all

Canadian taxes" and that Mr. Kelly relied on that confirmation because "[t]hey were the

contracting authority, and that was reinforced to us and we relied on their statements, their

commitments."  Kelly Dep. at 217–18.  Mr. Kelly also testified that Ms. Meikle and Mr. Day

told him "that because 9676 obligated RCMP to pay these taxes just discussed in my previous

questions, that it was not necessary to include in the articles of agreement more specific language

showing that RCMP had bound itself to pay those taxes."  Mr. Kelly trusted this advice because

"they knew 9676 and . . . understood the meaning."  *Id.* at 218–19.

The recollections of Ms. Meikle and Mr. Day dovetail with those of Mr. Kelly

and Ms. Edwards.  Mr. Day testified at deposition:

> Q.  You believed during your July 28, 2008, meeting with Tracey
> Kelly and Sue Edwards that Standard Conditions 9676, section 35,
> paragraph 3, obligated the RCMP to pay the Canadian government
> taxes that might be assessed against the Cruise Lines as a result of
> the charter; correct?
>
> A.  No.  *I believed that 9676, section 35, paragraph 3, permitted
> the RCMP to pay any taxes that changed or new taxes that were
> imposed after the contract was agreed on.*
>
> . . .
>
> Q.  One of the things that RCMP and CCCM had already agreed to
> [at the time of the July 28 meeting] is that RCMP would be
> responsible for paying any and all Canadian government taxes
> imposed as a result of the charter; correct? . . .
>
> A.  Yes.

42

> Q.  And that would include taxes imposed upon the Cruise Lines as a result of their ships being docked in port for an extended period of time; correct? . . .
>
> A. Yes.
>
> . . .
>
> Q.  You knew in July of 2008 that you were *agreeing to bind the Crown to pay the full contract price plus any and all Canadian government taxes imposed as a result of the charter*; correct? . . .
>
> A.  Yes, I would agree with that.
>
> Q.  D[id] you know how much taxes were at that time?
>
> A.  No, I did not.

Day Dep. at 137, 140, 191 (emphases added).

Ms. Meikle testified that "[t]o the extent there was discussion in the July 28 meeting . . . concerning the tax issue being raised by the Cruise Lines," those discussions "would have been conducted by Mike Day," Meikle Dep. at 186, and also indicated her agreement with Mr. Day:

> Q. . . . [Y]ou absolutely believed that 9676, paragraph 35(3) would have obligated RCMP to pay five and a half million dollars in taxes, estimated, if those taxes were assessed against the Cruise Lines as a result of their ships being docked in Vancouver Harbor for an extended period, right?
>
> MR CHRISTENSEN: Objection.  Objection.  Asked and answered repeatedly. . . .
>
> A. 9676 stands. . . . The answer is "yes."

Meikle Dep. at 245–47.

On July 30, 2008, Ms. Meikle forwarded a Second Draft of the proposed Articles of Agreement ("Second Draft").  Meeting the timeline proposed by CCCM, the Second Draft was signed by Mr. Day and Ms. Meikle.  Second Draft Articles of Agreement, CCCM MSJ, Ex.

21 [Dkt. 65-12] at CCCM13066.  As compared to the First Draft, the Second Draft did not

change: § 3, incorporating General Conditions 9676; § 6.2, regarding method of payment; § 10

(former Section 9) regarding Priority of Documents; §§ 4 and 19 regarding contract financial

security; Annex A § 4.5, requiring ISU to confirm acceptance of nominated vessels within forty-

eight hours; Annex A § 5.6, stating that CCCM's failure to "nominate and secure the ships

within the time required" constituted a breach of contract; and Annex B, requiring CCCM to, in

relevant part, provide "a second security deposit of ninety (90%) percent of the bid value, on or

before April 1, 2009."  *See id.* at CCCM13067–96.

      Among the provisions RCMP revised were:

      ***Basis of Payment—Tax Clause***: The title of the section was changed from "§ 6.3.

Goods and Services Tax/Harmonized Sales Tax and Provincial Sales Tax" to "§ 6.3. Goods and

Services Tax/Harmonized Sales Tax and Provincial Sales Tax AND HOTEL TAX."  *Id.* at

CCCM13072.   The text of § 6.3 was augmented with a new paragraph:

> If the City of Vancouver/Province of British Columbia imposes a
> Hotel Tax then the RCMP shall pay the applicable tax to the
> Charterer for submission to the appropriate government body. The
> RCMP shall seek exemption from the Provincial Government with
> respect to this tax under this contract, if necessary.

*Id.*

      ***Contractor's Obligation to Nominate Vessels and Timeline***: Section 18 was

amended to provide 30 days after acceptance of a nominated ship, instead of ten, for CCCM to

"confirm all terms and conditions of the Agreement between the parties" in the charter party

agreement  *Id.* at CCCM13076.  Similarly, while Annex A § 4.1 still required CCCM to "identify

and secure the vessel or vessels" within "ten (10) days of contract award," the deadline for

providing "[p]roof of security of the vessel, and proof of payment to the vessel provider

(minimum 75%)" was extended from 20 to 30 days.  *Id.* at CCCM13078.

### L.  July 30 and 31: Negotiations Over Second Draft of Articles of Agreement

After CCCM received the Second Draft, the parties engaged in a rapid-fire series of negotiations that led to final Articles of Agreement on July 31, 2008.  Much of the critical contract language that was in flux during the final bargaining is at issue in this case.

Late in the day on July 30, 2008, Ms. Edwards e-mailed Ms. Meikle a list of proposed changes to the Second Draft, suggesting that the document was "so close" to being final and only that "[t]here were some agreements that did not make it to the final document." July 30–31 E-mail Chain Among Susan Edwards & Kelly Meikle ("7/30-31 E-mail Chain"), RCMP MSJ, Ex. 71 [Dkt. 62-75] at CCCM1828; *see also* CCCM MSJ, Ex. 22 [Dkt. 65-13] (duplicates of some e-mails); RCMP Opp., Ex. 86 [Dkt. 66-88] (additional duplicates).  CCCM proposed the following changes; all language in the right column is quoted verbatim from Ms. Edwards's e-mail.

| Clause as of Second Draft | Edwards July 30 Proposal |
|---|---|
| § 6.2. Method of Payment.  An initial payment equal to eighty percent (80%) of the Contract value shall be payable on or before April 30, 2009) providing the contract financial security, in the amount of one-hundred (100%) of the contract value has been received by the ISU.  A second payment equal to fifteen percent (15%) of the Contract value shall be payable on or before October 31, 2009; A final payment equal to five percent (5%) of the Contract value shall be payable on or before March 31, 2010 providing full and satisfactory completion of the contract. | § 6.2. The last phrase . . . DELETE . . . providing the contract financial security in the amount of 100% of the contract value has been received by the ISU.  REPLACE WITH . . . providing that proof of the signed non-cancellable Cruise Line Contract is executed and a copy to the ISU (Section 18: Charter Party Agreement).  *Id.* at CCCM1828. |
| § 6.3. Goods and Services Tax/Harmonized Sales Tax and Provincial Sales Tax AND HOTEL TAX.  All prices and amounts of money in the Contract are exclusive of Goods and Services Tax (GST) as applicable, unless otherwise indicated. The GST is extra to the price herein and will be paid by the RCMP. | 6.3 ADDITION . . . Any potential additional taxes (assessed by the Provincial or Federal Governments) on behalf of this project are to be paid by the RCMP as per General Condition 9676, Section 35.  *Id.* |

| | |
|---|---|
| The RCMP is exempt from Provincial Sales Tax (PST) under exemption number R005521.<br><br>If the City of Vancouver/Province of British Columbia imposes a Hotel Tax then the RCMP shall pay the applicable tax to the Charterer for submission to the appropriate government body. The RCMP shall seek exemption from the Provincial Government with respect to this tax under this contract, if necessary.<br><br>The GST shall be extended and incorporated into all invoices and progress claims and must be shown as a separate item on invoices and progress claims. All items that are zero-rated, exempt or to which the GST does not apply, are to be identified as such on all invoices. The Contractor agrees to remit to Canada Customs and Revenue Agency any amounts of GST paid or due. | |
| § 10.  Priority of Documents. . . .  (a) the Articles of Agreement; (b) 9676 (2007/11/30) General Conditions-Services[;] (c) Annex A, Statement of Work[;] (d) Annex B, Basis of Payment[;] (d) [sic] The Contractor's Bid dated 2008-05-20[;] (e) Project Services Agreements[.] | 10. typo (a,b,c,d,d,e).  CORRECTION: We have in notes (e) and (f) as switched with PSA's before Contractor Bid.<br><br>*Id.* at CCCM1828. |
| § 19. Contract Financial Security.  The form of the required security will be as previously indicated in this Request for Proposal.  . . . | 19. Contract Financial Security<br>DELETE . . . The form of the required security will be as previously indicated in this request for proposal.<br><br>REPLACE WITH . . .  The form of the required security will be a fully signed non-cancellable Charter Party Agreement.<br><br>*Id.* |
| Annex A § 4.1.  The Contractor shall identify and secure the vessel or vessels within ten (10) days of contract award.  Proof of security of the vessel, and proof of payment to the vessel provider (minimum 75%) must be received by the ISU Contracting Authority within thirty | STATEMENT OF WORK ANNEX A . . . 4.1 DELETE 10 days[;] REPLACE with: 30 days<br><br>DELETE: 75%[;] REPLACE with: 70%<br><br>*Id.* at CCCM1829. |

| (30) days of contract award.  If this requirement is not met, the contract may be terminated. | |
|---|---|
| Annex B § 1.  In determining the Contractor financial capability to undertake this requirement, the Contractor has provided security in the form of an irrevocable Letter of Credit from a registered financial institution drawn in favor of the Receiver General for Canada in the amount of ten (10%) percent of the bid value, and a second security deposit of ninety (90%) percent of the bid value, on or before April 1, 2009 if a the bid is successful and contract is awarded. . . . | DELETE ANNEX B from this Articles of Agreement.<br><br>*Id.* |

Ms. Edwards has explained that she "ask[ed] [RCMP] to state in the Articles of Agreement that the taxes were to be paid by the RCMP 'as per General Condition 9676, Section 35' . . . because Michael Day had explained to me that General Conditions 9676, paragraph 35 did, in fact, obligate the RCMP to pay the taxes."  I Edwards Decl. ¶ 5.

Ms. Meikle responded early the next morning, writing that she would "look these over . . . .  However, just a heads up, once the RFP is bid on it is understood all clauses are agreed to and I cannot change anything which is in 9676."  7/30-31 E-mail Chain at CCCM1828. Mr. Kelly suggested, to satisfy the cruise lines without making any change to 9676, that § 35, subsection 3, of 9676[19] be cut and pasted into the agreement.  E-mail Chain Among Tracey Kelly & Kelly Meikle at CCCM MSJ, Ex. 22 at CAN729.

_____

[19] General Conditions 9676, § 35(3) stated:

> 3. Changes to Taxes and Duties
> In the event of any change in any tax imposed under the Excise Act, R.S.C 1985, c. E-14, and Excise Tax Act, R.S.C. 1985, c. E-15, or any duties imposed under the Customs Tariff or any other federal or provincial sales, excise or other like duties, taxes, charges or impositions after the bid submission date and which affects the costs of the Work to the Contractor, the Contract price

Ms. Meikle then wrote a lengthier response on each of Ms. Edwards's points, noting that "it appear[ed] there [were] some significant changes which were not discussed at the meeting."  E-mail Chain Among Kelly Meikle & CCCM Partners, RCMP Opp., Ex. 32 [Dkt. 66-34] at CAN2156.  Ms. Meikle's responses are quoted verbatim in the right-hand column:

| **Edwards July 30 Proposal** | **Meikle July 31 Response** |
| --- | --- |
| § 6.2. The last phrase . . .<br>DELETE . . . providing the contract financial security in the amount of 100% of the contract value has been received by the ISU.<br><br>REPLACE WITH . . . providing that proof of the signed non-cancellable Cruise Line Contract is executed and a copy to the ISU (Section 18: Charter Party Agreement). | No, the Government of Canada cannot pay out any money in advance of services not provided. What ever [sic] financial arrangements are in place cannot be the responsibility of the Government. We cannot assume the risk of funding a private company and by allowing funding not to be in place is a risk. The charter agreement is not a contract between the Government and the cruise lines. We cannot consider a third party contract meeting our risk to the taxpayer dollars. The reason we put in an LOC versus a Bid Bond/Security Performance Bond is that it does not cost the vendor money. If you would like we could change the document (Annex B) to read full 100% security bond, or if you would like we can also change the payment schedules to be paid 80% on first date of occupancy, and 20% within 30 days of departure??<br><br>*Id.* at CAN2157. |
| 6.3 ADDITION . . . Any potential additional taxes (assessed by the Provincial or Federal Governments) on behalf of this project are to be paid by the RCMP as per General Condition 9676, Section 35. | 6.3 cannot be "added" to as this is a clause that has been approved by the Department of Justice as such.  If you will please note, the second paragraph where I did indicate if a hotel tax is assessed then we would pay, however, this project is a fifty/fifty split funding from the Province of British Columbia and the Federal Government of Canada, and I have spoken to the Regional Director of the ISU for |

will be adjusted to reflect the increase or decrease in the cost to the Contractor.

48

|  | the Province of B.C. and he felt we could request and receive an exemption for this contract.<br><br>*Id.* |
|---|---|
| 10. typo (a,b,c,d,d,e).  CORRECTION: We have in notes (e) and (f) as switched with PSA's before Contractor Bid. | No, the Contractor's bid must be before the PSA's simply because if there was no bid, there would be no PSA's.<br><br>*Id.* |
| 19. Contract Financial Security<br><br>DELETE . . . The form of the required security will be as previously indicated in this request for proposal.<br><br>REPLACE WITH . . .  The form of the required security will be a fully signed non-cancellable Charter Party Agreement. | [No response from Ms. Meikle.] |
| STATEMENT OF WORK ANNEX A . . . | Normally, we do not change the SOW, as that was what was bid on however, I have also made comments and changes to the contract.<br><br>*Id.* |
| 4.1 DELETE 10 days[;] REPLACE with: 30 days | Done.<br><br>*Id.* at CAN2158. |
| DELETE: 75%[;] REPLACE with: 70% | No, this was in the RFP and we have not discussed this.  We are making payment of 80% which currently exceeds the monies which must be paid by yourselves to the [c]ruise ship lines.<br><br>*Id.* |
| DELETE ANNEX B from this Articles of Agreement. | No, we cannot delete this annex, as it relates to the LOC, this was put in place and written by the Dept of Justice, and I was directed to include it . . . .<br><br>*Id.* |

Ms. Meikle, Mr. Kelly, and Ms. Edwards exchanged additional e-mails and held a telephone conference.  The two primary points of discussion were (1) the percentage of prepayment to be made to the cruise line within thirty days under Annex A § 4.1, which RCMP agreed to reduce to 70%, E-mail Chain Among Susan Edwards & Kelly Meikle, *et al.*, RCMP Opp., Ex. 109 [Dkt. 66-111] at CAN373; and (2) modifying § 6.2 to require any agreement between CCCM and the cruise lines to contain a clause specifying that the vessels were chartered "for the express and exclusive use of the Vancouver 2010 ISU" as security for RCMP, *see* E-mail Chain Among Kelly Meikle & CCCM Partners, RCMP Opp., Ex. 36 [Dkt. 66-38] at CCCM1878.  Mr. Kelly recounted that conversation as follows:

> On July 31, 2008, I had a telephone conversation with Ms. Meikle, during which we discussed the fact that Mr. Day had assured me and Ms. Edwards that General Conditions 9676, paragraph 35 obligated the RCMP to pay any and all Canadian government taxes imposed as a result of the ship charters. Ms. Meikle responded that she shared that understanding, since Mr. Day had previously told her the same thing. Ms. Meikle also informed me during this phone call that she believed she would somehow be "changing 9676" if she wrote language into the Articles of Agreement stating that the RCMP was to pay the taxes "as per General Condition 9676, Section 35." Ms. Meikle said she was concerned that she could not change 9676 since it had been approved by the Department of Justice.
>
> Given Ms. Meikle's concerns about "changing" 9676, and given that Mr. Day had repeatedly stated that paragraph 35 of General Conditions 9676 obligated the RCMP to pay the taxes, Ms. Meikle and I ultimately agreed that the best way to satisfy the cruise lines' concerns about the taxes, without doing anything that Ms. Meikle considered to be "changing" 9676, was to copy and paste General Condition 9676, paragraph 35 into the Articles of Agreement. Pasting this paragraph from 9676 into the Articles of Agreement ended up being the last revision to the Articles of Agreement

I Kelly Decl. ¶¶ 13–14.  Ms. Meikle agreed at her deposition that she cut and pasted 9676 General Conditions § 35(3) into the main text of the Articles of Agreement "to try to help satisfy the Cruise Line tax concern."  Meikle Dep. at 197; *see also id.* at 217.

### M.  July 31: Executed Version of Articles of Agreement

The final version of the Articles of Agreement ("Articles of Agreement") was executed by Susan Edwards, Tracey Kelly, Michael Sloane, Kelly Meikle, and Michael Day on July 31, 2008.  Contract No. 7131092, RCMP MSJ, Ex. 18 [Dkt. 62-22] at CAN141; *see also* CCCM MSJ, Ex. 11 [Dkt. 65-5] (duplicate).  In this document, CCCM's address was identified as Winston-Salem, North Carolina, U.S.A.  Articles of Agreement at CAN141.  The terms of the Articles of Agreement were as follows:

*Choice of Law*: As in the RFP, the Articles of Agreement provided: "The Contract[20] must be interpreted and governed, and the relations between the parties determined, by the laws in force in British Columbia."  *Id.* § 9.

*Payment for CCCM*: The face sheet of the Articles of Agreement stated:

> Payment Terms: As agreed and upon satisfactory completion of terms under Annex A, the following payments shall be made by Direct Payment on or before the dates indicated: 80% of contract value on or before 30 April 2009[,] $43,332,537.00 plus GST[;] 15% of Contract value on or before 31 October 2009[,] $8,124,850.00 plus GST[;] 5% of Contract value on or before 30 March, 2010[,] $2,708,285.00 plus GST[;] Value of the contract is: $54,165,672.00 plus GST of $3,142,444.00[;] Total $57,308,116.00.

*Id.* at CAN141.  As the parties had negotiated during the preceding two days, § 6.2 read:

> Method of Payment. An initial payment equal to eighty percent (80%) of the Contract value shall be payable on or before April 30, 2009 providing the non-cancellable charter party agreement includes the clause:
>
> > These vessels are chartered for the express and exclusive use of the Vancouver 2010 ISU. The

---

[20] The Articles of Agreement defined "Contract" as "the Articles of Agreement, these general conditions [*i.e.*, 9676 (2007/11/30) General Conditions], any supplemental general conditions, annexes and any other document specified or referred to as forming part of the Contract, all as amended by agreement of the Parties from time to time[.]"  Articles of Agreement § 3.

> Holland America Vessel from January 19, 2010 to March 04, 2010 and the Carnival Cruise Line Vessels from January 31, 2010 to March 02, 2010 at Ballantyne Pier.

has been received by the ISU on or before September 1, 2008.

> A second payment equal to fifteen percent (15%) of the Contract value shall be payable on or before October 31, 2009; A final payment equal to five percent (5%) of the Contract value shall be payable on or before March 31, 2010 providing full and satisfactory completion of the contract.

Articles of Agreement § 6.2.

> ***Basis of Payment and Tax Clauses***: Section 6.1 of the Articles of Agreement

stated, in relevant part:

> The Contractor shall be paid for services rendered and accepted in accordance with the contract an all inclusive daily rate of $298.00 per bed, per day which includes: (a) All applicable licenses[;] (b) Water bunkering[;] (c) Recycling[;] (d) Solid garbage removal[;] (e) Embarkment costs[;] (f) Disembarkment costs[;] (g) Port Agent costs[;] (h) Ground Services Port Agent[;] (i) Vancouver Harbour Pilots[;] (j) On board meals not to exceed applicable Treasury Board of Canada Travel Directive standards for Meal Allowances and Incidentals[;] (k) Non-Alcoholic Beverages[;] (i) Chartering of Cruise Ships[.]

Articles of Agreement § 6.1.  The final version of the taxes clause incorporated verbatim § 35(3)

of the 9676 General Conditions document.  As relevant here, it read:

> 3.  Changes to Taxes and Duties.  In the event of any change in any tax imposed under the Excise Act, R.S.C 1985, c. E-14, and Excise Tax Act, R.S.C. 1985, c. E-15, or any duties imposed under the Customs Tariff or any other federal or provincial sales, excise or other like duties, taxes, charges or impositions after the bid submission date and which affects the costs of the Work to the Contractor, the Contract price will be adjusted to reflect the increase or decrease in the cost to the Contractor.

> 4.  Goods and Services Tax/Harmonized Sales Tax[.]  The estimated Goods and Services Tax (GST) or Harmonized Sales Tax (HST), if applicable, is included in the total estimated cost on page 1 of the Contract. The GST or HST is not included [i]n the

Contract price but will be paid by Canada as provided in the Invoice Submission clause below. The Contractor agrees to remit to Canada Revenue Agency any amounts of GST and HST paid or due.

Articles of Agreement § 6.3.3–.4.

***Contractor's Obligation to Nominate and Secure Vessels***: Annex A § 4.1 now reflected RCMP's concessions on the timeline for CCCM to subcontract for ships and on the percentage of prepayment that CCCM was required to make to the subcontractor.  It stated:

The Contractor shall identify and secure the vessel or vessels within thirty (30) days of contract award. Proof of security of the vessel, and proof of payment to the vessel provider (minimum 70%) must be received by the ISU Contracting Authority within thirty (30) days of contract award. If this requirement is not met, the contract may be terminated.

*Id.*, Annex A §§ 4.1, 4.6.  The deadline had also been extended to thirty days in the provision on charter party agreements, which read:  "The contractor must provide the RCMP with a Standard Cruise Ship Charter party agreement for review and comments. The Charter Party agreement shall confirm all terms and conditions of the Agreement between the parties within thirty (30) days of the Contractors [sic] confirmation of acceptance of the ship nominated."  *Id.* § 18.

Two new sections appeared in the Articles of Agreement, addressing financial security for RCMP against any failure to perform:

19.  The form of the required security will be a fully signed non-cancellable Charter Party Agreement, naming the Vancouver 2010 Integrated Security Unit, having exclusive use of the vessels.  The balance of the amount payable will be paid in accordance with the payment provisions of the Contract upon completion of delivery and acceptance by Canada of all Work performed in accordance with the Contract and a final claim in the form of an invoice is submitted to the attention of the Contracting Officer.

20.  Both parties acknowledge and agree that this contract is under 100% penalty for any reduction of days of service or cancellation by either party.  The RCMP acknowledges and understands that [CCCM] has an obligation to fulfill all terms and conditions in

> providing cruise ships for the use by the RCMP and [Canadian Armed Forces] on the dates specified under this contract. Further it is understood that in order to meet this obligation, [CCCM] must enter into non-cancelable charter agreement with the cruise lines and are under the same penalty clause (100%) penalty for any reduction in service.

*Id.* §§ 19, 20.

> As in the RFP, at the time of nomination, CCCM was required to provide:

> Name of the Vessel; Official number, Class, year built, Flag, length, beam, displacement, passenger capacity, proof of Health Canada inspection of no less than 95% in the last two years, proof of Canadian Insurance and permission from the Cruise Ship line Insurance Carrier for multi-ship Inventory to be docked at one location for an extended period of time.

*Id.*, Annex A § 4.7.

The 48-hour-response period remained, requiring CCCM to "ensure the vessel or vessels nominated . . . in all respects [met] the specification standards of the RFP document" and the RCMP to, in return, "confirm acceptance of the vessels within forty-eight (48) hours of receipt of the vessel nomination." *Id.*, Annex A § 4.5

*Requirements for Vessels*: These provisions were unchanged in any meaningful way from the RFP, *see supra* § I.B, except that the Articles of Agreement anticipated "two Carnival Cruise Line ships and . . . one 'S' Class Holland America Cruise Line ship." *Id.* § 1. In addition, the same health-score provisions, which had not been an issue in the parties' discussions to that point, appeared unchanged in the Articles of Agreement. *Id.*, Annex A § 5.4.

*Vessel Replacement*: The Articles of Agreement maintained the clause giving the cruise lines flexibility in substituting ships, with the same caveats. *Id.* § 4.11.

*Priority of Documents*: Without explanation in the record, the priority of documents differed from all drafts. The Articles of Agreement provided:

> If there is a discrepancy between the wordings of any documents, which appear on the list, the wording of the document, which first appears on the list, has priority over the wording of any document, which subsequently appears on the list.   (a) the Articles of Agreement[;]  (b)  9676  (2007/11/30)  General  Conditions-Services[;]  (c)  Annex  A.  Statement  of  Work[;]  (d)  The Contractor's  bid  dated  2008-05-20[;]  (e)  Project  Services Agreements[.]

*Id.* § 10.

The meaning of the Articles of Agreement and the significance of the evolution of the drafts are at issue in the parties' cross-motions for summary judgment.  As with other of the contracting documents, CCCM has offered declarations from its partners as to their understandings of the terms of the Articles of Agreement; RCMP has offered no conflicting evidence.  As CCCM's declarations are substantively similar, Mr. Kelly is quoted for consistency and clarity:

> On July 31, 2008 I signed the Articles of Agreement . . . .  At the time I signed the Articles of Agreement, I believed and understood that it, and the contract between Cruise Connections and the RCMP as a whole, obligated the RCMP to pay the taxes.  I had this understanding because Cruise Connections' bid and Project Services Agreement 1 both explicitly stated that the RCMP was required to pay the taxes, and both were made part of the contract. I also had this understanding because Mr. Day had repeatedly assured me and Ms. Edwards that General Conditions 9676, paragraph 35, bound the RCMP to pay the taxes. I also knew that Mr. Day had many years of contracting experience working for the Canadian government, was the RCMP's Director of Procurement and Contracting, and had worked with General Conditions 9676 repeatedly throughout his career.
>
> When agreeing to the final language of the Articles of Agreement and when deciding to sign the Articles of Agreement, I relied on Mr. Day's repeated assurances that General Conditions 9676, paragraph 35, bound the RCMP to pay the taxes, and his additional assurance that it was unnecessary to add further language into the Articles of Agreement to confirm that the RCMP was obligated to pay the taxes. I would not have agreed to the final form of, nor signed, the Articles of Agreement absent such assurances.

I Kelly Decl. ¶¶ 15–16; I Edwards Decl. ¶¶ 6–7 (substantively the same); *see also* Declaration of

Michael T. Sloane ("M. Sloane Decl."), November 29, 2012, CCCM MSJ, Ex. 20 [Dkt. 60-20]

¶ 4 (substantively the same).

        Almost immediately after receiving the executed Articles of Agreement, Ms.

Edwards sent a copy to Ms. Brand at the Royal Bank of Canada via e-mail.  E-mail from Susan

Edwards to Cindy Brand, *et al.*, RCMP Opp., Ex. 33 [Dkt. 66-35] at CCCM1907.

### N.  July 31 through August 19: CCCM Refocuses on Cruise Lines

        With the Articles of Agreement in hand, CCCM immediately returned its focus to

negotiations with the cruise lines to finalize charter party agreements (often referenced as

"CPAs").  *See* E-mail Chain Between Tracey Kelly & Susan Edwards, RCMP Opp., Ex. 38 [Dkt.

66-40] at CCCM1980.  Mr. Kelly, who owned a travel agency, served as CCCM's primary

negotiator with the cruise lines.  When the Articles of Agreement was executed on July 31, 2008,

CCCM intended to subcontract with Holland America and Carnival and expected to make a

profit of $14,415,182.  E-mail from Phillip Sloane to Cindy Brand & Profit Projections Doc.,

RCMP Opp., Ex. 80 [Dkt. 66-82] at CCCM2174–75.  During the quick pivot from negotiations

with RCMP to negotiations with the cruise lines, CCCM made one strategic choice that would

have later ramifications.  In order to "hide [CCCM's] 'profit' margin," Mr. Kelly decided that he

would not provide the cruise lines with the entire Articles of Agreement or provide RCMP with

complete copies of the final charter party agreements.  E-mail Chain Between Tracey Kelly &

Susan Edwards, RCMP Opp., Ex. 38 at CCCM1980 (he would "share 'parts' of the contract w/

the Cruise Lines as issues arise (such as Taxes)" but would not "provide a full copy of the ISU

Articles of Agreement to Cherie [Weinstein of Carnival];" E-mail Chain Among CCCM

Partners, RCMP Opp., Ex. 110 [Dkt. 66-112] at CCCM1996 (he would have the cruise lines

"blank out" portions of the CPAs that would allow RCMP to determine CCCM's profit).

### 1. Negotiations with Holland America Start Well

On August 5, 2008, Mr. Kelly forwarded a first draft of a charter party agreement between CCCM and Holland America to the CCCM partners, which Mr. Kelly had negotiated with Alexis Puma of the cruise line. E-mail Chain Among CCCM Partners & Alexis Puma, *et al.*, RCMP Opp., Ex. 111 [Dkt. 66-113] at CCCM2206. Mr. Kelly noted that he had asked Ms. Puma to seek management approval for several revisions on the next draft, including, most importantly: "that the 10% cash deposit be waived in-lieu of 70% [Letter of Credit] and full payment of Charter Hire in May 09. Explained how the payments come from Canadian Gov't to [the Royal Bank of Canada] and [the Bank] to Cruise Lines." *Id.* On August 11, 2008, Rob Coleman of Holland America notified Mr. Kelly that Holland America would agree to the financial structure Mr. Kelly had requested—*i.e.*, that CCCM would not be required to make any cash deposit and would instead post a 70% letter of credit upon signing the charter party agreement, and would pay the charter fare in full in May 2009. E-mail Chain Among Tracey Kelly & Holland America Personnel, RCMP Opp., Ex. 88 [Dkt. 66-90] at CCCM15118.

### 2. Negotiations with Carnival Stall; CCCM Considers Royal Caribbean

Mr. Kelly's first documented contact with Carnival ("CCCL" in emails) after the Articles of Agreement was to inform Ms. Weinstein on August 6, 2008 that he "believe[d]" that CCCM had "addressed . . . Taxes." E-mail Chain Between Tracey Kelly & Cherie Weinstein, RCMP Opp., Ex. 43 [Dkt. 66-45] at CCCM2258. Ms. Weinstein was not convinced:

> I do not believe that the tax issues have been dealt with to the satisfaction of our corp tax dept. . . . [Mark O'Brien] does not feel that we have any greater comfort level. The analysis that corp tax and finance have done shows us a potential tax liability of $5.456 million. Without letters of remission from the Canadian taxation authorities for specific tax liabilities that our Canadian advisors have laid out for us, we simply must have a[] [Letter of Credit] to cover that liability. As I noted, we did it once before on a 'written

> promise' from a government agency of tax relief that was later
> ignored by the Dept of Internal Revenue and we had to pay.
> Tracey, please understand that I am not trying to be difficult, but it
> is my responsibilty [sic] to work with the various experts here to
> ensure that Carnival is protected against all known risk in a project
> of this scale.

*Id.* at CCCM2258–60.  Mr. Kelly wrote back: "Where I do understand this concern, and the past

experience that CCCL had with Katrina, this is a much different situation and a different

government.  There is specific legislation (section 9676 of Canadian government contracts,

Terms and Conditions) that addresses taxes and confirms that the RCMP will pay."  *Id.*

Thereafter, Mr. Kelly contacted Vicki Freed and Stacy Shaw of Royal Caribbean

International ("RCI" or "RCL" in emails), indicating that CCCM "would like to do business with

[Royal Caribbean and Celebrity Cruises]."[21]  E-mail Chain Among Tracey Kelly, Vicki Freed &

Stacy Shaw, RCMP MSJ, Ex. 19 [Dkt. 62-23] at CCCM2465.  Mr. Kelly offered the same

structure to which Holland America had just agreed, *i.e.*, CCCM "would secure the Vessel(s)

with a 70% [Letter of Credit] w/in 14 days of contract signing.  [CCCM] would pay 100% of the

Charter Cruise Fare on or before the end of May 2009."  *Id.* at CCCM2466.  Ms. Shaw

responded on August 13, offering to provide at least one ship, *Jewel of the Seas*, and possibly a

second ship, *Radiance of the Seas*.  E-mail Chain Between Stacy Shaw & Tracey Kelly, RCMP

MSJ, Ex. 20 [Dkt. 62-24] at CCCM2542.  She also told Mr. Kelly that the proposed financial

structure would need some work, but Royal Caribbean would be willing to try to accommodate

the charter rate proposed by CCCM.  *Id.*

---

[21] Royal Caribbean Cruises Ltd. was formed in 1997 when Royal Caribbean and Celebrity
merged.  Mr. Kelly also made overtures to Norwegian Cruise Lines in mid-August, but those
talks did not progress.  E-mail Chain Among CCCM Partners and Norwegian Cruise Line
Personnel, RCMP Opp., Ex. 113 [Dkt. 66-115] at CCCM2906–10.

On August 14, 2008, the CCCM partners discussed by e-mail whether it would be financially advantageous for CCCM to switch from Carnival to Royal Caribbean.  E-mail Chain Among CCCM Partners, *et al.*, RCMP Opp., Ex. 112 [Dkt. 66-114] at CCCM2576.  A change was also driven in part by RCMP's request for an increase in the number of beds.  Mr. Kelly and Ms. Shaw then exchanged further electronic communications, by which Mr. Kelly asked Ms. Shaw to "move forward with this Proposal," including both "Radiance Class vessel[s]," and Ms. Shaw replied to confirm: "[D]o I understand your offer as follows if both ships are offered: Jewel of the Seas [and] . . . Radiance of the Seas[?]"  E-mail Chain Between Tracey Kelly & Stacy Shaw, RCMP MSJ, Ex. 21 [Dkt. 62-25] at CCCM10040–41.

### 3.  Holland America and Royal Caribbean Raise More Tax Concerns

Only a few days apart in mid-August 2008, representatives of both Holland America and Royal Caribbean expressed more concerns about the taxes they might have to pay if their ships were used for the 2010 Vancouver Olympics.  Mr. Kelly sought to assure both lines that their concerns had been addressed by the revisions to the Articles of Agreement on which CCCM had insisted.

First, in an August 14, 2008 e-mail, Mr. Coleman of Holland America wrote to Mr. Kelly:

> I did some work with David Walton on Friday regarding taxes and based on our latest charter hire, he has provided me the following estimate. I know that some of these taxes may be exempted due to the nature of the charter. However, per our Canadian tax counsel, the following should be anticipated. While I know that your agreement with the ISU has provisions to cover taxes, I'm not certain that this would be extended to corporate income tax paid by Holland America Line. David Walton indicates that Holland America Line did in fact have income tax assessments in Athens [the 2004 Olympics] and Jacksonville (perhaps this was the issue that emerged post-charter [sic] in JAX?), and we have had to integrate them into our recently signed agreement for South Africa

59

[the 2010 World Cup] through additional security. Unless there is a clear indication and management acceptance that we are exempt from corporate taxes and/or other line items, we will have to address this somehow in the agreement. I know one approach will be to put forth a copy of your ISU agreement that demonstrates the obligation by the ISU but we will need to get buy off.

| | |
|---|---|
| [Estimated charter fee] | $ 9 440 080 |
| Customs duty | 1,925,501 |
| GST | 664,554 |
| Payroll taxes | 40,500 |
| income taxes | 1,625,360 |
| hotel taxes | 1,000,000 |
| individual income taxes | 50,625 |
| [Total duties & taxes] | 5,306,539[22] |

E-mail Chain Among Rob Coleman, Tracey Kelly & Susan Edwards, *et al.*, RCMP Opp., Ex. 39

[Dkt. 66-41] at CCCM2872.  Interdelineating Mr. Coleman's email, Mr. Kelly responded:

Tracey Response: Customs Duty applies if we are opening [sic] the Shops on-board which we are not. GST of 5% is being paid by the ISU on the value of the Charter, the only other GST which will apply is that GST assesed for on-board purchases of Service (which HAL has agreed to collect and remit). Payroll Taxes are exempt via Legislation 9676. Hotel Taxes are exempt. "Individual Income Tax" do not know what is meant by this line item? . . . Summary: From what is presented here, the issue comes down to Corporate Income Tax?

*Id.*  In his e-mail, Mr. Coleman also "provided the details" of the Holland America's corporate

tax calculation:

Estimated charter fee: 9,440,080
estimated profit margin 36%
Taxable income 3,368,621
tax rate
Federal and provincial 31.0% 0.31
total federal and provincial tax 1,044,273
taxable income less fed & provincial tax 2,324,349
branch profits rate 25.00%
branch profits tax 581,087

---

[22] Mr. Coleman made either a mathematical or typographical error; the duties and taxes as written in his e-mail add up to an even $5,306,540.

total federal, provincial and BPT 1,625,360

*Id.* To these points, Mr. Kelly responded:

> Tracey Response: It is our understanding that the Tax Treaty that exists between the USA and Canada exempts the Branch Tax. Therefore the amount we are talking about is the Fed and Provincial Tax (31%) against the 'estimated profit' ($1,044,273.00). Does HAL not pay Corporate Income Tax? Is this not a standard for doing business?

*Id.* at CCCM2871. Responding only to Mr. Kelly, Ms. Edwards complained that it did not

"seem appropriate" for Holland America to ask CCCM "to be responsible for their Corporate

Income tax??" *Id.*

Mr. Kelly sent Mr. Coleman a more lengthy e-mail later on August 18, attaching a

copy of General Conditions 9676. *See* E-mail Chain Among Susan Edwards, Tracey Kelly &

Rob Coleman, RCMP Opp., Ex. 44 [Dkt. 66-46]. Writing that he was "highlighting General

Conditions 9676, section 35, paragraph 3," Mr. Kelly explained:

> Per Michael Day, Director of Procurement for the RCMP, and with 30 years of Canadian Government experience on contracting, this section addresses all Tax implications that 'may' be assessed, and insures that the Canadian Government (ie : RCMP) will be financially responsible.
>
> (There will be GST applied to on-board purchases of Services, and the Cruise Line will charge the GST to the Guests and remit to the Canadian gov't at the end of the Charter . . . )
>
> Pls note the red and bolded text that directly apply to the Tax issues being raised.
>
> Subsection 2 outlines that Provincial Sales Taxes are exempt from this Cruise Charter Contract under Exemption #R005521. However, Section 2(d) outlines that passengers onboard will be required to pay Provincial Sales Taxes on items of any personal nature ([*i.e.*] liquor purchases). The Cruise Line would be responsible for adding the appropriate amount of Sales Tax to purchases and remitting (or CCCMT would remit on behalf of the Cruise Line) to the Province of British Columbia.

> Subsection 3 outlines that any and all taxes applied after the fact to this Government of Canada Contract will be the responsibility of the Government of Canada and as such the Contract price will be adjusted up or down to reflect any unknown or new tax imposition that may arise.
>
> Subsection 4 outlines GST/HST that it is clearly the Government of Canada who is responsible for the payment of this tax to CCCMT and it is CCCM['s responsibility to remit (GST # 800972010RTOOOI) that said amount back to the proper authorities.

