UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CRUISE CONNECTIONS CHARTER MANAGEMENT 1, LP and CRUISE CONNECTIONS CHARTER MANAGEMENT GP, INC.,<br><br>         Plaintiffs,<br><br>    v.<br><br>ATTORNEY GENERAL OF CANADA, representing the Royal Canadian Mounted Police; ROYAL CANADIAN MOUNTED POLICE, an agency of the Ministry of Public Safety Canada; and HER MAJESTY THE QUEEN IN RIGHT OF CANADA, the Government of Canada, Royal Canadian Mounted Police, representing the Vancouver 2010 Integrated Security Unit,<br><br>         Defendants. | Case No. 08-CV-02054-RMC |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' TRIAL BRIEF
REGARDING THE DUTY TO MITIGATE UNDER THE CONTRACT**

    Defendants Attorney General of Canada, the Royal Canadian Mounted Police and her Majesty the Queen in Right of Canada (together, the "RCMP") file this opposition to the trial brief submitted by Plaintiffs Cruise Connections Charter Management 1, LP and Cruise Connections Charter Management, GP, Inc. (together, "CCCM"), at the final pretrial conference on November 14, 2013. As will appear at trial, not only did CCCM claim to have the experience needed to perform charter ventures similar to those needed for the 2010 Vancouver Olympics, CCCM had contemplated other alternative projects, but failed to pursue any of them to

completion after the RCMP contract terminated. CCCM's failure to mitigate damages by using its claimed resources to pursue other opportunities should not be assessed against the RCMP.

## I.     CCCM FAILED TO PROTECT ITSELF FROM EXCHANGE RATE RISKS

CCCM knowingly put itself into an exchange rate squeeze. CCCM pursued and signed a contract with the RCMP that was to be paid in Canadian dollars. CCCM then pursued and ultimately signed agreements to pay cruise lines in U.S. dollars. CCCM recognized that it was vulnerable to currency fluctuations no later than September 3, 2008, when its Chief Financial Officer contacted the Royal Bank of Canada to ask, "Can you give me the latest on US vs. Canadian dollar? Do we need to be concerned?" (P. Sloane Dep. Ex. 78 at CCCM003836.) By September 11, 2008, the CFO notified CCCM's partners in an email entitled "Currency Exchange Risk" that "I need to talk with Stevie ASAP. I want to get the latest on the strategy Bank America is using regarding currency values between US/CAD currency. This is VERY important!" (P. Sloane Dep. Ex. 79 at CCCM004231.) That same date, the CFO spoke with the Director of Foreign Exchange at RBC Capital Markets and received *six different options* that CCCM could pursue to hedge its foreign exchange vulnerability. (P. Sloane Dep. Ex. 80 at CCCM005526–27.)

On September 29, 2008, still with no exchange rate plan in place, one of the CCCM partners, Susan Edwards, sought advice from a financial advisor, hoping to close a deal with Royal Bank of Canada on Friday, October 3, 2008. (P. Sloane Dep. Ex. 81 at CCCM005196–97.) Ms. Edwards claimed that CCCM's CFO "has alzheimer's" and that she was starting to "question[] the decisions that the guy was making (is making)." (*Id*.) In response, CCCM was reminded a currency trader and advisor that, "The moment you committed to a fixed US$ payment amount to the Cruise lines without a corresponding US$ payment from the CDN govt you took on the FX [foreign exchange] risk." (*Id*. at CCCM005194.) CCCM was

further advised that, "If you have already committed to pay in US currency and you do not already own that currency (or a forward hedge on it) and the rate fluctuates (as it has) your overall profit from the deal can fall, rise or in lower margin deals be wiped out entirely depending on the direction and size of the rate movements . . . ." (*Id*. at CCCM005194.)

On September 22, 2008, the Royal Bank of Canada sent CCCM an "Acknowledgement of Satisfaction of condition precedent," the so-called "Conditions Precedent" document, among five other documents that required completion. (CCCM004959.) This occurred *before*, and therefore was not affected by, both Normande Morin's September 26 and 30, 2008 letters. The Royal Bank required as a necessary condition for financing that the RCMP sign the Conditions Precedent document to confirm that CCCM had performed all requirements to receive the first payment under the contract with the RCMP. CCCM itself delayed sending that document to the RCMP until October 1, 2008. (Defs. SJ. Ex. 32 at CCCM005434; Defs. SJ Ex. 33 at CCCM005464.) As a result, CCCM could never have closed a financing agreement with the Royal Bank on September 26, 2008, with or without exchange rate protection, because CCCM did not even attempt to complete a necessary element of that financing of which it was aware of *before* September 26, 2008, until *after* September 26, 2008. On October 1, 2008, CCCM's CFO advised all of the CCCM partners that, with respect to the foreign exchange rate, "We are totally helpless to do anything until we at least have the 'Conditions Precedent' document signed by the appropriate person at the RCMP." (P. Sloane Dep. Ex. 80 at CCCM005526.)

