UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Cruise Connections Charter Management 1, ) <br> LP, Cruise Connections Charter ) <br> Management GP, Inc., ) <br> ) <br>      Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> Attorney General of Canada, ) <br> Royal Canadian Mounted Police, and ) <br> Her Majesty the Queen in Right of Canada, ) <br> the Government of Canada, Royal Canadian ) <br> Mounted Police, ) <br> ) <br>      Defendants. ) <br> _____) | Civil Action No. 1:08-CV-02054-RMC |

### PLAINTIFFS' CLOSING BRIEF

This brief summarizes the key evidence presented to the Court during the November 2013 damages trial, provides a calculation of CCCM's damages, and explains the applicable rate for pre-judgment interest.

CCCM's damages fall into three categories: (1) CCCM's lost profit from the RCMP contract; (2) CCCM's lost net onboard revenue profit (OBR); and (3) CCCM's lost profit from the repositioning cruise agreement with AA Worldwide. As is discussed more fully below, the evidence presented at trial shows CCCM's total damages to be $23,067,581, plus interest. For the Court's convenience, an itemization of CCCM's damages proven at trial is set forth in the attached Exhibit A.[1]

---

[1] All amounts in Exhibit A are expressed in US Dollars. The amount of CCCM's contract with RCMP has been converted to US Dollars using the currency exchange rate as of September 26, 2008, per the Court's November 15, 2013 and December 6, 2013 Orders [ECF 88 and ECF 92]. All expenses that would have been paid in Canadian currency have been converted to US Dollars using the average exchange rate for the period in which the expenses were to be incurred. Plaintiff's trial exhibit number 34 shows the months when the expenses would have been paid.

# I.      LOST CONTRACT PROFIT

CCCM's first category of damages is its lost profit from the RCMP contract itself, which is calculated as the contract price less the costs and expenses CCCM would have incurred performing the contract.   RCMP contracted to pay CCCM $55,348,136 (CDN) to provide cruise ships for the Olympics.  [T.T. Day 1, p. 62, Ptf. Tr. Ex. 3.][2]  This contract price converts to $53,482,904 (US) using the September 26, 2008 exchange rate that the Court ruled applies. [ECF 88 and ECF 92]  From this amount, CCCM would have paid $40,406,163 in costs and expenses.  Thus, CCCM's total lost profit on the contract itself is $13,076,741.

CCCM's costs and expenses fall into three categories: (1) the amount that CCCM would have paid to the cruise lines to charter the ships; (2) port related costs that CCCM would have had to pay if RCMP had not breached the contract, and (3) costs and expenses related to operational and administrative aspects of CCCM's performance.  These three categories of costs and expenses will be discussed in turn.

## A.      The Amount That CCCM Would Have Paid To The Cruise Lines To Charter The Ships

The amount that CCCM would have paid the cruise lines to charter the ships is conclusively established by CCCM's charter party agreements with the cruise lines.  [Ptf. Tr. Exs. 4 and 5.]  The Holland America charter party agreement reflects a total price of $12,499,968 (US) to charter the Holland America ship. [T.T. Day 1, p. 65, Ptf. Tr. Ex. 4, p. 1 of 24.]  This total price consisted of $9,440,080 for the charter hire, $651,040 for hotel service charges (gratuities), and a contingent cost of $2,408,848 for guaranteed net onboard revenue ("OBR").[3]  [Ptf. Tr. Ex. 4, pp. 1 and 2 of 24.]

---

[2] The trial transcript is divided up into three volumes, one for each of the three separate trial days. Thus, the trial transcript volumes are identified by trial day and page.  Trial exhibits are identified as Ptf. Tr. Ex. ___ or Dft. Tr. Ex. ____.

[3] The contingent nature of the guaranteed OBR component of the charter price is addressed on pp. 12-13 below, in CCCM's discussion of its lost profit from OBR.  Based upon the evidence at trial, CCCM would have met its OBR obligations and thus realized an OBR profit of $8,738,840.

CCCM's charter party agreement with Royal Caribbean reflects a total price of $25,737,930 (US) for chartering the two Royal Caribbean ships. [T.T. Day 1, p. 67; Ptf. Tr. Ex. 5, at RCCL000003-4.]  This total price consisted of $18,167,100 for the charter hire, $1,240,830 for the hotel service charges, and a contingent cost of $6,330,000 for guaranteed OBR.  [*Id.*]  Added together, the total cost to CCCM for chartering the one Holland America ship and the two Royal Caribbean ships would have been $38,237,898 (US).[4]

### B.     Port Related Costs That CCCM Would Have Incurred If RCMP Had Not Breached The Contract

Stan Webber testified about the port related costs that CCCM would have incurred if it had been permitted to carry out the contract.  Mr. Webber has been in the marine transportation business since 1969, has been a port agent since 1983, and has worked as a cruise line port agent at Ballentyne Pier since 1987.  [T.T. Day 2, pp. 24-25.]  At Ballentyne, he has regularly provided port agent services for Holland America and Royal Caribbean cruise ships, including the very classes of cruise ships that CCCM had contracted to bring to Ballentyne for the Olympics.  [T.T. Day 2, p. 30]  In short, Mr. Webber was highly qualified to provide testimony concerning the port-related expenses for these ships.

If not for RCMP's breach, Mr. Webber would have served as CCCM's port agent during the Olympics.  [T.T. Day 1, p. 48.]  During the course of his work preparing to be CCCM's port agent, Mr. Webber provided CCCM with estimates of the expenses it would have likely incurred performing the contract.  [T.T. Day 2, pp. 26, 38.]  At trial, Mr. Webber testified as follows regarding these expenses:

- Recycling and solid garbage removal: Mr. Webber testified about his familiarity with the requirements for the removal of garbage and recycling from the cruise ships at Ballentyne.

---

[4]  The Court will likely note that Paragraph 6.1 of the Articles of Agreement, parts (j) and (k) obligated CCCM to provide food and non-alcoholic beverages on the ships. (See Ptf. Tr. Ex. 1 at CAN 000146). Those costs are already built into the charter party agreement prices, since both of the charter party agreements included meals within the price of the contracts. [Ptf. Tr. Ex. 4, p. 9, ¶ C; Ptf. Tr. Ex. 5, at RCCL 000007, ¶ 6.]

