UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CRUISE CONNECTIONS CHARTER
MANAGEMENT 1, LP and CRUISE
CONNECTIONS CHARTER MANAGEMENT
GP, INC.,

Plaintiffs,

v.

ATTORNEY GENERAL OF CANADA,
representing the Royal Canadian Mounted
Police; ROYAL CANADIAN MOUNTED
POLICE, an agency of the Ministry of Public
Safety Canada; and HER MAJESTY THE
QUEEN IN RIGHT OF CANADA, the
Government of Canada, Royal Canadian
Mounted Police, representing the Vancouver
2010 Integrated Security Unit,

Defendants.

Case No. 08-CV-02054-RMC

## DEFENDANTS' CLOSING TRIAL BRIEF

John M. Townsend, D.C. Bar No. 422674
Scott H. Christensen, D.C. Bar No. 476439
Corinne O. Lane, D.C. Bar No. 992715
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006-2401
Telephone:  (202) 721-4600
Facsimile:  (202) 721-4646
Email:  townsend@hugheshubbard.com
Email:  christensen@hugheshubbard.com
Email:  laneco@hugheshubbard.com

February 3, 2014

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

ARGUMENT ...................................................................................................1

I.     CRUISE CONNECTIONS' ON BOARD REVENUE CLAIMS ARE
EXAGGERATED.................................................................................2

      A.     Cruise Connections' On Board Revenues Expectations Are
Inflated.................................................................................2

           1.     Cruise Connections Did Not Take Into Account that the
Ships Were Not Full Every Day ......................................3

           2.     Cruise Connections Valued the Vessels as a Vacation
Destination, not Basic Housing.......................................4

      B.     Cruise Connections' Contemporaneous Estimates of On Board
Revenue Were Lower .................................................................8

      C.     Cruise Connections' Current Estimates Are Based on Conjecture
Regarding the Spending Habits of Security Personnel .............9

      D.     On Board Revenue Reduction ..................................................10

II.     CRUISE CONNECTIONS' RELOCATION CRUISE EXPECTATIONS
ARE SPECULATIVE..........................................................................11

      A.     Cruise Connections and AA Worldwide Travel Never Agreed On
A Contract................................................................................11

           1.     There Was Never an Agreement.....................................11

           2.     Cruise Connections' and AA Worldwide's Current
Recollections of the Nature of Their Agreement Are
Entirely Different ...........................................................12

      B.     AA Worldwide Travel Was a Questionable Business Partner...13

III.     CRUISE CONNECTIONS OMITS EXPENSES ..................................14

      A.     Cruise Connections Has Failed to Include the Cost of the Letter of
Credit........................................................................................14

      B.     Cruise Connections Has Failed to Include the Salary That Would
Have Been Owed to Phillip Sloane..........................................15

IV.     CRUISE CONNECTIONS UNDERESTIMATES OTHER COSTS..................15

## Table of Contents
### (Continued)

**Page**

    A.    Many Of Cruise Connections' Estimates Are Lower Than Would Have Been Incurred ...................................................................15

        1.    Recycling and Garbage Removal....................................................15

        2.    Snow Removal ................................................................................16

        3.    Water Bunkering ............................................................................16

    B.    Cruise Connections Removed Other Costs From Its Closing Brief ..........16

        1.    Ground Services..............................................................................16

        2.    Miscellaneous ................................................................................17

        3.    Hotel and Per Diem........................................................................17

V.    CRUISE CONNECTIONS FAILED TO MITIGATE ITS DAMAGES ..............17

VI.    NO INTEREST RATE IS SPECIFIED IN THE AGREEMENT BETWEEN CRUISE CONNECTIONS AND THE RCMP ................................20

VII.    SUMMARY JUDGMENT RECORD ................................................................22

VIII.    DAMAGES DETERMINATION........................................................................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Battrum v. MacKenzie*, 2010 CarswellBC 2417 (Can. B.C.S.C.) (WL) .......................................21

*Eastwalsh Homes Ltd. v. Anatal Devs. Ltd.* 1993 CarswellOnt 587 (Can. Ont. C.A.) (WL) ..........2

*Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854) ...........................................................2

*Janiak v. Ippolito*, 1985 Carswell Ont. 809 (Can. S.C.C.) (WL).....................................................20

*Onta Holdings Inc. v. Bonosusatya*, 1998 CarswellBC 1968 (Can. B.C.S.C.) (WL) ...................20

*Southcott Estates Inc. v. Toronto Catholic District School Board*, 2012 CarswellOnt
12505 (Can. S.C.C. 2012)..................................................................................................17, 18

*Teal Cedar Products v. British Columbia (Forets)*, 2013 CarswellBC 2954 (Can. S.C.C.)
(WL) .......................................................................................................................................21

*Tercon Contractors Ltd. v. British Columbia (Minister of Transportation and Highway)*,
2006 CarswellBC 730 (Can B.C.S.C.) (WL)...........................................................................3

*Tercon Contractors Ltd. v. British Columbia*, 1994 CarswellBC 3335 (Can. B.C.S.C.)
(WL)........................................................................................................................................20

*Trozzo Holdings v. M.V.S. Construction*, 2002 CarswellBC 2628 (Can. B.C.S.C.) (WL)...........21

*Van Snellenberg v. Cemco Electric Manufacturing Co.*, 1946 CarswellBC 128 (Can.
S.C.C. 1946) ...........................................................................................................................20

### STATUTES AND RULES

Court Order Interest Act, R.S.B.C. 1996, c. 79 ....................................................................19, 20

Crown Liability and Proceeding Act, R.S.B.C. 1996, c. 79 ..........................................................19

62845610_3

Defendants Attorney General of Canada, Royal Canadian Mounted Police, and Her Majesty the Queen in Right of Canada (together "RCMP") submit this Closing Trial Brief pursuant to the Court's Order of November 20, 2102.

As the Court directed (Trial Tr. vol. 3, 164:14–20, Nov. 20, 2013), this Closing Trial Brief also addresses certain factual issues that were shown by the summary judgment briefing to be in dispute between the parties, to the extent that such issues would bear on the Court's ruling on damages.  This Closing Trial Brief does not otherwise address the factual and legal conclusions stated by the Court in its September 9, 2013 decision granting partial summary judgment or in the Court's Order of November 15, 2013 granting Cruise Connections' Motion to Set the Exchange Rate, since those findings and conclusions must be accepted for purposes of this damages phase of this case.  The RCMP submits this Closing Trial Brief without prejudice to its positions that it has no liability to Cruise Connections and that changes in the exchange rate between Canadian and United States dollars in any event deprived Cruise Connections of any expectation of profit.

