UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Cruise Connections Charter Management 1, )
LP, Cruise Connections Charter )
Management GP, Inc., )
                                                     )
     Plaintiffs, )
                                                     )
v. )                  Civil Action No. 1:08-CV-02054-RMC
                                                     )
Attorney General of Canada, )
Royal Canadian Mounted Police, and )
Her Majesty the Queen in Right of Canada, )
the Government of Canada, Royal Canadian )
Mounted Police, )
                                                   )
     Defendants. )
_____)

**PLAINTIFFS' REPLY TO DEFENDANTS' CLOSING BRIEF**

**I. RCMP ASKS THE COURT TO IGNORE SUBSTANTIAL AND CREDIBLE EVIDENCE DETAILING CCCM'S LOST PROFITS FROM OBR**

**A. OBR Reportedly Generated by the Cruise Lines does not Reflect the Amount CCCM Would Have Generated**

RCMP's argument for reducing CCCM's onboard revenue ("OBR") damages is based on a faulty assumption – that OBR reportedly generated by Holland America and Carnival during the Olympics is a reasonable approximation of the amount CCCM would have realized if not for RCMP's breach. In order to prevail on this argument, the burden is on RCMP to show the Court that the cruise lines' efforts to generate OBR were similar to the efforts planned by CCCM. *See Tercon Contractors Ltd. v. British Columbia*, 1994 CarswellBC 2971. RCMP utterly fails to carry this burden because there is, in fact, no similarity between CCCM's OBR program and the one ultimately put in place by the cruise lines.[1]

---

[1] RCMP's reference to *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854) and *Eastwalsh Homes Ltd. v. Anatal Devs. Ltd.*, 1993 CarswellOnt 587 ¶¶ 33-45, 57-59 (Can. Ont. C.A.) (WL)

RCMP's failure to carry its burden at trial forces it within its closing brief to fundamentally misconstrue the basis for CCCM's OBR claim.  While the evidence CCCM presented at trial shows that it expected to generate $49 per person per day in OBR as compared to the approximately $5.33 per person per day reported by the cruise lines, CCCM is not arguing that, all things being equal, its ability to generate OBR is ten times greater than that of Holland America or Carnival.  Instead, CCCM showed that the cruise lines made no effort to generate OBR on the ships which led to incredibly low actual spends.[2]  RCMP completely ignores this evidence, and does not respond to CCCM's strong proof that the cruise lines had no financial incentive to generate OBR because the cruise lines had already built their expected OBR profit into the charter hire they charged RCMP. [T.T. Day 1, pp. 103-105; T.T. Day 3, pp. 32-33.]

In a clear example of the cruise lines' lack of incentive to generate additional OBR, CCCM showed that Holland America allocated a grand total of zero dollars to marketing and promoting OBR-generating venues on either of the ships it had in port during the Olympics.  [T.T. Day 1, p. 95; Ex. A to the Deposition of Jason Ross at CCCM014797.]  Furthermore, CCCM showed that of the 20 to 25 bars on the Holland America Statendam, all but three were completely shuttered during the time the ship was in port in Vancouver, and one of the three was an outdoor bar exposed

---

does not support its case.  The evidence at trial clearly shows that CCCM's lost profits were reasonably likely and more than mere speculation.

[2] Adam Snitzer testified that in all of his experience, he has never seen spend numbers as low as those reportedly generated by the cruise lines during that Olympics.  [T.T. Day 3, pp. 34-35.] RCMP also attempts to use a December 2008 email from Tracey Kelly to Stacy Shaw at Royal Caribbean in which he estimates the OBR spend to be on the order of $20 to $25 per person per day as evidence that CCCM's OBR expectations were inflated.  Again RCMP fails to address the evidence introduced at trial that Mr. Kelly made his estimate based on an assumption that any contract between RCMP and the cruise lines would be different and would lack CCCM's incentive to make OBR a priority as other entities would control the OBR programs.  [T.T. Day 1, page 149.] RCMP's continued attempts to make arguments on paper that do not reflect the evidence at trial should not guide this Court.

to the elements of winter in Vancouver. [T.T. Day 1, pp. 95-97; Ex. A to the Deposition of Jason Ross at CCCM014797.] As this evidence shows, the cruise lines dedicated minimal resources to the generation of OBR, because they had no reason to spend money going after money they already had in hand. As stated plainly by OBR expert Adam Snitzer, "I think what we're looking at is the actual scenario that occurred was very different than what had been agreed to in the [CCCM] charter agreement." [T.T. Day 3, p. 36.] Therefore, RCMP's attempt to misconstrue CCCM's OBR argument is not persuasive.

