**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **CRUISE CONNECTIONS CHARTER MANAGEMENT 1, LP,** *et al.*, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 08-2054  (RMC)** |
| **ATTORNEY GENERAL OF CANADA,** *et al.*, | ) ) ) | |
| **Defendants.** | ) ) ) | |

## OPINION

Canada hosted the 2010 Winter Olympic Games in Vancouver, British Columbia. Expecting crowds, the Royal Canadian Mounted Police sought alternative housing for its multi-agency task force that provided security to athletes and visitors at the various Olympic venues. Through a competitive bidding process in 2008, Plaintiff Cruise Connections Charter Management 1, LP, was selected as the broker to negotiate charters for three ships to be berthed at Vancouver's Ballentyne Pier as floating hotels for security personnel during the Games. Canada later changed its contracting representatives and terminated its agreement with Cruise Connections. Cruise Connections sued for breach of contract and the Court found RCMP liable. The matter then proceeded to a bench trial on damages. For the reasons set forth below, the Court will award $19,001,707, plus prejudgment interest.

## I. PROCEDURAL HISTORY

Cruise Connections Charter Management 1, LP, and Cruise Connections Charter Management GP, Inc., (collectively, CCCM) are Plaintiffs in this action. Defendants are the

Queen in Right of Canada, the Attorney General of Canada, and the Royal Canadian Mounted

Police (RCMP).  RCMP executed a contract with CCCM for the performance of brokering

services for three ships to house the Integrated Security Unit (ISU), a multi-agency task force

composed of security personnel from all Canadian Provinces, at the 2010 Winter Olympics in

Vancouver.[1]  CCCM filed suit on November 26, 2008**,** alleging that RCMP breached the

Contract.  The case was initially assigned to the Honorable James Robertson in Washington,

D.C.

RCMP moved to dismiss the Complaint on March 31, 2009, arguing that Canada

is immune from suit under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330,

1602–1611, and that no exception to FSIA applied.  RCMP also argued that the case should be

heard in a British Columbia court for convenience to the parties.  Judge Robertson granted the

motion to dismiss, finding that Canada was immune from suit under FSIA.  *See* June 9, 2009

Minute Entry; Mem. in Support of Ruling [Dkt. 18].  The D.C. Circuit disagreed and reversed on

April 6, 2010, holding that Canada was not immune from suit because it had engaged in

commercial activities that had a direct effect in the United States.  *Cruise Connections Charter*

*Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661 (D.C. Cir. 2010).

On remand, RCMP moved to dismiss, arguing that this action should be

transferred to British Columbia and that Count II of the Complaint, which alleged that RCMP

had violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-

1 *et seq*., should be dismissed for failure to state a claim.  Because Judge Robertson had retired,

the case was transferred to this Court.

---

[1]  The parties' agreement is reflected in a series of documents, including the Project Services
Agreement and the Articles of Agreement.  These documents are collectively identified as "the
Contract" for ease of reference.

On February 15, 2011, the Court granted in part and denied in part RCMP's

Motion to Dismiss.  *See* Feb. 15, 2011 Mem. Op. [Dkt. 42].  Specifically, the Court granted

RCMP's request that the Court apply British Columbia law and dismiss Count II, and denied its

motion to transfer the case to a British Columbia court.  The parties then engaged in fact

discovery, which was completed on October 12, 2012.

On November 30, 2012, RCMP and CCCM filed cross-motions for summary

judgment, each arguing that the opposing party had breached the Contract so that no liability

should attach to the movant.  After exhaustive review and detailed findings, the Court granted

summary judgment to CCCM.  *See Cruise Connections Charter Mgmt. v. Att'y Gen. of Can.*, 967

F. Supp. 2d 115 (D.D.C. 2013).  The Court found that RCMP anticipatorily repudiated the

Contract on September 26, 2008 and that RCMP formally terminated the Contract on November

17, 2008, by declaring default.

After the parties submitted pretrial motions, the Court set a Contract valuation

date of September 26, 2008, *i.e.,* the date on which RCMP anticipatorily breached the Contract,

for the purpose of setting an exchange rate from Canadian dollars (CAD) to U.S. dollars (USD).

*See* Nov. 15, 2013 Order [Dkt. 88] at 5; Dec. 6, 2013 Supp. Order.[2]  The Court granted Canada's

motion to admit evidence of CCCM's alleged failure to mitigate damages and granted CCCM's

motion to exclude evidence of alleged contributory fault.  *See* Nov. 15, 2013 Minute Orders.  A

three-day bench trial commenced on November 18, 2013.  At its conclusion, Canada asked to

---

[2] The Court issued an abbreviated Order on November 15, 2013, to aid the parties with trial
preparation.  The Court filed a Supplemental Order on December 6, 2013, to explain its analysis
and provide citations to cases upon which the Court relied.

submit a closing trial brief in lieu of closing argument.  The Court agreed and the parties' post-trial submissions were fully briefed on February 10, 2014.

## II.  FINDINGS OF FACT[3]

### A.  The Contract: Charter Costs

1.  RCMP contracted to pay CCCM $55,348,136 CAD to provide three cruise ships as accommodations for the ISU during the 2010 Winter Olympics in Vancouver.  Nov. 18, 2013 Trial Tr. [Dkt. 97] at 62; Pls. Trial Ex. 3 (Aug. 25, 2008 CCCM Contract Amendment).

2.  The valuation date for the Contract is set at September 26, 2013.  *See* Dec. 6, 2013 Supp. Order.  As of September 26, 2008, $55,348,136 CAD converted to $53,482,904 USD. *See* Bank of Canada Daily Noon Exchange Rates, <http://www.bankofcanada.ca/rates/exchange/10-year-lookup/> (last visited June 7, 2014).

3.  It is undisputed that, under British Columbia law, CCCM's lost profits must be measured by subtracting the anticipated costs of Contract performance from the $53,482,904 USD contract price.  *See Bank of Am. Can. v. Mut. Trust Co.*, 2002 CarswellOnt 1114, ¶ 47 (S.C.C. 2002) (reciting the "general rule of contract damages" that "'the amount which would have been received if the contract had been kept, is the measure of damages if the contract is broken'" (quoting *Hadley v. Baxendale*, 9 Exch. 341 (Eng. 1854) (other citation omitted))); *M.J.B. Enters. Ltd. v. Defence Constr.*, 1999 CarswellAlta 301, ¶ 55 (S.C.C. 1999) ("The general measure of damages for breach of contract is, of course,

---

[3] This section addresses general assumptions underlying the parties' estimates, as well as uncontested profit and expense items.  The Court will decide contested cost and profit categories in the Analysis section of this Opinion.

expectation damages."). The first category of expenses relates to costs that CCCM would have paid to charter the ships.

4. In its charter party agreement with Holland America Lines (occasionally, Holland America), CCCM agreed to pay $9,440,080 USD for the *ms Statendam*, plus $651,040 USD for hotel service charges and $2,408,848 USD for guaranteed net onboard revenue (OBR).[4] Pls. Trial Ex. 4 (Holland America Charter Party Agreement) at 2. In total, CCCM would have paid $12,499,968 USD for the charter hire of one Holland America ship named the *ms Statendam*. *Id.*; Nov. 18, 2013 Trial Tr. at 65.

5. In a charter party agreement with Royal Caribbean Cruise Lines (occasionally, Royal Caribbean), CCCM agreed to pay $18,167,100 USD for two Royal Caribbean ships named *Jewel of the Seas* and *Radiance of the Seas*; $1,240,830 USD for hotel service charges; and $6,330,000 USD for guaranteed net OBR. Pls. Trial Ex. 5 (Royal Caribbean Charter Party Agreement) at 3–4. In total, CCCM contracted to pay $25,737,930 USD for the charter hire of two Royal Caribbean ships. Nov. 18, 2013 Trial Tr. at 66.

6. The parties do not dispute that the total cost to CCCM for the charters of one ship from Holland America and two ships from Royal Caribbean would have been $38,237,898 USD.

## B. The Contract: Administrative and Operational Costs

7. CCCM also would have incurred port-related costs while performing its obligations under the Contract. *See* Nov. 19, 2013 Trial Tr. [Dkt. 98] at 24.

---

[4] Charterers are generally required to guarantee that cruise lines will earn a certain amount of revenue above and beyond the contracted-for services through incidental passenger purchases, such as sundries, alcohol, and personal services. It is customary for charterers to post letters of credit to guarantee this "onboard revenue," sometimes called "OBR."

8. Stanley Webber, an experienced Port Agent at Ballentyne Pier in Vancouver, would have been CCCM's Port Agent for the 2010 Winter Olympic Games. *Id.* at 40–41. Mr. Webber's testimony went largely unchallenged by RCMP, and thus, the Court accepts as true those statements that went unchallenged.

9. In his career as a port agent, Mr. Webber has been tasked with the negotiation of various services, including garbage, recycling, and stevedoring. *Id.* at 28. Further, Mr. Webber has contracted for services on behalf of cruise lines involved in this matter, including Royal Caribbean Radiance Class vessels and the Holland America *ms Statendam*. *Id.* at 30.

10. Mr. Webber testified that he would have charged CCCM approximately $46,000 CAD to serve as its Port Agent for the duration of the charter hire. *Id.* at 40–41.

11. Mr. Webber's company "arrange[s] contracts with and maybe even negotiate[s] contracts with the folks who are going to take garbage off and do recycling." *Id.* at 28. Based on his years of experience at the Ballentyne Pier, Mr. Webber estimated that recycling and solid garbage removal would have cost CCCM approximately $212,000 CAD. *See id.* at 39.

12. Mr. Webber testified that the costs of one embarkation and one disembarkation[5] would have been $80,000 CAD each, or $160,000 CAD total. *Id.* at 41–42. This estimate was

---

[5] Mr. Webber described the process of embarkation and disembarkation as follows: "[W]e set up booths at the [airport] terminal . . . and as the RCMP passengers [came] to the terminal, we would have help[ed] to provide meet and greet at the airport . . . . [W]e would have met them at the airport . . . . [p]rovide[d] transportation to the terminal and then [met] with them at the terminal and assign[ed] them the rooms for the categories that they were allotted to each of the ships." Nov. 19, 2013 Trial Tr. at 42.

in accord with CCCM's expectations and the Contract, although the Contract also allowed RCMP to add embarkations and disembarkations for additional fees.

13. Yet Donna Kaluza testified that RCMP did not intend to use CCCM's port agent to "collect its personnel from airports and hotels . . . before embarking on the cruise ships." Nov. 20, 2013 Trial Tr. at 75.  CCCM, however, included this service in its estimated costs for embarkation and disembarkation.  *See* Nov. 19, 2013 Trial Tr. at 42.

14. Because RCMP would not have used CCCCM's transportation and greeting services for purposes of embarkation and disembarkation, the Court finds that Mr. Webber's estimated costs must be reduced.  However, since the parties have not submitted alternative cost estimates, the Court will set CCCM's expenses for one embarkation and one disembarkation at $80,000 CAD total.

15. Mr. Webber testified knowledgeably about water bunkering requirements for the Holland America and Royal Caribbean ships, as he regularly negotiates and contracts for water bunkering services for these cruise lines at Ballentyne Pier.  Nov. 19, 2013 Trial Tr. at 30–31.  Based on his experience, Mr. Webber estimated that CCCM would have paid approximately $125,000 CAD for water bunkering over the duration of the charter hire. *Id.* at 43–44.