*Id.* at CCCM2828–29.  Ms. Edwards complimented Mr. Kelly on his phrasing in an e-mail sent only to him, noting that she "ha[d] a concern that they won't see the Corporate Income tax as being covered" but "hope[d] that 9676 mollifie[d] them."  *Id.* at CCCM2828.  Asked at her deposition about this e-mail, Ms. Edwards stated: "I had a great belief in the project that 9676 would cover it, but it didn't matter. We knew right from the very beginning that corporate income tax needed to be covered."  I Edwards Dep. at 136.

Second, and much to CCCM's consternation, Royal Caribbean contacted Mr. Kelly on August 19 about their own reservations concerning Canadian tax liability.  Ms. Shaw wrote:

> . . . [W]anted to share feedback from our Director of Tax relating to the Canadian Income Tax. He reviewed the specific section that you directed me to and discussed with our Canadian Tax Counsel in Vancouver. We've been advised that this section of the Agreement is written to cover GST/PST, customs duties and excise taxes that may change after the bid is submitted. *According to our guidance, the Government is only required to adjust the contract price if there is a change in those types of taxes. Further, we've been advised that it does not cover taxes that are currently in effect such as the Canadian Income Tax.* He did not find any reference that might indicate the Canadian Government will reimbursement [sic] Royal Caribbean for any income taxes that may be incurred. Let us know your thoughts on the above - we can arrange a call later today to discuss if that's easiest. If you are willing to allow language in the Charter Agreement that obligates CCCM to reimburse Royal Caribbean for income tax (if incurred and not

reimbursed by the Canadian government), we may be able to work around it.

E-mail Chain Among Royal Caribbean Personnel & Tracey Kelly, *et al.*, CCCM Reply, Ex. 12 [Dkt. 70-12] at CCCM9876 (emphasis added); *see also* Kelly Dep. at 220 ("Q. Did you show 9676 to the cruise lines? A. Yes.  Q. Did the cruise lines explain to you in so many words that they were unconvinced that 9676 obligated RCMP to pay the taxes about which cruise lines were expressing concerns? A. Yes.").

### O.  **August 20 through 27: Bank Financing Talks Stall; RCMP Ship Tour; Tax Issues Escalate**

On August 20, CCCM learned that the risk management department at the Royal Bank of Canada had rejected CCCM's request for financing.  P. Sloane Dep. at 125.  Tracey Kelly, Phillip Sloane, and Mike Sloane discussed possible sources for alternative funding by e-mail, with the most promising being another Canadian bank.  *See* E-mail from Phillip Sloane to Tracey Kelly & Mike Sloane, RCMP MSJ, Ex. 85 [Dkt. 62-89] at CCCM10017; E-mail from Tracey Kelly to Phillip Sloane & Mike Sloane, RCMP MSJ, Ex. 86 [Dkt. 62-90] at CCCM10018.  Mr. Kelly also suggested as a "last option" arranging direct funding with the cruise lines—possibly by proposing "10% cash down and a direct assignment of funds in April [2009]," with one payment to Holland America, one to Royal Caribbean, and the remainder (i.e., CCCM's profit) to CCCM.  E-mail from Tracey Kelly, RCMP MSJ, Ex. 86 at CCCM10018.

Notwithstanding the "bad news" from the Bank, *id.*, CCCM pressed on.  On August 23, Ms. Edwards took "RCMP personnel, including [Ms.] Meikle and [Inspector] Kaluza," on a tour of Holland America's *ms Statendam*—*i.e.*, the same ship for which CCCM had received a quote in May, but not the ship listed in the final Bid.  II Edwards Decl. ¶ 6. During the tour, Ms. Edwards "explained that the *Statendam* was part of a class of Holland America ships known as the 'S-class,' and that while this inspection was taking place on the

*Statendam*, it [might] not ultimately be the exact ship brought into port in Vancouver for the Olympics." *Id.* After explaining that ships within the same class are "identical as far as layout, amenities, beam width, length, displacement, and number of rooms" and that "it is not unusual for a cruise line to switch ships within a particular class, even when a charter party agreement names a specific ship[,] RCMP personnel informed [Ms. Edwards] that this arrangement was acceptable, and that the *Statendam*, in particular, and Holland America's S-class vessels, in general, would be acceptable the RCMP for use during the Olympics."[23] *Id.*

CCCM continued its work on avoidance of Canadian taxes while restarting its efforts to secure financing. Mr. Kelly and Ms. Edwards decided to "ask[ ] Ms. Meikle and Mr. Day to give [them] written assurance that the RCMP was obligated to pay the taxes, so that [CCCM] could provide that written assurance to the cruise lines." I Kelly Decl. ¶ 18. Although negotiations were ongoing with Royal Caribbean to replace Carnival, Mr. Kelly asked Mr. Border of Carnival to review a "proposed amendment" to the CCCM-RCMP contract and to have Mr. O'Brien, Carnival's Chief Tax Strategic Officer, review it as well. E-mail Chain Among Tracey Kelly & Jim Border, *et al.*, RCMP Opp., Ex. 47 [Dkt. 66-49] at CCCM3551. The document for review provides insight into CCCM's contemporaneous understanding of the tax issues:

> To provide further understanding of General Conditions (GC) 9676 and its application to the RCMP/ISU Vancouver 2010 Ship Charters, it has been requested by the Cruise Line Partners that the following be acknowledged and confirmed that:

---

[23] Towards the end of August 2008, RCMP and CCCM formally amended the contract to increase the number of beds from 181,764 to 185,732. Because the price per bed per day remained the same, the contract total increased to "$55,348,136 + GST." August 25, 2008 Contract Amendment, CCCM MSJ, Ex. 51 [Dkt. 65-40] at CAN1702; *see also* CCCM Opp., Ex. 29 [Dkt. 67-29]. This change supported CCCM's decision to abandon Carnival and pursue Royal Caribbean.

That GC Changes to Taxes and Duties

In the event of any change in any tax imposed under the Excise Act, R.S.C 1985, c. E-14, and Excise Tax Act, R.S.C. 1985, c. E-15, or any duties imposed under the Customs Tariff or any other federal or provincial sales, excise or other like duties, taxes, charges or impositions *after the bid submission date* and which affects the costs of the Work to the Contractor, the Contract price will be adjusted to reflect the increase or decrease in the cost to the Contractor.

• That these taxes were not identified, nor mentioned as taxes that would be, or even potentially assessed by the Government of Canada within the RFP # 2008-00147-ISU and therefore any "other like duties, taxes, charges or impositions after the bid submission date" (May 17, 2008) and therefore meet that definition of the regulation.

• That these taxes were not identified by the Cruise Lines to CCCMT until after Contract Award, May 30, 2008, as taxes that *may be potentially assessed*.

• That these taxes *may not ever* be assessed by the Government of Canada but that if these potential taxes are assessed then it is confirmed that GC 9676, Section 35 would apply, or, prior to any assessment and application of a tax, that a repeal will be sought prior to any pending assessment.

• That under the definition, "impositions" would include the identified *potential* taxes as identified by the Cruise Lines but not by the Government of Canada.

• CCCMT nor the RCMP have been advised that any of the potential taxes will be assessed as of August 20, 2008 by the Government of Canada.

• These taxes would be extraordinary and a direct cost of doing business as a static "hotel" Charter for the 2010 Olympic Games.

Potential Taxes:

1. Withholding Tax: The Cruise Lines advise that the Government of Canada potentially could place a Withholding Tax on the Bank funds, thereby preventing the payment of the Cruise Lines. This

failure to pay, due to a Government assessed Withholding tax would prevent the ships from arriving into Vancouver, 2010.

2. Corporate Income Tax: The Cruise Lines do not pay Corporate Income tax to any visiting countries on their itineraries. Cruise Lines pay a Port Fee and Port Tax. Whereas CCCMT will remit to the proper US authorities all Corporate Income tax applied to CCCMT, should the Government of Canada assess to the Cruise Line and/or CCCMT a Corporate Income Tax instead of, or in addition to the Port Fees and Taxes, this potential tax, unless deemed to be covered by GC 9676, would prevent the Cruise Line from signing a contract to fulfill the ISU Vancouver 2010 Ship Charters.

3. The Cruise Lines have discussed this issue with Canadian Tax Experts and representatives of VANOC [Vancouver Olympic Committee]. There requested action is to seek excemption [sic] of any of these potential taxes

E-mail from Tracey Kelly to Jim Border & CCCM Doc., RCMP Opp., Ex. 48 [Dkt. 66-50] at CCCM10118.  Mr. Border replied: "[P]lease understand that Mark and I represent Carnival in this matter and I can not [sic] review the agreement nor advise you regarding any aspect of this transaction except to strongly suggest[] that you engage Canadian counsel."  E-mail Chain Among Tracey Kelly & Jim Border, *et al.*, RCMP Opp., Ex. 47 at CCCM3550.

CCCM received a draft charter party agreement[24] from Royal Caribbean on August 27, 2008.  E-mail from Tracey Kelly to CCCM & E-mail from Stacy Shaw to Tracey Kelly with First Draft RCCL CPA, RCMP MSJ, Ex. 22 [Dkt. 62-26].  The draft charter party agreement covered *Jewel of the Seas* but contained many blanks and was labeled "For Discussion Purposes Only."  Ms. Shaw cautioned: "We have yet to address language specific to this project so we should expect certain clauses to change and/or be added . . . ."  *Id.* at

---

[24] Royal Caribbean internally uses the name "Whole Vessel Agreement," instead of charter party agreement, when a charterer contracts for an entire ship.  Deposition of Stacy Kay Shaw, September 12, 2012 ("Shaw Dep."), RCMP MSJ Ex. 5 [Dkt. 62-9]; CCCM Opp., Ex 10 [Dkt. 67-10]; RCMP Reply, Ex. 5 [Dkt. 69-6]; at 121.

CCCM3371.  Three areas of the Royal Caribbean draft charter party agreement are notable:

Section 5, titled "Taxes and Fees," would require CCCM to prepay to Royal Caribbean an

amount sufficient to cover "unknown" taxes, *id.* at CCCM3377;[25] Sections 8 and 9 proposed

(1) installment payments from CCCM to Royal Caribbean on unspecified dates and (2) delivery

of an irrevocable standby letter of credit, due upon signing the charter party agreement, for the

"Total Guaranteed Amount," *id.* at CCCM3377–78; and, finally, Section 22 would allow Royal

Caribbean, upon notice, to substitute another Radiance-class ship for *Jewel of the Seas*.  *Id.* at

CCCM3383.

Also on August 27, Mr. Kelly spoke with Ms. Meikle to update her.  In an e-mail

intended to serve as "a formal summary of our discussion and committed actions from our

conference call today 8/27/08," Mr. Kelly wrote to Ms. Meikle:

> C. Contract Status with the Cruise Lines: CCCM is nearly
> completion [sic] on all technical elements of the CPA (Charter
> Party Agreements). CCCM is working with the Cruise Lines on the
> alternate start dates, the Cruise Lines must determine if their
> existing deployment commitments will allow. The issue of Taxes
> continues to be addressed by the Cruise Lines. As we discussed
> today, the Cruise Lines (being Foreign Flagged Companies) pay no
> Corporate Income Tax. The extended stay pier-side in Vancouver,

---

[25] Section 5 stated:

> The fees specified in this Agreement are exclusive of any
> applicable governmental or quasi-governmental sales, use, value-
> added, excise or other taxes, duties, fees or charges (whether now
> in existence or hereafter imposed or charged) (collectively the
> 'TAXES').  Purchaser shall be responsible for any and all TAXES.
> The amount of such TAXES is currently unknown but a reasonable
> estimate of such TAXES is $_____.00 USD per person.  Purchaser
> shall prepay to CRUISE LINE the amount of $_____.00 USD (such
> paid amount shall be the 'Prepaid Taxes').  In the event the Taxes
> actually paid exceed the amount due, the excess shall be applied
> against other amounts due . . . .

*Id.* at CCCM3377.

BC may impact the Cruise Lines with a series of Canadian Taxes. CCCM has detailed the legislation 9676. The Cruise Lines have all asked to be directly "protected" against these potential Taxes.

Action: CCCM is working with Legal to develop specific (inclusive) contract language which will allow the Cruise Lines to go to contract stage. Time-line for this addendum, present to Kelly for input and review the week of 9/02/08.

. . .

3. Contract Amendment: ISU has approved for CCCM to negotiate with [Royal Caribbean] vessels for Contract. Since the RCI vessels are an increase of capacity, the replacement of RCI vs [Carnival] vessels impact[s] the Financial of the ISU contract with CCCM.

. . .

Action: Kelly [Meikle,] can you please review and confirm the addendum to the Contract with CCCM. Please sign/initial your approval and scan document and email copy back to me (with a hard copy sent via mail). Thank you.

E-mail Chain Among CCCM Partners & Kelly Meikle, RCMP Opp., Ex. 114 [Dkt. 66-116] at

CCCM3443–44; *see also* Kelly Dep. at 220 (stating that he "relay[ed]" the cruise lines' concerns

that 9676 did not obligate RCMP to Ms. Meikle and Mr. Day).

**P.  August 25 through September 5: Tax Issues Continue to Escalate**

Mr. Kelly again contacted Jim Border of Carnival on August 29:

The document I sent over last Friday, is intended to be an addendum to the Contract.  This addendum is to be structured to specifically identify both the Taxes and the Cruise Lines in order for the Canadian Government to "protect" the Cruise Lines from any Canadian Tax consequences.

I discussed this addendum with Mark O'Brien who suggested I forward to you for comment. While I clearly understand that you are not representing CCCM, I am asking that you review the document in order to insure that it "protects" Carnival and [Holland America].  As explained, the Ministry of Finance is out of session (has been since 6/15/08) and will not come back into session until 9/15/08 (at that time, for only two weeks and then elections begin in Canada).  Therefore, what CCCM is proposing is

> a two fold approach: 1. That the Canadian Government specifically identifies the Lines and Taxes and notes that if they are assessed the Canadian Government will pay. 2. That the Canadian Government (RCMP/ISU) will submit paper-work (as soon as Ministry of Finance is back in session) for remission or exemption of taxes for Lines.
>
> Before I took this addendum to the RCMP, I wanted to insure that it met with your approvals. In addition, Mark O'Brien noted last week that conversations w/ VANOC noted that they would support such actions? Please comment further.

*Id.* at CCCM3549–50.  Mr. Kelly also asked for Carnival's "Canadian Attorney contact information."  *Id.* at CCCM3549.  Mr. Border declined to answer Mr. Kelly's question, telling Mr. Kelly to let him know when CCCM retained an attorney.  *Id.* at CCCM3548.  Mr. Kelly then sent contact information for Will Joyner, an attorney with Womble Carlyle Sandridge & Rice in North Carolina who had drafted CCCM's organizational documents.  *Id.*  Mr. Border wrote to Mr. Kelly on September 1, 2008, that he "had a very pleasant chat with your North Carolina counsel concerning the charter. Our impression is that they will be recommending to you that you engage Canadian counsel for this transaction."  E-mail Chain Among Jim Border & Tracey Kelly, *et al.*, RCMP Opp., Ex. 49 [Dkt. 66-51] at CCCM3642.

Mr. Kelly wrote again to Mr. Border on the next day, apparently to confirm the subjects discussed during the conference call:

> Our legal counsel Will Joyner and Zeon Levi, held a conference call with Mark O'Brien this am to discuss the potential Canadian Tax consequences for the Cruise Lines (and CCCM) as a result of this Charter. The conference call dealt with the general topic of the potential Canadian Taxes, and not the proposed strategy to pursue a Remission of Canadian Taxes. No information was shared from the Canadian Counsel secured by Carnival Corp. Our Attorney is securing Canadian Legal Counsel to address the Taxes, and strategies for remission.

*Id.*

At this point—September 2—internal CCCM e-mails show that the CCCM partners considered three strategies to address the cruise lines' tax problem.  Ms. Edwards wrote to Mr. Kelly:

> It will be good to have the options from the Cruise Line in front of
> us. You advised:
> 1. Walk away
> 2. Pay upfront/LOC
> 3. Repeal any potential taxes.

E-mails from Susan Edwards to Tracey Kelly, RCMP Opp., Ex. 115 [Dkt. 66-117] at CCCM3674.  Ms. Edwards then drafted a document titled "Tax Protocol," "on Letterhead," that she sent to the CCCM partners, proposing that they send it to Ms. Meikle.  Although the first draft of this document does not appear in the record, Ms. Edwards told the CCCM partners:

> IT IS REALLY IMPORTANT that we emphasize again and again
> that these potential Taxes/Impositions were known to us AFTER
> the bid submission date. This is the crux of 9676(35). If we say
> that we brought up this tax issue at our June Meeting—this does
> NOT NOT NOT work in our favour as the RCMP could argue that
> we knew about the tax problem prior to the bid submit and hang us
> out to dry.  Let's emphasize that it became a formal issue in July
> . . . , please.

E-mail Chain Among CCCM Partners, RCMP Opp., Ex. 52 [Dkt. 66-54] at CCCM3762–63 (ellipsis in original).  Ms. Edwards also wrote that she was trying "to play up the idiocy of this so that we can psychologically team up on the same side" and that she "titled it, TAX PROTOCOL" because she was "trying to use language that creates a policy" and "indicate[ ] a POSITIVE, TEAM APPROACH."  *Id.*

Although he "like[d] what Sue wrote," Phillip Sloane advised: "We are hiring legal counsul [sic] in Canada today with an emergency status on their assignment.  Before we let take [sic] the next step do you think we might want to get comments back from our counsul? [sic] What do you say?"  *Id.* at CCCM3762.  Ms. Edwards disagreed:

> Good point Phillip however, we don't know the lawyers' definition
> of Emergency Status. We have not given the RCMP the
> opportunity to even formally address this issue. We may be
> making a mountain out of a molehill. Even Tracey's and Kelly's
> discussion last week on this was positive, so yes, we need some
> legal advice, but we also need to find out WHERE our ISU partner
> stands on this. It may be that the ISU support us totally, then our
> direction to our Legal Counsel changes slightly to include the
> RCMP in all of their musings. I believe we need to talk to the ISU
> and get their position first-as THAT outcome will also influence
> our directions to our legal team.

*Id.* The approach advocated by Ms. Edwards won out, and e-mails she sent to Mr. Kelly on

September 3 show that Mr. Kelly was tasked with sending the proposed letter to Ms. Meikle and

then calling her in hopes that she would agree to resolve the tax problem in a way favorable to

CCCM, either by pursuing a repeal of any potential taxes or paying additional funds to cover the

taxes. In an e-mail titled "Happy Place," Ms. Edwards included the following suggestions for

Mr. Kelly's phone call:

> It is time to talk to Kelly about the taxes.
> . . .
>
> 1. The RCMP are not going to let the ships go.
> 2. These are *All potential taxes/impositions.*
> 3. Repeat the above statement.
> 4. Explain the problem-Cruise ships won't sign unless.
> 5. Explain the Cruise Line Options as presented by their legal
> team.
> 6. Explain the options we have created and the options we support.
> 7. Explain that working together to get any POTENTIAL
> (phantom) taxes/impositions repealed the best option.
> 8. Explain that if RCMP will agree to taking that step, and
> documenting that step, then YOU can get the Cruise Line to agree
> to give us the time to do so without compromising the CPA/RCMP
> Contracts in any way.
> 9. Explain that if the RCMP cannot work with us to Repeal the
> taxes then the Cruise Lines will only sign if a fund is established
> immediately to protect them from these POTENTIAL taxes. As
> this falls under GC9676(35), CCCM must look to the RCMP to
> fulfill that fund in order to get the contract signed.
> 10. Stay in your happy place throughout. Repeat that these are
> potential.

E-mail from Susan Edwards to Tracey Kelly, RCMP Opp., Ex. 53 [Dkt. 66-55] at CCCM3732.

Ms. Edwards, who was questioned in depth about this e-mail at her deposition, summarized it as "cheerleader Sue hoping that Tracey can get through to Kelly when I wasn't able to." I Edwards Dep. at 132–33. She explained:

> I had been trying to get Kelly to, in plain language, agree to everything that everybody had already agreed to all the way down the line, all the taxes were a pass through, they had said that many a times, it was in our contracts all the way through, but as many times as I asked Kelly for clean sentence, it wasn't forthcoming. So this was me saying to Tracey, I don't know how else to ask her, so would you go to your happy place and I need you to ask Kelly, as a partner, that we know we have already agreed to all of the taxes, we know all of this is going on, can we not just get the one sentence. That's all we were after.

*Id.* Asked what she meant by the reference in point 7 to "phantom taxes," Ms. Edwards and CCCM's counsel had the following exchange:

> A. It had—we were under the impression that the RCMP is a federal body, so why would the federal body pay—charge themselves taxes when it's rob Peter to pay Paul. So in the end, it was a cancelled-out tax, a phantom tax. It didn't even really exist.
>
> Q. Why all this concern over something that you thought was a phantom?
>
> A. Oh, there was—perhaps that could apply to one or two taxes, but there was all the other taxes that were involved and they were a pass-through and that was agreed to.
>
> . . .
>
> Q. . . . So did you think all of these taxes at issue were potential taxes?
>
> A. I had no idea. I'm not a tax lawyer.

*Id.* at 134, 136.

On September 4, Mr. Kelly wrote Ms. Meikle an e-mail asking for a phone call to discuss "the Cruise Lines concerns on Canadian Taxes." E-mail Chain Among Tracey Kelly &

Kelly Meikle *et al.* & CCCM Letter to Kelly Meikle & Michael Day, CCCM MSJ, Ex. 25 [Dkt. 65-16] at CAN9640–41.  Ms. Meikle responded that she was available but, "to be quite honest I don't know much about Canadian Tax Law.  I'm not sure I am the person to advise or guide on this issue." *Id.*  In a second email on that day, Ms. Meikle advise that she needed more time because RCMP needed to check with "Canada Revenue Taxation Agency."  *Id.* at CAN9368.  As a result, she added: "Please consider the September 8, 2008 deadline [for CCCM to execute and submit charter party agreements] to be suspended until we can resolve this issue . . . ." *Id.*

At some point on September 4, Messrs. Kelly and Day and Ms. Meikle did talk by phone.  *See* CAN3637–38 (Mr. Kelly's "Minutes from Conf call 9/04/08 and proposed Tax strategy").  In his cover email. Mr. Kelly thanked RCMP for the extension of the September 8 deadline because legal counsel will need to review;" reminded Mr. Day and Ms. Meikle that the charter dates "require significant changes in the Cruise Lines['] printed itineraries [sic] and thus risk to the Lines for waiting;" and provided an attached ISU Tax Protocol for consideration. *Id.* at CAN9637–38.  The attachment, on CCCM letterhead, stated:

> BACKGROUND: This letter is offered without prejudice and subject to Legal review from both ISU and CCCM
>
> As a follow up to our discussion (and noted in the summary of minutes sent August 27, 2008), it is imperative that together we can produce the most reasonable solution that will address this Cruise Line issue of Canadian Taxes.
>
> The Cruise Lines have stated that the potential Canadian Tax consequences must be addressed before they will go to final contract with CCCM. Because the Cruise Lines are not US or Canadian Companies, and their Corporate Structure is such that they do not pay Corporate Income Tax, Payroll Income Tax and GST. [sic]  These Taxes are not a standard for their business end cost models.
>
> CCCM reviewed the new tax information during the July 28 negotiations with the ISU. At that time, the ISU was clear to

explain the role of General Conditions 9676, section 35, and the impacts of that section. CCCM has provided all referenced legislation (9676, section 35, paragraph 3) to the Cruise Lines but the Cruise Lines still remain unconvinced that these potential taxes are covered by 9676 even with CCCM being very clear that CCCM stands behind this ISU statement unequivocally.

In an effort to maintain the 9/08/08 time-line for finalizing Charter Party Agreements, CCCM provides the following summary and proposed actions:

Summary:
1. The Cruise Lines have firmly stated that if the Canadian Tax issue is not addressed fully to their satisfaction, the Cruise Lines will step away from fulfilling the charter requests.

2. The Cruise Lines have calculated the projected financial impact of these Canadian Taxes. (see attachments). The Cruise Lines wish to have an equal amount of security lodged (in the form of an [Letter of Credit], May 2009) in order that financial security is placed should these 'potential' taxes be assessed.  CCCM has, again, vigorously stated to the Cruise Lines that General Conditions 9676(35) would apply to any taxes, impositions after the bid submission date etc.

3. Carnival Corporation has secured Canadian Legal Tax counsel in order to research and identify potential ways to address the Canadian Taxes. . . .

4. CCCM has secured Canadian Legal counsel who notes that CCCM would need the support of the RCMP to process a Tax remission request. Canadian Counsel notes that this Process takes approximately 12 months.

5. CCCM and ISU have a time-line for signing CPAs of 9/08/08. The Cruise Lines CPA are [sic] complete, except for addressing the Canadian Taxes.

Proposed Actions for Discussion:

1. Include Amendments between CCCM and ISU to address the potential assessment of Taxes to the Cruise Line, should the Canadian Taxes be assessed so that in turn the Cruise Lines amend their rates to cover potential Tax costs. The ISU under General Conditions 9676, Section 35 would need to address this potential Tax, which will affect the costs of the Work to the Contractor, by

74

increasing their Contract Price to cover these potential taxes, impositions.

2. Include an Amendment between CCCM and Cruise Line, supported by the ISU, to address the Canadian Tax liability[] specifically an Amendment that would include that CCCM and the ISU would work collaboratively to pursue Remission of any potential Taxes or impositions.

3. Include an Amendment between CCCM and Cruise Line, supported by the ISU, to address an increase in the CPA should the ISU/CCCM efforts to gain a Tax remission on potential taxes or impositions fail. The CPA would be amended to reflect the potential taxes and impositions being charged to the Work of the Contractor, to the amounts indicated in the attachments provided. Recommendation for your review, comment, suggestion, and approval.

CCCM offers the following amendments for both the ISU/CCCM contract and the Cruise Lines and CCCM CPAs. The ISU and CCCM will pursue remission of Canadian Taxes to be applied against the Charter Hire for the ISU Vancouver 2010 Accommodations Charter. The timeline for seeking confirmation of Remission of Canadian Taxes is projected at 12 months. The Process to begin in September 2008 and run until end of September 2009, Should the Request for Remission of Taxes be denied, the CPAs would be increased to reflect the projected Canadian Tax consequence, in turn the ISU/CCCM Contract would be increased to reflect this increase in Cost to the Contractor. In closing, the CPAs (Cruise Line Charter Party Agreements) are 99% complete as of today, CCCM remains confident that the CPAs can be completed by 9/08/08, given our (ISU/CCCM) ability to address this Canadian Tax concern of the Cruise Lines.

*Id.* at CAN9643–45. Mr. Kelly also sent a follow-up e-mail, writing that he wished to clarify that "the Cruise Lines are based in the United States but they [sic] Foreign Flagged Companies (from Countries that do not have Corporate Income Tax, Payroll Taxes, and GST)." E-mail Chain Among Tracey Kelly & Kelly Meikle, *et al.*, RCMP Opp., Ex. 55 [Dkt. 66-57] at CAN7880; *see also* RCMP Opp., Ex. 65 [Dkt. 66-67] (duplicate).

Ms. Meikle responded the next morning to report that RCMP's solicitor had referred it to "Canadian Revenue Canada Taxation Agency." E-mail Chain Among Tracey Kelly and Kelly Meikle, *et al.*, RCMP Opp., Ex. 55 at CAN7800.  Ms. Meikle promised to respond further that same morning.  *Id.*

Mr. Day acknowledged at deposition that, at least no later than September 4, 2008, he "knew that the Cruise Lines had a concern about the potential of Canadian taxes."  Day Dep. at 42, 52.

### Q.  September 5 through 8: Discussions with Canadian Revenue Agency; Financing Approved

Mr. Day notified Mr. Kelly on September 5 that Mr. Day had contacted the Canada Revenue Agency (occasionally "CRA").  *See* E-mail Chain Among Kelly Meikle, Michael Day & Tracey Kelly, RCMP Opp., Ex. 56 [Dkt. 66-58] at CAN7904; *see also* CCCM Reply, Ex. 9 [Dkt. 70-9].  Mr. Day summarized the call in the e-mail:

> I have spoken to the Olympic section at the Canadian Revenue Agency (CRA). This unit in Vancouver acts as a conduit for Games related tax issues. Ultimately, they may refer this issue to others within CRA for a decision or ruling.
>
> I provided the basic details around the purpose of the contract, who you are, the contractual relationship between us, the relationship between you and the ship owners and the duration of the port stay for the three vessels. I posed three questions that we would like answers to:
>
> 1) Is the nature of this charter different enough to attract taxes that these corporations would not normally pay when doing business in Canada?
> 2) If the answer is yes, what would those taxes be and what is the potential value of them?
> 3) Is there a process or procedure by which a request can be made to have those extraordinary taxes waived and if there is, by whom and how is the process initiated? The upshot of the conversation was they need more information regarding our agreement with you and the agreements between you and the ship owners.

> I will forward them a copy of our contract with you. It was suggested that you or your representative contact them directly. I support this as we will serve no purpose being in the middle at this point.
>
> Your initial contact at CRA is: Matthew Keane [contact information].  I will be discussing this further with our finance and operations officers regarding how to handle these potential costs. It is my hope that we will be able to provide you with clear direction by Monday.

*Id.* at CAN7904.  Mr. Day acknowledged at deposition that he had begun "talking to RCMP finance in September of 2008 about how to handle the potential costs of the taxes imposed against the Cruise Lines . . . because as of September 5, 2008, [he] believe[d] that RCMP finance would be responsible for paying the taxes assessed against the Cruise Lines . . . [i]f those taxes were to become applicable."  Day Dep. at 54.

> Mr. Kelly responded:
>
> Thank you for the update, and the contact information for Matthew Keane with CRA.  I have put a call into his office and left a voice-mail stating that I am available to answer any questions or provide any information to further the project. I will follow-up with an email including all my contact information.  As noted to you earlier, the Cruise Lines still expect to go to contract on Monday 9/08/08. Due to the fact that CCCM has negotiated for cruise line vessels to be moved from the Caribbean to the West-coast in order to fulfill these charter dates, there will be some concerns with delay in finalizing CPAs. Therefore CCCM will work to keep the process smooth and insure [sic] that the charter vessels remain committed.

E-mail Chain Among Tracey Kelly & Michael Day, *et al.*, RCMP Opp., Ex. 118 [Dkt. 66-120] at CAN980.

Mr. Kelly and Ms. Edwards talked with Mr. Keane and Lana Sharpe of the Canada Revenue Agency on September 5, 2008.  According to Ms. Edwards's minutes, which she sent to Mr. Kelly and Canada Revenue, the parties discussed "possible taxes and the

process/procedures required to reach a decision as to what, if any, taxes would be assessed for the RCMP 2010 Charters."  E-mail Chain Among Tracey Kelly, Susan Edwards & CRA Staff, RCMP Opp., Ex. 87 [Dkt. 66-89] at CCCM4133–44.  The minutes demonstrate that the tax implications of chartering vessels to use as accommodations for the ISU at the Olympics were far more complicated than anyone at CCCM or RCMP had believed *and* that it would be a major undertaking for Canada Revenue to determine what taxes might apply to each ship, dependent on, *inter alia*, possible tax treaties between Canada and the ship's country of registration.  The conversation also clearly distinguished CCCM's potential tax liability, if it were found to be a Permanent Establishment under Canadian tax law, from the matter of cruise-line taxes.  Even in a "best case" scenario for CCCM, in which CCCM was determined not to be a "Permanent Establishment" in Canada, the extent of tax liability for it and the cruise lines might remain unknown until a tax waiver application had been resolved, which could not occur until very close to start of the 2010 Olympics.[26]

On September 8, 2008, Ms. Shaw of Royal Caribbean sought clarification on the charter party agreement and the entire project.  E-mail Chain Among Stacy Shaw & Tracey Kelly, RCMP MSJ, Ex. 24 [Dkt. 62-28] at CCCM10716.  The issues presented by Ms. Shaw and Mr. Kelly's answers (in italics) were as follows:

---

[26] Any grant of a tax waiver to CCCM or U.S. cruise lines would be contingent on an evaluation of tax treaties between Canada and the United States.  Such treaties are generally reciprocal; under such treaties, the nation in which income is received grants the foreign taxed entity either complete or partial relief from its taxes, on the understanding that the nation in which the taxed entity is resident will tax that income.  For example, if CCCM were not a Permanent Establishment in Canada, Canada would not tax CCCM fully on the income earned in Canada because CCCM would pay taxes on that income in the United States.  *See generally* Internal Revenue Service, "Tax Treaty Overview," *available at* http://www.irs.gov/Individuals/International-Taxpayers/Tax-Treaty-Overview (last accessed September 9, 2013).

1. Status of tax exemption from Canadian Government—when received, it must specifically exclude Royal Caribbean, Steiner, Starboard and any other potential party expected to operate on-board.

*CCCM Answer: The Taxes CCCM are pursuing exemption for RCI are the following: Canadian Corporate Income Tax, Canadian Payroll Tax, and GST. Regarding the application of GST to on-board services (Bar Drinks, etc), that is a "pass-thru" charge that RCI will charge the consumer and then remit the (collected) GST to Canada.*

*CCCM held a conference call with Canadian Revenue Agency (CRA) on Friday (9/05/08), we discussed the charters and whether CCCM or the Cruise Lines would be defined as Permanent Entity Status or Not. CCCM has already gone thru an evaluation of PE status in receiving our Canadian Government GST number and we were determined to be Non Permanent Entity Status. Because there is a Tax Treaty between the USA and Canada, the determination of Non PE will mean that No Canadian Taxes will apply. The CRA has requested information on which countries the cruise lines submit their taxes in (because if the country has a Canadian Tax Treaty Agreement, then there will be no Canadian Taxes assessed)?*

. . .

4. Legal is generally fine with the concept of increasing the charter rate if the tax exemption is not secured by X date. Do you reasonably expect this date to be resolved by June 30, 2009? If it is necessary to increase the charter rate to recoup the taxes if an exemption is not secured, additional taxes will be assessed to Royal Caribbean. Our Tax Department is comfortable with an increased rate of $2.85 Million per ship to cover the actual income tax expected and the increased tax on additional income.

*CCCM Answer: CCCM will need a formal letter documenting this increase and how the calculation was arrived so that we can include in an Amendment with the RCMP/ISU.*

*Id.* at CCCM10716–17.

While tax issues were percolating, Ms. Brand at Royal Bank of Canada sent a "Conditional Approval" to CCCM on September 8:

> We are very pleased to confirm that we have obtained a
> conditional approval for financing, to assist CCCM 1, LP in
> providing the necessary letters of credit to Carnival Corporation[27]
> and Royal Caribbean Cruises Ltd.
>
> Over the next several days, we will be working towards removing
> the conditions of the approval (as discussed) and providing you
> with a detailed Confirmation of Credit Facilities agreement.
> We are thrilled to partner with your group on this very exciting
> project and look forward to working closely with you as we
> continue to move through the next steps of the process together.

E-mail from Cindy Brand to Phillip Sloane & Susan Edwards, CCCM Opp., Ex. 18 at

CCCM4145.  The grant of "conditional approval" meant that the Royal Bank of Canada would

follow up with CCCM by providing "a detailed letter . . . outlining all of the approved credit

facilities and all the terms and conditions relating thereto."  Deposition of Thomas Siemens,

October 3, 2012 ("Siemens Dep."), RMCP MSJ, Ex. 6 [Dkt. 62–10]; CCCM MSJ, Ex. 46 [Dkt.

60-46]; CCCM Opp., Ex. 7 [Dkt. 67-7] at 10.  The Royal Bank of Canada intended to provide

CCCM with a "$1.5 million line of credit . . . for operating expenses," and "letters of guarantee

in favour of the cruise lines for $19.724 million," in return for which CCCM would assign to the

Bank its first payment from RCMP in the amount of for $44.278 million.  *Id.* at 13–14.  That

money would be transferred to the Bank "before the cruise lines . . . were allowed to draw under

the letters of credit."  *Id.* at 14–15.  Some of that money would remain available to CCCM after

the $1.5 million line of credit and $19.724 million letters of credit were drawn upon.  *Id.*

Phillip Sloane then forwarded Ms. Brand's e-mail to "Skip Brown[,] the president

of Tristone Bank in Winston-Salem,"[28] P. Sloane Dep. at 127, writing:

---

[27] At this point, Carnival was no longer part of CCCM's plans.

[28] Neither party has stated so directly, but the Court infers that Tristone Bank, located in North
Carolina where Messrs. Kelly, Sloane, and Sloane were based, was a potential source of business
operations funding for CCCM.

> I have forwarded the conditional approval (e-mail) of the Royal Bank of Canada on our financing package with respect to the contract with the RCMP/ISU for the Winter Olympic Games. The conditional letter is coming from Toronto and we will have that in a few days. The conditions are not onnerous. [sic] They want the Charter Party Agreement[s] with the cruise lines which we should have wrapped up by Friday.  They want to close on the 18th. of September. The financing package calls for $1.5 million line of credit drawn down monthly. First draw approximately $840,000. Letters of credit issued to Holland America Cruise Line and Royal Caribbean Cruise Line in the amount of $20,000,000.
>
> They will take an assignment of first payment (due on/before April 30, 2009) from RCMP in the amount of $44,278,508.00 which pays off the credit line drawn down to $1,343,568, pays off the cruise lines of $28,176,080 (this releases the letters of credit on the cruise fare portion). The approximate balance left in the bank will be $14,758,000.00. Also, part of the use of the line of credit is to place deposits with our sub-contractors providing services to the ships while they are in port. So we will in effect be pre-paid on services not rendered until Feb./2010. Our next payment due on/before October 31, 2009 in the amount of $8,302,220.00 is free of all encumberances [sic]. I will call you in the A.M. and we can answer all your questions and put into motion our credit line request. I think 45-60 days is safe.

E-mail from Phillip Sloane to "sbrown@tristonebank.com," CCCM Opp., Ex. 19 [Dkt. 67-19] at

CCCM4147.

Continuing the trend of positive developments for CCCM, Mr. Kelly reported that

he had just had a "good long conversation that was very positive" with Mr. Day on taxes.  Mr.

Kelly wrote:

> Just hung up the phone with Michael Day. Earlier in the day, I had communicated to Michael and Kelly (thru voicemail) that our CPAs were 99% complete (except the Taxes) and that CCCM finalized our Funding w/ RBC on schedule (Today). Michael Day noted that he has communicated with Ottawa (HDQ) about the Tax issue. MD has asked [Ottawa] the following questions:
> 1. Can he commit to CCCM that RCMP will resolve this issue, either by increasing the Contract Value or pursuing Remission of Taxes?
> 2. Or does this Tax issue get "pushed back to CCCM"? Michael and I had a good long conversation that was very positive,

and noted he [sic] belief that "Ottawa" will come back with some solution that will work for all. Michael and I will talk in the am, and based on what "Ottawa" directs CCCM/ISU will craft an addendum to our Contract.

E-mail from Tracey Kelly to CCCM Partners, RCMP Opp., Ex. 66 [Dkt. 66-68] at CCCM4149.

## R.  September 9 through 12: Parties' Discussions on Canadian Taxes

The positive tone of the conversation between Mr. Day and Mr. Kelly was the final highwater mark of the relationship between CCCM and the RCMP.  The following day, September 9, Mr. Day suggested a different course for addressing the tax problem to Ms. Meikle: tell CCCM that (1) its Bid, which specified that RCMP would pay the taxes, was part of the contract between CCCM and RCMP, which should be enough to assuage the cruise lines' concerns, and (2) RCMP would not sign any contract amendments.  His email clearly states his understanding of RCMP's commitments to CCCM:

I have discussed this issue with CRA, the CFO of the RCMP, the Privy council office, and our Finance advisor. We are now waiting to be called back by our TB [Treasury Board] analyst which will probably not happen before tomorrow morning.