The responsibility to finance CCCM's obligations under the contract with the RCMP was CCCM's responsibility alone. The RCMP had nothing to do with the currency

required by the cruise lines in their contracts with CCCM.  Irrespective of any actions by RCMP employees, CCCM's own actions were the proximate cause of its exchange rate woes.

## II.     CCCM CHOSE NOT TO PURSUE OTHER SIMILAR PROJECTS

CCCM, to take it at its word, had both the ability to pursue other similar projects and had actually contemplated other similar ventures in Vancouver during the Olympics, but did not pursue any of them to completion after the contract with the RCMP terminated.  CCCM claimed that it brought "together experts in all aspects of Charter Management," including expert negotiators, an in-house port agent, operations and customer service specialists, ground services, and more. (Plfs.' SJ Ex. 9 at CAN0000069.)  CCCM's management team claimed to have over 100 years of experience in the travel and hospitality industry.  (*Id.* at CAN0000070.)  CCCM claimed that it had "specific expertise in providing Charter Cruise Ships." (*Id.* at CAN00000071.)  CCCM claimed to have arranged more than 60 ship charters, and that it had in the recent past chartered ships for other "similar events to the proposed 2010 Olympics." (*Id.* at CAN00000071.)  CCCM's President, Michael Sloane, alone had chartered "10 Full Ship Charters within the last 40 months," a rate of one charter every four months, and was "renown[ed]" for his ability to meet the administration needs of several simultaneous charters. (*Id.* at CAN00000072.)  Touting its "successful track record" of working with entities such as governments, corporations, and organizing committees, CCCM claimed to be "uniquely qualified" in the area of chartering vessels for large events.  (*Id.* at CAN0000071.)

The President of CCCM stated that his interest in the Vancouver project stemmed originally from a plan to provide luxury hotel space to individuals attending the Olympics.  He testified that there was an opportunity to "make a killing" because "there was such a shortage of hotel rooms, that if we just moved cruise ships in there, that it would be very, very lucrative."

(M. Sloane Dep. 29:8–29:19.) CCCM contemplated positioning ships in Vancouver on its own if it could not resolve its differences with the RCMP:

> IF RCMP does not want the ships – and we still do – I suggest that we would move quickly to secure Ballantyne in our own right with VANOC (not sure what that would look like – Sponsorship, Volunteer workforce beds etc – I imagine VANOC would be interested) – as there would no longer be a hold on the property if the Gov't is not using the ships. We can still use the ships at Ballantyne – but sell retail – which opens a whole other ballgame.

(CCCM006229.) CCCM contemplated leasing at least one other ship to dock at a private pier that CCCM would secure to lease space to private guests. (CCCM009510.)

Colleen Ladwig, formerly of AA Worldwide Travel, testified that, in October 2008, CCCM contemplated using three other cruise ships, beyond those leased for the RCMP. In particular, Ms. Ladwig testified that she had discussed with CCCM the possibility of making use of "[t]he other 2-5 possible ships?" (Ladwig Dep. Ex. 1 at CCCM011889), three of which were not related to the RCMP charter, for repositioning or other cruises:

> Q. (BY MS. LANE) You're also asking about other ships? Correct?
>
> A. Correct.
>
> Q. Were those related to other repositioning cruises?
>
> Ms. Ladwig?
>
> A. I'm sorry?
>
> Q. I'm saying were those rela -- those other two to five vessels, were those related to repositioning cruises and the RCMP project?
>
> A. Yes and no. Some were, some were not.
>
> Q. Please explain that further.
>
> A. I had other interests at the time.
>
> Q. Can you explain a little bit more than that?

What were the other interests?

A. We were talking in general about other projects as well.

Q. What other projects were you discussing?

A. I don't need to go into that. That's not part of this.

Q. Ms. Ladwig, I --

A. That's not part of this.

Q. -- can you answer my question, please?

Which ones were related to the RCMP?

A. Two of them.

Q. Two of the additional two to five ships were related to the RCMP?

A. Correct.

Q. Can you explain what those project -- what projects you were planning on working on related to those two ships?

A. Repositioning cruises.

Q. As of October 16th, 2008.

A. Correct.

Q. Were the other ships related to additional projects with Mr. Kelly, Ms. Edwards and Cruise Connections?

A. Can you repeat that?

Q. The other three ships that you're referring to, were those related to other projects with Cruise Connections?

Ms. Ladwig?

A. Um. Hm. We didn't know at the time. It -- it was a possibility.

Q. Can you explain that further?

What possibility were you talking about with Mister -- with Cruise Connections?

>A. You know, it has nothing to do with this. We were just shooting around some ideas.
>
>Q. What were --
>
>A. It has nothing to do with this case.
>
>Q. What were some of those ideas?
>
>A. It has nothing to do with this case and I'm not going to answer that.
>
>Q. At -- at this point you all were shooting around other ideas --
>
>A. I'm not going to answer it. Drop it.

(Ladwig Dep. at 47:23-50:3.) CCCM and Ms. Ladwig evidently felt there were opportunities to make money with cruise ships — such as CCCM's proposed repositioning cruise — in connection with the Vancouver Olympics that had nothing to do with the RCMP.