[T.T. Day 2, pp. 30-31.]  He also testified that he regularly negotiates and arranges garbage and recycling disposal contracts for these ships.  [T.T. Day 2, pp. 28.]  Based on his experience, he estimated that garbage disposal and recycling would have cost CCCM a total of $212,000.  [T.T. Day 2, p. 39.][5]

- Port agent fees:  Mr. Webber was to be CCCM's port agent, and of course he knows the fee he would have charged for his services.  [T.T. Day 1, p. 48; T.T. Day 2, pp. 32-33.]  He testified that his charge would have been $46,000.  [T.T. Day 2, pp. 40-41]

- Embarkation and Disembarkation: Mr. Webber's knowledge of the customary charge for embarkation and disembarkation services comes from the fact that his company provides these services for cruise ships at Ballentyne, including for the classes of ships CCCM chartered for the Olympics.  [T.T. Day 2, p. 32.]  He estimated that embarkation would have cost CCCM $80,000, and that disembarkation would have also cost CCCM $80,000.  [T.T. Day 2, p. 41-42.]  This estimate was based on his understanding that there would have been one embarkment and one disembarkment per ship during the Olympics.  [T.T. Day 2, p. 42.]  That was appropriate because RCMP's contract with CCCM specifically provided that CCCM would be responsible for the costs of only one embarkment and one disembarkment.  [Plaintiff's Ex. 1, at CCCM001095, ¶ F.]

- Water bunkering: Mr. Webber testified that he is familiar with the water bunkering requirements of the classes of ships CCCM chartered for the Olympics, and that he regularly enters into water bunkering contracts for these ships.  [T.T. Day 2, pp. 30-31, 32.]  Based on his experience and knowledge of water bunkering costs, Mr. Webber estimated

---

[5] Phillip Sloane testified that when he received Mr. Webber's estimate of $212,000 for garbage disposal and recycling he mistakenly understood the estimate to be a separate $212,000 charge for each service.  [T.T. Day 2, p. 112.]  Based on this misunderstanding, CCCM included an extra $212,000 in its cash flow projections [Ptf. Tr. Ex. 34], but in light of the testimony at trial, CCCM has combined these services into one $212,000 line item in its damages calculation set forth in Exhibit A.

that CCCM's water bunkering expense for the Olympics would have been $125,000.  [T.T. Day 2, pp. 43-44.]

- Ground services:  Mr. Webber testified that he is familiar with the customary charge for ground services, which his company arranges.  [T.T. Day 2, p. 33.]  Mr. Webber explained that this expense was for transporting passengers between the airport and the pier, and he estimated that this service would have cost $50,000. [T.T. Day 2, p. 53]  RCMP's Donna Kaluza, however, testified that RCMP had its own transportation group that was responsible for shuttling security personnel between the airport and the cruise ships, and that RCMP had no intention of using CCCM's port agent for these services.  [T.T. Day 3, p. 75.] Because Ms. Kaluza's testimony makes it clear that CCCM would not have had to pay for ground services, this expense has not been included in the damages calculation set forth in Exhibit A.

- Vancouver harbor pilots: Mr. Webber also testified that he is familiar with the formula used to calculate the amount charged for harbor piloting.  [T.T. Day 2, pp. 35, 56.]  He indicated that this expense would have been $45,000.  [T.T. Day 2, pp. 54-56.]

- Stevedoring: Unlike the other port expenses listed above, stevedoring was not an expense specifically delineated in the contract as CCCM's responsibility.  (*See* Ptf. Tr. Ex. 1, at CAN000146, ¶ 6.1.)  Nevertheless, CCCM budgeted this expense into its cash flow and profit projections, and CCCM thus includes it as part of the port expenses it would have incurred because, unlike the $50,000 planned for ground services, there was no evidence at trial showing that CCCM would not have paid this expense.  Mr. Webber testified that he has extensive experience negotiating for stevedoring services for cruise ships at Ballentyne, and that he estimated that these services would have cost CCCM $225,000.  [T.T. Day 2, pp. 28-29, 62.]

Mr. Webber showed himself to be credible, knowledgeable, and clearly interested in providing the Court with accurate testimony regarding CCCM's port expenses. He patiently answered all questions posed to him by counsel and the Court, and provided clear bases for all of the expenses about which he testified. In response, RCMP failed to put up a single witness to rebut Mr. Webber's testimony or otherwise challenge his cost estimates. This is quite telling, given that RCMP had five years of litigation in which it could have searched for a witness to rebut Mr. Webber's testimony.

### C.     CCCM's Operational and Administrative Expenses

The Court heard testimony from Phillip Sloane, CCCM's Chief Financial Officer, about operational and administrative expenses that CCCM expected to pay in connection with its performance of the RCMP contract. Mr. Sloane testified that in his role as CFO, he analyzed CCCM's expected income and expenses in order to prepare cash flow projections. [T.T. Day 2, pp. 108-09.] Because the projections were being provided to CCCM's bank, Mr. Sloane took a conservative approach so as to not overstate the project's profit potential. [T.T. Day 2, pp. 110-11.] Consistent with this conservative approach, Mr. Sloane testified that he consulted with experts and conducted his own research in order to arrive at reasonable estimates for the administrative expenses CCCM would face. [*See, e.g.*, T.T. Day 2, pp. 111, 114, 118, 121.]

Using his September 22, 2008 cash flow projection (Ptf. Tr. Ex. 34) as a point of reference, Mr. Sloane testified that he projected the following administrative expenses, and he explained the bases underlying his projections at the pages cited below:

- Forensic accounting: $45,000 [T.T. Day 2, pp. 112-14];

- IT costs: $22,000 [T.T. Day 2, pp. 117-18];

- Insurance: $6,450 [T.T. Day 2, p. 118];

- Travel (airfare): $66,500 [T.T. Day 2, pp. 118-19];

- Legal: $80,000 [T.T. Day 2, p. 119];

- Miscellaneous (for incidental operational expenses) - $100,000 [T.T. Day 2, pp. 119-20]; [6]

- Apartment/office: $70,000 [T.T. Day 2, pp. 120-21];

- Hotel: $32,000[7] [T.T. Day 2, pp. 121-23];

- Per diem: $180,000[8] [T.T. Day 2, pp. 122-23];

- Operations personnel: $150,000[9] [T.T. Day 2, pp. 123-24];

- Site inspections: $6,000 [T.T. Day 2, p. 124];

- Executive assistant: $7,500 [T.T. Day 2, pp. 124-25];

- Letter of credit fees: $647,248 [T.T. Day 2, pp. 125, 137]; and

- Interest on letter of credit: $37,050 [T.T. Day 2, pp. 125, 137.]