## **ARGUMENT**

The parties agree that the appropriate measure of damages is lost profits.  Cruise Connections has presented its lost profits as its expected revenues minus its expenses, but it has overstated its projected revenues and understated its anticipated expenses.  With regard to revenues, Cruise Connections has provided an inflated estimate of likely on board revenue ("OBR"), based on optimistic speculation about what RCMP security personnel would have spent on board the chartered vessels and its equally unfounded expectations related to a relocation cruise for which there was no contract.  With regard to costs, Cruise Connections has significantly reduced the contemporaneous estimates that it used to persuade the Royal Bank of

Canada to provide financing for the project, and it neglects to take into account some key costs that would have been necessary to obtain and to carry out the contract with the RCMP.

## I.   CRUISE CONNECTIONS' ON BOARD REVENUE CLAIMS ARE EXAGGERATED

Canadian law allows only damages that can be shown to be the reasonable result of a party's breach.  If the damages claimed by a plaintiff represent only its own speculations about the profits it could have earned, or are too remote to have been contemplated at the time of contracting, the plaintiff cannot recover them.  *See Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854).  A plaintiff's loss of an opportunity to make a profit is not sufficient to recover damages:  a plaintiff must show that the lost opportunity was reasonably likely to result in a profit.  *Eastwalsh Homes Ltd. v. Anatal Devs. Ltd.* 1993 CarswellOnt 587 ¶¶ 33–45, 57–59 (Can. Ont. C.A.) (WL).

### A.   Cruise Connections' On Board Revenues Expectations Are Inflated

In its Closing Trial Brief, Cruise Connections claims that it would have realized OBR on the ships docked in port in the amount of $9.47 million.  This estimate is entirely speculative.  First, the actual OBR per-person-per-day realized in port by Holland America and Carnival Cruise Lines was approximately $5 per-person-per-day, far less than the $50 per-person-per-day that Cruise Connections claims.  (*See* J. Ross Ex. A at CCCM014798 (Total Net Onboard Revenue); B. Derby Ex. 1 at 7 (Actual Net Sales GCDs).)  Second, Cruise Connections' contemporaneous emails show that, in 2008, Cruise Connections expected the daily OBR to be far below the estimates it now claims in litigation.  Neither of Cruise Connections' two witnesses who testified about OBR offered anything other than speculation to rebut the evidence of the actual experience of Holland America and Carnival.

2

In response to a subpoena from Cruise Connections, Holland America and Carnival provided the actual OBR earned on the three ships actually positioned in Vancouver for the Olympics under the replacement charters.  These documents show that the security personnel housed on the ships did spend money on many of the categories of OBR that Cruise Connections imagines that they would, but at a much lower level.  Actual OBR earned by Holland America and Carnival for all three ships for the charter in Vancouver Harbor came to $676,603.[1]  This translates into about $5 per-person-per-day (*see, e.g.*, J. Ross Dep. Ex. A at CCCM014798 (Total Net Onboard Revenue); J. Ross Dep. 22:9–16; B. Derby Ex. 1 at 7 (Actual Net Sales GCDs)), one tenth of the $50 per-person-per-day claimed by Cruise Connections (Ex. C to Snitzer Rpt.; Trial Tr. vol. 1, 151:16–18, Nov. 18, 2013 (Kelly)).

Cruise Connections thus claims that it could have earned ten times more OBR than Holland America or Carnival, two of the best-known powerhouses in the cruise business. Aside from the sheer improbability of that claim, British Columbia law recognizes the actual results from a substitute contractor employed to complete a breached contract as an appropriate benchmark for calculating damages.  *Tercon Contractors Ltd. v. British Columbia (Minister of Transportation and Highway)*, 2006 CarswellBC 730 ¶ 156 (Can. B.C.S.C.) (WL).  Given the thin evidence presented by Cruise Connections at trial to support its OBR claim, the actual OBR numbers realized by Holland America and Carnival should be used as the best evidence of what OBR could have been realized by Cruise Connections.

### 1. Cruise Connections Did Not Take Into Account that the Ships Were Not Full Every Day

The 2010 Winter Olympics took place over 17 days, from February 12 to February 28, 2010.  The Cruise Connections charters were to be in Vancouver Harbor for

---

1.  The actual amount earned by Holland America is subject to a protective order, but can be found at Jason Ross Deposition Ex. A at CCCM014798 (Total Net Onboard Revenue).

between 31 days to 44 days.  In fact, the security forces concentrated in Vancouver gradually ramped up their presence as the Olympics approached and then ramped down after the Olympics were over.  (*See, e.g.*, Trial Tr. vol. 3, 49:7–12, Nov. 20, 2013 (Kaluza).)  Cruise Connections' estimate of OBR erroneously assumes that every bed on every ship would have been filled every day of all three charters — from the very first day to the very end.  (Ex. E to Snitzer Rpt.)  That simply was not what happened.[2]  The actual data show a 70% rate of occupancy on the Carnival ship, and lower rates of occupancy on the Holland America ships.[3]  (B. Derby Dep. Ex. 1 at 1 (Actual Guest Count/Budgeted Guest Count); J. Ross Dep. Ex. A at CCCM014798 (Acutal PCDs/Budget PCDs).)  Security personnel could not purchase spa treatments, haircuts, bottles of wine, and buckets of beer on days when they were not even on the ship.

### 2.      Cruise Connections Valued the Vessels as a Vacation Destination, not Basic Housing

The vessels provided for the Olympics were intended to house security personnel working long shifts.  Working at the Olympics was not a vacation.  As retired RCMP Inspector Donna Kaluza, who was in charge of accommodations for the security personnel for the Olympics, explained, a typical worker would work a "four on / four off" schedule.  (Trial. Tr.

---

2.  Retired RCMP Inspector Donna Kaluza testified that the RCMP was still working on how the personnel would have embarked the vessels when the Cruise Connections contract terminated, and that the personnel would not have been required to remain on the ships if they were not working.  (Trial Tr. vol. 3, 84:4–7, Nov. 20, 2013 (Kaluza).)  Inspector Kaluza testified that the RCMP would have handled much of the embarkation process through its accreditation teams.  (*Id.* 80:16–81:19.)   Because the logistical plans were still being developed, Inspector Kaluza testified that the final plans had not been developed when the Cruise Connections contract terminated.  (*Id.*)  Cruise Connections knew that more than one embarkation was possible, and the costs of additional embarkations would be borne by the RCMP.  (Plfs. Tr. Ex. 1 at CCCM001095 § (f).)