By contrast, CCCM's bottom line – its ability to make profits – was contractually tied to its ability to generate OBR. Its agreements with the cruise lines included OBR guarantees which, if not met, would decrease CCCM's profit. Therefore, CCCM was fully incentivized to put programs in place to maximize OBR. RCMP failed to offer any evidence to show how the cruise lines' OBR programs were similar to the program CCCM was prepared to put into place.[3] Without this evidence, there is simply no basis upon which to say that the OBR reported by the cruise lines can be used as a proxy for the OBR to be generated by CCCM.[4]

### B. RCMP Offered no Evidence that CCCM Would not Have Been Able to Successfully Implement its OBR-Generating Programs

RCMP makes much of the fact that the security personnel reportedly spent far less on revenue-generating items during the Olympics than CCCM projected. Contrary to RCMP's

---

[3] RCMP's reliance upon *Tension Contractors Ltd. V. British Columbia (Minister of Transportation and Highway)*, 2006 CarswellBC 730 ¶ 156 (Can. B.C.S.C.) (WL) is misplaced because the RCMP utterly failed to show the OBR programs of CCCM and the cruise lines were similar. Therefore, RCMP's attempt to use the actual OBR amount generated by the cruise lines as a benchmark is without merit.

[4] Even RCMP cannot with a straight face argue that CCCM should be limited to the actual spend. Rather, it adds in various items in an arbitrary fashion to obtain a figure of approximately $1.3 million. But, if RCMP is going to add in items such as laundry and internet, it is illogical and inconsistent not to add in the other aspects of CCCM's OBR program that would have resulted in a $49 per person per day spend.

assertion, this variance is not due to a misunderstanding on the part of CCCM regarding the purpose of the cruise ship accommodations or the spending habits of the security personnel. Instead, the decreased spend is directly attributable to the limited nature of the cruise lines OBR programs. There is no evidence that CCCM would have been nearly as limited in its efforts.

To the contrary, CCCM introduced substantial evidence that prior to the time Normande Morin and the new contracting regime took over and breached the Contract, RCMP and CCCM were of one mind that the security personnel's time on the ships should be as memorable as possible. [T.T. Day 1, pp. 83-84, 120; Mercer Dep., pp. 58, 66-67; Kaluza Dep., p. 79; DeBruyckere Dep., pp. 89-94.] In order to meet this need, CCCM was prepared to offer a variety of programs and amenities that would allow the security personnel to truly enjoy their time off, programs that would also maximize CCCM's OBR. [*Id*.] These included spa, laundry, and internet services, ship-wide theme nights, specialty dinners, cocktail parties, shore excursions and tours of the local Vancouver attractions. [T.T. Day 1, pp. 85-88.] At no point prior to RCMP's breach was CCCM ever notified that it would not be able to implement its planned OBR programs. [T.T. Day 3, pp. 100-01.] Again, the fact that the cruise lines took a different approach based on the fact that they had no need to generate OBR should have no bearing on determining the amount that CCCM would have generated if not for RCMP's breach.

C.   **While CCCM's Agreement with RCMP Contemplated that the Ships Would be Full, CCCM Also Provided Evidence Supporting its OBR Claim Should The Court Conclude That The Ships Would In Fact Not Be Full**

RCMP argues that CCCM's OBR analysis is flawed because it is based on the assumption that the cruise ships were to be full. The reason for this assumption is simple: it is supported by the evidence in this case. When CCCM entered into its agreement with RCMP to provide cruise ships for the Olympics, the Contract called for one embarkation of passengers at the beginning of the Olympics and one disembarkation of passengers at the end. [T.T. Day 1, pp. 57-59, 100; Ptf.

4

Tr. Ex. 1, at CCCM001095, ¶ F.]  Additionally, Kelly Meikle, the contracting authority who signed the Contract with CCCM on behalf of RCMP, made representations to CCCM that the ships would full.  [T.T. Day 1, pp. 57-59.][5]  Therefore, the evidence at trial shows that the deal CCCM struck with RCMP called for full ships during the course of the Olympics.