16. Mr. Webber testified that, as CCCM's Port Agent, he would have negotiated a customary charge for ground services.  *Id.* at 33.  He estimated that CCCM would have paid $50,000 CAD to move RCMP personnel to and from the airport and Ballentyne Pier.  *Id.* at 53. Although RCMP's original plans appear to have required CCCM to provide transportation from the airport, *see id.* at 53, Donna Kaluza, a former RCMP Inspector, testified at trial that RCMP changed its plan to use CCCM ground services.  Nov. 20,

2013 Trial Tr. [Dkt. 99] at 75.  The cost for ground services also included monies for

deliveries and last-minute errands.  *See* Nov. 19, 2013 Trial Tr. at 33.  Therefore, CCCM

would have incurred some charges related to ground services even if RCMP had provided

its own transportation for ISU personnel.

17. Mr. Webber is familiar with harbor pilot[6] charges to and from the Ballentyne Pier and he

estimated that CCCM would have paid $45,000 CAD for Vancouver harbor pilots.  Nov.

19, 2013 Trial Tr. at 56.

18. Based on Mr. Webber's experience negotiating for stevedoring[7] services at Ballentyne

Pier, he testified that CCCM would have paid $225,000 CAD.  Nov. 19, 2013 Trial Tr. at

28, 62.

19. Phillip Sloane, CCCM's Chief Financial Officer, testified concerning operational and

administrative expenses that CCCM would have paid in connection with its Contract

performance.

20. Mr. Sloane came out of retirement to perform accounting tasks for CCCM.  He prepared

cash flow projections, which were primarily intended to secure financing from the Royal

Bank of Canada.  Nov. 19, 2013 Trial Tr. at 108–09; *see* Pls. Trial Ex. 34 (2008 Cash

Flow Projections).  Mr. Sloane "took the conservative approach" to the cash flow

projections because he "didn't want to overplay [his] hand . . . [or] exaggerate."  Nov. 19,

2013 Trial Tr. at 110.

21. CCCM planned to hire a forensic accountant to ensure accurate financial reporting on the

Contract.  Nov. 19, 2013 Trial Tr. at 112–13.  Mr. Sloane estimated that CCCM would

---

[6] A pilot guides ships through harbors and, possibly, other dangerous or congested waters to
ensure ship safety.
[7] Stevedoring refers to the process of loading and unloading a ship.

have paid $45,000 CAD for a forensic accountant based on information provided by an

Assistant Professor of Accounting at Florida State University.  *Id.* at 113–14.

22. CCCM also would have paid approximately $22,000 USD for internet technology costs,

which included "any rewriting of software that might [have been] necessary for managing

the inventory."  *Id.* at 117.  Hill Tech, the writer of CCCM's proprietary software

program, provided information supporting this cost estimate.  *Id.* at 118.

23. Insurance on the Contract would have cost $6,450 USD.  *Id.*  Wilson Insurance, CCCM's

insurance agency, provided this cost estimate as a direct quote to CCCM.  *Id.*

24. CCCM estimated a cost of $66,500 USD for travel and airfare.  *Id.*  Mr. Sloane's brother

provided this estimate based on his experience as a travel agency employee.  *Id*. at 118–

19.

25. Mr. Sloane estimated that CCCM would have expended $80,000 USD in legal costs

associated with its performance of the Contract.  *Id.* at 119.  Mr. Sloane developed his

estimate by taking "the most expensive lawyer that was on [CCCM's] staff at the time,

Mr. Joiner.  He was charging [CCCM] $400 an hour.  And [Mr. Sloane] estimated $200

[USD] for drafting documents and reviewing closing statements."  *Id.*  CCCM offered no

additional support for this figure, but Canada did not contest the amount of this expense

item.

26. Mr. Sloane's cash flow projections included two $100,000 USD charges for

miscellaneous expenses.  *Id.* at 119–20.  Mr. Sloane testified that the first item of

miscellaneous expenses covered unanticipated subcontracting costs.  *Id.* at 115.  The

second item of miscellaneous expenses covered "minor things that would come up on a

monthly basis over the course of reaching the actual when the ships came in . . . . It [was] a catch all for things that you can't have a line item for." *Id.* at 120.

27. Mr. Sloane further testified that CCCM would have paid $70,000 CAD for office space in an apartment near Vancouver. *Id.* at 120.  Mr. Sloane determined this figure by researching the typical cost of an apartment and then "ratchet[ing] . . . up" the number to reflect anticipated overcharging during the 2010 Winter Olympics. *Id.* at 121.

28. Mr. Sloane estimated that CCCM would have paid $32,000 CAD for hotel rooms to accommodate CCCM partners and operations personnel from October of 2009 to March of 2010. *Id.*  Mr. Sloane's estimate assumed that CCCM's partners and operations personnel would have stayed in hotels for the entire six month period before and immediately after the Olympics.  Mr. Sloane later realized that CCCM's partners and staff would have stayed onboard the ships, and not in hotels, for approximately one month during the Olympics. *See id.* at 123–24.  Therefore, Mr. Sloane testified that an appropriate estimate would have budgeted for five months of hotel costs for operations personnel.  CCCM now claims $25,600 CAD for this cost.

29. Mr. Sloane originally estimated a further expense of $180,000 CAD to cover per diem for CCCM partners and staff in Vancouver. *Id.* at 122.  He included the estimated food costs for CCCM partners lodging in Vancouver hotels, with an allotment of $400 per-person-per-day over a six-month period. *Id.*  Mr. Sloane testified that he overestimated per diem expenses because he did not account for the fact that certain staff members would be housed onboard the ships for at least one month. *Id.* at 122–23.  CCCM now claims $150,000 CAD for this cost.

30. Mr. Sloane estimated that CCCM would have paid $150,000 CAD in salaries for operations personnel.  *Id.* at 123.  He testified that these expenses were calculated to cover wages for five employees at approximately $30,000 CAD each.  *Id.* at 123–24.

31. CCCM budgeted $6,000 CAD for site inspections.  *Id.* at 124.  Mr. Sloane testified that he projected this amount based on information from Sue Edwards, CCCM's Vice President of Operations and Project Manager.  Ms. Edwards instructed Mr. Sloane to budget for four site visits at $1,500 CAD each to cover associated incidental expenses.  *Id.*

32. Mr. Sloane anticipated that CCCM would have paid $7,500 CAD for a new employee to assist Ms. Edwards in February and March of 2010.  *Id.*  Mr. Sloane testified that the executive assistant, who had not yet been hired, was "primarily going to be working for [Ms. Edwards] while the ships were in port."  *Id.*

33. Mr. Sloane testified that CCCM anticipated a fee totaling $493,125 CAD for letters of credit.  *Id.* at 125.  His estimate included letters of credit for Contract performance costs and CCCM's guarantee of OBR to the cruise lines.  *Id.* at 125, 137.

34. Finally, Mr. Sloane testified that CCCM would have paid $37,050 CAD in interest on the letters of credit.  *Id.* at 125, 137.

## C.  The Contract: Costs Omitted By CCCM

35. RCMP contends that CCCM has omitted certain costs that would reduce total damages, such as the cost of a Letter of Credit from John Sessions and prospective payments to Phillip Sloane.  CCCM's costs of performance do not include any payment to John Sessions for a critical letter of credit that supported CCCM's bid to RCMP.  Close to the deadline for submitting its bid, and to satisfy a necessary element of the Request for

Proposal, CCCM and Mr. Sessions agreed that he would provide "an unredeemable, nonpayable Letter of Credit in the amount of $5,057,500 [USD]." *See* Defs. Trial Ex. 4 (Sessions Letter of Intent).  CCCM agreed that, if it won the bid, it would pay John Sessions's choice of "either . . . [a] special limited partnership interest or . . . allocations and distributions of the amounts described above [*i.e.*, $5,057,500] within 10 days after the Partnership receives its initial payment from the [RCMP] . . . ." *Id.* at 1–2. Negotiated hastily, the Letter of Intent anticipated that the parties would "work in good faith toward the preparation and execution of a definitive Limited Partnership Agreement." *Id.* at 2.  In fact, those parties never negotiated or executed a Limited Partnership Agreement.

36. CCCM also omitted any salary for Phillip Sloane from its cost estimates.  CCCM agreed to pay Phillip Sloane $500,000 USD for his work as Chief Financial Officer.  Mr. Sloane insists that any payment to him was "not a salary" from anticipated profit because "there was no guarantee.  It was voluntary on [the CCCM partners'] part.  It was out of profits." Nov. 19, 2013 Trial Tr. at 137.

37. Normande Morin, RCMP's Director of Strategic Procurement, testified that CCCM omitted or underestimated certain expenses that it would have incurred in performing the Contract.  *See* Nov. 20, 2013 Trial Tr. at 116.

38. For instance, while the Contract specified certain port-related expenses, *see* Contract at CAN0000146 ¶ 6.1, Ms. Morin testified that CCCM would have incurred additional expenses, as experienced by the replacement cruise lines, which it should have deducted here.

39. Ms. Morin testified that a one-page document titled "Recap of Known Port Costs Associated with the RCMP Charter" ("Recap") was a "revised . . . actual" list of expenses incurred by the cruise lines that contracted directly with RCMP after the Contract was terminated. *Id.* at 127–28; *see also* Pls. Trial Ex. 26 (Recap).

40. The record does not support Ms. Morin's testimony. First, the Recap has no identified author and is undated and unsigned. Second, Ms. Morin could not provide any foundation as to its origin beyond the fact that it was located in her files. Third, the Court finds it highly doubtful that the Recap listed final *actual* costs. *See* Nov. 20, 2013 Trial Tr. at 148 (Court: "[The exhibit] absolutely can't be the final, final because the numbers aren't precise enough. I mean, there's no cents or anything, nothing would ever come out that way."). In addition, the Recap included several costs that were not identified in the Contract list of CCCM work responsibilities. *Compare* Pls. Trial Ex. 26 (Recap) *with* Pls. Trial Ex. 1 (Contract) at CAN0000146 ¶ 6.1. Such added costs included janitorial services, fencing, and traffic expenses. Because the Recap was undated, unsigned, and without a proper foundation, and because it failed a commonsensical evaluation and included costs the Contract did not impose on CCCM, the Court finds it is entitled to no weight.

41. The value of the Recap is further undermined by the testimony of former RCMP Inspector Donna Kaluza, who testified that certain costs listed on the Recap concerned security costs that were paid by Canada. For instance, Ms. Kaluza testified that "when [RCMP] designated [Ballentyne Pier as] a venue site[,] all of the security planning and funds became available to put in protective barriers, perimeters, special mooring, do certain searches and secure that area basically to a degree that [] was . . . impenetrable."

Nov. 20, 2013 Trial Tr. at 73–74.  Put differently, once the Ballentyne Pier became an

official venue, the Government of Canada—not the cruise lines or even RCMP itself—

agreed to provide all necessary funding for security needs.  *Id.* at 106.

42. Specifically, Ms. Kaluza testified that the Government of Canada's funding would have

covered security fencing to restrict public access to Ballentyne Pier.  *Id.* at 107.