I have thought about what we have discussed previously and suggest the following.

In their proposal, CCCM indicated what was included in their price and stated the [sic] any extraordinary taxes or new taxes imposed or levied by the government would be extra to that price. Please review and confirm that approximates the statement.

When we issued the contract, *we incorporated their proposal in the priority of documents which makes it a part of the contract. On that basis, our contractor already has the assurance being sought by the ship owners regarding the potential tax.*

I do not think we should provide an additional written assurance on this issue. I do not think it is reasonable that we should have to assure someone that we do not have a contract with.

We will continue to seek a ruling on this matter and assist our contractor in getting it resolved. Unfortunately, that is not going to

82

> happen in the next few days. If you are in agreement with my
> analysis, I would like you to advise CCCM accordingly.

E-mail from Michael Day to Kelly Meikle, CCCM MSJ, Ex. 26 [Dkt. 65-17] at CAN20627

(emphasis added).

Questioned about this email during his deposition, Mr. Day was similarly clear

that he believed that § 35(3) of the General Conditions 9676 document and § 4.6.3 of the RFP

and Bid bound RCMP to pay the taxes about which the cruise lines were concerned:

> Q.  And you concluded as of September 9, 2008, that the contract
> you had entered with CCCM obligated the RCMP to pay the taxes
> assessed against the Cruise Lines if those were ever assessed;
> correct?
>
>  . . .
>
> A.  No.  It—the contract provided that any extraordinary taxes or
> new taxes imposed or levied by the government would be extra to
> the price . . . [in] 9676 . . . [p]aragraph 35.
>
> . . .
>
> Q.  As of September 9, 2008, the date on which you wrote the e-
> mail . . . did you believe that subsection 3 of paragraph 35 of
> General Conditions 9676 obligated the RCMP to pay the taxes
> about which the Cruise Lines were expressing concern?
>
> A.  Yes, I did.
>
> . . .
>
> Q.  You believed that page 54 part 6.3 of the proposal obligated the
> RCMP to pay the taxes about which the Cruise Lines were raising
> concern in late August, early September of 2008; correct?
>
> A. Yes.

Day Dep. at 65–66, 68–69.

On September 10, Ms. Meikle carried out Mr. Day's instruction, writing to Mr.

Kelly:

> We have sent your inquiry back to our Minister's representative in
> Ottawa. They are seeking advice from Treasury Board. This could
> take months to address and reach a decision. In the meantime, it
> has been suggested by our representatives that this issue should not
> hold up any agreement with the Cruise ship lines as the contract
> does address Taxation Issues. *In your Proposal there is a clause on
> Page 54 (Part 6.3) with respect to taxes. This has been accepted
> and has formed part of the contract document* (see priority of
> documents). If you could point this out to the Cruise Ship lines, it
> does offer, I believe the level of comfort they need to sign the final
> CPA.

E-mail Chain Among Tracey Kelly & Kelly Meikle, *et al.*, CCCM MSJ, Ex. 27 [Dkt. 65-18] at

CAN4009 (emphasis added). Mr. Day emphasized Ms. Meikle's email in a later message to Mr.

Kelly on September 12:

> Tracey,
> Sorry this took so long. . . .
>
> I have spoken to Kelly and understand you and her [sic] have this
> in hand. I will leave it with her to address your need in this with
> the following clarification.
>
> *The assurance you are seeking is already stipulated in the
> contract. What Kelly will provide is a written confirmation of that
> provision separate from the formal agreement.* This does not
> constitute a change to our agreement nor is it an amendment to the
> contract.
>
> I wish to be very clear that we are not changing or adding to the
> existing terms.

E-mail Chain Among Kelly Meikle, Michael Day & Tracey Kelly, *et al.*, CCCM MSJ, Ex. 28

[Dkt. 65-19] at CAN7869 (emphasis added). That evening, Ms. Meikle added: "Further to

Mike's email below, *the priority of documents includes the Federal Government shall be

responsible for any additional taxes which may be assessed to the contractor with respect to the

cruise ships lines. Please consider this email acknowledgment and acceptance of this clause*."

*Id.* (emphasis added). Ms. Meikle testified that she wrote this e-mail "[b]ecause the [Canada

Revenue Agency] might ultimately decide to charge the taxes, might ultimately decide not to

charge the taxes" and she "didn't know as of September 12, 2008, whether or not they were ultimately going to be assessed."  Meikle Dep. at 123.   Mr. Day testified that he concurred with Ms. Meikle's e-mail "based upon [his] understanding and participation in the contract negotiations with CCCM and [his] reading of the contract."  Day Dep. at 71.  These exchanges ended Mr. Day's direct involvement with CCCM, as he left for vacation with no e-mail access and did not return until October 8. *See id.* at 77–78, 154.

Knowing that the cruise lines would not be satisfied, CCCM decided to press forward to obtain more formal written confirmation that Bid § 4.6.3 should provide "the level of comfort" needed.   Mr. Kelly thanked Mr. Day and Ms. Meikle and then added:

> After reading Michael's email, I am working with our Legal Counsel to change the verbiage of the document to read "Clarification" (vs. Amendment). Expect to have the document approved over the week-end and will send it to Kelly on Monday for review and approvals. This document is for the benefit of the cruise lines, and to help them better understand that the Canadian Taxes will be the responsibility of the RCMP/ISU.

E-mail from Tracey Kelly to Kelly Meikle & Michael Day, *et al.*, RCMP Opp., Ex. 68 [Dkt. 66-70] at CCCM10914.

Also on September 10, as part of its evaluation of the tax questions, the Canada Revenue Agency asked Ms. Edwards for "information on the country in which the cruise lines file their tax returns" and "a copy of the proposed agreement between your company and the cruise lines."  E-mail from Lana Sharpe to Susan Edwards, *et al.*, RCMP Opp., Ex. 57 [Dkt. 66-59] at CCCM4214.  Ms. Sharpe stated: "Until we get this additional information we will not be able to proceed with the balance of our submission."  *Id.*  It is unclear whether or when CCCM answered this request.

S.  **September 10 through 13: Charter Agreements and Tax Terms Negotiations With Cruise Lines; RCMP Asks to Raise Contract Amount; Holland America Proposal**

During the evening of September 10, Mr. Kelly updated Royal Caribbean on the tax discussions between CCCM and RCMP.  Mr. Kelly wrote:

> CCCM is working with Canadian Counsel to create the Canadian Tax amendment for contract with the ISU . . . to 'safeguard' the projected funds needed (above our agreed upon Charter Rates) should the Canadian Taxes (Canadian Corporate Income Tax, Canadian Payroll Tax, and GST) be assessed to the Cruise Line. As noted previously, the ISU will begin the Tax Remission Process once the [CPAs] are signed (until that time, the name of the cruise lines can not be identified in the Remission Request).  Should the Remission Process not produce results by September 2009, then the ISU Contract Value to CCCM will be increased to meet the specified amount (by the Cruise Line) of Canadian Taxes.  These additional funds will be placed in a dedicated LOC until the Taxes are assessed, then the dedicated funds will be released to pay the assessed Taxes to the Canadian Government.  We must have your contract addendum that specifically deals with this issue of Canadian Taxes, so that we can incorporate that language into our Contract with the ISU.

E-mail Chain Among Stacy Shaw & Tracey Kelly, RCMP MSJ, Ex. 59 [Dkt. 62-63] at CCCM10760.  Ms. Shaw answered that Royal Caribbean was studying the tax issue and working on its response, although it assumed "that taxes will be due [and understood] that a pursuit of a remission will take place in the coming year."  *Id.* at CCCM10759.  Ms. Shaw forecast that Royal Caribbean would require approximately $2.8 million per ship to be pre-paid by CCCM if no tax remission were in place.  *Id.*  Answering Ms. Shaw on September 11, Mr. Kelly suggested that "CCCM and ISU will pursue a TAX Remission for the Cruise Lines, that Process takes up to 12 months, if by September 2009 the TAX Remission is not complete (or successful), then CCCM will receive additional Funds from the ISU to establish an [Letter of Credit] for the stated amount of Taxes. This TAX LOC will remain in place until TAXES are assessed. The Canadian Taxes will be paid from this LOC."  E-mail Chain Between Stacy Shaw & Tracey Kelly, RCMP

86

MSJ, Ex. 59 at CCCM10758.  Mr. Kelly and Ms. Shaw also spoke by phone later that day and

Mr. Kelly told Ms. Shaw that Royal Caribbean's tax projection was "250% higher than the other

Lines."[29]  *Id.* at CCCM10757.

   Royal Caribbean sent a second draft charter party agreement to Mr. Kelly on

September 12.  E-mail from Tracey Kelly to CCCM Partners & E-mail from Stacy Shaw to

Tracey Kelly, RCMP MSJ, Ex. 26 [Dkt. 62-30].  Still labeled "For Discussion Purposes Only," it

was far more complete than its predecessor.  *Id.* at CCCM4246.  However, Royal Caribbean's

offer was only valid if a charter party agreement were executed no later than September 17,

2008, and a letter of credit provided no later than September 30, 2008.  *Id.* at CCCM4259.  Royal

Caribbean named *Jewel of the Seas* and *Radiance of the Seas* for charter, and both ships were

mentioned in the replacement clause.  *Id.* at CCCM4246, CCCM4256.  The proposal would

require CCCM to pay Royal Caribbean $18,736,800.00USD by May 31, 2009 and

$1,240,830.00USD by December 31, 2009.  *Id.* at CCCM4250.  Royal Caribbean solved its tax

problem by making CCCM responsible for "any and all TAXES."  *Id.* at CCCM4249–50.  In

addition, Royal Caribbean wanted two letters of credit, one to "secure CRUISE LINE for the

Purchaser's obligations under this Agreement" for $13,115,760.00USD, and a second to "secure

CRUISE LINE for the Purchaser's obligations under this Agreement relating to estimated

TAXES," in the amount of $5,700,000.00USD.  *Id.* at CCCM4251.

   As CCCM was grappling with Royal Caribbean to negotiate charter party

agreements, Mr. Day of RCMP was grappling with the need to increase the contract price to

---

[29] It was Royal Caribbean's estimated tax liability that sent Mr. Kelly off to talking with
Norwegian Cruise Lines as an alternative.  *See* E-mail Chain Among Tracey Kelly, CCCM
Partners & Norwegian Cruise Line Representatives, RCMP Opp., Ex. 77 at CCCM10754 [Dkt.
66-79] ("Because of Stacy's most recent email, I am not willing to let go of NCL as of yet.
. . . Keeping all options OPEN.").

cover taxes on the cruise lines.  It appears that his request was not warmly received, as he first

spoke to Deirdre Dare, a senior RCMP staffer, and then sent her an email on September 12 to

warn that considerable money damages would be due to CCCM if RCMP repudiated the contract

instead of increasing its value:

> Following up on our discussion.
>
> The contract with Cruise Connections Charter Management LP (CCCM) stipulates that they provide a specific amount of beds in Vancouver at the required time. In order to do that, CCCM has entered in to contracts with the ship owners (cruise lines) through contracts referred to as charter Party Agreements (CPA's). This process has progressed to the point that we have been advised of the specific names and ownership of the vessels that will be sent to vancouver [sic] to meet the requirement.
>
> The contract at this point contains language that requires payment in full for any cancellation or reduction in service. While we would be able to try and negotiate that amount downwards, there would be little incentive on the part of the contractor to do so. On that basis, any effort to reduce the value of the contract would result in the crown paying damages in an amount close or equal to the value of the contract.
>
> While our general conditions provide us with the ability to cancel a contract for the convenience of the crown, that results in damages flowing to the contractor for all expenses incurred to date which could be in the millions. It is my opinion that we must consider our commitment under this contract to be fixed and that any attempt to modify it to reflect the current limitation we are seeking to have changed to be impractical. The potential costs to the crown would far outweigh any perceived benefits.

E-mail from Michael Day to Deirdre Dare, *et al.*, CCCM Reply, Ex. 10 [Dkt. 70-10] at

CAN20596.  Later on the same day, Mr. Day wrote again to Ms. Dare, setting out the history of

the CCCM-RCMP contract and requesting authorization for an additional $10 million "in the

event that CRA rules that the contractor is to pay corporate taxes."  E-mail Chain Among

Deirdre Dare & Michael Day, *et al.*, Excel Spreadsheet & Background Doc., CCCM MSJ, Ex. 23

[Dkt. 65-14] at CAN20556–57.  Mr. Day attached a spreadsheet and a lengthy narrative to his

email; the narrative explained "the history and background of the contract for accommodation vessels, the background on the corporate tax issue and the possible impact of that." *Id.* at CAN20554.  The spreadsheet illustrated the sequence of negotiations as the number of beds increased.  *Id.* at CAN20555.  As Mr. Day's narrative stated, he and Ms. Meikle considered corporate taxes "extraordinary" and unforeseen until they were "identified by the contractor providing the accommodation vessels." *Id.* at CAN20556–57.  Mr. Day testified at deposition that by the time he wrote to Ms. Dare, "the RCMP had agreed to pay those very taxes that the Cruise Lines were expressing concern about."  Day Dep. at 88.

The narrative document confirms Mr. Day's contemporaneous intentional agreement to bind RCMP to pay Canadian taxes assessed against the cruise lines and confirms many details of the parties' contracting history.  Mr. Day wrote to Ms. Dare:

> Proposal: To increase the current single vendor aggregate contract value to $70 million form [sic] $60 million to allow for potential increased cost solely due to extraordinary taxes that may be imposed by Canada
>
> Background: In December 2007, Treasury Board (TB 834086), granted the RCMP an exceptional contracting limit to enter into service contracts for an aggregate amount of up to $85 million for temporary accommodations for policing and security personnel deployed during the 2010 Olympic and Paralympic Winter Games. In addition, Treasury Board noted that no vendor shall be awarded contracts whose aggregate amount will exceed $40 million. In May, 2008 a competitive contract was issued to secure two vessels to be berthed in downtown Vancouver to provide 4104 beds at a cost of $37.9 million plus $1.9 million in GST, resulting in a total aggregate value of $39.8 million[.]
>
> In June 2008, Treasury Board (TB 834469) granted the RCMP an increase in the exceptional contracting limit for temporary accommodations. This was in response to the inclusion of a substantial increase to the requirement by the Department of National Defence (DND) as a major partner in the provision of security. The exceptional contracting authority increased to $140 million from $85 million and the single vendor aggregate value

limitation increased to $60 million from $40 million. The increase to the single vendor aggregate limit recognized that an option was available to contract for a third, smaller vessel that would accommodate the majority of the DND requirement in the Metro Vancouver area, without adversely impacting the availability of traditional accommodation at Games time.

The option for the third vessel to provide an additional 1248 beds for DND was exercised in June, 2008. Fees for this contract will be paid by the ISU and recovered from the Canadian Forces by interdepartmental settlement.

The addition of the third vessel resulted in a contract for 5,352 beds at a cost of $54.3 million plus $2.7 million in GST, resulting in a total aggregate value of $58.0 million.

In July 2008, the determination of the actual vessels that would be dispatched to Vancouver resulted in a minor change of the bed total to 5,468 from 5,352. This change increased the contract value to $55.4 million plus $2.8 million in GST resulting in a total aggregate value of $59.2 million.

In September 2008, a potential additional cost related to the possible applicability of corporate taxes was identified by the contractor providing the accommodation vessels. The issue was raised to the contractor by the cruise ship lines during the final negotiation of the Charter Party Agreements.

Cruise ships are considered by Canada Revenue Agency (CRA) to be the same as foreign transportation companies that come in and out of Canada to do business. Under that interpretation, they do not normally attract corporate taxes in Canada. In this instance, the extended berthing periods of the vessels in Canada presents the possibility that the unique nature of this charter may attract these taxes.

The RCMP and the contractor have approached the Olympic Section of CRA seeking a clarification and ruling on this point. CRA has not been able to provide us with an estimate of when we can expect a ruling on the question.

In the event such taxes are assessed, they have been estimated at approximately $5.5 million. The terms of the contract stipulate that any changes to existing taxes or the imposition of new taxes are considered to be extra to the contract.

Conclusion:
The imposition of this tax would increase the contract value to an estimated $64.7 million including GST. That amount exceeds the current aggregate limit of $60 million to a single vendor stipulated in TB minute 834469.

On that basis, the RCMP is requesting that the aggregate limit of $60 million to a single vendor be increased to $70 million for this vendor only. This increase of $10 million is composed of two elements. An additional $4.7 million is required in the event that CRA rules that the contractor is to pay corporate taxes. The second component is a $5.7 million contingency in the event that other unforeseen costs arise. This contingency would allow additional flexibility in contracting so as to avoid having to return to Treasury Board for increases to the special contracting limit.

E-mail Chain Among Deirdre Dare & Michael Day, *et al.*, Excel Spreadsheet & Background Doc., CCCM MSJ, Ex. 23 at CAN20556–57.  Asked about this email and its attachments at deposition, Ms. Dare testified that Mr. Day sent her this information in preparation for Ms. Dare to make a submission to the Treasury Board for additional spending authority.  Deposition of Deirdre Dare ("Dare Dep."), June 26, 2012, CCCM Reply, Ex. 3 [Dkt. 70-3] at 78–80.

On September 13, 2008, Mr. Kelly received the first draft of a charter party agreement from Ms. Puma of Holland America.  E-mail from Alexis Puma to Tracey Kelly & First Draft HAL CPA, RCMP MSJ, Ex. 25 [Dkt. 62-29].  The proposed charter agreement was for *ms Statendam*, the ship RCMP had toured in August, and it carried an option date of September 12, 2008—*i.e.*, the day before CCCM received it.  Holland America proposed three payments from CCCM: security of $6,608,056 due 30 days after a final charter party agreement was signed; a final payment of $9,440,080 due May 31, 2009; and "$2,929,680" in "additional tax" due on July 15, 2009.  *Id.* at CCCM4356–57.  Holland America proposed to reserve the right to substitute "any vessel of adequate size and similar standards as the VESSEL," with prior consent of CCCM, *id.* at CCCM4369; and proposed that U.S. maritime law would goven its

charter, with disputes resolved in Washington State, *id.* at CCCM4375.  The proposed charter

party agreement from Holland America also contained lengthy provisions on taxes, with the

repeated effect of requiring CCCM to reimburse Holland America for any and all assessed taxes.

*Id.* at CCCM4362, CCCM4365–66.

On that same day, September 13, RCMP delegates inspected *Radiance of the*

*Seas*, a Royal Caribbean ship.  During the tour, Ms. Edwards "explained . . . that the Radiance of

the Seas was part of Royal Caribbean's Radiance class of ships, identical in all material respects

with the other ships in that class" and "that it was common in the industry for ships within a class

to be switched for various reasons, but that in any case the ship which would be brought into port

for the Olympics would be a Radiance class vessel that satisfied the requirements of Cruise

Connections' contract with the RCMP."  II Edwards Decl. ¶ 15.  Ms. Edwards avers that "the

RCMP officials informed [her] that this arrangement was acceptable, and that the Radiance of

the Seas in particular, and the Radiance class in general, would be acceptable for use during the

Olympics."  *Id.*

**T.  September 15 through 23: CCCM Proposes Contract Clarification; Further Involvement with CRA; CCCM's Lawyers Involved; Negotiations with Royal Caribbean**

As he had forecast on September 10, Mr. Kelly sent a "Proposed Clarification to

Contract" to Ms. Meikle on September 15.  E-mail from Tracey Kelly to Kelly Meikle &

Proposed Clarification to Contract, CCCM MSJ, Ex. 29 [Dkt. 65-20] at CAN7859.  In his cover

email, Mr. Kelly wrote: "As promised, attached is our ISU Contract Clarification on Taxes.  For

your review and if approved, please sign, scan, and then email back to me.  This document is

requested by the cruise lines prior to finalizing CPA. . . . We expect to finalize CPAs this week.

The Financing is approved . . . ."  *Id.*

92

The Proposed Clarification would have adopted the course of action that CCCM had discussed internally in the prior days: RCMP would apply for tax relief for the cruise lines and, if unsuccessful, would pay the cruise lines' taxes. The Proposed Clarification emphasized RCMP's tax-payment obligation from the Bid, to which Mr. Day and Ms. Meikle had directed CCCM; it was designed to obtain explicit confirmation from RCMP that "the term 'all taxes' shall be interpreted to include, without limitation, all taxes of any kind imposed by Canada . . . , including without limitation, income, capital, sales, goods and services or excise taxes, and levies, duties, deductions and withholdings, incurred by: (i) [Holland America] and Royal Caribbean . . . in connection with the respective charter party agreements . . . (the "Pass Through Tax Costs"); and (ii) the Contractor or the partners thereof (the "CCCM Tax Costs") in connection with the Contract." *Id.* at CAN7860–61.

CCCM's lawyer in North Carolina, William Joyner, called Ms. Meikle on September 18 and then sent a follow-on email to advance a slightly different "Tax Proposal." CCCM recognized that RCMP had a "$60 million per vendor cap[, which] preclude[d] ISU from confirming additional monies to cover these taxes in total." E-mail from G. William Joyner, III to Kelly Meikle, *et al.*, RCMP Opp., Ex. 69 [Dkt. 66-71] at CAN19717–18. To address this limitation, CCCM proposed that RCMP pay directly $1,777,000 for Garbage Disposal, Recycling, Pilotage and other third-party costs, while leaving the contract value payable to CCCM at $CDN57,308,116; that RCMP would pay all taxes assessed against the cruise lines and CCCM up to its contract limit of $60 million, unless it obtained greater expenditure authority; that RCMP would immediately apply for and use its good efforts to obtain greater expenditure authority; and that RCMP would apply for and use its good efforts to obtain a tax remission from the Canada Revenue Agency. *Id.*

Mr. Joyner's email is notable for appearing to confirm Ms. Meikle's assurances that RCMP had "agreed that the Canadian taxes are the responsibility of the ISU" although it was unable to provide further written assurance because of "the $60 million per vendor cap" (also part of the emails between Mr. Day and Ms. Dare).  *Id.*  There was no immediate response.

Canada Revenue again asked Ms. Edwards on September 17 for the cruise lines' tax "filing information" and a copy of "the most complete contract between CCCM and the Cruise Line."  E-mail from Lana Sharpe to Susan Edwards, *et al.*, RCMP Opp., Ex. 61 [Dkt. 66-63] at CCCM4641.  This time, Mr. Kelly answered the next day and forwarded an e-mail from Royal Caribbean that stated in relevant part: "We do file and pay income taxes in the US[,] but only on a small portion of our worldwide income.  Liberia does not impose income taxes on [Royal Caribbean].  In general [Royal Caribbean] does not pay income taxes anywhere else in the world with the exception of a few cruises in certain countries."  E-mail Chain Among Tracey Kelly & Lana Sharpe, *et al.*, RCMP Opp., Ex. 63 [Dkt. 66-65] at CCCM4767.  Because the Royal Caribbean email also referenced an "email of September 9th regarding Permanent Entity status," Canada Revenue asked for a copy of that e-mail too, *id.*; Mr. Kelly declined, writing: "We had sent an email to [Royal Caribbean] explaining what [Permanent Entity] status meant and requesting the information of where they file taxes. This is a long way to say that the referenced email did not contain any usable information."  *Id.* at CCCM4766.  Mr. Kelly then directed Ms. Sharpe to "to [CCCM's] Canadian Legal Counsel for this project," "TJ Kang of McCarthy Tétrault LLP in Calgary."  *Id.*  Finally, Mr. Kelly noted that: "As for Holland America Line, they have not sent a formal notification, but they file ship[-]based revenue income tax in Netherlands/Antillles. They also file income taxes in the states for their USA operations."  *Id.*

This was the last interaction between CCCM and the Canada Revenue Agency before CCCM's relationship with RCMP broke down completely.

Despite uncertainty about RCMP's acceptance of its most recent Tax Proposal, CCCM continued its negotiations with Royal Caribbean. CCCM received a third draft of a charter agreement from Royal Caribbean on September 19. Royal Caribbean's management urged a speedy resolution of the negotiations because of "the impact of this project to open deployment and pending announcements." E-mail Chain Between Stacy Shaw & Tracey Kelly, RCMP MSJ, Ex. 27 [Dkt. 62-31] at CCCM11220.

Royal Caribbean's third proposed charter agreement was not much different from its second. It continued to require CCCM to pay all Canadian taxes, although the taxes were to be paid directly to the Canadian taxing authorities (national, provincial, municipal) and not to Royal Caribbean. *Id.* at CCCM11226. The payment provisions were unchanged, and the security provision was modified only slightly to reduce the amount of the first letter of credit from $13,115,760 to $12,716,970. *Id.* at CCCM11227–28. Royal Caribbean also inserted a more expansive right to substitute ships "with a capacity of 2,110 or greater and with comparable amenities" but not necessasrily within the Radiance class of ships. *Id.* at CCCM11234. Mr. Kelly sent back proposed revisions on September 23, 2008. E-mail from Tracey Kelly to Stacy Shaw with Revised RCCL CPA, RCMP MSJ, Ex. 29 [Dkt. 62-33]. This fourth draft contained only two substantive areas of change, the more important being a complete revision to Section 5 on Taxes and Fees, called Rider 5A. CCCM's Rider 5A provided that CCCM would be responsible for "any applicable Canadian federal, state, municipal, provincial or other governmental or quasi-governmental sales, use, value-added, excise, or other taxes, duties, fees or charges (whether now in existence or hereafter imposed or changed)" and was required to

"reimburse CRUISE LINE for any and all Canadian federal, state, municipal or provincial income taxes actually imposed against CRUISE LINE." *Id.* at CCCM4933–35.  Mr. Kelly wrote that these changes were "aimed at ensuring that the Cruise Line: (i) [would] comply with all Canadian filing and other requirements on a timely basis; (ii) [would] take commercially reasonable efforts to minimize Canadian taxes; and (iii) [would] deliver to CCCM any refund of Canadian taxes that they receive for which CCCM has made a prior payment." *Id.* at CCCM4928.  Mr. Kelly added that CCCM's proposal was "aimed at making clear that CCCM pay Canadian tax only to the extent that it does not minimize other foreign taxes payable by the Cruise Line and confirm that carriage of any dispute in respect of tax with a Canadian governmental authority is controlled by CCCM." *Id.*  Mr. Kelly also inserted three sentences to the Security section of the draft charter party agreement to clarify that CCCM would provide a Tax Letter of Credit to Royal Caribbean only 12 months after execution of the charter agreement and only if a tax remission were not obtained by that time. *Id.* at CCCM4936–37.

While Royal Caribbean and CCCM were thus negotiating final terms for a charter party agreement, Normande Morin, RCMP Director of Strategic Procurement in Ottawa, became involved in the ISU's vessel chartering project.  The first indication in the record of Ms. Morin's involvement comes from an internal e-mail written on September 19, 2008, in which Ms. Morin reacted to Mr. Joyner's e-mail to Ms. Meikle:

> We will need to be very careful with this firm.  We have never said what they are stating in the second sentence of their email.  "We understand that that the ISU has agreed that the Canadian taxes are the responsibility of the ISU."  I will rebut this in a subsequent email.  This firm has to pay the income tax on it revenue [sic] from this contract not the Crown so we have to be very careful.  Furthermore, the email content does not quite resemble the information they provided us on the phone, one more reason to be cautious.

E-mail Chain Among Normande Morin & Kelly Meikle, *et al.*, CCCM MSJ, Ex. 31 [Dkt. 65-21]

at CAN7791.  Ms. Meikle wrote back:

> The clause you are referring to is in new "confirmation agreement" (their words) which they wanted me to sign.  I told them I was not prepared to sign it.  For the reasons you outline as well as we could not establish who the "affiliates" were.   I also reiterated the contents on withholding tax, which is for employees.  The way I understand this from Immigration Canada, if an [sic] person is working on a vessel, and they spend more than 8 hours on shore, withholding tax (employee/employer contributions) MAY be applicable.   We cannot establish how many people this will involve on three cruise ships and so, I told them that no one must leave the ship or conversely, no one can be off the ship for more than 4 hours.
>
> I am not happy with the way this is transpiring.  The Charterer asked for an extension to September 1, then changed cruise ship supplier, then ask [sic] for an extension, and then brought this mess forward.   They were awarded the contract verbally (to their Canadian affiliate who actually submitted the bid) on June 27. Then they asked that all correspondence go to their American affiliate.  I did not think the withholding tax issue would apply as this was bid by a Canadian firm with a Canadian GST #. I have to apologize to all of you for this mess.  I feel really bad. This is such a unique procurement for all of us, but I think I should have researched all this in a lot more detail prior to moving forward, but like anything we seem to do, time and human resource constraints do [not—*sic*] give us the luxury of this.

*Id.*

### U.  September 26 through 30: Normande Morin Replaces Kelly Meikle as RCMP Contracting Authority; Contractual Relationship Begins to Break Down

Ms. Morin reviewed the Articles of Agreement sometime between September 22

and September 26, 2008.  Deposition of Normande Morin ("Morin Dep."), June 27, 2012,

CCCM MSJ, Ex. 30 [Dkt. 60-30], RCMP Opp., Ex 6 [Dkt. 66-8], CCCM Opp., Ex. 42 [Dkt. 67-

42] at 90.   In a letter titled "Nomination of Cruise Ships and Security Requirement" and faxed to

CCCM on Friday, September 26, 2008, Ms. Morin demanded that CCCM "nominate the vessels

and provide the security documents" within a week:

The RCMP wishes to inform you that the Contracting Authority for the Contract has been replaced by Normande Morin, or a representative, and that contract clause 5.1 is hereby amended accordingly. Please direct all further correspondence on this file to the undersigned.

In accordance with Clause 4, Annex "A" of the contract, the Contractor shall identify and secure vessels within 30 days of contract award. The Contractor was provided additional time to identify and secure the vessels and, accordingly, the Contractor was required to secure the vessel by September 19, 2008. To date, the Contractor has not identified or secured the vessels.

. . .

Cruise Connection Charter Management 1, LP has submitted to the RCMP a tax request for our review. Please refer, amongst others, to Contract clause 10(b) and to 9676 General Conditions Services Articles 3 and 35. The RCMP is dealing in good faith and will honor its contract dated July 28, 2008.

Failure by the contractor to secure vessels and comply with the security requirement by the required date constitutes a breach under the contract. The Contractor must nominate the vessels and provide the security documents required by 4:00PM Eastern Daylight Saving time October 3, 2008 to prevent further action by the Crown.

Letter from Normande Morin to CCCM, CCCM MSJ, Ex. 32 [Dkt. 65-22] at CAN19480.

Ms. Morin's letter caused immediate concern.  *See* II Edwards Decl. ¶ 17 ("Ms. Morin's letter confirmed the concerns previously expressed by Ms. Meikle regarding the negative impact of Ottawa's involvement, and specifically gave us concern that Ms. Morin was eager to find any excuse to terminate the contract with Cruise Connections.").[30] Mr. Kelly answered Ms. Morin by email on Sunday, September 28, writing:

---

[30] Ms. Meikle, "with whom [Ms. Edwards] had a good relationship," had explained in September "that RCMP officials in Ottawa were taking over contract responsibilities that were previously assigned to her and Mr. Day." II Edwards Decl. ¶ 12.  Ms. Edwards could not "recall the specific language that Ms. Meikle used" but "understood that she was very concerned that RCMP officials in Ottawa would have serious problems with her and Mr. Day's handling of this contract."  *Id.* ¶ 14.

> Thank you for your fax of 9/26/08. As our group works to keep good records of all communications with the ISU, we ask if future written correspondence could be via email. One of the points you noted was in regards to the time-line with the ISU. Please see below email from former Contracting Authority (dated 9/04/08) that suspends time-line until the Tax issue is resolved. In an effort to move our project forward the attached document addresses the points from your faxed letter of 9/26/08.

E-mail Chain Among Tracey Kelly, Kelly Meikle & Normande Morin, *et al.*, & CCCM Doc.,

RCMP Opp., Ex. 28 [Dkt. 67-28] at CAN2076. The attachment was titled "Nomination of

Cruise Ships and Security Requirement" and contained a lengthy rebuttal of the negative

assertions made in Ms. Morin's September 26 letter:

> In accordance to Clause 4, Annex A, the Contractor shall identify and secure vessels within 30 days of contract award. In your letter you identify that we were to have done so by September 19, 2008. Please refer to Attachment #1 where it states that the previous Contracting Authority suspended the deadline of September 19, 2008 to allow time for the Federal Government to address the tax concerns.

> CCCM has verbally nominated all 3 ships on many occasions to the Contracting Authority, to the Director of Security and Director of Accommodations as the Holland America Ship, Statendam (1248 capacity) and the RCCL sister ships, The Radiance of the Seas and the Jewel of the Seas (2110 capacity each). In addition, as per Contract Clause 6 (6.1)(6.2) Vessel Inspection. 6.1 provides that, " . . . contractor must arrange a meeting within 30 days of contract award between Ship Staff and ISU . . . ."

> These Clauses have been met, as meetings with Executives, and on site Tours on all the nominated Ships (or sister ship) occurred on August 23, 2008 onboard the Statendam, and again on September 13, 2008 on board the Radiance of the Seas. . . .

> Further, we identified many times to the Contracting Authority that CCCM has secured the vessels to 99% (as of Monday, September 8, 2008) but that CCCM could not complete to 100% without the RCMP defining and agreeing to a process that would meet the tax requirements of the Contract dated July 28, 2008 and sought many opportunities to meet and address this.

We had no communications with the Contracting Authority for 9 critical days despite daily emails and phone messages left so that CCCM could fully secure the vessels to 100%. Those emails and phone records are available upon request.

On September 27, CCCM receives your fax.

CCCM is ready and eager to move to 100% completion on this Contract.

Documented over the last month to the previous Contracting Authority, the required actions to complete the contract are:

1. CCCM requests that the RCMP define the process that would meet the tax concerns of the Contractor prior to final signatures of the Cruise Line Contracts.

2. The RCMP, at the request of CCCM and of the Royal Bank of Canada, reviews all Cruise Line Contracts, (Charter Party Agreements-CPA's).

3. The RCMP acknowledges the Assignment of Funds as per the Federal Financial Administration Act.

Normande, will you be the person to review and acknowledge these documents or will we work with Mike McAuley in Vancouver for this final review?

CCCM believes that this review is best facilitated in person, and it must completed no later than Wednesday, October 1, 2008 in order to meet all expectations by the RCMP, CCCM, RBC and Cruise Lines partners. CCCM notes that you are in Ottawa. During this final time line to completing all CPA's and financial requirements for the Bank, there has been a significant lack of communication from the RCMP. We are at a critical juncture where we must now meet all the above requirements within 48 hours.

We look forward to meeting and working with you, Normande[,] and we will continue to work in good faith and bring best efforts to meet and exceed RCMP expectations.

*Id.* at CAN2080–81 (formatting as in original).

Ms. Morin and Mr. Kelly spoke by telephone on Monday, September 29, and Mr.

Kelly then sent another email to Ms. Morin, which she printed and on which she wrote

comments.  E-mail from Tracey Kelly to Normande Morin, *et al.*, with Ms. Morin's Notes,

CCCM MSJ, Ex. 34 [Dkt. 65-24]; *see* Morin Dep. at 150 (acknowledging handwritten notes).

That document, with Ms. Morin's notes in italics, reads as follows:

> As a follow-up we discussed . . . email communications that were
> sent to you, the following titles are in the Subject line:
> 1.   Response to new Contracting Authority (sent Sunday
> 9/28/08).—*being prepared –addressed*
>
> . . .
>
> As noted in our first communication . . . we are requesting . . . a
> formal review and acknowledgement of the following items for
> Wednesday (10/01/08) of this week: —*document are* [sic] *to be
> submitted to my ATTENTION*
>
> A.  Define the Process that will meet the Tax concerns—*Already
> addressed no further clari will be pro* [illeg.]
>
> B.  Review all cruise line Charter Party Contracts—*where are*
>
> . . .
>
> Since September 8, 2008 a series of requests for action of the
> (former) Contracting Authority have not been responded to.
> Because of this lack of response, we are in a critical time-line in
> order to meet our objectives and deliver the charter cruise vessels.

*Id.* at CAN2049.  At her deposition, Ms. Morin testified that the "no further clari" line meant that

"no further clarification" would be provided on the tax issue because she believed she had made

RCMP's position with respect to Canadian taxes clear by September 29, 2008.  Morin Dep. at

151–52.

Ms. Morin sent a September 30 letter to CCCM reiterating her position on

payment of Canadian taxes:

> As stated in our letter dated September 26, 2008, tax items are
> articulated in the Contract and the parties are to be guided
> accordingly. There are no other tax processes and the Contract
> makes no provisions for the Contractor to impose conditions on tax

items in the contract. The Contractor must respect the contract and proceed without further delays.

The Contractor is required to identify and secure the vessels in accordance with contract article 4. Securing the Vessels. The following must be provided by the Contractor and has not been received to date:

• Proof of securing vessels and the payment to the vessel providers have not been provided.

. . .

• Information related to specifics of the vessels has not been provided.

Failure by the contractor to secure vessels and comply with contract requirements by the required date constitutes a breach under the contract. The Contractor must nominate the vessels and comply with the requirements of the contract by 4:00PM October 3, 2008 to prevent further action by the Crown.

Letter from Normande Morin to CCCM, CCCM MSJ, Ex. 35 [Dkt. 65-25] at CAN1984; *see also*

CCCM Opp., Ex. 32 [Dkt. 67-32].

### V.  Evening of September 30: CCCM Prepares Nomination Documents

On the evening of September 30, with only four days remaining before the

deadline imposed by Ms. Morin, the CCCM partners scrambled to finalize their nominations.  As

stated above, three ships had been the subject of the ongoing negotiations between CCCM and

the cruise lines: Royal Caribbean's *Jewel of the Seas* and *Radiance of the Seas*, and Holland

America's *ms Statendam*.  CCCM was required to provide, *inter alia*, "Name of the Vessel;

Official number, Class, year built, Flag, length, beam, displacement, [and] passenger capacity,

proof of Health Canada inspection of no less than 95% in the last two years."  Articles of

Agreement, Annex A § 4.7.   The Articles of Agreement also required "a Health Canada Cruise

ship Inspection score of no less than 95% for the year 2006 and 2007" and "within ten (10) days

of the vessel receiving, the Inspection scores for the years 2008 and 2009."  *Id.*, Annex A § 5.4.

**1. Discussion of Nomination of Ships by Class**

In their September 30 emails, the CCCM partners discussed for the first time nominating a ship by class of ship instead of by a specific ship name—for example, "two ships from the Royal Caribbean Radiance Class" instead of *Radiance of the Seas* and *Jewel of the Seas*.  RCMP contends that the contract required CCCM to nominate specific ships *by name* and CCCM argues that cruise contracting industry practice is to refer to classes of ships.