CCCM failed to pursue any of these contemplated projects to completion. CCCM thus failed in its duty to mitigate its losses by seeking alternative profit streams. It should not be permitted to shift to the RCMP the cost of its own inactivity.

**III.   CCCM CANNOT HIDE BEHIND ITS SINGLE-PURPOSE STATUS**

CCCM attempts to distinguish *Southcott Estates Inc. v. Toronto Catholic District School Board*, 2012 CarswellOnt 12505, para. 24 (WL), [2012] 2 S.C.R. 675 (Can.) (Pls.' Br. at 4–5), but that case applies well to these facts. There, as here, the plaintiff single purpose entity was closely affiliated with a larger entity engaged in the same business. In order to succeed on its bid to the RCMP, CCCM claimed that its "team brings together experts in all aspects of Charter Management," with a "stellar record of successful Charters," and a "[c]orporate history [that] includes many Similar Scope Charters." CCCM claimed that "With over 60 Cruise Ship Charters to our record, we have the most experience in a full range of clientele, including some very recent and relevant charters for similar events to the proposed 2010 Olympics." (Pls.' SJ

Ex. 9 at CAN0000070–73)  Those other projects included providing "Ships at the Athens Olympics (collective 84 days of Charter Ship)" in 2004, "Ships at the NFL Super Bowl, Jacksonville, FL. (collective 14 days of Charter Ships)" in 2005, "1 Ship Cricket World Cup (collective 30 days of Charter Ship)" in 2007.  (*Id.* at CAN0000071.)  On the cover of its bid, CCCM claimed to be "Your Cruise & Tour Vacation Headquarters Since 1992." (*Id.* at CAN0000065.)  CCCM assured the RCMP that,

> Cruise Connections was founded in 1992 by Mike Sloane.  The business, based in Winston Salem, North Carolina has agents operating coast-to-coast within the continental United States.
>
> Cruise Connections is dedicated exclusively to cruise/land package sales and counseling, and is dedicated to ongoing training to bring to the marketplace the latest in the cruise industry development.  Our overall objective is to provide quality, professional consultation, and planning services for individuals, corporations, associations, and incentive and vacation groups.
>
> In the past 5 years Cruise Connections has focused primarily on full ship charters and large groups and has proved that Cruise Connections is a true leader in that aspect of the industry.

(*Id.* at CAN0000094.)

What, in fact, had been operating since 1992 was Cruise Connections, Inc., a business owned by CCCM's President, Michael Sloane.  CCCM was formed in 2008 as a single purpose entity to pursue the contract with the RCMP.  Like the single-purpose entity in *Southcott Estates*, CCCM is related to another corporation, namely Cruise Connections, Inc.  CCCM or Cruise Connections, Inc. (or both, since CCCM refers to one to show the qualification of the other) claimed a history of pursuing full-ship and large group charters through agents operating coast-to-coast within the continental United States.  CCCM's claims now that it lacked the ability or means to pursue any other ship charter in order to mitigate damages is belied by its

own description of its "stellar record of successful Charters" and "[c]orporate history [that] includes many Similar Scope Charters." (*Id.* at CAN0000071–73.)

As *Southcott Estates* makes clear, the fact that an unusual opportunity did not succeed is not an excuse for failure to pursue another one in order to mitigate damages.

> As a separate legal entity, Southcott was required to mitigate by making diligent efforts to find a substitute property. . . . Southcott is entitled to the benefits of limited liability, but it is also saddled with the responsibilities that all legal entities have. The requirement to take steps to mitigate losses is one such responsibility. A plaintiff cannot recover losses that could reasonably have been avoided.

2012 CarswellOnt 12505, para. 24. Like the plaintiff in *Southcott Estates*, CCCM was obligated as a matter of law to take responsibility to mitigate its damages by using its self-described wealth of resources, as well as those of its affiliate. CCCM failed to do so here, and its claimed damages should be reduced as a result. *Id.* ("As a general rule, a plaintiff will not be able to recover for those losses which he could have been avoided by taking reasonable steps.")

Dated: November 15, 2013

Respectfully submitted,

  /s/ Scott H. Christensen
John M. Townsend, D.C. Bar No. 422674
Scott H. Christensen, D.C. Bar No. 476439
Corinne O. Lane, D.C. Bar No. 992715
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006-2401
Telephone: (202) 721-4600
Facsimile: (202) 721-4646
Email: townsend@hugheshubbard.com
Email: christensen@hugheshubbard.com
Email: laneco@hugheshubbard.com

*Attorneys for Defendants*

62665979_1

9

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2013, I electronically filed the foregoing with the Clerk of the Court for the District Court for the District of Columbia Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have served the foregoing document by First Class Mail for delivery within 3 calendar days, to the following non-CM/ECF participants:

> David J. Mazza
> WOMBLE, CARLYLE, SANDRIDGE & RICE, PLLC
> One West Fourth Street
> Winston-Salem, NC 27101

Dated:  November 15, 2013                    s/ Corinne O. Lane
                                                                Corinne O. Lane