---

[6] Mr. Sloane testified that his conservative cash flow projections also included a second $100,000 miscellaneous expense (see Ptf. Tr. Ex. 34, Line 26), the purpose of which was to cover any port-related subcontractor expenses that CCCM may have overlooked.  [T.T. Day 2, pp. 114-115.] However, since Mr. Webber's testimony clearly identified all such subcontractor expenses for which CCCM would have been responsible, the evidence shows that this $100,000 for miscellaneous subcontractor port charges would not have been expended, and this amount is therefore not included in the damages calculation set forth in Exhibit A.

[7] Mr. Sloane testified that his estimated hotel cost assumed that CCCM operations personnel would stay in hotels for a six-month period that included the time when the cruise ships were to be in port, an assumption that he later realized was incorrect.  [T.T. Day 2, pp. 121-22.]  In CCCM's damages calculation set forth in Exhibit A, the hotel cost has been reduced by one month (to $25,600 CDN), reflecting the fact that CCCM's operations personnel would have stayed on the cruise ships at least during February 2010.

[8] Mr. Sloane testified that per diem costs consisted primarily of the cost of putting the partners in hotels for a six-month period that included the time when the ships were going to be in port.  However, as was the case with other operations personnel, the partners were actually going to stay on the ships during the Olympics.  [T.T. Day 2, pp. 122-23.]  Therefore, in CCCM's damages calculation set forth in Exhibit A, the per diem cost has been reduced by one month (to $150,000 CDN), reflecting the fact that the CCCM partners would have stayed on the cruise ships at least during February 2010.

[9] The transcript reflects that counsel misspoke in his questioning of Mr. Sloane and erroneously stated this amount to be $130,000.  However, Mr. Sloane clearly testified that he calculated the operations cost to be $30,000 of wages per employee, for five operations employees.  [T.T. Day 2, p. 123.]  This cost equals $150,000.

Mr. Sloane was the only witness at trial to provide any testimony about the administrative and operational expenses associated with CCCM's performance of the contract. He showed himself to be credible and forthright, and his testimony regarding these expenses was uncontested.

### D. RCMP Presented No Valid Challenge To CCCM's Evidence Regarding Its Expenses

The amount CCCM was to receive from RCMP was set by contract, as was the amount CCCM was to pay to the cruise lines to secure the ships. Therefore, the only room for RCMP to even attempt to reduce CCCM's lost profits on the contract itself would have been to (1) challenge the reasonableness of the expense estimates provided by Mr. Webber and Mr. Sloane and/or (2) show that CCCM failed to include additional expenses it would have had to pay. RCMP failed to do either. This is true even though RCMP promised in opening statement that it would demonstrate how, in its estimation, CCCM "grossly understate[d] its expenses." [T.T. Day 1, p. 23.] Indeed, RCMP claimed that it would be able to use the "actual costs" that RCMP incurred chartering ships for the Olympics as benchmarks for the purpose of challenging CCCM's damages. [*Id.*] However, RCMP failed to provide any meaningful cost benchmarks, and never provided the Court with the "actual costs" it incurred. Moreover, at no point during the trial did RCMP elicit any testimony or introduce any evidence challenging the reasonableness of the expense estimates set forth in CCCM's witness testimony. RCMP also failed to introduce any evidence of additional expenses for which CCCM would have been responsible.

#### 1. RCMP failed to provide a benchmark for comparison with CCCM's expense estimates.

RCMP's attempt to provide expense benchmarks for comparison with CCCM's expense estimates suffered from an essential flaw – RCMP was completely unable, or unwilling, to provide the Court evidence showing the actual costs it incurred when it contracted directly with the cruise lines after breaching the CCCM contract. As part of its pre-trial statement, RCMP identified a number of invoices and other documents presumably tied to port-related costs it incurred during the Olympics.

However, as CCCM demonstrated at trial, this collection of documents was woefully incomplete. [*See, e.g.*, T.T. Day 2, pp. 45, 49, 52, 88-89.] At no point did RCMP explain its failure to provide full documentation, or anything close to full documentation, of its actual expenses. This is true even though Normande Morin, the Director General of Contracting and Procurement for the RCMP [T.T. Day 3, p. 136-37] testified that she has a file containing records showing what RCMP's actual costs were [T.T. Day 3, p. 134], and thus RCMP could have provided that evidence to the Court had it believed doing so would have shown CCCM's cost estimates were low.

Instead of providing the "actual cost" numbers promised in opening statements, RCMP put Ms. Morin on the stand to claim that she "believes" that RCMP's actual port-related costs were reflected in Ptf. Tr. Ex. 26, an undated one-page document produced by RCMP. [T.T. Day 3, pp. 127-129.] This despite the fact that RCMP's counsel had on at least two prior occasions represented to the Court that the document was no more than an "estimate" of RCMP's expenses. [*See* RCMP Pre-Trial Statement, ECF 79, p. 8; T.T. Day 1, pp. 24-25.] Indeed, although Ms. Morin testified during direct examination that she "believed" that the document reflected actual expenses compiled after the Olympics [T.T. Day 3, p. 129], on cross examination Ms. Morin admitted that she had not prepared the document, she did not know whether the numbers reflected on the document were accurate, and she was unable to testify as to what any of RCMP's final, actual costs were. [T.T. Day 3, pp. 131-32, 134-36, 137-38, 140-44, 146.] In the midst of this cross-examination, the Court observed that Ptf. Tr. Ex. 26 could not be a record of RCMP's actual, final expenses [T.T. Day 3, p. 148], and counsel for RCMP was forced to concede to the Court that "it would be a challenge" to discern RCMP's actual expenses from that document [T.T. Day 3, p. 149]. RCMP counsel further admitted that perhaps "none" of the expenses listed on Ptf. Tr. Ex. 26 would have been borne by CCCM. [*Id.*, p. 148.] Having failed to present any evidence of its actual port costs, RCMP has no basis upon which to make a benchmark argument concerning CCCM's port cost estimates. Nor can RCMP claim that the port-related expenses testified to by Mr. Webber are unreasonable. Not only did RCMP fail to offer a witness to challenge Mr.

Webber's testimony about the costs listed on pages 3 to 5, *infra*, but RCMP did not even cross examine Mr. Webber on any of these costs.  [T.T. Day 2, pp. 97-101.]