3.  The actual figures from Holland America are subject to a protective order, but can be found at Jason Ross Deposition Ex. A at CCCM014798, and calculated by dividing the Actual PCDs with the Budgeted PCDs.

vol. 3, 54:15–23, Nov. 20, 2013 (Kaluza).)  This would require security agents to work two consecutive day shifts, followed by two consecutive night shifts, followed by four days off.  On the first two days, for example, the agent would begin a shift by 6:00 a.m., and would complete a shift at 6:00 p.m.  To begin a shift by 6:00 a.m., however, an agent would need to rise well before that time, muster with his or her colleagues, go through an inspection, and leave an hour before starting time to allow for travel  to the site.  After the shift was over at 6:00 p.m., the agent would then return to the ships, losing another hour in travel time.  (*Id.* 54:15–56:6.) Inspector Kaluza estimated that, if she had been on board, she would have awoken at 4:15 a.m., and would likely have returned at 7:00 or 7:30 p.m., leaving her less than eight hours to eat dinner and sleep before repeating the process the next day.  (*Id.*)

   After the two day-shifts, a security agent would have a "swing shift," followed by two night-shifts, where the agent would leave for a night-shift at 4:30 or 5:00 p.m., and would return to the ships at 7:00 a.m., again leaving approximately eight hours to both eat and sleep in preparation for the next night-shift.  Once the agent finished the second two days, he or she would be able to leave the vessels, visit Vancouver on his or her own time, or travel to see friends or family in the area, returning for a morning shift three days later.  (*Id.*)  Moreover, the agents could work extra shifts on days off to receive supplemental overtime pay.  (*Id.* 53:16–19; 93:16–94:4.)  This opportunity for overtime pay was key to maintaining the morale of the workers,[4] but it would further reduce the free time for them to spend money on board the vessels. (*Id.* 53:16–19.)

---

4.  The partners in Cruise Connections and Mr. Snitzer have often pointed to the need to maintain "morale" as a reason that the security personnel would have spent their own money to drink heavily on board the vessels and to partake in costly sightseeing excursions.  (Trial Tr. vol. 3, 35:14–24, Nov. 20, 2013 (Snitzer).)  Inspector Kaluza explained that the RCMP attached more importance to ensuring that the accommodations were not substandard, that

Additionally, because the security personnel's housing and food needs were being provided, the individuals housed on board the ships were entitled to a per diem of only $17 dollars per day.  (*Id.* 65:22–66:19.)  To the extent that a security agent spent more than that, he or she would be paying out of his or her own pocket.

### a.       No box lunches would have been provided for sale

Mr. Snitzer opined that the cruise lines would have provided box lunches for sale to the security personnel to take with them to their shifts.  Moreover, he estimated that half of those on board the vessels would have purchased such a box lunch every day.  (Trial Tr. vol. 2, 153:12–22, Nov. 19, 2013 (Snitzer); Ex. C to Snitzer Rpt.)  But the record is devoid of any basis for this claim.

Inspector Kaluza explained that there were never any discussions of providing box lunches for sale, because all food for the security personnel was to have been covered as part of the contract payment to Cruise Connections.  (Trial Tr. vol. 3, 64:24–65:11, Nov. 20, 2013 (Kaluza).)  Moreover, she explained that many of the venues prohibited anyone, including security personnel, from bringing food into the venues, because of agreements with concessionaires.  (*Id.* 57:18–59:20.)  She testified that security personnel were provided vouchers by the Vancouver Olympic Committee to purchase lunches at the venues. (*Id.* 57:18–58:20.) Even if Cruise Connections had wanted to provide box lunches for sale, the security personnel would not have been able to bring them into the venues where they worked.

---

proper food was being provided, and that shift scheduling allowed for adequate rest between shifts.  (*Id.* 52:1–53:19 (Kaluza).)

### b. The laundry and communications prices quoted by Cruise Connections are too high to have been used

Although the RCMP requested that Cruise Connections negotiate flat internet and laundry rates to be paid by the security personnel on board,[5] Cruise Connections now claims that it would have ratcheted those rates higher to increase its revenue.  Mr. Kelly estimated that Cruise Connections would have charged each person on board the vessels $10 per day for internet access, and $12 per day for laundry, a cost that he said he had discussed with Holland America.  (Trial Tr. vol. 1, 158:23–159:6, 160:2–5, Nov. 18, 2013 (Kelly).)

Inspector Kaluza testified that, had Cruise Connections presented her with such inflated rates, the RCMP would have made alternative arrangements to ensure that the security personnel on board the vessels would not be forced to pay more than their entire $17 per diem merely to cover their laundry and internet costs.  (*See, e.g.*, Trial Tr. vol. 3, 67:9–19, Nov. 20, 2013 (Kaluza).)  She testified that, had Cruise Connections posed a $12 per-person-per-day fee

---

5.  Mr. Snitzer opined that Cruise Connections would have charged each security worker $10 per day for laundry and "communications," the latter of which Mr. Snitzer states includes "internet and for phone cards and for cell phone use while on board."  Mr. Snitzer claims that these costs were determined "Per the charter contract terms."  (Ex. C to Snitzer Report.)  The contract terms, however, stated that the combined cost of laundry and communications was to be only $5 per-person-per-day.  (Plfs. Tr. Ex. 4 at CCCM015034 §§ 12–13 ($2 for internet and $3 for laundry.)

To explain this discrepancy, Mr. Snitzer testified that that the contract between the RCMP and Cruise Connections stated that the RCMP would provide a "subsidy" to its employees, who would in turn use the internet and laundry more because it was subsidized.  (Trial Tr. vol. 2, 164:5–6; 165:9–14, Nov. 19, 2013 (Snitzer); Trial Tr. vol. 3, 20:10–20:21, Nov. 20, 2013 (Snitzer).)  These statements are mistaken.  First, the contract between Cruise Connections and the RCMP does not state that the RCMP would subsidize the laundry and internet costs of its personnel.  (*See generally* Plfs. Trial Ex. 1.)  It is RCMP policy, in fact, that its personnel are to pay for those items out of their per diem.  (Trial Tr. vol. 3, 67:9–70:3, Nov. 20, 2013 (Kaluza).)  Moreover, Cruise Connections had agreed to negotiate a flat rate that each person on board the ships would pay for the laundry and internet services.  (Defs. Tr. Ex. 9.)  Since a flat rate is paid regardless of use, however, Mr. Snitzer's theory that the security personnel would use the services more, therefore doubling of cost specified in the contract, makes no sense.