Notwithstanding, it is inaccurate to argue that CCCM has made no provision whatsoever for RCMP's apparent change of plans after it breached the Contract regarding the accommodation arrangements.  In fact, to the extent the Court is inclined to rule that, despite the terms of the Contract and the representations made to CCCM by RCMP, the ships would not have been at 100% capacity while in port, CCCM provided evidence at trial showing the amount it lost in OBR because of RCMP's breach under this alternative scenario.  OBR expert Adam Snitzer testified, taking into account the 70% utilization rate of the actual ships used during the Olympics reflected in the documents provided by the cruise lines, CCCM would still have generated $6.74 million in OBR.  [T.T. Day 2, p. 181, Ptf. Tr. Ex. 13.]  Again, RCMP completely disregards the evidence introduced at trial.

**II.    RCMP'S BREACH CAUSED CCCM TO LOSE PROFITS FROM ITS AGREEMENT WITH AA WORLDWIDE**

As a direct result of RCMP's breach, CCCM lost at least $1,252,000 in profit from its agreement with AA Worldwide for the sale of repositioning cruises.  RCMP asks the Court to ignore this evidence, claiming that there was never any agreement between CCCM and AA Worldwide.  While it is undisputed that RCMP breached the Contract before CCCM and AA Worldwide could enter into a final written agreement, it is also undisputed that these material terms were solidly in place:

---

[5] Even more telling is the fact that RCMP requested that the contract to be amended in August 2008 to provide additional berths because RCMP believed it had not contracted for enough rooms for its security personnel.

5

- AA Worldwide would sub-charter the Holland America Statendam from CCCM and sell repositioning cruises from San Diego to Vancouver and back. [T.T. Day 1, p. 107; Ladwig Dep. pp. 16-17.]

- In consideration, AA Worldwide would pay CCCM no less than $125 per person per day to sub-charter the ship. [T.T. Day 1, pp. 108-10, 190; Ladwig Dep. p. 21.]

CCCM's evidence shows that it had a firm deal in place with AA Worldwide to sub-charter the Statendam for repositioning cruises.[6] Ultimately, it was RCMP's breach of the underlying Contract that prevented CCCM from being able to move forward with this deal. RCMP should not be allowed to avoid compensating CCCM for this direct consequence of its breach.

Lastly, RCMP is incorrect in its assertion that CCCM has dropped its claim for OBR from the relocation cruises. To the contrary, the $9.47 million that CCCM would have generated in OBR includes $410,000 in OBR from the repositioning cruises. [*See* Plaintiff's Closing Brief, ECF 95, p. 16 and Ex. A thereto.][7] Furthermore, Mr. Snitzer's alternative scenario based upon 70% occupancy also includes OBR from the repositioning cruise to support his opinion of lost OBR profits of $6.74 million. [T.T. Day 2, p. 181, Ptf. Tr. Ex. 13.] RCMP's arguments thus fail.

---

[6] RCMP's argument regarding the lack of a confidentiality agreement is a red herring because the confidentiality agreement had no bearing on the ability of CCCM and AA Worldwide to come to an agreement regarding the sub-charter of the Holland America ship. At most, the confidentiality agreement would have been needed before the parties reduced the sub-charter agreement to writing, but RCMP breached the Contract before that could take place.

[7] CCCM's expected OBR from the repositioning cruises was combined with expected OBR while the ships were in port to show that CCCM would have had no problem exceeding its OBR guarantees to the cruise lines, thereby allowing CCCM to net $8.74 million in profit from OBR. [*Id.*]

6

### III. CCCM'S LOST PROFITS ARE NOT REDUCED BY AMOUNTS ALLEGEDLY OWED TO JOHN SESSIONS OR PHILLIP SLOANE

#### A. CCCM Was Never Obligated to Pay John Sessions Any Money in Connection with CCCM's Performance Under the Contract; Therefore Any Amounts Allegedly Owed to Sessions Have no Bearing on CCCM's Contract Damages