43. Ms. Kaluza also suggested that traffic coordination would have been a security cost to be

paid by Canada.  *See id.* at 110 (When asked about traffic coordination costs, Ms. Kaluza

responded: "[I]t is my understanding . . . that all related security planning costs that

would have been deemed appropriate . . . to secure that site to the level that was required

would have . . . been borne under this special [designation] for security funding").  Ms.

Kaluza's testimony on these costs supports CCCM's understanding of its obligations and

explains the absence of such items from the Contract.

44. Snow removal was not identified as a Contract expense to be paid by CCCM.  However,

Ms. Kaluza testified that "[s]now removal was a key component of all of our planning

. . . .  It was felt and decided that we could not anticipate nor control the weather and

therefore, we needed to make sure that snow removal was in place."  Nov. 20, 2013 Trial

Tr. at 75–76.  She further testified that "the normal process for snow removal in Canada

. . . is you pay for it up front . . . .  If it doesn't snow all winter well it was basically

insurance but when it snows it's necessary to have it."  *Id.* at 76.

45. Mr. Webber agreed that snow removal would be an important consideration for RCMP

security forces because "snow would . . . have been a very difficult problem if the troops

had to move very fast . . . ."  Nov. 19, 2013 Trial Tr. at 101.  However, Mr. Webber

testified that he would not have advised CCCM to pre-pay for snow removal, as its

occurrence in Vancouver is so uncertain.  Because it did not snow at Ballentyne Pier

during the 2010 Olympics, Mr. Webber and CCCM maintain that there would have been

no Contract cost for snow removal.  *Id.* at 75–76.

### D.  Lost Onboard Revenue

46. In its charter party agreement with Holland America, CCCM guaranteed $2,408,840 USD

in net OBR.  Pls. Trial Ex. 4 (Holland America Charter Party Agreement) at 2.  CCCM

agreed to pre-pay $1,204,424 USD, or fifty percent of the guaranteed amount, by

December 31, 2009.  *Id.* at 4.

47. CCCM guaranteed Royal Caribbean $6,330,000 USD in combined net OBR for both of

its ships.  Pls. Trial Ex. 5 (Royal Caribbean Charter Party Agreement) at 3.  CCCM

agreed to pre-pay $3,165,000, or fifty percent of the guaranteed amount, by December

31, 2009.  *Id.* at 8.

48. To assure payment of the cruise lines' guaranteed OBR, both charter party agreements

required CCCM to set aside $8,738,840 in funds received from RCMP to cover the full

guaranteed amount.  *See* Nov. 18, 2013 Trial Tr. at 75–83.  Of this amount, CCCM was

required to pre-pay one-half to each cruise line on December 31, 2009.  If a cruise line

recovered less than half of its full guaranteed OBR, it would retain the full pre-payment

and CCCM would have covered the additional loss from the set-aside funds.  If a cruise

line earned half of its guaranteed OBR, it would keep the entire pre-payment (thus

realizing 100% of the guarantee) and CCCM would retain the second half as profit.  If a

cruise line earned the full guaranteed OBR, as CCCM anticipated CCCM could achieve

through heavy marketing, the cruise lines would repay to CCCM the pre-paid half of

OBR and CCCM would keep the second half, thereby transforming all of the potential cost into a profit. *See id.*

49. The charter party agreements were enforceable in the United States, and CCCM guaranteed OBR in USD. As a result, all figures supporting the total OBR calculation are expressed in USD.

50. CCCM presented the testimony of Adam Snitzer, an independent consultant for Peak Revenue Performance in Miami, Florida, to establish that CCCM would have recouped the full net OBR guaranteed to the cruise lines. Mr. Snitzer testified that he had worked in the cruise industry for approximately eighteen years and had extensive experience with estimating and forecasting OBR. *See* Nov. 19, 2013 Trial Tr. at 142, 144, 145–47. Mr. Snitzer worked as Chief Revenue Management Officer of Kenard Cruises, a subsidiary of the Carnival Corporation; Vice President of Special Projects for Carnival Corporation; Vice President of Onboard Revenue Management for Costa Cruise Lines, a subsidiary of Carnival Corporation; and Vice President of Marketing and Revenue Management for Seabourn Cruise Lines, a subsidiary of Carnival Corporation. *Id.* at 146–48.

51. Without conceding that Mr. Snitzer qualified as an expert, defense counsel expressed no objection to his testifying at the damages trial. *Id.* at 151. The Court reserved the question of whether Mr. Snitzer was qualified to provide expert testimony on the calculation and projection of cruise line onboard revenue. Based on Mr. Snitzer's uncontested expertise in the cruise line industry, the Court finds that Mr. Snitzer is qualified to provide expert testimony on the calculation and projection of cruise line onboard revenue, and therefore accepts him as an expert. *See* Fed. R. Evid. 702

(providing that a witness may qualify as an expert "by knowledge, skill, experience, training, or education").

52. Mr. Snitzer based his OBR estimates on the assumption that ISU members would pay for various services onboard the ships, including bars, casinos, food in the alternative restaurants, box lunches, shore excursions, shops, photos, spas, communications, laundry, medical services, and art.  Nov. 19, 2013 Trial Tr. at 153.

53. Mr. Snitzer based his estimates on documents that he reviewed in connection with this case, the charter party agreements, deposition excerpts, and email communications.  *Id.* at 154.  From these sources, Mr. Snitzer surmised that RCMP had an interest in "maintaining morale, providing a relaxing atmosphere, allowing people to drink while on board, [and] preferring [that] people . . . spend time on board during their recreation" rather than venture into certain parts of Vancouver that were close to the port and unsafe. *Id.*

54. Mr. Snitzer's estimates also assumed that the cruise ships would have been full while in port at Ballentyne Pier.  *Id.* at 175.  Mr. Snitzer explained that "typically when a company acquires space . . . for a venue like the [Olympics] . . . the intention is to use all the space because you're paying for it all.  So typically you would expect that people would fill this space first before they use any other space that's available to them."  *Id.* at 175–76. Similarly, Tracey Kelly, a CCCM partner, testified that the Contract provided for one embarkment and one disembarkment.  Nov. 18, 2013 Trial Tr. at 57–58.  Mr. Kelly explained that CCCM negotiated contract terms with Kelly Meikle, RCMP Contracting Officer, and that Ms. Meikle had represented that the cruise ships would be full, and, in

fact, worried that the vessels would not be able to accommodate all of the ISU personnel. *Id.* at 58.

55. Yet Donna Kaluza testified that when RCMP contracted with CCCM, RCMP was not certain as to how personnel would have embarked, or "ramped up." Nov. 20, 2013 Trial Tr. at 84. Moreover, the Contract provided that "any additional[] embarkation and disembarkation dates are possible, but would require additional funding." Pls. Trial Ex. 1 (Contract) at CCCM001095 ¶ f. Thus, RCMP rejects Mr. Snitzer's estimates, which were based on one embarkment and one disembarkment.

56. Mr. Snitzer described a chart that demonstrated his methodology for estimating a per-person-per-day (pppd) OBR for the Royal Caribbean ships:

> The number at the very bottom of the column is $44.10 which is the net on board revenue that the Royal Caribbean Corporation reported on their 10-K statement for 2010. So that was their actual experience that they reported in their public filings. Then I allocated the $44.10 according to the percentages in the [column titled] breakdown by on board venue . . . . So for example, based on my experience I estimate that of the $44.10 about $12 of that would have been in bar. Nearly $9 of that would have been in casino and for shore excursions.

Nov. 19, 2013 Trial Tr. at 156. Mr. Snitzer used the same methodology to calculate a per-person-per-day figure for the Holland America ship. *Id.*

57. From this methodology, Mr. Snitzer calculated the likely OBR for the Contract under thirteen individual revenue categories: (1) Bar/Lounges; (2) Bar/Alternative Restaurants; (3) Casino; (4) Food/Alternative Restaurants; (5) Food/Box Lunches; (6) Shore Excursions; (7) Shops; (8) Photo; (9) Spa; (10) Communications; (11) Laundry; (12) Medical; and (13) Art. *See* Pls. Trial Ex. 9 (Net OBR Estimate Detail Chart).

58. Mr. Snitzer started with an analysis of standard OBR for each cruise line on a typical cruise. *See* Net OBR Detail Chart; Nov. 19, 2013 Trial Tr. at 155–58. Mr. Snitzer then considered how each OBR category would have varied under the Contract. *See* Nov. 19, 2013 Trial Tr. at 158–60.

59. Mr. Snitzer estimated that ISU members would have spent no money on casinos, art, and medical expenses because "by contract the casinos were meant to be closed . . . . [a]rt was going to be closed and . . . [RCMP] was going to cover medical." *Id.* at 158. Mr. Snitzer also estimated that the cruise lines would not realize photo revenue because the photo operation would have been closed. *See* Net OBR Detail Chart.

60. Mr. Snitzer estimated that Bar/Lounges revenue would total $17.87 USD per-person-per-day. *See id.* Mr. Snitzer "assumed that the bar numbers would be higher during this operation" because he believed that ISU members would be mostly male, of drinking age, and that no spouses would be on board. Nov. 19, 2013 Trial Tr. at 159. Mr. Snitzer also assumed that, because RCMP would be assigning two people to a room, ISU personnel would "congregate in the lounges where they would be drinking . . . . This would be essentially the only form of unwinding entertainment and socializing on the ship." *Id.* Therefore, Mr. Snitzer estimated that the cruise lines would have earned two-thirds more than a typical cruise from onboard bars and lounges. *Id.* at 160.

61. Mr. Snitzer estimated that revenue from Bar/Alternative Restaurants would total $3.94 USD per-person-per-day. *See* Net OBR Detail Chart. Mr. Snitzer testified that general food services would have been buffet style, available twenty-four hours a day. Nov. 19, 2013 Trial Tr. at 161. He therefore projected that "a little bit more than once a week each person would go into an alternative dining venue in order to enjoy . . . table service, sit

19

down, a varied menu, more choice and more selection." *Id.*  Mr. Snitzer also assumed that when ISU members dined in an alternative restaurant, they would have consumed one cocktail and one-half bottle of wine per visit. *Id.*

62. Mr. Snitzer estimated that revenue from Food/Alternative Restaurants would total $5.14 USD per-person-per-day.  *See* Net OBR Detail Chart.  This figure assumed 1.2 meals per-person-per-week in an alternative restaurant at $30 CAD per person, including gratuity. *Id.*

63. Mr. Snitzer estimated that revenue from Food/Box Lunches would total $2.86 USD per-person-per-day.  *Id.*  This figure assumed that fifty percent of guests would purchase an $8.00 CAD box lunch each working day.  *Id.*

64. Mr. Snitzer estimated that shore excursion revenue would total $6.11 USD per-person-per-day.  *See* Net OBR Detail Chart.  In reaching this number, he assumed that shore excursions revenue would be lower than a typical operation "because people were not . . . on vacation the whole time.  They were working.  But I had assumed that a little bit less than half of the people would participate in one tour on each of two days off per week." *Id.* at 163.  The Court finds that Mr. Snitzer presented an insufficient foundation for this figure, particularly given that ISU personnel would have been working and attending Olympic events.  Because Mr. Snitzer presented no alternative, the Court will deduct shore excursions entirely from the total OBR calculation.