Cruise ships within a given class are called "sister ships" and are structurally identical.  I Edwards Dep. at 50 (sister ships are "completely identical except for probably interior design and carpet colour"); Kelly Dep. at 31 ("Ships are designed, for lack of a better term, in a cookie-cutter format. So once you understand the class of the vessel, they're all the same. You know, it would be like you driving a Mercedes E350, and Corinne has a Mercedes E350. Well, they are built exactly the same; right?"); Shaw Dep. at 160 (stating that "all Radiance-class ships are "basically identical" "[f]rom a physical standpoint").  Noteworthy is the language of the signed Minutes of the June 3, 2008, meeting—to wit, "the original bid award of 3 ships (2 Fantasy Class Carnival Ships, 1 S Class Holland America Line Ship) will move forward."  Minutes at CAN9671–72.  Cruise industry practice was also clear, according to the CCCM partners.  Ms. Edwards testified:

> A. . . . You never—as I explained before—just do one ship; you do a class of vessels.
>
> Q. Does it say that you were to provide a class of vessels or that you were to provide vessels?
>
> A. It is imperative we attempt to provide the vessels. For us, that's a class. I know that it seems a bit awkward, but in the industry that's what we mean.
>
> . . .

103

> Q . . . Why would you have listed particular ships if you were supposed to have nominated only classes of vessel?
>
> A. I could have just as easily have put the *Maasdam* or the *Statendam*. You pick one so that people can actually look at it, but it's a class of ship. That's what we do.

I Edwards Dep. at 49–50; *see also id.* at 54, 74.  Mr. Kelly's testimony was in accord:

> A: . . . So it's really the class of vessels. Securing them or which final ships came through would have been done at the CPA level. But even at the CPA level, it would say class of vessel.
>
> Q. The charter party agreement was not for specific ships? It was for class of vessel?
>
> A. Charter agreements are always for specific ships, but it will bring in class of vessel.

Kelly Dep. at 31–32; *see also id.* at 67.  RCMP's counsel had the following exchange with Mike

Sloane during Mr. Sloane's deposition:

> Q. The name of a ship doesn't matter in a charter party agreement?
>
> A. No.
>
> Q. Ever?
>
> A. No.
>
> Q. When you book passengers on cruise lines at Cruise Connections, Inc., do you book them on specific ships or do you tell passengers they're going to be booked on some class of ship?
>
> A. We book them on a specific ship. But if you read the ticket, it says that at any time the cruise lines can change it.

M. Sloane Dep. at 53–54.  For his part, Phillip Sloane stated: "And so if you're in the business, if

you're in the ship business, if you're in the charter business, you know that any ship can be

replaced with an equal ship of equal quality, size and space."  P. Sloane Dep. at 43.

When asked whether the contract required CCCM to "nominate classes of ships or

. . . nominate specific vessels," Ms. Edwards answered: "We were asked to nominate vessels,

and we knew when everybody agreed that the substitution of vessels—it is not a point of anything for us." I Edwards Dep. at 54. Mr. Kelly testified that RCMP "requested that we nominate specific vessels." Kelly Dep. at 32. Mike Sloane, however, testified: "Q. Mr. Sloane, CCCM's contract with the RCMP required CCCM to nominate vessels? . . . THE WITNESS: Class of vessels." M. Sloane Dep. at 39; *see also id.* at 45 ("Q. Where in the document does it refer to 'class of vessels'? A. Doesn't."). And Phillip Sloane testified that "the Royal Caribbean Cruise Lines ships were [R]adiance class ships which is what the contract called for, a class of ship." P. Sloane Dep. at 26.

The industry flexibility is reflected in the vessel replacement clauses that are apparently standard in charter party agreements. The CCCM partners' deposition testimony about classes versus specific ships referenced such clauses. *See* Kelly Dep. at 50 ("Cruise lines have the ability to interchange classes."); M. Sloane Dep. at 53–54 ("Because in the contract, it says that the cruise lines can substitute ships at any time if the ships aren't safe or if there's a problem with the ships. . . . It says that they can change the ship at any time."); P. Sloane Dep. at 43 ("And so at any point in time, that ship could have been replaced by another ship of equal class."). Notably, § 4.11 of Annex A of the RFP agreed that "[t]he cruise ship line shall have the option to substitute the vessels of similar size and quality that fully meets [sic] the requirement of the ISU and the Contractor," with limited conditions of prior approval and inspection. RFP Annex A, § 4.11.

### 2. September 30 E-mails Preparing Nomination Documents

The flurry of e-mails and documents exchanged among the CCCM partners on September 30 has become the evidence behind one of RCMP's primary arguments in its motion for summary judgment. RCMP argues that CCCM purposefully misled it by phrasing its

nomination to mask CCCM's intent to use a ship with noncompliant health scores for the 2010

Olympics.  Health scores for the four relevant ships—*Radiance of the Seas*, *Jewel of the Seas*,

*Serenade of the Seas*, and the *Statendam*—presented contract problems.  With a 2008 score of 88

for *Radiance of the Seas*, 93 in 2007 for *Jewel of the Seas*, and 94 for the *Statendam* in 2006 and

2007, the ships failed to meet the range of 95 or better required by the contract.

      Michael Sloane acknowledged at deposition that *Radiance of the Seas* was not in

compliance in 2008.  M. Sloane Dep. at 58.  Mr. Kelly testified that "[t]he health scores of the

cruise industry are exceptional" and "better than any hotels," describing the single score of 88 for

*Radiance of the Seas* as an "anomaly."  Kelly Dep. at 66.

      Ms. Edwards circulated a draft of "Ship Nominations" to the CCCM partners on

September 30.  *See* 8:01 p.m. E-mail from Susan Edwards to CCCM Partners, RCMP MSJ, Ex.

38 [Dkt. 62-42] at CCCM5276–78.  In the text of her cover e-mail, Ms. Edwards sought their

advice:

> I am not sure how to sugar coat this if [sic] the Cruise Lines or we
> feel it is too dishonest to 'mislead' on the Ships being nominated.
> I have made a start—but if the Cruise Lines and we, feel that we
> can nominate 1 ship then exchange it with another as per the CPA
> and it's [sic] ability to 'replace the ships within 12 months due to
> deployment' then the attached document will change.  Please
> advise as soon as you can so I can fix the formatting or replace.
> This will meet one of the RCMP's requirements. . . .

*Id.* at CCCM5276.  The draft nominating document, intended for Ms. Morin, stated:

> Please see attached printed emails that denote that these vessels
> were previously nominated by class only as requested by the
> Contracting Authority, due to National Security reasons.  The class
> of ships are the Radiance Class of Ships by Royal Caribbean
> Cruise Lines.  This is only Class of ship with 2110 passengers
> as agreed to in Contract Amendment on August 25, 2008.
>
> Within the Radiance Class of Ships, there are 3 ships under
> nomination:
> Radiance of the Seas (Toured September 13, 2008)

Serenade of the Seas
Jewel of the Seas
Brilliance of the Seas (deployed in Europe and not being nominated)

Final deployment will be confirmed by the Cruise Lines 12 months prior to the Charter date as per [CPA] (and also meets the required National Security concerns previously addressed to CCCM)

. . .

Centre for Disease Control/Health Canada Scores for 2008/2007: average 94–98

The Holland America Line Ship nominated is within the S Class of Ships.

. . .

Within the S Class, there are 2 ships under nomination:
Ryndam
Statendam
Final deployment will be confirmed by the Cruise Lines 12 months prior to the Charter date as per the [CPA] . . .

. . .

Centre for Disease Control/Health Canada Scores 2008/2007: average 94–97.

*Id.* at CCCM5277–78.

Counsel for RCMP questioned Ms. Edwards at length during her deposition about this e-mail.  Ms. Edwards testified:

A. . . . I had made a start on collating all the sister information on the sister vessels, the class. We had Ms. Morin not talking to us, and—that's not the word—finding all of these huge roadblocks to things that had been previously agreed to ad nauseam, i.e. the taxes, i.e. the 90 percent letter of credit, and I would be darned if we would—with Ms. Morin going down a garden path that was a moot point with the ship—the vessel replacement. That had been agreed to. I was frustrated and I did not want Ms. Morin to go down a garden path, be led down a garden path where trying to get her to understand what our industry is like when we can't even get her to talk about the big issues that had previously been agreed to.

107

The vessel replacement clause was here. We knew what it meant. The previous contracting authorities knew what it meant.

. . .

A. . . . [I]t was not too dishonest to mislead her on the ships being nominated. We did not want to mislead her down a garden path that she had no comprehension about when the previous contracting authorities had agreed to it. It was in here about the sister ships. She just didn't get it, and I did not in any way want to lead her down a garden path.

. . .

Q. What did you mean by saying: "I am not sure how to sugar coat this"?

A. I think I was trying to find a way to speak to somebody who wasn't going to speak back to me. She—just there was no communication. How do you sugar coat anything when they won't speak to you?

. . .

Q. So was Cruise Connections nominating Radiance of the Seas, Serenade of the Seas, Jewel of the Seas?

A. Within that Radiance class of ships, yes, those were the three that were immediately available to us.

Q. And below in the document, it says: "Within the S class, there are two ships under nomination: Ryndam and Statendam." Correct?

A. Yes, and there were others that we could call on if the vessel replacement clause was required, because there are other sister ships there.

Edwards Dep. at 62–64.

At 8:34 p.m.—approximately 30 minutes after sending her first e-mail—Ms. Edwards e-mailed the CCCM partners again, attaching a revised version of the Ship Nominations to add the *Maasdam* as a Holland America sister ship, with a resulting improvement of that cruise line's health scores from "94–97" to "94–98." 8:34 PM E-mail from Susan Edwards to

CCCM Partners, RCMP MSJ, Ex. 39 [Dkt. 62-43] at CCCM5279–81.  Ms. Edwards wrote: "I added in the *Maasdam* as it had good scores.  I printed off all the Health Canada and CDC scores and they are ready to go when this next pakg [sic] is completed."  *Id.* at CCCM5279; *see also* I Edwards Dep. at 66 (acknowledging that the reference to "good scores" was to health scores).

Ms. Edwards then turned her attention to the other topics referenced in Ms. Morin's most recent letter, writing at 8:43 p.m.:

> 1.  It appears as if the RCMP will sign off on review of the CPA's—as it is in the Contract.
>
> 2.  Not sure about this—but if the RCMP won't play ball with signing the acknowledgment of the Assignment of Funds or not agree to meet any of the other required documents from RBC.  Will RBC back out??
>
> 3.  If the Bank drops out—do we have any other options??  Can we:
> a) beg the cruise lines to wait to April 2009?  We are only months away now!  That would be a challenge??  But is it possible??
> b) find anyone who can come up with the funds? . . .
>
> 4.  I am trying to come up [sic] an out of the box solution. . . .
>
> 5.  Do we partner with the Cruise Lines and use them to finance as a *VERY* last resort?? . . . .

E-mail Chain Among CCCM Partners, RCMP MSJ, Ex. 41 [Dkt. 62-45] at CCCM5286; *see also* RCMP MSJ, Ex. 87 [Dkt. 62-91] (duplicate).  At 9:01 p.m., Ms. Edwards sent another e-mail to bring her partners up to date:

> Today's letter required us to  . . .
> 2. Taxes—I think it was said that we must move on from this and accept it for the moment.  No action at this time.
> 3. Identify the Vessels
> Created a letter that was sent to everyone for input.  . . .
> 4.  Proof of securing vessels and payment—we can provide proof of securing vessels with CPA's they should be in tomorrow (ship names on the CPA's??)[.]  The CPA's are scheduled to be received in  the  morning  and  we  should  be  able  to  send.

—we can't currently provide proof of payment to the RCMP. The RCMP have not received any of RBC's documents. At this point, do we simply send them and see what happens? We can send supporting emails re: Assignment of Funds when we fax RBC's documents. . . .

6. Information Specific to the Vessel.

This is included in the Cruise Line Ship Nomination Document. Pls refer.

Once we clear up as much as possible in this letter, then we move to identify yet again our request for RBC documents to be signed as outlined in 4 (with supporting emails).

7. We will reiterate in each rebuttal package that the timelines were suspended and that we do not agree with the October 3[ ] deadline as we have been waiting for the RCMP. Tracey, if you could pls pull the emails that you like the best, and print them off in preparation for faxing. Don't be shy, print off as many as you think will help us. We will send in order and swamp her with evidence that we have been working in good faith. We will refer to good faith, same as she did in her first letter.

E-mail Chain Among CCCM Partners, RCMP MSJ, Ex. 40 [Dkt. 62-44] at CCCM5290–91; *see also* RCMP Opp., Ex. 72 [Dkt. 66-74] (duplicate). Phillip Sloane responded at 9:14 p.m.:

It is going to come down to whether the RCMP wants these cruise ships or not. They have been assigned the rights to Ballentyne Pier. I think this is a big deal. . . . I think w/o a 'great' reason this would be a very BIG embarrament [sic] to the RCMP/ISU.

And what have we done that is soooooo outrageous that they would want to 'fire' us? It comes down to credibility. If we get any flak from Normande we ALL get on a plane and get a meeting with the 'boss' in Ottawa. We definitely have the records on our side to fight 'an action by the Crown.' . . . BUT we have to keep from shooting ourselves in the foot. *We should not have this health issue on the ships at this point in the game. We knew about this from the beginning. We have to be very careful in the future and make sure we take care of the details.*

E-mail Chain Among CCCM Partners, RCMP MSJ, Ex. 41 at CCCM5286 (emphasis added).

At her deposition, Ms. Edwards disclaimed any knowledge of what Phillip Sloane's reference to "this health issue" meant. I Edwards Dep. at 68. Mr. Sloane testified that with this e-mail he was "basically saying" that Ms. Morin was a "stick of dynamite" who was

"not being cooperative," making "threats," and "looking for trouble" instead of "coming up with solutions." P. Sloane Dep. at 41–43. Mr. Sloane acknowledged that the "health issue" was that: "One of the ships . . . and I'm not sure even which one because I didn't—I wasn't involved in the names of the ships, appears not to have met the criteria for health score." *Id.* at 43.

At 9:26 p.m., Phillip Sloane sent an additional e-mail to the CCCM partners, suggesting: "What about having multiple ships [sic] names on the contract knowing full well the ones the cruiselines [sic] want to use and then put the onus on them to get these ships up to Canadian health standards by 12/31/09?? Is this possible?" E-mail Chain Among CCCM Partners, RCMP MSJ, Ex. 40 at CCCM5290. At his deposition, Mr. Sloane stated that he could not "remember why" he wrote this e-mail and "really [did]n't know why [he] did it." P. Sloane Dep. at 45. Ms. Edwards also disclaimed any understanding of what Mr. Sloane meant. I Edwards Dep. at 73.

Ms. Edwards e-mailed Mr. Kelly at 9:27 p.m., including nothing in the body of the e-mail and attaching a document with the filename "Cruise Connections Charter Management (Clean) 09.19.08.doc." E-mail from Susan Edwards to Tracey Kelly, RCMP MSJ, Ex. 36 [Dkt. 62-40] at CCCM5292. The document is an unsigned charter party agreement with Royal Caribbean with Microsoft Word's Track Changes feature enabled. The tracked changes for the first page show that "*Radiance of the Seas*" was replaced with "*Serenade of the Seas*" in one place but not another. *Id.* at CCCM5293. Separately, at 9:56 p.m., Ms. Edwards responded to Phillip Sloane's 9:26 p.m. e-mail about having "multiple ship names" on the document. 9:56 PM E-mail from Susan Edwards to CCCM Partners, RCMP MSJ, Ex. 42 [Dkt. 62-46] at CCCM5321. She sent the CCCM partners a link to http://www.hc-sc.gc.ca/hl-vs/travel-

voyage/general/ship-navire-eng.php, writing that she was "including this Health Canada

explanation page in our package tomorrow so that she might 'forgive us' a few points." *Id.*

At 10:07 p.m., Ms. Edwards sent the CCCM partners a document titled

"Amended Nomination Document," writing: "Check this one out.  I have printed off all the

supporting documents from Health Canada and CDC and they are ready to go."  10:07 PM E-

mail from Susan Edwards to CCCM Partners, RCMP MSJ, Ex. 43 [Dkt. 62-47] at CCCM5323.

Compared to the 8:01 p.m. draft, the 10:07 p.m. version was shorter and contained the names of

fewer vessels; it stated:

> Please see attached printed emails that denote that these vessels
> were previously nominated by *class only* as requested by the
> Contracting Authority, due to National Security reasons.
>
> The Class of Ships are the Radiance Class of Ships by Royal
> Caribbean Cruise Lines.
>
> This is only Class of ship with 2110 passengers as agreed to in
> [sic]  Contract Amendment on August 25, 2008.
> *Nominated Ships:*
> 1.  Serenade of the Seas (Toured sister ship Radiance of the Seas,
> September 13, 2008)
> 2.  Jewel of the Seas
> Radiance Class
> Registry: Bahamas
> Official # (name) Serenade of the Seas, Jewel of the Seas.
> . . .
> Centre for Disease Control/Health Canada Scores for 2008/2007
> Jewel of the Seas: 99, 97 (did not call into Canada, hence CDC
> scores)
> Serenade of the Seas: 97, 99
>
> The Holland America Line Ship nominated is within the S Class of
> Ships.
> . . .
> 3.  Statendam
> S Class
> . . .
> Official # (name) Statendam
> . . .

> Centre for Disease Control/Health Canada Scores 2008/2007: 95, 94.

*Id.* at CCCM5324.

This draft is notable because it lacked any mention of *Radiance of the Seas*, one of the ships for which CCCM had been negotiating with Royal Caribbean but which had a noncompliant health score of 88 in 2008. Instead, Ms. Edwards had named *Serenade of the Seas*, which had never incurred a noncompliant health score during the reported period. Phillip Sloane responded to Ms. Edwards, asking: "The only change I see is you left off one of the RCCL ships?" E-mail Chain Among CCCM Partners, RCMP MSJ, Ex. 44 [Dkt. 62-48] at CCCM5331. She responded: "Yes, I only put down the exact # of ships that we are contracting for." *Id.*

### W.  October 1: CCCM Responds to September 30 Letter & Nominates Ships

CCCM sent Ms. Morin three groups of documents on October 1—two days in advance of her deadline. The first group included: (i) a "Response to Faxed Letter from Contracting Authority on September 30, 2008, Subject: Nomination of Cruise Ships and Security Requirements" and (ii) "Nominated Vessels and Information related to specifics of the vessels." Oct. 1, 2008, Fax from Susan Edwards to Normande Morin & Attachs., part of RCMP MSJ, Ex. 10 [Dkt. 62-14] at CAN1378; *see also* CCCM MSJ, Ex. 38 [Dkt. 65-28] (duplicate with "Received" stamps). The "Response" from CCCM was a lengthy document that stated, in relevant part:

> The Contractor, in good faith, must re-submit that the Contract is vague in its description of processes as to how any additional Taxes and impositions under General Conditions 9676 and this contract will apply or look like. The Contractor must ask that the Crown respect our need for this explanation which is reasonable to request. We have been requesting this clarification since September 2, 2008 and have provided a possible solution, see attached: Tax Clarification. If the Crown does not agree to this process included in the Tax Clarification, then it is reasonable, that in good faith, that we accept the emails by Kelly Meikle and

Michael Day that all taxes will be covered by the Crown and that the Contractor will provide invoices of all additional impositions and taxes imposes after the Contractor bid that affect the costs of the Work to the Contractor to the Crown for payment within 30 days.

The Contractor does provide, with this package, a document that reiterates all the ship names for nomination, previously relayed verbally on multiple occasions (witnessed by other ISU members) to the previous Contracting Authority.  We have included all information specific to each vessel as requested as well as supporting documents re: Health Inspection Scores from Health Canada and the Centre for Disease Control.

Proof of securing vessels is being sent in a separate fax . . . .  These Charter Party Agreements were available as of September 8, 2008, but despite numerous attempts to submit them to the Contracting Authority, we had no reply.  We look forward to your comments and request that you sign the acknowledgement page that the Crown has reviewed the CPA's for our records.

Please note that the Contractor respectfully submits that all deadlines were suspended by the Contracting Authority on September 8, 2008 as previously submitted with evidence.

The Contractor is working in absolute good faith to complete this contract.  There is much to review.  The Contractor has required and requested repeatedly a meeting to review the CPA's and an explanation as to the processes of how GC 9676 works, since early September.  We were ready then to present.

The Contractor will be able to complete all Contracts as soon as we receive the CPA's back by the Contracting Authority and as previously submitted:

1.  CCCM requests that the RCMP define the process that would meet the tax concerns of the Contractor prior to final signatures of the Cruise Line Contracts or accept that any additional . . . imposed duties, taxes, charges or impositions after the bid submission date and which affects the costs of the Work to the Contractor, the Contractor price will be adjusted to reflect the increase or decrease in the cost to the Contractor and that the Contractor will provide Invoices to the Crown reflecting those impositions for payment within 30 days.

2. The RCMP[ ] reviews all Cruise Line Contracts[ ] (Charter Party Agreements–CPA's) and acknowledges the completed review.

3. The RCMP Acknowledges the Assignment of Funds as per the Federal Financial Administration Act.

Nominated Vessels Doc., RCMP MSJ, Ex. 10 at CAN1380–81 (formatting as in original).

Among the "Nominated Vessels" were Royal Caribbean's *Jewel of the Seas* and *Serenade of the Seas*, and Holland America's *ms Statendam*, with no reference to *Radiance of the Seas*. *See id.* at CAN1383. Asked about this change at her deposition, Ms. Edwards engaged in the following exchange with the RCMP's counsel:

Q. [A]re those the two Royal Caribbean cruise lines ships that Cruise Connections was nominating to the RCMP, the *Serenade of the Seas* and the *Jewel of the Seas*?

A. Yes, with the context, of course, that the *Radiance of the Seas* is also included in that sister class of vessels.

Q. Were you nominating the *Radiance of the Seas*?

A. It was a distinct possibility that that would be nominated under the vessel replacement under the sister ships.

Q. Where is that articulated?

A. It was a non-issue because of the fact that we had agreed earlier to the vessel replacement.

Q. The two ships—were you nominating three ships here under nominated vessels, the *Serenade of the Seas*, the *Radiance of the Seas*, and the *Jewel of the Seas*?

A. We were nominating the Serenade, the Jewel, the Radiance class of ships.

I Edwards Dep. at 58–59; *see also id.* at 53 ("Well, we nominated the class of ships called the Radiance class of ships and also Holland America class of ships; two different classes of ships were nominated."). Ms. Edwards acknowledged that she did not provide the health scores for

115

*Radiance of the Seas*, explaining that she did not because "[t]he context [was] . . . that [CCCM was] nominating ships within a class of ships" and CCCM "just chose these ones at this time, knowing that it was a non-issue due to the vessel replacement clause that all had agreed to."  *Id.* at 60–61.

Mr. Kelly denied knowing who changed the name of the ship in the draft sent to the RCMP.  Kelly Dep. at 70.  Pressed to explain, he testified:

> Q. But they're not the same two ships that were nominated to the Government of Canada on October 1st, 2008, correct? . . .
>
> A. The same class of vessel.
>
> Q. That wasn't my question, sir. The *Serenade of the Seas* and the *Radiance of the Seas* are not the same ship; correct?
>
> A. They are the same class of vessel, but they are different-named ships, yes. . . . what we were really focused on was class of vessel.
>
> Q. Why did Cruise Connections Charter Management negotiate a charter party agreement for one—for a specific ship, *Radiance of the Seas*, with the Royal Caribbean Cruise Lines, and nominate a different ship, the *Serenade of the Seas*, to the RCMP?
>
> A. The charter party agreement was about the class of vessel in that it didn't matter, honestly, to us. What we needed is how many berths, the class of ship, and where was it going to be when the RCMP and ISU needed it.
>
> Q. Well, then, why wouldn't you have nominated and negotiated the same ship, nominate it to the RCMP and negotiate it with Royal Caribbean for the same ship?
>
> A. To be honest with you, I didn't really see this as an issue.

Kelly Dep. at 67.  Stacy Shaw confirmed that she did not approve replacing *Radiance of the Seas* with *Serenade of the Seas*, and she did not recall ever being informed by CCCM that they had nominated *Serenade of the Seas* instead of *Radiance of the Seas*.  Shaw Dep. at 125, 130.

The second group of documents sent by CCCM to Ms. Morin included

(1) "Charter Party Agreement (CPA) between RCCL and CCCM" and (2) an "Acknowledgment

Form" that, according to Mr. Kelly, was "a Bank requirement to insure that the CPA has been

reviewed and acknowledged by the Contracting Authority."  E-mail from Tracey Kelly to

Normande Morin titled "Response #2 CPA for RCCL and CCCM" & Attachments, RCMP MSJ,

Ex. 32 [Dkt. 62-36] at CCCM5433; *see also* CCCM MSJ, Ex. 52 [Dkt. 65-41].  In the e-mail

body, Mr. Kelly wrote:

> I would like to address your question in regards to how [sic] will
> CCCM secure the charter vessels.  CCCM has been pre-approved
> by the [Royal Bank of Canada] for an initial loan to secure the
> charter vessels.  The RBC loan will be implemented after receipt of
> the ISU Acknowledgment signatures and CCCM signs the [Charter
> Party Agreements] with the cruise lines.  Working with RBC,
> CCCM and ISU will assign funding from the first ISU payment (in
> April '09) that will go from the ISU to RBC to the cruise lines.

E-mail from Tracey Kelly to Normande Morin, RCMP MSJ, Ex. 32 at CCCM5433.

Mr. Kelly forwarded to Ms. Morin an unsigned charter party agreement with

Royal Caribbean that did not match perfectly any of the four drafts CCCM had exchanged with

that cruise line.  *Id.* at CCCM5435–62.  It stated "Issue Date: September 2, 2008" and was not

valid unless executed "on or before Monday, September 22, 2008 with a valid irrevocable letter

of credit to follow on or before September 30, 2008."  *Id.* at CCCM5450. The cost of the charter

was deleted.  *Id.* at CCCM5437.  The draft referred to *Jewel of the Seas* and *Serenade of the Seas*

on the first page and *Jewel of the Seas* and *Radiance of the Seas* on the third page.  *Id.* at

CCCM5435, CCCM5437.

Mr. Kelly also forwarded a document from the Royal Bank of Canada titled,

"Acknowledgement of Satisfaction of Condition Precedent."  *Id.* at CCCM5434.  The subject

line read: "Re: Contract titled 'Charter Services to Provide Vessel Accommodation for Royal

117

Canadian Mounted Police and Canadian Armed Forces, Vancouver 2010 Integrated Security

Unit, Contract Number 7131902' dated July 28, 2008, as amended by a Contract Amendment

dated August 25, 2008 (the 'Amendment') and by a Clarification to Contract dated September

15, 2008 (the 'Clarification') (together the 'Contract') . . ." *Id.* The final referenced document—

"Clarification to Contract dated September 15, 2008"—was significant because, as discussed

*supra* at § I.T, RCMP did not sign any such document on September 15, 2008; that date was

when Mr. Kelly sent a proposed "Clarification" to RCMP for review and signature.  Above the

place for Ms. Morin's signature, the Bank explained its purpose:

> The Crown acknowledges and confirms to RBC that the Crown is
> satisfied with the wording of the non-cancellable charter party
> agreements with the Contractor and that they contain the wording
> required by section 6.2 of the Contract, so the contractual condition
> precedent to the First Payment by the Crown of $44,278,508.00
> plus GST on or before April 30. 2009 under the Contract as
> amended by the Amendment and Clarification (together the 'said
> Contract') has been satisfied.

*Id.*

Mr. Kelly's final e-mail to Ms. Morin attached an unsigned charter party

agreement with Holland America and a second "Acknowledgement of Satisfaction of Condition

Precedent" form from the Royal Bank of Canada.  E-mail from Tracey Kelly to Normande Morin

titled "Email #3 CPA for HAL and CCCM" & Attachments, RCMP MSJ, Ex. 33 [Dkt. 62-38];

*see also* CCCM MSJ, Ex. 53 [Dkt. 65-42].  The charter party agreement was for *ms Statendam*; it

had an option date of September 26, 2008, and a redacted charter price.  HAL CPA, RCMP MSJ,

Ex. 33 at CCCM5464–84.

**X.  October 2 through 6: RCMP Response to Nomination; Renewed Discussions with Cruise Lines; RBC Sends Formal Conditional Credit Offer**

In her October 2 response to the CCCM nominating documents, Ms. Morin indicated that RCMP would review them and emphasized that RCMP would not agree to any tax clarification.  Since her position is critical to the dispute, it is quoted at length:

> [T]he Crown wishes to provide the following comments with respect to the tax concerns brought forward by the Contractor. The Contract signed by the parties, dated July 28, 2008,[31] addresses the responsibilities of the parties as it relates to tax and no further clarifications is necessary:
>
> • Contract Clause 6.1, Basis of Payment, is clear that an all inclusive daily rate of $298.00 per bed per night applies. The all inclusive daily rate includes all costs unless specified otherwise in the contract.
>
> For example, pursuant to Clause 6.1, Fuel surcharge, Waste Management and Port Fees, if applicable, are paid by the RCMP. No clause indicates that the RCMP is responsible for taxes, charges or impositions applicable at the time of the bid, except for GST/HST if applicable.
>
> • Contract Clause 6.3 specifies responsibilities of the parties for taxes. In particular, Clause 6.3(2) states: In the event of any change in any tax imposed under the Excise Act, R.S.C 1985, c. E-14, and Excise Tax Act, R.S.C. 1985, c. E-15, or any duties imposed under the Customs Tariff or any other federal or provincial sales, excise or other like duties, taxes, charges or impositions after the bid submission date and which affects the costs of the Work to the Contractor, the Contract price will be adjusted to reflect the increase or decrease in the cost to the Contractor.
>
> • General Terms and Conditions 9676 (2007/11130), Article 3 (2), states: " . . . The Contractor is fully responsible for all deductions and remittances required by law in relation to its employees including those required for Canada and Quebec Pension Plans, unemployment insurance, worker's compensation, or income tax."

---

[31] It is unclear what Ms. Morin meant with this reference, although she likely intended to refer to the date of the Articles of Agreement, July 31.

> • Contract Clause 10, Priority of Documents, indicates that "If there is a discrepancy between the wordings of any documents, which appears on the list, the document, which first appears on the list, has priority over the wording of any documents, which subsequently appears on the list."
>
> Since the Articles of Agreement and General Conditions both appear on the list before the Contractor's bid and the Project Services Agreements, the wordings of the Articles of Agreement and of the General Conditions have priority over these documents. We are confidant [sic] that this will answer your concerns and we hope that we can move forward with this contract. Please acknowledge that this is satisfactory.

Letter from Normande Morin to CCCM, RCMP Opp., Ex. 70 [Dkt. 66-72] at CAN1375–76.

Also on October 2, Royal Caribbean assured CCCM that "[t]he taxes and fees language was considered significant by our Legal and Tax teams but they are diligently working on it with counsel and Canada." E-mail Chain Between Tracey Kelly & Stacy Shaw, RCMP MSJ, Ex. 45 [Dkt. 62-49] at CCCM5583. Mr. Kelly responded: "We are literally at the Bank, waiting for the revised CPA from [Royal Caribbean]. We sent the very same language to [Holland America] and they incorporated it within 24 hours. I do understand that [Royal Caribbean] is conservative, and we hope that the CPA is returned asap. Looking to close this week!" *Id.*

On October 3, Ms. Morin sent the CCCM nomination documents to Mr. Day, Ms. Meikle, Inspector Kaluza, and Kevin DeBruyckere[32] and asked for their review and comments. E-mail from Normande Morin to RCMP Staff, RCMP MSJ, Ex. 30 [Dkt. 62-34] at CAN161. Ms. Morin instructed:

> The attachment consisted of the official nomination of the ships made by Cruise Connection Charter Management 1, LP. October

---

[32] Mr. DeBruyckere was an operations officer with ISU in 2008. Deposition of Kevin DeBruyckere, October 4, 2012 ("DeBruyckere Dep."), CCCM MSJ, Ex. 1 [Dkt. 60-1], CCCM Opp., Ex. 8 [Dkt. 67-7] at 7–10.

> 1, 2008.  We received the Health certificates and this item is
> acceptable under the contract. . . . Please confirm that the RCMP
> has viewed these ships and there are no issues related to the ships
> from a security perspective at this point for this contract.  Should
> you have any reservations related to the ships PLS state them.  We
> must confirm acceptance of the ships today by 11:00 BC time.
> Your response is required before 11:00 am BC time today

*Id.* (paragraph breaks removed).  The responses are not included in the record, but Ms. Morin

must have been satisfied because, at 4:08 p.m., she wrote to Mr. Kelly:

> The RCMP confirms acceptance of the vessels nominated by
> CCCM in its fax dated October 1, 2008.  The security inspection
> has been completed and the outcome is satisfactory to the RCMP.
> The Vessels are as follows:
> Royal Caribbean Cruise Lines: Vessel Serenade of the Sea and
> vessel Jewel of the Sea.
> Holland America Line Ship: Vessel Statendam
> Confirming receipt of Health Certificates in good order for all
> three vessels.
> Confirming receipt of the certification from Royal Caribbean.  The
> certification from Holland America Line Ship has not been
> received and is still require.  PLS provide.
> Proof of insurance received and document being verified.
> RCMP is completing its verification of the two Charter Party
> [Agreements] for the three vessels.  Will revert with comments as
> soon as the verification is completed.

E-mail from Normande Morin to Tracey Kelly, RCMP MSJ, Ex. 31 [Dkt. 62-35] at CCCM13414

(errors and formatting as in original).

> While RCMP was reviewing the nomination documents, CCCM continued its

negotiations with the cruise lines over language concerning tax liabilities.  On October 3,

Holland America informed Mr. Kelly that its "outside tax counsel [would] review provision 4H,

Taxes, as a point of due diligence" and that it was awaiting a response.  E-mail Chain Among

Tracey Kelly, Rob Coleman, Alexis Puma & Other HAL Representatives, RCMP MSJ, Ex. 49

[Dkt. 62-53] at CCCM11668.  Royal Caribbean was engaged in a similar review process.  *See* E-

mail Chain Among Katie Turner & Tracey Kelly, *et al.*, RCMP MSJ, Ex. 52 [Dkt. 62-66] at

CCCM5622.  A revised draft charter party agreement for Royal Caribbean, referring to *Jewel of the Seas* and *Radiance of the Seas,* provided that Royal Caribbean would invoice CCCM for "CONSUMPTION TAXES" and "CDN TAXES" after the charter.  *Id.* at CCCM5661–62.  Both forms of taxes were to be CCCM's responsibility.  *Id.* at CCCM5661–62.

CCCM executed a formal Credit Facilities Offer Letter with the Royal Bank of Canada on October 6, 2008.  *See* RBC Credit Facilities Offer Letter ("Credit Offer Letter"), RCMP MSJ, Ex. 84 [Dkt. 62-88]; *see also* CCCM MSJ, Ex. 47 [Dkt. 65-36].   The Credit Offer Letter offered a revolving credit facility of $1,500,000; a non-revolving demand facility of $19,724,000 in the form of letters of guarantee ("LGs," another term for letters of credit); and a $100,000 "VISA Business" facility.  *Id.* at CCCM15008–09.   If CCCM fulfilled its terms, the Credit Offer Letter ensured that CCCM could finance the RCMP project.  However, it attached a Terms and Conditions document that required CCCM to "covenant and agree" to various stipulations, among them that: CCCM had not "granted, created, assumed or suffered to exist any charge, lien, pledge, security interest, or other encumbrance affecting any of its assets or other rights . . . ;" and CCCM had not "incurred any indebtedness other than under the agreements described in the preceding paragraph."  *Id.* at CCCM15013-15.

RCMP argues that the Sessions Letter of Intent violated these terms so that, had CCCM been truthful with the Royal Bank of Canada, the Bank would never have extended credit, with the ultimate result that CCCM could not have performed and, therefore, breached the contract.

## Y.  October 9 through 15: Increased Urgency Leads to Frayed Relationships

As of October 9, RCMP had neither returned executed Acknowledgment Forms required by the Royal Bank of Canada nor advised CCCM that the charter party agreements were acceptable.  The cruise lines wanted action and certainty.  E-mail Chain Among Tracey Kelly &

Stacy Shaw, RCMP MSJ, Ex. 47 [Dkt. 62-51] at CCCM5756 (Royal Caribbean writing that its "natives [were] getting restless"). Mr. Kelly promptly requested an update from Ms. Morin, reminding her that the cruise lines had postponed announcing their 2010 sailing schedule in September to accommodate the ship charter in Vancouver but needed to sign the charter party agreements. E-mail Chain Among CCCM Partners and Normande Morin, RCMP MSJ, Ex. 34 [Dkt. 62-38] at CCCM6237. Ms. Morin answered that RCMP was "completing its last review" of the charter agreements and would provide its comments "as soon as possible before the end of the week." *Id.* at CCCM6236. (October 9 was a Thursday.) Ms. Morin also commented that the Credit Offer Letter had referenced a "Clarification to the Contract dated September 15, 2008," to which RCMP had never agreed. *Id.* at CCCM6237. She concluded that the Clarification "cannot be included in the letter as being part of the Contract." *Id.*

Mr. Kelly sent "an updated Acknowledgment of Conditions Precedent document" on Friday, the next day, and asked Ms. Morin to sign it "before noon" Pacific time because CCCM's contact person at the Royal Bank of Canada was leaving for a week-long vacation at 3:00 p.m. *Id.* at CCCM6236 (without attachment). Ms. Morin did not meet Mr. Kelly's requested deadline and failed to provide any comments on the charter agreements.

Stacey Shaw of Royal Caribbean contacted Mr. Kelly on Monday, October 13 with increasing frustration at the delay and noting that "[t]he deployment announcement for Radiance is scheduled for tomorrow." E-mail Chain Among Stacy Shaw & CCCM Partners, RCMP MSJ, Ex. 48 [Dkt. 62-52] at CCCM5834. Mr. Kelly replied that he had not heard from RCMP on the preceding Friday, as expected, and that October 13 was a Canadian holiday, but he promised immediate action thereafter. *Id.* Mr. Kelly renewed his efforts to contact Ms. Morin on October 14 and 15, with increasing urgency. *See* E-mail Chain Among CCCM Partners &

Normande Morin, RCMP MSJ, Ex. 34 at CCCM6235–36 ("As of today (10/14/08) there has been no email, fax, or phone call from the Contracting Authority. . . . Because of this continuing delay, the cruise lines have noted that these CPAs are endanger [sic] of being cancelled and the vessels put into general sales.  The Bank (RBC) is also awaiting the requested documents."); *id.* at CCCM6235 ("In addition to this email, I have placed calls (and left a message) to your office today.  CCCM is in urgent need of an update from the ISU.").

Notwithstanding the tie-up at RCMP, Mr. Kelly continued negotiations with Holland America on October 15 to address several issues regarding its charter party agreement. Mr. Kelly wrote that the several documents he sent "represent[ed] the concerns and revisions from both our Legal Counsel, and the ISU."  E-mail from Tracey Kelly to Alexis Puma & Rob Coleman, RCMP MSJ, Ex. 50 [Dkt. 62-55] at CCCM11849.  Noting that CCCM continued to work to obtain final approval of the charter agreements from RCMP, Mr. Kelly proposed that CCCM supply Tax Letters of Credit in Canadian dollars to Holland America, delivered after CCCM received its second payment from the Canadian Government, on or before November 30, 2009.  *Id.* at CCCM11862.  Mr. Kelly also proposed a very broad definition of the Taxes for which CCCM would assume responsibility, taking up three single-spaced pages.  The details of the proposal are not relevant to the outcome here, but the fact of the ongoing negotiations *over Canadian taxes* and CCCM's continued efforts to salvage the contract with RCMP are noteworthy.  *See id.* at CCCM11858–60.