The same is true with respect to CCCM's administrative expenses testified to by Mr. Sloane. Given that RCMP chartered cruise ships on its own after it breached the contract with CCCM, it must have incurred related operational and administrative expenses that it could have attempted to use as a benchmark for comparison with CCCM's estimated expenses.  However, RCMP failed to put up a single witness to testify about these expenses, and Mr. Sloane's testimony regarding the above-stated expenses was uncontroverted.  Indeed, RCMP did not even attempt to cross examine Mr. Sloane concerning the reasonableness of, or the bases supporting, his cost estimates.  [T.T. Day 2, pp. 134-40.]

**2.      RCMP attempted to claim that CCCM would have been responsible for certain additional expenses not listed in the contract, but the evidence clearly shows otherwise.**

The contract sets forth those port-related expenses that CCCM was to be responsible for paying.  [*See* Ptf. Tr. Ex. 1 at CAN0000146, ¶ 6.1.]  As the Court recognized at trial, other expenses not listed in the contract should have no bearing on CCCM's damages.  [T.T. Day 3, pp. 146-47.] Nevertheless, RCMP tried to identify other expenses that it claimed should be used to decrease CCCM's damages.  These alleged expenses are addressed in turn.

**Janitorial services:**  Nowhere in the contract does it state that CCCM would be responsible for janitorial services at Ballentyne Pier.  As the Court correctly noted, "I don't see how that [janitorial expense] would be billed to the cruise ship in any event.  It's cleaning up the building that belongs to the pier.  It's not in the contract.  Is it?"  MR STRAUCH: "I don't think it is either."  [T.T. Day 3, p. 146.]  While CCCM presented evidence through the testimony of Mr. Webber about the reasonable cost of janitorial services, this was simply a precautionary measure should the Court somehow determine that CCCM was responsible for paying these costs.  The cost of janitorial services should have no bearing on CCCM's damages.

**Security fencing:**  RCMP asserted at trial that CCCM should be responsible for paying for certain security-related items for the period when the ships were in port.  One such item is security fencing.  [T.T. Day 2, pp 99.]  However, security fencing, like janitorial services, is not listed as one of CCCM's expenses in the contract.  Furthermore, RCMP's own witness, Donna Kaluza, testified that when Ballentyne Pier was designated by the Canadian government as a national security venue, funds were appropriated by the government to cover "all related security planning costs" in order "to secure that site to the level that was required."  [T.T. Day 3, pp. 73, 106, 110-11.]  This included funding to erect security fencing.  [T.T. Day 3, p. 107.]  This was unquestionably a Canadian government expense arising from a decision made, after CCCM and RCMP entered their contract, to change the pier into a special security site requiring special security measures.  CCCM should not be held responsible for this fencing cost.

**Traffic control:**  RCMP also attempted to suggest that CCCM should be responsible for paying for traffic control at the pier, in light of the importance of making sure that the security forces could mobilize at a moment's notice should an emergency arise.  [T.T. Day 2, p. 100.]  Again, nowhere in the contract is the cost of traffic control listed as CCCM's responsibility.  Furthermore, Ms. Kaluza testified that the ISU had its own traffic planning unit, which would have been responsible for traffic coordination in the Ballentyne Pier area.  [T.T. Day 3, pp. 107-110.]  This cost is one which would have been paid using security funding appropriated for the site.  [*Id*.]  CCCM provided evidence about the excessive nature of RCMP's traffic control cost estimate only as a precautionary measure, as it did with the janitorial services cost estimate.

**Snow removal:**  Snow removal was another cost that RCMP claimed CCCM should have been responsible for paying.  Similar to traffic control, snow removal was described as an important security concern, since snow at the pier could have negatively impacted the security forces' ability to mobilize quickly in the event of an emergency.  [T.T. Day 2, p. 100-01; T.T. Day 3, p. 76.]  As such, the amount RCMP pre-paid for snow removal logically fits within the category of costs to be paid using the

appropriated security funds.  In any event, snow removal is not listed as one of CCCM's costs in the contract, and this cost should not have any impact on CCCM's damages.  In any case, it did not snow at Ballentyne Pier while the ships were in port, and Mr. Webber testified that he would have never advised CCCM to pre-pay for snow removal.  [T.T. Day 2, pp. 75-76; Ptf. Tr. Ex. 27.]

## II.    LOST ONBOARD REVENUE

### A.    RCMP's Breach Cost CCCM $8,738,840 In Profit From OBR

Onboard revenue consists of the money spent by passengers on food, drinks, shore excursions, sundries, and other items available for purchase on the ship.  [T.T. Day 2, p. 153.]  In addition to the profit it stood to earn from the RCMP contract itself, RCMP's breach deprived CCCM of $8,738,840 in profit it would have earned from OBR during the charter.  [T.T. Day 2, p. 175, Ptf. Tr. Ex. 12.]

#### 1.    CCCM's OBR guarantees to the cruise lines during the Olympics were a contingent cost which it could recoup if the guaranteed amounts were met.

CCCM guaranteed Holland America that it would receive $2,408,840 in OBR, and guaranteed Royal Caribbean that it would receive $6,330,000.  [T.T. Day 1, pp. 75, 80.]  These OBR guarantees constituted a contingent cost for CCCM, which it would have to pay only to the extent it failed to generate the guaranteed OBR amount during the charter.  [T.T. Day 1, pp. 78-80, 82-83.]  Here is why the OBR guarantee was a contingent cost to CCCM, and why every dollar generated in OBR on the ships, up to the total OBR guarantee amount, translated into profit for CCCM.  When RCMP paid CCCM the contract price, CCCM was to set aside $8,738,840 (the total OBR guarantee amount promised to the cruise lines, in aggregate) from the RCMP payment in a separate account.  That money would potentially be paid to the cruise lines.  If, however, the OBR generated during the charter period was equal to or greater than the $8,738,840 OBR guarantee, then CCCM would never have to pay the cruise lines any of the $8,738,840 from the set aside account, because the cruise lines had already recovered their guaranteed OBR amount.  In this situation, CCCM would get the keep the full $8,738,840, removing it as a cost to CCCM, and thus making the full amount profit on CCCM's

bottom line.  If, however, CCCM only generated $6,000,000 in OBR on the two ships, then CCCM would have to pay the cruise lines $2,738,840 to fulfill the OBR guarantee, since the cruise lines had already recovered $6,000,000 of the guaranteed $8,738,840.  The $6,000,000 that CCCM would not have to pull out of its set aside account and pay to the cruise lines was CCCM's to keep, thus removing that $6,000,000 from CCCM's costs, and turning it into profit.  [T.T. Day 1, pp. 75-83; Ptf. Tr. Ex. 4 at p. 3 or 24, ¶ 6; Ptf. Tr. Ex. At RCCL 000003-4, ¶ 3.c.][10]