7

for laundry, the RCMP would have made alternative arrangements, such as using a drop-off laundry service similar to those that it had created for other large detachments.  (*Id.* 68:13–25.) Because the ships would not be at sea, Inspector Kaluza said, the quoted fee of between $7 and $10 per-person-per-day for internet and communications also was excessive.  Wireless internet signals would have been provided at no charge to the security personnel, who could use their own cell phones.[6]  (*Id.* 69:1–70:6.)

### B.      Cruise Connections' Contemporaneous Estimates of On Board Revenue Were Lower

In 2008, when Cruise Connections was trying to obtain financing for the contract, it estimated that OBR would be $15 per-person-per-day.  (Defs. Tr. Ex. 6; Trial Tr. vol. 1, 147:13–15, 19–21, Nov. 18, 2013 (Kelly).)  When Cruise Connections was trying to persuade Royal Caribbean Cruise Lines to submit a bid to the RCMP in January 2009, Cruise Connections raised that estimate to $20 to $25 per-person-per-day.  (Shaw Dep. Ex. 55, RCCL000554–57.) Mr. Tracey Kelly told the cruise lines in December 2008 that "the projected amounts of on-board spend by the ISU members is $20 to $25 pppd."  (Shaw Dep. Ex. 55 at RCCL00557.)

By the time of his deposition in June of 2012, Mr. Kelly had revised his estimates, stating that he then believed that the security personnel would, on average, spend $90 to $100 per-person-per-day in OBR.  (T. Kelly Dep. 208:2–5.)  He testified during his deposition that he was "disappointed" that Cruise Connections was only trying to recover $54 dollars per-person-per-day, because he thought that that number ought to have been much higher, because in his view, the security agents would be "trapped [on the vessels] with nothing to do."  (*Id.* 206:2–14.)

---

6.  Ms. Susan Edwards, one of the partners of Cruise Connections, told Cruise Connections that, if it imposed inflated rates on the RCMP, the RCMP would find free sponsors who would provide the services, and Cruise Connections would lose that source of revenue altogether. (Defs. Trial Ex. 9, CCCM003730.)

8

C.      **Cruise Connections' Current Estimates Are Based on Conjecture Regarding the Spending Habits of Security Personnel**

Cruise Connections' extravagant expectations for what the security personnel would have spent on board the vessels is backed by nothing more than speculation.  Tracey Kelly testified that Cruise Connections' estimate was based on hosting events for visiting dignitaries, charging security personnel for cocktail parties, dancing and musical venues, charging security personnel for steak dinners, and charging security personnel for transportation to and from the ships.  When Cruise Connections proposed these ideas to the RCMP, however, the RCMP insisted that the charters were to provide "bare bones," "Holiday Inn Express" type accommodations.  (Trial Tr. vol. 3, 50:30–51:2, Nov. 20, 2013 (Kaluza).)  As Inspector Kaluza testified, she had thought that a dinner could be hosted at which Assistant Commissioner Bud Mercer, the Chief Operating Officer of the ISU, could thank the security personnel, but she was not under the impression that there would be additional charges on top of the price per day that Cruise Connections was to be paid under the terms of the contract.  (*Id.* 64:2–65:11.)

Adam Snitzer's estimates that the RCMP personnel would have spent $49 on a daily basis are similarly unsupported by the evidence.  Mr. Snitzer's estimates were made without having reviewed the actual revenue reports from the cruise lines that eventually entered into the RCMP charters.  (*See generally* Ex. B to Snitzer Rpt.)   Moreover, Mr. Snitzer's estimates were shown to be based on misunderstandings of the nature of the charters.  For example, Mr. Snitzer stated that the reason he expected security personnel to spend two-thirds more money on alcohol than would an average individual on vacation was that "all guests [would be] of drinking age," most would be male, there would be no spouses, and the fact that two individuals would be rooming together, and would therefore spend more time outside of the room than inside.  (*See* Ex. C to Snitzer Rpt.)

9

The trial testimony of Inspector Kaluza exposed the fallacies underlying these assumptions.  Some RCMP and Canadian Forces personnel could have been under the cruise lines drinking age (Trial Tr. vol. 3, 10:19–12:6, Nov. 20, 2013 (Kaluza)); there were spouses on the ships who would have been housed together on the ships (*id.* 104:16–19); and the security personnel were to have been assigned to rooms based on one on/one off shift schedules, to minimize the amount of overlap that two people would have be in a room together (*id.* at 70:10–71:11).

### D.    On Board Revenue Reduction

For the reasons explained above, the figure used by Cruise Connections for anticipated OBR should be significantly reduced, as follows:

- First, the Court should begin with the actual OBR earned by Holland America and Carnival during the Olympics, which was $676,603 (s*ee* Section I.A *supra*).

- Second Cruise Connections' anticipated profits on laundry and internet should be reduced to the amount that it could have passed on: $5 per-person-per day (*see* Plfs. Tr. Ex. 4 at CCCM015034 §§ 12, 13; Trial Tr. vol. 1, 163:25–164:5; 166:25–167:2, Nov. 18, 2013 (Kelly) ($2 for internet, $3 for laundry). Multiplying $5 by 126,978, the number of days that security personnel actually spent on board the vessels (Derby Dep. Ex. 1 at 1 (Actual Gross Guest Count)); Ross Ex. A at CCCM014798 (Total Actual PCDs)), suggests that Cruise Connections would have recouped $634,899 from RCMP personnel for laundry and internet services.

Cruise Connections should thus have expected to make $1,311,493 in OBR, $7,427,347 less than the figure for OBR in Cruise Connections' claim.

## II.     CRUISE CONNECTIONS' RELOCATION CRUISE EXPECTATIONS ARE SPECULATIVE

### A.     Cruise Connections and AA Worldwide Travel Never Agreed On A Contract

Cruise Connections and AA Worldwide Travel never came to an agreement on the basic terms of the relocation cruise.  Cruise Connections cannot recoup "lost profits" when the agreement on which such profits would be based is as ephemeral as the evidence on which Cruise Connections relies.

### 1.     There Was Never an Agreement

Cruise Connections confirmed to this Court a year ago that there was never "a final copy, signed copy of an agreement with AA Worldwide."  (Nov. 8, 2012 Tel. Conf. Tr. at 1–2.)  Although Cruise Connections claimed, in October 2008, that "we have one ship all set for you.  Dates, Prices, etc.," none of those terms was ever reduced to writing, and the cruise ship business does not function on oral contracts.  (Ladwig Dep. Ex. 1 at CCCM0011890.)  Cruise Connections never produced any confidentiality agreement signed by Ms. Ladwig, or even a copy of one ever sent to her for signature.