Contrary to RCMP's mischaracterization, the Letter of Intent between CCCM and John Sessions is not evidence of a "cost [CCCM] would have incurred had the contract gone forward." In fact, while RCMP repeatedly characterizes the letter as an "agreement," the evidence shows otherwise.[8] The letter contemplates that the parties would later undertake a good faith effort to prepare and execute a "definitive" limited partnership agreement. [Defs. Tr. Ex. 4 at CCCM015133.] Furthermore, the letter refers in general terms to provisions that would be included in the definitive agreement, but not to all of them, as the letter stated that the definitive agreement is "not necessarily…limited" to such provisions. [*Id*. at CCCM015132.] Other terms, not described in even a general way in the letter, are to be within Sessions' "discretion." [*Id*.] The very need for a later "definitive" agreement means that the Letter of Intent itself did not express any binding obligations between the parties, and was at most an unenforceable agreement to agree to as-yet undefined obligations. As it turns out, RCMP breached the Contract before any definitive agreement could be reached between Sessions and CCCM.

Regardless of its enforceability, any sums owed to Sessions (which is denied) do not represent a cost to CCCM to perform the Contract. Indeed, any payment made to Sessions is outside the costs to perform the Contract and would be paid, in any event, by the partners from profits <u>after</u> RCMP made its payment to CCCM under the Contract. Any payment to Sessions would at most be a cost associated with submitting CCCM's bid to obtain the Contract. Once

---

[8] As noted at trial, CCCM disputes the enforceability of the Letter of Intent, calling into question whether that document entitles Sessions to payment in any amount.

7

CCCM's bid was accepted, the letter of credit – if it can be characterized as such – expired. Therefore, it was not in effect during and has absolutely nothing to do with CCCM's performance under the RCMP Contract ultimately executed between the parties. Just as CCCM's lost profits should not be decreased by the amount it paid for printing, postage, or other amounts it expended in preparing and submitting its bid to RCMP, the cost of obtaining the Letter of Intent should have no bearing on CCCM's contract damages.

      **B.    Any Money to be Paid to Phillip Sloane was to be Paid Out of CCCM Partner Profits**

Finally, the evidence at trial does not support RCMP's assertion that CCCM's damages should be decreased by the amount of Phillip Sloane's alleged salary. As Mr. Sloane testified, he was not on the payroll and was not to receive a salary from the company. [T.T. Day 2, p. 137.] Instead, any amount he would have been paid if not for RCMP's breach would have consisted of voluntary payments from the partners at the end of the project, money that would have been paid out of each partner's share of the profits. [*Id.*] This is consistent with the testimony of Mike Sloane, which confirms that Phillip was only to be paid if CCCM turned a profit. [M. Sloane Dep. 138:21-25.] Therefore, any amount Mr. Sloane would have received from partners out of their profits but for RCMP's breach has no bearing on the amount RCMP owes to CCCM.

**IV.    CCCM HAS ACCOUNTED FOR ALL COSTS AND EXPENSES ASSOCIATED WITH ITS PERFORMANCE OF THE CONTRACT**

RCMP states in its closing brief that "[t]he invoices received and paid by the RCMP in connection with the actual charters provide the best evidence of the additional costs that Cruise Connections would have incurred . . ." [ECF 96, p. 15.] Following this proclamation, one would reasonably expect RCMP to cite the Court to a grand collection of invoices RCMP allegedly received and paid in order to prove what its actual expenses were during the Olympics. However,

8

just as RCMP failed to offer evidence of its final, actual expenses at trial, its closing brief is similarly deficient.

All RCMP points to within its closing brief is one solitary invoice for an alleged prepayment for snow removal. However, RCMP completely ignores the fact that snow removal is not listed as one of CCCM's costs in the Contract. Therefore, even if the Court were to determine that snow removal would have ultimately been a cost that CCCM would have had to cover, the only cost that could rightfully be charged to CCCM would be the amount paid to actually remove snow from Ballentyne Pier. It is undisputed that no such snow removal services were actually used, because it did not snow at Ballentyne Pier while the ships were in port [T.T. Day 2, pp. 75-76] and Stan Webber testified that as port agent for CCCM, he never would have pre-paid for this service. [T.T. Day 2, p. 76.]