65. Further, Mr. Snitzer estimated that shopping revenue would total $1.70 USD per-person-per-day.  *See* Net OBR Estimate Detail Chart.  This figure was based on the assumption that guests would only purchase sundries onboard the vessels. *Id.*  Mr. Snitzer testified that "[to] the extent that [passengers] were going to purchase souvenirs they would

probably purchase their souvenirs in the [O]lympic venues because again, the ship was not the main event." Nov. 19, 2013 Trial Tr. at 160–70. Therefore, Mr. Snitzer calculated shopping revenue at one-third the rate of a typical cruise operation. *See* Net OBR Estimate Detail Chart.

66. Mr. Snitzer estimated that spa revenue would total $2.21 USD per-person-per-day. *See* Net OBR Estimate Detail Chart. This figure assumed that "50% of guests [would] get one $40 haircut every two weeks, 30% [would] have one $80 spa treatment every two weeks, [and] 30% [would] participate in two $15 fitness classes every week." Net OBR Estimate Detail Chart. While passengers on a typical cruise have a tendency to spend more money on massages and salons, Mr. Snitzer projected that "during the [Olympics] . . . it would be more utilitarian." Nov. 19, 2013 Trial Tr. at 169.

67. Mr. Snitzer estimated that communications revenue would total $3 per-person-per-day. *See* Net OBR Detail Chart. These charges would have primarily consisted of internet, phone cards, and cell phone use while onboard. Nov. 19, 2013 Trial Tr. at 163. Noting that the Contract provided that RCMP would subsidize internet costs, Mr. Snitzer's calculation "include[d] the subsidy and also increased usage because the price was subsidized and because people would be away from family and friends for a prolonged period of time . . . ." *Id.* at 163–64.

68. Mr. Snitzer estimated revenue of $7.00 USD per-person-per-day for laundry services. *See* Net OBR Detail Chart. Although laundry would have been subsidized by RCMP, Mr. Snitzer forecasted higher laundry expenditures than a typical cruise because the prices would have been reasonable and ISU staff would have been onboard for a prolonged period. Nov. 19, 2013 Trial Tr. at 164.

21

69. Based on these items, Mr. Snitzer estimated that the Contract likely would have generated a total onboard revenue figure of $49.84 USD per available lower berth days (ALBD), *i.e.*, per bed.  *See* Net OBR Total Detail Chart.

70. Mr. Snitzer then determined the number of ALBDs for ISU members on the ships: Holland America's *ms Statendam* had 55,088 ALBDs and the two Royal Caribbean ships had a total of 126,600 ALBDs, for an overall total of 181,688 ALBDs.  See Pls. Trial Ex. 12 (Net OBR Estimate Summary); *see also* Nov. 19, 2013 Trial Tr. at 175.

71. By multiplying his OBR estimate of $49.84 USD per-person-per-day by 181,688 ALBDs, Mr. Snitzer estimated a net total OBR of $9,060,000 USD.  Nov. 19, 2013 Trial Tr. at 172–73; *see also* Net OBR Estimate Summary.

72. CCCM also offered evidence concerning its missed opportunity to earn OBR during two anticipated repositioning cruises on the *ms Statendam*, which would have traveled from San Diego, California, to Vancouver, Canada, and back.[8]  Using the same methodology, Mr. Snitzer estimated that vacationing passengers on the repositioning cruises would have spent an estimated $41.33 USD per ALBD.  Nov. 19, 2013 Trial Tr. at 173.

73. The *ms Statendam* had a capacity of 1,252 passengers and, thus, two four-day repositioning cruises would have totaled 10,016 ALBDs.  *See* Pls. Trial Ex. 12 (Net OBR Estimate Summary).  Multiplying $41.33 USD per-person-per-day by 10,016 ALBDs led

---

[8] A repositioning cruise is usually a one-way trip in which a ship moves from one location to another to be available for further business.  Often, a cruise line offers less expensive costs for such a cruise because the ship does not return passengers to the port of origin.  In this case, repositioning cruises would have transported passengers from San Diego, California, to Vancouver, Canada, before the Games, and back again at the Games' conclusion.  *See* Nov. 19, 2013 Trial Tr. at 172.

Mr. Snitzer to estimate that CCCM would have earned $413,961 USD[9] in total OBR

from the repositioning cruises.  Nov. 19, 2013 Trial Tr. at 175; *see also* Pls. Trial Ex. 12

(Net OBR Estimate Summary).

74. Mr. Snitzer's total net OBR projection for the Contract and the repositioning cruises was

$9,047,000 USD.

75. RCMP rebutted CCCM's OBR estimates with information from the replacement charters

that RCMP executed directly with Holland America and Carnival after it terminated the

Contract.  Under the replacement charters, Holland America and Carnival earned a

combined total of $676,603[10] in net OBR for three vessels at Ballentyne Pier during the

2010 Winter Olympics.  This translates into an overall revenue rate of approximately $5

per-person-per-day.

76. Data from the replacement charters shows an approximate occupancy rate of seventy-

percent.  In response, Mr. Snitzer provided alternate OBR calculations based on a 69.9

percent occupancy rate, *i.e.*, the actual combined ship utilization rate for the replacement

charters.  *See* Nov. 19, 2013 Trial Tr. at 181.

77. In this alternative calculation, Mr. Snitzer multiplied $49.83 USD per-person-per-day by

the actual combined occupancy rate.  Based on that calculation, Mr. Snitzer determined

---

[9] Mr. Snitzer misspoke at trial, indicating that the net OBR for repositioning cruises would have been $41,000.  Nov. 19, 2013 Trial Tr. at 175.  The Court notes that Mr. Snitzer multiplied $41.33 by 10,016 ALBDs, which results in a projection of approximately $410,000.  *See id.*

[10] This figure represents the combined total OBR earned by Holland America and Carnival.  All financial reports of Holland America are subject to a protective order; therefore, no details have been provided in this Opinion.  *See* Stipulated Protective Order [Dkt. 31].

that CCCM would have generated $6.74 million USD in net OBR from the Contract and repositioning cruises. *Id.* at 183.

78. RCMP rebutted Mr. Snitzer's estimates with testimony from Ms. Kaluza, who testified that she had been on cruises with "buffets" and "extravagant menus," but that RCMP was "not looking for that kind of formality." Nov. 20, 2013 Trial Tr. at 54.

79. Ms. Kaluza further testified that ISU personnel worked twelve-hour shifts, with four workdays followed by four days off. *Id.* at 54–55. The four workdays consisted of two successive daytime shifts, from 6:00 a.m. to 6:00 p.m., and two successive nighttime shifts, from 6:00 p.m. to 6:00 a.m. *Id.* Ms. Kaluza attested that security personnel could have worked overtime to receive supplemental pay. *Id.* at 53.

80. Ms. Kaluza noted that RCMP would have paid for basic housing and food costs for all ISU personnel. As a result, security personnel were limited to a per diem of $17.00 CAD per day, which left limited funds for meals and tours. *See id.* at 66.

81. Despite preliminary discussions between CCCM and RCMP regarding the sale of box lunches, none would have been provided by the ships and no OBR would have been realized therefrom. Donna Kaluza explained that "[RCMP personnel] were directed by . . . the Vancouver organizing committee, that we were not allowed to take any food of any type into any venue sites, that they were providing food and it was necessary for [ISU members] to . . . purchase these vouchers and [] use these vouchers for food." *Id.* at 58.

82. RCMP also contests CCCM's initial OBR projections for laundry and internet services. Donna Kaluza testified that if CCCM had presented a rate of $12 CAD per-person-per-

day for laundry, she would have sought out alternative arrangements, such as a drop-off dry cleaning service at Ballentyne Pier.[11]   *Id.* at 68.

83. Ms. Kaluza also described an internet estimate of $7 to $10 CAD per-person-per-day as "excessive."[12]   *Id.* at 69.  Ms. Kaluza testified that RCMP "could have set up a wireless network that would serve the cruise ship," *id.*, although neither she nor RCMP provided evidence from internet service providers to support her position.

84. Ms. Kaluza stated that RCMP generally intended to provide an "accommodation level for the personnel staying at the [O]lympics [at] no lesser standard than you would find at a Holiday Inn Express Hotel which is a chain and a respected chain in Canada which would usually have no more than a three star rating in the hotel trade."  *Id.* at 50–51.

85. Further, Ms. Kaluza testified that certain ISU personnel would have been onboard with spouses that also served on the ISU; however, RCMP offered no evidence regarding how many couples actually worked the 2010 Olympic Games, which renders this testimony unsupported and speculative.

86.  To refute Mr. Snitzer's presupposition that ISU members would have sought diversions from crowded staterooms, Ms. Kazula testified that room assignments were to be based on alternate shift schedules to minimize the amount of overlap in stateroom occupancy. *Id.* at 70–71.

87. CCCM argues in rebuttal that OBR generated on the replacement charters is irrelevant due to reduced scope of RCMP's requested services as compared to the original Contract.

---

[11] Mr. Snitzer provided a laundry estimate of $7 CAD per-person-per-day.  Ms. Kaluza's testimony, however, referenced Tracey Kelly's initial estimate of $12 CAD per-person-per-day.

[12] Mr. Snitzer provided an internet estimate of $3 CAD per-person-per-day.  Again, Ms. Kaluza's testimony referenced Tracey Kelly's initial estimate of $7 to $10 CAD per-person-per-day.

88. First, Mr. Kelly testified that "[w]hen [CCCM] met with Kelly Meikle and Michael Day and Donna Kaluza and also in meetings with Bud Mercer [RCMP's Assistant Commissioner] we had direct communication from them that they wanted a phenomenal experience for the [RCMP] personnel.  That this was a once in a life time type of experience.  These people were coming from all over Canada [and] they would work hard, but they were to play hard."  Nov. 18, 2013 Trial Tr. at 83–84.

89. Mr. Snitzer testified that "all of [the] money" in the replacement charter contracts, including net OBR, "was just rolled up into the charter hire figure and there was no separate breakout for [OBR] or for gratuities.  But in fact the dollars involved were essentially the same number of dollars."  Nov. 20, 2013 Trial Tr. at 33.  RCMP did not challenge this testimony and it explains, in part, why RCMP paid so much more to charter three ships, even without the cost of a broker.  *See Cruise Connections Charter Mgmt.*, 967 F. Supp. 2d at 217 (identifying $76,000,000 CAD as the actual cost to RCMP of the replacement charters).

90. Relatedly, Tracey Kelly testified that the replacement charters did not include any budget for marketing and promoting services that would have earned OBR.  Nov. 18, 2013 Trial Tr. at 95.  Mr. Kelly testified that "Holland America didn't apply a budget [to generate OBR,] and if they didn't apply a budget, they didn't provide any resources to promote on board revenue."  *Id.*  As further evidence of the replacement charters' inattention to OBR, Mr. Kelly testified that only three of twenty-four bars on the *ms Statendam* were open during the replacement charter, and one of those was an open-air bar that held little appeal in a Vancouver winter.  *Id.* at 96.

26

**E. Repositioning Cruises**

91. CCCM's charter party agreement with Holland America anticipated that CCCM would
    sell repositioning cruises for the four-day sail from San Diego to Vancouver before the
    Olympics and the four-day sail from Vancouver to San Diego after the Olympics.  Nov.
    18, 2013 Trial Tr. at 106.  CCCM agreed informally with AA Worldwide, a travel service
    agency, to sell two repositioning cruises.  *Id.*  AA Worldwide agreed to pay CCCM $125
    USD per-person-per-day for an eight-day sub-charter.  *Id.* at 108–110.