### Z. October 16 through 23: Despite Resolution on Some Issues, Disputes Over Taxes and CPA Review Continue

Ms. Morin finally responded to Mr. Kelly on Thursday, October 16, writing:

> Several people were away due to the long weekend.  The RCMP intends to provide a formal reply today.  The RCMP has confirmed acceptance of the vessels nominated by CCCM.  CCCM must ensure that the vessels proposed can be accommodated at the berth

> specified in the contract.  The CPA is between the CCCM and the cruise lines and CCCM is responsible to ensure that services and other [sic] outlined in the CPA meet in all respect [sic] the requirement of CCCM's contract with the RCMP.

E-mail Chain Among CCCM Partners and Normande Morin, RCMP MSJ, Ex. 34 at

CCCM6234.

Mr. Kelly's immediate answer thanked Ms. Morin for her email but warned

that RCMP's delay had "put [the] CPAs in jeopardy."  *Id.* at CCCM6234.  After assuring

Ms. Morin that the pier could accommodate the vessels, and that CCCM understood its

responsibilities, he added, "as acknowledged in the July 14th, 2008 correspondence with the

ISU, CCCM must fund tens of millions of dollars at time of closing the CPAs, and the ISU

has already confirmed the process in which the Bank (RBC) must insure that the CPAs

include all the conditions of the ISU/CCCM contract. That is why we have requested both

your review of the CPA and the Conditions Precedent document. Once we have these

documents, CCCM can move to a simultaneous closing of both the CPAs and the

Financing."  *Id.*

Later on October 16, Ms. Morin forwarded a signed version of the Bank's

Acknowledgment Form to Mr. Kelly.  *See* E-mail from Tracey Kelly to CCCM Partners &

Signed RCMP Acknowledgment Form, RCMP MSJ, Ex. 64 [Dkt. 62-68] at CCCM6283–85.

Without explanation, she had modified the Bank's document yet again, defining the

Contract without the Articles of Agreement and acknowledging only that RCMP had agreed

to certain payment terms but not that it was satisfied with the charter party agreements.

More precisely, the changes were:

| Original RBC Acknowledgement Form | Version Revised by Ms. Morin |
|---|---|
| Re: Contract titled 'Charter Services to Provide Vessel Accommodation for Royal Canadian Mounted Police and Canadian Armed Forces, Vancouver 2010 Integrated Security Unit, Contract Number 7131902' dated July 28, 2008, as amended by a Contract Amendment dated August 25, 2008 (the 'Amendment') and by a Clarification to Contract dated September 15, 2008 (the 'Clarification") (together the 'Contract') . . . | Re: Contract titled 'Charter Services to Provide Vessel Accommodation for Royal Canadian Mounted Police and Canadian Armed Forces, Vancouver 2010 Integrated Security Unit, Contract Number 7131902' dated July 28, 2008 . . . |
| The Crown acknowledges and confirms to RBC that the Crown is satisfied with the wording of the non-cancellable charter party agreements with the Contractor and that they contain the wording required by section 6.2 of the Contract, so the contractual condition precedent to the First Payment by the Crown of $44,278,508.00 plus GST on or before April 30. 2009 under the Contract as amended by the Amendment and Clarification (together the 'said Contract') has been satisfied. | The Crown acknowledges to RBC that it entered into the above-noted Contract with Cruise Connections Charter Management 1, LP. Further, the Crown acknowledges that, in accordance with the Contract, the initial payment by the Crown, equivalent to 80% of the Contract and currently valued at $44, 278,508.00 plus GST, will be payable on or before Apri130, 2009 if the conditions of the Contract have been satisfied. |

Mr. Kelly warned his CCCM partners that Ms. Morin's revised version of the Bank document did "not accomplish what the original RBC [document] requested," and that it did "not address the fact the contract has been amended" to assign a first payment of $44 million to the Royal Bank of Canada "'if' the CPAs meet the contract precedent." *Id.* at CCCM6283.

Mr. Kelly expressed his reservations to Ms. Morin on October 17 but said that he would ask the Royal Bank of Canada if it would accept the revised document. E-mail from Tracey Kelly to Normande Morin, RCMP MSJ, Ex. 35 [Dkt. 62-39] at CCCM6289; *see also* RCMP MSJ, Ex. 65 [Dkt. 62-69] (duplicate). As he reported to her later, the Bank was:

> . . . not satisfied that the essence of their document has been met and requests that the original document be signed, or in lieu of, that the RCMP supply a document which confirms the following: "That the RCMP has reviewed the CPA's and that the CPA's satisfy

(fulfill/reflect) the contract requirements that are listed between the RCMP and CCCM."

E-mail from Tracey Kelly to Normande Morin, Mike Sloane & Sue Edwards, RCMP MSJ, Ex. 61 [Dkt. 62-65] at CCCM6306.  Mr. Siemens's deposition testimony confirmed that the Bank needed "acknowledgment of the assignment of that first $44 million payment to RBC" and "that CCCM was entitled to that payment on or before April 30, 2009."  Siemens Dep. at 25.  With that acknowledgment, the Royal Bank of Canada would have had "the protection it needed to fund the credit facility if everything was done in a timely manner."  *Id.*

A telephone call between Ms. Morin and Mr. Kelly on October 17 did not prompt Ms. Morin to take favorable action.  While Mr. Kelly wanted to talk about the changes to the Bank document and CCCM's need for RCMP to approve the charter party agreements, Ms. Morin used the call to raise different problems with the contract, particularly liability waivers that would be required from ISU staff.  *See* E-mail from Tracey Kelly to Normande Morin, Mike Sloane & Sue Edwards, RCMP MSJ, Ex. 61 at CCCM6305–06.  Ms. Morin told Mr. Kelly that she was "not authorized to provide" approval of the charter party agreements "now" because someone had "been out everyday this week" who needed to "provide a response to a specific section of the CPAs."  *Id.*  In fact, she saw "no big problem" with eventually approving the charter party agreements, but liability waivers from ISU members were "[t]he area of concern." *Id.*  Mr. Kelly tried to explain that such waivers "are standard clauses to all charter contracts," and, more critically, the cruise lines were "at a point where they may very well pull their vessels and then CCCM would have to start over.  If that were to happen, and CCCM began to re-negotiate all the vessels at this point, it would be very difficult to find vessels that could accommodate the RCMP (ISU) needs as currently outlined."  *Id.*  Ms. Morin said that she

understood and did not "want [CCCM] to lose these ships," but could only provide an update

when her "Superior" returned on the following Monday.  *Id.*

> As a closing to his follow-up email, Mr. Kelly stressed:
>
> [I]t is worth pointing out that area of concern by the RCMP, regarding the "Waiver" section of the CPAs, is outside of the scope of the contract between the RCMP (ISU) and CCCM. If as noted in our conference call the CPAs reflect and satisfy the requirements of the contract, then the Contracting Authority can proceed with signing the Conditions Precedent document for RBC.

*Id.*

Ms. Morin finally sent Mr. Kelly a lengthy e-mail with RCMP's responses to the

charter party agreements and another revision to the Bank's Acknowledgement Form on

September 20.  E-mail from Normande Morin to Tracey Kelly, RCMP MSJ, Ex. 53 [Dkt. 62-57].

She stated that "[o]nce above comments for the CPAs have been addressed and the RCMP has

your confirmation of the acceptance of the content of the letter [for the Royal Bank of Canada]

we will finalize the letter."  *Id.* at CCCM13647–48.

In part, Ms. Morin objected to the requirement that ISU officers sign waivers of

liability and insisted that the charter party agreements (between CCCM and the cruise lines) be

governed by Canadian law as was the contract between RCMP and CCCM.  *See id.* at

CCCM13647–48.  On the Acknowledgement Form for the Royal Bank of Canada, Ms. Morin's

definition of the Contract remained just as limited and failed to mention the Articles of

Agreement; her assurance on payments to CCCM was equally vague.  She only added the

sentence: "The Crown has reviewed the charter party agreements and they reflect the

requirement found at section 6.2 of the Contract between the RCMP and Cruise Connections

Charter Management 1, LP."  *Id.*

Mr. Kelly responded to Ms. Morin later on October 20, with brief replies to each of her questions on the charter agreements.  E-mail Chain Among Normande Morin & CCCM Partners, RCMP MSJ, Ex. 54 [Dkt. 62-58] at CCCM12021–23.  For present purposes, the only noteworthy part of his response was the statement that the Royal Bank of Canada required an acknowledgment that "the CPA's [sic] satisfy (fulfill/reflect) the contract requirements that are listed between the RCMP and CCCM."  *Id.* at CCCM12022–23.  Mr. Kelly asked to schedule a conference call at 10 AM on October 21 so that CCCM could "meet the cruise line time-line of 12 noon."  *Id.* at CCCM12023.

Ms. Morin's comments on its charter party agreement were not satisfactory to Royal Caribbean.  On October 22, Ms. Shaw sent "discussion points" to Mr. Kelly stating, *inter alia*, that Royal Caribbean would not agree to be governed by Canadian law.  E-mail Chain Between Tracey Kelly & Stacy Shaw, RCMP MSJ, Ex. 57 [Dkt. 62-61] at CCCM6403–05.  The cruise line's tax department was "conducting a review of the proposed [tax] language/revisions."  *Id.*

### AA.  October 24 Meeting; RCMP States that 90% Letter of Credit Requirement Is Reimposed, Then Re-waived

It is unclear whether the telephone conference ever occurred, but on October 24, the contract negotiators (Mr. Kelly, Ms. Edwards, Ms. Meikle and Mr. Day) attended a face-to-face meeting with Ms. Morin at RCMP's Vancouver office.  Summaries of the events of this meeting are set forth both in Mr. Kelly's sworn declaration and in RCMP's typed minutes.[33]  RCMP's minutes are titled "CCCM Negotiation on Charter Bargaining" and state that the purpose of the meeting was "Negotiations regarding Accommodation Vessels between CCCM and ISU/RCMP-Re: Charter Party Agreements."  Meeting Minutes, RCMP Opp., Ex. 74 [Dkt.

---

[33] The minutes were recorded by "Scribe" Ryan B. Burns, who is otherwise unidentified.

66-76] at CAN4134.  According to the minutes, the relevant parts of the meeting were as

follows, with certain comments highlighted to show the rationale for each party's position:

> TK [Tracey Kelly]-Opening remarks: Stresses need for clarification on a few key points; emphasised team concept of co-operation; asks question, "Does the RCMP want these ships?"

> NM [Normande Morin]: Responded that if the ships were not wanted, this meeting would not be occurring; point made that nomination of charter only rec'd on Oct. 1st; RCMP resolutions take time, more so than private industry, demonstrating that the delay in meeting is not intentional but in many ways out of ISU/RCMP control; Charter Parties agreements have been reviewed, and CCCM feedback given; ready now to discuss TK's comments rec'd Oct. 20th.

> TK-Points of Clarification: Charter Party documents received by NM recently, as well as a check-list for sign-off per RCMP requirements to-date; initial response by RCMP was requirement for Jan. 2009; each delay has impacted the cruise lines, as they operate on schedules 18 months in advance; CCCM has been ready for months to move forward, now the cruise line partners have said, "that's enough," and there needs to be a sense of urgency as there is no longer time to delay (SE confirms and agrees with TK's points of clarification)[.]

> *NM: Terms and conditions agreed upon prior to this meeting have changed in some cases, contributing to delays; some items are negotiable, some not[.]*

> Item 1-Dispute Resolution (?)

> NM: Full agreement per Charter Party[.]

> TK: ISU/*RCMP is not part of the Charter Party Agreement, merely a beneficiary* of it; services provided by CCCM are required by contract between CCCM & ISU/RCMP - Ch. Party Agreement reflects this, but ISU not bound by those legal ramifications, only CCCM is[.]

> NM: What are the limitations?

> SE [Susan Edwards]: 'Statement of Work' document language should be clear, and can be adjusted to satisfy RCMP's need for clarity[.]

NM: suggested that term 'Terms and Conditions' be replaced by 'Service Requirements'; both parties agree[.]

. . .

Item 7- RBC payment terms document

NM: In consultation with Ottawa, RCMP/ISU request a language change to present to RBC per the language of payment terms[.]

TK: RBC drafted payment terms letter to be signed essentially stating that ISU/RCMP will not withhold first payment, as there is not enough collateral available from CCCM, etc. to cover it; RBC will then be assured to receive first payment[.]

NM: Letter of Agreement states that Gov't of Canada guarantees payment upon receipt of services agreed to[.]

SE: Such a letter is not part of the Terms and Conditions[.]

TK and SE: Such an agreement for *payment after conditions are satisfied is not an industry standard/ and not ever done; not that CCCM pays RBC/cruise lines up front, then Gov't of Canada pays back*[.]

NM: *Both parties have already agreed to this, in the original Terms and Conditions of the RFP*[.]

TK and SE: *In the RFP, CCCM did not agree to these terms of payment*; meeting between ISU/RCMP and CCCM on Oct 6th, both parties verbally agreed that CCCM was not in agreement with this Term and Condition that CCCM would obtain a line of credit and float the first payment up-front[.]

TK and SE: Mike McCauley, on behalf of Michael Day, signed that CCCM's proposal for payment was accepted (industry standard payment terms)[.]

NM: *In RFP, 90% requirement was included*[.]

SE: 1st payment would go directly to the cruise line, bypassing CCCM, to satisfy RCMP/Gov't of Canada regulations; this is done to ensure that in case something was to happen with CCCM, the ships still show up on time as agreed to; *everything since the RFP*

> *done by CCCM has been on the premise of disagreement with the terms of payment clause in the RFP*[.]
>
> TK: Unsure of the ramifications if this issue is not resolved today; CCCM will always be more exposed than the Crown, under industry standard terms, by design; stressed that at June 6th meeting there was no intent to circumvent any agreements or requirements, merely adjustments made to allow process to move forward[.]
>
> KM [Kelly Meikle]: *Agrees with SE and TK's assertion that there was a verbal recognition by the ISU/RCMP at the June 6th meeting that CCCM did not agree with 1st payment terms, and that they were impossible as written*[.]
>
> Item 8-Amendment to RBC letter language Both parties agree, upon confirmation with respective legal council, [sic] that the word "if" be replaced with the phrase " . . . when they satisfy that the service requirements . . ." in the RBC 1st payment terms letter; letter then signed and faxed + delivered to RBC by SE . . . .

*Id.* at CAN4134.

Mr. Kelly's account of the meeting is consistent with the RCMP minutes.

CCCM's objectives were "to discuss any remaining issues with the draft charter party agreements" and "to demand that the RCMP honor its contractual commitment to pay the taxes." I Kelly Decl. ¶ 21.  The parties never reached the subject of taxes because "Ms. Morin declared that Cruise Connections was required to secure a letter of credit for 90% of the value of the contract between Cruise Connections and the RCMP—which was approximately $50 million." *Id.* ¶ 23.  According to Mr. Kelly, he and Ms. Edwards:

> . . . told Ms. Morin that Cruise Connections could not possibly obtain a $50 million letter of credit, and that, in any event, Ms. Meikle and Mr. Day had, months earlier, specifically agreed to waive the 90% letter of credit requirement because [CCCM] had arranged a financing plan that rendered the 90% letter of credit unnecessary.  Mr. Day did not speak up, but Ms. Meikle confirmed to Ms. Morin that she and Mr. Day had in fact waived the 90% letter of credit requirement. Despite Ms. Meikle's confirmation, Ms. Morin refused to agree that the 90% letter of credit requirement had been waived.

132

*Id.* CCCM decided not to press the tax issue during the meeting and to reraise it in writing afterward "[a]fter seeing how Ms. Morin dismissed Ms. Meikle's confirmation that the RCMP had waived the 90% letter of credit requirement, and given Mr. Day's inexplicable lack of participation in the meeting."[34]  *Id.*  Ms. Morin has admitted that Ms. Meikle stated during the meeting that "she [Ms. Meikle] and Mike Day had waived the 90 percent letter of credit requirement."  Morin Dep. at 94.

On October 24, Ms. Morin signed a version of the Bank's Acknowledgment Form that was markedly different from the original but apparently satisfied the Bank and CCCM. Revised Executed Conditions Precedent Doc., RCMP MSJ, Ex. 66 [Dkt. 62-79] at CAN1898. While the Contract was still narrowly defined, Ms. Morin agreed that RCMP would pay $44 million to CCCM, assigned to the Royal Bank of Canada, before April 30, 2009, "with provisions that the conditions of the Contract have been satisfied."  *Id.*  She also agreed that "[t]he Crown has reviewed the charter party agreements and they satisfy the service requirements of the Contract between the RCMP and Cruise Connections Charter Management 1, LP."  *Id.*

When reporting on the meeting to the CCCM partners, their North Carolina attorney Mr. Joyner, and their Canadian attorney, Mr. Kang, Mr. Kelly opined that CCCM had achieved something by securing the signed Acknowledgment Form for the Royal Bank of Canada, but stressed that three other issues worth about $20 million dollars to CCCM still needed resolution.  E-mail Chain Among CCCM Partners, G. William Joyner, III & TJ Kang, RCMP Opp., Ex. 96 [Dkt. 66-98] at CCCM15024.  One new problem was the change in the exchange rate between Canada and the U.S., which was "so low that we will not have enough

---

[34] Mr. Kelly further avers that he later "learned through Mr. Day's deposition testimony that Ms. Morin had instructed Mr. Day not to speak during the meeting."  I Kelly Decl. ¶ 22.  That assertion is not reflected in the excerpts of Mr. Day's deposition submitted to the Court by the parties.

money coming in to cover our costs." *Id.*  Mr. Kelly suggested that CCCM needed three

amendments to the Contract: to cover taxes explicitly; to cover changes in the exchange rate; and

to cover the intervening increase in charter costs of about $6 million due to delay.  *Id.*

Even more critical, however, was Ms. Morin's insistence that CCCM provide a

Letter of Credit to RCMP for 90% of the value of the Contract, as required by RFP Annex B § 1.

Mr. Kelly wrote to Ms. Morin:

> Thank you for meeting with CCCM on Friday, October 24, 2008, although it extended beyond the 30 minutes allocated, it was essential to get the issues discussed.
>
> CCCM requires confirmation of the acceptance of the negotiations completed with Kelly Meikle, Mike Day, Ben Roth and Donna Kaluza on June 6, 2008 where the 90% LOC requirement was deleted as a requirement.  During that June 6th meeting, it was discussed and agreed that the 90% LOC was not fiscally feasible and that CCCM could not proceed with that requirement (as indeed CCCM advised in our original bid that neither CCCM or anyone in the Charter Industry could proceed with an 90% LOC requirement).
>
> The alternative solution proposed and accepted at the June 6th mtg, was for CCCM to provide a 100% cruise fare payment to the cruise lines at the time of the first payment by the RCMP/ISU.  CCCM working with the Royal Bank of Canada created the documents called Conditions Precedent and Assignment of Funds. These two documents insure that the first payment by the RCMP/ISU goes directly to the Bank, and from the Bank to the cruise lines (these Funds coupled with CCCM funds will make 100% payment to the cruise lines).
>
> As noted in our meeting of 10/24/08, CCCM cannot move forward without the (new) Contracting Authority confirmation, that the RCMP/ISU will honor their prior commitment in deleting the 90% LOC from the requirement. CCCM requires this confirmation by end of business on Monday, October 27, 2008.

E-mail from Tracey Kelly to Normande Morin, *et al.*, CCCM MSJ, Ex. 41 [Dkt. 65-31].

Ms. Morin asked Mr. Day to review the RFP and CCCM contract documents, and Mr. Day responded on October 27, explaining that the 90% letter of credit requirement had been waived:

> On page 54 of the proposal received from CCCM and in direct reference to part 4, 4.1 of the RFP, CCCM addresses the request to provide 100% bid security. The gist of this is to highlight the expense of the request for an Letter of Credit (LOC) guaranteeing that amount and proposing an alternative way of providing the security required.
>
> . . . The provisions of Annex B, Basis of Payment, with the exception of the 10% LOC were not mandatory for a proposal to be responsive. In this instance, the proposal contained an LOC reflecting 10% of the bid price as was requested but proposed there were alternatives to meeting the intent of the contract security in a more cost effective manner.
>
> This alternative was discussed in a meeting at the ISU between CCCM, who had been deemed the sole responsive proposal, and the RCMP on June 06th.  *In that meeting, the proposed alternative to submitting a 90% LOC was discussed and the alternative agreed to by the contracting officer responsible for the file. While there are no notes on the file to that effect, that agreement has been verified by the contracting officer and can be confirmed by Inspector D. Kaluza, who was present at the meeting. This change was reflected in article 6.2, Method of Payment in the subsequent contract which contains no reference to the provision of a 90% LOC.*
>
> The applicability of this change is stipulated at Article 10, Priority of Documents which references a) the articles of agreement and d) the Contractor's bid dated 2008-05-20. *Regardless of the wisdom of the decision to agree to the proposed change, it is my opinion that was the agreement which forms part of the contract.* . . .

E-mail from Michael Day to Normande Morin, CCCM MSJ, Ex. 39 [Dkt. 65-29] at CAN1067–68 (emphases added); *see also* CCCM Opp., Ex. 16 [Dkt. 67-16].  Despite Mr. Day's confirmation, Ms. Morin was dissatisfied and "still had to verify this matter" further.  Morin Dep. at 101.  So she wrote back to Mr. Kelly on October 27:

The RCMP is working arduously to collect the information required for our analysis of passed [sic] discussions between CCCM and representatives of the RCMP in order to make a determination on the 90% LOC.  The collection of information is being expedited through our office in Richmond, BC.

The RCMP is not in agreement with the comment made by CCCM in the forth [sic] paragraph of the email below. The RCMP understood that the letter and checklist signed by the Contracting Authority on October 24, 2008 would be acceptable by the bank and sufficient for CCCM to proceed. The RCMP committed to carry a review of passed [sic] discussions on the file in order to determine the extent and validity of any discussion related to the LOC for 90% of the contract value.  The RCMP understands that the matter is or [sic] high importance and will revert promptly as soon as a determination is made in this respect.

E-mail Chain Among Tracey Kelly and Normande Morin, *et al.*, CCCM Opp., Ex. 22 [Dkt. 67-22] at CAN15429–30.  Mr. Kelly replied on the very same day, reiterating that RCMP had already waived the 90% letter of credit requirement and warning that "without the confirmation that there is no requirement for 90% LOC, the Bank will not Fund."  *Id.* at CAN15429.

Mr. Day sent additional e-mails to Ms. Morin on October 28, 2008.  In his first email of the day, he asked whether she would be able "to advise CCCM that the provision to provide an LOC for 90% of the contract value has been determined to not apply to the contract so they can finalize the CPA and secure the vessels."  E-mail from Michael Day to Normande Morin, CCCM MSJ, Ex. 40 [Dkt. 65-30] at CAN1069.  He added: "Please understand that I am getting tremendous pressure from Operations regarding the status of this contract. I am trying to assure them this is moving forward but I need to be able to show them something to keep them from pushing the panic button."  *Id.*  In his second email that day, Mr. Day explained to Ms. Morin that because "Article 6.2 of the contract" required CCCM to provide "the non-cancellable charter party agreement" with an exclusive-use clause no later than April 1, 2009, CCCM's right to payment under the contract in May 2009 was contingent on RCMP receiving the charter party

agreements, not on CCCM paying the cruise lines the full charter fare. *See* E-mail Chain Among

Michael Day, Normande Morin & Kevin DeBruyckere, CCCM Opp., Ex. 15 [Dkt. 67-15] at

CAN1889.

Ms. Morin testified at deposition that she did not ask Mr. Day about any

agreement on RCMP responsibility for taxes because: "In some [cases], the contract spoke to the

issues; in some other cases we had to understand how the contract spoke to the issues." Morin

Dep. at 107. Since "there was no—no belief in what we had in terms of information, at a certain

point, that the tax issue had been decided, for sure." *Id.* at 108.

**BB.  October 28: Threatening to "Walk Away," CCCM Demands Assurance on Three Issues**

Late in the afternoon on October 28, 2008, CCCM escalated the saber-rattling.

Mr. Kelly sent an e-mail with a two-page letter attachment to RCMP Superintendent Kevin

DeBruyckere and Assistant Commissioner Bud Mercer, who was also Chief Operating Officer of

the ISU.  In the e-mail, Mr. Kelly stated that he was attaching "a letter outlining a series of

critical issues that place the ISU charter vessels in jeopardy.  [CCCM] has worked diligently and

in good-faith with the RCMP to resolve all issues, but the continuing delays and lack of actions

by the Contracting Authority have brought this project to a complete stop. CCCM has made

every effort to work with the Contracting Authority, but believes that without your intervention,

the project will fail this week."  E-mail Chain Among RCMP Personnel & CCCM October 28

Letter, RCMP MSJ, Ex. 70 [Dkt. 62-74] at CAN1070.  Because the frayed relationship was

reaching its tearing point, the text of the letter is included:

Dear Mr. Mercer,

We have endeavored to gain an appointment with you to further
our ISU Project. The RCMP and Cruise Connections Charter
Management 1, LP ("CCCM") are at a cross-roads. The Project is
in jeopardy. Due to a continuing strategy by the (new) Contracting

Authority to delay and ask for documents to be "re-sent," the Project is now 8 weeks past deadline.

Using last week as only the most recent example, we placed 8 urgent emails (all of which were unanswered) and a dozen phone calls to the Contracting Authority, stating that the cruise lines have had enough, and that the charter contracts were void. Finally, on Friday 10/24/08 (5 working days later), a 30-minute meeting was granted by the RCMP's Contracting Authority. The objective of CCCM at that meeting was to gain a commitment from the RCMP as to whether the ISU Charter Project was to move forward or not, and to address the issues that threaten the Project. Unfortunately, although the meeting lasted over six hours, most of the meeting was spent discussing a 90% letter of credit requirement that was previously waived by the RCMP. Therefore, a new issue was added to the list and we were not afforded the opportunity to have our other issues addressed.

Here are the issues that currently stand in the way of our moving forward with this Project:

1. 90% Letter of Credit. CCCM was the lowest bidder for the RFP. We got to that low cost by using our 30 years of experience and relationships with the cruise lines to negotiate the best fares. In addition, we maintained the industry standard of 10% mark-up to cover our 3 years of operations and administration costs. This "margin" was communicated at the 6/06/08 meeting in order to explain why CCCM could not position both a 70% deposit with the cruise lines and 90% LOC with the RCMP. At that meeting we came up with an alternative solution to protect the Funds of the Crown (which was for CCCM to pay 100% of the cruise fare of the charters at the same time that the RCMP made an 80% payment to CCCM). This alternative solution was accepted by the RCMP at that meeting on 6/06/08, as confirmed by Kelly Meikle of the RCMP in our most recent meeting on 10/24/08. However, the Contracting Authority is still telling us they are looking into this issue. Please confirm that there is no requirement of a 90% LOC, as such a requirement would not be feasible and would kill the Project.

2. Taxes. We need the RCMP to confirm in writing its commitment to pay for the Canadian taxes incurred by the cruise lines and CCCM in connection with the Project. Please note that the RCMP previously agreed to this, and is obligated to cover these taxes. However, based on conversations with and correspondence from the new Contracting Authority, we are concerned about the

RCMP's commitment to its obligation to cover these taxes in full. The cruise lines have no flexibility on this issue. In August 2008, the cruise lines stated that they would not pay for the Canadian taxes (that could be assessed). There is much documentation to support the accurate communication of this cost issue to the RCMP. Due to the fact that the cruise lines' taxes are expected to reach nearly U.S. $7 million, which exceeds CCCM's expected gross margin of approximately U.S. $5.7 million, we require the RCMP to confirm its commitment to cover these taxes.

3. Exchange Rate. In May of 2008, when CCCM was awarded the RCMP/ISU RFP, the Canadian and US currency exchange was approximately even (CDN was valued slightly higher by 2 cents). Today, the currency exchange value is nearing a loss for the CDN Dollar of 30 points. The strategy of delay by the Contracting Authority has now created a new problem that must be faced. The Contract Value of approximately $57 million dollars in CDN is only worth $40 million in US currency. Not only is CCCM a US company, but the cruise lines are all paid in US currency. Under the current exchange rate, CCCM would not be able to cover its costs on the Project. Therefore, the Contract between RCMP and CCCM needs to be amended to address the exchange rate issue.

To put all of this in perspective, I want to highlight the fact that we are approximately 15 months away from the world descending upon Vancouver for the Olympics. If, due to the delays caused by the RCMP, CCCM does not go forward with Project, the RCMP will have to start the process all over again by issuing a new RFP. Whoever wins the new contract will be substantially far behind the point of preparedness CCCM has currently reached, creating a real risk of a mad scramble to [sic] housing for the security forces in time for the games, and, there is no guarantee that the cruise lines will be willing to recommit ships for the Project, especially since fuel prices have fallen so dramatically and the RCMP will be viewed as an unreliable business partner. In addition, it is highly likely that the narrowed time-line would eliminate the cruise lines' ability to re-create these charter sailings. If the cruise lines could re-create the charters, there would be increased costs assessed by the cruise lines to the RCMP/ISU, because they will have to 'buyoff' customers who would have purchased the retail sailings during the charter period. Further, whoever wins the new contract will insist (a) that the RCMP assume the risk of currency exchange fluctuations (per the Canadian financial institutions, they expect the CDN Dollar to fall further, losing 40 points or more) and (b) that the RCMP cover the taxes to be paid by the cruise lines. If the RCMP's failure to act causes CCCM to walk away, the best case

scenario for the RCMP is that it will, in any event, end up paying to CCCM's successor the increased costs outlined above.

As Normande Morin made reference at our 10/24/08 meeting at ISU Headquarters, "The RCMP is not going to put anyone out of business" referring to costs. Therefore, we are hopeful that a resolution can be reached promptly, as the Project is dangerously behind schedule. Because of the urgent timing of these issues, CCCM must decide whether to continue forward with the Project or walk away from the Project due to the delays caused by the RCMP. Therefore, please notify us not later than Thursday October 30th, 2008 of your agreement in principle to address the three issues described above. If we do not receive a satisfactory response by that time, we will walk away from the Project, reserving our rights and remedies against the RCMP.

*Id.* at CAN1072–73.  The inclusion of direct reference to CCCM's own Canadian taxes and to the exchange rate problem were new matters.

Mr. Day forwarded CCCM's letter to Ms. Morin and advised her that he had already spoken to Mr. DeBruyckere and told him "of the contract issues at play and some of the discrepancies in the letter.  The short version was that we can not agree to this latest demand . . . ."  *Id.* at CAN1070.  Mr. Day also noted "several contradictions to the information you related to me."  *Id.*  Notably, Mr. DeBruyckere had called Mr. Kelly before he heard from Mr. Day and had promised CCCM to discuss the letter internally.  *Id.*

On October 28, CCCM also received unpromising news from the Royal Bank of Canada.  That morning, Mr. Kelly had sent electronic copies of the "final version[s]" of (unsigned) charter party agreements with Royal Caribbean and Holland America to Cindy Brand at the Royal Bank of Canada, asking whether they would "suffice to move the Financing forward."  E-mail Chain Among Tracey Kelly & Cindy Brand, *et al.*, RCMP Opp., Ex. 76 [Dkt. 66-78] at CCCM6662.  Ms. Brand noted "concerns" because the drop in the exchange rate meant

CCCM might not have sufficient funds to secure letters of credit to cover on-board revenue, as required by the charter party agreements.[35]   *Id.*

### CC.  October 29 through November 7: RCMP's Response; Final Royal Caribbean Charter Party Agreement; Attorneys Involved; the Bank Withdraws Financing; Final Holland America Charter Party Agreement

Responding to CCCM's letter to Mr. Mercer on October 29, 2008, Ms. Morin took a stern tone:

> The RCMP has reviewed the content of your letter and the contract and provides the following:
>
> 1. 90% Letter of Credit: The Contract encompasses the terms and conditions of the RFP and the 90% Letter of Credit is due in accordance with the contract.  In accordance with Article 4 of General Conditions Services and Conditions 9676 forming part of the contract, no modification to the work or amendment to the contract shall be binding unless it is incorporated into the Contract by written amendment.  *There is no binding amendment to the contract related to the 90% letter of Credit.  However, the RCMP would consider negotiating alternative arrangements* and issue a proper amendment to the contract should an agreement be reached to the satisfaction of both parties.
>
> 2. Taxes: Please refer, amongst others, to Contract Clause 10(b) and to 9676 General Conditions Services Articles 3 and 35. Our letter dated September 26 addresses this issue.
>
> 3. Exchange Rate: In as much as the contract was negotiated in Canadian dollars, the effect of the exchange rate is the responsibility of the Contractor.
>
> In accordance with Clause 4, Annex "A" of the contract, the *Contractor shall secure the vessels and provide the RCMP with a proof, in the form of a written letter form [sic] the Cruise Line that vessels have been secured, by 5:00PM Eastern Time November 5*, 2008.

---

[35] Charterers are generally required to guarantee that cruise lines will earn a certain amount of revenue above and beyond the contracted-for services through incidental passenger purchases, such as sundries, alcohol, and personal services.  It is customary for chaterers to post letters of credit to guarantee this "onboard revenue," sometimes called "OBR."

In addition, in accordance with clause 6.2, please provide proof that the proper wording has been incorporated to the Charter Party as CCCM agreed to do October 24, 2008.

In your letter you indicated that CCCM "must decide whether to continue forward with the Project or walk away." Please confirm that CCCM agrees with all the above and intends to satisfy its obligations under the contract by 5:00PM Eastern Time November 5, 2008.

Please be guided accordingly.

Letter from Normande Morin to CCCM, RCMP MSJ, Ex. 81 at CAN115–16 (emphases added); *see also* CCCM MSJ, Ex. 36 [Dkt. 65-26].

The consequence of Ms. Morin's October 29 letter was that CCCM faced a November 5 deadline to decide (1) to reaffirm the contract, (2) to provide proof that the ships were secured, and (3) to provide proof that the charter party agreements were satisfactory. In addition, RCMP maintained its insistence on a 90% letter of credit and would agree to no further clarifications or agreements on taxes or the exchange rate.

When asked at deposition why she did not acknowledge that the 90% letter of credit requirement had been waived, Ms. Morin testified:

Q. So is it your testimony that in order to agree that the 90 percent letter of credit had been waived, you needed to receive a fully executed charter party agreement?

A. It was a matter of what all the guarantees under the contract per se. Right? And the guarantee required under the contract were the—the—the delivery of the executed charter parties. And we did not have that yet, so we were looking for what kind of guarantee to the Crown at this point in—in the process do we really have, given that what was required under the contract, under Clause 4.1 of Annex A, still had not been delivered to us.

Morin Dep. at 120; *see also id.* at 123 (agreeing that she "needed to satisfy [her]self that the interests of the RCMP had been adequately protected"). Ms. Morin also testified that she had concerns about the validity of the Sessions Letter of Credit, which CCCM had submitted to meet

the 10% security requirement when it submitted the Bid.  Ms. Morin believed that the Sessions

Letter of Credit was "not negotiable" and "wasn't a valid letter of credit as the 10 percent piece,"

which was "another element added to concerns . . . .  There was so many unclarified details on

the file, as such, that it was a lot to pick up and look at and move easily forward with this . . . ."

*Id.* at 124.  Notably, however, the Sessions Letter of Credit had expired, by its own terms, on

July 1, 2008, *see supra* § I.D—long before Ms. Morin became involved.  RCMP had never

before questioned its validity, strongly suggesting that it had waived any concerns about the

letter of credit.

        Royal Caribbean formally executed a final charter party agreement with CCCM

on October 31, 2008.  Final RCCL CPA, RCMP MSJ, Ex. 55 [Dkt. 62-59] at RCCL1–30.  The

agreement covered *Jewel of the Seas* and *Radiance of the Seas* but not *Serenade of the Seas*,

officially nominated to RCMP.  *Id.* at RCCL1.  The final price was $18,167,100.00USD, and

CCCM was required to provide a $12,716,970USD letter of credit no later than November 24,

2008.  *Id.* at RCCL3, 8–9.  The provisions on Canadian taxes required CCCM to reimburse

Royal Canadian for "any and all Canadian federal, state, municipal or provincial income taxes

imposed against CRUISE LINE."  *Id.* at RCCL5.  In all, CCCM was required to provide three

separate letters of credit: (1) "an irrevocable Standby Letter of Credit ['Purchase LOC']" worth

$12,716,970.00USD, which Royal Caribbean would draw down no later than May 31, 2009;

(2) "a second irrevocable Standby Letter of Credit," worth $6,330,000.00USD, to cover on-board

purchases by passengers; and (3) a "third irrevocable Standby Letter of Credit," the "Taxes

LOC", "in Canadian Dollars equal to $5,700,00.00USD at the exchange rate in effect on

November 30, 2009."  *Id.* at RCCL8–9.

On October 31, Mr. Joyner, CCCM's U.S. attorney, answered Ms. Morin's

October 29 letter:

> As legal counsel to Cruise Connections Charter Management 1, LP ("CCCM"), we have received and reviewed your letter dated October 29, 2008 addressed to CCCM. The letter raises multiple issues that will need to be resolved. However, as a threshold matter, we require immediate resolution of the tax issue. After reviewing Item 2 of your October 29, 2008 letter, we are still unclear as to the RCMP's current position with respect to the tax issue.
>
> Our understanding since the outset has been that the RCMP is responsible for Canadian taxes incurred by the cruise lines and CCCM in connection with this project. This has clearly been the RCMP's position as well, as the attached e-mails from the RCMP show. I also attach Section 6.3 of CCCM's bid proposal and the contract provision relating to Priority of Documents, because those documents confirm the RCMP's responsibility for taxes. Your recent correspondence, however, makes us question whether the RCMP still intends to honor this obligation. Thus, we must ask you to indicate the RCMP's position below by initialing the applicable response:
>
> ____ The RCMP is responsible for Canadian taxes incurred by the cruise lines and CCCM in connection with this project.
>
> ____ The RCMP is not responsible for Canadian taxes incurred by the cruise lines and CCCM in connection with this project.
>
> Please provide your response by 12:00 noon Eastern time on Monday, November 3, 2008. Thank you in advance for your prompt response, as it will guide CCCM's decision whether to continue with this project.

Letter from G. William Joyner, III to Normande Morin, RCMP MSJ, Ex. 77 [Dkt. 62-81] at

CAN1108.

Ms. Morin answered on November 3, with distinct clarity as to RCMP's position

on cruise line taxes:

> The RCMP is not responsible for taxes incurred by the cruise lines in connection with this project.

The RCMP will respect all its contractual obligations with CCCM. The Contract is clear with respect to all taxes. As indicated in our letters to Cruise Connections Charter Management 1, LP (CCCM), which were dated September 26, 30, 2008 and October 29, 2008, the Basis of Payment clause of the Contract provides for an all-inclusive rate which includes, amongst other costs, all taxes under the contract. The Goods and Services Tax/Harmonized Sales Tax (GST/HST) is the only tax that is not included in the all-inclusive rate.

The RCMP is still awaiting an answer to their October 29, 2008 letter addressed to CCCM.

Please be guided accordingly.

November 3, 2008 Letter from Normande Morin to G. William Joyner, III, CCCM Reply, Ex. 7

[Dkt. 70-7].  The exchange continued on November 4, as Mr. Joyner replied in a letter that

disagreed with RCMP on taxes, reasserting that CCCM was not responsible for these amounts.