### 2. CCCM would have easily exceeded the amount of OBR it guaranteed to the cruise lines.

The testimony of CCCM's OBR expert, Adam Snitzer, shows that CCCM would have had no problem meeting and exceeding its guaranteed OBR goals.  Mr. Snitzer is highly qualified through his training and experience to provide his opinions on OBR in this case.  Mr. Snitzer currently runs his own consulting firm, Peak Revenue Performance, which assists cruise lines with pricing and revenue management strategies.  [T.T. Day 2, p. 142.]  Mr. Snitzer has an MBA from New York University, and since 1995 he has worked in revenue management in the cruise industry and travel industry.  [T.T. Day 2, pp. 144-48.]  Over the years he has worked for a number of cruise lines, including Royal Caribbean, Norwegian Cruise Lines, and various cruise line brands within the Carnival Corporation, including Holland America. [*Id.*]  At these cruise lines, he served as director of revenue management and chief revenue management officer, with responsibilities for pricing, forecasting, and managing cruise ship revenues, including estimating and forecasting OBR.  [T.T. Day 2, pp. 145-47.]  As a result, Mr. Snitzer developed expertise in the various methodologies used to estimate and predict OBR.  At trial, he provided the Court with probative testimony regarding the OBR CCCM would have earned to a reasonable degree of probability in his field.  [T.T. Day 2, pp. 149-50.]  Tellingly, at the time of

---

[10] This explanation, while accurate, oversimplifies the OBR guarantee structure, but only in a way that does not ultimately affect CCCM's damages.  The explanation does not discuss the fact that CCCM had to deposit half of the OBR guarantee with the cruise lines before the Olympics.  An accounting between CCCM and the cruise lines following the Olympics would have taken the deposit into consideration, effectively making the OBR guarantee structure operate precisely as indicated in the above explanation.

trial, RCMP had known for years that CCCM was claiming millions of dollars in lost OBR profits, yet RCMP failed to produce any expert to challenge Mr. Snitzer's methodology or opinions.

Mr. Snitzer's OBR profit calculations began with an analysis of the amount of OBR Royal Caribbean and Holland America would expect to make on a typical cruise.  [T.T. Day 2, pp. 155-58, Ptf. Tr. Ex. 9.]  He then considered how each component of OBR would be different during the Olympics than for a typical cruise.  [T.T. Day 2, pp. 158-60.]   In order to compare, Mr. Snitzer reviewed, among other things, the charter party agreements between CCCM and the cruise lines, CCCM's contract with RCMP, and deposition testimony from RCMP witnesses describing RCMP's intention to create a relaxing, morale-building atmosphere on the cruise ships.  [T.T. Day 2, pp. 155, 159, Ptf. Tr. Ex. 10.]  Mr. Snitzer determined that certain onboard venues would be expected to generate less revenue than a typical cruise.  For example, during a typical cruise, casino revenue would be expected to comprise 20% of OBR, but since CCCM's contract with RCMP called for the casinos to be closed, Mr. Snitzer included no casino revenue in his OBR calculation.  [T.T. Day 2, p. 158, Ptf. Tr. Ex. 9.] Other venues, such as spas and shops would also generate less revenue than on a typical cruise, though they would not be completely eliminated.  [Ptf. Tr. Ex. 9.]

On the other hand, some onboard venues, such as bars, would have been expected to generate higher revenue than during a typical cruise.  [T.T. Day 2, p. 159, Ptf. Tr. Ex. 9.]  Bar revenue would have been higher because the occupants of the ship were mostly males of drinking age, which typically increases the amount of revenue a ship generates from alcohol sales.  [*Id.*]  Another factor leading Mr. Snitzer to assume higher bar revenues is the fact that the RCMP personnel on the ship would not have been travelling with spouses or family. In fact, RCMP personnel were not permitted to select their roommates, and instead were bunking with strangers.  [T.T. Day 3, pp. 103-04.]  This would encourage passengers to spend their free time outside of their rooms, and since the casinos were to be closed, the bars and lounges would be essentially the only places on the ships to unwind and socialize.  [*Id.*]  Furthermore, if there were good bars open on the ships, RCMP personnel would have been highly

incentivized to purchase after work drinks on the ships, rather than trekking into Vancouver.  As Ms. Kaluza testified, the personnel were forbidden to go to a bar or even drink while in uniform, so they were required to come back to the ship following their shifts and change before engaging in any after work drinks.  [T.T. Day 3, pp. 113-14.]  Bud Mercer, who was the Chief Operating Officer for the Vancouver 2010 ISU during the Olympics, testified at deposition that it was his intention that security personnel drink in the controlled environment of the ships, as opposed to patronizing any of the bars in the immediate area surrounding Ballentyne Pier, an area known for prostitutes and open drug use.  [Mercer Dep., pp. 58-59; *see also* T.T. Day 1, p. 120]  Stan Webber also described the area near the cruise ships as "very depressed," with "lots of narcotics," and "unsavory pubs."  [T.T. Day 2, p. 96.]  If the RCMP personnel wanted to unwind in the more inviting neighborhoods of the city, they dealt with either a long walk to catch the city bus, or an even longer walk into the city itself.  [*Id*.]  Mr. Webber described taxi service during the Olympics as a "nightmare."  [*Id*.]

These factors all support Mr. Snitzer's opinion that OBR for the three ships would have reached $49.84 per available lower berth day (ALBD) during the course of the Olympics.  [T.T. Day 2, p. 175, Ptf. Tr. Ex. 9.]  By multiplying $49.84 by the ALBDs on the ships,[11] Mr. Snitzer determined that approximately $9.06 million in OBR would have been generated during the time the ships were in port in Vancouver.  [T.T. Day 2, p. 175, Ptf. Tr. Ex. 12.]

In addition to OBR while the ships were in port, CCCM also lost the opportunity to earn OBR during repositioning cruises.  Using the same methodology described above, Mr. Snitzer testified that passengers on the repositioning cruises would have been expected to spend $41.33 per ALBD on the various onboard venues.  [T.T. Day 2, pp. 172-73, Ptf. Tr. Ex. 11.]  Multiplying this number by the

---

[11] The Holland America ship had 55,088 ALBDs (1,252 beds x 44 days) and the Royal Caribbean ships had 126,600 ALBDs (4,220 beds x 30 days).  The total ALBDs for the Olympic games during port is therefore 181,688.