Ms. Ladwig testified that AA Worldwide and Cruise Connections "were still trying to finalize a lot of things." (Ladwig Dep. at 41:16–17.)  As of October 16, 2008, AA Worldwide was still trying to get information from Cruise Connections about details of the ship charters.  (Ladwig Dep. at 47:4–7.)  Not until November 3, 2008 — *after* Cruise Connections had threatened to walk away from the contract with the RCMP (*see* Defs. S.J. Ex. 70 at CAN0001073 [Docket No. 62-74]), and just days before the contract with the RCMP was terminated — did Cruise Connections offer to send AA Worldwide a Confidentiality Agreement, which had to be signed "before we can share any information."  (Ladwig Dep. Ex. 3 at CCCM012511.)  There is no evidence that Mr. Kelly ever sent the confidentiality agreement to

11

AA Worldwide or shared sufficient information to form the basis for a repositioning cruise agreement.

### 2.  Cruise Connections' and AA Worldwide's Current Recollections of the Nature of Their Agreement Are Entirely Different

Cruise Connections and AA Worldwide have no common understanding about the of the nature of their supposed agreement.  According to Ms. Ladwig, Cruise Connections was to be paid a flat fee per person.  (Ladwig Dep. 21:10–11.)  Ms. Ladwig described a lavish, all-inclusive cruise which would cost potential passengers between $4,000 and $10,000 per person for a three-and-a-half day cruise.  Ms. Ladwig was planning on creating a "fully inclusive" package "which is not the standard or what's heard of in the cruise line industry."  (*Id.* at 16:14–24.)  Unlike normal cruises, Ms. Ladwig expected her customers to pay an extraordinarily high package rate, but that rate would include services and items normally included in OBR, such as shore excursions at each of the three or four ports at which the ship would be docking during the repositioning cruise, matching t-shirts, keepsakes, luxury chocolates, beer and wine from the Pacific Northwest, and Olympic memorabilia.  (*Id.* at 16:2–18:16.)  Ms. Ladwig was clear that all of these items, which would normally be counted as OBR, "were all part of the package.  So [the passengers] weren't buying those."  (*Id.* at 18:1–3.)

Cruise Connections has testified that it had a very different understanding.  Under Cruise Connections' contract with Holland America, there would have been no stops between Southern California and Canada.  (Plfs. Trial Ex. 4 at CCCM015036.)  But, at trial, Cruise Connections testified that, in addition to the flat fee per person contemplated by Ms. Ladwig, Cruise Connections would also be entitled an additional $120 to $130 per-person-per-day that the passengers would pay on "spas, sundries, photos, bars, and then in addition to that special

events and then of course shore excursions." (Trial Tr. vol. 1, 113:1–7, Nov. 18, 2013 (Kelly).)

That is double counting with a vengeance.

Mr. Kelly's description of Cruise Connections' plan bears no resemblance to Ms.

Ladwig's plan to provide a "fully inclusive" experience to her passengers.[7]  In the absence of any

written evidence of the basic terms of the supposed agreement, the inventions of both Cruise

Connections and AA Worldwide should be disregarded.

Tellingly, after the trial, Cruise Connections has decided to drop its claims for

OBR from the relocation cruise.  (*See generally* Plfs. Closing Trial Br.)

**B.      AA Worldwide Travel Was a Questionable Business Partner**

Ms. Ladwig's descriptions of the scope of the project hardly inspires confidence.

AA Worldwide, the company with which Cruise Connections claims to have had a contract, was

alleged by Ms. Ladwig to have been "stolen" by Christie and Steve Downing in 2008.  (Ladwig

Dep. 54:5–10.)  Ms. Ladwig testified that the transactions with the Downings that led to the

revocation of her license (for fraud) took place during the fall of 2008.  This is the same time

period in which she claims to have been negotiating the details of the repositioning cruise with

Cruise Connections.  (*Id.* 54:5–54:23.)  Ms. Ladwig testified that she spent "thousands and

thousands of hours working on this event with thousands of vendors," over the course of a year

and a half.  (*Id.* at 14:18–15:44.)  But Cruise Connections was not awarded the bid from the

RCMP until late May 2008, and had not settled on which ships it was going to use until mid-

August, 2008.  Mr. Kelly admitted that he was not working with Ms. Ladwig during the time she

---

7.  Mr. Snitzer's assumptions about the repositioning cruise contradict both the testimony of Ms. Ladwig and that of Mr. Kelly.  Mr. Snitzer fails to note in any of his assumptions that many of the typical on OBR items would have been included in the package price.  (Ex. D to Snitzer Rpt.)

13

claimed, when Ms. Ladwig states that she was fighting the Downings over the alleged theft of

her company.  (Trial Tr. vol. 1, 133:23–134:6, Nov. 18, 2013 (Kelly).)

Without any writing spelling out the details of the supposed oral agreement, the

claims made by Mr. Kelly and Ms. Ladwig are too speculative and too contradictory to form the

basis of a damages award.  The entire $1,252,000 sought by Cruise Connections as profits from

this cruise should be subtracted from its claim.

### III.     CRUISE CONNECTIONS OMITS EXPENSES

#### A.     Cruise Connections Has Failed to Include the Cost of the Letter of Credit

Cruise Connections failed to include the amount it had agreed to pay to John

Sessions for a letter of credit as a cost it would have incurred had the contract gone forward.

That cost alone reduces its claims for lost profits by more than $5 million.  The plain language of

the agreement with Mr. Sessions states that Cruise Connections agreed to pay Mr. Sessions

$5,057,500 "10 days after the [Cruise Connections] Partnership receives its initial payment from

the Royal Canadian Mounted Police . . . (currently expected to be 75% of the total project fee

(The 'Initial Fee Installment')."  (Defs. Trial Ex. 4 at CCCM015133.)  By the terms of that

agreement, the payment was to have been made from Cruise Connections to Mr. Sessions in

April 2009, *not* out of the final profits.  This $5,057,500 was a deferred payment for the letter of

credit in favor of the RCMP that was required to be submitted with Cruise Connections' bid to

the RCMP.

Cruise Connections should not be permitted to ignore a $5,057,500 cost that it

would have had to pay had the contract not been terminated.  Like the cost of the vessels, the

cost of the letter of credit was a cost of the contract with the RCMP.  Without the letter of credit

backed by Mr. Sessions, Cruise Connections never would have been allowed to bid on the

RCMP contract.  (*See* Defs. Trial Ex. 3 (Mr. Kelly stating one of the reasons that they won the

contract was "We were able to submit BID with the 10% LOC"); Trial Tr. vol. 1, 137:1–138:9;

140:5–16, Nov. 18, 2013 (Kelly); Trial Tr. vol. 2, 139:20–140:2, Nov. 19, 2013, (P. Sloane); M.