Additionally, as RCMP explained, snow removal was an important security concern, since snow at the pier could have negatively impacted the security forces' ability to mobilize quickly in the event of an emergency. [T.T. Day 2, pp. 100-01; T.T. Day 3, p. 76; T.T. Day 3, pp. 129-130.] Thus, this cost would not have been CCCM's responsibility, because it should be grouped together with the costs of fencing and traffic control and paid using the funds appropriated by the Canadian government to pay security-related expenses. [T.T. Day 3, pp. 73, 106-11.]

RCMP also argues that CCCM should be charged higher amounts for recycling, garbage removal, and water bunkering, but it fails once again to provide any evidence of its actual, final expenses for these items. Instead, it asks the Court to use CCCM's preliminary estimates, as opposed to the amounts that were testified to by its port agent, Mr. Webber. [T.T. Day 2, pp. 39, 43-44.] Mr. Webber's testimony was based on his 30 years of experience as a port agent, 26 years of which he served as a cruise line port agent at Ballentyne Pier. [T.T. Day 2, pp. 24-25.] RCMP

9

failed to put up a single witness to rebut his testimony at trial, and has provided no other basis to contradict his testimony regarding the expenses to be incurred by CCCM in performing the Contract. Thus, Mr. Webber's testimony regarding the amounts for recycling, garbage removal and water bunkering stands undisputed.

Finally, RCMP attempts to include items that CCCM initially listed as potential expenses, but which the evidence shows would not have been expended at all – namely ground services, hotel expenses for the time during which CCCM personnel would have stayed on cruise ships, and miscellaneous expenses. The evidence at trial does not support RCMP's argument. There is no evidence to support that these expenses would have been incurred by CCCM in performing the Contract. RCMP's argument fails.

## V.     RCMP'S MITIGATION OF DAMAGES ARGUMENT IS BASELESS

### A.     Duty to Mitigate Must be Reasonable Under the Circumstances

RCMP arbitrarily asks the Court to discount CCCM's damages by 25% based on CCCM's alleged failure to mitigate the damages flowing from RCMP's breach. RCMP contends that CCCM should be penalized for failing to pursue alternative projects that would have lessened its damages. RCMP's mitigation argument is without merit.

CCCM does not disagree that there is a general duty to mitigate or avoid damages. Nonetheless, the opportunity to mitigate or avoid damages must be reasonable under the circumstances. "Mitigation is a doctrine based on fairness and common sense, which seeks to do justice between the parties in the particular circumstances of the case." *Southcott Estates Inc. v. Toronto Catholic District School Board*, [2012] 2 S.C.R. 657 at para. 25 (Can.). The evidence at trial, common sense, and fairness all lead to one conclusion here – RCMP has failed in its burden to show that CCCM could have mitigated any of its claimed damages.

>   B.   **The Burden is on RCMP to show CCCM Failed to Reasonably Mitigate Damages**

Canadian law clearly establishes that RCMP has the burden to show CCCM failed to mitigate its damages. As stated by the Supreme Court of Canada*:*

> If it is the defendant's position that the plaintiff could reasonably have avoided some part of the loss claimed, it is for the defendant to carry the burden of that issue, subject to the defendant being content to allow the matter to be disposed of on the trial Judge's assessment of the plaintiff's evidence on avoidance consequences….But the burden which lies on the defendant in proving that the plaintiff has failed his duty of mitigation is by no means a light one, for this is a case where a party already in breach of contract demands positive action from the one who is often innocent of blame.

*Michaels v. Red Deer College,* [1976] 2 S.C.R. 324 at para. 5-6 (Can). RCMP has made conclusory statements asserting CCCM failed to mitigate its damages, including a superfluous summary of the CCCM partners' experience in the cruise industry. However, it has utterly failed to set forth any evidence of any specific opportunities that CCCM had to mitigate its damages.[9] RCMP has thus failed to carry its burden.

>   C.   **Mitigation Under the Circumstances was not Reasonable**

It is absurd to suggest CCCM could have mitigated its damages as asserted by RCMP. First, to the extent RCMP is suggesting that CCCM should have used the ships it chartered from Holland America and Royal Caribbean for other projects, the agreements CCCM entered prevented any such alternate use. Both charter party agreements ("CPAs") contain provisions specifically stating the chartered vessels were for the "express and exclusive use" of the Integrated Security Unit ("ISU") in Vancouver during the 2010 Olympics. [*See* Ptf. Tr. Ex. 4, p. 2, ¶2; Pt. Tr.