92. However, certain terms of the repositioning agreement were never finalized.  As of
    November 17, 2008, when RCMP terminated the Contract, CCCM had not sent a
    confidentiality agreement to AA Worldwide for signature.  In addition, Colleen Ladwig
    of AA Worldwide testified in deposition that the agency planned to sell a pre-packaged
    cruise, which suggested that the repositioning cruises would not have generated OBR.
    *Compare* Deposition of Colleen Ladwig (Ladwig Dep.) at 16:2–18:16 *with* Kelly Trial
    Testimony, Nov. 18, 2013 Trial Tr. at 113.

93. RCMP breached the Contract before AA Worldwide and CCCM reached final terms on
    an agreement for the sale of repositioning cruises.  *Id.* at 107.

94. Ms. Ladwig's license has since been revoked for allegedly fraudulent activities that took
    place during the fall of 2008.

## II.  LEGAL STANDARDS

The Project Services Agreement provided that the Contract "must be interpreted
and governed, and the relations between the parties determined, by the laws in force in British
Columbia."  Pls. Trial Ex. 1 (Contract) CAN0000149 § 9.  Therefore, the Court reviews the legal
principles that apply to determine damages for breach of contract under British Columbia law.

27

**A.  Breach of Contract Under British Columbia Law**

It is undisputed that the appropriate measure of damages is lost profits.  The
general rule is that contract damages should place a plaintiff in the economic position that it
would have achieved had the defendant performed the contract.  *See, e.g., Bank of Am. Can. v.
Mut. Trust Co.*, 2002 CarswellOnt 1114, ¶ 47 (S.C.C. 2002) (reciting the "general rule of
contract damages . . . . [that] the amount which would have been received if the contract had
been kept, is the measure of damages if the contract is broken'" (quoting *Hadley v. Baxendale*, 9
Exch. 341, 156 Eng. Rep. 145 (Eng. 1854) (other citation omitted)); *M.J.B. Enters. Ltd. v.
Defence Constr.*, 1999 CarswellAlta 301, ¶ 55 (S.C.C. 1999) ("The general measure of damages
for breach of contract is, of course, expectation damages.").  A plaintiff that proves a breach of
contract can collect damages that are shown to be the reasonable result of the breach.  *Berhe v.
Coblez Holdings Ltd.*, 2013 CarswellBC 3562, ¶ 32 (B.C. Ct. App. 2013).

However, damages cannot be recovered if they only represent a plaintiff's
speculations about lost profits, or are too remote to have been contemplated at the time of
contracting.  *See Houweling Nurseries Ltd. v. Fisons W. Corp.*, 1988 CarswellBC 471, ¶ 27
(B.C. Ct. App. 1988) (citing *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145, 151 (1854)).  In
other words, "damages arising in respect of a breach of contract should be such as arise either
naturally, *i.e.*, in the usual course of things, or such as may reasonably be supposed to have been
in the contemplation of both parties, at the time they made the contract, as the probable result of
a breach."  *RBC Dominion Secs., Inc. v. Merrill Lynch Can. Inc.*, 2008 CarswellBC 2099, ¶ 10
(S.C.C. 2008) (citing *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854)).  A plaintiff
seeking damages based on a lost opportunity must show that the lost opportunity was reasonably

likely to result in a profit. *Eastwalsh Homes Ltd. v. Anatal Devs. Ltd.*, 1993 CarswellOnt 587,

¶¶ 33–45, 57–59 (Ont. Ct. App. 1993).

Under British Columbia law, a defendant may rely on the actual results from a

substitute contractor employed to complete a breached contract as an appropriate benchmark for

calculating damages. *Tercon Contractors Ltd. v. British Columbia (Minister of Transp. and

Highway)*, 2006 CarswellBC 730, ¶ 156 (B.C.S.C. 2006), *reversed on other grounds*, 2010

CarswellBC 296 (S.C.C. 2010).   However, actual results from a substitute contractor can only be

used when a defendant shows that "the conditions . . . of both contractors would have been

comparable." *Id.*

## B.  Duty to Mitigate

"Mitigation is a doctrine based on fairness and common sense, which seeks to do

justice between the parties in the particular circumstances of the case." *Southcott Estates Inc. v.

Toronto Catholic Dist. Sch. Bd.*, 2012 CarswellOnt 12505, ¶ 25 (S.C.C. 2012).  A plaintiff has a

duty to take all reasonable steps to mitigate any loss arising from a breach of contract, and may

not recover any part of the loss that is due to its own neglect or failure to take such reasonable

steps. *Id.*   But a defendant bears the burden of demonstrating that a plaintiff has failed to

mitigate damages. *See Michaels v. Red Deer Coll.*, 1975 CarswellAlta 57, ¶ 11 (S.C.C. 1975)

("If it is the defendant's position that the plaintiff could reasonably have avoided some part of

the loss claimed, it is for the defendant to carry the burden of that issue . . . .").  If a defendant

makes the required showing, a court is authorized to reduce an award of damages. *See Onta

Holdings Inc. v. Bonosusatya*, 1998 CarswellBC 1968, ¶ 30 (B.C.S.C.); *Van Snellenberg v.

Cemco Elec. Mfg. Co.*, 1946 CarswellBC 128, ¶ 6 (S.C.C. 1946).

## III.  ANALYSIS

RCMP contracted to pay CCCM $55,348,136 CAD, which converts to $53,482,904 USD as of September 26, 2008.  CCCM claims that RCMP's breach caused it to lose additional profit opportunities from onboard revenue and the sale of repositioning cruises, while RCMP claims that CCCM underestimated expenses, omitted necessary costs, and failed to mitigate damages.  The Court will assess damages based on the Contract and certain lost onboard revenue, but not repositioning cruises, for which the evidence is too speculative.  The Court will then address questions of law related to the proper interest rate and mitigation of damages.

### A.  The Contract

RCMP objects to CCCM's estimated costs of performance because CCCM omitted certain expenses and allegedly underestimated other costs.  The Court will address each contested category of contract expenses, *i.e.*, the $5,000,000 USD to John Sessions and $500,000 USD to Phillip Sloane, as well as the costs of recycling and garbage removal, snow removal, water bunkering, ground services, miscellaneous expenses, and hotel and per diem.  As to the uncontested categories, such as costs for stevedoring, a port agent, harbor pilots, forensic accounting, information technology, insurance, airfare, and legal services, the Court accepts CCCM's estimated costs of performance.

#### i.  *$5,000,000 to John Sessions*

RCMP contends that CCCM entered into a binding and enforceable agreement with John Sessions for $5,057,500 USD.  RCMP emphasizes that the Sessions Letter of Credit ensured CCCM's eligibility to bid for and secure the Contract, and, as the successful bidder, CCCM had an obligation to repay Mr. Sessions.  As a result, RCMP claims that CCCM must deduct from its claimed profit the full $5,057,500 USD owed to Mr. Sessions.  CCCM responds

that the Sessions Letter of Credit was insufficiently definite in its terms to constitute a binding

agreement.  CCCM also argues that "any payment made to [Mr.] Sessions is outside the costs to

perform the Contract and would be paid, in any event, by the partners from profits *after* RCMP

made its payment to CCCM under the contract."  CCCM Reply [Dkt. 100] at 7.

   The Letter of Intent memorialized Mr. Sessions's agreement to provide an

"unredeemable, nonpayable Letter of Credit in the amount of $5,057,500" to support CCCM's

bid for the Contract.  Defs. Trial Ex. 4 (Sessions Letter of Intent) at 1.  The Letter of Intent

provided that if RCMP awarded a contract to CCCM, Plaintiffs would pay "[Mr.] Sessions'

choice of either the redemption for [a] special limited partnership interest or . . . allocations and

distributions of the amounts described above [*i.e.*, the $5,057,500] within 10 days after the

Partnership receives its initial payment from the [RCMP] . . . [which is] (currently expected to be

75% of the total project fee) (the 'Initial Fee Installment')."  *Id.* at 1–2.  The Letter of Credit also

committed the parties to "work[ing] in good faith toward the preparation and execution of a

definitive Limited Partnership Agreement," which never happened.  *Id.* at 2.

   But the Sessions Letter of Intent made no mention or reference to CCCM's

performance on the Contract.  Indeed, the self-identified "nonpayable Letter of Credit" intimates

that Mr. Sessions never put any money at risk, which could complicate any prospective effort to

collect.  Further, the terms of the Letter of *Intent* required later substantive negotiations to

finalize the arrangement through the establishment of a limited partnership; the absence of such

further agreement could also complicate Mr. Sessions's efforts to collect from CCCM.  These

observations are not intended to express an opinion on the enforceability of the Letter of Intent,

but rather to indicate that CCCM's alleged obligation to Mr. Sessions is not entirely certain.

Without regard to these predicate issues, the Court finds that CCCM's execution of the Contract

*and* receipt of funds were preconditions to any payment to Mr. Sessions.  *See id.*  Mr. Sessions's

entitlement to payment, if any, is a matter to be settled between Mr. Sessions and CCCM from

the award here, but the Sessions Letter of Intent is not a cost of performance to be deducted.  *See*

*Waterman v. IBM Can. Ltd.*, 2013 CarswellBC 3726, ¶ 72 (S.C.C. 2013) ("[A]n important

purpose of the law of contracts is to protect the reasonable expectations of the parties," and

therefore, courts must "ensure that there is a good 'remedial fit' between the breach of obligation

and the remedy").  The Court finds that CCCM is not required to deduct $5,057,500 USD as an

anticipated expense of Contract performance.

### ii. *Phillip Sloane's Salary*

RCMP contends that CCCM should have deducted $500,000 USD owed in salary

to Phillip Sloane.  It is agreed by all parties that Mr. Sloane came out of retirement to serve as

CCCM's Chief Financial Officer.  CCCM claims, however, that Mr. Sloane would not have been

paid a "salary," but, rather, a stipulated payment divided among each partner's share of the

profits.

Mr. Sloane testified that his receipt of $500,000 was "not a salary . . . because . . .

there was no guarantee.  It was voluntary on their part.  It was out of profits."  Nov. 19, 2013

Trial Tr. at 137.  Despite vigorous cross examination, RCMP could establish no more than that

CCCM had agreed to pay Mr. Sloane $500,000 out of profits.  *See id.* at 138.  An agreement to

pay funds out of anticipated profits does not constitute a "salary" tantamount to overhead or

expenses; to the contrary, the payment itself is dependent on sufficient profit.  Mr. Sloane's

testimony indicated that he functioned as a partner insofar as his payment depended on CCCM

earning a profit; the actual payment depended on subsequent agreement of the partners; and his

payment was capped at $500,000 regardless of the final profit.  Although Mr. Sloane was an

interested witness, his testimony was cogent and unequivocal, and therefore is credited by the Court. As with Mr. Sessions, payment to Phillip Sloane is to be decided between him and the CCCM partners. *See Waterman v. IBM Can. Ltd.*, 2013 CarswellBC 3726, ¶ 72 (S.C.C. 2013). CCCM is not required deduct $500,000 USD as a cost of performance.