He stated that CCCM would investigate other options for proceeding but demanded that RCMP

confirm that the 90% letter of credit requirement was waived:

On behalf of our client Cruise Connections Charter Management 1, LP ("CCCM"), we have received and reviewed your letter dated November 3, 2008.  First of all, we disagree with your assertion that the RCMP is not responsible for taxes incurred by the cruise lines in connection with this project.  CCCM has been moving forward with this project in reliance on the RCMP's prior agreement to be responsible for such taxes.  However, in light of the RCMP changing its position on the tax issue, CCCM is currently evaluating the feasibility of going forward with the project.  This will involve difficult discussions with the cruise lines and our bank, Royal Bank of Canada.  Therefore, due to the RCMP proposing to change the terms of this project, please be advised that CCCM will not be providing the RCMP with written letters from the cruise lines that the vessels have been secured by 5:00PM Eastern Time, November 5, 2008, as requested in the RCMP's letter to CCCM dated October 29, 2008 (the "October 29, 2008 Letter").

The October 29, 2008 Letter references a requirement of a 90% letter of credit.  Please note that there is no requirement of a 90% letter of credit in the contract.  This RFP requirement was waived by the RCMP at the June 6, 2008 meeting between representatives

145

of RCMP and CCCM, and in the RCMP's subsequent dealings with CCCM. We further call your attention to Section 4.1 of Annex A of the contract which incorporates a 70% payment requirement in lieu of a 90% letter of credit. Again, CCCM has been moving forward with the project based on the RCMP's waiver of the 90% letter of credit requirement. Please confirm that there is no requirement of a 90% letter of credit, as such a requirement would result in the RCMP effectively terminating the project. In the meantime, CCCM will continue to evaluate the feasibility of going forward with the project, as well as its available legal rights and remedies against the RCMP.

November 4, 2008 Letter from G. William Joyner, III to Normande Morin, RCMP MSJ, Ex. 78 [Dkt. 62-82] at CAN1106; *see also* CCCM MSJ, Ex. 42 [Dkt. 65-32].

The next day brought a response from RCMP, which asserted for the first time that CCCM was in breach of contract for failing to provide proof that the ships had been secured. Totally ignoring what had already been agreed to, Ms. Morin suggested that RMCP "was prepared to consider negotiating alternative arrangements instead of the 90% Letter of Credit." Letter from Normande Morin to G. William Joyner, III, CCCM MSJ, Ex. 37 [Dkt. 65-27] at CAN1852.

The letter stated:

The Royal Canadian Mounted Police (RCMP) has reviewed the content of your letter dated November 4, 2008, and provides the following:

As indicated in our letter dated October 29, 2008, the RCMP is prepared to consider negotiating alternative arrangements instead of the 90% Letter of Credit. Please note that the Charter Party Agreements did not provide for payment for the vessels within 30 days of contract award as specified in section 4.1 of Annex A. As long as the RCMP and CCCM can agree on mutually satisfactory terms of payment to CCCM and to the ship companies, the RCMP is prepared to waive the requirement for a 90% Letter of Credit.

Again the RCMP reviewed the contract provisions for taxes and the contract terms apply and remain unchanged in this respect. Finally, your letter indicates that CCCM will not be providing the RCMP with written letters from the cruise lines confirming that the

146

> vessels have been secured by the date and time requested in the
> RCMP letter dated October 29, 2008. Please consider this as our
> notice, pursuant to Article 23 of General Conditions 9676, that
> CCCM is in breach of contract for failure to secure the vessels.
>
> Should CCCM not provide the letters from the cruise lines as proof
> that the vessels have been secured by 12:00 noon Eastern Time
> November 7, 2008, the RCMP will consider that CCCM has
> repudiated its contract with the RCMP and will proceed to take
> action at its disposition and fulfill its needs.

*Id.*

CCCM responded with a two-page letter on November 6, attaching letters from

Holland America and Royal Caribbean confirming that CCCM had signed charter party

agreements with them.  Mr. Joyner's letter stated:

> First of all, we take issue with your assertion that CCCM is in
> breach of contract for failure to secure the vessels.  CCCM is not in
> breach of contract for failure to secure the vessels.  Attached please
> find letters from Holland America Line and Royal Caribbean
> International (Royal Caribbean Cruise Line) stating that the vessels
> are secured by contract.  Any delay in CCCM's providing these
> letters is directly attributable to the RCMP.  CCCM has been ready
> and willing to perform throughout the entire process.  However,
> the RCMP has delayed the process and jeopardized the project
> altogether.  For example, although CCCM provided RCMP with
> the cruise line charter party agreements on September 30, 2008, the
> RCMP did not sign Royal Bank of Canada's "Acknowledgement
> of Satisfaction of Condition Precedent" document until October
> 24, 2008, and even then it came with an attempt to require a 90%
> letter of credit in favor of the RCMP.  Due to the RCMP's attempt
> to require a 90% letter of credit in its favor, Royal Bank of Canada
> is presently not willing to financially secure the vessels by
> establishing the 70% letters of credit in favor of the cruise lines.
>
> While we have stated this position to the RCMP
> before, . . . [discussion of letter of credit omitted].
>
> In addition, as stated previously we strongly disagree with your
> assertion that the RCMP is not responsible for taxes incurred by
> the cruise lines in connection with this project.  While CCCM
> currently remains willing and able to perform the contract, CCCM
> will take appropriate legal actions to ensure that the RCMP's
> obligation to cover such taxes is enforced.

> Due to the RCMP's attempts to change material contract terms to the detriment of CCCM, such as the 90% letter of credit and responsibility for taxes, please allow this letter to serve as notice that CCCM considers the RCMP to be in breach of the contract. While CCCM currently remains willing and able to perform the contract, CCCM reserves all of its available legal rights and remedies against the RCMP in connection with the RCMP's breach.
>
> Please note that the RCMP's immediate cooperation will be required in order for Royal Bank of Canada to fund the 70% letters of credit in favor of the cruise lines, in order to financially secure the vessels. The only reason RBC is unwilling to fund the 70% letter of credit at this time is because of the RCMP's recent, unsupportable assertion that a 90% letter of credit is required, despite clear, documented agreement to the contrary. Therefore, please confirm your agreement that, pursuant to the contract, the RCMP does not require a 90% letter of credit in its favor. Please provide your response by 5:00 p.m. Eastern time on Friday, November 7, 2008. If you do not, the project will be at risk of failure solely as a result of the RCMP's actions.

E-mail and Letter from G. William Joyner, III to Normande Morin *et al.*, RCMP MSJ, Ex. 73 [Dkt. 62-77] at CCCM12585–86; *see also* CCCM MSJ, Ex. 43 [Dkt. 65-33].

Ms. Morin wrote to Mr. Joyner on November 7, finally agreeing that RCMP would "waive the requirement for a 90% Letter of Credit" *but* on the understanding that "CCCM will have paid the cruise lines for 100% of the CPAs at the time of the initial payment of 80% by the RCMP to CCCM." Letter from Normande Morin to G. William Joyner, III, RCMP MSJ, Ex. 68 [Dkt. 62-72] at CAN11354–55; *see also* CCCM MSJ, Ex. 44 [Dkt. 65-34]. She also asserted: "RCMP is not in breach of contract." Letter from Normande Morin to G. William Joyner, III, RCMP MSJ, Ex. 68 at CAN11354. This November 7 letter extended the deadline for CCCM to provide "fully executed non-cancellable Charter Party Agreements naming the Vancouver 2010 Integrated Security Unit as having exclusive use of the vessels" and "proof of payment (minimum 70%) to the vessel provider" to 5:00 p.m. Eastern time on November 10, 2008. *Id.*

On the day Ms. Morin sent her letter electronically to Mr. Joyner, CCCM wrote to the Royal Bank of Canada in an effort to preserve its relationship.  As then forwarded by Mr. Joyner to Ms. Morin, the Bank responded:

> [W]e are incredulous that the interactions with the Agent for the Crown have degenerated so rapidly to the current nadir.  One would have thought that with a Contract of such import that maintenance of good faith professional deportment would be of the essence.  When first evaluating your request for financial support relative to this Contract, our approval was premised on, *inter alia*, three conditions being in effect: the waiver of the standard 90% Letter of Credit in favour of the RCMP, the understanding that the RCMP would be responsible for applicable taxes, and that the foreign exchange conversion rate between the Canadian and US currencies would remain (or be managed) within viable bounds. Based on our review of the relative correspondence, neither of the first two conditions are definitively met as of this date.  In addition, the inordinate delays experienced since Contract execution date, coupled with the extraordinary foreign exchange market volatility of late, has called into serious question, in our view, the viability of the entire Contract.
>
> Hence, at this juncture, pending positive resolution of these issues to the satisfaction of the Bank, we are not in a position to proceed further with issuance of Letter of Credit instruments in favour of the cruise lines.

Letter from G. William Joyner, III to Normande Morin & Attached Siemens E-mail, RCMP MSJ, Ex. 72 [Dkt. 62-76] at CCCM13976, CCCM13974.

Despite the chaotic situation between CCCM and Ms. Morin, Holland America and CCCM reached a final charter party agreement for the *ms Standendam* on November 7, 2008.  *See* Final HAL CPA, RCMP MSJ, Ex. 56 [Dkt. 62-60] at 6.[36]  That agreement required CCCM to post three letters of credit: charter security of USD$6,608,056 due 30 days from signing; additional tax security of CDN$1,000,000 due November 30, 2009; and on-board

---

[36] This document has no Bates numbers.

revenue security of USD$2,408,840 due May 31, 2009.  *Id.* at 2.  CCCM accepted responsibility for paying both "Taxes" and "Additional Tax Amounts," as broadly defined.  *Id.* at 11–15.

### DD.  November 10 through 17: Contract Termination

On Ms. Morin's deadline of November 10 for CCCM to deliver copies of executed charter party agreements and proof of 75% payment to the cruise lines, Mr. Joyner sent a letter stating that those items would not be forthcoming that day.  *See* Letter from G. William Joyner, III to Normande Morin & Attached E-mail, RCMP MSJ, Ex. 72 [Dkt. 62-76] at CCCM13974–76; *see also* RCMP MSJ, Ex. 80 [Dkt. 62-84]; CCCM MSJ, Ex. 45 [Dkt. 65-35]. To the contrary, he told Ms. Morin that, unless RCMP notified CCCM by November 13, 2008, that RCMP would be responsible for Canadian taxes and did not require a 90% letter of credit, CCCM would terminate the contract.  In relevant part, Mr. Joyner stated:

> With respect to demand (a) [for production of fully executed [CPAs], the contract does not require CCCM to provide these executed Charter Party Agreements to the RCMP.  CCCM has already provided the RCMP with letters from the cruise lines that the vessels are secured by contract.  With respect to demand (b) [for proof of payment to the cruise lines by November 10, 2008], CCCM has explained to the RCMP on numerous occasions the process for finalizing the establishment of the 70% letters of credit in favor of the cruise lines. . . . Even if the RCMP's November 7 Letter had taken the demand of an additional 90% letter of credit off the table, there is no way the letters of credit could have been in place by today at 5:00 p.m. The unrealistic deadline contained in this demand suggests that the RCMP is pursuing a strategy of attempting to demonstrate that CCCM is in breach of the contract, in order to terminate the contract. As we have stated repeatedly, CCCM is not in breach of the contract. Further, CCCM will not be in breach by a failure to meet the deadlines set forth in the November 7 Letter.
>
> To underscore the extent to which the RCMP's conduct has jeopardized the contract, please see the attached letter from Royal Bank of Canada.  The language in the November 7 Letter did not satisfy Royal Bank of Canada with respect to the 90% letter of credit issue, as the language just states that the "RCMP is prepared to waive the requirement for a 90% Letter of Credit." As we have

previously explained to the RCMP in great detail, most recently in our letter to the RCMP dated November 6, 2008, there is no contractual requirement of a 90% letter of credit, as an alternative to this requirement was agreed to with the RCMP. More importantly, it is clear from this letter that Royal Bank of Canada is not prepared to finance this transaction unless the RCMP definitively indicates its agreement to waive the 90% letter of credit requirement and its intent to pay all Canadian taxes that might be assessed, as the contract obliges the RCMP to do. Also, Royal Bank of Canada is gravely concerned about the exchange rate issue, which has become a critical issue due to the delays caused by the RCMP's attempts to change the applicable contract terms to CCCM's detriment.

In the spirit of good faith negotiations, we will give the RCMP one more opportunity to demonstrate that it will honor its contractual commitments with respect to the 90% letter of credit issue and the tax issue. If the RCMP desires for this contract to go forward, it must notify CCCM that it will be responsible for the taxes and drop the 90% letter of credit issue by not later than 5:00 pm Eastern time on Thursday, November 13, 2008.

If the RCMP does not comply with this deadline, CCCM will have no choice but to terminate the contract due to the RCMP's breach. CCCM will also be forced to terminate the charter vessel contracts with the cruise lines, which will cause the cruise lines to take immediate action to return the vessels to the retail marketplace. Upon termination, CCCM will commence litigation against the RCMP to protect the interests of CCCM. . . .

Letter from G. William Joyner, III to Normande Morin and Attached E-mail, RCMP MSJ, Ex. 72 at CCCM13975.

Mr. Kelly was asked at deposition about the decision not to provide the final versions of charter party agreements to RCMP. He testified that he believed that "[a]ll [he] needed to do was provide confirmation that the ships were under charter" and that Ms. Morin improperly "expanded" the scope of what was required concerning charter party agreements because she wanted "to understand how much money [CCCM was] making." Kelly Dep. at 76. Mr. Kelly also testified that the charter party agreements "were proprietary documents between CCCM and the cruise lines. . . . [P]roviding that information was—would give away how much

money we were making with these charters."  *Id.* at 75; *id.* at 97 ("[I]t was not my intention to

share with [the RCMP] what our final pricing was, and that's what I was referring to when I said

we would not be sending the executed CPAs.").

   Ms. Morin responded by letter on November 12, 2008.  In a somewhat more

conciliatory tone, she finally admitted that the 90% letter of credit requirement was waived but

refused to agree to CCCM's demands on payment of Canadian taxes, adjustments for the

exchange rate, and RCMP's need for signed charter party agreements and proof of payment, for

which she extended the deadline to November 14 at noon eastern time.  November 12, 2008

Letter from Normande Morin to G. William Joyner, III, RCMP MSJ, Ex. 75 [Dkt. 62-79] at

CAN1832–34; *see also* CCCM MSJ, Ex. 48 [Dkt. 65-37].  Ms. Morin's letter stated:

> The Royal Canadian Mounted Police (RCMP) has reviewed the
> content of your letter dated November 10, 2008, and wishes to
> clarify a very basic issue. The RCMP would like nothing better
> than to resolve all outstanding issues to the satisfaction of both
> parties so that we may proceed to a productive relationship
> henceforth. In this spirit we wish to provide closure on some
> outstanding issues and seek your concurrence on a way forward.
>
> 1. The 90% Letter of Credit is waived.
>
> 2. Article 6.3 of the Articles of Agreement and Articles 3 and 35 of
> the 9676 General forming part of the contract are clear that the
> taxes for which the RCMP is responsible for are the GST and
> changes to duties and taxes imposed under the Excise Act R.S.C
> 1985, c. E-14 and Excise Tax Act, R.S.C 1985. CE-15, or any
> duties imposed under the Customs Tariff or any other federal or
> provincial sales, excise or other like duties, taxes, charges or
> impositions after the bid submission date and which affects the
> costs of the work to the Contractor. All other taxes are the
> responsibility of the Contractor as per contract.
>
> 3. Considering that the contract was negotiated in Canadian
> dollars, the effect of the exchange rate is the responsibility of the
> Contractor.

With respect to items 2 and 3 above, the RCMP consistently reiterated these terms of the contract and is not prepared to discuss these further.

4. The only way for CCCM to satisfy the requirement of contract clauses 6.2, 19 and clause 4.2 of Annex "A" would be to provide a fully signed non-cancellable Charter Party Agreements naming the Vancouver 2010 Integrated Security Unit as having exclusive use of the vessels and the proof of payment (minimum 70%) to the vessel provider. A letter from the cruise lines that the vessels are secured is not sufficient to demonstrate that CCCM met its contractual obligation.

Your letter suggests that CCCM would require more time to finalize the establishment of the 70% Letters of Credit in favor of the Cruise Lines. The RCMP is willing to provide CCCM with an additional two weeks, up to November 25, 2008, to finalize and confirm the 70% Letters of Credit are in place and provide a copy of the signed Charter Part[y Agreements].

We need your confirmation that CCCM will produce the Letters of Credit and the signed Charter Part[y Agreements] by the specified date above, and this confirmation is required by 12:00 noon Eastern time Friday, November 14, 2008.

Please be guided accordingly.

November 12, 2008 Letter from Normande Morin to G. William Joyner, III, RCMP MSJ, Ex. 75 at CAN1833–34. At deposition, Ms. Morin testified that RCMP was comfortable stating that the 90% letter of credit requirement was waived, by November 12, because it had "been satisfied and explained." Morin Dep. at 125.

Although RCMP gave CCCM until November 14 to reply, Ms. Morin received an internal draft of a revised RFP on November 13 for cruise ship accommodations at the 2010 Vancouver Olympics. E-mail from Kaleigh Ferguson to Normande Morin & Draft Revised RFP, CCCM Opp., Ex. 24 [Dkt. 67-24] at CAN11852–84. RCMP also suspended the contracting authority of Ms. Meikle, Mr. Day, and Mike McAuley pending "a review to be undertaken by HQ Internal Audit, of the contracting processes with regards [sic] to the Cruise Ship contract."

153

E-mail from Robert Jorssen to Michael Day, CCCM MSJ, Ex. 33 [Dkt. 65-23] at CAN20637;

*see also* Meikle Dep. at 24–25 (acknowledging that her contracting authority was suspended in

November 2008).

CCCM did not comply with RCMP's November 14 deadline and sent a letter

from Mr. Joyner instead, stating that CCCM's "positions . . . ha[d] not changed."  November 14,

2008 Letter from G. William Joyner, III to Normande Morin, RCMP MSJ, Ex. 76 [Dkt. 62-80] at

CAN1825–26; *see also* RCMP MSJ, Ex. 80 [Dkt. 62-84]; CCCM MSJ, Ex. 49 [Dkt. 65-38].  Mr.

Joyner also sought a meeting "[a]s a final good faith effort to salvage this project," failing which

"CCCM will terminate the contract, notify the cruise lines, and pursue its legal rights and

remedies" after the close of business on Monday, November 17, 2008.  November 14, 2008

Letter from G. William Joyner, III to Normande Morin, RCMP MSJ, Ex. 76 at CAN1825.

No meeting occurred.  RCMP sent a November 17, 2008, letter to CCCM

declaring CCCM in default and the contract therefore terminated:

> The Royal Canadian Mounted Police (RCMP) has reviewed the
> content of your letter dated November 14, 2008, and is providing
> its comments.
>
> The RCMP has reviewed the entire situation under the Contract in
> a last attempt to explore the possibility of making concessions on
> the contract terms related to taxes and the currency and to resolve
> the outstanding issues to the satisfaction of both parties.
> The RCMP came to the conclusion that it is not possible for the
> RCMP to negotiate these firm terms under the contract and both
> items remain the responsibility of the Contractor.  In as much as
> the RCMP must maintain the terms of the contract in this respect, a
> meeting with CCCM would not be productive.
>
> CCCM is in default of contract for failure to comply with the
> requirement of contract clauses 6.2, 19 and clause 4.2 of Annex
> "A" which is to provide a fully signed noncancellable Charter
> Party Agreements naming the Vancouver 2010 Integrated Security
> Unit as having exclusive use of the vessels and the proof of
> payment    (minimum    70%)    to    the    vessel    provider.

> The RCMP gave sufficient time to CCCM to provide the
> documents requested above.  Since CCCM did not provide the
> documents, the RCMP considers that CCCM has repudiated its
> contract with the RCMP. Since this contract is terminated, the
> RCMP is proceeding to take action at its disposition and fulfill its
> needs.

E-mail & Letter from Normande Morin to G. William Joyner, III, RCMP MSJ, Ex. 83 at

CAN1174–76; see also CCCM MSJ, Ex. 50 [Dkt. 65-39].

### EE.  Late November: CCCM's Actions Post-Termination

On November 18, Mr. Kelly notified Holland America that RCMP had "reversed

their position on paying the (potential) Canadian taxes" but that CCCM intended to honor the

charter contracts and "enforce the non-cancelable contract with the RCMP."  E-mail from Tracey

Kelly to Rob Coleman, *et al.* & CCCM Doc., RCMP Opp., Ex. 83 [Dkt. 66-85] at CCCM6988–

70.  When contacted by attorneys for Holland America, who had read news accounts of the

cancellation of RCMP charter contracts, Mr. Kelly said that CCCM believed RCMP was trying

"to force the cruise lines to accept responsibility for any taxes and to renegotiate the entire deal

for a lower price."  E-mail Chain Among HAL Personnel, RCMP Opp., Ex. 84 [Dkt. 66-86] at

CCCM15080–81.  These e-mails are the final documents in the record from either Holland

America or Royal Caribbean.

### FF.  November 28 through April 2009: RCMP Issues New RFP and Contracts Directly with Cruise Lines

On November 28, 2008—eleven days after terminating its contract with CCCM—

RCMP issued a renewed and modified RFP for ISU security accommodations for the 2010

Vancouver Olympics ("Revised RFP").  It later issued several amendments and clarifications for

the Revised RFP.  *See* Revised RCMP RFP & Amendments, RCMP Opp., Ex. 37 [Dkt. 67-37] at

CAN20189 *et seq.*  The Revised RFP stated that it would not explain why the contract with

CCCM was terminated.  *Id.* at CAN7363 (Amendment #1, Q7 & Q8).  However, acting as its

own broker, RCMP discovered the complexities with which CCCM had been dealing and agreed to significant concessions on the contested issues.

### 1.  Revised RFP

The Revised RFP is notable in several respects for the changes that RCMP made following its experience with the CCCM contract.  *See* E-mail from Kevin DeBruyckere to Alain Seguin, CCCM Opp., Ex. 23 [Dkt. 67-23] at CAN16857 ("Many of the points in the SOR [Statement of Requirements in the Revised RFP] were developed based on our experience with the first RFP and were specifically included to avoid confusion and/or post contract award negotiations.  The ISU learned a great deal by going through the process with the last contractor, and our learning was incorporated into very specific language in the current RFP SOR.").  Among these initial modifications, a new contact person was identified in place of Ms. Meikle; the Revised RFP specified that there would be no protection for exchange rate fluctuation, *id.* at CAN20194;  the Revised RFP prohibited brokers from bidding because RCMP would contract only with an "official Cruise Line Company," *id.* at CAN20220 ("No Cruise Line Broker shall appear on the final contract."), *id.* at CAN20197, CAN20207; *and* the Revised RFP allowed a possible advance payment upon receipt of an irrevocable standby letter of credit for 100% of the value of the advance payment.  *Id.*

As to the critical issue of Canadian taxes, the Revised RFP retained the language on GST and HST from the earlier RFP and added: "All other taxes are included in the firm price except as provided in Article 13 of the General Conditions 2035 (12/05/08)."  *Id.* at CAN20201. This clause did not clarify matters, and RCMP was required to issue a series of clarifications and amendments before it finally offered to cover:

> Section 4. Additional direct costs (submit estimated cost with your bid): ADD to the list: "Canadian taxes incurred and directly attributable to this contract."
>
> ADD: 'Ceiling Price for Canadian taxes: The bidder must provide a total ceiling price for Canadian taxes incurred and directly attributable to this contract that may be applicable to the requirement, exclusive of GST and HST. *The Canadian taxes incurred for the performance of the work will be reimbursed at actual cost not to exceed the ceiling price.* The Canadian taxes ceiling will not be evaluated as part of the bid price, however, should there be significant discrepancy between the winning bid and other bids, the RCMP, at its sole discretion, may either contact the winning bidder for a revised estimate, award the contract to another bidder, or both.'

*Id.* (emphasis added).  In addition, RCMP eventually allowed bidders to contact Ms. Sharpe of the Canada Revenue Agency "for tax information."  *Id.* at CAN6269.

## 2.  RCMP-Holland America Charter Party Agreement

RCMP and Holland America executed a charter party agreement for the *ms Statendam* on April 9, 2009.  RCMP-HAL Charter Party Agreement ("RCMP-HAL CPA"), CCCM Opp., Ex 33 [Dkt. 67-33] at CAN2538–66.  RCMP was its own Charterer.  *Id.* at CAN2538.  It agreed to pay Holland America $14,500,000 USD "net," with 50% payable upon execution of the charter agreement and smaller percentages as various contract milestones, such as arrangements for berthing, occurred.  *Id.* at CAN2538–40.  The agreed-upon price to Holland America was exclusive of, *inter alia*, "(i) any Canadian Taxes (defined below) payable by CHARTERER in respect of this Agreement or the property or services provided hereunder, [and] (ii) any Canadian Taxes payable by, remittable by, assessed against, or levied against OWNER or its personnel or crew in respect of or arising out of or in connection with or as a consequence of this Agreement or the property or services provided hereunder."  *Id.* at CAN2540.  The definition of Canadian taxes substantially mirrored that proposed by Holland America in

negotiations with CCCM in the fall of 2008.  *See supra* § I.CC.  The aggregate amount of reimbursable Canadian taxes was not to exceed USD$8,000,000.  *Id*. at CAN2541.

RCMP also took a new approach to ships' health scores.  It agreed with Holland America on applicable scores above 90 after 2006—perhaps unsurprising, in that the *ms Statendam* had scored 94 and 94 in 2006 and 2007, respectively.  *Id.* at CAN2546.

In addition to *Statendam*, RCMP also signed two other charter party agreements for the 2010 Vancouver Olympics that are not in the record.  According to news reports, RCMP contracted for Holland America ships *ms Statendam* and *ms Oosterdam*, and one Carnival ship, *Elation*, with a total value of $76 million Canadian dollars for all three final contracts.  Stephanie Levitz, "Three ships to house 2010 Olympics security staff in new $76 million deal," *The Canadian Press* (Apr. 21, 2009); Damian Inwood, "Three cruise ships rented for Olympic security," *Canwest News Service* (Apr. 21, 2009).

### GG. *Post Facto* Issues

The parties have submitted *post facto* evidence on two of the issues in their cross-motions for summary judgment that does not fit neatly into the above history of the case.  That evidence is discussed by issue here—first, the Sessions Letter of Credit, and second, health scores.

### 1.  The Sessions Letter of Credit

Shown the $5 million "letter of credit" that Mr. Sessions provided as part of the Bid, *see supra* § I.D, Mr. Siemens of the Royal Bank of Canada testified at deposition that he had not seen it before and did not believe CCCM had provided it to the Bank when applying for financing.  Siemens Dep. at 56–57.  He testified that he did not know that the Sessions Letter of Credit had expired in July, that it could not be drawn upon, or that CCCM was "$5 million in debt as a result of obtaining th[e] letter of credit."  *Id.*  Had the Bank known about the Sessions

Letter of Credit, it would have affected the "risk analysis . . . unfavorably." *Id.* Mr. Siemens

also testified that the clause in the Sessions Letter of Credit to the effect that it could not be

drawn upon meant that it was "not a definitive debt obligation and could never be." *Id.* at 57.

### 2. The Health Scores

Ms. Edwards's second declaration, submitted as an exhibit to CCCM's opposition

on January 14, 2013, provided a more detailed, if self-serving, explanation of the replacement of

*Radiance of the Seas* (with a subpar health score) with *Jewel of the Seas* (with compliant health

scores) in the final nomination on September 30 and October 1. She stated:

> At this very sensitive juncture [*i.e.*, September 30], our fear was
> that Ms. Morin would see the Radiance's health score of 88% and
> use that as a pretext to argue that Cruise Connections could not
> deliver suitable ships, and might even use that excuse as leverage
> to try to get Cruise Connections to stop pushing the RCMP to
> acknowledge that it owed the taxes. Given this fear, we decided to
> submit to Ms. Morin a draft Royal Caribbean charter party
> agreement naming two other Radiance class ships (the Serenade of
> the Seas and Jewel of the Seas), believing that the issue could be
> easily resolved after Mr. Day returned from vacation and spoke
> with Ms. Morin and explained to her the agreements we had
> reached including the agreement on the taxes. Furthermore, given
> the ship's health score history, Cruise Connections knew that any
> issue regarding the health scores was very likely to be resolved
> after the Radiance of the Seas was re-inspected.

II Edwards Decl. ¶¶ 3, 18, 20–22.

### HH. Procedural History

CCCM filed its Complaint on November 26, 2008, less than ten days after

receiving RCMP's November 17 letter of contract termination. Compl. [Dkt. 1]. CCCM

claimed breach of contract, Compl. ¶¶ 28–36, and violation of the North Carolina Unfair and

Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 *et seq.* (*id.* ¶¶ 37–43). The case was

randomly assigned to the Honorable James Robertson.

RCMP moved to dismiss, arguing that the Court lacked subject matter jurisdiction because Defendants were immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–11.  *See* [Dkt. 9].  CCCM opposed, *see* Dkt. 12, and Judge Robertson held oral argument on June 9, 2009.  Concluding that FSIA applied and CCCM's allegations did not fit within any exception in 28 U.S.C. § 1605(a)(2), Judge Robertson granted the motion to dismiss at the conclusion of the hearing.  In an opinion expanding on his reasoning, Judge Robertson concluded that the CCCM-RCMP contract did not involve a "direct effect" in the United States as required by § 1605(a)(2) because "there was an 'intervening element'— [CCCM's] inability to perform its contractual obligations to the [cruise lines and the travel agency that had booked a relocation cruise]—between the defendants' actions and [CCCM's] financial loss."  *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Can.*, 634 F. Supp. 2d 86, 90 (D.D.C. 2009), *rev'd*, 600 F.3d 661 (D.C. Cir. 2010), *reh'g denied*, 609 F.3d 450.  On appeal, the D.C. Circuit concluded that there was a direct effect in the United States because:

> The travel agency agreement was a done deal: Cruise Connections would have received a flat fee no matter how many passengers the travel agency booked. Likewise, "all that remained for the [Charter Party Agreements] to be formally consummated was for the cruise lines to sign the agreements once RCMP confirmed its contractual responsibility for Canadian taxes." Appellants' Br. 40. In both instances, then, RCMP's termination of the Cruise Connections contract led inexorably to the loss of revenues under the third-party agreements.

600 F.3d at 664–65.

Shortly following remand, the case was reassigned to the undersigned when Judge Robertson retired.  RCMP answered the Complaint and filed a Counterclaim for breach of contract.  *See* Ans., Aff. Defenses & Countercl. [Dkt. 22].  RCMP then again moved to dismiss, Dkt. 23, and CCCM again opposed, Dkt. 25.  This time, the RCMP argued (1) forum *non conveniens* and (2) failure to state a claim for violation of the North Carolina Unfair and

Deceptive Trade Practices Act.  Applying the four-step inquiry set forth in *Pain v. United Technology Corp.*, 637 F.2d 775, 779 (D.C. Cir. 1980), this Court concluded that dismissal for forum *non conveniens* was not appropriate because CCCM was "entitled to litigate [its] claim in U.S. Courts, even if the law of British Columbia, Canada" applied.  *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Can.*, 764 F. Supp. 2d 155, 157, 159–64 (D.D.C. 2011).  Count II was dismissed because "Canada is not a 'person, firm or corporation' subject to suit under the N.C. Trade Practices Act."  *Id.* at 164–65.

Discovery on the cross claims of breach of contract began in March 2011 and lasted approximately eighteen months.  Following a status conference on October 26, 2012, the Court entered a briefing schedule for cross-motions for summary judgment on the sole remaining count[37] and scheduled a bench trial to begin on October 15, 2013.  After the parties' cross-motions were fully briefed, the Court continued the trial due to the complexity of the case "so that the need, scope, and purpose of a trial [could] be determined once the pending cross-motions for summary judgment are resolved."  *See* Minute Order dated July 1, 2013.

## II.  LEGAL STANDARD

### A.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly

---

[37] CCCM asserts in its summary judgment motion that its Complaint also contains "a claim for the RCMP's bad faith breach of the contract," on which CCCM "reserves all of its rights." CCCM MSJ Mem. at 43.  RCMP responds that only one Count remains after dismissal of the North Carolina law claim.  CCCM Opp. at 45.  After reviewing the Complaint and the record, the Court finds that that the only remaining claim is CCCM's "FIRST CLAIM FOR RELIEF (Breach of Contract)," Compl. ¶¶ 28–36, with no separate bad faith breach claim.

granted against a party who "after adequate time for discovery and upon motion . . . fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).

   In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the

nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*,

164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that

would enable a reasonable jury to find in its favor.  *Id.* at 675.  If the evidence "is merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477

U.S. at 249-50 (citations omitted).  Further, "[w]hen opposing parties tell two different stories,

one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Reetz v. Jackson*, 176 F.R.D. 412,

414–15 (D.D.C. 1997) (a plaintiff cannot create a genuine issue of material fact by contradicting

her own deposition testimony).

### B.  Application of Foreign Law

   The parties agree that the law of British Columbia, Canada governs their dispute.

Federal Rule of Civil Procedure 44.1 provides that "[i]n determining foreign law, the court may

consider any relevant material or source, including testimony, whether or not submitted by a

party or admissible under the Federal Rules of Evidence."  A court may "consider any material

the parties wish to present," and it "may do its own research on foreign law, just as . . . on issues

of domestic law."  9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* ("*FPP*") § 2444 (3d ed.); *see also Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984) (noting that "written or oral expert testimony accompanied by extracts from foreign legal sources" are common sources of foreign law accepted under Rule 44.1).  The Court need not accept the law proffered by the parties and is free to "reexamine and amplify material that has been presented by counsel in partisan fashion." *Estate of Botvin ex rel. Ellis v. Islamic Repub. of Iran*, 772 F. Supp. 2d 218, 228 (D.D.C. 2011) (quoting Fed. R. Civ. P. 44.1 advisory committee note).

The Court's determination of foreign law is "treated as a ruling on a question of law."  Fed. R. Civ. P. 44.1; *see also Ry. Labor Execs.' Ass'n v. U.S. R.R. Retirement Bd.*, 749 F.2d 856, 860 (D.C. Cir. 1984).  Therefore, "[o]nce foreign law is ascertained to the judge's satisfaction," a court is free to decide summary judgment motions "as it would in any other context." *FPP* § 2444.

In this case, both parties have provided the Court with statements of the British Columbia law they believe to be applicable, complete with citations to authority.  *See, e.g.*, RCMP Opp. at 37, CCCM Reply at 11 (parties' statements of promissory estoppel).  The Court has verified the law cited by the parties and has also conducted its own research to provide a full discussion of the principles relevant to the case.

### III.  ANALYSIS

At the outset, the Court reviews the British Columbia law that governs the parties' breach of contract claims.  The Court will then briefly discuss the status of the parties' various agreements, identifying the contractual provisions that were in effect at the time of the alleged breaches.

Next, the Court will address CCCM's argument that RCMP anticipatorily repudiated its duty to pay taxes that the cruise lines (and possibly CCCM) would incur due to

their vessels being in Vancouver for the 2010 Olympics.  For the reasons stated below, the Court

finds that: (i) RCMP anticipatorily repudiated its contractual duty to pay the cruise lines' taxes;

(ii) RCMP is liable for that repudiation on a promissory-estoppel theory; and (iii) the repudiation

was a fundamental breach because it frustrated the commercial purpose of the entire contract.

The Court will then address RCMP's claims that CCCM breached the contract

with respect to financing and financial security.  The Court concludes that CCCM's

noncompliance was excused by RCMP's repudiation of its agreements as to taxes, which made it

impossible for CCCM to finalize its financing.

Finally, the Court will discuss the issue of ship health scores, concluding that a

charter party agreement for a ship with a noncompliant health score was not a fundamental

breach of the contract.

## A.  British Columbia Law

It is undisputed that the law of British Columbia, Canada, governs this contract

dispute.  In British Columbia, as in the rest of Canada, contractual relationships are governed by

the common law.  *See Hodgkinson v. Simms*, [1994] 3 S.C.R. 377, ¶ 144 (Can.).  For the most

part, owing to our shared British ancestry, British Columbia contract law and prevailing United

States contract law are similar.  As appropriate, the Court draws analogies or contrasts to

American law.

A brief word on the Canadian court system will also be helpful.  Canada has a

dual federal-provincial court structure similar to the dual federal-state structure of the United

States' court system.  The first level court in British Columbia is the Provinicial Court, which

hears some first-instance cases, and the Supreme Court, which hears most first-instance cases as

well as some appeals from the Provinicial Courts.  The British Columbia Court of Appeals,

which ordinarily decides cases in three-judge panels, is the final arbiter of provincial British

Columbia law in most cases; its decisions are cited as "Can. B.C.C.A." and are printed in multiple reporting services, such as the British Columbia Law Reports ("B.C.L.R."). The Supreme Court of Canada is the final court of appeal; like the United States Supreme Court, its docket is mostly discretionary, subject to limited exceptions. Its decisions are generally reported in the Supreme Court Reports, cited as "S.C.R." *See generally* "Legal System of Canada," 40 St. Louis U. L.J. 1343 (1996); Canadian Department of Justice, "How the Courts Are Organized" (Apr. 30, 2013) http://www.justice.gc.ca/eng/csj-sjc/ccs-ajc/page3.html (last accessed Sept. 9, 2013).

### 1. Contract Interpretation

"In the absence of ambiguity, words in a contract are to be given their literal meaning[.] Words of ordinary use in a contract must be construed in their ordinary and natural sense[.] The paramount test of the meaning of words in a contract is the intention of the parties[.]" *Rickards Estate v. Diebold Election Sys. Inc.* (2007), 69 B.C.L.R. 4th 75, ¶ 20 (Can. B.C.C.A.) (quoting *MacMillan Bloedel Ltd. v. B.C. Hydro & Power Auth.* (1992), 72 B.C.L.R. 2d 273, ¶ 30 (Can. B.C.C.A.); other citations omitted). A court should determine the intention of the parties "in the objective sense by reference to the surrounding circumstances at the time of signing the contract" because "the meaning of words varies according to the circumstances with respect to which they were used" due to "the imperfection of language." *Id.* ¶¶ 20–21 (citation omitted); *see also Compagnie francaise du Phénix v. Travelers Fire Ins. Co.*, [1952] 2 S.C.R. 190, ¶ 116 (suggesting best interpretation of term would be one "consistent with the intention of the parties as disclosed in relation to the contract as a whole").

"When the parties are in agreement as to the meaning of a provision, a court, in the absence of compelling reasons to the contrary, should construe the document in accord

therewith." *Phénix*, [1952] 2 S.C.R. ¶ 98. "[W]ords must be given their primary meaning where

that meaning 'is unambiguous, . . . is not excluded by the context, and is sensible with reference

to the extrinsic circumstances in which the writer was placed at the time of writing.'" *Rickards*,

69 B.C.L.R. 4th ¶ 22 (quoting *Shore v. Wilson*, [1842] 8 Eng. Rep. 450, 518 (U.K.H.L.)).  For

example, when the parties write a contract clause that is "as wide as possible and there is no

reason for attributing to [them] any intention of restricting [the clause's] natural meaning," the

clause should be read as broadly as written.  *Victoria-Vancouver Stevedoring Co. v. Grand Trunk*

*Pac. Coast S.S. Co.*, [1918] 3 W.W.R. 450, ¶ 7 (Can. S.C.C.) (upholding broad reading of clause

limiting common carrier's liability).  Still, "the parties to a contract must be presumed to have

attributed a meaning and purpose to its several parts which, when read together, constitute a

complete consistent contract and, therefore, repugnancy should be, if reasonably possible,

avoided." *Phénix*, [1952] 2 S.C.R. ¶ 117.