ALBDs on the repositioning cruises,[12] Mr. Snitzer determined that approximately $410,000 in OBR would have been generated during the repositioning cruises.[13]  [T.T. Day 2, p. 175, Ptf. Tr. Ex. 12.]

All told, Mr. Snitzer testified that the cruise ships chartered by CCCM would have been expected to generate approximately $9.47 million while in port and during the repositioning cruises. This amount would have easily exceeded the amount of OBR CCCM had guaranteed to the cruise lines.

Mr. Snitzer's $9.47 million figure is based on the assumption that the cruise ships would have been full while in port for the Olympics.  [T.T. Day 2, p. 175.]  CCCM presented two bases supporting this assumption.  First, its contract with RCMP called for one embarkation of passengers at the beginning of the Olympics and one disembarkation of passengers at the end.  [T.T. Day 1, pp. 57-59, 100; Ptf. Tr. Ex. 1, at CCCM001095, ¶ F.]  Second, Kelly Meikle the contracting authority who signed the contract with CCCM on behalf of RCMP, made representations to CCCM that the ships would full. [T.T. Day 1, pp. 57-59.]  In fact, the RCMP required a contract amendment to increase the size of the ships because under the original contract "they had not secured enough nights or berths for their planned troops."  [T.T. Day 1, pp. 61-62.]  Despite the fact that Ms. Meikle signed a contract calling for one embarkation and one disembarkation and made representations to CCCM that the ship would be full, it is apparent that RCMP's accommodation plan changed after Ms. Meikle was replaced with the contracting regime that subsequently breached the contract with CCCM.  Nevertheless, the evidence at trial shows that the deal CCCM struck with RCMP called for full ships during the course of the Olympics.

---

[12] The repositioning cruises were to take place on the Holland America ship, which had a capacity of 1,252 passengers.  This ship was to be used for two four-Day repositioning cruises, so there were a total of 10,016 ALBDs for the repositioning cruises (1,252 beds x 8 days).

[13] While the transcript reflects that Mr. Snitzer erroneously stated that OBR for the repositioning cruise was "$41,000," it is clear that he intended to multiply 10,016 ALBDs by $41.33 PPPD, which would actually come to $413,961.28 [T.T. Day 2, p. 175, ll. 15-20.]

However, should the Court determine that notwithstanding the contract and representations of RCMP, the ships would not have been used at 100% capacity in any event, then CCCM requests the Court apply the alternative OBR calculation provided by Mr. Snitzer.  [T.T. Day 2, p. 181, Ptf. Tr. Ex. 13.]  As he testified, Mr. Snitzer derived his alternative calculation by analyzing the actual ship utilization during the Olympics as reflected in documents produced by Carnival Cruise Lines and Holland America.[14]  If it is assumed that the ships would have been utilized at a similar rate had CCCM been allowed to perform under the contract, Mr. Snitzer opined that OBR generated on the ships would have decreased from $9.47 million ($8.74 million would have been profit for CCCM, for the reasons discussed above) to $6.74 million.  [*Id.*]  Under this alternate scenario, CCCM's profit from OBR would decrease from $8.74 million to $6.74 million.

### B.      RCMP has no basis to make a benchmark argument regarding CCCM's OBR profit loss

RCMP improperly seeks to make a benchmark argument to challenge CCCM's OBR damages. Specifically, RCMP seeks to argue that OBR generated by Holland America and Carnival Cruise Lines, with whom RCMP contracted directly after breaching the contract with CCCM, provide a benchmark against which CCCM's OBR projection should be compared.   However, RCMP's benchmark argument fails, because RCMP offered nothing to prove that the OBR program put in place by Holland America and Carnival were at all similar to the operation planned by CCCM.  *See Tercon Contractors Ltd. v. British Columbia*, 1994 CarswellBC 2971 (The Court accepted profit estimates of nonbreaching party as opposed to using substitute contractor's actual results, noting "[t]he wider the diversity between the methods and means of the two contractors, the more compelling becomes the argument to use the [plaintiff's] own estimate."  The Court also noted that "it would be an error to

---

[14]  The documents produced by the Carnival and Holland America reflected a utilization rate of approximately 70%. [T.T. Day 2, p. 181.]  Mr. Snitzer's alternative OBR calculation continues to use revenue of $49.84 per ALBD.

assume that [the nonbreaching party] would have carried out the work in the same fashion as [the substitute contractor].")

Tracey Kelly, CCCM's managing partner, testified that CCCM planned to make the security personnel's time on the ship as memorable as possible.  [T.T. Day 1, pp. 83-89.]  Indeed, this was in keeping with the intentions of RCMP, as communicated to CCCM by RCMP's Kelly Meikle, Michael Day, Donna Kaluza, and Bud Mercer [T.T. Day 1, pp. 83-84, 120], and as Kaluza, Mercer and Kevin DeBruyckere testified to in their depositions, which were offered at trial.  [Mercer Dep., pp. 58, 66-67; Kaluza Dep., p. 79; DeBruyckere Dep., pp. 89-94.]  CCCM planned a number of appealing programs and amenities designed to maximize the enjoyment factor for the security personnel, which at the same time would maximize OBR.  [*Id.*]  These included spa, laundry, and internet services, ship-wide theme nights, specialty dinners, cocktail parties, shore excursions and tours of the local Vancouver attractions.  [T.T. Day 1, pp. 85-88.]  Indeed, CCCM was planning to offer multiple shore excursions to RCMP personnel that they could enjoy on their numerous days off, including excursions to be spectators at Olympic events.  [T.T. Day 1, pp. 86-87.]  Because the RCMP personnel were not permitted to leave the district that contained the Olympic venues even during breaks of four consecutive days off [T.T. Day 3, pp. 54-55, 92], the RCMP personnel were quite available to partake in these shore excursions, which "they certainly could take advantage of if they wished."  [T.T. Day 3, p. 90.]