Sloane Dep. 37:12–38:3).)  Nor can Cruise Connections be heard to assert that this cost does not

affect its profits.  Cruise Connections agreed to pay $5,057,500 to Mr. Sessions in order to

satisfy a condition for submitting a bid for the contract with the RCMP.  That $5,057,500 cost

would inevitably have reduced Cruise Connections' profits, and should be subtracted from its

claim.

> ### B.      Cruise Connections Has Failed to Include the Salary That Would Have Been Owed to Phillip Sloane

Cruise Connections' list of cost and expenses does not include the salary of

Phillip Sloane, who was to have been paid $500,000 out of the proceeds of the RCMP contract.

(M. Sloane Dep. 135:15–138:7.)  Cruise Connections has accounted for the cost of the operations

employees that would have been hired, and must also account for the amount it had promised to

pay Mr. Sloane. (*See generally* Exhibit A to Plfs. Closing Br.)  This amount should also be

subtracted.

## IV.    CRUISE CONNECTIONS UNDERESTIMATES OTHER COSTS

The invoices received and paid by the RCMP in connection with the actual

charters provide the best evidence of the additional costs that Cruise Connections would have

incurred, but omits from its calculations.

> ### A.      Many Of Cruise Connections' Estimates Are Lower Than Would Have Been Incurred

> #### 1.      Recycling and Garbage Removal

On July 29, 2008, Cruise Connections estimated that its recycling and garbage

costs would be $880,000. (Plfs. Tr. Ex. 2)  Now, five years later, it believes that these services

would have cost less than a quarter of that amount.  (Ex. A to Plfs. Closing Br.)  Cruise

15

Connections' contemporaneous estimate should be used to determine this element of cost, raising its costs by $670,653.

### 2.      Snow Removal

One of the services needed for the vessels was, in effect, an insurance policy to cover the removal of snow from the vessels should it be needed.  As both Inspector Kaluza and Ms. Normande Morin explained, provision for snow removal was seen as a necessary expense. (Trial. Tr. vol. 3, 75:18–76:4, 76:12–18, Nov. 20, 2013 (Kaluza); *id.* 129:12–130:8 (Morin).) Ms. Morin explained that she was skeptical about the need to expend such funds, but, because of the uncertain weather in the Vancouver area, it was a necessary expense.  (*Id.* 129:12–130:8 (Morin); *see also* Trial Tr. vol. 2, 100:23–101:7, Nov. 19, 2008 (Webber) (Mr. Webber stating that there might be a need to remove snow to ensure that security personnel could quickly respond to an emergency).)  Because payment was required to be made in advance, the actual lack of snow did not change the cost of the contract.  (Trial Tr. vol. 3, 75:18–76:4, 76:12–18, Nov. 20, 2013 (Kaluza).)  This $79,800 should be added to the costs of the contract.

### 3.      Water Bunkering

In a June 2008 estimate, Cruise Connections estimated that the ships' water bunkering costs would be $200,000 (P. Sloane Dep. Ex. 80), but have now made the claim that it would be only $121,902.  Cruise Connections' contemporaneous estimate should be used to determine this element of cost, raising its cost by $78,098.

### B.      Cruise Connections Removed Other Costs From Its Closing Brief

### 1.      Ground Services

Cruise Connections now claims that it would have incurred no "ground services" costs, because the RCMP would have been responsible for mustering its security personnel as part of the embarkation process.  The estimate for ground services had to do with ground

operations, hiring employees to make deliveries, paying for such shipping, and last minute

running.  (Trial Tr. vol. 2, 33:1–9, Nov. 19, 2013.)  These are not costs that would have been

eliminated by the RCMP's transporting its own personnel to Vancouver Harbor.  This $50,000

cost should be restored to the expected expenses.

### 2.   Miscellaneous

Mr. Phillip Sloane allocated a total of $100,000 to a contingency category to

cover any unforeseen costs.  (*See, e.g.*, Defs. Tr. Ex. 8 at Resp. 10.)  This cost has been

accounted for in nearly every cost estimate for five and a half years.  If Mr. Sloane changed his

mind about this expected cost, Cruise Connections had a duty to correct its interrogatory

responses.  (*Id.*)  This $100,000 cost should be restored to the expected expenses.

### 3.   Hotel and Per Diem

Cruise Connections' arbitrary reductions of its estimated hotel expenses from

$32,000 to $24,502 and of its per diem costs from $180,000 to $143,068 should be disregarded.

(*Compare* Plfs. Tr. Ex. 34 *with* Ex. A to Plfs. Closing Br.)  Although Cruise Connections would

have had access to several state rooms on board the vessels, no testimony or documentation has

been provided that would justify reducing the hotel costs.  There is no evidence that the hotel

cost and per diem as previously estimated by Cruise Connections did not already make such an

allowance.  The $44,430 difference in these costs should be restored to the expected expenses.

## V.   CRUISE CONNECTIONS FAILED TO MITIGATE ITS DAMAGES

A plaintiff has a duty to take all reasonable steps to mitigate any loss consequent

upon a breach of contract, and may not recover any part of the loss that is due to his neglect to

take such steps.  *Southcott Estates Inc. v. Toronto Catholic District School Board*, 2012

CarswellOnt 12505, ¶ 24 (Can. S.C.C. 2012).  That duty applies as much to a single-purpose

corporation such as Cruise Connections as to any other plaintiff.  *Southcott Estates Inc.* ¶ 24.
Cruise Connections failed in this duty.

        Cruise Connections claimed to have the ability to pursue other similar projects
and had actually contemplated other similar ventures in Vancouver during the Olympics.  Cruise
Connections claimed that it brought "together experts in all aspects of Charter Management,"
including expert negotiators, an in-house port agent, operations and customer service specialists,
ground services, and more.  (Pls.' SJ Ex. 9 at CAN0000069.)  Cruise Connections' management
team claimed to have over 100 years of experience in the travel and hospitality industry.  (*Id*. at
CAN0000070.)  Cruise Connections claimed that it had "specific expertise in providing Charter
Cruise Ships."  (*Id*. at CAN00000071.)  Cruise Connections claimed to have arranged more than
60 ship charters, and that it had in the recent past chartered ships for other "similar events to the
proposed 2010 Olympics."  (*Id*. at CAN00000071.)  Those other projects included providing
"Ships at the Athens Olympics (collective 84 days of Charter Ship)" in 2004, "Ships at the NFL
Super Bowl, Jacksonville, FL. (collective 14 days of Charter Ships)" in 2005, "1 Ship Cricket
World Cup (collective 30 days of Charter Ship)" in 2007.  (*Id*. at CAN0000071.)