---

[9] CCCM points out that this case is not a typical mitigation case; CCCM did not manufacture goods or materials which it could have sold to some other buyer when RCMP breached the contract. Rather, CCCM was providing a specific service (chartering ships) for a specific event (the Olympics) to RCMP and RCMP deprived it of its ability to perform its service.

Ex. 5, p.1, ¶1.] Thus, pursuant to the CPAs with each cruise line, the chartered vessels *could not* be used by any entity other than the ISU *during* the 2010 Olympics in Vancouver, the purpose and time period for which the vessels were chartered.[10]

Second, in order to fully secure the ships in question, or any ships, CCCM would have been required to obtain financing and to post letters of credit but was prevented from doing so by RCMP's actions. This Court held that RCMP's conduct "was the proximate cause of the failure of bank financing for CCCM's contract with RCMP." [*See* ECF 73, p. 207; s*ee also id*. at p. 206 ("The Court concludes that Ms. Morin's anticipatory breach of contract on September 26 and 30 and her demands for a 90% letter of credit, which had already been waived, fundamentally changed the financial underpinnings of the contract….If anyone bore the brunt of responsibility for the financing falling through, it was Ms. Morin."); *id.* at p. 208 ("…by its repudiation of its contract obligations, RCMP made it impossible for CCCM to maintain its financing, and RCMP bears responsibility for that loss.")] Because of RCMP's repudiation and breach and CCCM's subsequent inability to secure financing, it was impossible for CCCM to charter vessels to market to other parties.

The reasonableness of CCCM's ability, or lack thereof, to mitigate its damages is further underscored by the fact that there was only one 2010 Olympics. To suggest CCCM find another venue hosting an event drawing participants from worldwide which would necessitate housing for thousands of people, or find another similar project is not reasonable.

---

[10] In its brief in support of its Motion for Summary Judgment, RCMP not only recognizes that the vessels were obligated to be for the exclusive use of the ISU during the 2010 Vancouver Olympic games, but RCMP states that the exclusive use provision was for its own benefit. *See* Memorandum of Points and Authority in Support of Defendant's Motion for Summary Judgment, ECF No. 62-1, p. 21.

### A. RCMP's Reliance Upon *Southcott Estates* is Misplaced

RCMP cites *Southcott Estates Inc. v. Toronto Catholic District School Board, supra*, in support of its argument CCCM failed to mitigate damages, analogizing CCCM to the single purpose corporation plaintiff in that case. The facts of the *Southcott* case are inapposite. In *Southcott*, the plaintiff was a wholly owned subsidiary of a larger corporation whose business was building homes in the Toronto area and was incorporated without any assets for the sole purpose of developing the land belonging to the defendant school board. The defendant school board entered into an agreement of purchase and sale with the plaintiff for the sale of some of the defendant's surplus land, most of which was zoned for industrial use and therefore required rezoning to be of use to the plaintiff developer. Pursuant to the agreement of purchase and sale, the defendant was obligated to use its best efforts acting in good faith to obtain consent from the appropriate governmental entity for rezoning the subject properties. The defendant did not obtain the rezoning by the closing date and took the position that the agreement for purchase and sale was therefore terminated. Plaintiff then claimed damages for failure to close and an issue arose as to whether the plaintiff mitigated its loss by subsequent purchases of land. The Supreme Court of Canada held that the plaintiff developer still had the ability to purchase other properties and that the property at issue was not unique but was similar to other investment properties. Further, the parent company of the plaintiff subsequently purchased other property, demonstrating that mitigation was possible.

Here, as set forth above, CCCM did not have the right to market the vessels to another entity for charter. Further, unlike in *Southcott*, the vessels were being chartered for a unique event, the Winter Olympics, which occurs in a different location every four years, and no similar event or venue existed at any time proximate to the 2010 Olympics in Vancouver. Furthermore, while in *Southcott* there was other suitable undeveloped land for purchase, there was no substitute for

13

the Contract with RCMP. Nor has RCMP shown that mitigation was possible by producing another party or entity to whom CCCM could have chartered vessels during the time in question. Simply put, RCMP has failed to carry its burden to prove that CCCM failed to mitigate and its argument is meritless.