### iii. *Recycling and Garbage Removal*

RCMP argues that CCCM underestimated costs that it would have incurred for recycling and garbage removal for three vessels at Ballentyne Pier. Specifically, RCMP urges the Court to rely on CCCM's cost estimate from July 29, 2008, which projected a cost of $880,000 CAD for recycling and garbage removal. RCMP is dubious of CCCM's current estimate of only $212,000 CAD, which is less than one-quarter of the initial projection. CCCM retorts that its own preliminary estimates are not reliable and the Court should base its calculation on the uncontroverted testimony of its expert witness, Stanley Webber.

RCMP provides no basis for the Court to select the July 2008 preliminary cost estimate by Phillip Sloane as opposed to Stan Webber's detailed trial testimony concerning normal actual costs for these ships at Ballentyne Pier. Mr. Webber testified that he had extensive experience with Holland America and Royal Caribbean Cruise Line ships at Ballentyne Pier. Nov. 19, 2013 Trial Tr. at 30–31. He also testified that, as a longtime Port Agent, he understood waste removal requirements and "coordinate[d] with Tymac for the removal of the sludge and dry and wet garbage and recycling." *Id.* at 31. Based on his experience, Mr. Webber opined that the cost for recycling and garbage removal for the duration of the 2010 charters would have been approximately $212,000 CAD. RCMP offered no rebuttal witness. It did, however, offer an exhibit indicating that the actual cost of recycling and garbage removal totaled $187,267.51 CAD for the replacement charters. *See* Pls. Ex. 21A (Tymac Invoices). Mr. Webber justified his

33

higher estimate by explaining that the replacement charters consisted of "two smaller ships[,] so less people and less waste." Nov. 19, 2013 Trial Tr. at 59. The Court finds that Mr. Webber's testimony was direct, clear, and highly credible. The trial evidence supports a cost of $212,000 CAD for recycling and garbage removal.

### iv. Snow Removal

The parties contest whether CCCM would have pre-paid $79,800 CAD for snow removal despite the fact that it never snowed at Ballentyne Pier during the 2010 Winter Olympics. This dispute has two components: first, whether snow removal should be treated as a necessary pre-payment or as an actual expense; and second, whether CCCM would have been responsible for snow removal at all.

RCMP contends that prepayment for snow removal was required to ensure its clearance from Ballentyne Pier and, therefore, is a cost that would have been incurred without regard to actual snowfall. By contrast, CCCM argues that snow removal, at best, would have been an actual cost, incurred only if it had snowed at the Pier during the Winter Olympics. Noting that snow accumulation would have hampered ISU's ability to mobilize for emergencies, CCCM also contends that snow removal was a security-related expense to be paid by Canada. *See id.* at 101 (On cross examination, Mr. Webber testified that "snow would [] have been a difficult problem if the troops had to move very fast").

CCCM's assertions are supported by the record. CCCM correctly notes that the Contract is silent as to snow removal, omitting it as an expense for which CCCM would have been responsible. Moreover, Mr. Webber attested that he would not have advised CCCM to pre-pay for snow removal. Nov. 19, 2013 Trial Tr. at 76. To be sure, Ms. Kaluza testified that RCMP required the replacement cruise lines to pre-pay for snow removal because "[w]hether it

gets used, it doesn't matter . . . . If it doesn't snow all winter [] it was basically insurance but

when it snows it's necessary to have it." Nov. 20, 2013 Trial Tr. at 76.  But the Court finds that

this testimony related to decisions that were made after RCMP breached the Contract and revised

the scope of the charter hires.

In sum, the trial evidence demonstrates that snow removal was not a Contract

expense that CCCM would have pre-paid.   It is undisputed that there was no snow at Ballentyne

Pier during the 2010 Olympics, which means that snow removal would not have been an actual

expense.  Without Contract language requiring CCCM to pre-pay for snow removal, the Court

will not add it to CCCM's costs of Contract performance.  The Court need not decide whether

snow removal would have been a security-related cost under the Contract.

### v. Water Bunkering[13]

RCMP calculates Contract costs for water bunkering by referencing CCCM's

June 2008 estimate of $200,000 CAD.  It argues that Mr. Webber's current projection of

$121,902 CAD is woefully insufficient and the Court should rely on CCCM's original estimate

to determine the total cost, raising it by $78,098 CAD.  CCCM responds that Mr. Webber's

testimony should control, as it was based on his thirty years of experience as a Port Agent,

twenty-six years of which he served as a cruise line Port Agent at Ballentyne Pier.  *See* Nov. 19,

2013 Trial Tr. at 24–25.

RCMP offers no rationale as to *why* the Court should select CCCM's rough 2008

estimate over Mr. Webber's uncontroverted testimony.  RCMP claimed that CCCM's expense

---

[13] Mr. Webber testified that water bunkering costs consist of charges from the City of Vancouver
for water a ship takes on board. Nov. 19, 2013 Trial Tr. at 32.  He further testified that the cost
of water bunkering was approximately $2.00 CAD per ton during the 2010 Winter Olympics. *Id.*
at 44.

calculations at the damages trial were inaccurate because "[t]he invoices received and paid by the

RCMP in connection with the actual charters provide the best evidence of the additional costs

that Cruise Connections would have incurred, but omits from its calculations." Defs. Closing

Trial Brief at 15. Yet RCMP made no such showing at trial. Because RCMP offered no reason

to select the higher 2008 estimate and because Mr. Webber's testimony was entirely credible, the

Court concludes that CCCM properly estimated water bunkering at $125,000 CAD.

### vi. Ground Services

CCCM initially estimated that it would have paid approximately $50,000 CAD

for ground services during the 2010 Winter Olympics. It now contends that the trial testimony of

Donna Kaluza established that CCCM would not have incurred any cost for ground services

because "RCMP had its own transportation group that was responsible for shuttling security

personnel between the airport and the cruise ships, and [] RCMP had no intention of using

CCCM's port agent for these services." Pls. Closing Trial Brief at 5. Thus, CCCM asks the

Court to assess $0 CAD for ground services. RCMP argues that CCCM would nonetheless have

paid for ground services because this expense item "had to do with ground operations, hiring

employees to make deliveries, paying for such shipping, and last minute running." Defs. Closing

Trial Brief at 17. RCMP discounts the impact of Ms. Kaluza's testimony, although she was its

own witness, and urges the Court to recognize the full amount of $50,000 CAD as an expense

that would have been incurred in Contract performance.

Donna Kaluza testified that RCMP "had [its] own transportation group" and

would not have relied on CCCM's Port Agent to collect its personnel from hotels and airports

before embarkation. Nov. 20, 2013 Trial Tr. at 75. Her testimony indicates that CCCM would

not have expended a full $50,000 CAD, as budgeted, for ground services. However, it is

36

difficult to discern from the record whether RCMP would have used Mr. Webber's ground transportation if the Contract with CCCM had remained in force during the 2010 Olympics, because the intentions of RCMP's contracting agents changed dramatically once Ms. Morin assumed control. In addition, CCCM offered no witnesses or evidence to dispute that it would have incurred at least some cost for "deliveries and last minute running." Nov. 19, 2013 Trial Tr. at 33; *see also* Nov. 20, 2013 Trial Tr. at 75. Nor did CCCM provide an alternate estimate to reflect the projected costs for deliveries, ground shipment, and last minute runners, without transportation of passengers before embarkation. In this respect, the Court finds that CCCM failed to overcome RCMP's evidence that $50,000 CAD for ground services is an exaggerated amount. Because all witnesses agree that some expense would have been incurred, the Court will recognize a cost of $25,000 CAD for ground services.

### vii. Miscellaneous

Phillip Sloane charted his cash flow projections for the Contract, which included two "Miscellaneous" categories of $100,000 each.[14] *See* Pls. Trial Ex. 34 (Cash Flow Projections). At trial, Mr. Sloane offered the following testimony regarding the "Miscellaneous" items:

> I had a hundred thousand dollars down below the line where you see other expenses. And I got nervous at the end actually because I didn't have anything for subcontractors and it was the last minute decision on my part, still trying to be all ultra conservative, and I was trying to make sure that I had all of my bases covered. Quite frankly, I didn't know what [the first "Miscellaneous" item] was for. So I put [it] down . . . [because] I . . . really wanted to just cover my [bases] in case we had anything uncovered.

---

[14] While the first $100,000 Miscellaneous item covered subcontracting expenses, the second $100,000 covered unidentified expenses. Because the first $100,000 Miscellaneous item applied to subcontracting expenses, however, the Court finds that this expense item would have been paid in CAD rather than USD.

Nov. 19, 2013 Trial Tr. at 115.

CCCM now argues that, since Mr. Webber's testimony clearly identified all subcontractor expenses for which CCCM would have been liable, the evidence shows that the second $100,000 would not have been expended.  CCCM therefore maintains that one of the Miscellaneous items, in the amount of $100,000, should be excluded from its cost of performance.  Pls. Closing Trial Brief at 7 n.6.  RCMP, however, notes that both miscellaneous budget items of $100,000 have been included in nearly every cost estimate exchanged between the parties.  RCMP contends that "[i]f Mr. Sloane changed his mind about this expected cost, Cruise Connections had a duty to correct its interrogatory responses."  *Id.*

Mr. Sloane explained that he included two $100,000 miscellaneous charges to support an "ultra-conservative" profit estimate for the purpose of securing bank financing.  *See* Nov. 19, 2013 Trial Tr. at 115.  Mr. Webber provided thorough testimony regarding the subcontracting costs that CCCM would have incurred in performing the Contract.  But because the Contract was never performed, it cannot be said that Mr. Sloane's inclusion of additional costs was unnecessary.  Given the complexity and duration of performance, the uncertainty of operating at a time of increased expenses during the Games, and CCCM's continued inclusion of two Miscellaneous items in its pre-trial damages calculations, the Court finds that CCCM did not carry its burden of showing that one of the Miscellaneous charges should be omitted from the cost of performance.

### viii.  Hotel and Per Diem

Finally, CCCM seeks to reduce its hotel and per diem estimates by one month based on the trial testimony of Phillip Sloane.  Specifically, CCCM contends that "Mr.

38

Sloane['s] . . . estimated hotel cost assumed that CCCM operations personnel would stay in hotels for a six-month period that included the time when the cruise ships were to be in port, an assumption that he later realized was incorrect."  Pls. Closing Trial Brief at 7 n.7.  Similarly, CCCM avers that Mr. Sloane included an extra month of per diem costs because he mistakenly assumed that CCCM partners would be lodged in hotels for six months.  *Id.* at 7 n.8 (noting that "the per diem cost has been reduced by one month (to $150,000 [CAD]), reflecting the fact that the CCCM partners would have stayed on the cruise ships at least during February 2010").  RCMP objects to these reductions as "arbitrary," and argues that "[t]here is no evidence that the hotel cost and per diem as previously estimated by Cruise Connections did not already make [] an allowance" for the reduced time that CCCM partners would have stayed in hotels.

Mr. Sloane further testified that his per diem estimate was based on dining and incidental costs for CCCM partners over six months, but he later realized that "a lot of these people were going to be on the ships, but [he] didn't go back and reduce [the] numbers."  *Id.* at 122.  Mr. Sloane was subsequently asked where CCCM partners would be lodged while the ships were in port, and he responded that "[t]hey were on the ships."  Nov. 19, 2013 Trial Tr. at 123.  RCMP does not contest that Mr. Sloane's testimony applied to both CCCM partners and operations personnel.  Accordingly, the Court finds that CCCM properly adjusted its hotel and per diem estimates by one month, with hotel costs totaling $25,600 CAD and per diem totaling $150,000 CAD.