### 2. The "Factual Matrix"

In interpreting a contract, British Columbia courts permit consideration of certain

contextual facts called the "factual matrix," relying on a United Kingdom case from the House of

Lords titled *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381.  *See Black Swan Gold Mines Ltd. v.*

*Goldbelt Res. Ltd.* (1996), 25 B.C.L.R. 3d 285, ¶ 12 (Can. B.C.C.A.).  The factual matrix may be

considered without finding an ambiguity in the contract because it is "always helpful."  *ACLI*

*Ltd. v. Cominco Ltd.* (1985), 61 B.C.L.R. 177, ¶¶ 4, 16 (Can. B.C.C.A.).

> The factual matrix is the background of relevant facts that the
> parties must clearly have been taken to have known and to have
> had in mind when they composed the written text of their
> agreement.  It can throw light on what the parties must have meant
> by the words they chose to express their intention.  In this respect it
> is much like trade usage and trade practice.  If both parties were
> clearly using the language of the trade in their practice of the trade

then evidence is always admissible to show the meaning of that language.

*Glaswegian Enters. Inc. v. BC Tel Mobility Cellular, Inc.* (1997), 49 B.C.L.R. 3d 317, at *7

(Can. B.C.C.A.).[38]

In evaluating the factual matrix, a court must "ke[ep] the contextual facts in the background and the text of the agreement in the foreground," because "[t]he words of the contract must not be overwhelmed by a contextual analysis." *Black Swan*, 25 B.C.L.R. 3d ¶ 19. Thus, "the Court cannot make a new agreement," *Glaswegian*, 49 B.C.L.R. 3d 317 at *7; "where the language used in the deed in its primary meaning is unambiguous, and that meaning is not excluded by the context, and is sensible with reference to the extrinsic circumstances, then such primary meaning must be taken conclusively as that in which the words are used." *Black Swan*, 25 B.C.L.R. 3d ¶ 23 (quoting *Canadian Delhi Oil Ltd. v. Alminex Ltd.* (1967), 62 W.W.R. 513, ¶ 15 (Can. Alta. C.A.); internal quotations omitted).

In a lengthy passage quoted from *Prenn*, the *Black Swan* court gave particular instructions about how the factual matrix should be considered in a case involving a lengthy course of negotiations:

> By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, although converging, still divergent. It is only the final document which records a consensus. . . . It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true; the commercial, or business object, of the transaction, objectively ascertained, may be a surrounding fact. . . . And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. . . . The words used may, and often do, represent a formula which means

---

[38] Due to what appears to be a formatting error in the Westlaw research service, the paragraph numbers for most of the text of this case are missing. The Court references the printed page.

> different things to each side, yet may be accepted because that is
> the only way to get "agreement" and in the hope that disputes will
> not arise. The only course then can be to try to ascertain the
> "natural" meaning.

*Id.* ¶ 17 (quoting *Prenn*, [1971] 1 W.L.R. at 1384–85); *see also Glaswegian*, 49 B.C.L.R. 3d at

*7 (emphasizing that courts should always search "for the meaning intended by the parties as

expressed in the agreement" in concluding that trial judge assigned the meaning "most consistent

with commercial reality and most consistent with the other clauses of the whole agreement").

### 3. Promissory Estoppel

The Supreme Court of Canada has adopted the doctrine of promissory estoppel as

set forth in *Engineered Homes Ltd. v. Mason*:

> When one party has, by his words or conduct, made to the other a
> clear and unequivocal promise or assurance which was intended to
> affect the legal relations between them and to be acted on
> accordingly, then, once the other party has taken him at his word
> and acted on it, the one who gave the promise or assurance cannot
> afterwards be allowed to revert to their previous legal relations as
> if no such promise or assurance had been made by him, but he
> must accept their legal relations subject to the qualification which
> he himself has so introduced.

[1983] 1 S.C.R. 641, ¶ 7 (citation omitted); *see also John Burrows Ltd. v. Subsurface Surveys*

*Ltd.*, [1968] S.C.R. 607, ¶ 17 (requiring "some evidence that one of the parties entered into a

course of negotiation which had the effect of leading the other to suppose that the strict rights

under the contract would not be enforced").  For example, in *Hansen v. British Columbia*

*(Minister of Transportation & Highways)*, the British Columbia Court of Appeals upheld a

finding of promissory estoppel because: "The representation was unambiguous.  It was a

representation of fact.  It was intended to be relied upon, and was relied upon. [And, i]n the

circumstances as found by the Board, the reliance was reasonable."  (2000) 76 B.C.L.R. 3d 241,

¶¶ 10–15 (Can. B.C.C.A.).

### 4.  Repudiation, Fundamental Breach, and Effect of Breach

There are three general circumstances in which a contract is discharged:

"(i) renunciation by a party of his liabilities under it; (ii) impossibility created by [a party's] own

act; [or] (iii) total or partial failure of performance."  *Celgar Ltd. v. Star Bulk Shipping Co.*

(1979), 12 B.C.L.R. 62, ¶ 9 (Can. B.C.C.A.) (quoting *Heyman v. Darwins Ltd.*, [1942] A.C. 356,

378–79 (U.K.H.L.)).  A partial failure only relieves the nonbreaching party's obligations under

the contract when the partial failure is a fundamental breach—*i.e.*, it "occur[s] in a matter which

goes to the root of the contract," a concept akin to materiality under U.S. contract law that is

defined further below.  *See id.*  When a breaching party "has done something which puts it out of

his power to perform his part of the contract[,] has intimated that he does not intend to perform

his part," or has otherwise prevented the performance of a condition precedent, the nonbreaching

party's duty to perform any conditions precedent is relieved.  *Whitehall Estates Ltd. v. McCallum*

(1975), 63 D.L.R. 3d 320, ¶ 49 (Can. B.C.C.A.) (internal citation and quotation marks omitted).

To evaluate whether a party's repudiation was wrongful, courts apply an "objective reasonable

person" standard to determine whether the party has, "by words or conduct, evince[d] an

intention to refuse the performance of the contract and not to be bound by it."  *Vancouver*

*Canucks Ltd. P'ship v. Canon Can. Inc.*, 2013 BCSC 866, ¶ 157 (Can. B.C. Sup. Ct.) (quoting,

*inter alia*, *Business Depot Ltd. v. Lenhdorff Mgmt. Ltd.* (1996), 24 B.C.L.R. 3d 322, ¶¶ 66–67

(Can. B.C.C.A.)).

A "fundamental breach" occurs when "a particular breach or breaches of contract

by one party is or are such as to go to the root of the contract which entitles the other party to

treat such breach or breaches as a repudiation of the whole contract. Whether such breach or

breaches do constitute a fundamental breach depends on the construction of the contract and on

all the facts and circumstances of the case." *Celgar*, 12 B.C.L.R. ¶ 8 (quoting *Suisse Atlantique*

*Société D'Armement Maritime S.A. v. N.V. Rotterdamsche Kolen Centrale*, [1967] 1 A.C. 361,

363 (U.K.H.L.)); *see also id.* ¶ 11 (referring to a breach that "has the effect of substantially

depriving the injured party of what he bargained for").  Put another way, a fundamental breach is

one that is "tantamount to the frustration of the contract either as a result of the unequivocal

refusal of one party to perform his contractual obligation or as a result of conduct which has

destroyed the commercial purpose of the contract, thereby entitling the innocent party to be

relieved from future performance."  *Poole v. Tomenson Saunders Whitehead Ltd.* (1987), 16

B.C.L.R. 2d 349, ¶¶ 26–28 (Can. B.C.C.A.) (collecting cases).

> When a fundamental breach occurs:
>
> [T]he innocent party to a contract may elect to affirm the contract
> and hold the other party to the performance of its contractual
> obligations and sue as well for damages. On the other hand, he
> may elect to accept the breach as a repudiation of the contract. This
> is an election between inconsistent rights. It must generally be
> made with promptitude and communicated to the other party, and,
> once made, it is irrevocable.

*Id.* ¶ 10 (quoting *Morrison-Knudsen Co. v. B.C. Hydro & Power Auth.* (1978), 85 D.L.R. 3d 186,

¶ 116 (Can. B.C.C.A.)); *see also Elderfield v. Aetna Life Ins. Co. of Can.* (1996), 27 B.C.L.R. 3d

1, ¶ 15 (Can. B.C.C.A.) ("[A] repudiation of a contract does not automatically terminate that

contract. Instead, an act of repudiation confronts the innocent party with two choices—to affirm

the contract and treat it as continuing or to accept the wrongful repudiation and treat the contract

as at an end.").

Once the non-breaching party accepts the repudiation, the non-breaching party is

freed "from further performance and [may] sue for damages immediately, even if the breach that

constitutes the repudiation is anticipatory." *Elderfield*, 27 B.C.L.R. 3d ¶ 15.  "Failure to

unequivocally accept the repudiation means that the repudiation has no effect unless there is a

continued refusal to perform. The contract continues to exist for the benefit of both parties and an action cannot be brought until one of the parties fails to perform." *Id.*; *see also Homestar Indus. Props. Ltd. v. Philps* (1992), 72 B.C.L.R. 2d 69, ¶ 29 (Can. B.C.C.A.) ("If the innocent party wishes to crystallize his rights before the time for performance and elects to accept an anticipatory repudiation as putting an end to the contract, he must so notify the other party and thereupon his rights to damages arise."). The nonbreaching party may also defer acceptance of the repudiation. *Homestar*, 72 B.C.L.R. 2d ¶ 21; *see also Bogusinski v. Rashidagich*, [1974] 5 W.W.R. 53, ¶ 42 (Can. B.C. Sup. Ct.) (in insurance case, holding that the nonbreaching party could "defer[ ] action until properly and reasonably convinced by investigation that proper grounds for repudiation had arisen").

### B. Summary of Parties' Arguments

The parties have filed cross-motions for summary judgment, each arguing that the other breached the contract. CCCM alleges that RCMP materially breached its obligations under the contract when, in September 2008, it declared that it would not pay approximately $6 million in Canadian government taxes that might be assessed against the cruise lines. CCCM MSJ Mem. at 1–2. In the alternative, CCCM contends that the deadline for nominating and securing the ships had not yet arrived and RCMP's wrongful equivocation regarding taxes impaired CCCM's ability to perform. CCCM Opp. at 2.

RCMP argues that "CCCM has attempted to stitch a quilt out of shreds of testimony, distorted timelines, and partial threads of emails to hide CCCM's failure to accurately account for basic costs, or determine how it would finance the project before it submitted its response to the RCMP's Request for Proposal and before it signed a contract with the RCMP." RCMP Opp. at 1. RCMP puts the entire blame on CCCM, asserting that:

> [CCCM] breached the contract by refusing to provide the final, signed copies of the [charter party agreements] to the RCMP; CCCM failed to provide what the RCMP had bargained for, and thus cannot recover. Moreover, even absent CCCM refusing to provide the [charter party agreements] it had in its possession, as of the date that the RCMP terminated the contract, CCCM had not negotiated for ships that met the stringent requirements set out in the contract, and CCCM had obtained the preliminary financing it needed from the [Royal Bank of Canada] to secure non-conforming vessels based on substantial misrepresentations to the RCMP, the [Bank], and the cruise lines.

RCMP MSJ Mem. at 43.

### C.  Status of the Agreements at the Time of Breach

A brief word on the status of the parties' agreements is necessary to any discussion of their respective contractual duties.  The Court refers to the parties' "contract," but, to be clear, there was no single, final, integrated agreement between CCCM and RCMP.  The last agreed-to document between the parties was the Articles of Agreement, signed on July 31, 2008. *See supra* § I.M.  Section 10 of the Articles of Agreement listed various documents in descending order of priority in the event of a "discrepancy between the wordings of any documents:" (1) the Articles of Agreement; (2) 9676 General Conditions, *see supra* § I.G; (3) "Annex A Statement of Work;" (4) the Bid, *see supra* § I.E; and (5) Project Services Agreement, signed on July 16, *see supra* § I.H.

### D.  Responsibility for Taxes

CCCM contends that RCMP anticipatorily repudiated the contract by reneging on its agreement to pay all Canadian government taxes imposed on the cruise lines due to the ships' prolonged stay in Vancouver.  These taxes, including income taxes for the foreign-flagged ships, came to an estimated $6 million.  RCMP's position is that it never entered into any such agreement and agreed only to be accountable for Goods and Services Taxes ("GST") and Harmonized Sales Tax ("HST").  RCMP argues that CCCM did not recognize the cost of

Canadian taxes on the cruise lines when formulating its bid and only when CCCM learned such

taxes could increase its costs and decrease its profits did CCCM try to get RCMP to amend the

contract.

### 1. Whether the Taxes Include CCCM's Taxes

As a threshold matter, RCMP contends that CCCM has slyly expanded the

breadth of taxes at issue.  It argues that there are two sets of taxes at issue—those that would be

imposed by Canada on (a) the cruise lines and (b) CCCM.  RCMP Opp. at 28.  RCMP insists that

neither party ever "contemplated that the RCMP should or would be responsible for carving out

a tax haven to shield only CCCM . . . ."  *Id.* at 28–29.  According to RCMP, only in early

September 2008 did CCCM realize "that it had never accounted for taxes that it could owe the

[Canada Revenue Agency]," and, "unwilling to change its profit estimates to account for the cost

of paying standard taxes on its activities, CCCM tried to force the RCMP to take responsibility

for paying any and all taxes that CCCM and its partners would incur."  *Id.* at 29–30 (citations

omitted).  RCMP argues that CCCM demanded that RCMP agree "to pay for any tax assessed,

for any amount, for any activity, incurred by CCCM and its partners," referring to § "b.ii" of the

September 15 Proposed Clarification, *see supra* § I.T, which, indeed, would have required

RCMP to pay "all taxes" (very broadly defined) assessed against Holland America, Royal

Caribbean *and* CCCM.

CCCM characterizes this issue as a "diversion" because "the contract language,

[Mr.] Day's unequivocal testimony, and [Ms.] Meikle's approval of the clear agreement as stated

in [the Project Services Agreement] [demonstrate] that, like the cruise line taxes, any Canadian

government taxes imposed against CCCM would also be treated as a pass through cost to

RCMP."  CCCM Reply at 12.  It concedes possible confusion in the record but attributes that

confusion to the fact that the dispute "clearly narrowed to a back and forth exchange on the cruise lines' taxes," not CCCM taxes.  *Id.* at 13–14.

   As explained below, RCMP has much the better side of this argument.  While the Court concludes that RCMP agreed to pay Canadian taxes that would be imposed on the cruise lines due to their unusually extended stay in Vancouver, it did not agree to pay ordinary business taxes assessed against CCCM, a business located in Victoria, British Columbia, Canada, according to its Bid.  *See supra* § I.E (discussing scope of Bid); Bid at CCCM8302 ("Any additional taxes *identified by the Cruise Lines* are questionable, and a tax lawyer will be consulted on these issues after the Bid Award." (emphasis added)); *see also supra* § I.F (June 3 meeting's focus on taxes that might be imposed on the cruise lines).  CCCM persuaded Ms. Meikle and Mr. Day that Canadian taxes would scare away any cruise line because of the financial structure of the cruise lines, but no such discussion or reasoning applied to CCCM. After RCMP told CCCM that Canadian taxes on the cruise lines were CCCM's responsibility, both parties at times referred to them as CCCM taxes.  That imprecision does not mean, however, that RCMP ever agreed to pay customary doing-business taxes assessed against CCCM, and nothing in the parties' contract documents or representations made to CCCM by Ms. Meikle and Mr. Day during their voluminous negotiations on Canadian taxes conveyed that meaning.  The references to "the taxes" throughout this Opinion refers to taxes that Canadian taxing authorities might have assessed against the cruise lines—at that time, an indeterminate fact and an indeterminate amount.

### 2.  Parties' Arguments

   CCCM argues that, from early in the parties' contractual relationship, their mutual intent was for RCMP to pay "any and all" Canadian government taxes imposed, as its Bid

proposed. *Id.* at 25–28. It urges the Court to find all of the written agreements between the parties unambiguous in reflecting agreement that RCMP would pay all Canadian taxes. *Id.* at 30–34. CCCM cites Mr. Day and Ms. Meikle, RCMP's two contracting authorities, for making it "clear that when they entered the contract with Cruise Connections, they intended to bind the RCMP to pay any and all Canadian government taxes, including income tax imposed upon the cruise lines as a result of the charter." *Id.* at 27.

RCMP also reads the contract as clear and unambiguous, but leading to a different conclusion: CCCM bore full responsibility for all taxes except for the Goods and Services Tax (GST) and the Harmonized Sales Tax (HST). RCMP Opp. at 32–36. Its argument hinges on the premise that § 6.3 of the Articles of Agreement "explicitly described the specific taxes that for which [sic] the RCMP would pay," *i.e.* GST and HST. *Id.* at 32–33. Because § 6.3 is clear and did not impose liability on RCMP for cruise-line taxes, and because the terms of the Articles of Agreement take priority, RCMP argues that any earlier contract documents (the Bid or Project Services Agreement) cannot alter or amend its clear language. *Id.* at 33–34.[39]

### 3. The Articles of Agreement Bound RCMP to Pay Canadian Taxes Imposed on the Cruise Lines

The Court finds that § 6.3 of the Articles of Agreement required RCMP to pay any Canadian taxes imposed on the cruise lines because that was the parties' intent when RCMP and CCCM agreed to the Articles of Agreement on July 31 and the factual matrix in which

---

[39] The reader will note the irony in RCMP's argument that the Articles of Agreement take priority and do not require it to pay the taxes in dispute (conceding, *sub silentio*, that the Bid and Project Services Agreement do so) because Ms. Morin steadfastly refused to include the Articles of Agreement in the definition of the "contract," once she began dealing with CCCM. Her efforts to ignore that July 31 document are unsuccessful, as Mr. Day and Ms. Meikle freely acknowledge its existence, purpose and intent. It might also be questioned whether RCMP breached the parties' contract by rejecting the Articles of Agreement through Ms. Morin's actions and correspondence on the scope of the contract in September 2008.

agreement was achieved supports that conclusion.  The Court also finds that, if there were any

ambiguity in the Articles of Agreement, other contract documents incorporated into the Articles

of Agreement by § 10, Priority of Documents, indisputably bound RCMP.

       Section 6.3 of the Articles of Agreement is discussed at length *supra* at § I.M.

Subsection 3 provided in relevant part:

> 3.  Changes to Taxes and Duties.  *In the event of any change in any* tax imposed under the Excise Act, R.S.C 1985, c. E-14, and Excise Tax Act, R.S.C. 1985, c. E-15, or any duties imposed under the Customs Tariff or any other *federal or provincial sales, excise or other like duties, taxes, charges or impositions after the bid submission date and which affects the costs of the Work to the Contractor, the Contract price will be adjusted to reflect the increase or decrease in the cost to the Contractor.*

> 4.  Goods and Services Tax/Harmonized Sales Tax[.]  The estimated Goods and Services Tax (GST) or Harmonized Sales Tax (HST), if applicable, is included in the total estimated cost on page 1 of the Contract. The GST or HST is not included [i]n the Contract price but will be paid by Canada as provided in the Invoice Submission clause below. The Contractor agrees to remit to Canada Revenue Agency any amounts of GST and HST paid or due.

(Emphasis added.)  This language repeated a portion of § 35 of General Conditions 9676

verbatim.  RCMP's current argument rests on the contention that, because § 6.3 of the Articles of

Agreement did not expressly cover Canadian corporate taxes unrelated to excise or customs

taxes, the taxes at issue naturally fell on CCCM, its contractor.  The flaw in the argument is that

the contracting representatives of both RCMP and CCCM viewed Canadian taxes on the cruise

lines as potential, unquantified (and unquantifiable) taxes that *might* be imposed, and the parties'

joint intent is the pole star of contract interpretation.  *See Rickards*, 69 B.C.L.R. 4th ¶ 20.

Docking cruise ships in port for approximately six weeks as accommodations for the 2010

Vancouver Olympics was an unprecedented scenario with which neither RCMP nor CCCM had

experience.  No person engaged in the negotiations from RCMP or CCCM (or even experienced

176

tax counsel at the cruise lines, who were preparing estimates throughout the summer of 2008) knew exactly whether or what or in what amount Canadian taxes might be imposed.  The immediate negotiating parties on both sides of the table viewed potential Canadian taxes on the cruise lines as "change[s] in any tax imposed," "after the bid submission date," that would "affect[ ] the costs of the Work to the Contractor," which were, therefore, covered by § 35(3) of General Conditions 9676 and § 6.3 of the Articles of Agreement.  *See, e.g.*, Bid § 4.6.3 ("Any additional taxes identified by the Cruise Lines are questionable, and a tax lawyer will be consulted on these issues after the Bid Award."); Kelly Dep. at 216 (stating that, during the June 3 meeting, RCMP representatives took the position that the taxes were "potential and questionable" and the RCMP representatives "didn't even know if [the taxes] would be applied"); E-mail Chain Among Kelly Meikle and CCCM Partners, RCMP Opp., Ex. 32 at CAN2157 (Ms. Meikle's statement that "I did indicate if a hotel tax is assessed then we would pay . . . I have spoken to the Regional Director of the ISU for the Province of B.C. and he felt we could request and receive an exemption for this contract."); E-mail Chain Among Tracey Kelly and Carnival Representatives, RCMP MSJ, Ex. 42 at CCCM965–66 (e-mail from Carnival that the potential taxes were "outside [Carnival's] normal tax consequences" and "complicated" and that they should discuss with "Canadian tax advisors").  CCCM's interactions with the Canada Revenue Agency in September 2008—through a contact provided by RCMP—yielded the information that determining any taxes would be complex and require at least "several weeks minimum."  *See supra* § I.Q.  After it began acting as its own broker under the Revised RFP, RCMP discovered the tax issues to be very complex, leading bidders to submit multiple series of questions and leading RCMP to the same inescapable conclusion—RCMP had to bear the tax costs itself.  *See supra* § I.FF.

If the language of § 35(3) of General Conditions 9676 appears clear to a lawyer used to reading statutes closely, it was not so clear to Messsrs. Day or Kelly or Mses. Edwards or Meikle. Clarity in hindsight does not bring a victory home to RCMP on these facts; what is "paramount" in contract interpretation "is the intention of the parties." *Rickards*, 69 B.C.L.R. 4th ¶ 20. British Columbia courts—and courts in Canada generally—rely on the factual matrix surrounding a contract to inform their interpretations of the parties' intentions in adopting contract terms. *See Black Swan*, 25 B.C.L.R. 3d ¶ 12. In this case, the facts that comprise that "matrix" are clear: authorized representatives of RCMP repeatedly read § 35(3) of General Conditions 9676 to impose an obligation on Canada to pay cruise-line taxes that were uncertain and incalculable at the time of the Bid, making such taxes incapable of inclusion in the contract cost and, therefore, "extraordinary." *See, e.g.*, E-mail Chain Among Deirdre Dare & Michael Day, *et al.*, Excel Spreadsheet & Background Doc., CCCM MSJ, Ex. 23 at CAN20556 (Michael Day's reference to "potential increased cost solely due to extraordinary taxes that may be imposed by Canada").

The details of events demonstrate the problem. The exchanges between CCCM and RCMP leading to the Articles of Agreement demonstrate RCMP's commitment: since the taxes were unknown and indefineable, if ever assessed, they came within § 6.3 of that Agreement, which merely quoted General Conditions 9676. When Ms. Edwards asked Ms. Meikle to insert the phrase "[a]ny potential additional taxes (assessed by the Provincial or Federal Governments) on behalf of this project are to be paid by the RCMP as per General Condition 9676, Section 35," July 30–31 E-mail Chain Among Susan Edwards & Kelly Meikle, RCMP MSJ, Ex. 71 at CCCM1828, Ms. Meikle declined because she lacked authority to change the regulatory text, *not* because she disagreed with the substance of the change, E-mail Chain

Among Kelly Meikle and CCCM Partners, RCMP Opp., Ex. 32 at CAN2157.[40]  Ms. Meikle

testified at deposition that she agreed to paste the text of General Conditions 9676 § 35(3) into

the Articles of Agreement "to try to help satisfy the Cruise Line tax concern."  Meikle Dep. at

197; *see also* Meikle Dep. at 217.  In light of RCMP's own documentary evidence showing that

Ms. Meikle and Mr. Day repeatedly assured CCCM that the parties need not include any stronger

language regarding RCMP's responsibility for taxes because § 6.3 of the Articles of Agreement

covered the point and should be cited to the cruise lines, RCMP cannot now fault CCCM for

failing to insist on the inclusion of different language.[41]

> There is much more evidence demonstrating that negotiators for both parties

intended § 6.3, Articles of Agreement, to reflect their agreement that RCMP was responsible for

the cruise lines' Canadian taxes.  Mr. Day testified at deposition:

> > Q.  You believed during your July 28, 2008, meeting with Tracey
> > Kelly and Sue Edwards that Standard Conditions 9676, section 35,
> > paragraph 3, obligated the RCMP to pay the Canadian government
> > taxes that might be assessed against the Cruise Lines as a result of
> > the charter; correct?

---

[40] RCMP argues loudly and repeatedly that the Court cannot grant summary judgment to CCCM because RCMP has "opposed the overwhelming majority of CCCM's 'factual' representations it references in its matrix and list of extrinsic evidence."  RCMP Opp. at 35–36; *see also* RCMP Reply at 21–23 (arguing that CCCM relies on "purely conclusory, self-serving testimony").  To the contrary, this Opinion relies on the most probative evidence, which overwhelmingly comes from documents or testimony of RCMP's own representatives, as shown by the Court's parallel citations to both parties' documents throughout § I.  RCMP complains that the CCCM partners' declarations are self-serving and unsupported, but as the text shows, the Court has only relied on them in limited places where the declarations are supported by other evidence or where RCMP has not controverted the assertions.  Moreover, as RCMP's Statement of Facts as to Which There Exists a Genuine Issue, Dkt. 66-1, demonstrates, the parties' disputes of "fact" are almost uniformly better characterized as legal arguments—*e.g.*, paragraph 43 argues in part that "The contract signed by CCCM and the RCMP on July 31, 2008 did not "[make] Project Services Agreement 1 bid part of their contract."

[41] Many of these same facts are relevant to the question of whether RCMP is also liable on a theory of promissory estoppel, as discussed *infra* at § III.D.5.

> A.  No.  I believed that 9676, section 35, paragraph 3, permitted the RCMP to pay any taxes that changed or new taxes that were imposed after the contract was agreed on.
>
> . . .
>
> Q.  You knew [in] July of 2008 that you were agreeing to bind the Crown to pay the full contract price plus any and all Canadian government taxes imposed as a result of the charter; correct? . . .
>
> A.  Yes, I would agree with that.
>
> Q.  D[id] you know how much taxes were at that time?
>
> A.  No, I did not.

Day Dep. at 137, 140, 191.  Mr. Day also testified:

> Q.  And you concluded as of September 9, 2008, that the contract you had entered with CCCM obligated the RCMP to pay the taxes assessed against the Cruise Lines if those were ever assessed; correct?
>
>  . . .
>
> A.  No.  It – the contract provided that any extraordinary taxes or new taxes imposed or levied by the government would be extra to the price . . . [in] 9676 . . . [p]aragraph 35.
>
> . . .
>
> Q.  As of September 9, 2008, the date on which you wrote the e-mail . . . did you believe that subsection 3 of paragraph 35 of General Conditions 9676 obligated the RCMP to pay the taxes about which the Cruise Lines were expressing concern?
>
> A.  Yes, I did.

*Id.* at 65–69; *see also* E-mail Chain Among Deirdre Dare & Michael Day, *et al.*, Excel Spreadsheet & Background Doc., CCCM MSJ, Ex. 23 (Mr. Day's request for an increase to the contract limit "in the event that [Canada Revenue Agency] rules that the contractor is to pay corporate taxes," referring to the taxes as "extraordinary" and writing that "the extended berthing periods of the vessels in Canada presents the possibility that the unique nature of this charter may

attract these taxes"). Mr. Day's correspondence with Ms. Dare clearly demonstrates that he believed preexisting Canadian procurement regulations bound or permitted RCMP to pay the cruise lines' taxes and that he had so agreed, writing that "the terms of the contract stipulate that any changes to existing taxes or the imposition of new taxes are considered to be extra to the contract." Mr. Day thus requested an increase to RCMP's budget of "[a]n additional $4.7 million . . . ." E-mail Chain Among Deirdre Dare & Michael Day, *et al.*, Excel Spreadsheet & Background Doc., CCCM MSJ, Ex. 23 at CAN20556–57.

> Ms. Meikle's testimony was similar to Mr. Day's:
>
> Q . . . [Y]ou absolutely believed that 9676, paragraph 35(3) would have obligated RCMP to pay five and a half million dollars in taxes, estimated, if those taxes were assessed against the Cruise Lines as a result of their ships being docked in Vancouver Harbor for an extended period, right?
>
> MR CHRISTENSEN: Objection. Objection. Asked and answered repeatedly. . . .
>
> A. 9676 stands. . . . The answer is 'yes.'

Meikle Dep. at 245–47.

Having evaluated "the background of relevant facts that the parties must clearly have been taken to have known and to have had in mind when they composed the written text of their agreement," *Glaswegian*, 49 B.C.L.R. 3d at *7, the Court finds that the parties were "in agreement as to the meaning" of § 6.3 of the Articles of Agreement when it was signed: RCMP had agreed to pay any Canadian taxes imposed on the cruise lines because of the ships' lengthy stay at the Vancouver 2010 Olympics. *See Phénix*, [1952] 2 S.C.R. ¶ 98.

### 4.  The Documents Incorporated in the Final Articles of Agreement Required RCMP to Pay the Cruise Lines' Canadian Taxes

If a lawyer's limiting interpretation of § 35, General Conditions 9676 were to prevail over the intentions and understanding of all negotiators, other contract documents

incorporated into the Articles of Agreement by its Priority of Documents made RCMP's

obligation to pay the taxes at issue clear.  The incorporated contract documents under which

RCMP agreed to pay the contested taxes are § 6.3 of the Bid, discussed in detail *supra* at § I.E,

and the Project Services Agreement, discussed in detail *supra* at § I.H.  The Bid stated:

> In Part 6.3, the ISU have identified only 2 taxes that they believe
> will apply to these Charters.
>
> 1. The GST (Goods and Services Tax or Harmonized Sales Tax)
> which will be paid by the RCMP.
>
> 2. PST or Provincial Sales Tax which the RCMP is exempt from
> by law (Exemption# R005521 ).
>
> Any additional taxes identified by the Cruise Lines are
> questionable, and a tax lawyer will be consulted on these issues
> after the Bid Award.  *In any case, all taxes are not the
> responsibility of the Charterer, they are additional and a pass
> through cost to the Government of Canada.*

(Emphasis added).  The Project Services Agreement emphasized the point:

> Components of the Contract Price. As noted within the Response
> to RFP there are costs that the Cruise Line and Cruise Connections
> Charter Management One, LP must pass thru to the RCMP. . . .
> c. Government Taxes. As noted in the Response to RFP *any and
> all Canadian Government Taxes imposed as a result of this
> Charter will be the responsibility of the RCMP.* CCCM is
> providing a Service and the RCMP is paying the 5% GST in
> addition to $298 [per person per day].

(Emphasis added).

Despite these terms, RCMP argues that § 6.3 of the Articles of Agreement was

exhaustive in identifying taxes for which RCMP was responsible, and because the disputed taxes

were not listed, the Court cannot look to any other contract document.  RCMP Opp. at 33–34.

RCMP's argument misses the mark.  Nowhere in the parties' voluminous correspondence or

agreements is there support for the assertion that the Articles of Agreement were intended to

supersede or invalidate prior contract documents that were expressly incorporated.  The Articles

of Agreement did not include a merger clause, which might have extinguished the legal effect of

prior agreements.  To the contrary, the interpretation urged by RCMP, whereby the Articles of

Agreement replaced and preempted all prior contract documents, would be contrary to its express

terms by which they were explicitly incorporated.  Only if there were a "discrepancy" between

contract documents would the Articles of Agreement prevail.  If one read § 6.3 of that

Agreement so as *not* to require RCMP to pay the cruise-line taxes (contrary to the negotiators'

understanding and intentions), there would still be no discrepancy between it and the Bid or

Project Services Agreement.   As RCMP posits § 6.3, it is silent on the subject of cruise-line

taxes, but the Bid and Project Services Agreement are specific.  RCMP does not argue that its

contract representatives could not have bound RCMP to pay costs that were not mandated by its

standard procurement clause**,** as is demonstrated by RCMP's later agreement to do just that

because the unusual circumstances of retaining cruise ships in port for weeks required it.  Having

agreed to incorporate the Bid and the Project Services Agreement into the Articles of Agreement,

RCMP representatives are bound to them, even under RCMP's interpretations.

It is noteworthy that CCCM and RCMP negotiated the Articles of Agreement

because necessary outside parties (the cruise lines and Royal Bank of Canada) would not accept

RCMP's Purchase Order as representing a bilateral contract.  *See supra*, § I.*I* (CCCM would

"need a full contract created to work in conjunction with the [Purchase Order]" because "the

Cruise Lines and [ ] other Key Partners [were] not accepting the contractual value of the PO").

Viewing the Articles of Agreement as the parties' intended sole and exclusive agreement would

contravene § 3 of the Articles of Agreement, which defined the parties' "Contract" as "the

Articles of Agreement, these general conditions [*i.e.*, 9676 (2007/11/30) General Conditions],

any supplemental general conditions, annexes and any other document specified or referred to as

183

forming part of the Contract, all as amended by agreement of the Parties from time to time[.]"  It

would also directly contradict Mr. Day's understanding of the parties' contractual relationship.

E-mail from Michael Day to Kelly Meikle, CCCM MSJ, Ex. 26 at CAN20627 ("When we issued

the contract, we incorporated their proposal in the priority of documents which makes it a part of

the contract.").  On this record and with these accords, it is clear that the contract documents

agreed to by RCMP remained in force and effect.

        RCMP's further argument that there was, in fact, a "discrepancy" between the

Articles of Agreement and the tax provisions in other incorporated contract documents is without

merit.  RCMP would have the Court accept the fanciful notion that Messrs. Day and Kelly and

Mses. Meikle and Edwards intended the Articles of Agreement to reverse the terms of the Bid

and Project Services Agreement binding RCMP to pay the cruise lines' Canadian taxes, if any.

Since one of the prime purposes of the Articles of Agreement was to cement that requirement in

language acceptable to necessary third parties—a goal as to which Mr. Kelly and Ms. Edwards

finally accepted the assurances of Mr. Day and Ms. Meikle that § 35, General Conditions 9676

was sufficient—RCMP has offered no reason why CCCM would agree to such an irrational step

or evidence that Mr. Day and Ms. Meikle intended to accomplish such a sleight of hand.  To be

blunt, the evidence of the parties' discussions leading to the Articles of Agreement disproves

RCMP's after-the-fact claim.

        Because there was no "discrepancy" on paying the cruise lines' Canadian taxes

between the terms of (i) the Articles of Agreement and either (ii) the Bid or the Project Services

Agreement, the language of the latter two contract documents independently required RCMP to

pay any Canadian taxes imposed on the cruise lines.

### 5. Promissory Estoppel

Finally, if there were not an express or valid agreement that RCMP would pay for the cruise lines' Canadian taxes, the doctrine of promissory estoppel would bar RCMP from now denying that obligation.

CCCM argues that the official contracting authorities for RCMP made repeated statements accepting RCMP's responsibility for cruise-line taxes on which CCCM detrimentally relied. CCCM MSJ Mem. at 28–30. Specifically, CCCM contends that it "relied upon [Mr.] Day and [Ms.] Meikle's assurances that General Conditions 9676 properly gave effect to their agreement that the RCMP was required to pay the taxes, as is specifically set forth within [the Bid] and [the Project Services Agreement]." *Id.* at 29. CCCM contends that it "would not have executed the final contract in the absence of [Mr.] Day's assurances," so "the RCMP is estopped from enforcing any provision or construction of the contract that leads to any conclusion that it was not responsible for the taxes." *Id.* at 28–29. RCMP responds that the doctrine of promissory estoppel does not apply because a written contract governed the CCCM/RCMP relationship and that contract was clear. RCMP Opp. at 36–38. It further argues that promissory estoppel is a legal principle developed by courts of equity to protect a party that has been harmed in the *absence* of a contract and CCCM is misusing the principle in an effort to bind RCMP to CCCM's own interpretation of their written contract. From this vantage point, RCMP emphasizes that CCCM cannot indicate any post-contract statement by RCMP designed to change the terms of their written contract and upon which CCCM detrimentally relied.

The elements of promissory estoppel under British Columbia law, discussed *supra* at § III.A.3, are familiar: to recover, an aggrieved party must show that its counterpart made an unambiguous promise or assertion that was intended to induce reliance and upon which,

in fact, the aggrieved party reasonably relied.  *Engineered Homes*, [1983] 1 S.C.R. ¶ 7.  If, as

RCMP contends, there is doubt about the binding nature of the contract documents, RCMP

remains liable to CCCM under the doctrine of promissory estoppel.  There is no genuine dispute

of material fact (almost all facts are demonstrated by RCMP documents and witnesses); the

evidence and testimony of RCMP representatives demonstrate that RCMP repeatedly made such

assertions; and CCCM reasonably acted in reliance upon them.[42]

There are two roughly-defined instances of promissory estoppel in the record:

(1) the events of late July leading to execution of the Articles of Agreement on July 31, discussed

*supra* in §§ I.H through L, and (2) the events of early August through September, when Ms.

Morin replaced Ms. Meikle as Contracting Authority, discussed *supra* in §§ I.N through I.T.

First, CCCM agreed to the wording of § 6.3 of the Articles of Agreement—using

the text of § 35(3), General Conditions 9676; to wit: RCMP would cover "any change in any

tax"—based entirely on the good-faith representations and assurances of Mr. Day and Ms.

Meikle.  These two RCMP contracting authorities acknowledged as much under oath when

testifiying at deposition.  *See* Meikle Dep. at 197, 245–47; Day Dep. at 137, 140, 191.  Mr. Day

was "trying to come up with contract language that confirmed what the RCMP and CCCM had

already agreed to" in the Project Services Agreement.  Day Dep. at 139–40.  The testimony of

Mr. Day and Ms. Meikle is confirmed by the deposition testimony and declarations of Ms.

Edwards and Mr. Kelly.  *See* Kelly Dep. at 217–18 (Mr. Kelly testifying Ms. Meikle and Mr. Day

---

[42] Again, in a vacuum without the factual matrix, a lawyerly reading of General Conditions 9676 might lead to a different conclusion at law.  Promissory estoppel is a principle of equity so that one actor can not induce reliance by another and then skate clear.  RCMP representives negotiating for ships for the 2010 Vancouver Olympics clearly believed that they had correctly interpreted § 35(3) of General Conditions 9676 and repeatedly assured CCCM's representatives that, if taxes were imposed on the cruise lines, § 35(3) bound (or allowed) RCMP to pay them. Despite obvious misgivings, CCCM accepted their assurances.