From an expertise standpoint, Mr. Kelly and the other members of the CCCM team had years of experience in the cruise industry, and in particular had experience chartering other affinity cruises similar to the RCMP cruise.  [T.T. Day 1, pp. 42, 46, 83, 88-91.]  As a result, CCCM fully understood the importance of OBR and the means to best market and promote revenue venues so as to tap their full potential.   As for incentive, as discussed above, the OBR guarantees built into CCCM's agreements with the cruise lines made it crucial to CCCM's bottom line that it maximize OBR.  Every

dollar spent on OBR was a dollar that CCCM did not have to pay to the cruise lines, and instead got to keep as profit.

In its opening statement, RCMP suggested that CCCM's OBR projections were unrealistic, and as principal support for this proposition RCMP pointed to the actual OBR spend from the three cruise ships that were ultimately used by RCMP after it breached the contract with CCCM. [T.T. Day 1, p. 17.] This comparison fails.

First, it is improper to use the actual OBR spend from the 2010 Olympics as a benchmark because the scope of the project had obviously changed from the one CCCM had contracted to perform. In the first instance and as discussed above, occupancy during the RCMP's charter was significantly lower than the full occupancy that had been contemplated under CCCM's contract resulting in an obvious decease in OBR spend.

Second, the actual OBR spend fails to provide an accurate benchmark for what CCCM would have received because it is clear that the cruise lines did not make anything close to the same effort CCCM would have made to maximize OBR. Full OBR profit was already built into the underlying cost of the RCMP's contract with the cruise lines [T.T. Day 3, pp. 32-33], and thus the cruise lines had already made their OBR money by including it within the charter hire.[15]  [Id.].

That the cruise lines lacked further incentive to pursue OBR is made patently clear within the OBR documents produced by Holland America. Mr. Kelly reviewed the OBR reports produced for the Statendam and as a former worldwide vice president of sales for Holland America is intimately

---

[15] In all, CCCM's agreements with the cruise lines called for total payments of $38,237,898, which included $8,738,840 in guaranteed OBR that CCCM could recoup depending on the success of its OBR programs. [T.T. Day 1, pp. 78-79, 81-82, Ptf. Tr. Ex. 4, 5.] On the other hand, RCMP's charter party agreements called for total payments of $46,000,000 to the cruise lines, with no provisions for any reimbursement to RCMP based on the amount of OBR generated on the ships. [T.T. Day 1, pp. 103-105, Ptf. Tr. Ex. 6 at CAN0002479, CAN0002509, and CAN0002538.] The difference of at least $7,762,102 makes it clear that when dealing with RCMP, the cruise lines built in the amount of money they would have expected to make on OBR, and therefore and no incentive to make any efforts to maximize OBR during the Olympics. Mr. Snitzer also testified that he performed this analysis and concluded that OBR had been included in the charter hire between RCMP and the cruise lines. [T.T. Day 3, pp. 32-33.]

familiar with the reports.  Furthermore, from his time at Holland America, Mr. Kelly is familiar with the Statendam and its configuration, had previously chartered the ship, and was on the ship's inaugural cruise.  [Day 1, pp. 96-97' Ex. F to the Deposition of Jason Ross at CCCM014940.]  Mr. Kelly testified that the OBR reports reflect that there was no budget allocated for selling OBR on the ship during the Olympics, and thus show that Holland America devoted no resources whatsoever to promoting any of the ship's OBR venues.  [Day 1, p. 95, Ex. A to the Deposition of Jason Ross at CCCM014797.]  Moreover, Mr. Kelly testified that of the 20 to 25 bars on the ship, only three bars were actually open during the Olympics.  [*Id.*]  One bar was at the front of the ship, another was in the middle of the ship, [Day 1, p. 97], and a third bar was at the rear of the ship outdoors near the pool – hardly the ideal venue for a relaxing drink during the winter in Vancouver.

If RCMP wanted to establish the Holland America and Carnival OBR reports as valid benchmarks, it was obligated to offer evidence proving that the cruise lines' program, if any, to offer and promote OBR opportunities was similar to what CCCM planned to offer and promote.  RCMP did nothing to carry this burden.  Instead, it simply provided the naked cruise line OBR reports, authenticated through employee depositions conducted at the eleventh hour, that contain almost no information regarding the circumstances and events that generated the actual OBR spend.[16]  Because there is no valid benchmark comparison, the cruise lines' actual OBR results should have no bearing on CCCM's damages.

## III.    LOST PROFIT FROM SALE OF REPOSITIONING CRUISES

The final category of CCCM's damages is the amount of profit it lost from the sale of repositioning cruises prior to and following the Olympics.  Tracey Kelly testified that CCCM had an agreement with AA Worldwide to sell repositioning cruises on the Holland America Statendam.  [T.T. Day 1, p. 106.]  Colleen Ladwig, the principal of AA Worldwide, a travel agency that had secured

---

[16] The only information that may be probative is the number of ALBDs that took place during the Olympics as discussed above in the context of Mr. Snitzer's conclusions.

groups who were interested in purchasing the repositioning cruises, confirmed that she had an agreement with CCCM regarding those cruises. [Ladwig Dep. pp. 12, 14-15.] Under that agreement CCCM would have earned $1,252,000 from these cruises. [T.T. Day 1, pp. 124, 190; Ladwig Dep. p. 21.]

CCCM's charter party agreement with Holland America allowed it to sell cruises to passengers for the four-day sail from San Diego to Vancouver prior to the Olympics, and again for the four-day sail back to San Diego following the Olympics. [T.T. Day 1, p. 106; Ladwig Dep. p. 27.] In order to sell these cruises, CCCM worked out an agreement with AA Worldwide. [T.T. Day 1, p. 107; Ladwig Dep. p. 27.] Although RCMP breached its contract with CCCM before CCCM could reduce its agreement with AA Worldwide to writing, there was an oral agreement between CCCM and AA Worldwide. [T.T. Day 1, p. 107; Ladwig Dep. pp. 12, 14-15.] The parties agreed that AA Worldwide would sub-charter the ship from CCCM and sell the repositioning cruises to the public. [T.T. Day 1, p. 107; Ladwig Dep. pp. 16-17.] AA Worldwide was to pay CCCM $125 per person per day to sub-charter the Statendam for eight days. [T.T. Day 1, pp. 108-10, 190; Ladwig Dep. p. 21.] The Statendam holds 1,252 passengers, so this sub-charter fee would have yielded CCCM $1,252,000 in profit. [T.T. Day 2, pp. 12-13; T.T. Day 1, pp. 124, 190.][17]

## IV.   INTEREST

Contrary to the RCMP's assertion from its pre-trial statement, British Columbia's Court Order Interest Act ("COIA") does not govern the proper amount and rate of pre-judgment interest. Under the express provisions of the COIA, the statute is not applicable when "there is an agreement about interest between the parties." R.S.B.C. 1996, c. 79, § 2(b). *See also Fast Trac Bobcat & Excavating Service v. Riverfront Corporate Centre Ltd.*, 2009 BCSC 840 at ¶¶ 31-36 (finding the rate of interest agreed upon

---

[17] Ladwig confirmed that she had an agreement with CCCM to pay $125 pppd, but her memory was imprecise and she thought the deal could have actually been as much as $150 pppd. [Ladwig Dep. p. 21.] Mr. Kelly outlined the particular components of the price during his trial testimony. [T.T. Day 2, pp. 12-13.]

by the parties in their written contract was applicable and refusing to apply COIA); Interest Act, R.S.C. 1985, c. I-15, § 2 (allowing parties to agree on an applicable rate of interest).

In the present case, the parties agreed that interest would be calculated at three percent (3.0 %) per year above the average bank rate[18] in effect for the calendar month immediately preceding the date of payment.  [Ptf. Tr. Ex. 1, at CAN007118-19, ¶ 14]**.**  Accordingly, the Court's judgment should state that pre-judgment intent is awarded at a rate equal to a rate 3.0% higher than the average Bank Rate for the month preceding the date the Government of Canada pays the judgment.

Further, pre-judgment interest should be awarded from September 27, 2008 to the date of payment.  This is because the parties agreed that interest would begin accruing on the first day following the date upon which payment became due.  When RCMP breached the contract on September 26, 2008, CCCM immediately became entitled to payment under the contract.

Should the Court somehow decide not to give effect to the contractual provision concerning interest, neither the COIA nor British Columbia case law dictate that CCCM should be limited to the pre-judgment interest rate set by the Registrar.  In *Hardwoods Specialty Products LP v. Rite Style Manuf.*, 2006 BCCA 139, the British Columbia Court of Appeal noted that the rates set by the Registrar are "only rates of convenience to trial judges" and that "[i]n a commercial case the Registrar's rates might not be appropriate." *Id.* at ¶ 17.  As a result, the Court determined that "the rate fixed by the Registrar at any given time should not be seen to be a default rate with respect to disputed claims." *Id.*  In determining that the wronged party should receive interest at a rate of 5% (where the Registrar's rate had fluctuated between 2.25% and 3%), the Court made note of the fact that the wronged party was delayed for a long period of time in getting the money owed to it, and had lost the opportunity to earn interest on the money. *Id.* at ¶18. *See also Domtar Inc. v. Univar Canada Ltd.*, 2012 BCSC 510 at ¶11 ("The approach taken by the Court of Appeal [in *Hardwoods*] makes sense, as it is obvious that where a commercial party is deprived of money to which it was entitled, it would

---

[18] http://www.bankofcanada.ca/rates/interest-rates/canadian-interest-rates/ (last visited Jan. 21, 2014).

have either earned interest or paid interest on borrowed funds.")  Similarly, while compound interest is generally not granted under the COIA, compound interest is available in breach of contract cases "where there is evidence that the parties agreed, knew, or should have known, that the money which is the subject of the dispute would bear compound interest as damages."  *Bank of America Canada v. Mutual Trust Co.*, 2002 CarswellOnt 1114, at ¶55.

Here, CCCM should have received its first payment from RCMP nearly five years ago.  In that time, CCCM has been completely deprived not only of the opportunity to use the funds, but also to earn interest on the funds.  If not for RCMP's breach, CCCM would have deposited its profits into a bank account where the money would have earned compound interest.  [T.T. Day 2, p. 335]  RCMP knew, or should have known, that the money it was to pay to CCCM would have drawn compound interest, since the contract required it to directly deposit CCCM's funds into a bank account via wire transfer.  [Ptf. Tr. Ex. 1 at CCCM 001093.]  Therefore, CCCM requests that if the Court decides not to give effect to the contract provision regarding interest, that the Courtuse its discretion to grant interest at the prime rate, which would be a more equitable interest rate to use in this case.  According to the Federal Reserve, the average daily prime rate since September 26, 2008 is 3.29%[19]  Furthermore, CCCM requests that interest be compounded monthly.

## V.    CONCLUSION

CCCM respectfully requests that the Court enter judgment in CCCM's favor in the amount of $23,067,581 (US) and award pre-judgment interest at a rate equal to 3.0 % higher than the average Bank Rate during the month prior to payment of the judgment or, in the alternative a rate of 3.29 % compounded monthly.

Respectfully submitted this the 21st day of January, 2014.

---

[19] http://www.federalreserve.gov/releases/h15/data.htm (last visited Jan. 21, 2014).

/s/ Jack M. Strauch
_____
Jack M. Strauch
*Admitted Pro Hac Vice*
N. C. State Bar No. 22341
Stanley B. Green
*Admitted Pro Hac Vice*
N. C. State Bar No. 25539
Jessie C. Fontenot, Jr.
*Admitted Pro Hac Vice*
N. C. State Bar No. 40597
Strauch Green & Mistretta, PC
530 North Trade Street, Suite 303
Winston-Salem, NC 27101
Telephone:  (336) 837-1061
Facsimile:  (336) 725-8867
jstrauch@sgandm.com
sgreen@sgandm.com
jfontenot@sgandm.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he is an attorney at law admitted pro hac vice to practice in the United States District Court for the District of Columbia for this case, is attorney for plaintiff, and is a person of such age and discretion as to be competent to serve process.  That on January 21, 2014, he personally delivered and electronically filed a copy of the foregoing **PLAINTIFFS' CLOSING BRIEF** with the Clerk of Court using the CM/ECF system which will electronically notify counsel hereinafter named:

John M. Townsend, Esq.
Scott H. Christensen, Esq.
Corinne Lane, Esq.
Hughes Hubbard & Reed, LLP
1775 I Street, NW, Ste. 600
Washington, DC 20006-2402
townsend@hugheshubbard.com
christensen@hugheshubbard.com
lanec1@hugheshubbard.com

/s/ Jack M. Strauch
Jack M. Strauch
*Admitted Pro Hac Vice*
N. C. State Bar No. 40597
Strauch Green & Mistretta, PC
530 North Trade Street, Suite 303
Winston-Salem, NC 27101
Telephone:  (336) 837-1061
Facsimile:  (336) 725-8867
jstrauch@sgandm.com

*Attorneys for Plaintiffs*