        Cruise Connections' President, Michael Sloane, claimed to have chartered "10
Full Ship Charters within the last 40 months," a rate of one charter every four months, and was
"renown[ed]" for his ability to meet the administration needs of several simultaneous charters.
(*Id*. at CAN00000072.)

        On the cover of its bid to the RCMP, Cruise Connections claimed to be "Your
Cruise & Tour Vacation Headquarters Since 1992."  (*Id*. at CAN0000065.)  Cruise Connections
assured the RCMP that,

> Cruise Connections was founded in 1992 by Mike Sloane.  The business, based in Winston Salem, North Carolina has agents operating coast-to-coast within the continental United States.
>
> Cruise Connections is dedicated exclusively to cruise/land package sales and counseling, and is dedicated to ongoing training to bring to the marketplace the latest in the cruise industry development. Our overall objective is to provide quality, professional consultation, and planning services for individuals, corporations, associations, and incentive and vacation groups.
>
> In the past 5 years Cruise Connections has focused primarily on full ship charters and large groups and has proved that Cruise Connections is a true leader in that aspect of the industry.

(*Id*. at CAN0000094.)  The President of Cruise Connections stated that his interest in the Vancouver project stemmed originally from a plan to provide luxury hotel space to individuals attending the Olympics.  He testified that there was an opportunity to "make a killing" because "there was such a shortage of hotel rooms, that if we just moved cruise ships in there, that it would be very, very lucrative."  (M. Sloane Dep. 29:8–29:19.)   Cruise Connections also contemplated leasing at least one other ship to dock at a private pier that Cruise Connections would secure to lease space to private guests.  (C. Ladwig Dep. 49:10–50:3.)

Colleen Ladwig, formerly of AA Worldwide Travel, testified that, in October 2008, Cruise Connections contemplated using three other cruise ships, beyond those leased for the RCMP.  Ms. Ladwig testified that she had discussed with Cruise Connections the possibility of making use of "[t]he other 2-5 possible ships?" (Ladwig Dep. Ex. 1 at CCCM011889), three of which were not related to the RCMP charter, for repositioning or other cruises.

Cruise Connections thus claimed to have had the ability and means to pursue other ship charter opportunities when the RCMP contract fell through.  But Cruise Connections failed to pursue any of these contemplated projects to completion, and thus failed in its duty to

mitigate its losses by seeking alternative profit streams.  It should not be permitted to shift to the RCMP the cost of its own inactivity.

Canadian courts reduce damage awards for failures to mitigate damages.  *See Onta Holdings Inc. v. Bonosusatya*, 1998 CarswellBC 1968 ¶ 30 (Can. B.C.S.C.) (WL); *see also Van Snellenberg v. Cemco Electric Manufacturing Co.*, 1946 CarswellBC 128 ¶ 6 (Can. S.C.C. 1946); *cf. Janiak v. Ippolito*, 1985 Carswell Ont. 809 ¶ 32 (Can. S.C.C.) (WL).  The RCMP urges the court to reduce any award of damages to Cruise Connections by 25 percent on account of Cruise Connections' utter neglect of its duty to mitigate.  Because this is not a situation where the Court can look to an alternative contract as a measure of the failure to mitigate, a discount should be used to ensure that Cruise Connections does not benefit from that failure.

## VI.   NO INTEREST RATE IS SPECIFIED IN THE AGREEMENT BETWEEN CRUISE CONNECTIONS AND THE RCMP

Cruise Connections claims for the first time after trial that a contractual provision in the agreement with the RCMP governs the prejudgment interest rate for damages.   (Plfs. Closing Br. 22.)  It is mistaken.  Section 9676-14 of the General Terms and Conditions for the Public Works and Government Services Canada merely provides the rate of interest that the Government of Canada is to pay on overdue accounts.  The title of the section, "Interest on Overdue Accounts" makes that clear.  *See also Tercon Contractors Ltd. v. British Columbia*, 1994 CarswellBC 3335 ¶¶ 2–3 (Can. B.C.S.C.) (WL) (providing that the proper interest rate for the damages purposes was that set by the registrar, over plaintiffs' objections that a Financial Administration Act regulation that applied to late payments owed by or to the government should be used).

As set out in the RCMP's Pretrial Statement, the rate of prejudgment interest applicable here is governed by the Court Order Interest Act, R.S.B.C. 1996, c. 79 ("COIA").

The Crown Liability and Proceeding Act, R.S.B.C. 1996, c. 79 ("CLPA"), which allows for civil proceedings against the Canadian government, specifies that a "judgment debt due to or from the government bears interest in the same way as a judgment debt due from one person to another." CLPA 12.  The provisions of the COIA relating to prejudgment interest therefore bind the Crown as they would any other person subject to the jurisdiction of the court.

Under the COIA, the rate of prejudgment interest is set by the court registrar. Courts may not depart from that rate unless presented with evidence of special circumstances. *See Battrum v. MacKenzie*, 2010 CarswellBC 2417 ¶ 36 (Can. B.C.S.C.) ("there is no evidence that would support an exercise of discretion to award rates higher than those set by the registrar"). Interest is awarded from the date on which the cause of action arose to the date of the order. COIA § 1; *see also Trozzo Holdings v. M.V.S. Construction*, 2002 CarswellBC 2628 ¶ 10 (Can. B.C.S.C.) (WL). Since September 26, 2008, the registrar's interest rate has ranged from 0.25% to 2.75%.

The COIA prohibits compounding prejudgment interest.  *See* COIA 2(c) ("The court must not award interest under section 1 on interest or on costs."); *Teal Cedar Products v. British Columbia (Forets)*, 2013 CarswellBC 2954 ¶ 10 (Can. S.C.C.) (WL) (simple interest "remains the rule in British Columbia," because the legislature has not removed the prohibition on compound interest under the COIA.)

COIA rates are set by the court registrar every six months, in July and January respectively.  Attached hereto as Annex A is a list of the rates set by the court registrar from July 2008 through January 2014, and the RCMP's calculation of prejudgment interest at those rates on the amount of damages that would result from the adjustment urged in this brief.

## VII.   SUMMARY JUDGMENT RECORD

The RCMP draws the Court's attention to the following factual disputes relevant to the determination of damages in response to the Court's invitation to do so.  (Trial Tr. vol. 3, 164:14–20, Nov. 18, 2013.)  Since the date of breach fixed by the Court establishes the rate for converting the value of the contract from Canadian to United States dollars, the Court's choice of September 26, 2008 for that purpose results in conversion at a relatively high rate — and a correspondingly high contract value — during a period when the value of the Canadian dollar was falling.[8]  The RCMP respectfully submits that the evidence in the record shows that Cruise Connections was not in a position to perform on that date, or indeed until sometime after October 1, 2008.

RCMP's Offer of Proof [Docket No. 89 (Nov. 18, 2013)], demonstrated that Cruise Connections could not have closed its financing deal with the Royal Bank of Canada on September 25 or September 26, 2008.  Cruise Connections was seeking at that time to amend to the contract between Cruise Connections and the RCMP.  In order for such an amendment to be signed, it had to be reviewed by many individuals in the RCMP.  The amendment, which was not provided to the RCMP until September 15, 2008, attempted to force the RCMP to pay the taxes both of the cruise lines *and of the Cruise Connections partners*.  As this court found in the Order on Summary Judgment, this had never been agreed to by the RCMP [Docket No. 73, Order at 173], and the request raised concerns within the RCMP.

---

8.   The attachment to the Plaintiffs' Trial Brief Regarding the Conversion of the Contract from Canadian Dollars to U.S. Dollars shows that a Canadian dollar was worth US$0.9663 on September 26, 2008, but had fallen to US$0.9426 by October 1, 2008 and to US$0.8398 by October 10, 2008.  The RCMP argued in the Defendants' Response to Plaintiffs' Trial Brief Regarding the Conversion of the  Contract from Canadian Dollars to U.S. Dollars that the appropriate date of conversion should be either November 13 or 17, 2008.

Even if the RCMP had agreed to sign Cruise Connections' amendment, Cruise Connections' financing could not have been completed until the RCMP signed the "Condition Precedent" document.  (P. Sloane Dep. 134:18–137:84; Defs. SJ Ex. 61.)  This document stated that Cruise Connections had performed *all* of its required duties under the contract, and that Cruise Connections had earned its entire first payment.  (*Id*; Defs. SJ Exs. 32 & 33)  It also confirmed that the RCMP had reviewed the charter party agreements with the cruise lines, and they met all the conditions of the contract.  (Defs. SJ Exs. 32 & 33.)

Cruise Connections did not receive the Condition Precedent document from the Royal Bank of Canada until September 22, 2008.  (CCCM004959.)  Cruise Connections did not send the document to the RCMP until October 1, 2008.  (Defs. SJ Exs. 32 & 33.)  Cruise Connections can hardly argue now that (a) it would have provided the charter party agreements to the RCMP, (b) the RCMP would have had time to review the contracts to ensure that all requirements were met, and (c) the RCMP would have then certified that Cruise Connections had performed each and every duty it owed the RCMP 18 months before the ships would dock in Vancouver Harbor.  On September 23, 2008, Mr. Phillip Sloane told the Royal Bank of Canada that Cruise Connections did not have revised charter party agreements from the cruise lines, and would need to delay finalization until October.  (CCCM004973; *see also* CCCM005762 (T. Kelly blaming Holland America for delaying the completion of the charter party agreements in October 2008).)  The Royal Bank of Canada told Cruise Connections that it would have been unable to complete financing by September 25, 2008, and needed until October. (CCCM004992.)  Phillip Sloane admitted that Cruise Connections would not have been able to complete financing until the RCMP approved the charter party agreements, which would

23

necessarily have been some time after those agreements were provided to the RCMP on October 1, 2008.  (Defs. SJ Exs. 32 & 33; P. Sloane Dep. Ex. 80 at CCCM005526.)

## VIII.   DAMAGES DETERMINATION

The RCMP believes that the following adjustments must be made to Cruise Connections' expectations of revenue and projections of costs that would have been deducted from such revenue:

| Defendants' Proposed Adjustments to Cruise Connections' Claim | |
|---|---|
| **Cruise Connections' Claim:** | $23,067,581 |
| | |
| **Proposed Subtractions:** | |
| **OBR** | -$7,427,347 |
| **Repositioning Cruise** | -$1,252,000 |
| **John Sessions LOC** | -$5,057,500 |
| **Phillip Sloane Salary** | -$500,000 |
| **Recycling and Garbage** | -$670,563 |
| **Snow Removal** | -$79,800 |
| **Water Bunkering** | -$78,098 |
| **Ground Services** | -$50,000 |
| **Miscellaneous** | -$100,000 |
| **Hotel and Per Diem** | -$44,430 |
| | |
| **Total of Proposed Subtractions:** | -$15,525,974 |
| | |
| **Subtotal Minus Proposed Subtractions** | $7,807,843 |
| **Failure to Mitigate (25% of $7,807,843 remaining after subtractions):** | -$1,951,960 |
| | |
| **Adjusted Claim** | **$5,855,883** |

The resulting damages figure is $5,855,883, or approximately 10.9% of the contract price.[9]  This percentage is very close to the estimate that Tracey Kelly gave to Bud Mercer before the contract was terminated, when Mr. Kelly told Mr. Mercer that Cruise Connections expected a 10% profit margin.  (Plfs. Trial Ex. 8 at CCCM006675 ("we maintained

---

9.  This figure, pursuant to the Court's ruling of November 15, 2013, contains no adjustment for the erosion of the value of the contract due to currency fluctuations.

the industry standard 10% mark-up . . . . This 'margin' was communicated . . . .")  If Cruise

Connections expected to earn a 10% profit by doing all the work that would have been needed to

carry out the contract with the RCMP, it can hardly expect to be paid more than 10% for doing

what little work it did.

## <u>CONCLUSION</u>

        For all of the foregoing reasons, the damages sought by Cruise Connections

should be reduced as shown in this brief.


Dated:  February 3, 2014                Respectfully submitted,

                                                    /s/ Scott H. Christensen
                                                John M. Townsend, D.C. Bar No. 422674
                                                Scott H. Christensen, D.C. Bar No. 476439
                                                Corinne O. Lane, D.C. Bar No. 992715
                                              HUGHES HUBBARD & REED LLP
                                              1775 I Street, N.W., Suite 600
                                              Washington, D.C. 20006-2401
                                              Telephone:  (202) 721-4600
                                              Facsimile:  (202) 721-4646
                                              Email:  townsend@hugheshubbard.com
                                              Email:  christensen@hugheshubbard.com
                                              Email:  laneco@hugheshubbard.com

                                              *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2014, I electronically filed the foregoing with the Clerk of the Court for the District Court for the District of Columbia Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have served the foregoing document by First Class Mail for delivery within 3 calendar days, to the following non-CM/ECF participants:

> David J. Mazza
> WOMBLE, CARLYLE, SANDRIDGE & RICE, PLLC
> One West Fourth Street
> Winston-Salem, NC 27101

Dated:  February 3, 2014                    __/s/Corinne O. Lane_____