VI.  **CCCM IS ENTITLED TO INTEREST ABOVE THE RATE SET BY THE REGISTRAR**

CCCM maintains that the Contract between the parties sets the proper rate of interest that should be applied in this case because the amount of payment under the Contract remains outstanding and overdue. However, even if the Court is not inclined to follow this contractual provision, RCMP completely ignores CCCM's alternative argument that the Court Order Interest Act (CORE) does not deprive the Court of its discretion to apply an interest rate higher than that set by the Registrar. As CCCM noted in its closing brief, British Columbia Courts have described the Registrar's rates as "only rates of convenience" which "might not be appropriate" in a commercial case such as this one. [*See* ECF 95, p. 22, *citing Hardwoods Specialty Products LP v. Rite Style Manuf.*, 2006 BCCA 139, at ¶ 17.] British Columbia courts have also granted compound interest in analogous breach of contract cases, undercutting RCMP's argument such compound interest is "prohibited." [*See* ECF 95, pp. 22-23, *citing Bank of America Canada v. Mutual Trust Co.*, 2002 CarswellOnt 1114, at ¶55.]

VII. **THE COURT'S RULING REGARDING THE DATE OF BREACH SHOULD STAND**

While no response should be necessary, CCCM will nevertheless briefly address RCMP's puzzling effort to once again re-litigate the date upon which it breached the Contract. In multiple prior Orders, this Court has definitively set September 26, 2008 as the date of breach and the date upon which the contact would be valued for exchange rate purposes. [*See* ECF 73, p. 191; ECF 88, p. 5; ECF 92, p. 7.] In so doing, the Court has already concluded that the various delays that

RCMP once again raises in its closing brief and its Offer of Proof should have no bearing on CCCM damages, since any such delays were the direct result of the repudiatory actions of RCMP. [*See* ECF 92, p. 3.]  Accordingly, CCCM's lost profit analysis rightly utilizes September 28, 2008 as the date to calculate its damages under the Contract.

## VIII.   CONCLUSION

CCCM respectfully renews its request that the Court enter judgment in CCCM's favor in the amount of $23,067,581 (US) and award pre-judgment interest at a rate equal to 3.0 % higher than the average Bank Rate during the month prior to payment of the judgment or, in the alternative a rate of 3.29 % compounded monthly.

Respectfully submitted this the 10th day of February, 2014.

/s/ Jack M. Strauch
Jack M. Strauch
*Admitted Pro Hac Vice*
N. C. State Bar No. 22341
Stanley B. Green
*Admitted Pro Hac Vice*
N. C. State Bar No. 25539
Jessie C. Fontenot, Jr.
*Admitted Pro Hac Vice*
N. C. State Bar No. 40597
Strauch Green & Mistretta, PC
530 North Trade Street, Suite 303
Winston-Salem, NC 27101
Telephone:  (336) 837-1061
Facsimile:  (336) 725-8867
jstrauch@sgandm.com
sgreen@sgandm.com
jfontenot@sgandm.com

*Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

       The undersigned hereby certifies that he is an attorney at law admitted pro hac vice to practice in the United States District Court for the District of Columbia for this case, is attorney for plaintiff, and is a person of such age and discretion as to be competent to serve process. That on February 10, 2014, he electronically filed a copy of the foregoing **PLAINTIFFS' REPLAY TO DEFENDANTS' CLOSING BRIEF** with the Clerk of Court using the CM/ECF system which will electronically notify counsel hereinafter named:

    John M. Townsend, Esq.
    Scott H. Christensen, Esq.
    Corinne Lane, Esq.
    Hughes Hubbard & Reed, LLP
    1775 I Street, NW, Ste. 600
    Washington, DC 20006-2402
    townsend@hugheshubbard.com
    christensen@hugheshubbard.com
    lanec1@hugheshubbard.com

    /s/ Jack M. Strauch
    Jack M. Strauch
    *Admitted Pro Hac Vice*
    N. C. State Bar No. 40597
    Strauch Green & Mistretta, PC
    530 North Trade Street, Suite 303
    Winston-Salem, NC 27101
    Telephone:  (336) 837-1061
    Facsimile:  (336) 725-8867
    jstrauch@sgandm.com

    *Attorneys for Plaintiffs*