## B.  Lost Onboard Revenue During the Olympics

CCCM claims that RCMP's breach of contract deprived CCCM of $9,060,000 USD in OBR profits during the Olympics, as calculated by Adam Snitzer.  RCMP's objections to Mr. Snitzer's estimates are twofold.  First, RCMP contests CCCM's OBR projections based on

the actual onboard revenue reported by Holland America and Carnival during the replacement charters.  Second, RCMP attacks certain assumptions underlying Mr. Snitzer's estimates as inconsistent with the intended purpose or scope of the Contract.

As to the first point, RCMP argues that CCCM overestimated its OBR profit because Holland America and Carnival realized actual onboard revenue at a rate of approximately $5 per-person-per-day.  RCMP contends that CCCM's OBR estimate of approximately $50 per-person-per-day assumes that CCCM could have earned ten times more OBR than Holland America or Carnival, "two of the best-known powerhouses in the cruise business."  Def. Closing Trial Brief at 3.  CCCM retorts that its plans cannot be compared to the replacement charters' OBR because "the cruise lines made no effort to generate OBR on the ships which led to incredibly low actual spends."  CCCM Reply at 2.  Specifically, CCCM notes that Holland America did not allocate funds to marketing or promoting OBR during the Winter Olympics, and that all but three bars on the Holland America *ms Statendam* were closed during the Games.  CCCM concludes that "the cruise lines dedicated minimal resources to the generation of OBR because they had no reason to spend money going after money they already had in hand."  *Id.* at 3.

British Columbia courts recognize that a defendant might use actual results from a substitute contractor as an appropriate damages benchmark for breach of contract.  *See Tercon Contractors Ltd. v. British Columbia (Minister of Transp. and Highway)*, 2006 CarswellBC 730, ¶ 156 (B.C.S.C. 2006).  While RCMP relies on this principal, it failed to show that "the conditions . . . of both contractors would have been comparable."  *Id.*  When questioned at trial about the actual OBR generated by Holland America and Carnival, Adam Snitzer testified that he had "never seen numbers this low."  Nov. 20, 2013 Trial Tr. at 34.  Mr. Snitzer further

testified that onboard revenue in the replacement contracts was "just rolled up into the charter hire figure and there was no separate breakout for OBR or . . . gratuities. But in fact, the dollars involved were essentially the same number of dollars." *Id.* at 33. In other words, OBR was an unspecified cost built into the basic charter hire rate in RCMP's contracts with Holland America and Carnival. *Id.* RCMP did not contest that the replacement charters failed to budget for the marketing of onboard services, Holland America closed most of the available bars onboard the *ms Statendam*, and the replacement charters increased their hire rates to include typical OBR figures. Nor did RCMP present evidence that its replacement charter contracts were sufficiently similar to justify relying on actual OBR as a benchmark for damages under the Contract. In fact, rather than having OBR in hand, CCCM had guaranteed a high revenue rate on OBR and had every incentive to earn it. The evidence shows that RCMP's approach to onboard activities, and therefore the resulting OBR, entirely changed from its initial requirements and expectations for CCCM. The Court finds that the replacement charters are not sufficiently equivalent to determine CCCM's reasonably-anticipated OBR income.

RCMP also argues that CCCM's damages calculations have failed to appreciate that the ships would not have been full for the thirty-one to forty-four days that the CCCM charters were to be in port. RCMP relies on the lower occupancy rates of the Carnival and Holland America ships, which were attributable to the fact that "the security forces concentrated in Vancouver gradually ramped up their presence as the Olympics approached and then ramped down after the Olympics were over," so that, overall, the ships were not full. *Id.* From these facts, RCMP argues that CCCM based its OBR estimates on the erroneous assumption of a 100% occupancy rate during the entire 2010 Olympics. CCCM responds that the Contract "called for one embarkation of passengers at the beginning of the Olympics and one disembarkation of

passengers at the end."  CCCM Reply at 4 (citing Nov. 18, 2014 Trial Tr. at 57–59, 100) (other

citation omitted).  CCCM also argues that Kelly Meikle, RCMP's Manager of Contracting,

represented that the ships would be full throughout the Olympics.  *Id.* at 5.  In the alternative,

CCCM offered an OBR projection prepared by Mr. Snitzer based on a seventy percent utilization

rate.  *Id.* at 5.

        The Contract clearly stated that there would be "one embarkation date . . . and one

disembarkation date . . . ."  Pls. Trial Ex. 1 (Contract) at CCCM001095.  Yet it also provided that

"[*a*]*ny additional embarkation and dis-embarkation dates are possible, but will require*

*additional funding*."  *Id.* (emphasis added).  Accordingly, multiple embarkation and

disembarkation dates, such as those that occurred in fact, were within the contemplation of the

Contract.  While CCCM's planning in 2008 assumed that the ships would be full while in port,

*see* Nov. 18, 2013 Trial Tr. at 58, the Contract clearly allowed a different schedule.  Changes

would have required additional funding, but neither party offered evidence of additional costs or

profit margins to cover such a possibility.  Because RCMP's gradual onboarding process was

within the scope of the Contract and CCCM presented no evidence of additional costs, the Court

will assess damages based on the actual seventy percent occupancy rate of the replacement

charters.

        Further, RCMP contends that CCCM's OBR estimates are speculative and fail to

recognize the spending habits of ISU personnel on a government per diem.  Consistent with

CCCM's negotiations with RCMP's first representatives, Adam Snitzer testified that his revenue

estimates assumed that RCMP would be concerned with "maintaining morale, providing a

relaxing atmosphere, allowing people to drink while on board, [and] preferring [that] people . . .

spend time on board during their recreation versus going into certain parts of town in Vancouver

that were close to the port." Nov. 19, 2013 Trial Tr. at 154. In contrast, based on RCMP's changed requirements after the Contract breach, Donna Kaluza testified that RCMP intended to provide an "accommodation level . . . no lesser [] than you would find at a Holiday Inn Express Hotel which . . . would usually have no more than a three star rating in the hotel trade." Nov. 20, 2013 Trial Tr. at 51. Ms. Kaluza testified that RCMP planned to increase morale by providing ISU personnel with an opportunity to work additional hours and earn overtime pay. *Id.* at 53. But RCMP offered no records of such overtime pay and failed to otherwise demonstrate the limited availability of ISU personnel. Without such support, the Court finds that Ms. Kaluza's generalized testimony is insufficient to reduce CCCM's cost of performance.

The full record, including the deposition testimony of Bud Mercer and Donna Kaluza; the compensation and profit structure of the Contract; and the OBR guarantees in the charter party agreements between CCCM and the cruise lines, corroborate Mr. Snitzer's general assumption that CCCM would have had opportunities to maximize onboard revenue from selected venues that were to remain open. Ms. Kaluza's testimony to the contrary was consistent only with the revised expectations that RCMP applied to the replacement charters after it breached the Contract.

RCMP further relies on CCCM's contemporaneous OBR estimates, which were lower than the estimates it presents here, and argues that CCCM's current numbers should be discounted. RCMP emphasizes that CCCM's OBR estimates have moved ever upward since 2008, with an initial estimate of $15 per-person-per-day in 2008, an estimate of $20 to $25 per-person-per-day in January 2009, and a current estimate of $49 per-person-per-day. The purpose of each of these estimates shows the flaw in RCMP's argument: on August 23, 2008, before the charter party agreements between CCCM and the cruise lines had been finalized, a cautious

Phillip Sloane estimated an OBR rate of $15 per-person-per-day for the purpose of obtaining financing, *see* Def. Ex. 6 (Aug. 23, 2008 Email from Phillip Sloane to Tracey Kelly); Tracey Kelly estimated an OBR figure of $20 to $25 per-person-per-day in December 2008 when CCCM was trying to convince Royal Caribbean to submit a bid after RCMP breached the Contract.   Neither of these estimates, tied to their purposes and authors, affects the analysis of CCCM's legitimate expectation from OBR revenues based on the Contract and charter party agreements that it actually obtained.

Aside from generalized objections, RCMP also contests itemized portions of CCCM's OBR projections.   Specifically, RCMP contends that CCCM would not have realized any revenue from box lunches.   The Court agrees.   The trial testimony established that security personnel could not bring lunches inside the security perimeters for the 2010 Games, and therefore, CCCM would not have earned OBR from box lunches.   *See* Nov. 20, 2013 Trial Tr. at 57–58.

RCMP also asserts that CCCM submitted inflated rates for onboard laundry and internet service.   Relying on Tracey Kelly's approximations of $10 per day for internet access and $12 per day for laundry, *see* Nov. 18, 2013 Trial Tr. at 158–59, RCMP stands on Donna Kaluza's testimony that if CCCM had presented her with those rates, she would have searched for alternative arrangements.   Nov. 20, 2013 Trial Tr. at 68.   This argument entirely ignores the lower estimations provided by Mr. Snitzer.   *See* Nov. 19, 2013 Trial Tr. 163–64.   In any event, Ms. Kaluza's testimony suffered from the inherent limits of after-acquired knowledge.   When RCMP accepted a lower bid price from CCCM in 2008 than it actually paid for replacement charters in 2010, RCMP neither knew nor asked for the bases underlying CCCM's onboard revenue estimates; those details were provided only in the charter party agreements, but not the

44

Contract to which RCMP was a party.  RCMP failed to provide any reasoned basis for an alternate estimate *under the Contract*.  Nor has RCMP proffered any evidence of alternative sources from which lesser costs for laundry or internet service could have been obtained.  Based on the record, the Court finds that CCCM supported its estimates for OBR from laundry and internet service and that RCMP failed to overcome that estimate.

### C.  Repositioning Cruises

The final category of CCCM damages is lost profit from the sale of repositioning cruises before and after the 2010 Winter Olympics.  CCCM contends that it had a definite agreement with AA Worldwide to sell repositioning cruises on the Holland America *ms Statendam*, and that CCCM would have earned approximately $1,252,000 USD from the sale of those cruises.  While CCCM acknowledges that its agreement with AA Worldwide was not reduced to writing, it insists that an oral agreement with definite terms existed, whereby AA Worldwide would sell repositioning cruises and, in return, would pay CCCM $125 USD per-person-per-day to sub-charter the *ms Statendam* for eight days.  In response, RCMP argues that CCCM and AA Worldwide never entered into an enforceable agreement because "the cruise ship business does not function on oral contracts."  Defs. Closing Trial Brief at 11.

The Court agrees with RCMP.  Before RCMP breached the Contract, CCCM had not submitted final documents, including a confidentiality agreement, to Colleen Ladwig at AA Worldwide.  Moreover, it is clear that Ms. Ladwig and CCCM had materially different understandings regarding the scope and quality of the repositioning cruises.  Ms. Ladwig testified at deposition that AA Worldwide was planning a "fully inclusive" cruise package.  *See* Ladwig Dep. at 16.  CCCM did not share the same understanding, as it envisioned additional opportunities to earn OBR from spas, sundries, bars, special events, and shore excursions.  *See*

Nov. 18, 2013 Trial Tr. at 113. These material differences clarify that Ms. Ladwig and the CCCM partnership had not reached a definite agreement on all material terms related to the repositioning cruises. Because there was no definite contract—oral or otherwise—the Court finds that CCCM cannot claim lost profits from the repositioning cruises as part of its damages here. Since CCCM's agreement with AA Worldwide was too speculative to warrant a damages award for lost profits, CCCM is similarly barred from recovering onboard revenue from the sale of repositioning cruises.

### D. Duty to Mitigate

RCMP contends that CCCM's damages should be reduced by twenty-five percent because CCCM failed to mitigate its damages by pursuing other charter opportunities. Specifically, RCMP claims that CCCM could have secured other similar projects and that CCCM considered other ventures in Vancouver associated with the 2010 Winter Olympics. Based on the experience of CCCM's partners in the cruise industry and Ms. Ladwig's deposition testimony that CCCM had discussed using other ships for different cruises, RCMP urges the Court to find that CCCM had a reasonable opportunity to mitigate any damages arising from RCMP's breach. CCCM counters that it could not have reasonably mitigated damages because the charter party agreements provided that the ships were reserved for the "express and exclusive use" of RCMP during the 2010 Winter Olympics. *See* Pls. Trial Ex. 4 (Holland America Charter Party Agreement at 3, ¶ 2); Pls. Trial Ex. 5 (Royal Caribbean Charter Party Agreement at 1). CCCM also contends that RCMP's breach made it impossible for CCCM to secure financing for the charter of any other ships.

British Columbia law is clear that a plaintiff has a duty to take all reasonable steps to mitigate any loss resulting from a breach of contract, and may not recover any part of a loss

that is due to its own neglect or failure to take reasonable mitigation efforts.  *See Southcott Estates Inc. v. Toronto Catholic Dist. Sch. Bd.*, 2012 CarswellOnt 12505, ¶ 24 (Can. S.C.C. 2012).  A defendant bears the burden of proving that a plaintiff failed to mitigate damages.  *See Michaels v. Red Deer Coll.*, 1975 CarswellAlta 57, ¶ 11 (S.C.C. 1975) ("If it is the defendant's position that the plaintiff could reasonably have avoided some part of the loss claimed, it is for the defendant to carry the burden of that issue . . . .").  If a defendant makes the required showing, the court may reduce an award of damages.  *See Onta Holdings Inc. v. Bonosusatya*, 1998 CarswellBC 1968, ¶ 30 (B.C.S.C.); *Van Snellenberg v. Cemco Elec. Mfg. Co.*, 1946 CarswellBC 128, ¶ 6 (S.C.C. 1946).

RCMP failed to carry its burden.  The question of mitigation devolves into whether CCCM could have chartered other ships to serve as floating hotels during the 2010 Vancouver Olympics.  But RCMP presented no evidence to demonstrate that CCCM had an opportunity to charter Holland America or Royal Caribbean ships, much less any other cruise ships, during the 2010 Olympics, which was the period during which mitigation might be measured.  Any charters to other destinations are too speculative to assess meaningfully, and no evidence supports such opportunities.

Moreover, Colleen Ladwig's deposition testimony does not prove that CCCM had an actual opportunity to mitigate damages.  Ms. Ladwig generally stated that CCCM had discussed the possibility of using other ships for additional cruises during the 2010 Winter Olympics, but this testimony was too speculative and imprecise to prove that CCCM could have chartered other ships during the 2010 Winter Olympics.  Accordingly, the Court finds that RCMP failed to establish that CCCM failed to mitigate damages.

**E. Interest**

CCCM seeks a prejudgment interest rate of three percent (3%) per year above the average bank rate in Canada in the calendar month preceding the date that Canada pays the judgment. CCCM asserts that the rate for prejudgment interest set under the British Columbia Court Order Interest Act (COIA), R.S.B.C. 1996, ch. 79, is irrelevant because the parties specified an alternative rate. *See* Pls. Trial Ex. 1 (Contract) at CAN007118–19, ¶ 14. Not so. CCCM cites a Contract provision titled "Interest on Overdue Accounts," which required only that RCMP remain liable for unpaid and overdue Contract services at an average rate plus 3%. *Id.* The parties' agreement concerning uncontested, overdue amounts during Contract performance does not control CCCM's demand for prejudgment interest.

More to the point, CCCM contends that the Registrar's rates are "only rates of convenience to trial judges . . . [that] might not be appropriate," and seeks prejudgment interest at the prime rate, which has averaged 3.29% since September 26, 2008,[15] the date of the breach. *Id.* CCCM notes that neither COIA nor British Columbia precedents require limiting prejudgment interest to the rates set by the Registrar. *Id.* To the contrary, RCMP argues that the Court is bound by COIA, which establishes prejudgment interest at the rate set by the Court Registrar.

COIA provides that the applicable prejudgment interest rate is set by the Court Registrar. *See Battrum v. MacKenzie Estate*, 2010 CarswellBC 2417, ¶ 36 (B.C.S.C. 2010). However, in *Hardwoods Specialty Products LP Inc. v. Rite Style Manufacturing Ltd.*, 2006 CarswellBC 595 (B.C. Ct. App. 2006), the British Columbia Court of Appeal explained:

---

[15] Given the Court's ruling that the breach occurred on September 26, 2008, when Ms. Morin anticipatorily repudiated the contract, *see Cruise Connections Charter Mgmt.*, 967 F. Supp. 2d at 236–39, it is undisputed that interest should be measured from on or around that date.

> Under [section] 1 of the Court Order Interest Act, the appellant must pay interest at "a rate the court considers appropriate in the circumstances" from when the cause of action arose to judgment . . . . However, the rates of interest fixed by the Registrar are only rates of convenience to trial judges who resolve disputed claims, whether or not the claims are liquidated. In a commercial case the Registrar's rates might not be appropriate. Business entities often must borrow working capital at bank rates of interest that are higher than the rates fixed by the Registrar. Other business entities often invest excess cash on hand, also at higher rates of return. Therefore, . . . the rate fixed by the Registrar at any given time should not be seen to be a default rate with respect to disputed claims.

*Id.* ¶ 17.

CCCM anticipated that it would receive all payments from RCMP by March 31, 2010, approximately four years ago. *See* Contract at CAN0000147. As a North Carolina corporation, CCCM would have taken its profits, converted Canadian dollars to U.S. dollars, and deposited those funds into an interest-bearing account. *See* Nov. 19, 2013 Trial Tr. at 140 (Tracey Kelly testified that CCCM intended to deposit any profits into an interest-bearing bank account). RCMP failed to refute this testimony. While CCCM contends that a higher interest rate is permitted here because of the length of the delay, it has failed to provide any evidence or testimony that it "borrow[ed] working capital at bank rates of interest that [were] higher than the rates fixed by the Registrar." *See Hardwoods Specialty Prods. LP Inc. v. Rite Style Mfg. Ltd.*, 2006 CarswellBC 595, ¶ 17 (B.C. Ct. App. 2006).

Finally, CCCM claims that, if not for RCMP's breach, CCCM would have deposited its profits into a bank account earning compound interest. While COIA generally prohibits an award of compound interest, *see* R.S.B.C. 1996, ch. 79, § 2(c) ("The court must not award interest under section 1 on interest or on costs."); *Teal Cedar Prods. v. British Columbia (Forets)*, 2013 CarswellBC 2954, ¶ 10 (S.C.C. 2013) (noting that simple interest "remains the

rule in British Columbia"), compound interest is permitted "where there is evidence that the parties agreed, knew, or should have known, that the money which is the subject of the dispute would bear compound interest as damages." *Bank of Am. Can. v. Mut. Trust Co.*, 2002 CarswellOnt 1114, ¶ 55 (S.C.C. 2002).  CCCM offered no evidence that RCMP knew or should have known that it could be held liable for compound interest.  As a result, the Court finds that CCCM is entitled to a prejudgment interest under COIA, with no additional allowance for compound interest.

### F.  Final Damages Calculation

The Court will award CCCM damages as provided below.  While RCMP contests certain damages categories, it does not challenge CCCM's method of calculating and converting expenses.  Accordingly, the Court accepts CCCM's methodology for calculating damages as uncontested, and converts all expenses based on the exchange rate that applied on the date that CCCM contends the expense would have been paid.  The RCMP Contract has been converted to U.S. dollars using the exchange rate that applied on September 26, 2008.  *See* Dec. 6, 2013 Supplemental Order [Dkt. 92] at 2.  Expenses that would have been paid in U.S. dollars are only listed by the U.S. dollar amount.

| Category | Canadian Dollars (CAD) | U.S. Dollars (USD) |
|---|---|---|
| **RCMP Contract Price** | $55,348,136 | $53,482,904 |
|  |  |  |
| **Cruise Ship Expenses** |  |  |
| Charter Hire for Ships |  |  |
| Charter Hire for Royal Caribbean Ships |  | $18,167,100 |
| Charter Hire for Holland America Ship |  | $9,440,080 |

| | | |
|---|---|---|
| Total Charter Hire | | $27,607,180 |
| Hotel Service Charges (Gratuities) | | |
| Royal Caribbean Ships | | $1,240,830 |
| Holland America Ship | | $651,040 |
| Total Hotel Service Charges | | $1,891,870 |
| Onboard Revenue Guarantee | | |
| Royal Caribbean Ships | | $6,330,000 |
| Holland America Ship | | $2,408,840 |
| Total Onboard Revenue Guarantee | | $8,738,840 |
| | | |
| **Other CCCM Costs** | | |
| Garbage and Recycling | $212,000 | $209,437 |
| Port Agent | $46,000 | $45,019 |
| Embarkation | $40,000 | $39,624 |
| Disembarkation | $40,000 | $39,624 |
| Water Bunkering | $125,000 | $121,870 |
| Ground Services | $25,000 | $24,713 |
| Harbor Pilots | $45,000 | $42,579 |
| Forensic Accounting | $45,000 | $44,775 |
| Miscellaneous (Subcontracting Costs) | $100,000 | $96,733 |
| Stevedoring | $225,000 | $223,875 |
| Information Technology | | $22,000 |
| Insurance | | $6,450 |
| Airfare | | $66,500 |

| | | |
|---|---|---|
| Legal | | $80,000 |
| Miscellaneous | | $100,000 |
| Apartment/Office | $70,000 | $66,472 |
| Hotel Room | $25,600 | $24,502 |
| Per Diem | $150,000 | $143,295 |
| Operations Personnel | $150,000 | $143,068 |
| Site Inspections | $6,000 | $5,865 |
| Executive Assistant | $7,500 | $7,214 |
| Letter of Credit Fees | $647,284 | $626,053 |
| Interest on Line of Credit | $37,050 | $30,099 |
| | | |
| **Total Expenses** | | $40,447,657 |
| | | |
| **RCMP Contract Profit** | | $13,035,247 |
| | | |
| **Additional Income** | | |
| Net Onboard Revenue | | $5,966,460 |
| Repositioning Cruises | | $0 |
| | | |
| **Total Profit** | | $19,001,707 |

**IV.  CONCLUSION**

For the reasons set forth above, the Court will award CCCM $19,001,707 USD, with prejudgment interest under COIA.  A memorializing Order accompanies this Opinion.


Date: July 21, 2014                                      _____/s/_____
                                                         ROSEMARY M. COLLYER
                                                         United States District Judge