"confirm[ed] multiple times that 9676 obligated the RCMP to pay any and all Canadian taxes.");
*see also* I Kelly Decl. ¶ 12; I Edwards Decl. ¶ 4. Ms. Meikle and Mr. Day told Mr. Kelly "that
because 9676 obligated RCMP to pay these taxes just discussed . . . that it was not necessary to
include in the articles of agreement more specific language showing that RCMP had bound itself
to pay those taxes." Kelly Dep. at 218–19. While counsel for RCMP argues that the CCCM
partners' assertions are self-serving, RCMP has not offered any contradictory evidence and its
own, authorized, representatives agree. These representatives' agreement on the development
and purposes of the contract documents is entirely consistent because, as stated *supra* at
§§ III.D.3–.4, Ms. Meikle, Mr. Day, and the CCCM partners shared the belief that the taxes in
question were "unknown" (and unknowable) and thus covered by § 35 of General Conditions
9676. *See, e.g.*, Day Dep. at 105 ("Q. RCMP had accepted by July 15, 2008, that RCMP would
be responsible for any and all Canadian government taxes imposed as a result of the charter;
correct? A. Yes."). Only when Ms. Morin became involved in late September did RCMP's
position change. The record is undisputed, except for the argument of counsel, that RCMP made
repeated representations that it was liable for cruise-line taxes with the purpose and intention of
persuading CCCM to agree to the language of § 6.3 in the Articles of Agreement.

It is also undisputed that CCCM relied on RCMP's assurances when it signed the
Articles of Agreement on July 31. *E.g.*, Kelly Dep. at 217–18 (relying on Mr. Day and Ms.
Meikle because "[t]hey were the contracting authority, and that was reinforced to us and we
relied on their statements, their commitments"); *see also*, *e.g.*, E-mail Chain Among Susan
Edwards, Tracey Kelly & Rob Coleman, RCMP Opp., Ex. 44 at CCCM2828–29 ("Per Michael
Day, Director of Procurement for the RCMP, and with 30 years of Canadian Government
experience on contracting, this section [9676 section 35, paragraph 3] addresses all Tax

187

implications that 'may' be assessed, and insures that the Canadian Government ([*i.e.,*]: RCMP) will be financially responsible."). The Court also concludes that CCCM's reliance was reasonable. When the Articles of Agreement were signed, CCCM well knew that the RCMP charter could raise complex tax issues for the cruise lines that needed to be resolved in contract negotiations. *See supra* § I.C (discussing, *inter alia*, warning e-mail from Carnival on May 23, 2008). CCCM does not dispute that point but insists that it thought it had addressed those issues through § 6.3 of the Bid and the Project Services Agreement that RCMP pay "any and all Canadian Government Taxes imposed as a result of this Charter." Thus, when Mr. Day and Ms. Meikle assured CCCM during drafting of the Articles of Agreement and at their July 28 meeting, that § 6.3 of the Articles of Agreement (reciting § 35(3) of General Conditions 9676) was (i) consistent with all prior agreements and (ii) sufficient to protect CCCM, CCCM acted reasonably in relying on those assurances. The legitimacy of of CCCM's reliance is bolstered by the fact that Ms. Meikle and Mr. Day were procurement specialists with RCMP with years of experience concerning the meaning and applicability of standard Canadian government contracting clauses with which RCMP dealt routinely, even if the charter contract presented a unique concept.

The second instance of promissory estoppel involves the events of early August through late September, recounted in detail *supra* in §§ I.N through I.T. During that time period, the cruise lines notified CCCM that their legal departments were not satisfied that the terms of the Articles of Agreement guaranteed payment by RCMP of Canadian taxes that might be imposed on them. CCCM then asked RCMP for additional written clarification to assuage the cruise lines. Mr. Day and Ms. Meikle continued to press General Conditions 9676 and, in further reliance on their representations, CCCM ultimately offered to the cruise lines that it would

arrange to post letters of credit to cover the taxes on the understanding that a remission might be possible. By late September, Ms. Morin had taken over the contract and reversed RCMP's position.

Unfortunately, RCMP's belief in the expansive scope of § 35(3) General Conditions 9676 became critically unsettling to CCCM's dealings with the cruise lines and the Royal Bank of Canada. Holland America and Royal Caribbean were both firm in their rejections of any tax liability to Canada and in their reliance on § 35; they both insisted that RCMP provide more explicit assurances or CCCM provide letters of credit. *See supra* § I.N.2.[43] CCCM made efforts to persuade the cruise lines, citing Mr. Day and Ms. Meikle, that the language of § 35(3) General Conditions 9676, covered their taxes, but these efforts fell on deaf ears. *See e.g.*, E-mail Chain Among Susan Edwards, Tracey Kelly & Rob Coleman, RCMP Opp., Ex. 44 at CCCM2828–29 (responding to Holland America by "highlighting General Conditions 9676, section 35, paragraph 3").

With the charter party agreements in danger because the cruise lines feared Canadian taxes, Mr. Day and Ms. Meikle continued to try to persuade CCCM that CCCM should rely on payment from Canada if the taxes were ever assessed. For instance, on September 10, Ms. Meikle wrote to Mr. Kelly at Mr. Day's direction, advising him:

> *We have sent your inquiry back to our Minister's representative in Ottawa.* They are seeking advice from Treasury Board. This could take months to address and reach a decision. In the meantime, *it has been suggested by our representatives that this issue should not hold up any agreement with the Cruise ship lines as the contract does address Taxation Issues.* In your Proposal there is a

---

[43]  Carnival, which was still in play in early August, had advised Mr. Kelly on August 6 that "[w]ithout letters of remission from the Canadian taxation authorities for specific tax liabilities," Carnival would demand a letter of credit from CCCM to cover the potential tax liability, estimated at $5.5 million. E-mail Chain Among Tracey Kelly & Cherie Weinstein, RCMP Opp., Ex. 43 at CCCM2258–60.

> clause on Page 54 *(Part 6.3) with respect to taxes. This has been accepted and has formed part of the contract document* (see priority of documents).  If you could point this out to the Cruise Ship lines, it does offer, I believe the level of comfort they need to sign the final CPA.

E-mail Chain Among Tracey Kelly & Kelly Meikle, *et al.*, CCCM MSJ, Ex. 27 at CAN4009 (emphasis added).  Mr. Day offered the same comfort in an email dated September 12:  "*The assurance you are seeking is already stipulated in the contract*.  What Kelly will provide is a written confirmation of that provision separate from the formal agreement."  E-mail Chain Among Kelly Meikle, Michael Day & Tracey Kelly, *et al.*, CCCM MSJ, Ex. 28 at CAN7869 (emphasis added).  Ms. Meikle then added:

> Further to Mike's email [*i.e.*, the one immediately above], the priority of documents includes the *Federal Government shall be responsible for any additional taxes which may be assessed to the contractor with respect to the cruise lines.  Please consider this email acknowledgment and acceptance of this clause*.

*Id.* (emphasis added).

The record is clear that by late August, CCCM very well knew that the cruise lines had identified major tax liabilities that they unequivocally refused to pay and wanted to impose on CCCM.  RCMP had told CCCM in late July that RCMP's general contracting clauses covered the taxes and should pacify the cruise lines; in August, it became clear that the cruise lines were not pacified.  Before it received Ms. Meikle's and Mr. Day's clear reassurances on September 10–12 that the "Federal Government shall be responsible," *id.*, CCCM feared it would be left to pay any cruise-line taxes owed to Canada and the CCCM partners considered walking away from the contract.  E-mails from Susan Edwards to Tracey Kelly, RCMP Opp., Ex. 115 at CCCM3674.  Expressing skepticism at first, but then assured by RCMP's representatives, the CCCM partners opted to go forward with finalizing charter party agreements.  It must again be said that their reliance on the expertise of RCMP's contracting authorities was reasonable.

CCCM and RCMP fully understood the gravity of the cruise lines' position and, without doubt, Ms. Meikle and Mr. Day intended in good faith to induce and persuade CCCM to proceed, as it did. CCCM's reliance on their assurances through August and September is further demonstrated by its negotiation of, and agreement to, complex contract language to address applications for tax remission process and interim letters of credit from CCCM as tax security.

The Court concludes that, even if RCMP were not contractually obligated to pay Canadian taxes assessed against the cruise lines, RCMP is estopped from denying that obligation. At two separate critical points, RCMP made extensive representations to CCCM beyond the contract itself that RCMP would pay such taxes. CCCM reasonably relied to its detriment on those representations.

### 6. Anticipatory Repudiation by Normande Morin

Having found that the RCMP was contractually obligated to pay any Canadian taxes incurred by the cruise lines, the question remains whether RCMP breached that duty, and, if so, when. The Court concludes that Ms. Morin anticipatorily repudiated RCMP's obligation to pay the taxes at issue by reinstituting previously-suspended contract deadlines on September 26, 2008.

On September 4, Ms. Meikle suspended the September 8 deadline for CCCM to execute and submit charter party agreements "until we can resolve [the tax] issue." E-mail Chain Among Tracey Kelly & Kelly Meikle *et al.* & CCCM Letter to Kelly Meikle & Michael Day, CCCM MSJ, Ex. 25 at CAN9368. While RCMP's negotiators thought that they had solved the problem, the cruise lines refused to proceed on those terms. It was suggested by RCMP that CCCM should ascertain information from Canada Revenue Agency and, in Mr. Day's words, possibly "have those extraordinary taxes waived." CCCM and the cruise lines began

negotiations on a plan that would give CCCM and RCMP 12 months to obtain tax remission from the Canada Revenue Agency but require CCCM to post letters of credit to cover the potential taxes.

Before these negotiations and arrangements could be completed, Ms. Morin unilaterally reinstated the deadline for CCCM to "nominate the vessels and provide the security documents required" on September 26, requiring CCCM to do so no later than October 3.  *See supra* § I.U.  Understanding that the cruise lines, RCMP, and CCCM were still working to resolve the tax issue, CCCM responded with disbelief.  *See id.*  Ms. Morin responded with stern language on September 30:

> As stated in our letter dated September 26, 2008, tax items are articulated in the Contract and the parties are to be guided accordingly. There are no other tax processes and the Contract makes no provisions for the Contractor to impose conditions on tax items in the contract. The Contractor must respect the contract and proceed without further delays.
>
> The Contractor is required to identify and secure the vessels in accordance with contract article 4.
>
> . . .
>
> Failure by the contractor to secure vessels and comply with contract requirements by the required date constitutes a breach under the contract. The Contractor must nominate the vessels and comply with the requirements of the contract by 4:00PM October 3, 2008 to prevent further action by the Crown.

Letter from Normande Morin to CCCM, CCCM MSJ, Ex. 35 at CAN1984.

The September 26 and September 30 letters from Ms. Morin constituted an anticipatory repudiation of the contract and represent RCMP's first refusal to pay Canadian taxes imposed on the cruise lines, in breach of contract.[44]  *See Celgar*, 12 B.C.L.R. ¶ 9; *see also*

---

[44] Ms. Morin expressly repudiated the tax obligation no later than November 3, when she wrote: "The RCMP is not responsible for taxes incurred by the cruise lines in connection with this

*Vancouver Canucks*, 2013 BCSC 866 ¶ 157 (a party repudiates a contract when it has, "by words

or conduct, evince[d] an intention to refuse the performance of the contract and not to be bound

by it").   CCCM did not accept her position.  To the contrary, on October 1, CCCM wrote to Ms.

Morin:

> The Contractor, in good faith, must re-submit that the Contract is
> vague in its description of processes as to how any additional
> Taxes and impositions under General Conditions 9676 and this
> contract will apply or look like.  The Contractor must ask that the
> Crown respect our need for this explanation which is reasonable to
> request.   We have been requesting this clarification since
> September 2, 2008 and have provided a possible solution, see
> attached: Tax Clarification.  If the Crown does not agree to this
> process included in the Tax Clarification, then it is reasonable, that
> in good faith, that we accept the emails by Kelly Meikle and
> Michael Day that all taxes will be covered by the Crown and that
> the Contractor will provide invoices of all additional impositions
> and taxes imposed after the Contractor bid that affect the costs of
> the Work to the Contractor to the Crown for payment within 30
> days.

Nominated Vessels Doc., RCMP MSJ, Ex. 10 at CAN1380.  Ms. Morin never acceded to this

request.  At that point, CCCM turned away from the tax issue to focus on other contentious

issues with RCMP and to negotiate with the cruise lines.  The Court finds that, upon Ms. Morin's

anticipatory repudiation, CCCM chose to preserve its disagreement and continue with

performance, thus preserving its right to sue.  *Poole*, 16 B.C.L.R. 2d ¶ 10.

### 7.  Fundamental Breach

The final question with respect to Canadian taxes is whether Ms. Morin's

anticipatory repudiation amounted to a fundamental breach of contract—a concept akin to

materiality under U.S. law.  First, of course, the question of taxes was a critical one to the cruise

lines.  None of them would charter a single ship to ISU for the 2010 Winter Olympics unless it

---

project."  November 3, 2008 Letter from Normande Morin to G. William Joyner, III, CCCM
Reply, Ex. 7.

had an ironclad assurance that the unusually-long port stay would not be taxed. The issue was raised just at the time of the Bid and CCCM addressed it in its Bid, later accepted by RCMP. Second, RCMP representatives had been assuring CCCM, at least since July 28, that § 35 of General Conditions 9676 (and the terms of the Bid and Project Services Agreement, explicitly made part of the contract) covered any cruise-line taxes. Third, when the cruise lines rejected the supposed tax assurances in the late-July Articles of Agreement, CCCM asked RCMP for more definite language and Ms. Meikle and Mr. Day provided commitments of payment under § 35 only. Fourth, all parties considered the possibility of a tax remission but realized that it would take months, if successful. Finally, the cruise lines refused to commit to charter party agreements without certainty.

Looking through its own lens, CCCM views the tax issue as fundamental because "RCMP's sudden refusal to abide by its agreement to pay the taxes would have placed an approximately $6 million burden on Cruise Connections. This amount would have been greater than 10% of the total contract price, and approximately 25% of Cruise Connections' anticipated profits." CCCM MSJ Mem. at 37. According to CCCM, "such a large and unanticipated financial burden would have frustrated the commercial purpose of the contract." *Id.*; *see also* CCCM Reply at 16. RCMP retorts that "the taxes that the RCMP was refusing to pay would comprise 25 percent of CCCM's expected profits," which "would leave CCCM nearly [CDN]$18,000,000 expected profits from performing, with the ability to sue for the balance." RCMP Opp. at 38–39. RCMP argues that such a decrease was insufficient to deprive CCCM "of 'substantially the whole benefit' of the contract, nor would the remaining [CDN]$18,000,000 destroy the commercial purpose of the contract." *Id.*

The Court concludes that RCMP's breach of the tax obligation it had accepted was plainly fundamental as described by British Columbia law because it went "to the root of the contract" and "destroyed the commercial purpose of the contract." *Celgar*, 12 B.C.L.R. ¶ 8; *Poole*, 16 B.C.L.R. 2d ¶¶ 26–28. The estimated $6 million in tax assessments was worth more than 10% of the $56 million value of the contract and represented a substantial portion of CCCM's estimated profit, which had been estimated at $14.4 million as of July 31 but had decreased to $5.7 million by October. E-mails Among CCCM Partners & Other Documents, RCMP Opp., Ex. 92 at CCCM15153; Profit Projections Doc., RCMP Opp., Ex. 80 at CCCM2174–75; CCCM October 28 Letter, RCMP MSJ, Ex. 70 at CAN1072–73. On the facts and circumstances of this case, a breach that might have rendered the contract wholly unprofitable was fundamental to its commercial purpose.

Apart from mere profit concerns, Ms. Morin's breach affected the contract in another fundamental way: CCCM could neither obtain financing if it were required to pay Canadian taxes nor execute charter party agreements with any cruise line. First, as to the financing: CCCM, which had no standing capital, was working with narrow margins of credit and had no means to finance a contingency of approximately $6 million on its own. CCCM was able to obtain financing from the Royal Bank of Canada because the Bank was effectively depending on RCMP's good credit and the Bank's receipt of the initial RCMP payment of $44 million, long before CCCM had to pay the cruise lines. After Ms. Morin's repudiation, CCCM could only proceed if the Bank agreed to extend additional letters of credit to cover cruise-line taxes, in the hopes that General Conditions 9676 and the contract required RCMP to reimburse CCCM or that a tax remission could be obtained. Borrowers have hopes; banks like a sure thing.

Among other parts of the financing, RCMP's agreement to cover cruise-line taxes was critical to the Bank's evaluation of CCCM's ability to perform.

Second, the possibility of Canadian taxes was *the* issue that had prevented finalization of charter party agreements; such taxes had been of critical concern since the Bid. The inability of RCMP's contract representatives to state their admitted contract obligation in plain English in September 2008 placed a major roadblock to expedient conclusion of negotiations on the charter party agreements. RCMP's agreement to cover cruise-line taxes was critical to the cruise lines' willingness to charter any ships, as is proved by the months of discussion and debate about the tax issue by them, by CCCM, and by RCMP representatives. It was no small matter and, in fact, when RCMP negotiated its own charter agreements with these selfsame cruise lines, it was forced to agree to pay any Canadian taxes. When Ms. Morin announced that she would not fulfill RCMP's agreement on taxes, it added insurmountable difficulties to CCCM's negotiations with the Royal Bank of Canada and the cruise lines that caused delays and additional expense. RCMP fundamentally breached the contract when Ms. Morin rejected its prior agreement to cover Canadian taxes imposed on the cruise lines for their participation at the 2010 Vancouver Olympics.

### E.  RCMP's First Breach Argument: Provision of Charter Party Agreements

RCMP alleges that CCCM breached their contract by refusing to provide the agreed-upon security for the CCCM-RCMP agreement—*i.e.*, CCCM refused to provide RCMP with signed charter party agreements. It is undisputed that CCCM provided unsigned draft charter party agreements to RCMP no later than October 1; that CCCM provided letters from the cruise lines attesting that they had executed charter party agreements; and that CCCM did not send RCMP copies of its final charter agreements with the cruise lines. *See supra* § I.X.

RCMP contends that it asked CCCM to "fulfill its obligations" on November 7 and 12, 2008, and submit the signed charter party agreements with Holland America and Royal Caribbean, which, by then, had been finalized.  RCMP MSJ Mem. at 33.  Further, RCMP asserts that the charter party agreements served as its financial security to ensure the ships' presence in Vancouver and that "[t]he contract clearly stated that the RCMP's financial security would be . . . 'a fully signed non-cancellable [charter party agreement] naming the Vancouver 2010 Integrated Security Unit, having exclusive use of the vessels.'"  *Id.* at 31–32.  Admitting that Ms. Meikle extended the deadline for charter party agreements twice, RCMP asserts that Ms. Morin legitimately reinstated the deadline and eventually gave CCCM until November 25, 2008, to submit signed charter agreements to RCMP but CCCM never complied and therefore breached the contract.

CCCM insists that there was no such breach.  It argues that the time for performance, *i.e.*, providing signed charter party agreements to RCMP, had not yet arrived. CCCM offers two bases to support its argument that delivery would have been premature: (1) Ms. Meikle had suspended all deadlines and Ms. Morin wrongly revived them; and (2) CCCM was not obligated to provide final, executed charter agreements to RCMP until April 1, 2009 (as CCCM argues was orally agreed at June 3, 2008, meeting).  There is no dispute about Ms. Meikle's indefinite suspension of any deadline for submission of charter party agreements, although RCMP challenges the oral agreement from June 3.  Beyond these points, however, CCCM also contends that Ms. Morin first cited contract language by which she only needed letters to prove the ships were under contract, not signed charter party agreements, and then, after CCCM's attorney sent her such letters, she abruptly demanded executed charter party agreements.  The written record supports this sequence.  *See supra* §§ I.CC–.DD; Letter from

Normande Morin to CCCM, RCMP MSJ, Ex. 81 at CAN115–16 ("In accordance with Clause 4,

Annex "A" of the contract, the Contractor shall secure the vessels and provide the RCMP with a

proof [sic], in the form of a written letter form [sic] the Cruise Line that vessels have been

secured . . . ."); Letter from Normande Morin to G. William Joyner, III, CCCM MSJ, Ex. 37 at

CAN1852 ("Should CCCM not provide the letters from the cruise lines as proof that the vessels

have been secured . . . ."). CCCM complied with that demand on November 6, ahead of Ms.

Morin's deadline, by providing the requested letters. *See supra* § I.CC. On the very next day,

November 7, RCMP abruptly changed its demand to "fully executed non-cancellable Charter

Party Agreements naming the Vancouver 2010 Integrated Security Unit as having exclusive use

of the vessels" and "proof of payment (minimum 70%) to the vessel provider," to be submitted

no later than November 10, 2008.

   The sequence of events makes clear that the contretemps about signed charter

party agreements has no relevance to this litigation, and RCMP's position is without merit.

RCMP admits that Ms. Meikle acted in early September to suspend the deadline indefinitely,

until the parties could resolve the tax issue to the satisfaction of the cruise lines, which would

otherwise not agree to charter their ships to the ISU. Soon thereafter Ms. Morin repudiated

RCMP's agreement to pay any Canadian taxes imposed on the cruise lines, resulting in an

anticipatory breach of the contract. Because the very declaration by which Ms. Morin rejected

RCMP's tax obligation also constituted a fundamental breach of contract, it is impossible to

accept RCMP's current argument that her unilateral statement "resolved" the tax issues and freed

her to reinstate the suspended deadline.[45] Therefore, it is unnecessary to sort through the parties'

---

[45] RCMP argues that CCCM's October 1 submission to RCMP, a document titled "Nomination
of Cruise Ships and Security Requirements," "indicated that [CCCM] understood that the
deadline had been reinstated, and that the tax issue had been resolved." RCMP Reply at 10.

various arguments about differing deadlines.  Put another way, RCMP's argument that it had a

right to demand performance with a November 10 deadline and declare breach of contract for

failure to submit charter agreements requires the Court to accept three untenable premises: (1)

RCMP could repeatedly agree to pay cruise-line taxes throughout the summer of 2008 and into

September; (2) in early September, RCMP could suspend deadlines for submission of charter

agreements until taxes were resolved; and, (3) in September and early November, RCMP could

repudiate its agreement to pay cruise-line taxes.

   The entire record makes it plain that RCMP's own conduct was the central reason

why negotiations for charter party agreements were prolonged and expensive.  The cruise lines

would not pay Canadian taxes, and they could use their ships elsewhere.  While Ms. Meikle and

Mr. Day knew very well that the cruise lines sought additional assurances on taxes and tried to

provide them to CCCM, Ms. Morin was new to the issues and appears, at best, to have been

terribly impatient.  Mr. Kelly tried to explain CCCM's situation on September 28:

> Further, we identified many times to the Contracting Authority that
> CCCM has secured the vessels to 99% (as of Monday, September
> 8, 2008) but that CCCM could not complete to 100% without the
> RCMP defining and agreeing to a process that would meet the tax
> requirements of the Contract dated July 28, 2008 and sought many
> opportunities to meet and address this. . . . CCCM requests that the
> RCMP define the process that would meet the tax concerns of the
> Contractor prior to final signatures of the Cruise Line Contracts.

*See, e.g.*, CCCM Doc., RCMP Opp., Ex. 28 at CAN2080–81.  Ms. Morin was not moved.  She

refused to engage further on taxes and continued to insist on a 90% letter of credit that she knew

full well RCMP representatives had waived for other security.  In the face of her intransigence,

CCCM continued to negotiate on tax language with Holland America and Royal Caribbean until

---

That submission did no such thing and instead maintained CCCM's position on RCMP's
obligation to cover the cruise-line taxes.  *See* Nominated Vessels Doc., RCMP MSJ, Ex. 10 at
CAN1380–81.

the end of October.  However one might sort through the dates, there is no doubt that RCMP's own actions impeded finalization of charter party agreements.  Its prior breach of contract also renders its claim about delivery of final charter agreements legally empty.

### F.  RCMP's Second Breach Argument: CCCM's Inability to Obtain Financing

RCMP's second claim of breach of contract against CCCM doubles as an impossibility defense: "At the time that the RCMP terminated the contract, CCCM could not have performed its obligations . . . because it had no means to finance the agreements due to a "host of covenants" CCCM made to the Royal Bank of Canada and immediately breached "as of the day that CCCM entered into a preliminary financing agreement with the [Bank]."  RCMP MSJ Mem. at 39; *see also* RCMP Opp. at 25 (arguing that CCCM could never receive letters of credit for taxes because it "had made significant misrepresentations to the Royal Bank of Canada to obtain financing[ ] and violated covenants in its preliminary financing agreement").

RCMP's argument has two threads.  First, it asserts that "[i]f CCCM had paid Mr. Sessions US$5,057,500 pursuant to the terms of the [Sessions Letter of Intent], or if CCCM had disclosed this obligation to the Royal Bank of Canada, CCCM's financing scheme would have crumbled" because "CCCM agreed to assign its first payment from the RCMP to the Royal Bank in order to guarantee these letters of credit, and the RCMP was asked to sign an agreement promising to make the first payment to the Royal Bank."[46]  RCMP Opp. at 26.  Moreover, RCMP asserts that CCCM's agreement to the Sessions Letter of Intent violated several covenants in CCCM's financing agreement with the Bank, "which prohibited entering into any other agreements that would affect its assets or rights, assign any interest in its rights under the

---

[46] Although Ms. Morin expressed some concern at deposition that the Sessions Letter of Credit "wasn't a valid letter of credit as the 10 percent piece," Morin Dep. at 124, RCMP does not argue here that CCCM's Bid was invalid due to any perceived deficiency in the Sessions Letter of Credit.

contract with the RCMP, incur any debt, provide for any payment to a third party, or from changing its ownership structure." *Id.* The second thread of the RCMP's argument is that CCCM did not disclose to the Royal Bank of Canada that CCCM had provided to the RCMP charter party agreements that were materially different from the actual charter agreements and which "did not meet the [Bank's] condition precedent requirement." RCMP MSJ Mem. at 41–42 & n.13. RCMP insists that such a disclosure "would have affected [the Bank's] analysis as to whether the [Royal Bank of Canada] would provide the preliminary financing to CCCM." *Id.*; *see also* RCMP Reply at 20 ("What the RCMP and the Royal Bank did not know, however, was that CCCM had provided falsified charter party agreements to the RCMP, chartering a ship that did not meet the material service requirements of the contract, and that CCCM had not included the RCMP's changes that CCCM agreed would be made in the final charter party agreements.").

CCCM responds that the Sessions Letter of Intent is of no significance for four reasons: (1) it was not enforceable; (2) if enforceable, it did not violate CCCM's covenants to the Bank; (3) CCCM could have paid Mr. Sessions if not for RCMP's delay; and, as an investor, (4) Mr. Sessions' fiduciary duties would have prevented him from causing a breach of the financing agreement between CCCM and the Royal Bank of Canada. As to CCCM's ability to finance the deal overall, CCCM argues that RCMP's breach of its obligation to pay Canadian taxes imposed on the cruise lines and RCMP's failure to acknowledge that the RCMP security requirement had changed from a 90% LOC to signed charter party agreements frustrated CCCM's ability to obtain financing. CCCM Opp. at 9–13; *see also id.* at 28 (asserting that RCMP "wrongfully declared the contract terminated because RCMP's conduct prevented CCCM from obtaining funding of its financing agreement with the [RBC]").

The Court concludes that Ms. Morin's anticipatory breach of contract on September 26 and 30 and her demands for a 90% letter of credit, which had already been waived, fundamentally changed the financial underpinnings of the contract.  Moreover, on review of the entire record, the Court cannot find that CCCM would have been unable to secure the requisite financing for the transaction without Ms. Morin's actions.  If anyone bore the brunt of responsibility for the financing falling through, it was Ms. Morin, whose repudiation of the taxes, modifications to the Bank's Acknowledgement Form, and insistence on reinstating the 90% letter of credit requirement, discussed *supra* at §§ I.AA–.DD, directly led to the November 7 decision by the Royal Bank of Canada to decline to proceed with the transaction, as Mr. Siemens advised the parties:

> [The Bank's] approval was premised on, *inter alia*, three conditions being in effect: the waiver of the standard 90% Letter of Credit in favour of the RCMP, the understanding that the RCMP would be responsible for applicable taxes, and that the foreign exchange conversion rate between the Canadian and US currencies would remain (or be managed) within viable bounds.  Based on our review of the relative correspondence, neither of the first two conditions are definitively met as of this date. In addition, the inordinate delays experienced since Contract execution date, coupled with the extraordinary foreign exchange market volatility of late, has called into serious question, in our view, the viability of the entire Contract.
>
> Hence, at this juncture, pending positive resolution of these issues to the satisfaction of the Bank, we are not in a position to proceed further with issuance of Letter of Credit instruments in favour of the cruise lines.

*See* Siemens E-mail, RCMP MSJ, Ex. 72 at CCCM13976.  RCMP's delay in reviewing documents CCCM had submitted on October 1 for an entire month, during which Ms. Morin was essentially incommunicado, *see supra* § I.Y; unilateral and repeated re-writing of a form presented by the Royal Bank of Canada, without the Bank's input or permission; and insistance

on a 90% letter of credit that Ms. Morin already knew had been waived months prior are all unexplained in the record.

The progression makes clear that RCMP was the proximate cause of the failure of bank financing for CCCM's contract with RCMP. RCMP's argument that CCCM must bear the blame can be made with a straight face only if RCMP ignores its own actions. Moreover, accepting RCMP's argument would requirs too much speculation as to (i) the validity and effect of the Sessions Letter of Intent and (ii) whether CCCM could have satisfied the eight conditions precedent set forth in the Credit Facilities Offer Letter issued by the RBC after granting preliminary approval to CCCM. *See supra* § I.X (discussion of RBC preliminary approval). While RCMP contends that the Sessions Letter of Intent "would have made CCCM's financing scheme and compliance with the RCMP's contract unworkable" because it violated the Terms and Conditions document CCCM signed for the RBC, RCMP Opp. at 43, the deposition testimony of Mr. Siemens on that point was equivocal.[47] *See supra* § I.GG.1 (discussing Mr. Siemens's testimony that he did not believe CCCM had provided the Sessions document to the RBC and believed that it would have affected the Bank's "risk analysis . . . unfavorably," but also that the letter of credit was "not a definitive debt obligation and could never be").

In similar circumstances, a British Columbia court found that plaintiff-homebuyers were excused from a contractual condition requiring them to "arrang[e] satisfactory financing" because "the defendants had, by their repudiation, made it impossible for the

---

[47] The Court notes that British Columbia adheres to the doctrine of privity of contract. Because RCMP was not in privity with the parties to the Sessions-CCCM contract or the parties to the CCCM-Bank financing agreement, RCMP only has standing to challenge those agreements as a third party beneficiary. While the parties have not addressed RCMP's standing, RCMP may very well lack third party beneficiary standing to challenge either contract. *See, e.g.*, *Kitimat (District) v. Alcan Inc.* (2006), 51 B.C.L.R. 4th 314, ¶ 72 (Can. B.C.C.A.) (setting forth two-factor test for exception to privity doctrine for third party beneficiaries).

plaintiffs to obtain financing because their 'rejection of the whole arrangement made compliance with the condition by the [plaintiffs] impossible in any practical sense.'" *Cameron v. Albrecht* (1981), 121 D.L.R. 3d 767, ¶ 6 (Can. B.C. Super. Ct.) (quoting *Whitehall Estates Ltd. v. McCallum* (1975), 63 D.L.R. 3d 320, ¶ 59 (Can. B.C.C.A.)).  The same reasoning applies here: by its repudiation of its contract obligations, RCMP made it impossible for CCCM to maintain its financing, and RCMP bears responsibility for that loss.[48]

### G.  RCMP's Third Breach Argument: Health Scores

Finally, RCMP argues that CCCM is liable for breach of contract because its charter agreement with Royal Caribbean was for *Radiance of the Seas*, a ship that did not meet RCMP's contract requirement for certain health scores.  RCMP further contends that CCCM contrived to hide its breach by nominating *Serenade of the Seas*, which had compliant health scores but had not been subject to negotiations with Royal Caribbean.

Without doubt the Articles of Agreement, *see supra* at § I.M, required CCCM to contract only for ships that met certain health requirements.  *See* Articles of Agreement Annex §§ 4.7, 5.4.  Without doubt, *Radiance of the Seas* did not meet the contract requirements for the years in question, but *Serenade of the Seas* was compliant in those years.

CCCM acknowledges that it nominated *Serenade of the Seas* but contracted for *Radiance of the Seas*, which received a non-compliant health score of 88 on June 20, 2008. CCCM Opp. at 2 ("CCCM's personnel should have reacted differently . . . .").  Despite these concessions, CCCM argues that it did not breach the contract because its deadline for delivering charter party agreements had not arrived; it had more than enough time to contract with Royal Caribbean for *Serenade of the Seas*, which was an identical sister ship to *Radiance of the Seas*;

---

[48] The Court's decision is without prejudice to further consideration of the impact of the Sessions Letter of Intent on CCCM's claims for damages.

and, in any event, any ship's health score in prior years might readily improve or decrease in subsequent years as they were all working vessels and subject to regular inspections.

The Court agrees that the record shows legedermain by CCCM in its nomination of *Serenade of the Seas*. Nonetheless, the issue of health scores is not fundamental to the contract because the scores were variable from ship to ship and year to year. ISU needed "healthy" ships for the 2010 Vancouver Winter Olympics, and the RFP measured that health by scores for 2006 and 2007. *See supra* § I.B. Realistically, however, the various contractual documents also recognized that such scores might change from year to year, *e.g.*, RFP Annex A §§ 5.1, 5.4**,** and it allowed the cruise lines to substitute ships. Under such contractual and real-life dynamics, the Court cannot find that the specific health score of a nominated ship in 2008 was *fundamental* to contract performance with healthy ships in 2010. *See Celgar*, 12 B.C.L.R. ¶¶ 8–9.

That strict compliance with health scores was not fundamental to the contract is further confirmed by RCMP's explicit acceptance of *Jewel of the Seas* and *ms Statendam* upon nomination by CCCM. Both ships, included in the nominations, had scores below 95 prior to nomination (93 for *Jewel of the Seas* in 2007; 91, 92, 94, 94 in 2004, 2005, 2006, and 2007, respectively, for *Statendam*). Nonetheless, on October 3, Ms. Morin wrote to Mr. Kelly that she was "[c]onfirming receipt of Health Certificates in good order for all three vessels," *see* E-mail from Normande Morin to Tracey Kelly, RCMP MSJ, Ex. 31 at CCCM13414, and on October 16, she wrote: "The RCMP has confirmed acceptance of the vessels nominated by CCCM." E-mail Chain Among CCCM Partners and Normande Morin, RCMP MSJ, Ex. 34 at CCCM6234. (RCMP modified its health-score requirements when contracting itself for *Statendam*, *see supra* § I.FF.2, allowing for "scores of 90 or better for inspections held since October 2006" and only

requiring a "commercially reasonable effort" to maintain a 95 score through the 2010 Olympics. RCMP-HAL CPA at CAN2546. This point is made only in concert with the evaluation of whether strict compliance with health scores was a fundamental contract requirement in 2008.)[49]

For the foregoing reasons, the Court concludes that a noncompliant health score as of September 2008 neither "destroyed the commercial purpose of the contract," *Poole*, 16 B.C.L.R. 2d ¶¶ 26–28, nor went "to the root of the contract," *Celgar*, 12 B.C.L.R. ¶ 8. Accordingly, even if CCCM breached the contract by nominating *Seranade of the Seas* but contracting for *Radiance of the Seas*, that breach was not a fundamental breach as it did not concern a contemporaneous fundamental issue, and Ms. Morin had breached the contract before the charter party agreement for *Radiance of the Seas* was finalized.

### H. RCMP's Fourth Breach Argument: Canada versus United States Law in Charter Party Agreements

Finally, the Court briefly addresses RCMP's argument that CCCM failed to require that the governing law and legal jurisdiction for the charter party agreements would be Canada and not the United States, as Ms. Morin demanded. RCMP MSJ Mem. at 38. RCMP contends that Ms. Morin's October 20 changes to the draft charter agreements, *see supra* § I.Z, obligated CCCM to impose the law of British Columbia onto Royal Caribbean and Holland America, instead of U.S. law as the cruise lines had proposed. *Id.* at 38–39.

---

[49] RCMP argues that these ships were close to the threshold and "all had compliant health scores at the time of nomination," while *Radiance of the Sea* had a "significant shortcoming" due to its low score. RCMP Reply at 15–16. As indicated in the text, ships' health scores at nomination were not fundamental to the contract. Moreover, the Canadian Government views any score above 86 as satisfactory, and even a score below 85 "does not mean . . . that the travelling public is exposed to any imminent risk to their health." Health Canada, "Cruise Ship Inspection Program" (Nov. 2, 2011), *available at* http://www.hc-sc.gc.ca/hl-vs/travel-voyage/general/ship-navire-eng.php (last accessed Sept. 9, 2013).

This argument is without merit.  The contract assured RCMP of the right to review charter agreements for compliance with the RCMP/CCCM contract but did nothing to make RCMP a party to the charter party agreements.  RCMP's role was only as a party to a contract with CCCM and a beneficiary of CCCM's charter agreements with the cruise lines.  Ms. Morin confused her position as government contractor with CCCM's position as broker/contractor for cruise lines.  Nothing in the RFP, the Articles of Agreement, or any other contract document addressed venue or jurisdiction for the charter party agreements to be negotiated between RCMP's broker and various cruise lines.  In other words, Ms. Morin (and RCMP) had no legal right to insist on the law or venue to control disputes between RCMP's contractor and its subcontractors.  Her statement—"U.S.A. Jurisdiction: The RCMP contract with Cruise Connections is a Canadian Contract.  Issues arising from that contract are to be resolved by a Canadian Court," E-mail from Normande Morin to Tracey Kelly, RCMP MSJ, Ex. 53 at CCCM13647—failed to recognize that CCCM's charter agreements with the cruise lines were *not* the same as "RCMP contract with Cruise Connections."

RCMP relies on CCCM's response to Ms. Morin's point, which was "AGREED," E-mail Chain Among Normande Morin and CCCM Partners, RCMP MSJ, Ex. 54 at CCCM12022.  Whether CCCM agreed to the legal point or only to raise the issue with the cruise lines is unclear.  The non-lawyers representing CCCM in negotiations, dealing with non-lawyers from RCMP, may not have appreciated the difference between Canadian and U.S. law and venue for any dispute under the charter agreements, but the cruise lines did and flatly refused to agree.  Inasmuch as RCMP did not have a contractual or legal right to insist, the refusal of the cruise lines to agree to terms in a contract to which RCMP was not privy, could not possibly violate the contract between RCMP and CCCM.  Even if CCCM's "AGREED" response established an

obligation breached by CCCM, any such breach dealing with the charter party agreements was not fundamental to the RCMP/CCCM contract, especially in light of the fundamental breach by RCMP of its agreement to pay Canadian taxes assessed against the cruise lines, if any.

## IV.  CONCLUSION

RCMP breached its contract with CCCM by anticipatorily repudiating its obligation to pay Canadian taxes that might be imposed on the cruise lines as a result of the 2010 Olympics charter.  CCCM is not liable to RCMP for any of the contract breaches alleged by RCMP.  Accordingly, CCCM's motion for summary judgment will be granted, and RCMP's cross-motion for summary judgment will be denied.  A trial date for a bench trial on damages will be set at the status conference on October 15, 2013.

A memorializing Order accompanies this Opinion.


DATE: September 9, 2013


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge